**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE OETKEN

---

Delama GEORGES, individually and on
behalf of the Estate of Desilus GEORGES
and all others similarly situated; Alius
JOSEPH, individually and on behalf of the
Estate of Marie-Claude LEFEUVE and all
others similarly situated; Lisette PAUL,
individually and on behalf of the Estate of
Fritznel PAUL and all others similarly
situated; Felicia PAULE, individually and
on behalf of all others similarly situated;
Jean Rony SILFORT, individually and on
behalf of all others similarly situated,

          Plaintiffs,

     v.

United Nations; United Nations
Stabilization Mission in Haiti; Ban Ki-
Moon, Secretary-General of the United
Nations; and Edmond Mulet, former Under-
Secretary-General for the United Nations
Stabilization Mission in Haiti,

          Defendants.

---

## 13 CV 7146

Civil Action No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**



Plaintiffs Delama Georges, Alius Joseph, Lisette Paul, Felicia Paule and Jean

Rony Silfort (the "Named Plaintiffs"), by and through undersigned counsel, on behalf of

themselves and all others similarly situated ("the Class") hereby respectfully allege as

follows:

### INTRODUCTION

1.     This class action arises out of an epidemic of cholera that broke out in

Haiti in October 2010.  At the time of this filing, the epidemic has killed at least 8,300

people and sickened at least 679,000 others in Haiti, and has resulted in additional

cholera cases in at least the United States, the Dominican Republic, and Cuba.

1

2.      The outbreak resulted from the negligent, reckless, and tortious conduct of the Defendants: the United Nations ("UN"); its subsidiary, the United Nations Stabilization Mission in Haiti ("MINUSTAH"); and at least two of their officers.

3.      Prior to Defendants' introduction of the cholera bacterium to Haiti in October 2010, Haiti had no reported cases of cholera.

4.      Defendants have long known that Haiti's weak water and sanitation infrastructure created a heightened vulnerability to waterborne disease but failed to exercise due care to prevent the devastating outbreak of such disease.

5.      In or around October 2010, Defendants knowingly disregarded the high risk of transmitting cholera to Haiti when, in the ordinary course of business, they deployed personnel from Nepal to Haiti, knowing that Nepal was a country in which cholera is endemic and where a surge in infections had just been reported.  Defendants failed to exercise reasonable care to test or screen the personnel prior to deployment, allowing them to carry into Haiti a strain of cholera that a UN-appointed panel of experts and other independent scientific experts have since determined is the source of Haiti's present cholera epidemic.

6.      Defendants stationed their personnel on a base on the banks of the Meille Tributary, which flows into the Artibonite River, Haiti's longest river and primary water-source for tens of thousands.  There, Defendants discharged raw sewage from poor pipe connections, haphazard piping, and releases of water contaminated with human waste.  They also regularly disposed of untreated human waste in unprotected, open-air pits outside the base where it flowed into the Meille Tributary. Defendants' sanitation

facilities and disposal pits overflowed in heavy rain, emitted noxious odors, and exposed the local community to raw sewage.

7.     Defendants knew or should have known that their release of raw sewage into Haiti's primary water source created a high risk of contamination, but they did not take any steps prior to the outbreak to mitigate the dangers or to prevent highly foreseeable harm to the local population, environment and any visitors to the area.

8.     In or around October 2010, human waste from the base seeped into and contaminated the Meille Tributary with cholera.   From the Meille Tributary, the contaminated waters flowed into the Artibonite River, resulting in explosive and massive outbreaks of cholera along the river and eventually throughout the entire country.

9.     Defendants recklessly failed to take remedial steps necessary to contain the outbreak of cholera, willfully delayed investigation into the outbreak, and obscured discovery of the outbreak's source.   As a result of Defendants' tortious acts and omissions, cholera continues to present an ongoing grave threat to water quality, public health and safety in Haiti, resulting in additional injuries and deaths.

10.     The Named Plaintiffs and the members of the proposed Class they seek to represent have been proximately harmed through Defendants' acts and omissions.  These plaintiffs, who are residents in Haiti and the United States, have been or will be sickened, or have family members who have died or will die, as a direct result of the cholera introduced to Haiti by Defendants.f

11.     Defendants UN and MINUSTAH have well-established legal obligations to provide redress to victims of harm caused by acts or omissions attributable to the Defendants, which includes the members of the proposed Class.  The Convention on the

Privileges and Immunities of the UN of 1946 ("CPIUN") expressly requires Defendant UN to provide appropriate modes of settlement for third-party private law claims. The Status of Forces Agreement ("SOFA") signed between Defendant UN and the Government of Haiti expressly requires the UN to establish a standing claims commission to address claims for harm.

12.     In November 2011, pursuant to and relying on the obligations mandated by the CPIUN and SOFA, members of the proposed Class filed claims with Defendants UN and Ban, formally requesting that the UN comply with their obligations by establishing a standing claims commission and/or providing settlement for the victims' injuries. In February 2013, the UN refused to receive those claims and, to date, has failed to establish any such commission or otherwise provide members of the proposed Class with any form of redress.

13.     For the foregoing reasons, under the common law of torts, Plaintiffs are entitled to compensation and other remedies as requested herein.

## PARTIES

14.     Plaintiff Georges brings this action individually and on behalf of his deceased father, Desilus Georges, their surviving family, and all others similarly situated. Desilus Georges was a citizen of Haiti and resident of the United States. Plaintiff Georges presently resides in New York and is a citizen of the United States.

15.     Plaintiff Joseph brings this action individually and on behalf of his deceased wife, Marie-Claude Lefeuve; their minor children; and all others similarly situated. Lefeuve was a citizen and resident of Haiti. Plaintiff Joseph presently resides in Haiti and is a citizen of Haiti.

4

16.     Plaintiff Paul brings this action individually and on behalf of her deceased brother, Fritznel Paul; his spouse and minor children; and all others similarly situated. Fritznel Paul was a citizen and resident of Haiti. Plaintiff Paul presently resides in Haiti and is a citizen of Haiti.

17.     Plaintiff Paule brings this action on behalf of herself and all others similarly situated. She presently resides in Haiti and is a citizen of Haiti.

18.     Plaintiff Jean Rony Silfort brings this action on behalf of himself and all others similarly situated. He presently resides in Florida and is a citizen of Haiti.

19.     Defendant UN is an international organization that was founded in 1945. According to the Charter of the UN, the functions of the organization include "maintain[ing] international peace and security" and endeavoring to "promot[e] and encourag[e] respect for human rights." At all times relevant to this Complaint, Defendant UN was responsible for ensuring that Defendant MINUSTAH conducted its operations in Haiti with full respect for the principles and rules of international law. Defendant UN is a resident of New York, with its principal place of business located on 1st Avenue between 44th Street and 45th Street in New York City, New York 10017 (the "headquarter district"). Defendant UN has maintained continuous and systematic contacts with New York since its establishment in 1945, including maintaining offices staffed with its employees at numerous locations in New York City, outside of the headquarters district; regularly availing itself of public services in New York; and sending its officers and employees to conferences, speaking engagements and events throughout New York City.

20.     Defendant MINUSTAH is a subsidiary organ of the UN. It is a resident of Haiti, with its headquarters in Port-au-Prince. It was established by the UN in New York

in 2004, and operates solely pursuant to the authority granted to it by the UN in New York. Upon information and belief, during the time period relevant to this Complaint, employees and officers of Defendant MINUSTAH reported on their activities to Defendant UN in New York City, both in person and through other forms of communication. Many of MINUSTAH's strategic, administrative, and other business decisions were made in New York.

21.    Defendant Ban Ki-moon is and was at all relevant times herein the Secretary-General of the UN. As such, he has and had overall responsibility for the management of the UN and its operations, including all operations in Haiti. Pursuant to Article 97 of the Charter of the UN, the Secretary-General is "the chief administrative officer of the Organization." Upon information and belief, Defendant Ban participated in, directed, condoned, ratified, and/or authorized the tortious conduct alleged herein, or he knew or reasonably should have known that hazardous conditions or activities under his authority and control could injure Plaintiffs, and he negligently and recklessly failed to take or order appropriate action to avoid the harm. Defendant Ban also appointed and oversaw Defendant Mulet in his capacity as Special Representative of the Secretary-General. Upon information and belief, Defendant Ban is a national of the Republic of Korea and resides at 3 Sutton Place, New York City, New York 10022.

22.    Defendant Edmond Mulet was the Special Representative of the Secretary-General and Head of MINUSTAH from March 31, 2010, to May 17, 2011. As stipulated in UN Security Council Resolution 1542 creating MINUSTAH, and reaffirmed in two subsequent resolutions in 2010, Defendant Mulet had "overall authority on the ground for the coordination and conduct of all activities of the United Nations agencies,

funds and programmes in Haiti." At all relevant times herein, Defendant Mulet was personally responsible for ensuring that members of MINUSTAH complied with Haitian law, as mandated by the SOFA. Upon information and belief, Defendant Mulet participated in, directed, condoned, ratified, and/or authorized the tortious conduct alleged herein, or he knew or reasonably should have known that hazardous conditions or activities under his authority or control could injure Plaintiffs, and he negligently failed to take or order appropriate action to avoid the harm. Upon information and belief, Defendant Mulet is a national of the Republic of Guatemala and resides at 429 E 52nd Street, Apartment 36A-E, New York City, New York 10022.

## JURISDICTION AND VENUE

23.     The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(d)(2)(B), and supplemental jurisdiction pursuant to 28 U.S.C. §1367, because the case is a class action in which some members of the proposed Class are citizens of the foreign state of Haiti and others are citizens of U.S. states other than New York, whereas some Defendants are citizens of New York, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

24.     The Court has personal jurisdiction over the Defendants because they are domiciled in New York and they have purposely availed themselves of the laws of the United States and the State of New York.

25.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because all Defendants except for MINUSTAH (a foreign resident) reside, and are subject to the Court's personal jurisdiction, in this District.

## CLASS ACTION ALLEGATIONS

26.     The Named Plaintiffs bring this action on behalf of themselves and a class of all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

27.     The Named Plaintiffs seek to certify a class for purposes of determining liability and obtaining appropriate injunctive, declaratory, compensatory, punitive, and other relief.

28.     This action satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

29.     Plaintiffs seek certification of the following Class: "All individuals residing in Haiti or the United States who have been or will be injured or who are or will be the personal representative of a person who was or will be killed by cholera contracted in Haiti on or after October 9, 2010." Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

30.     Plaintiffs propose that the Class be composed of the following Subclasses:

  a.     The Category I Subclass, which consists of all individuals who have been or will be personally injured by cholera contracted in Haiti on or after October 9, 2010.  Plaintiffs Paule and Silfort are the named representatives of this Subclass.

  b.     The Category II Subclass, which consists of all individuals who are or will be the personal representative of a person who was or will

8

be killed by cholera contracted in Haiti on or after October 9, 2010.
Plaintiffs Georges, Joseph, and Paul are the named representatives
of this Subclass.

31.    **Numerosity—Fed. R. Civ. P. 23(a)(1):** The exact number or
identification of the Class members is presently unknown.  Upon information and belief,
the Class includes at least 679,000 individuals, including the representatives of the more
than 8,300 people who contracted and died from the cholera epidemic that was
introduced into Haiti by Defendants.  The identity of the Class members is ascertainable
and can be determined based on available records.  All Class members are so numerous
that joinder of individual members is impractical.

32.    **Commonality—Fed. R. Civ. P. 23(a)(2) and 23(b)(3):**  The Named
Plaintiffs' injuries arise from a set of facts and circumstances common to that of the
Subclasses they seek to represent.  The questions of law and fact common to the
Subclasses predominate over questions affecting only individual Subclass members, and
include, but are not limited to:

a.    Whether Defendants' acts or omissions directly and proximately
caused the introduction of cholera to Haiti;

b.    Whether Defendants were negligent, grossly negligent, and/or
reckless in introducing cholera, or causing cholera to be
introduced, to Haiti;

c.    Whether Defendants' actions proximately caused the Category I
Subclass members to be exposed to cholera;

9

d.   Whether Defendants' actions proximately caused the Category I and II Subclass members to suffer physical, emotional and/or pecuniary harm as alleged herein;

e.   Whether Defendants' actions constituted a public or private nuisance;

f.   Whether Defendants' actions give rise to liability under state law; and

g.   Whether Defendants illegally sought to cover up their actions, thereby exacerbating harm suffered by Plaintiffs.

33.   **Typicality—Fed. R. Civ. P. 23(a)(3):** The Named Plaintiffs' claims are typical of the claims of the Class because the Named Plaintiffs and all Class members were or will be affected by, or are or will be the personal representatives of persons who were or will be affected by, cholera contracted in Haiti on or after October 9, 2010. The damages and relief sought by the Named Plaintiffs are also typical of their respective Subclasses because the injuries suffered, nature of treatment received, all related costs, and additional consequential losses are similar for all members of each Subclass.

34.   **Adequacy—Fed. R. Civ. P. 23(a)(4) and 23(g)(1):** The Named Plaintiffs are able to, and will, fairly and adequately protect the interests of each Subclass because they fit within the definition for each respective Subclass, and their interests do not conflict with the interests of the members of the Subclass they seek to represent. The Named Plaintiffs are represented by Class Counsel who have experience in class action and tort litigation and who have extensive experience working in Haiti and with Haitians in the United States. Class Counsel intends to prosecute this action vigorously for the

benefit of the entire Class.  The Named Plaintiffs and Class Counsel can fairly and adequately protect the interests of all of the members of the Class.

35.     **Superiority—Fed. R. Civ. P. 23(b)(3):** A class action is the best and potentially only available method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable, economically and otherwise, and individual litigation would be unduly burdensome to the courts.  The economic situation of the vast majority of Class members prohibits them from being able to pursue litigation individually.  Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses.  Further, individual litigation has the potential to result in inconsistent or contradictory judgments.  A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

36.     **Issue Certification and/or Subclasses—Fed. R. Civ. P. 23(b)(1),(b)(2), (c)(4), & (c)(5):** On the motion of a party and/or in the discretion of the Court, one or more of the issues or claims set forth in this Complaint may be certified under the provisions of Fed. R. Civ. P. 23 (b)(1),(b)(2), and/or (c)(4), and subclasses designated under Fed. R. Civ. P. 23(c)(5).

37.     Class certification is appropriate under Rule 23 of the Federal Rules of Civil Procedure because (1) the prosecution of separate actions by individual members of the Class would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of the other members or would substantially impair or impede their ability to protect their interests, and/or (2) Defendants have acted and continue to act

on grounds generally applicable to the Class, making final injunctive, declaratory, compensatory, and punitive relief appropriate.

## STATEMENT OF FACTS

General Facts

38.    The Republic of Haiti is located on the western third of the Caribbean island of Hispaniola.  As documented by Defendant UN, it is the poorest country in the Western Hemisphere and one of the world's most water insecure countries, meaning that the population lacks the capacity to access adequate quantities and acceptable quality of water to protect against water-borne pollution and water-related disasters.

39.    In the most recent national census, conducted in 2003, sixty-four percent of the Haitian population reported relying on raw water (that is, naturally occurring water in the environment, such as river water) as their primary water source.   Thirty-two percent reported that they depended specifically on river water as their primary water source.

40.    Via the World Health Organization ("WHO")-UN Children's Fund Joint Monitoring Program, Defendant UN identified that in 2010, only sixty-nine percent of the Haitian population had regularized access to an improved water source that "by nature of its construction or through active intervention, is protected from outside contamination, in particular from contamination with fecal matter."  Only seventeen percent had access to improved sanitation that "hygienically separates human excreta from human contact."

41.    On January 12, 2010, Haiti was struck by a 7.0 magnitude earthquake that killed over 200,000 people and displaced an additional 1.5 million. The earthquake

severely damaged or destroyed many public buildings and institutions and key parts of Haiti's infrastructure.

42.     The WHO, an agency of the UN, assessed the public health risks in Haiti shortly after the earthquake and found that the earthquake had exacerbated already poor conditions by severely damaging water, sanitation, and health infrastructure, thereby increasing the country's vulnerability to waterborne diseases.

43.     Humanitarian workers and medical experts also publicly stressed Haiti's heightened vulnerability to waterborne diseases, including cholera.  These warnings were published in over 100 articles across a wide array of international media outlets.

44.     Cholera is an acute intestinal infection caused by a waterborne toxigenic bacterium, *Vibrio cholerae*.  Cholera has a disease profile that includes profuse diarrhea, vomiting, and muscle cramping.  The disease often causes severe discomfort, pain, dehydration, and death if untreated.  Cholera induces such rapid dehydration that a person can lose up to 20 liters of fluid daily, and a person who weighs 120 pounds can lose over 10 pounds in a matter of hours.  Unless treated immediately, the loss of fluids from the body can rapidly cause shock and death.

45.     Cholera is most often transmitted through the ingestion of water or food that has been contaminated by the feces of an infected person.  Even persons with no apparent symptoms can transmit the disease.  The bacterium appears in the feces of an infected person for up to fourteen days from the point of initial infection.  The incubation period for cholera—that is, the time between contraction of the illness and the onset of symptoms—ranges from about two hours to five days.

46.     The need to prevent the transmission of cholera has been internationally recognized since at least 1851, and Defendant UN has long known of this need.  Since 1948, Defendant UN's health agency has been responsible for promulgating international regulations to prevent the transmission of cholera, and the present International Health Regulations that are binding on all WHO Member States explicitly recognize that cholera possesses the "ability to cause serious public health impact and to spread rapidly internationally," and thus constitutes a particular risk for causing a public health emergency of international concern.

<u>The Presence of Defendants UN and MINUSTAH in Haiti</u>

47.     Defendant UN has had a military presence in Haiti since at least 1994 and has had seven different civilian and military missions there for most of the last three decades.

48.     On or about April 30, 2004, the UN Security Council passed a resolution establishing Defendant MINUSTAH and providing it with the mandate to enhance stability and a secure environment, promote democracy and rule of law, and support the Haitian government as well as Haitian human rights institutions and groups "in their efforts to promote and protect human rights, particularly of women and children, in order to ensure individual accountability for human rights abuses and redress for victims."

49.     On or about June 1, 2004, Defendant MINUSTAH began operations in Haiti.

50.     MINUSTAH's operations in Haiti are governed by, *inter alia,* the SOFA executed by the UN and the Government of Haiti on or about July 9, 2004.

51.   The SOFA specifically provides that MINUSTAH shall cooperate with the Government of Haiti "with respect to sanitary services and shall extend to each other the fullest cooperation in matters concerning health, particularly with respect to control of communicable diseases, in accordance with international conventions."

52.   The SOFA also requires that MINUSTAH and its members, including Defendant Mulet, "respect all local laws and regulations." The SOFA appoints the Special Representative to be personally responsible for ensuring that members of MINUSTAH comply with Haitian law.

53.   Haitian laws and regulations prohibit (1) disposal of human waste in waterways; (2) negligence, including the negligent transmission of a contagious disease; (3) manslaughter caused by negligence; and (4) commission of acts impacting the environment or ecological balance.

54.   Haitian law also incorporates into its national laws all international treaties that are duly ratified by the Parliament of Haiti. Included among those treaties are prohibitions on violating the right to life and the right to health.

55.   MINUSTAH is also bound by the rules set forth in the UN standards of conduct, which require MINUSTAH to (1) respect the environment of the host country; (2) treat the inhabitants of the host country with respect, courtesy and consideration; and (3) refrain from engaging in any illegal activities.

56.   MINUSTAH is also bound by international law applicable to UN forces. Specifically, as recognized by the former Secretary-General of Defendant UN in a Bulletin published on August 6, 1999, forces such as MINUSTAH are "prohibited from

… destroying … or rendering useless objects indispensable to the survival of the civilian population, such as … drinking-water installations and supplies."

57.   At the time of the cholera outbreak in October of 2010, MINUSTAH consisted of approximately 8,940 military personnel and 4,391 policemen. In the 2010 to 2011 fiscal year, MINUSTAH's budget was $853,827,400, equivalent to approximately one-third of the Haitian government's total annual budget for all government services.

Deployment of Cholera-Infected UN Personnel to Haiti

58.   Defendants UN and MINUSTAH draw military personnel from various countries including Nepal, where cholera is endemic.

59.   On or about October 9, 12, and 16, 2010, Defendants UN and MINUSTAH deployed 1,075 troops from Nepal to Haiti as a part of a regular six-month rotation. The Nepalese contingent represented the third largest national contingent of military personnel in the MINUSTAH force.

60.   In the months immediately preceding October 2010, Nepalese authorities reported a surge in cholera cases concentrated in the Kathmandu Valley. The outbreak was reported widely in Nepalese and English newspapers, and officials from the UN knew that Nepal was experiencing a surge in cholera cases. The outbreak involved a particularly virulent strain of cholera known as El Tor cholera.

61.   Upon information and belief, prior to their deployment to Haiti, the soldiers constituting the Nepalese contingent spent three months training at the Birendra Peace Operations Training Centre in Panchkhal, Nepal, located in the outskirts of the Kathmandu Valley.

16

62.    Upon information and belief, after completing their training in Panchkhal, the Nepalese soldiers spent ten days visiting their families.    Many traveled to the Kathmandu Valley and other cholera-infected areas directly prior to their deployment to Haiti.

63.    In the days or weeks prior to deployment, one or more of MINUSTAH's soldiers were exposed to and contracted cholera.

64.    Defendants UN and MINUSTAH did not test any Nepalese MINUSTAH soldier for cholera, or require any such testing, or otherwise take reasonable steps to rule out or address the presence of the infectious bacteria in the troops that were sent to Haiti prior to deploying them.  The Nepalese Army's Chief Medical Officer confirmed this fact to the British Broadcasing Corporation ("BBC") News on or around December 8, 2010.

65.    Upon information and belief, Defendants UN and MINUSTAH also failed to take reasonable precautions, such as providing vaccinations, prophylactic antibiotics, or other medical treatments, to prevent the foreseeable transmission of cholera from the Nepalese soldiers who were coming from cholera-endemic regions to Haiti.    Many of these treatments are extremely inexpensive, and could have, at minimal cost to Defendants, substantially improved the health of infected persons and limited their ability to transmit the disease.

66.    One or more of the soldiers deployed by Defendants UN and MINUSTAH carried cholera from Nepal to Haiti.

67.    Defendants UN and MINUSTAH knew or should have known, and recklessly disregarded the obvious risk, that one or more of the soldiers was carrying the infectious cholera bacteria into Haiti.

68.     Within one day of arriving in Haiti, the soldiers were transported to their posts in the Centre Department, a region in the center of Haiti.

69.     At all times relevant to this Complaint, Defendants UN and MINUSTAH stationed the soldiers from Nepal on three military bases in Haiti: Meille, Hinche, and Terre Rouge.  The bases are located in rural parts of Haiti, where the local population is particularly reliant on raw water sources and consequently vulnerable to waterborne diseases.

70.     Upon information and belief, at all relevant times herein, Defendants UN and MINUSTAH maintained exclusive possession and control over the bases.

71.     The majority of the Nepalese battalion of MINUSTAH was stationed on the basecamp in Meille known as NEPBATT 1 (the "Meille Base").  Meille is a small village located approximately one mile south of the town of Mirebalais.  It is situated on the banks of the Meille tributary system ("the Meille Tributary"), which flows into the Artibonite River at Mirebalais.  Aside from MINUSTAH, there is no other significant non-Haitian presence in Meille.

72.     The Meille Base is located on a perch above the Meille Tributary.  At the time of the outbreak of cholera in Haiti, the wall of the Meille Base was separated from the waterway by only a steep, narrow slope of dirt and rock no wider than a few feet in some areas.

UN Sanitation Facilities and Waste Disposal in Meille

73.     Defendants UN and MINUSTAH recklessly designed, constructed, operated and oversaw a waste management and disposal system that failed to meet minimal sanitary and safety requirements, and caused cholera contamination of the

Meille Tributary through leakage and/or overflow from Defendants' pipes and sanitation facilities on the Meille Base, and/or overflow from Defendants' waste disposal into open-air pits in the Meille community, outside the base.

74.    The toilet and showering facilities for Defendant MINUSTAH's Meille Base were situated together in one contiguous main area near the rear of the base on a low point on the land, sloping down towards the Meille Tributary.  During heavy rains, flooding created a high risk that contaminated water would run from the facilities towards and into the river.

75.    Graywater waste (that is, shower water, kitchen water, and other wash water) flowed from the facilities through different pipes into one or more soak pits located on the base, where it drained into the ground. At least one of the soak pits overflowed in heavy rain before the time of the cholera outbreak.

76.    The toilet facilities contained squat toilets that were flushed by manually pouring water over the waste. Blackwater waste, which contains human feces, was designed to flow from the toilets through plastic pipes to six 2,500-liter fiberglass septic storage tanks.

77.    Defendant MINUSTAH failed to properly maintain the pipes and pipe connections, allowing them to become cracked and to fall into severe disrepair.  The pipes were exposed to the air and suspended over an open drainage ditch that extended through the camp and emptied into the Meille Tributary, creating a high risk of contamination by blackwater and graywater.

78.    Defendant MINUSTAH stored the blackwater waste in septic tanks that had to be manually emptied.  If the septic tanks were not emptied when full, there was a

high risk that blackwater waste would either flow back through the pipes and up the toilets or otherwise empty into the surrounding environs.

79.    Defendant MINUSTAH or its agents periodically emptied the septic tanks on the base by pumping the untreated waste into a truck and transporting it across Route HT-3, which runs adjacent to the Meille Base, to dispose of it in open-air pits located outside the base in the Meille community (the "disposal site").

80.    Upon information and belief, Defendant MINUSTAH also transported its waste from the medical facility on the Meille Base and disposed of it in the same open-air pits at the Meille disposal site.

81.    Defendant MINUSTAH also transported all of the waste water from its Hinche and Terre Rouge bases, where the other Nepalese soldiers were stationed, and disposed of it in the Meille pits.

82.    The pits were unfenced and easily accessible to the public, and Defendants took no precautions to protect the local community or its visitors from the hazardous waste.

83.    The pits were located at the top of a hill approximately 100 feet from the Meille Tributary.  The land sloped in the direction of the Meille Tributary, and the pits regularly overflowed in the rain, creating a high and foreseeable risk that waste would flow from the pits into the river.

84.    Upon information and belief, Defendant MINUSTAH did not have or enforce minimum standards for waste water disposal sites, standard operating protocols for waste water management, or any environmental policy or guidelines that would

20

minimize the risk of harm of MINUSTAH's practices to the local population, the surrounding environment or visitors there.

85.    Upon information and belief, Defendant MINUSTAH leaked or disposed of untreated, cholera-infected human fecal matter from sanitation facilities on the Meille Base and/or the open-air pits outside that base into the Meille Tributary, thereby contaminating the waterway with the cholera bacteria.

86.    Defendant MINUSTAH knew or should have known that there was a significant risk that its waste water would leak from its base into the Meille Tributary, and that disposing of raw fecal matter in the manner described herein posed a grave risk of contaminating the waterways upon which thousands of Haitians rely for drinking water. Local residents living near the Meille Base reported that they experienced noxious odors emanating from the rear of the base where the pipes were located and witnessed sewage spilling over. Mayor of Mirebalais Lochard Laguerre told the BBC and Associated Press that he raised the issue of the unsanitary conditions on the Meille Base with the MINUSTAH Base Commander several times prior to the outbreak.

87.    MINUSTAH took no action to correct the sanitation facilities on the base.

The Outbreak of Cholera in Haiti

88.    The cholera bacteria introduced to the Meille Tributary by Defendant MINUSTAH spread downstream into the Artibonite River, thereby exposing the thousands of Haitians who rely upon those waterways to the bacteria.

89.    On or about October 14, 2010, five days after the arrival of the first group of Nepalese troops, a twenty-eight-year-old man living near the Meille Base ("Victim 1") developed acute onset of watery diarrhea. Victim 1 regularly bathed in and drank from a

small river that feeds from the Meille Tributary. He died within twenty-four hours of the onset of the symptoms.

90.   Epidemiologists from Partners In Health, a Boston-based non-profit health care organization, determined that Victim 1 is the first documented patient who died in the epidemic in Haiti.

91.   On or about October 14 through October 19, 2010, several hundred residents living in the region near the Meille Base began to experience acute onset of profuse watery diarrhea and vomiting. Some affected individuals died within hours of the onset of symptoms, sometimes in as little as two hours.

92.   In the first week of the outbreak, Haiti's Ministry of Public Health, the *Ministère de la Santé Publique et de la Population* ("MSPP"), recorded over 1,000 cases of cholera-like illness and 135 associated deaths.

93.   On or about October 21, 2010, MSPP confirmed the existence of a cholera epidemic.

94.   On or about October 21, 2010, the U.S. Centers for Disease Control & Prevention ("CDC") conducted laboratory testing and identified the causal agent of the epidemic as toxigenic *Vibrio cholerae* of serogroup O1, serotype Ogawa, biotype El Tor.

95.   The cholera bacteria traveled downstream through the Artibonite River. The first cluster of cases near the Meille Base was followed by an explosion of cases downstream from Meille, in the lower Artibonite region of Haiti where the river spreads out across a delta, specifically in the communes of Grande Saline, St. Marc, Desdunes, Petite-Riviere-de-l'Artibonite, Dessalines, and Verrettes.

96.    By or around midday on October 22, 2010, 4,470 cholera cases and 195 deaths had been reported in 21 of Haiti's 141 communes. The geographic concentration of the epidemic had a radius of approximately fifty kilometers around the delta of the Artibonite River, just downstream from the Meille Tributary.

97.    A joint investigation by the CDC and MSPP conducted between October 21 and October 23, 2010, found that most affected persons worked or resided in the rice fields alongside a stretch of the Artibonite River, and that 67% of patients reported drinking untreated water from the river or canals that were fed by the river.

98.    By November 14, 2010, MSPP reported that the death toll from cholera had reached over 900 and that more than 14,600 people had been hospitalized with cholera-like symptoms.

99.    The explosion of cholera, combined with a lack of public information about the source of the disease, caused widespread panic. As infected people fled to other communes, cholera rapidly spread to other parts of Haiti.

100.    On or about November 15, 2010, the CDC confirmed the first U.S. case of cholera in a Florida resident who had contracted the disease while traveling in Haiti.

101.    On or before November 20, 2010, MSPP reported cases of cholera in all of Haiti's ten geographic departments.

102.    On or about November 22, 2010, the media reported that the mortality rate from cholera in Haiti had risen to nine percent. Public health experts generally consider an epidemic to be well-managed if mortality rates are below one percent.

103.   As of April 2011, researchers had confirmed twenty-three cases of cholera in the United States associated with the Haiti epidemic, four of which were confirmed in New York City.

104.   Upon information and belief, many cases go unreported because infected individuals do not seek medical attention in the United States.  Even where cases are diagnosed, doctors often fail to inform the CDC.

Early Investigations of the Source and the UN's Response

105.   Within days of the first death from cholera, suspicions emerged that the Meille Base was the source of the contaminant due to the concentration of early cases near the base and its known sanitation problems.

106.   Defendants UN and MINUSTAH initially refused to respond to, or to release any information related to, allegations that the Meille Base was the source of the cholera outbreak.

107.   Upon information and belief, on or about October 21, epidemiologists from the Haitian government requested access to examine the MINUSTAH soldiers on the Meille Base.  Defendant MINUSTAH refused to grant such access, thereby impeding efforts to remediate the continued spread of cholera.

108.   On or about October 26, 2010, Defendants UN and MINUSTAH issued a false and misleading statement to the press ("the October 26 Statement"), "seek[ing] to clarify rumors circulating in certain media that human waste spilled into a river in Mirebalais by MINUSTAH is the cause of the cholera epidemic in Haiti."

24

109.    Defendant Mulet later informed the Associated Press that Defendants UN and MINUSTAH did not respond to allegations prior to October 26, 2010, because "it was such a minor thing."

110.    The October 26 Statement incorrectly and misleadingly claimed that the Meille Base had "septic tanks [that] conformed to construction standards of the [U.S.] Environmental Protection Agency ["EPA"]," and that the management of waste was "consistent with established international standards."

111.    Upon information and belief, EPA standards that regulate structures similar to those maintained by Defendants require detailed safeguards to prevent waste water from contaminating drinking water. Defendants were not in compliance with such standards and/or did not maintain the types of facilities required by the EPA.

112.    Defendant UN knew or should have known that the claims made in the October 26 Statement were misleading or false at the time they were made.

113.    On or about October 27, 2010, Jonathan Katz, the Associated Press' Haiti correspondent, traveled to the Meille Base to fact-check the claims made in the October 26 Statement. He reported that, immediately upon arrival at the base, he was struck by a "debilitating ... stench of excrement." The smell was so intense that the people there had to cover their noses and mouths.

114.    Katz observed Guatemalan UN military police officers collecting samples of the water run-off from the MINUSTAH base and storing them in small jars. Katz learned from one of the officers the gravity of the situation.

115.    Katz observed an exposed broken plastic pipe "running from near what looked like a building of latrines inside the perimeter." The pipe was connected to an

25

overflowing septic tank.  He observed "reeking, dark liquid flow[ing] out of [the] broken pipe, toward the river."

116.    Katz watched as MINUSTAH personnel opened the septic tank from which the pipe was running and was immediately struck by a strong smell that he recognized as human feces.

117.    Katz phoned MINUSTAH Spokesperson Vincenzo Pugliese to alert him to the critical sanitary conditions.  Upon information and belief, Pugliese confirmed that the dark liquid was overflow from the base, but falsely told Katz that the broken pipe contained waste from the kitchen and showers, not toilets.  Pugliese also confirmed that the Guatemalan soldiers were collecting water samples to test them for cholera.

118.    Local Meille residents accompanied Katz to the disposal site across the street from the base.  Katz described the scene as "two shining pools of feces, filling pits dug directly into the ground."

119.    The residents told Katz that the pits frequently overflowed during rainfall, causing waste to run into the river.  One resident, Jean Paul Chery, observed that, when the pits overflowed in the other direction, down the hill towards his house, the smell would get so bad that the family could not sleep.

120.    Also on or about October 27, 2010, Sebastian Walker of the news organization Al Jazeera English arrived at the Meille Base with a film crew to investigate the base.  Walker documented "UN soldiers working furiously to contain what looks like a sewage spill" stemming from the same pipe.  Walker noted the smell of sewage by the base.  In the news segment that ran on Al Jazeera English the same evening, one

MINUSTAH soldier working on the pipe is seen wearing a mask over his nose and mouth.

121.   Walker also observed liquid running from stalls on the perimeter of the Meille Base and draining into the Tributary just a few yards away.  A MINUSTAH soldier on the base confirmed to Walker that the stalls contained toilets.

122.   Walker reported that "local residents said they had frequently seen sewage from the base leak into the river and that families in the area had recently become ill."

123.   On or about October 28, 2010, MINUSTAH issued another statement that falsely asserted that all Nepalese soldiers deployed to Haiti in October 2010 underwent all necessary medical testing and that none tested positive for cholera, when in fact, none of the soldiers had been tested for cholera at all.

124.   Spokesperson Pugliese repeated the false assertion that "none of the soldiers had the illness" at a press conference held the same day.

125.   Katz later asked Pugliese about Defendant MINUSTAH's allegation that the Nepalese soldiers had tested negative for cholera, and Pugliese admitted that that statement was false and that the soldiers had not, in fact, been tested for cholera.  This admission comports with the statement by the Chief Medical Officer of the Nepalese Army that no MINUSTAH soldiers from Nepal had been tested for cholera.

126.   Defendant MINUSTAH has never issued any public statements to correct or clarify the claim that "none [of the soldiers] tested positive."

127.   On or about October 31, 2010, Defendant MINUSTAH invited Katz back to the Meille Base for a supervised tour of the premises.  Katz noted that "[i]t was immediately apparent that the soldiers had literally covered up the most incriminating

evidence, most notably the smell." The soldiers "admitted to having undertaken repairs on the eve of [Katz's] visit, including replacing the broken PVC pipe from the back of the base and scrubbing a drainage canal that emptied into the river."

128.    Katz also noted that "the repairs had been superficial at best. When we went out back, we noted that a series of cracked aboveground pipes that originated at the latrines still ran over the drainage canal, cracks showing. One pipe was held together with what looked like electrical tape. In the river below, where the canal let out, a soupy brown mixture bubbled along the bank. Flies swarmed over it."

129.    Despite the knowledge that sanitation conditions on the Meille Base failed to meet minimal standards of hygiene and safety, Defendants UN and MINUSTAH continued to deny any possibility that they had caused the cholera outbreak. Defendants further refused to conduct a timely investigation, thereby impeding efforts to contain the immediate danger.

130.    Defendants also denied the importance of identifying the source of the outbreak, contrary to their own materials on the topic and internationally recognized best practices. At the same press conference on October 28, Dr. Michel Tierren, a doctor employed by the Pan-American Health Organization ("PAHO"), Defendant UN's regional health agency, denied responsibility and discouraged further questions regarding the source, stating that "it is simply rumors … there is no agent, no entity, no person, no structure that is responsible for the introduction of cholera in Haiti…. There is nothing more to say on this and all attempts at stigmatization, pointing fingers, identifying [the source] are erroneous…."

131.    Furthermore, Defendants released false statements and misleading information about the evidence, which placed anyone relying on their assertions at additional risk of contracting cholera.

132.    During all times when it would have been possible to determine more conclusively whether cholera came from Defendants' agents or property, Defendants UN and MINUSTAH deliberately acted to prevent independent investigations and access to information.

133.    Defendant MINUSTAH did not permit independent examination of, or collection of stool samples from, the soldiers during the fourteen-day period that infected individuals typically shed cholera bacteria in their stools.  After that time period, it is impossible to effectively test for cholera.

134.    Upon information and belief, Defendant MINUSTAH, acting in bad faith, conducted unreliable tests of the water on the Meille Base and used this information to mislead the public regarding its liability.  MINUSTAH told the press that they tested water samples from the base and adjacent waters on October 22, October 25, and October 27, 2010, and that the results were negative for cholera.  MINUSTAH did not provide details regarding the type of testing or the procedures followed, and did not allow independent review of the tests or results.  MINUSTAH repeatedly cited to those tests as evidence that it was not the source of cholera.

135.    Reputable epidemiologists have questioned the reliability of testing for cholera based on environmental samples such as water samples because of the high risk that contaminated sewage discharge results in transient presence of the bacterium in water and could be easily missed by point sampling, resulting in false negatives.

136.   Moreover, upon information and belief, MINUSTAH sent the water samples for analysis by a general medicine doctor, Dr. Maximo Rodriguez, who specializes in treating obesity at a MINUSTAH-contracted patient-treatment facility in the Dominican Republic, and who does not have knowledge or experience in laboratory testing for cholera.

137.   Relying upon Defendants' release of misinformation and as a result of their obstruction of access to their base, people falsely attributed the epidemic to other sources in a manner that exacerbated the spread of injury and death throughout Haiti, and specifically to Plaintiffs.

138.   Many of the class members are farmers who rely on the harvesting and sale of grains to financially support themselves and their families.  The release of false information by Defendants UN and MINUSTAH resulted in misplaced fears that crops from regions affected by the cholera outbreak were a source of the disease.   A preliminary assessment on or about December 29, 2010, by the Food and Agricultural Organization, an agency of the UN, found that a "significant portion of the rice harvest in northwestern Haiti is likely to be lost because of farmers' fears of cholera contamination."  Consumers also became unwilling to purchase produce from cholera-infected regions.   Thus, as a direct and proximate result of Defendant UN and MINUSTAH's actions, the farmers suffered substantial loss of income and loss of livelihood.

139.   For several months, while individuals were suffering from injuries in the United States and Haiti and dying from cholera in Haiti, Defendants UN and MINUSTAH continued to release false information to conceal their liability.

30

140.   Around November 2010, as death rates were soaring around Haiti, Defendant Mulet told Time Magazine that "[i]t's really unfair to accuse the U.N. for bringing cholera into Haiti."

141.   On or about December 15, 2010, nearly two months after Pugliese admitted to Katz that no soldiers had been tested for cholera, Under-Secretary General for Peacekeeping Operations Alain Le Roy repeated the original false statement at an international press conference, stating that "all soldiers had tested negative for the strain" and simultaneously stressed that the UN "had been very transparent in its efforts to determine the source."

<u>Haitian-French Joint Independent Investigation</u>

142.   In light of the refusals of Defendants UN and MINUSTAH to conduct a *bona fide* investigation, the Government of Haiti asked the Government of France for support in bringing in an independent expert to investigate the source of the epidemic. The Haitian and French governments appointed a team led by global cholera expert and renowned epidemiologist Dr. Renaud Piarroux (the "Haitian-French team"). The Haitian-French team conducted an epidemiological investigation in Haiti from November 7 to November 27, 2010.

143.   The Haitian-French team shared the results of their investigation with the Ambassador of France, Haitian authorities, and UN officials. They stated that their findings showed "no doubt" that cholera had been imported to Haiti by MINUSTAH. They concluded that the epidemic "started around the camp of MINUSTAH and was spread explosively due to massive contamination of the water in the Artibonite River and one of its tributaries with feces of patients with cholera."

144.   In the unpublished report, which was leaked to the public in December 2010, the Haitian-French team recounted that residents of Meille "reported that a nauseating liquid poured from pipes from the base at the time the outbreak occurred." They also noted that an investigatory team from MSPP and other doctors who passed by the Meille Base observed the presence of a pipe from a septic tank that poured dark liquid into the Meille Tributary and that the pipes were removed after the start of the epidemic.

145.   The Haitian-French team hypothesized that a cholera epidemic was underway in the Meille Base at the time that cholera broke out in the Artibonite region of Haiti.   They also noted the possibility that MINUSTAH had intentionally covered up its actions: "It cannot be ruled out that steps were taken to remove feces and erase traces of an epidemic of cholera among the soldiers."

146.   The Haitian-French team's findings comport with an internal assessment conducted by Defendant UN around the same time.

UN-Appointed Panel Investigation

147.   On or about January 6, 2011, over two months after the cholera epidemic began, and only after the results of the Haitian-French investigation were leaked to the public, Defendant Secretary-General Ban relented to mounting public pressure and announced that the UN would appoint a panel composed of four international experts to investigate the source of cholera in Haiti ("the UN Panel of Experts").   Defendant Ban directed the UN Panel of Experts to present the findings of their investigation in a written report and to submit it to him and to the Government of Haiti.

148.   On or about January 14, 2011, Nigel Fisher, Defendant Ban's Under Secretary-General for Coordination of Humanitarian Affairs, told the Public Broadcasting Service that "in retrospect, maybe we should have had the [panel] much sooner."

149.   In or around February 2011, nearly four months after the cholera epidemic began, the UN Panel of Experts arrived in Haiti. On or about May 3, 2011, it presented its findings to Defendant Ban in a report entitled the "Final Report of the UN Panel of Experts on the Cholera Outbreak in Haiti" ("the UN Panel Expert Report"). The report was released to the public on or about the following day, May 4, 2011. At the time of the release, over 4,500 Haitians had died from cholera. Upon information and belief, the release of the UN Panel Expert Report was delayed at the request of Defendant Ban, who wished to wait until after the Nepalese contingent of MINUSTAH had concluded its six-month rotation in Haiti.

150.   The UN Panel of Experts found that "the evidence overwhelmingly supports the conclusion that the source of the Haiti cholera outbreak was due to contamination of the Meille Tributary of the Artibonite River with a pathogen strain of current South Asian type *Vibrio cholerae* as a result of human activity."

151.   The UN Panel of Experts found that the epidemic began in the upstream region of the Artibonite River delta and, within three days, led to an "explosive" outbreak in the entire region of the delta. It also found that the first cases of cholera came from Meille, 150 meters downstream from the MINUSTAH base.

152.   The UN Panel of Experts investigated the water and sanitation conditions on the Meille Base. The conditions described in its report reflect the status of the piping system as of February 2011, after Defendant MINUSTAH made several repairs to the

system in October 2010. The UN Panel of Experts concluded that even the post-repair sanitation conditions were not sufficient "to prevent fecal contamination of the Meille Tributary System of the Artibonite River." It found that, even at the time of its investigation, human feces could enter into and flow from the drainage canal, and could run off or be transported from the open septic disposal pit into the Meille Tributary.

153.   The UN Panel of Experts also concluded that construction of the piping that ran from the toilets and showers was "haphazard, with significant potential for cross-contamination through leakage of broken pipes and poor pipe connections." The UN Panel of Experts noted a particularly high risk of cross-contamination from the pipes that ran over the open drainage ditch extending throughout the camp and flowing directly into the Meille Tributary.

154.   In addition, the UN Panel of Experts investigated the disposal pits across the road from the Meille Base and confirmed that Defendant MINUSTAH disposed of all human waste from the three MINUSTAH bases in Haiti at the disposal pits in Meille. The UN Panel of Experts observed children playing and animals roaming in the area around the unfenced, open-air pits. They found that "the area is susceptible to flooding and overflow into the [Meille] Tributary during rainfall."

155.   The UN Panel of Experts calculated that it would take between two and eight hours for waste water to flow from the disposal pits into the Meille Tributary, and from there to the junction where the tributary meets the Artibonite River.

156.   The UN Panel of Experts cited extensive evidence documented by numerous independent scientific studies that tied the source of cholera in Haiti to Nepal, including the following:

34

a.       The CDC compared the entire genetic material of fifteen strains of cholera, including three Haitian strains, and found that the Haitian strains were identical to each other, thus suggesting a common source. The three Haitian strains were also tightly clustered with isolates from South Asia, suggesting a common origin.

b.       The Harvard Cholera Group, using the most recently-developed DNA-sequencing method to analyze the entire genomic sequences of the Haitian strain, found that strains in Haiti were nearly identical to strains in South Asia, including Nepal, but distinct from other strains circulating in the Americas.

c.       The Wellcome Trust Sanger Institute in Cambridge, England found that the Haitian strains were all identical and closely related to strains from the Indian subcontinent and distinct from strains in other parts of the world.

d.       The Emerging Pathogens Institute in Gainesville, Florida, analyzed *Vibrio cholerae* isolated from sixteen patients in Haiti with severe diarrhea within the first three weeks of the outbreak onset and found minimal diversity among the isolates, supporting the existence of a single point source for the epidemic.

157.    The UN Panel of Experts also found that cholera strains from Nepal and from Haiti were a "perfect match."  They drew on the work of Dr. Dong Wook Kim of the International Vaccine Institute, who used Multi-locus Variable-number tandem repeat Analysis ("MLVA"), a genetic method, to compare the Haitian strains with strains isolated in Nepal between 2007 and 2010 and other South Asian strains.

158.    Based on the findings of its investigation, the UN Panel of Experts made certain recommendations to prevent any future introduction of cholera by UN troops.  In particular, it recommended that UN troops traveling from cholera-endemic areas should

"either receive a prophylactic dose of appropriate antibiotics before departure or be screened with a sensitive method to confirm absence of asymptomatic carriage of *Vibrio cholerae*, or both." It further recommended that fecal waste from UN bases should be treated "using on-site systems that inactivate pathogens before disposal [and that are] operated and maintained by trained, qualified United Nations staff or by local providers with adequate United Nations oversight."

159. Defendant UN responded to the UN Panel Expert Report by denying that it "does not present any conclusive scientific evidence linking the outbreak to the MINUSTAH peacekeepers or the Mirebalais camp," and asserting that "[a]nyone carrying the relevant strain of the disease in the area could have introduced the bacteria into the river."

160. Meanwhile, cholera has continued to cause personal injury and death. In July 2011, the epidemic generated new infections at a rate of one person every minute.

161. Defendant Ban's sole public action in response to the UN Panel Expert Report was to announce that he planned to appoint a task force to "ensure prompt and appropriate follow-up." The subsequent task force operated in secrecy for eighteen months and, upon information and belief, privately delivered its recommendations in an internal report to Defendant Ban in or around December 2012. As of the date of this Complaint, that task force has not issued any public statements or reports, and the full findings have not been made publicly available. Defendants Ban and the UN have repeatedly denied all requests for information about the task force's findings and recommendations.

162.   In or around May 2013, a report by Physicians for Haiti, a non-profit organization that works to support medical education and training in Haiti, has tracked the UN's response to cholera, found that Defendant UN had not implemented "any of the changes in its medical or sanitation protocols recommended by the [UN Panel of Experts'] report."

<u>Subsequent Evidence of the UN's Responsibility</u>

163.   Since the release of the UN Panel Expert Report, further evidence has established the Defendants' responsibility for causing the cholera epidemic in Haiti.

164.   In or around July 2011, Piarroux and his team formally published the findings of their investigation in a peer-reviewed article entitled "Understanding the Cholera Epidemic, Haiti" in *Emerging Infectious Diseases*. In the article, they provided additional evidence confirming that cholera was imported from Nepal to Haiti:

> There was an exact correlation in time and places between the arrival of a Nepalese battalion from an area experiencing a cholera outbreak and the appearance of the first cases in Meille a few days after. The remoteness of Meille in central Haiti and the absence of report of other incomers make it unlikely that a cholera strain might have been brought there another way. DNA fingerprinting of *V. cholerae* isolates in Haiti and genotyping corroborate our findings because the fingerprinting and genotyping suggest an introduction from a distant source in a single event.

165.   The article also documents that an epidemiological team from MSPP observed sanitary deficiencies on the Meille Base on October 19, 2010, including a pipe discharging sewage from the camp into the river. On October 31, 2010, they observed that the sanitary deficiencies had been corrected, which coincided with a decrease in the daily incidence of cholera.

166.   A joint study, published on or about August 23, 2011, by Dr. Rene Hendriksen of the National Food Institute at the Technical University of Denmark and

Dr. Paul Keim of the Translational Genomics Research Institute of Flagstaff, Arizona, used whole-genome sequence typing to compare the entire genome of the cholera strain in Haiti to that in Nepal. Their analysis revealed that the strains were identical, differing only in one of four million base-pairs compared. They published their findings in the peer-reviewed journal, *Mbio*, concluding that:

> Only a single SNP [Single-nucleotide polymorphism] separates the Haitian and Nepalese isolates, providing strong evidence that the source of the Haitian epidemic was from this clonal group. This molecular phylogeny reinforces the previous epidemiological investigation [of Piarroux *et al.*] that pointed towards United Nations peacekeepers from Nepal as the source of the Haitian cholera epidemic.

167.    Microbiologist John Mekalanos, who led the Harvard Cholera Group, reviewed Hendriksen *et al.*'s study and also observed that the cholera strains were "practically identical." He noted that the finding from the genome sequencing was so conclusive that it represents "as close as you can come to molecular proof … closing the book on this issue at the molecular-genetic level." Speaking to the New York Times in April 2012, G. Balakrish Nair, one of the four international experts on the UN Panel of Experts, stated that the study provided "irrefutable molecular evidence" that Haiti's cholera came from Nepal.

168.    In or around March 2012, Piarroux and his team published a second peer-reviewed study on the origins of the cholera epidemic in Haiti in *Emerging Infectious Diseases* entitled "Nepalese Origins of Cholera in Haiti." The study presented the results of a combined analysis of all available evidence related to the origins of cholera in Haiti, including three field investigations to Meille, a comprehensive review of literature pertaining to cholera in Haiti, and available laboratory results from molecular analyses of

the strain. They concluded that the evidence "all point[ed] to Nepalese UN peacekeepers

as the initial source of cholera in Haiti." They elaborated:

> The evidence that the Nepalese UN peacekeeping troops brought cholera
> to Haiti appears particularly strong, based on background events and
> published epidemiologic and molecular-genetic investigations. The
> soldiers came from Nepal where a cholera outbreak had just occurred.
> None of the soldiers were tested for cholera, either before they left Nepal
> or when arriving in Haiti. A few days after they arrived, cases of cholera
> appeared in the village next to the UN camp housing the new Nepalese
> troops. Local people had complained to journalists that pipes from the
> camp leaked fecal waste into the river and the Haitian company
> responsible for waste disposal at the UN camp was seen dumping waste
> from its truck outside the unusual location. Finally, a waste septic pit on a
> hilltop near the UN camp was found to allow waste fluids to seek down
> into the nearby river.

169.    On or about March 7, 2012, former U.S. President Bill Clinton, in his

capacity as UN Special Envoy to Haiti, publicly stated at a press conference in Mirebalais

that the UN troops were the "proximate cause" of the cholera outbreak in Haiti.

170.    In or around October 2012, Danielle Lantagne, another one of the four

international experts on the UN Panel of Experts, told the BBC that, after studying the

new evidence available, "[the UN Panel of Experts] can now say the most likely source

of the introduction of cholera into Haiti was someone infected with the Nepal strain of

cholera and associated with the United Nations Mirebalais camp." Speaking on National

Public Radio, she emphasized that the additional scientific evidence available solidifies

the conclusion that "the most likely source of introduction was someone associated with

the peacekeeping camp."

171.    On or around May 22, 2013, the members of the UN Panel of Experts

released an article in which they clarified their conclusions on the source of cholera in

Haiti, in light of the totality of the evidence that had become available. The members of

the panel concluded that "the preponderance of the evidence and the weight of the circumstantial evidence does lead to the conclusion that personnel associated with the Mirebalais MINUSTAH facility were the most likely source of introduction of cholera into Haiti."

Defendants' Violations of Legal Obligations to Provide a Remedy

172.    Despite the clear evidence establishing their liability, Defendants UN and MINUSTAH have continued to deny responsibility for causing the cholera epidemic and have stonewalled attempts of the press and victims to discuss the situation.

173.    It is well-established under international law and UN documents, resolutions, reports and treaties that Defendants UN and MINUSTAH can incur legal liability and have an obligation to provide compensation for injury caused by them. Despite this obligation, they have taken no action to compensate the victims of the epidemic or otherwise provide legally-required remedies.

174.    The SOFA requires Defendants UN and MINUSTAH to establish a "standing claims commission" to hear "third-party claims for ... personal injury, illness or death arising from or directly attributed to MINUSTAH." In violation of that requirement, Defendants UN and MINUSTAH have refused to establish such a commission to hear Plaintiffs' (or any other) claims.

175.    The CPIUN, to which the United States has acceded, requires the UN to "make provisions for appropriate modes of settlement of ... disputes of a private law character to which the United Nations is a party." In violation of that requirement, Defendant UN has failed to provide any mode of settlement for cholera-based claims.

176.   On or about November 3, 2011, approximately 5,000 victims of cholera ("Petitioners"), all of whom are members of the proposed Class and who were represented by proposed Class Counsel, filed claims with Defendants UN and MINUSTAH seeking (1) compensation; (2) remediation through water and sanitation infrastructure, and (3) a formal admission of responsibility, in accordance with the UN's obligations under the CPIUN and other treaties. Petitioners also requested that the UN establish a standing claims commission to hear their case in a fair, transparent, and impartial manner, in accordance with the SOFA.

177.   Defendants UN and MINUSTAH did not substantively respond to the Petitioners' claims for fifteen months. During these fifteen months, another 1,386 people died from cholera and another 168,988 people suffered non-fatal injuries from the disease.

178.   On February 21, 2013, Defendant UN's Legal Counsel sent Petitioners' counsel a letter announcing that the claims were "not receivable." The letter provided a one-sentence assertion that the Petitioners' claims "would necessarily include a review of political and policy matters" as the sole justification for its refusal to receive the claims, with no further explanation.

179.   In an interview with Al Jazeera on or about March 7, 2013, Defendant Ban stated that it was his personal decision to deny victims a remedy.

180.   On May 7, 2013, Petitioners responded to the UN's February 21 letter with a detailed brief that established that the UN's refusal to receive the claims was not justified under relevant international law, comparative law, or the UN's own treaties and documents that establish its legal obligations. Petitioners requested that the UN provide a

41

legal justification for refusing to receive the Petitioners' claims and explained that Petitioners had not asserted any political or policy-related claims. Petitioners also requested (1) a meeting with the UN's Office of Legal Affairs, (2) the engagement of a mediator, and/or (3) the establishment of a standing claims commission as required by the SOFA.

181.   On July 5, 2013, UN counsel responded on behalf of Defendant UN to Petitioners' May 7 letter, summarily denying Petitioners' three requests regarding a meeting, mediation, and/or a standing claims commission. The response also failed to provide any additional explanation for the UN's refusal to receive Petitioners' claims.

182.   The July 5 letter confirmed that Defendant UN will not comply with its legal obligations to provide a remedy to members of the proposed Class.

183.   As a result of Defendant UN's refusal to comply with its legal obligations, Plaintiffs and members of the proposed Class have suffered a complete denial of due process and justice. Upon receipt of the UN's July 5 letter, Plaintiffs and members of the proposed Class had exhausted their extrajudicial options for pursuing a remedy for their injuries and damages. Pursuing this action in a court of law is the only option left for Plaintiffs and members of the proposed Class to seek enforcement of their right to a remedy and other rights protected under New York law, the U.S. Constitution, and international law and Haitian law.

The Cost of Remediation and Defendants' Failure to Mitigate Damages

184.   Defendants UN and MINUSTAH have failed to take adequate measures to mitigate damages or remediate the cholera epidemic.

185.    At the time of this Complaint, cholera continues to kill and injure Haitians and Americans.  The Agency for Technical Cooperation and Development has projected that 120,000 people will contract cholera in Haiti in 2013.

186.    In or around May 2013, Duncan McLean, a health manager for Doctors Without Borders, one of the key humanitarian organizations responding to the cholera epidemic in Haiti, observed that "[t]he situation is worse than it was two years ago."

187.    Jon Kim Andrus, Deputy Director of PAHO, has stated that Haiti's UN-caused cholera epidemic is now the world's worst single-country epidemic in modern times.  Fifty-seven percent of the world's cholera cases in 2011 were found in Haiti—more cases than the rest of the world combined.

188.    The Haitian government, in partnership with a number of non-governmental organizations and UN agencies, launched a plan to eliminate cholera from Haiti through improved access to water, sanitation, medical care, and public education campaigns ("the Plan").  The details of the Plan were released on or about February 27, 2013.  The Haitian government, in close collaboration with UN agencies, estimated that it will take ten years[1] and cost $2.2 billion to eliminate the cholera that the UN brought to Haiti.  That cost is roughly equivalent to the Haitian government's total annual budget for all government services.

189.    On or about December 11, 2012, in advance of the Plan's full release, Defendant Ban publicly endorsed the Plan.  Defendant Ban pledged $23.5 million from

---

[1] The ten-year time-frame for cholera elimination in Haiti is based in part on the experience of a cholera epidemic in the 1990s that began in Peru and spread to more than twenty-one countries in the Americas in just two years.  With support from the international community, investments in water and sanitation infrastructure contributed to the virtual elimination of cholera from Central and South America within a decade.

the UN to fund the Plan, representing one percent of the total amount needed to eliminate the cholera introduced to Haiti by Defendants UN and MINUSTAH. Defendant Ban also announced the repurposing of $215 million in previous pledges for earthquake recovery to support the cholera elimination efforts. That amount represents nine percent of the total needed for the Plan.

190.   In or around May 2013, Defendant Ban announced that the total amount of funds committed to support the Plan was $209.4 million, representing a *decrease* in available funds from the $238.5 million announced in December.[2]

191.   Since May 2013, Defendants have committed no additional funding.

192.   Over 100 members of the U.S. Congress have, in the form of numerous letters, called on the UN to respond justly to the epidemic and provide funding for water and sanitation initiatives. On July 5, 2013, Defendant Ban responded to a letter from Congresswoman Maxine Waters and others. Ban's letter misrepresented the actions taken by Defendant UN to control the epidemic, including, for example, claiming that the UN established two water treatment plants in Haiti. Those plants have not been operational due to lack of funding.

193.   Because neither Defendants nor any other entity took adequate immediate action to control and contain the cholera epidemic in Haiti, the disease will, in all likelihood, be extremely difficult to eradicate. The cholera epidemic in Haiti is currently expected to persist for at least a decade. The UN Deputy Special Envoy to Haiti, Dr. Paul Farmer, has expressed concern that, given the persistently high rates of infection and lack of progress, cholera is likely to become endemic to Haiti.

---

[2] http://www.un.org/apps/news/story.asp?NewsID=43743&Cr=cholera#.Ud7LwWQ_9J_

## ALLEGED INJURIES

194.   Defendants' acts, omissions and practices have caused injury to the Named Plaintiffs and other members of the proposed Class.

The Death of Fritznel Paul

195.   The Paul family at all times relevant herein was composed of Haitian citizens residing in Mirebalais, Haiti, located approximately one mile from the Meille Base.

196.   Decedent Fritznel Paul died as a direct result of exposure to cholera caused by Defendants.   He was married to Idovia J. Baptiste and had two minor daughters.   Fritznel Paul and Idovia Baptiste lived together with their children in Mirebalais.   Plaintiff Lisette Paul is decedent Fritznel Paul's sister, and also lived in Mirebalais, close to Fritznel and his family.   All members of the Paul family relied on river water for drinking, bathing, cooking, washing and other services.

197.   On or about October 1, 2012, Fritznel Paul was working in the fields when he experienced a sudden onset of rapid and continuous vomiting and diarrhea.

198.   He became so dehydrated that he lost the ability to stand or walk.   Within a few hours of the onset of symptoms, he lost consciousness.

199.   The same day, Fritznel Paul was transported to City-Med Hospital in Mirebalais.   He was admitted to the hospital and administered oral rehydration solutions. The medical personnel informed his family that he was suffering from cholera.   Fritznel vomited and excreted diarrhea continuously for seven days.

200.   On or about October 7, 2012, Fritznel Paul, then age 34, died.

201.    Fritznel Paul is survived by his spouse; their two minor children; his mother, Henrietta Paul; and five siblings, including Plaintiff Lisette.

202.    Plaintiff Paul was present at the hospital when Fritznel died.

203.    Plaintiff Paul constantly relives her brother's death in her nightmares. She suffers from depression and regularly questions why she is still alive.

204.    Plaintiff Paul has incurred debt to pay for Fritznel's funeral and medical expenses. The family has been forced to sell Fritznel's car to repay some of the debt, and has had to pull Fritznel's eleven-year-old daughter out of school because they can no longer pay her tuition expenses.

205.    Plaintiff Paul and her family continue to fear contracting cholera. They continue to be exposed to cholera as they do not have the means to obtain clean, treated water and continue to rely on the Artibonite River.

The Death of Marie-Claude Lefeuve

206.    Marie-Claude Lefeuve, the deceased wife of Plaintiff Joseph, died as a direct result of exposure to cholera caused by the Defendants. Lefeuve was a survivor of the 2010 earthquake and, at the time she contracted cholera, was residing in a displacement camp in the Tabarre neighborhood in Port-au-Prince with Plaintiff Joseph and their children.

207.    Lefeuve consumed contaminated water or otherwise ingested cholera bacteria. On or about October 8, 2011, Lefeuve began to sweat and tremble and experience a sudden onset of diarrhea and vomiting so severe and frequent that she lost the ability to stand.

208.    Lefeuve was admitted to Hospital Saint Luc in Tabarre, Port-au-Prince, where she received intravenous hydration. She was treated for cholera at the hospital for five days, during which time she continued to experience violent diarrhea and vomiting.

209.    On or about October 13, 2011, while at the hospital, Lefeuve lost consciousness in her husband Plaintiff Joseph's arms. Plaintiff Joseph immediately summoned a doctor, who upon examination pronounced Lefeuve dead.

210.    Plaintiff Joseph was present at the hospital during Marie-Claude's hospitalization and at the time of her death and directly witnessed her pain and suffering.

211.    Plaintiff Joseph regularly suffers from nightmares related to cholera, has difficulty sleeping, experiences loss of appetite and fluctuations in weight. He also suffers from nervousness and mood swings, including shortness of temper that he did not experience prior to Lefeuve's death.

212.    In addition to her husband, Lefeuve is survived by her mother and seven children. Prior to her death, Lefeuve supported her family by selling jewelry made from recycled materials. Plaintiff Joseph is now the primary breadwinner for the surviving members of his family, a financial burden resulting from Lefeuve's death.

213.    Lefeuve's death has had profound impact on her surviving family, including her mother, who has been unable to regain her normal productivity since her daughter's death.

The Death of Desilus Georges

214.    Decedent Desilus Georges was a permanent resident of the United States who died while visiting Haiti, as a direct result of exposure to cholera caused by Defendants.

47

215.   Desilus Georges was married to Amarante Parisse Georges and had four adult children: Plaintiff Delama Georges, Junel Georges, Marie-Claude Georges, and Yanick Georges.

216.   In November 2011, Desilus Georges and his wife were in Haiti visiting their daughter Yanick.  While there, they stayed in Bas de Sainte-Anne, a rural area on the northern coast.

217.   On or about November 8, 2011, Amarante Georges experienced a sudden onset of vomiting and had profuse, continuous diarrhea. Within a few hours, she became so weak that she could no longer stand or walk on her own.  Yanick arranged for family friends to carry her to the local treatment center, Dispensaire de Communautaire de Bas Sainte-Anne ("the Center").

218.   Amarante Georges was admitted to the Center and diagnosed with cholera. She was placed in the cholera treatment section on a cholera cot, a wooden pallet with a hole carved in the middle, through which a patient's fecal waste is channeled into a bucket or other receptacle.

219.   She was given intravenous hydration.   Nonetheless, she suffered dehydration so severe that she lost consciousness after arriving at the treatment center and remained unconscious for three days.

220.   On or about November 9, 2011, her husband, Desilus Georges, also experienced an abrupt onset of vomiting and diarrhea.  He was carried and admitted to the same treatment center where he was assigned to a cholera cot in the same hall as his wife. He was given intravenous hydration.

221.   On or about November 10, 2011, while his wife lay unconscious by his side, Desilus Georges, then age 79, died.  Prior to contracting cholera, he had been in good health.

222.   The medical personnel did not permit Yanick to touch Desilus Georges' body for fear that he was contagious.  Plaintiff Delama Georges, along with his siblings Junel and Marie-Claude, who were in the United States at the time, pulled together funds for a coffin that was delivered to the treatment center, where personnel placed his body in the casket and sealed it for burial.  They did not have the opportunity to speak with their father between the onset of the disease and his death the next day.

223.   On or about November 14, 2011, after spending six days in the treatment center, Amarante Georges' symptoms subsided, and she was discharged.  The medical personnel did not immediately inform her of her husband's death for fear that the shock would be so severe that she would suffer further injury.

224.   Desilus Georges is survived by his wife and four children, including Plaintiff Delama.  The family continues to suffer emotional distress from his death, including suffering from depression and feeling dissociated from reality.

225.   Plaintiff Georges' mother, Amarante, has not fully returned to good health since contracting cholera.  She experiences constant headaches, hot flashes, and general weakness.

226.   Plaintiff Georges fears that his sister, Yanick, and mother, Amarante, who are still living in Haiti continue to be vulnerable to contracting cholera.

Harm Suffered by Felicia Paule

227.  Plaintiff Paule suffered personal injury as a direct result of exposure to cholera caused by Defendants.

228.  Plaintiff Paule is a farmer who sells her own produce and is the family's primary bread-winner.  She lives in Bocozelle, a rural area near Saint Marc, one of the areas hardest hit by cholera in Haiti.  She is a single mother of two daughters, Viergeline Sergil Paule and Mencia Pierre Paule.  Plaintiff Paule and her daughters' primary water source for drinking, bathing and other services was a well that drew water from the Artibonite River.

229.  Late at night in or around the end of October 2010, Plaintiff Paule began to feel weak.  She suddenly began to vomit and experience diarrhea so severe that she lost track of the number of occurrences.  She also experienced severe stomach pains and cramping so severe that she lost her ability to stand.

230.  Plaintiff Paule's daughters helped her onto a local bus and transported her to RHEMA, a medical center in Bocozelle.

231.  Plaintiff Paule was admitted to the hospital, where she was diagnosed with cholera and given oral rehydration solution to treat her dehydration.  She continued to experience cholera symptoms for twelve more days.

232.  Plaintiff Paule survived cholera, but has not fully returned to being in good health.

233.  Cholera has affected every aspect of life for Plaintiff Paule and her family.  She continues to have nightmares about suffering from cholera, has difficulties sleeping, and has lost interest in the activities that she used to enjoy prior to contracting cholera.

She has also experienced unusual changes such as loss of appetite, changes in weight, nervousness and nausea. She is no longer able to work as she did prior to contracting cholera, thereby causing economic hardship including making it difficult to pay for her daughters' schooling.

234.   Plaintiff Paule lives in constant fear of contracting cholera again. She has had to divert scarce funds from other basic needs to purchase treated water in Saint Marc. Nonetheless, she feels vulnerable to the disease, especially as she witnesses others around her die from it.

Harm Suffered by Jean Rony Silfort

235.   Plaintiff Silfort suffered personal injury as a direct result of exposure to cholera caused by the Defendants.

236.   Plaintiff Silfort lives in Florida. He is the father of four, and works in construction. Along with his wife, he serves as a financial provider for his household. He was in good health prior to contracting cholera.

237.   Plaintiff Silfort periodically makes trips to Haiti to visit his family in Cap Haitien, Haiti.

238.   On or about December 15, 2011, Plaintiff Silfort traveled to Haiti to help his family construct a home in the rural area of Borgne, approximately two hours from Cap Haitien.

239.   While en route between Borgne and Cap Haitien, Plaintiff Silfort had to rely on public water sources for drinking water, including a public water pump. Upon information and belief, Plaintiff Silfort drank or otherwise ingested cholera bacteria.

240.    Shortly thereafter, Plaintiff Silfort began experiencing a sudden onset of vomiting and diarrhea. His symptoms got progressively worse, and for about six days, he excreted diarrhea as many as thirty times per day, vomited continuously, and had difficulties standing and walking. He was so dehydrated that he was unable to urinate.

241.    On or around January 2, 2011, Plaintiff Silfort's sister and nephew transported him to the hospital in a taxi. He was admitted to Hospital Justinien in Cap Haitien, where he was placed on a hard cholera cot without sheets or a mattress. The medical personnel treating Plaintiff Silfort informed him that he was severely dehydrated and administered intravenous rehydration. He was also given oral rehydration fluids.

242.    Plaintiff Silfort's symptoms were so severe that he feared that he would die from cholera. During the week he was sick, his weight dropped approximately 41 pounds, from 201 to 160 pounds. Plaintiff Silfort continues to experience recurring nightmares, finds it difficult to sleep, and is experiencing more difficulties concentrating on work.

## FIRST CLAIM FOR RELIEF

(On Behalf of the Category I Subclass Against All Defendants for Negligence)

243.    The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

244.    At all times relevant to this Complaint, Defendants owed to Plaintiffs Paule and Silfort and members of the Category I Subclass a duty to exercise reasonable care, skill, and diligence in executing their mission in Haiti. Defendants also owed a duty to those plaintiffs and the putative Subclass to exercise reasonable care in designing, building, operating and maintaining their sanitation facilities and waste disposal system to prevent the foreseeable transmission of human waste into Haiti's waterways, which

Plaintiffs and the putative Subclass relied upon as their primary water source. Moreover, Defendants owed a duty to Plaintiffs and the putative Subclass to exercise reasonable care to prevent introducing a contagious disease to the local population and its visitors.

245.    Defendants also owed a duty to Plaintiffs and the putative Subclass under the SOFA to respect all laws and regulations in Haiti, which prohibit the disposal of human waste into waterways, the negligent transmission of contagious diseases, and the commission of acts impacting the environment or ecological balance. The Defendants owed a duty to cooperate with the Haitian government regarding sanitary services and the control of communicable diseases in accordance with international conventions, which highlight the serious international public health risk posed by cholera and which require respect for the right to life, health, clean water, and sanitation.

246.    Defendants breached those duties by ignoring the foreseeable risk of introducing the cholera bacterium into Haiti by negligently deploying personnel from Nepal, a country in which cholera was known to be endemic and which had experienced a recent surge in cholera cases. Despite this risk, Defendants deployed personnel from Nepal to Haiti within the known contagious period for cholera. Furthermore, although Defendants knew or should have known that infectious carriers of the cholera bacterium are often asymptomatic, these personnel were deployed without being adequately tested or treated. Furthermore, upon the arrival of infected personnel in Haiti, Defendants stationed them in an area that Defendants knew to be vulnerable to cholera and other waterborne diseases. In doing so, Defendants ignored severe and foreseeable health risks to the population in Haiti and its visitors.

247.   Defendants also breached their duties by defectively and inadequately designing, constructing, operating, and maintaining their facilities on the Meille Base, including: establishing facilities that discharged gray and/or blackwater waste directly in Meille Tributary; allowing the piping for gray and blackwater waste to crack and fall into disrepair and leak harmful waste and contaminate the surrounding environs; exposing cracked pipes to open air and directing them over an open drainage ditch that carried water and discharged it directly into the Meille Tributary; disposing of graywater waste in soak pits known to overflow in heavy rains; placing toilets and shower facilities in a flood-prone, low-lying area in close proximity to the Meille Tributary; and storing blackwater waste in septic tanks that were prone to, and did in fact, overflow.

248.   Moreover, Defendants breached their duty of care by defectively and inadequately designing, using, maintaining, overseeing and ratifying waste disposal sites outside the Meille Base, including: designating and maintaining a waste disposal site in the Meille community located on high-laying land in close proximity to, and sloping in the direction of, the Meille Tributary; allowing that site to overflow and leak human and medical waste into the Meille Tributary and surrounding community; and disposing of harmful fecal and medical waste in unprotected, open-air pits that were readily accessible to the public and unreasonably endangered the local community and its visitors through exposure to bacteria present in the waste.

249.   Defendants also breached their duties by failing to take immediate corrective action once the epidemic began, including failing to properly address and contain the cholera outbreak they caused. Defendants acted to conceal the source of the

outbreak, thus causing further harm to Plaintiffs and the putative class by impeding a more quick and effective response to the epidemic.

250.     As a direct and proximate result of these breaches: (1) Defendants were responsible for the arrival of Nepalese troops infected with cholera in Haiti, where the troops shed the harmful cholera bacteria in their waste; (2) Defendants caused the release of this harmful waste into the environment, contaminating the Artibonite River, Haiti's longest and most critical source of water, with that bacteria; and (3) Defendants exposed Plaintiffs, members of the Category I Subclass and their communities to, and infected them with, the harmful bacteria.

251.     Defendants' breaches caused these plaintiffs to suffer personal or economic injuries as a result of cholera.

252.     Therefore, Plaintiffs Paule and Silfort and members of the Category I Subclass are entitled to recover compensatory damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

(On Behalf of the Category I Subclass Against All Defendants for Gross Negligence/Recklessnes)

253.     The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

254.     At all times relevant to this Complaint, Defendants owed certain duties to Plaintiffs Paule and Silfort and other members of the putative Category I Subclass, and breached those duties, causing harm, as described in the First Claim for Relief.

255.     Defendants actions and omissions in that regard were wanton, outrageous, reckless and intentional, and they failed to exercise even slight care or diligence.

256.    Defendants knew or should have known that cholera transmission is a longstanding matter of concern under international law, and that WHO regulations, which are binding on all WHO Member States, explicitly recognize that cholera possesses the "ability to cause serious public health impact and to spread rapidly internationally" and thus constitutes a particular risk for causing a public health emergency of international concern.

257.    Defendants knew or should have known that they were deploying troops from a region in which cholera was endemic and which was experiencing a surge in cholera cases and, thus, that there was an obvious risk that one or more of those troops was a carrier of cholera and could introduce it to Haiti.  Moreover, Defendants knew or should have known that the historic absence of cholera from Haiti meant that the population lacked resistance to the cholera bacterium and was thus particularly susceptible to harm from it.  Even so, Defendants consciously disregarded that risk and failed to adequately test or treat the Nepalese troops for cholera prior to their deployment to Haiti.

258.    Defendants further knew or should have known that the sanitation and waste disposal facilities at the Meille Base were defective, inadequate and improperly maintained and, thus, that there was an obvious and unreasonable risk that potentially cholera-infected human waste could be transmitted into the Meille Tributary that flows into the Artibonite River.  Moreover, Defendants knew or should have known that untreated human waste presents a health risk regardless of presence of the cholera bacteria.  Defendants knew or should have known that the Artibonite River is heavily

relied on as a primary water source, and that thousands of Haitians consume untreated water from the river.

259.   Defendants knew or should have known that contamination of the Artibonite River with cholera-ridden waste would cause massive, widespread injury and death.  Even so, Defendants consciously disregarded that risk and failed to correct the MINUSTAH waste disposal facilities.

260.   In addition, once the epidemic began, Defendants intentionally interfered with the investigation into the source of cholera in Haiti, including by (1) making cosmetic repairs to the waste disposal facilities on the Meille Base shortly after the epidemic began, (2) preventing independent and accurate testing of the troops for cholera, and (3) disseminating false and misleading information regarding the source of cholera in Haiti.  Such conduct in the midst of a cholera epidemic contributed to the lack of a timely and effective response to the epidemic and increased the panic in Haiti, and as such, is and outrageous and shocks the conscience.

261.   As a direct and proximate result of Defendants' reckless and grossly negligent actions, Plaintiffs Paule and Silfort and other members of the putative Category I Subclass contracted cholera and were thereby injured.

262.   Therefore, Plaintiffs Paule and Silfort and other members of the putative Category I Subclass are entitled to recover compensatory and punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

(On Behalf of the Category II Subclass Against All Defendants for Wrongful Death)

263.   The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

264. Plaintiffs Georges, Joseph, and Paul and other members of the proposed Category II Subclass are or will be duly appointed personal representatives of the estates of persons who were or will be killed by cholera contracted in Haiti ("Decedents") and are therefore entitled to bring a cause of action for wrongful death pursuant to N.Y. Code—Estate Powers and Trusts §§ 5-4.1 *et seq*.

265. Plaintiffs Georges, Joseph, and Paul are familial relatives of Decedents Desilus Georges, Marie-Claude Lefeuve, and Fritznel Paul, respectively.

266. As a direct and proximate result of the negligent and reckless acts and omissions described above, Decedents were exposed to, ingested, or otherwise came into physical contact with, contaminated water or food or other substances and thereby contracted and died of cholera.

267. Decedents' contraction of cholera and subsequent death caused Plaintiffs Georges, Joseph, and Paul and other members of the proposed Category II Subclass to suffer pecuniary losses as follows:

a. Plaintiffs Joseph and Paul sustained pecuniary losses as a result of the deaths of Decedents, who were the sole or substantial income earners in their families.

b. Plaintiffs Joseph and Paul sustained pecuniary losses as a result of the deaths of Decedents, who performed household duties for their spouses.

c. Plaintiffs Georges, Joseph and Paul sustained pecuniary losses as a result of the deaths of Decedents, who provided to their children parental love and guidance.

    d.      Plaintiffs Joseph and Paul sustained pecuniary losses, when they paid for medical treatment, including transportation, that Decedents required as a result of contracting cholera prior to their deaths.

    e.      Plaintiff Georges and Paul sustained pecuniary losses, when they paid for the funeral services of Decedents.

    f.      Other members of the Category II Subclass similarly sustained pecuniary losses as a result of Decedents' deaths in the form of payments for medical treatment and related transportation, funeral services, loss of the sole or a substantial income earner, loss of parental love and guidance, *inter alia*.

268.    Therefore, these plaintiffs are entitled to recover damages in an amount to be determined at trial as fair and just compensation for the pecuniary injuries resulting from Decedent's deaths.

### FOURTH CLAIM FOR RELIEF

(On Behalf of the Category I Subclass Against Defendants UN, Ban and Mulet for Negligent Supervision)

269.    The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

270.    Defendant UN had a duty to oversee the operations of MINUSTAH, its subsidiary in Haiti.

271.    Defendant Ban, as the head of the UN, has ultimate and final responsibility under the UN Charter to ensure that the UN and its subsidiaries' operations did not cause harm to the local population or those visiting the area. He has a duty to oversee all peacekeeping operations, including MINUSTAH, and to appoint and oversee the Special Representative, who reported directly to the Secretary-General.

272.   Defendant Mulet, as the Special Representative to the Secretary-General for MINUSTAH, had a duty under the SOFA to oversee all of MINUSTAH's operations in Haiti and to ensure that it did not cause harm to the local population or those visiting there.  Specifically, Defendant Mulet had a duty under the SOFA to respect all local laws and regulations in Haiti, which prohibit the disposal of human waste into waterways, and to ensure that all members of MINUSTAH adhered to these local laws and regulations.

273.   Defendants UN and Ban breached their duties by negligently overseeing, controlling, and maintaining a policy of deploying personnel from a cholera-endemic region to a cholera-vulnerable region without testing or treating those personnel for cholera.

274.   They, along with Defendant Mulet, further breached their duties by negligently and recklessly overseeing, controlling, and maintaining the sanitation facilities of the Meille Base.  This negligence and recklessness directly contributed to the fecal contamination of the Artibonite River with cholera, causing harm and violating Haitian law.

275.   Defendants UN, Ban, and Mulet, thereby, directly and proximately caused injuries to Plaintiffs Paule and Silfort and other members of the Category I Subclass.

276.   Therefore, these plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF

(On Behalf of the Class Against All Defendants for Negligent Infliction of Emotional Distress)

277.   The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

60

278.    Defendants negligently transmitted cholera to Haiti, as described in the First Claim for Relief.

279.    As a result, the Named Plaintiffs and other members of the Class or their immediate family members contracted cholera.

280.    Experiencing, or watching their close family members experience, acute pain and discomfort and die in their presence caused these plaintiffs to suffer psychological trauma, including fear, worry, anxiety, grief, recurring nightmares, hopelessness, despair, depression, pain and mental suffering.

281.    That trauma resulted in residual physical manifestations, including loss of appetite, weight loss and difficulty sleeping.

282.    Therefore, these plaintiffs are entitled to compensatory damages for their pain and suffering in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

(On Behalf of the Class Against All Defendants for Intentional Infliction of Emotional Distress)

283.    The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

284.    Defendants engaged in extreme and outrageous conduct by (1) failing to adequately test and treat troops whom they knew or should have known had a high likelihood of carrying cholera; (2) designing, operating and maintaining sanitation facilities that created a high, foreseeable risk of fecal contamination of the Artibonite River, which is Haiti's largest and longest river, upon which tens of thousands of Haitians rely as their principal source of water; and (3) exposing the Meille community to untreated, hazardous waste by disposing of harmful waste into unprotected open-air pits

61

that were prone to, and in fact did, overflow into the Meille Tributary and surrounding community; and (4) failing to take proper immediate corrective action to address the outbreak of disease and, moreover, willfully delaying investigation into the outbreak and obscuring discovery of the outbreak's source.

285.   Defendants knew or should have known, and disregarded the substantial probability, that their acts would cause the transmission of cholera to Haiti, thereby causing severe emotional distress to those who died or suffered, or who witnessed others die or suffer, from cholera.

286.   As a result of Defendants' extreme and outrageous conduct, the Named Plaintiffs and other members of the Class suffered severe emotional distress, including fear, worry, anxiety, grief, recurring nightmares, hopelessness, despair, depression, pain and mental suffering.

287.   Therefore, these plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

(On Behalf of the Category I Subclass Against All Defendants for Private Nuisance)

288.   The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

289.   Defendants, with recklessness and deliberate disregard for the interests of others, have substantially and unreasonably interfered with the use and enjoyment by Plaintiffs Paule and Silfort and other members of the Category I Subclass of their land, resulting in damage to their property, including but not limited to contamination of waters running within or adjacent to their property, and contamination of their property when

these waters flood. Moreover, noxious odors have caused these plaintiffs to lose sleep and interfere with their comfort and safety.

290. Defendants knew or should have known, and consciously disregarded the unreasonable risk that contamination of the Artibonite River with cholera was substantially certain to result from their actions and omissions.

291. Plaintiffs Paule and Silfort and other members of the Category I Subclass relied on the Artibonite River, which is a public resource that all Haitians have a right to use and enjoy, as their primary source of water for drinking, bathing, clothes washing, and irrigation.

292. Defendants' actions and omissions substantially and unreasonably interfered with these plaintiffs' use and enjoyment of the Artibonite River.

293. Therefore, these plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

(On Behalf of the Category I Subclass Against All Defendants for Public Nuisance)

294. The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

295. The Artibonite River is a public resource that all Haitians have a right to use and enjoy. Plaintiffs Paule and other members of the Category I Subclass, like many people in Haiti, relied on that river as their primary source of water for drinking, bathing, clothes washing, and irrigation.

296. Defendants, with negligence, recklessness, and deliberate disregard of the interests of others, contaminated, and thereby damaged, the Artibonite River with the cholera bacteria through their acts and omissions.

63

297.    By contaminating the Artibonite River with the cholera bacteria, Defendants interfered with the public and plaintiffs' right to use and enjoy that river. People, including Plaintiffs Paule and members of the Category I Subclass, can no longer use the river without fear or risk of contracting or spreading cholera. Defendants' conduct and the resulting contamination of the Artibonite River has created a public nuisance that endangers, and will continue for many years in the future to endanger, their safety, health, livelihoods and comfort.

298.    As a result of Defendants' interference, Plaintiffs Paule and other members of the Category I Subclass have suffered injuries through having contracted cholera.

299.    Therefore, these plaintiffs are entitled to recover compensatory and punitive damages in an amount to be determined by at trial.

## NINTH CLAIM FOR RELIEF

(On Behalf of the Class Against Defendants UN and Ban for Breach of Contract)

1.    The Named Plaintiffs and other members of the putative Class repeat and re-allege paragraphs 1 through 242 above as if fully set forth herein.

2.    The SOFA between the Government of Haiti and Defendant UN expressly provides that Defendant UN must establish a standing claims commission to receive and settle "[t]hird party claims for … personal injury, illness or death arising from or directly attributable to MINUSTAH," which cannot be settled through the internal procedures of the UN.

3.    The Named Plaintiffs and other members of the Class, as such third party claimants, are intended third-party beneficiaries of the SOFA's requirement for the establishment of a standing claims commission.

4.      Defendants UN and Ban breached the SOFA by refusing to establish a standing claims commission to receive and settle claims.    Members of the Class submitted claims to the UN by personally delivering over 5,000 claims to Defendant Ban. However, Defendants UN and Ban refused to receive those or any other similar claims, and they have failed to establish a claims commission for that purpose.

5.      As a result of the breaches of Defendants UN and Ban, the Named Plaintiffs and other members of the putative Class have been harmed through the denial of their right under the SOFA to have their claims heard and settled.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, demand judgment as follows:

1.      Determining that this action may be maintained as a class action and appointing Plaintiffs as Lead Plaintiffs and their counsel as Lead Counsel for the Class and certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure;

2.      Entering judgment against Defendants and in favor of Plaintiffs and the Class on the Claims for Relief in this Complaint, for declaratory relief, and for actual, injunctive, compensatory and punitive damages to remedy the injuries sustained by the Plaintiffs and the Class, including remediation of Haiti's waterways and provision of adequate sanitation to Plaintiffs and Class members in amounts to be determined at trial, including $2.2 billion that the Haitian government requires to eradicate cholera;

3.      Awarding Plaintiffs' attorneys' fees, litigation costs, and other expenses incurred in this action;

4.    Awarding pre-judgment and post-judgment interest, to the extent allowable by law; and

5.    Granting all other and further relief as this Court may deem necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs and members of the Class demand a trial by jury on all issues so triable.


Dated: October 9, 2013
       New York, New York

*Beatrice Lindstrom*

Beatrice Lindstrom (S.D.N.Y. Bar No. BL8321)
Institute for Justice & Democracy in Haiti
666 Dorchester Avenue
Boston, Massachusetts 02127
Tel.: (617) 652-0876

Brian Concannon (*pro hac vice* to be filed)
Institute for Justice & Democracy in Haiti
666 Dorchester Avenue
Boston, Massachusetts 02127
Tel.: (617) 652-0876

Ira Kurzban (*pro hac vice* to be filed)
Kurzban Kurzban Weinger Tetzeli & Pratt P.A.
2650 S.W. 27th Avenue
Second Floor
Miami, Florida 33133
Tel: (305) 444-0060
Fax: (305) 444-3503

Mario Joseph (*pro hac vice* to be filed)
Bureau des Avocats Internationaux
2:ieme Impasse Lavaud, No. 3
Port-au-Prince, Haiti
Tel: +509-3701-9879

Jeffrey Brand (*pro hac vice* to be filed)
Center for Law and Global Justice

University of San Francisco School of Law
2130 Fulton Street
San Francisco, CA 94117
Tel: (415) 422-6360
Fax: (415) 422-6433

*Counsel for Plaintiffs Delama Georges, Alius Joseph, Lisette Paul, Felicia Paule, and Jean Rony Silfort*