**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Delama GEORGES, *et al.* | Civil Action No.   1:13-cv-07146-JPO |
| Plaintiffs, | **MEMORANDUM OF LAW** |
| v. | Oral Argument Requested |
| United Nations, *et al.* | |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S
STATEMENT OF INTEREST**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................**Error! Bookmark not defined.**

FACTS .......................................................................................**Error! Bookmark not defined.**

STANDARD OF REVIEW ..........................................................**Error! Bookmark not defined.**

ARGUMENT..............................................................................**Error! Bookmark not defined.**

   I.     THIS CASE PRESENTS AN ISSUE OF FIRST IMPRESSION**Error! Bookmark not defined.**

   II.    THIS COURT SHOULD NOT DEFER TO THE GOVERNMENT'S
          UNREASONABLE INTERPRETATION OF IMMUNITY**Error! Bookmark not defined.**

        A.    Whether Defendants Are Entitled to Immunity Is Within the
             Province of This Court..............................**Error! Bookmark not defined.**

        B.    To Interpret the Relevant Immunity Provisions, the Court Should
             Rely on General Rules of Construction and the Context in Which
             the Provisions Arise ..................................**Error! Bookmark not defined.**

        C.    Government's Position Is Not Entitled to Deference When It Is
             Unreasonable.............................................**Error! Bookmark not defined.**

   III.   THE UN AND MINUSTAH'S ENJOYMENT OF IMMUNITY IS
          CONDITIONAL ON ADHERENCE TO THE OBLIGATIONS
          IMPOSED UPON THEM UNDER THE CPIUN .**Error! Bookmark not defined.**

        A.    The UN's Immunity Regime Incorporates Reciprocal Obligations
             to Provide Tort Victims Access to Remedies**Error! Bookmark not defined.**

            1.    The UN's Founders Established a Limited and Balanced
                  Immunity Regime Consistent with the Organization's
                  Purposes .......................................**Error! Bookmark not defined.**

            2.    The CPIUN Imposes a Legal Obligation on the UN and
                  MINUSTAH to Settle Private Law Claims Such As
                  Plaintiffs' Claims ...........................**Error! Bookmark not defined.**

            3.    The UN and MINUSTAH Have Further Obligations to
                  Establish a Standing Claims Commission for Harms
                  Arising Out of Their Operations in Haiti**Error! Bookmark not defined.**

        B.    The UN and MINUSTAH's Enjoyment of Immunity Under
             Section 2 is Conditional on Their Adherence to Section 29**Error! Bookmark not defined**

i

C.      The Government Presents an Unreasonable Interpretation of the
        CPIUN That Is Not Entitled to Deference .**Error! Bookmark not defined.**

IV.     IN THIS CASE, DEFENDANTS UN AND MINUSTAH ARE NOT
        ENTITLED TO IMMUNITY BECAUSE THEY HAVE BREACHED
        THEIR OBLIGATIONS TO HEAR PLAINTIFFS' CLAIMS**Error! Bookmark not defined.**

        A.      The UN and MINUSTAH Have Breached Their Legal Obligations
                to Hear Plaintiffs' Claims .........................**Error! Bookmark not defined.**

                1.      The UN and MINUSTAH Have Violated Section 29 of the
                        CPIUN by Refusing to Hear Plaintiffs' Claims**Error! Bookmark not defined.**

                2.      The UN and MINUSTAH Have Also Breached Their
                        Obligations Under the SOFA by Refusing to Refer
                        Plaintiffs' Claims to a Standing Claims Commission**Error! Bookmark not defined.**

                3.      The UN and MINUSTAH's Refusal to Provide Access to
                        Alternative Modes of Settlement Violates the UN Charter**Error! Bookmark not d**

        B.      The UN and MINUSTAH's Breach Renders Their Immunity Void
                and Unenforceable .....................................**Error! Bookmark not defined.**

                1.      Defendants UN and MINUSTAH Are Not Entitled to
                        Immunity Because They Have Failed to Fulfill Their
                        Conditional Obligations.................**Error! Bookmark not defined.**

                2.      Defendants UN and MINUSTAH Are Not Entitled to
                        Immunity Because They Have Materially Breached the
                        CPIUN...........................................**Error! Bookmark not defined.**

                3.      The UN and MINUSTAH's Bad Faith Deprives Them of
                        Standing to Assert the Defense of Immunity.**Error! Bookmark not defined.**

V.      DEFENDANTS BAN AND MULET ARE NOT ENTITLED TO
        IMMUNITY IN LIGHT OF THE BREACH OF THE CPIUN**Error! Bookmark not defined.**

VI.     THE COURT SHOULD NOT DISMISS THE CLAIMS OF PLAINTIFFS
        WHO ARE U.S. CITIZENS BECAUSE DOING SO WOULD VIOLATE
        THEIR RIGHT OF COURT ACCESS................................................................38

        A.      The U.S. Plaintiffs Have a Right of Court Access That Is Protected
                Under the Constitution.............................................................................39

        B.      Infringement of the Right of Court Access Is Subject to Strict
                Scrutiny....................................................**Error! Bookmark not defined.**

          1.      Granting Immunity to Defendants in This Case Would Not
                 Satisfy Strict Scrutiny ................... **Error! Bookmark not defined.**

    C.      This Court Should Follow Past Precedent Refusing to Enforce or
          Uphold Immunity Provisions Where the Application of Such
          Immunity Would Violate Constitutional Rights**Error! Bookmark not defined.**

CONCLUSION ........................................................................ **Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abbott v. Abbott,*
    560 U.S. 1 (2010)..................................................................................................23

*Adarand Constructors, Inc. v. Peña,*
    515 U.S. 200 (1995)..............................................................................................41

*Air France v. Saks,*
    470 U.S. 392 (1985)..............................................................................................11

*Am. Civil Liberties Union v. Dep't of Defense,*
    543 F.3d 59 (2d Cir. 2008), *vacated on other grounds,* 558 U.S. 1042 (2009)......................12

*Asakura v. City of Seattle,*
    265 U.S. 332 (1924)..............................................................................................24

*Ashley v. Boyle's Famous Corned Beef Co.,*
    66 F.3d 164 (8th Cir. 1995)..................................................................................33

*Askir v. Boutros-Ghali,*
    933 F. Supp. 368 (S.D.N.Y. 1996) ......................................................................10

*Bank of New York v. Yugoimport SDPR J.P.,*
    780 F. Supp. 2d 344 (S.D.N.Y. 2011)..................................................................31

*BG Group PLC v. Republic of Arg.,*
    134 S. Ct. 1198 (2014)..........................................................................................11

*Bill Johnson's Restaurants, Inc. v. NLRB,*
    461 U.S. 731 (1983)..............................................................................................39

*Bisson v. United Nations,*
    No. 06 Civ. 6352(PAC)(AJP), 2007 WL 2154181 (S.D.N.Y. 2007) ...................6, 9

*Boddie v. Connecticut,*
    401 U.S. 371 (1971)..............................................................................................43

*Boimah v. United Nations General Assembly,*
    664 F. Supp. 69 (E.D.N.Y. 1987).......................................................................8, 43

*Brzak v. United Nations,*
    No. 06-CV-3432 (RWS), (S.D.N.Y. Oct. 2, 2007)..........................................20, 21

*Brzak v. United Nations,*
    597 F.3d 107 (2d Cir. 2010).............................................................................8, 9, 43, 44

*Buckley v. Fitzsimmons,*
   509 U.S. 259 (1993)..................................................................................45

*Butz v. Economou,*
   438 U.S. 478 (1978)..................................................................................46

*Cablevision Sys. Corp. v. FCC,*
   570 F.3d 83 (2d Cir. 2009).........................................................................11

*Chambers v. B.&O. R.R.,*
   207 U.S. 142 (1907)..................................................................................39

*Choctaw Nation of Indians v. United States,*
   318 U.S. 423 (1943)..................................................................................11

*Christopher v. Harbury,*
   536 U.S. 403 (2002)..................................................................................40

*Chubb & Son, Inc. v. Asiana Airlines,*
   214 F.3d 301 (2d Cir. 2000).......................................................................12

*Chuidian v. Philippine Nat'l Bank,*
   912 F.2d 1095 (9th Cir. 1990), *abrogated on other grounds by Samantar v. Yousuf,*
   560 U.S. 305 (2010)..................................................................................12

*City of New York v. Beretta U.S.A. Corp.,*
   524 F.3d 384 (2d Cir. 2008).......................................................................45

*Clinton v. Jones,*
   520 U.S. 681 (1997)..................................................................................46

*Craig v. Bank of N.Y.,*
   169 F. Supp. 2d  202 (S.D.N.Y. 2001) .......................................................33

*Dennis v. Sparks,*
   449 U.S. 24 (1980)....................................................................................46

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,*
   525 U.S. 155 (1999)..................................................................................12

*Factor v. Laubenheimer,*
   290 U.S. 276 (1933)..................................................................................24

*Galli v. Metz,*
   973 F.2d 145 (2d Cir. 1992).......................................................................24

*Garcia v. Wyeth-Ayerst Labs.,*
   385 F.3d 961 (6th Cir. 2004) .....................................................................43

*Glick v. Gutbrod*,
    782 F.2d 754 (7th Cir. 1986) ...................................................................45

*Goldstein v. Delgratia Mining Corp.*,
    176 F.R.D. 454 (S.D.N.Y. 1997) .............................................................33

*Guttman v. Khalsa*,
    669 F.3d 1101 (10th Cir. 2012) ...............................................................40

*Hikel v. King*,
    659 F. Supp. 337 (E.D.N.Y. 1987) ..........................................................39

*Imbler v. Pachtman*,
    424 U.S. 409 (1976).................................................................................45

*In re Lazarus*,
    478 F.3d 12 (1st Cir. 2007).......................................................................36

*Int'l Fid. Ins. Co. v. Ctny. of Rockland*,
    98 F. Supp. 2d 400 (S.D.N.Y. 2000)........................................................30

*Johnson v. California*,
    543 U.S. 499 (2005).................................................................................41

*Kelly v. Chambers*,
    No. 07 CV 1005, 2008 WL 4279976 (N.D. Ill. Sept. 17, 2008)................46

*Keystone Driller Co. v. General Excavator Co.*,
    290 U.S. 240 (1933).................................................................................33

*Kwiatkowski v. Polish & Slavic Fed. Credit Union*,
    511 F. App'x 117 (2d Cir. 2013) .................................................................7

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)........................................................................7

*Lia v. Saporito*,
    909 F. Supp. 2d 149 (E.D.N.Y. 2012) ......................................................34

*Lilly v. Lewiston-Porter Cent. Sch. Dist.*,
    853 F. Supp. 2d 346 (W.D.N.Y. 2011)......................................................46

*Luckett v. Bure*,
    290 F.3d 493 (2d Cir. 2002)........................................................................7

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803)..............................................................39, 40

*Medellin v. Texas*,
    552 U.S. 491 (2008).................................................................................12

*Mendaro v. World Bank*,
    717 F.2d 610 (D.C. Cir. 1983)..........................................................8, 42

*Merrill Lynch & Co. v. Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007)...................................................................31

*Milstein v. Cooley*,
    257 F.3d 1004 (9th Cir. 2001) ...............................................................45

*Monsky v. Moraghan*,
    127 F.3d 243 (2d Cir. 1997)...................................................................40

*Morrison v. Nat'l Australia Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008).....................................................................7

*N.Y. Central R.R. Co. v. White*,
    243 U.S. 188 (1917)...............................................................................43

*NAACP v. Button*,
    371 U.S. 415 (1963)...............................................................................41

*Nicol v. United Nations Missions in Liberia*,
    No. 09-1800, Civ. A. No. 09-1800, 2009 WL 2370179 (E.D. Pa. July 30, 2009)...................9

*Nielsen v. Johnson*,
    279 U.S. 47 (1929)................................................................................24

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945)...............................................................................34

*Reid v. Covert*,
    354 U.S. 1 (1957)..................................................................................38

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002)...............................................................................41

*Rodgers v. United States*,
    185 U.S. 83 (1902).................................................................................36

*Ryland v. Shapiro*,
    708 F.2d 967 (5th Cir. 1983) .................................................................40

*Sadikoglu v. United Nations Dev. Programme*,
    No. 11 Civ. 0294(PKC), 2011 WL 4953994 (S.D.N.Y. Oct. 14, 2011).............................6, 9

*Sanders v. Szubin,*
    828 F. Supp. 2d 542 (E.D.N.Y. 2011) ................................................................11

*Sarei v. Rio Tinto, Plc,*
    487 F.3d 1193 (9th Cir. 2007), *on reh'g en banc* 550 F.3d 882 (9th Cir. 2008) ...................13

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist.,*
    482 U.S. 522 (1987)...........................................................................11, 12, 19

*Sullivan v. Kidd,*
    254 U.S. 433 (1921)...............................................................................31

*Sumitomo Shoji Am., Inc. v. Avagliano,*
    457 U.S. 176 (1982)...............................................................................12

*Sure-Tan Inc. v. NLRB,*
    467 U.S. 883 (1984)...............................................................................41

*Tarros S.p.A. v. United States,*
    No. 13 CIV. 1932 (JPO), 2013 WL 6084243 (S.D.N.Y. Nov. 19, 2013).................................7

*Tennessee v. Lane,*
    541 U.S. 509 (2004)............................................................................39, 40

*The Katingo Hadjipatera,*
    40 F. Supp. 546 (S.D.N.Y. 1941)..................................................................13

*The Paquette Habana,*
    175 U.S. 677 (1900)...............................................................................22

*United Mine Workers, Dist. 12 v. Ill. State Bar Ass'n,*
    389 U.S. 217 (1967)...............................................................................39

*United States v. Kras,*
    409 U.S. 434 (1973)...............................................................................43

*United States v. Lee,*
    106 U.S. 196 (1882)...............................................................................45

*United States v. Smith,*
    18 U.S. (5 Wheat) 153 (1820)......................................................................22

*United States v. Stuart,*
    489 U.S. 353 (1989)...............................................................................24

*Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes,*
    336 F.2d 354 (2d Cir. 1964).......................................................................44

*Wallace v. Powell*,
No. CIV.A 09-CV-286, 2009 WL 4051974 (M.D. Pa. Nov. 20, 2009) .................................46

*Wells Fargo Bank, N.A. v. Ullah*,
No. 13 CIV. 0485 (JPO), 2014 WL 470883 (S.D.N.Y. Feb. 6, 2014).....................................7

*Whitney v. Robertson*,
124 U.S. 190 (1888)....................................................................................................................36

**INTERNATIONAL CASES**

*Ashby v. White* (King's Bench 1703) ...........................................................................................39

*Competence of the ILO in regard to International Regulation of the Conditions of the
Labour of Persons Employed in Agriculture*, Advisory Opinion, 1922 P.C.I.J. (ser. B)
No. 2 (Aug. 12) ..........................................................................................................................19

*Diversion of Water from the Meuse* (Neth. v. Belg.), 1937 P.C.I.J. (ser. A/B) No 70 (June
28) ........................................................................................................................................31, 33

*Drago v. Int'l Plant Genetic Resource Inst.*, No. 3718/07, ILDC 827 (It.) (Feb. 19, 2007) .........23

*Effects of Awards of Compensation Made by the United Nations Administrative Tribunal*,
Advisory Opinion, 1954 I.C.J. Reports 47 (Jul. 13) ........................................................15, 29

*Gabcikovo-Nagymaros Project* (Hung. v. Slovk.), 1997 I.C.J. (Sept. 25) ...................................31

*Maida v. Administration for International Assistance,* (1956) RDI 575, 23 ILR 510
(Court de Cassazone) [Supreme Court] (It.) (May 27, 1955)...................................................23

*Reparations for Injuries Suffered in the Service of the United Nations*, Advisory Opinion,
1949 ICJ 179 (Apr. 11) ........................................................................................................16, 17

*Stichting Mothers of Srebrenica and Others v. Netherlands*, App. No. 65542/12, ECtHR
(2013) .........................................................................................................................................42

*Stravrinou v. United Nations* (1992) CLR 992, ILDC 929 (CY 1992) (Sup. Ct. Cyprus 17
July 1992) ...................................................................................................................................23

*Tacna-Arica Question* (Chile v. Peru), 2 R.I.A.A. 921 (1922)......................................................31

*UNESCO v. Boulois*, Cour d'Appel, Paris (Fr.) (Jun. 19, 1998) ...................................................22

**STATE CASES**

*Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.*,
25 Misc.2d 299 (N.Y. App. Div. 1960) ....................................................................................44

*People v. Weiner*,
    378 N.Y.S.2d 966 (N.Y. Crim. Ct. 1976) ............................................................47

*Smith v. Long*,
    723 N.Y.S.2d 584 (N.Y. Sup. Ct. 2001) ............................................................33

*Shamsee v. Shamsee*,
    74 A.D.2d 357 (N.Y. App. Div. 1980) ............................................................10

*Westchester County v. Ranollo*,
    67 N.Y.S.2d 31 (N.Y. Crim. Ct. 1946) ........................................................29, 47

**FEDERAL STATUTES**

22 U.S.C. § 288 *et seq*. ..................................................................................36

28 U.S.C. § 517 ..............................................................................................6

28 U.S.C. § 1346(b)(1) ..................................................................................45

28 U.S.C. § 1605(a) ......................................................................................44

**TREATIES**

Agreement Between the United Nations and the Government of Haiti Concerning the
    Status of the United Nations Operations I Haiti, U.N.-Haiti, July 9, 2004 ..................... *passim*

Charter of the United Nations ........................................................................ *passim*

Convention on the Privileges and Immunities of the United Nations, adopted Feb. 13,
    1946, 21 U.S.T. 1418, 1 U.N.T.S. 16 ............................................................ *passim*

Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, 500 U.N.T.S. 95 .......................36

Vienna Convention on the Law of Treaties, *opened for signature* May 23, 1969, 1155
    U.N.T.S. 331 ....................................................................................... *passim*

**RULES**

Fed. R. Civ. P. 16 ..........................................................................................49

Fed. R  Civ. P. 12(b) ....................................................................................6, 7

**UNITED NATIONS**

Committee 5, Sub-Committee on Privileges & Immunities Draft, U.N. Doc. PC/LEG/34,
    art. VIII(3), Dec. 8, 1945 ..............................................................................20

Committee 5: Legal Questions, Summary Record of Meetings, U.N. Doc. PC/LEG/41 .............20

Draft Resolution Concerning the Question of Immunities, Facilities and Privileges of the United Nations, Prep. Comm. Doc. PC/LEG/17, art. 9, Nov. 30, 1945 ...............................20

G.G. Fitzmaurice, Special Rapporteur on Treaties, Report on the Law of Treaties, U.N. Doc. A/CN.4/120, Art. 20 (1-2)....................................................................................31

*Report of the International Law Commission*, 57th Sess., UN Doc. A/60/10 (2005) ..................33

*Report of the Secretary General, Administrative and Budgetary Aspects of the Financing of United Nations Peace-Keeping Operations*,  U.N. Doc. A/51/389 (Sept. 20, 1996)...........18

*Report of the Secretary General: Administrative and Budgetary Aspects of Peacekeeping*, U.N. Doc. A/51/903 (May 21, 1997) ....................................................................................18

Study on Privileges & Immunities in Prep. Comm. Doc. PC/EX/113/Rev.1 (Nov. 12, 1945.............................................................................................................................14

U.N. Secretariat, *Study Prepared by the Secretariat on the Practice of the United Nations, the Specialized Agencies and the International Atomic Energy Agency Concerning their Status, Privileges and Immunities*, U.N. Doc. A/CN.4/L.118 and Add.1 and 2 (Mar. 8, May 5 & 23, 1967) ..............................................................16

U.N. Secretary-General, *Report of the Secretary General on the Procedures in Place for Implementation of Article VIII, Section 29, of the Convention on the Privileges and Immunities of the United Nations*, U.N. Doc. A/C.5/49/65 (Apr. 24, 1995) ..........................26

## OTHER AUTHORITIES

A. S. Muller, International Organizations and Their Host States (1995) ......................................22

August Reinisch, International Organizations Before National Courts (2000) ............................15

August Reinisch & Ulf Andreas Weber, *In the Shadow of Waite and Kennedy,*1 Int'l Org. L. Rev. 59 (2004) ...........................................................................................................23, 44

Bruce Rashkow, *Immunity of the United Nations, Practice and Challenges,* 10 Int'l Org. L. Rev. 332 (2014).................................................................................................................27

Bruno Simma & Christian J. Tams, The Vienna Conventions on the Law of Treaties: A Commentary (Olivier Corten & Pierre Klein eds. 2011).........................................................32

Cedric Ryngaert, *The Immunity of International Organizations Before Domestic Courts: Recent Trends*, 7 Int'l Org. L. Rev. 121 (2010)...................................................................23

Editorial Board, *United Nations Must Admit Its Role In Haiti's Cholera Outbreak,* Wash. Post, Aug. 13, 2013....................................................................................................................35

Emmanuel Gaillard & Isabelle Pingel-Lenuzza, *International Organizations and Immunity from Jurisdiction, To Restrict Or To Bypass*, 51 Int'l & Comp. L. Q. 1 (2002)...........................................................................................................21

Frédéric Mégret, La résponsabilité des nations unies aux temps du choléra, Belg. R. Int'l L. (forthcoming 2014).........................................................................................26

Guglielmo Verdirame, *The UN and Human Rights: Who Guards the Guardians*? (2011)..........21

International Court of Justice, *Difference Relating to Immunity from Legal Process*, Verbatim Record (Dec. 10, 1995)..............................................................................21

Introductory Note to the Convention on Privileges and Immunities of the United Nations, *available at* http://legal.un.org/avl/ha/cpiun-cpisa/cpiun-cpisa.html......................................15

Jonathan Katz, *UN Cholera Envoy: 'It was Never the Intention ... to Bring Cholera in Haiti'*, Interview with UN Senior Coordinator for Cholera Response in Haiti, Feb. 24, 2014.........................................................................................................35

Linda S. Frey & Marsha L. Frey, The History Of Diplomatic Immunity  (1999).........................36

Restatement (Third) of the Foreign Relations Law of the United States (1987)................... *passim*

Restatement (Second) on Contract  Law (1987)........................................................31

Riccardo Pavoni, *Italy*, *in* August Reinisch, Privileges and Immunities of International Organizations in Domestic Courts 160 (2013) ........................................................23

Riccardo Pavoni, *Human Rights and the Immunities of Foreign States and International Organizations*, *in* Hierarchy in International Law: The Place of Human Rights .................23

Sir Humphrey Waldock, Second Report on the Law of Treaties, *in* [1963] 2 Y.B. Int'l L. Comm'n 36 .................................................................................................32

Tim Witcher, Mariano Andrade, UN Warns of Surge in Haiti Cholera Deaths, ReliefWeb, Jan. 22, 2014 ..............................................................................................35

Transnational Development Clinic, Yale Law School *et al.*, *Peacekeeping Without Accountability: The United Nations' Responsibility For The Haitian Cholera Epidemic* (2013).........................................................................................26

## PRELIMINARY STATEMENT

Plaintiffs seek to represent a class of several thousand people killed, and hundreds of thousands injured, by a virulent cholera epidemic that has spread throughout Haiti and beyond its borders. Defendants, through a Statement of Interest filed by the U.S. Government ("Government"), now attempt to avoid their direct responsibility for this tragedy by stretching the bounds of their immunity beyond any reasonable formulation. In so doing, they assert a novel proposition of law that this Court should reject: that the United Nations ("UN") and its affiliates possess immunity even when they have violated treaty obligations to provide those same victims with some remedy and mechanism for redress.

Defendants enjoy broad immunity under the UN Charter and the Convention on the Privileges and Immunities of the United Nations ("CPIUN"). But as the UN itself has recognized and represented to this very Court,[1] immunity under these treaties does not, and cannot, equate to impunity. The immunity protection is conditioned on the UN's adherence to its corresponding duties, namely, that it establish a mode of settlement when it commits private law torts, such as those endured by Plaintiffs.

The Government relies on an interpretation of immunity under Section 2 of the CPIUN that carves the provision out of its necessary context. The grant of immunity must be read in the context of the treaty's corresponding obligations. Defendants' duties are stated plainly in Section 29 of the CPIUN—"[t]he United Nations shall make provisions for appropriate modes of settlement of contracts or other disputes of a private law character"—and underscored by the treaty's drafting history, which carefully preserved the rights of tort victims to seek remedies. These obligations are restated and reinforced by the Status of Forces Agreement ("SOFA")

---

[1] *Brzak v. United Nations*, 06-CV-3432 (RWS), Memorandum of Law In Support of the Motion of the United Nations to Dismiss and to Intervene, at 4-5 (S.D.N.Y. Oct. 2, 2007) ("In civil cases, the uniform practice is to maintain immunity, while offering, in accord with section 29 of the General Convention, alternative means of dispute settlement … This practice … eliminates the prospect of impunity.").

between Defendant UN and the Government of Haiti, which applies the CPIUN regime to the operations of the UN Stabilization Mission in Haiti ("MINUSTAH"). The SOFA explicitly requires the UN and MINUSTAH to establish a "standing claims commission" to settle "claims for personal injury, illness, and death arising from or directly attributed to MINUSTAH."

In November 2011, Plaintiffs, in reliance on Defendants' obligations under the CPIUN and the SOFA, formally requested that Defendants establish a standing claims commission, to avoid proceedings in this Court.  In February 2013, after almost fifteen months, Defendants refused to receive those claims, responding with a dismissive and legally unsupported statement that "consideration of the[] claims would necessarily include a review of political and policy matters."

 Defendants' position was as untenable then as it is today.  Plaintiffs' claims are quintessential private law tort claims for which no "political and policy matters" exception to liability exists.  Defendants cannot reasonably say that the claims involve a review of political or policy matters that would exempt them from Section 29's promise of a forum for resolution of their claims.  The UN has long accepted its duty to compensate victims of torts, as well as its duty to remedy contracts violations.  Yet in this case, Defendants refuse to recognize Plaintiffs' claims for wrongful death and personal injury as the classic torts that they are, but rather allege them to be some ostensibly non-receivable issue of politics and policy.

Defendants seek the protections of the CPIUN on the one hand, while attempting to avoid their corresponding duties under the same treaty on the other.  They demand absolute immunity, while seeking that this Court render Section 29 of the CPIUN meaningless.  The critical question before this Court is *not* whether Defendants have impliedly or expressly waived their immunity, as courts have previously examined, but rather whether Defendants may avail themselves of

protections that are conditional on their fulfillment of their obligations, and granted under a treaty that they have breached.  Both international law and U.S. law provide that a material breach of a treaty or contract by one party excuses performance by other parties.  Defendants' failure to establish a standing claims commission, or *any* other mechanism for relief, should deny Defendants the benefits of immunity and the right to shield themselves from responsibility in the instant case.  The immunity accorded to individual officers, such as Defendants Ban and Mulet, is similarly offset by the same obligations that limit Defendants UN and MINUSTAH's immunity.

Plaintiffs have turned to this Court as a last resort.  If this Court accepts Defendants' position as expressed by the Government, victims of the cholera epidemic will be denied any form of justice and remedy.  Moreover, such a ruling would reward Defendants' bad faith acts and violate the U.S. citizen Plaintiffs' constitutionally protected right of access to the courts.  Such a result would offend the underlying equities of this case and fundamental notions of due process.

Plaintiffs acknowledge that Defendants must enjoy broad immunity protections to fulfill the UN's core functions and missions.  But at the same time, Defendants cannot, under law, wholly evade accountability for acts of gross negligence and recklessness that directly caused one of the deadliest torts of our time.

This Court may set aside Defendants' immunity here without affecting UN immunity in other contexts.  A narrow, fact-specific ruling that limits UN exposure to liability for private law tort claims in a case where the UN refuses to provide *any alternative remedies* would not impact the UN's core functions or undermine the underlying policy considerations that have justified

courts' protection of UN immunity in the past. Plaintiffs respectfully urge this Court to issue

such a ruling and allow Plaintiffs to proceed on the merits of their case and seek remedies.

## FACTS

Since October 2010, a cholera epidemic in Haiti has killed at least 8,500 people and

sickened at least 702,000 others. Haiti had no known cases of cholera in recorded history prior

to the introduction of the disease by UN personnel in 2010. Defendants UN and MINUSTAH

drew military personnel from various countries, including Nepal, where cholera is endemic.

Despite the widely known prevalence of cholera in Nepal, Defendants did not test or treat the

personnel for the disease prior to their deployment. The Nepalese personnel were stationed on

three MINUSTAH military bases, and the waste from the bases was collected and disposed of at

the MINUSTAH base in the town of Meille along the banks of a tributary system that flows into

the Artibonite River. *See* Compl. ¶¶ 58-72, Dkt. No. 1. The base's infrastructure was wholly

inadequate. At the time of the cholera outbreak, human waste from the base had leaked through

broken pipes and overflowing disposal pits into the Meille tributary where it contaminated the

waterways upon which thousands of Haitians rely for their drinking water and for bathing. *See*

Compl. ¶¶ 73-87.

That Defendants' acts were the direct and proximate cause of Haiti's cholera epidemic is

undeniable. Epidemiologists have proven conclusively that the cholera in Haiti originated from

the UN base, and experts in genetic analysis have matched the strain in Haiti to the one in Nepal.

Communicable disease experts, global health organizations and innumerable media outlets have

laid blame for Haiti's cholera crisis squarely at the feet of Defendants. *See* Compl. ¶¶ 88-171.

Even the UN's own panel of experts concluded that "the preponderance of the evidence and the

weight of the circumstantial evidence does lead to the conclusion that personnel associated with

the Mirebalais MINUSTAH facility were the most likely source of introduction of cholera into Haiti." Compl. ¶ 171. President Bill Clinton, the UN Special Envoy for Haiti, conceded that UN troops "were the proximate cause" of cholera's introduction to Haiti. Compl. ¶ 169. The Government does not deny Defendants' responsibility for the epidemic; it denies only that Defendants can be held accountable.

On November 3, 2011, approximately 5,000 victims of cholera, all members of the proposed Plaintiff class, submitted administrative claims for compensation and remediation pursuant to Defendants UN and MINUSTAH's duties under paragraphs 54 and 55 of the SOFA. Lindstrom Decl. Ex. 1[2] (Pet. for Relief, Nov. 3, 2011). Defendants did not substantively respond to these claims for fifteen months, during which time another 1,386 people died from cholera and close to 170,000 people were infected. *See* Compl. ¶¶ 176-77. On February 21, 2013, Defendant UN's Legal Counsel responded in a letter that the claims were "not receivable" because they implicated matters of "politics" and "policy." Lindstrom Decl. Ex. 2 (Letter from Patricia O'Brien, Under Secretary-General for Legal Affairs, United Nations, to Brian Concannon, Director, Institute for Justice & Democracy in Haiti (Feb. 21, 2013)). Plaintiffs responded on May 7, 2013, with a detailed brief demonstrating that this characterization is untenable. *See* Lindstrom Decl. Ex. 3 (Letter from Brian Concannon, Director, Institute for Justice & Democracy in Haiti, to Patricia O'Brien, Under Secretary-General for Legal Affairs, United Nations (May 7, 2013)). Plaintiffs requested a meeting with the UN's Office of Legal Affairs, the engagement of a mediator, and/or the establishment of a standing claims commission. On July 5, 2013, the UN summarily denied those requests without any further explanation. *See* Lindstrom Decl. Ex. 4 (Letter from Patricia O'Brien, Under Secretary-General

---

[2] "Lindstrom Decl." refers to the Declaration of Beatrice Lindstrom in Support of Plaintiffs' Memorandum of Law in Opposition to the Government's Statement of Interest, filed herewith.

for Legal Affairs, United Nations, to Brian Concannon, Director, Institute for Justice & Democracy in Haiti (July 5, 2013)).

The cholera epidemic continues in Haiti to this day.  The UN warns that another 2,000 people may die of cholera in Haiti in 2014 alone.

Plaintiffs filed the Complaint in this case on October 9, 2013.  On February 2, 2014, Plaintiffs filed Certificates of Service on Defendants MINUSTAH, Ban, and Mulet, and moved for affirmation of service on Defendant UN.  On February 7, 2014, this Court ordered that Defendant UN could file an opposition to that motion by February 21, 2014.  This Court also invited the U.S. Attorney to file a letter expressing the Government's view on Plaintiffs' motion.  On March 7, 2014, the Government filed a Statement of Interest pursuant to 28 U.S.C. § 517, alleging that this Court lacks subject-matter jurisdiction over this matter and arguing that Plaintiffs' case should be dismissed.  Letter from Preet Bharara, U.S. Attorney, to Hon. J. Paul Oetken (Mar. 7, 2014) (Dkt. No. 21) (hereinafter "SOI").  Defendants have not yet entered an appearance in this case.  Plaintiffs now respectfully submit this Memorandum of Law in Opposition to the Government's Statement of Interest.

## STANDARD OF REVIEW

In its Statement of Interest, the Government argues that this Court lacks subject-matter jurisdiction to hear this case because Defendants are immune from legal process and suit.  SOI at 1.  Accordingly, the Government's request for dismissal should be addressed under the standards governing a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1).  *See Sadikoglu v. United Nations Dev. Programme*, No. 11 Civ. 0294(PKC), 2011 WL 4953994, at *2 (S.D.N.Y. Oct. 14, 2011); *Bisson v. United Nations*, No. 06 Civ. 6352(PAC)(AJP), 2007 WL 2154181, at *4 (S.D.N.Y. 2007).  A case is properly dismissed

under Rule 12(b)(1) when the Court "lacks the statutory or constitutional power to adjudicate it." *Luckett v. Bure*, 290 F.3d 493, 496 (2d Cir. 2002). A Rule 12(b)(1) motion is subject to the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Tarros S.p.A. v. United States*, No. 13 CIV. 1932 (JPO), 2013 WL 6084243, at *4 (S.D.N.Y. Nov. 19, 2013) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003). If the plaintiff can prove subject-matter jurisdiction by a preponderance of the evidence, the case should not be dismissed. *Wells Fargo Bank, N.A. v. Ullah*, No. 13 CIV. 0485 (JPO), 2014 WL 470883, at *2 (S.D.N.Y. Feb. 6, 2014). In considering a motion to dismiss, the Court "must accept all material facts alleged in the Complaint as true and draw all reasonable inferences liberally in Plaintiff's favor." *Tarros S.p.A.*, 2013 WL 6084243, at *4 (citing *Kwiatkowski v. Polish & Slavic Fed. Credit Union*, 511 F. App'x 117, 118 (2d Cir. 2013)). In so doing, it "may consider evidence outside of the pleadings." *Id.* at *4 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

As set forth in detail below, Defendants are not entitled to immunity in this case. This Court therefore has jurisdiction to hear this case, and the Government's request for dismissal should be denied.

## ARGUMENT

### I.    THIS CASE PRESENTS AN ISSUE OF FIRST IMPRESSION.

Plaintiffs—third-party victims of Defendants' tortious behavior—have no means to access justice other than suit in a national court such as this one. Defendants have rejected Plaintiffs' attempts to engage Defendants through an extrajudicial process. Plaintiffs first filed claims with the Office of the Secretary-General in New York and MINUSTAH's local claims unit in Haiti, which the UN and MINUSTAH have previously used to adjudicate the claims of

other tort victims in Haiti.  *See, e.g.*, Ex. 1 (2009 UN Jurid. Y.B. 428, 429-30) (summarizing

recommendations of a Local Claims Review Board regarding a claim brought by a victim shot in

the leg during an exchange of gunfire involving MINUSTAH)).  Defendants denied Plaintiffs

access to the local claims board.  Defendants also refused to receive their claims through the

UN's internal dispute settlement, rejecting them on the ground of implicating "political and

policy matters," without valid legal explanation.  Defendants have also refused mediation.

Furthermore, the UN and MINUSTAH have consistently refused, in breach of their obligations

under the CPIUN and SOFA, to establish a standing claims commission or any other

adjudicatory body, which must be established when an amicable settlement with claimants

cannot otherwise be reached.  *See* Convention on Privileges & Immunities of the United Nations,

§ 29, adopted Feb. 13, 1946, 21 U.S.T. 1418, 1 U.N.T.S. 16; Agreement Between the United

Nations and the Government of Haiti Concerning the Status of the United Nations Operations in

Haiti, ¶¶ 54-55, U.N.-Haiti, July 9, 2004.

     The potential complete denial of access to justice and a remedy distinguishes this case

from previous cases cited by the Government.  These suits have been brought, by and large, by

current or former UN employees who had access to the UN's internal dispute resolution system.

*See, e.g.*, *Brzak v. United Nations*, 597 F.3d 107 (2d Cir. 2010); *Boimah v.  United Nations*

*General Assembly*, 664 F. Supp. 69 (E.D.N.Y. 1987); *see also Mendaro v. World Bank*, 717 F.2d

610, 618 (D.C. Cir. 1983) (noting that courts have upheld the immunity of international

organizations in employee suits because in that context immunity uniquely protects against

interference with the organizations' internal administration).  None of those suits addressed the

complete unavailability of a mechanism for redress, though some questioned the adequacy or

efficacy of the mechanism that was available to the plaintiffs.  For example, the plaintiffs in

*Brzak v. United Nations* were both employees of the UN High Commissioner for Refugees (a

UN agency), one of whom filed a complaint with the UN's Office of Internal Oversight Services

and then appealed the decision of that office through the UN's internal complaint adjustment

process. 597 F.3d at 110. In that case, the Second Circuit rejected their argument that

"purported inadequacies with the [UN's] internal dispute resolution mechanism indicate a waiver

of immunity," and affirmed dismissal of the case. *Id.* at 112. In another case, this Court rejected

a similar claim made by a UN employee plaintiff. *See Bisson v. United Nations*, 2007 WL

2154181, at *9-10 ("[The plaintiff's] dissatisfaction with certain features of the UN's

compensation policy [for injuries sustained by an employee of the World Food Programme, a

subsidiary program of the UN] does not make them inadequate, and certainly does not constitute

an *express* (or implied) waiver of immunity.") (emphasis in original). By contrast, Plaintiffs here

do not challenge the adequacy or efficacy of an extrajudicial mechanism for dispute resolution.

Plaintiffs challenge the absence of any such mechanism, and the UN's refusal to establish one as

it promised to do in the CPIUN and SOFA.

        In the few previous suits against the UN and its affiliates that have been brought by non-

employees, courts have not addressed whether the complete lack of any mechanism for redress

affects the UN's ability to assert absolute immunity. *See, e.g.*, *Sadikoglu*, 2011 WL 4953994, at

*5 (rejecting argument that the "contested status of the parties' efforts to arbitrate or settle the

current dispute strip [a UN agency] of its immunity," where the UN agency had engaged in

informal settlement discussions with the plaintiff who was a UN contractor, but had refused to

submit to arbitration thereafter); *Nicol v. United Nations Missions in Liberia*, No. 09-1800, Civ.

A. No. 09-1800, 2009 WL 2370179, at *2 (E.D. Pa. July 30, 2009) (rejecting argument that the

UN waived its immunity when rendering medical services to a pedestrian struck by a UN driver);

9

*Askir v. Boutros-Ghali*, 933 F. Supp. 368, 371-73 (S.D.N.Y. 1996) (rejecting arguments that UN immunity does not apply to commercial activities or to malfeasance).

Accordingly, past precedent does not govern Plaintiffs' arguments regarding Defendants' immunity.  This case presents the narrow—and previously unaddressed—question of whether Defendants enjoy absolute immunity when they have violated their obligations to provide third-party tort victims with a mechanism for redress.

## II.    THIS COURT SHOULD NOT DEFER TO THE GOVERNMENT'S UNREASONABLE INTERPRETATION OF IMMUNITY.

This Court has final authority to determine whether the CPIUN and UN Charter grant the Defendants immunity in this case.  This Court should apply general rules of treaty construction and should read the relevant provisions in their appropriate context, to give effect to the drafters' intent.  For the reasons elaborated in the subsequent section, the proper construction of the treaties—when viewed in light of their drafting history, object, and purpose—provides that Defendants' immunity is void when the UN and its affiliates disregard their obligations to provide alternative means of dispute resolution.  The Government argues that Defendants are entitled to an absolute and unfettered immunity, but that interpretation is unreasonable.  The Government's interpretation flouts the treaties' balanced scheme of immunity and alternative dispute resolution, and would allow a manifestly unjust result that would deny Plaintiffs their fundamental rights under the U.S. Constitution and international law.

### A.  Whether Defendants Are Entitled to Immunity Is Within the Province of This Court.

This Court has final authority to determine whether Defendants are entitled to immunity. Restatement (Third) of the Foreign Relations Law of the U.S., § 326(2)(hereinafter "Restatement For. Rel."); *see also Shamsee v. Shamsee*, 74 A.D.2d 357, 360 (N.Y. App. Div. 1980) ("[T]he

question of immunity from legal process under treaties and statutes of the United States lies within the province of the courts …. [C]laims of immunity must be resolved by the court on the basis of the facts properly before it.") (citation omitted).  This Court need not substitute the Government's interpretation of immunity for its own here, where the Government's interpretation of the scope of immunity would result in a denial of Plaintiffs' constitutional rights.  *See Sanders v. Szubin*, 828 F. Supp. 2d 542, 548 (E.D.N.Y. 2011) (stating that district courts need not defer to the Executive Branch's disposition of constitutional issues and instead must engage in its own *de novo* review) (citing *Cablevision Sys. Corp. v. FCC*, 570 F.3d 83, 91 (2d Cir. 2009)).

### B.  To Interpret the Relevant Immunity Provisions, the Court Should Rely on Rules of Construction and the Context in Which the Provisions Arise.

This Court should interpret the relevant immunity provisions of the CPIUN and UN Charter using general rules of treaty construction.  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist.*, 482 U.S. 522, 533 (1987).  Treaties are contracts between nations. *BG Group PLC v. Republic of Arg.*, 134 S. Ct. 1198, 1208 (2014).  But they should be construed "more liberally than private agreements, and to ascertain their meaning [courts] may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties."  *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431-32 (1943).

In interpreting a treaty, a court should first look to the "text of the treaty and the context in which the written words are used."  *Societe Nationale.* 482 U.S. at 533-34 (quoting *Air France v. Saks*, 470 U.S. 392, 397 (1985)); *accord* Vienna Convention on the Law of Treaties (hereinafter "Vienna Convention") art. 31, *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 (treaties should be interpreted in accordance with the ordinary meaning to be given to the

terms in their context, including the full text read in the light of its object and purpose); *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 308-10 (2d Cir. 2000) (in interpreting treaties, U.S. courts should apply the rules found in the Vienna Convention, which provides "an authoritative guide to the customary international law of treaties").

This Court's interpretation of a treaty should be guided by the history and negotiations from which the treaty arose, subsequent practice in relation to the treaty, and relevant rules of international law. *Societe Nationale,* 482 U.S. at 533; s*ee also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999); Vienna Convention art. 31(2)-(3).

### C.  The Government's Position Is Not Entitled to Deference When It Is Unreasonable.

The Government suggests that its views on Defendants' immunity are entitled to deference because it is "charged with maintaining relations with the United Nations." SOI at 4. That suggestion is misguided. Although courts may generally afford "great weight" to the Government's interpretation a treaty, s*ee, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 513 (2008), such deference is due only when that interpretation is reasonable. *Am. Civil Liberties Union v. Dep't of Defense*, 543 F.3d 59, 88 (2d Cir. 2008) ("[R]espect is ordinarily due the *reasonable* views of the Executive Branch concerning the meaning of an international treaty...") (emphasis added) (citations and quotation marks omitted), *vacated on other grounds*, 558 U.S. 1042 (2009); *see generally Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) (the role of the court is to give effect to the intent of the treaty parties, and though the meaning attributed to the treaty provisions by the State Department is given great weight, it is not conclusive).

Indeed, a court may disregard the Executive's position when it finds that position to be unreasonable. *See, e.g*., *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103 (9th Cir. 1990) (finding that an individual was covered by the Foreign Sovereign Immunities Act, despite the

government's statement of interest presenting its view that the statute does not apply to individuals), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010); *Sarei v. Rio Tinto, Plc*, 487 F.3d 1193, 1206 (9th Cir. 2007) (noting that "[w]hen we take the [statement of interest] into consideration and give it 'serious weight,' we still conclude that a political question is not presented," despite the assertion in the government's statement that the case would adversely impact U.S. foreign relations), *on reh'g en banc* 550 F.3d 882 (9th Cir. 2008); *Katingo Hadjipatera*, 40 F. Supp. 546, 548 (S.D.N.Y. 1941) ("overrul[ing]" the government's argument in favor of immunity and denying its request for dismissal).

Therefore, this Court must consider, in the first instance, the meaning of the treaties upon which the Government relies to argue for immunity and how those treaties apply to the circumstances present here. Only after conducting that searching inquiry should the Court determine whether the Government's interpretation is entitled to any weight. In fact, that interpretation unreasonably disregards the UN's obligations under Section 29, effectively rendering them meaningless. Thus, as described below, the Government's interpretation is unreasonable and not entitled to deference by this Court.

III.    THE UN AND MINUSTAH'S ENJOYMENT OF IMMUNITY IS CONDITIONAL
        ON ADHERENCE TO THE OBLIGATIONS IMPOSED UPON THEM UNDER
        THE CPIUN.

The Government argues that the UN Charter and the CPIUN shield Defendant UN, and Defendant MINUSTAH as a subsidiary of the UN, with absolute and unconditional immunity. SOI at 1. As described below, that interpretation is unavailing because those same documents require the UN and MINUSTAH to provide Plaintiffs with access to an alternative mechanism to resolve their claims, which the organizations have failed to provide. The CPIUN's object and

purpose is only given effect when Section 2 and Section 29 operate together, as intended by the drafters.

**A.  The UN's Immunity Regime Incorporates Reciprocal Obligations to Provide Tort Victims Access to Remedies.**

*1.   The UN's Founders Established a Limited and Balanced Immunity Regime Consistent with the Organization's Purposes.*

In 1945, nations of the world came together determined to create a world body that would "reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the equal rights of men and women and of nations large and small," and "to establish conditions under which justice and respect for the obligations arising from treaties and other sources of international law can be maintained."  U.N. Charter pmbl.  The UN's founders recognized the need to protect the nascent organization from vexatious litigation in its many member states.  But the founders also understood the importance of limiting UN immunity such that the organization could simultaneously fulfill its responsibilities to innocent third parties harmed by UN operations, and further its aims of promoting human rights, including the right to due process and effective remedies.  *See* Ex. 2 (Study on Privileges & Immunities *in* Prep. Comm. Doc. PC/EX/113/Rev.1, at 70, Nov. 12, 1945) (laying the groundwork for the UN's immunity framework and stressing that "[i]t should be a principle that no immunities and privileges, which are not really necessary, should be asked for")).

In accordance with that understanding, the UN Charter provides that the UN and its affiliates enjoy immunities to the extent they "are necessary for the fulfillment of its purposes." Similarly, the Charter states that UN employees enjoy immunity "as necessary for the independent exercise of their functions in conne[ct]ion with the Organization."  U.N. Charter art. 105(1)-(2).  Thus, the Charter authorizes a limited immunity whose scope must be consistent

14

with the UN's purposes.  Those purposes are expressly identified in the Charter and include, *inter alia*, "promoting … respect for human rights" and the settlement of international disputes "in conformity with the principles of justice and international law."  *Id.* art. 1.  The UN Charter also instructs that the details of the UN's immunity regime would be determined in a later convention—what came to be the CPIUN.  *Id.* art. 105(3).

> 2. *The CPIUN Imposes a Legal Obligation on the UN and MINUSTAH to Settle Private Law Claims Such As Plaintiffs' Claims.*

The CPIUN defines UN immunities broadly, but also contains two important reciprocal obligations that ensure that the CPIUN framework comports with the limited immunity authorized in the Charter: 1) an obligation for the UN, including its subsidiaries, to "provide appropriate modes of settlement," set forth in Section 29; and 2) a duty on the Secretary-General to "waive immunity when it impedes with the course of justice," set forth in Section 20.  These provisions accord with customary international law that protects a universal right to due process and effective legal remedies, Restatement For. Rel. § 711 cmt. b, and ensures that the UN's immunity is not at odds with the organization's mandate to promote human rights.  *See* Ex. 3 (Introductory Note to the Convention on Privileges and Immunities of the United Nations) (Section 29 mitigates the immunity granted in Section 2 and is an "acknowledgment of the right of access to court as contained in all major human rights instruments"); Effect of Award of Compensation made by the United Nations Administrative Tribunal, Advisory Opinion, 1954 I.C.J. Reports 47, at 57 (Jul. 13) (providing access to judicial recourse for UN staff is consistent with the aims of the UN Charter).  The provisions also ensure that UN immunity does not conflict with right to access court commonly found in the constitutions of the UN's member states, including that of the United States. *See* Ex. 4 (August Reinisch, International Organizations Before National Courts 281, 290-305 (2000)).

As a party to the CPIUN, the UN is bound by the legal obligations contained therein, and especially to those clauses expressly imposing obligations on it.  *See* CPIUN § 35 ("This Convention shall continue in force as between the United Nations and every Member which has deposited an instrument of accession.…"); Reparations for Injuries Suffered in the Service of the United Nations, 1949 ICJ 174 (Apr. 11) (adopting the UN's argument that it is a party to the CPIUN and acknowledging the UN's rights and duties under the treaty); *id.*, Verbatim record, at 71 (affirming that the CPIUN "binds the United Nations").  The plain language of Section 29 of the CPIUN imposes a non-discretionary legal obligation on the UN.  The section reads in full:

> The United Nations **shall** make provisions for appropriate modes of settlement of: (a) disputes arising out of contracts or other disputes of a private law character to which the United Nations is a party; (b) disputes involving any official of the United Nations who by reason of his official position enjoys immunity, if immunity has not been waived by the Secretary-General. (emphasis added)

The UN has repeatedly affirmed in resolutions, statements, and practice throughout its nearly seventy-year history that Section 29 imposes legal obligations on the organization and its leadership.  *See, e.g.*, Ex. 5 (2001 U.N. Jurid. Y.B. 381, 382) ("Pursuant to [CPIUN], article VIII, section 29, the organization is *required* to make provisions for appropriate modes of settlement.") (emphasis added); Ex. 6 (U.N. Secretariat, Study Prepared by the Secretariat on the Practice of the United Nations, the Specialized Agencies and the International Atomic Energy Agency Concerning their Status, Privileges and Immunities, ¶ 56, p. 220, U.N. Doc. A/CN.4/L.118 and Add.1 and 2 (Mar. 8, May 5 & 23, 1967)) ("[I]n keeping with generally recognized legal principles and with the [CPIUN] … [i]t has always been the policy of the United Nations, acting through the Secretary-General, to compensate individuals who have suffered damages for which the Organization was legally liable.").

Indeed, the immunity granted in the CPIUN and Charter has never been intended to

protect the UN from its obligations to individuals claiming harm from its operations.  In accord with international law and the plain language of the Charter, the UN itself has frequently confirmed the well-established principle that, "as an attribute of the international legal and juridical personality of the United Nations … the Organization is capable of incurring obligations and liabilities of a private law nature."  Ex. 5, at ¶ 4; *see also* Reparations for Injuries Suffered in the Service of the United Nations, Advisory Opinion, 1949 ICJ 179 (Apr. 11) (establishing that the UN has international legal personality).  The UN has further explained that such liabilities arise, *inter alia*, when the UN or its agents cause injury or death to private individuals.  Ex. 5, at ¶ 4.  When the UN incurs liabilities of this kind, "[a]s a matter of international law, it is clear that the Organization … is obligated to pay in regard to such liabilities."  *Id.* ¶ 14.

The CPIUN therefore does not confer unlimited immunity on the UN and MINUSTAH, but rather carefully balances immunity from national court jurisdiction against the countervailing fundamental right of access to a remedy and the need to meet the organization's legal liabilities. The grant of immunity in Section 2 must be read in the greater context of the treaty as a whole, which only permits immunity in light of the promise of an alternative settlement mechanism.

### 3.   *The UN and MINUSTAH Have Further Obligations to Establish a Standing Claims Commission for Harms Arising Out of Their Operations in Haiti.*

In addition to the general obligation to provide appropriate modes of settlement of claims pursuant to Section 29 of the CPIUN, the UN and MINUSTAH have made a commitment to protect the right of individuals to seek remedies for harms resulting from MINUSTAH's malfeasance.  Paragraphs 54 and 55 of the SOFA that governs MINUSTAH's operations in Haiti provide that "third-party claims for personal injury, illness or death arising from or directly

attributed to MINUSTAH, which cannot be settled through the internal procedures of the United

Nations … ***shall*** be settled by a standing claims commission" (emphasis added).

These provisions ensure that the obligations under CPIUN Section 29 are implemented

with regard to the UN's operations in Haiti.  Ex. 7 (Report of the Secretary General,

Administrative and Budgetary Aspects of the Financing of United Nations Peace-keeping

Operations, ¶ 7, U.N. Doc. A/51/389 (Sept. 20, 1996)) ("In conformity with section 29 … [the

UN] has undertaken … to settle by means of a standing claims commission claims resulting from

damage caused by members of the force….).  Additionally, the UN has made clear that these

provisions were enacted, and should be strictly maintained, to afford individuals aggrieved by

peacekeeping operations—such as Plaintiffs —access to an *independent* review of claims.  Ex. 8

(Report of the Secretary General: Administrative and Budgetary Aspects of Peacekeeping, ¶ 10,

U.N. Doc. A/51/903 (May 21, 1997)) (observing that "[b]ased on the principle that justice should

not only be done but also be seen to be done, a procedure that involves a neutral third party

should be retained in the text of the [SOFA] as an option for potential claimants" so as not to

make the UN "a judge in its own case").  Compliance with these provisions is thus both legally

mandated and essential to ensure that the UN's immunities comport with its purposes.

**B.  The UN and MINUSTAH's Enjoyment of Immunity Under Section 2 Is Conditioned on Their Adherence to Section 29.**

Interpreting the CPIUN in accordance with general rules of construction and the

principles set forth in the Vienna Convention establishes that the immunity granted to the UN, as

well as its subsidiaries, in Section 2 of the treaty is conditioned on the UN's promise to provide

alternative dispute resolution pursuant to Section 29.  The CPIUN's text and drafting history, the

UN's post-ratification practice, the views of experts in international law, and the practice of

foreign courts all compel the conclusion that the UN's immunity does not apply where the UN disregards its obligation to afford victims with access to alternative dispute resolution.

First, Section 2 must be read in the context of the full text of the CPIUN, including Section 29. *Societe Nationale,* 482 U.S. at 533-34; Vienna Convention art. 31. The systematic structure of a treaty is of equal importance to the ordinary linguistic meaning of the words used; thus, it would not be proper for this Court to look only to the language of Section 2 when interpreting its application here. *See* Competence of the ILO In Regard to International Regulation, Advisory Opinion, 1922 PCIJ (ser. B) No. 2 at 23 (Aug. 12) ("[A] [t]reaty must be read as a whole, and … its meaning is not to be determined merely upon particular phrases which, if detached from the context, may be interpreted in more than one sense."). It is clear from the text of the CPIUN, when read as a whole, that Section 29 was created to eliminate the possible accountability vacuum resulting from immunity in Section 2. Section 29(a) generally addresses the need for settlement of private law disputes in light of Section 2 immunity, while Section 29(b) expressly refers to an obligation to settle claims against officials who enjoy immunity as a result of the CPIUN. This full text of the CPIUN thus compels an understanding of Section 2 as being conditioned on the existence of dispute settlement mechanisms required by Section 29.

Second, the CPIUN's drafters understood the UN's entitlement to immunity to be conditioned on the provision of alternative remedies. In the study on privileges and immunities that preceded the CPIUN's drafting, the UN's Preparatory Committee counseled that the UN must afford aggrieved individuals access to alternative dispute settlement as a precondition to immunity: "[W]here the United Nations or a specialized agency concludes contracts with private individuals or corporations, it should include in the contract an undertaking to submit to

arbitration disputes arising out of the contract, *if it is not prepared to go before the Courts*." Ex. 2, at 70 (emphasis added). The drafters also noted that undertaking an obligation to afford access to alternative dispute settlement was standard practice among other international organizations, stressing that "[m]ost of the existing specialized agencies have already agreed to do this." *Id.*

Consequently, even in early drafts of the CPIUN, the drafters incorporated an express requirement for the UN to provide alternative dispute settlement outside of the courts as a condition of its immunity. The first draft of the CPIUN included a predecessor to Section 29, which required the organization to refer contract disputes concerning it or its officers to an international tribunal, under the heading "Control of Privileges and Immunities of Officials,"[3] a descriptor that further suggests the conditional nature of Sections 2 and 29. Ex. 9 (Draft Resolution Concerning the Question of Immunities, Facilities and Privileges of the United Nations, Prep. Comm. Doc. PC/LEG/17, Nov. 30, 1945), art. 9. One week later, the drafting committee produced its first full draft of the CPIUN, which included a near verbatim version of what is now Section 29 that obligated the UN to provide appropriate modes of settlement of all types of private law claims. Ex. 10 (Committee 5, Sub-Committee on Privileges & Immunities Draft, U.N. Doc. PC/LEG/34, Dec. 8, 1945), art. VIII(3). The Committee unanimously adopted and incorporated the article into the text of the CPIUN. Ex. 11 (Committee 5: Legal Questions, Summary Record of Meetings, U.N. Doc. PC/LEG/41). This early emphasis on codifying the obligation to provide appropriate modes of settlement demonstrates the drafters' understanding that affording access to alternative modes of dispute resolution is a critical pre-condition to immunity.

Third, the UN's post-ratification interpretations of, and practice pursuant to, Section 29

---

[3] Though the heading only refers to officials, the text of the clause applies to the organization: "the Organization shall make provision for the determination of an appropriate international tribunal…." Ex. 9, art. 9.

further support that enjoyment of immunity is premised on the provision of alternative dispute settlement.  In explaining the regime "envisaged by the [CPIUN] and implemented by the United Nations" to the International Court of Justice ("ICJ"), the UN reassured the court that "[t]he immunity of the United Nations, or its agents, does not leave a plaintiff without remedy … [because] in the event that immunity is asserted, a claimant seeking a redress against the Organization *shall* be afforded an appropriate means of settlement [under Section 29]." Difference Relating to Immunity from Legal Process, Verbatim Record, ¶ 13 (Dec. 10, 1995) (emphasis added).  The UN also emphasized that "the immunity accorded to the United Nations by Article II of the [CPIUN] … is offset by an obligation in Article VIII [Section 29] to make remedies available to private parties who might otherwise be harmed by the immunity of the Organization and its agents." *Id.*, Verbatim Record, ¶ 5 (Dec. 10, 1998).

Similarly, in 2007, the UN represented to this very Court that in order to "ensure[] the independence of the United Nations and its officials from national court systems …  the uniform practice is to … provide[] the appropriate mechanisms to resolve *all* complaints of a private law nature."  Memorandum of Law In Support of the Motion of the United Nations to Dismiss and to Intervene, *Brzak v. United Nations* (2007) (No. 06-CV-3432 (RWS)), at 4-5 (emphasis added).  The UN further explained that offering alternative means of settlement of all claims "eliminates the prospect of impunity" that would attach to unfettered immunity.  *Id.*  Thus, as the UN itself has repeatedly and forcefully asserted, the provision of alternative dispute settlement under Section 29 is part and parcel of its enjoyment of immunity from national courts.  By failing to accord Plaintiffs' the remedy to which they are entitled under Section 29, the UN has not met the conditions necessary for it to enjoy immunity under Section 2.

Fourth, the conditional nature of the UN's immunity is reinforced by the views of

international law experts, whose views are a recognized source of international law.  *See, e.g.*, Ex. 12 (A. S. Muller, International Organizations and Their Host States 176 (1995)) ("[T]he availability of proper alternative means of redress for private parties dealing with the organization can be considered a precondition for granting immunity from suit."); Ex. 13 (Guglielmo Verdirame, *The UN and Human Rights: Who Guards the Guardians*? 359 (2011)) ("[C]ourts should deny immunity to the UN where it has failed to provide alternative means of dispute settlement."); Emmanuel Gaillard & Isabelle Pingel-Lenuzza, *International Organizations and Immunity from Jurisdiction, to Restrict or to Bypass*, 51 Int'l & Comp. L. Q. 1, at 3 (2002) ("According to the dominant theory, it is the existence of these alternative means of dispute resolution that justifies maintaining the absolute character of the immunity of international organisations"); *see also* Statute of the ICJ, art. 38(1)(d).  The views of these commentators are authoritative evidence.  *See United States v. Smith*, 18 U.S. (5 Wheat) 153, 160-61 (1820) ("What the law of nations on this subject is, may be ascertained by consulting the works of jurists, writing professedly on public law...."); *The Paquete Habana*, 175 U.S. 677, 700 (1900) ("[T]he works of jurists and commentators who by years of labor, research and experience, have made themselves peculiarly well acquainted with the subjects ... are resorted to by judicial tribunals ... for trustworthy evidence of what the law really is."); *see also* Restatement For. Rel. § 103(2) (1987) ("In determining whether a rule has become international law, substantial weight is accorded to ... the writings of scholars.").

    Fifth, this interpretation is borne out in a growing consensus among national courts that the availability of immunity for the UN and other international organizations depends on whether that organization has afforded access to alternative remedies.  *See, e.g.*, Ex. 14 (*UNESCO v. Boulois*, *Cour d'Appel*, Paris (Fr.), Jun. 19, 1998) (refusing to grant immunity where UN agency

refused to adhere to an arbitration clause on the basis that granting immunity would result in a denial of justice); Ex. 15 (Riccardo Pavoni, *Human Rights and the Immunities of Foreign States and International Organizations*, *in Hierarchy in International Law: The Place of Human Rights* 71, 104 (citing *Stavrinou v. United Nations* (1992) CLR 992, ILDC 929 (CY 1992) (Sup. Ct. Cyprus 17 July 1992)) (confirming that applicant had access to internal dispute settlement system before according immunity to UN peacekeepers in Cyprus); Ex. 16 (*Drago v. Int'l Plant Genetic Resource Inst.*, No. 3718/07, ILDC 827 (It.) (Feb. 19, 2007)) (satisfaction of the remedy provision in the international organization's statute is a prerequisite to the immunity provision of the same statute, and, as such, that immunity was not applicable where the organization had failed to provide an adequate remedy); Ex. 17 (Riccardo Pavoni, *Italy*, *in* August Reinisch, Privileges and Immunities of International Organizations in Domestic Courts 160 (2013) (citing *Maida v. Administration for International Assistance*, (1956) RDI 575, 23 ILR 510 (Court de Cassazione) [Supreme Court] (It.) (May 27, 1955)); *see also* Cedric Ryngaert, *The Immunity of International Organizations Before Domestic Courts: Recent Trends*, 7 Int'l Org. L. Rev. 121, 144 (2010) ("[T]here is undeniably a tendency in domestic courts to make the immunity of an international organization dependent on its putting in place effective internal complaints mechanisms, or making recourse to administrative tribunals available."); August Reinisch & Ulf Andreas Weber, *In the Shadow of Waite and Kennedy,* 1 Int'l Org. L. Rev. 59, 72 (2004) (observing a "clearly discernible trend in recent immunity decisions... to consider the availability of alternative fora when deciding whether to grant or deny immunity.").  The international development of jurisprudence on immunity provides persuasive authority for this case.  *See generally Abbott v. Abbott*, 560 U.S. 1, 16 (2010) ("In interpreting any treaty, the opinions of our sister signatories … are entitled to considerable weight.") (citations and internal quotation marks

omitted); *United States v. Stuart*, 489 U.S. 353, 369 (1989) ("[T]he practice of treaty signatories counts as evidence of [a] treaty's proper interpretation, since their conduct generally evinces their understanding of the agreement they signed.") (citations omitted).

### C. The Government Presents an Unreasonable Interpretation of the CPIUN That Is Not Entitled To Deference.

Contrary to the object and purpose of the CPIUN — as evidenced by the treaty text, history, subsequent practice, and views of sister courts and international law scholars — the Government would have this Court extend an unconditional, absolute immunity to Defendants, despite their failure to establish an alternative mechanism of redress.  Such an interpretation is unreasonable because it effectively renders Section 29 meaningless, and controverts at least three general canons of construction:  First, all treaties, such as the CPIUN, must be interpreted in a way that gives effect to the legal obligations established by the plain language of the treaty, including Section 29.  *See Factor v. Laubenheimer*, 290 U.S. 276, 303-04 (1933) ("This phrase, like all the words of the treaty, is to be given a meaning, if reasonably possible, and rules of construction may not be resorted to to render it meaningless or inoperative."); *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.") (internal quotation marks and citations omitted).   Second, when there are two possible interpretations of a treaty clause, where one interpretation would restrict rights under the treaty and the other would enlarge or support rights under the treaty, courts should give preference to the latter. *Asakura v. City of Seattle*, 265 U.S. 332, 342 (1924); *Nielsen v. Johnson*, 279 U.S. 47, 52 (1929).  To read the treaty to accord unconditional immunity even where Section 29 is violated not only restricts the rights under the treaty, but completely vitiates them.  Finally, the fundamental principle of *pacta sunt servanda* ("agreements must be kept") requires that treaty

promises, such as the UN's promise to provide alternative mechanisms of dispute resolution, must be kept. *See* Restatement For. Rel. § 321 cmt. a (1987) (*pacta sunt servanda* "lies at the core of the law of international agreements and is perhaps the most important principle of international law"). According the UN immunity, while ignoring its breach, would disregard this principle. *See* Ex. 14 (applying the principle of *pacta sunt servanda* to withhold immunity from a UN agency that had failed to comply with an arbitration agreement).

The Court, based on one or more of these principles, should interpret the UN and MINUSTAH's violation of Section 29 in a manner that gives effect to the provision and the rights and duties it entails. The Government's position does not comport with these rules of interpretation, and ignores the legal consequences of the UN's breach. As such, the interpretation offered by the Government is unreasonable, and the Court should not afford it the deference typically afforded to positions assumed by the Executive Branch.

IV.    IN THIS CASE, DEFENDANTS UN AND MINUSTAH ARE NOT ENTITLED TO IMMUNITY BECAUSE THEY HAVE BREACHED THEIR OBLIGATIONS TO HEAR PLAINTIFFS' CLAIMS.

Contrary to the view offered by the Government, the UN and MINUSTAH are not entitled to immunity in this case because they have breached the treaty that would otherwise grant them immunity here. They have thus forfeited their rights under the treaty.

**A. The UN and MINUSTAH Have Breached Their Legal Obligations to Hear Plaintiffs' Claims.**

*1.    The UN and MINUSTAH Have Breached Section 29 of the CPIUN by Refusing to Hear Plaintiffs' Claims.*

The personal injury and death Plaintiffs have suffered as a result of Defendants' negligence and recklessness constitute private law matters within the meaning of Section 29. As such, the UN and MINUSTAH have an unequivocal obligation to provide alternative modes of settlement of Plaintiffs' claims. Yet the UN refused to receive the claims of approximately 5,000

members of the Proposed Class on the grounds that "consideration of these claims would necessarily include a review of political and policy matters."  Lindstrom Decl. Ex. 2.  In that way, the UN has failed to comply with Section 29.

To the extent that the UN's response might be read as taking a position that the claims fall outside the scope of the UN's Section 29 duties because they are not of a private law character, such a contention is baseless, and not explained in the UN's communications.  In discussing the UN's practice under Section 29, the Secretary-General has cited "[t]hird-party claims related to United Nations peacekeeping operations, including claims for compensation for personal injury or death" as examples of the most common types of private law claims that fall within the scope of Section 29.  Ex. 18 (U.N. Secretary-General, *Report of the Secretary General on the Procedures in Place for Implementation of Article VIII, Section 29, of the Convention on the Privileges and Immunities of the United Nations*, U.N. Doc. A/C.5/49/65 (Apr. 24, 1995)) ¶ 15; *see also* Ex. 7, at ¶ 7 (claims of personal injury resulting from UN peacekeeping forces are a type of private law claim that the UN has settled amicably or submitted to arbitration in accordance with Section 29).  International law scholars have widely affirmed that Plaintiffs' claims are of a private law character.  *See, e.g.*, Frédéric Mégret, La résponsabilité des nations unies aux temps du choléra, Belg. R. Int'l L. (forthcoming 2014) (surveying the definition of private law and rejecting the notion that the cholera claims could be characterized as anything but private law claims); Transnational Development Clinic, Yale Law School *et al*., Peacekeeping Without Accountability: The United Nations' Responsibility For The Haitian Cholera Epidemic 31 (2013) (hereinafter "Yale Report") ("[D]emand[s] for individual redress for the introduction of cholera is a prototypical 'dispute of a private law character.'").

Further, the UN's offered reason for rejecting the claims—that they implicate a review of political or policy matters—has no basis in law.  The plain text of the CPIUN, relevant case law, and UN resolutions and statements that define the scope of the obligation neither expressly nor implicitly create a "political and policy" exception to the obligation to provide a mode of settlement.  *See, e.g.*, CPIUN § 29; SOFA ¶ 54; Ex. 7, ¶ 14. The only exception contained in these documents is a carve-out for claims concerning damages that result from operational necessity,[4] which is not at issue here.  CPIUN § 29; SOFA ¶ 54; Ex. 7, ¶ 14.  These documents make no mention of policy or politics.  Scholars of international law, including the former head of the UN's legal office, have widely criticized the UN's rejection as unjustified.  *See, e.g.*, Bruce Rashkow, *Immunity of the United Nations, Practice and Challenges,* 10 Int'l Org. L. Rev. 332, fn. 27 (forthcoming 2014) (distinguishing the cholera case from other cases that might conceivably concern policy or politics, and noting that "as the head of the UN legal office that routinely handled claims against the Organization for some ten years, I did not recall any previous instance where such a formulation was utilized…").

But even if such an exception for claims that "involve a review of policy or politics" existed, Defendants' suggestion that Plaintiffs' claims would fall under such an exception is untenable.  Surely no "policy" or "politic[al]" decision of the UN required discharging contaminated sewage from broken pipes and disposal pits into Haiti's central river system. Moreover, Plaintiffs have not requested that the UN review or revise its policies or political decisions in Haiti—only that the UN bear the cost of its harms and make the victims whole.

The UN and MINUSTAH's unjustifiable rejection of Plaintiffs' claims violates their legal obligations under Section 29 of the CPIUN.

---

[4] The UN's liability is not engaged where harms arise out of operation necessity, which requires finding that: 1) a good-faith conviction that an operational necessity exists; 2) the operational need must be strictly necessary and not a matter of mere convenience or expediency; 3) the act must be in pursuance of an operational plan; and 4) the damage caused must be proportional to that what is strictly necessary.  Ex. 7, ¶ 14.

2.  *The UN and MINUSTAH Have Also Breached Their Obligations Under the SOFA by Refusing to Refer Plaintiffs' Claims to a Standing Claims Commission.*

In addition to refusing to receive and resolve Plaintiffs' claims internally in violation of the CPIUN, Defendants UN and MINUSTAH also breached their obligation to establish a standing claims commission as set forth in the SOFA.  That obligation is triggered when "claims for personal injury, illness or death … cannot be settled through the internal procedures of the [UN]."  SOFA ¶¶ 54-55.  In the instant case, Defendants first ignored Plaintiffs' demand for the establishment of such a commission.  Then, after repeated requests, they tersely rejected the request with the circular assertion that "there is no legal basis for establishing a claims commission in regards to claims that are not receivable."  Lindstrom Decl. Ex. 4.  Defendants' failure to establish a claims commission is a clear violation of their legal obligations under the SOFA, and legal scholars have recognized it as such.  *See, e.g.*, Yale Report, *supra*, at 30-33.  This violation of Defendants legal obligations has left Plaintiffs without any means to seek redress short of coming before this Court.

3.  *The UN and MINUSTAH's Refusal to Provide Access to Alternative Modes of Settlement Violates the UN Charter.*

Finally, the UN and MINUSTAH's attempt to claim absolute immunity after refusing to provide an alternative mechanism for redressing Plaintiffs' claims not only violates the CPIUN and SOFA, it also violates the UN Charter.  The plain language of the Charter requires that UN immunity be applied carefully and only to the extent that it furthers the UN's purposes of promoting human rights, the rule of law, and justice.  To the extent the UN and MINUSTAH argue that they have a sweeping, unfettered immunity that should apply irrespective of their compliance with Section 29, they seek an extreme version of immunity beyond the limited and contingent immunity authorized by their founding document.  In effect, they are asking this

Court to ratify their *ultra vires* actions by interpreting the UN Charter in a manner that its

founders in 1945 neither intended nor authorized, and, to the contrary, cautioned against. *See*

Ex. 2 ("Any excess or abuse of immunity and privilege is as detrimental to the interests of the

international organization itself as it is to the countries who are asked to grant such

immunities."); *see also Westchester County v. Ranollo,* 67 N.Y.S.2d 31, 34 (N.Y. Crim. Ct.

1946) ("To recognize the existence of … unrestricted [UN officer] immunity from suit or

prosecution … is carrying the principle of immunity completely out of bounds … [and] … flouts

the very basic principle of the [UN and its Charter].)."

As early as 1954, the ICJ determined that the UN General Assembly could not refuse to

pay an award for compensation to an aggrieved staff member.  The Court found that

> [i]t would … hardly be consistent with the expressed aim of the Charter to
> promote freedom and justice for individuals and with the constant preoccupation
> of the [UN] to promote this aim that it should afford no judicial or arbitral remedy
> to its own staff for the settlement of any disputes….

Effects of Awards of Compensation Made by the United Nations Administrative Tribunal,

Advisory Opinion, 1954 I.C.J. Reports 47, at 57 (Jul. 13).  Though the ICJ addressed the claim of

a staff member and not a third-party plaintiff, its reasoning applies with equal force here.  To

deny Plaintiffs' claims would violate the express aims of the Charter.

### B.  The UN and MINUSTAH's Breach Renders Their Immunity Void and Unenforceable.

Having wholly disregarded their own legal obligations, Defendants UN and MINUSTAH

now seek to avoid appearing before this Court by claiming immunity from service of process and

suit under the CPIUN and UN Charter.[5]  As demonstrated above, the UN Charter does not

authorize immunity here.  But because it is the CPIUN that defines the precise scope and

---

[5] While the SOFA imposes additional binding obligations on the UN and MINUSTAH that the Defendants have breached, it is not a separate source of immunity from this suit, as it merely applies the CPIUN to the UN and MINUSTAH's operations in Haiti. Moreover, the UN-Haiti SOFA is not binding upon U.S. courts.

application of Defendants' immunity, this Court should look to the CPIUN rather than the UN

Charter to interpret the nature and application of the immunity of the UN and its officials in this

case.  *See* CPIUN pmbl. (noting that the UN General Assembly adopted the CPIUN and

proposed it for accession by UN member states in consequence to Article 105 of the UN

Charter); Restatement For. Rel. § 467 cmt. b (Article 105 "is given specific content by the

[CPIUN]").

Defendants' breach of the CPIUN prevents them from claiming immunity in this case for

at least three reasons: 1) Defendants' enjoyment of immunity under Section 2 of the CPIUN is

conditioned on the provision of alternative remedies under Section 29, and that condition has not

been met; 2) any obligation to afford immunity under the CPIUN is extinguished by Defendants'

failure to comply with the requirement that they provide alternative remedies; and 3) under the

doctrine of unclean hands, Defendants cannot avail themselves of the Court's protection pursuant

to the CPIUN after having acted in bad faith.  The Government would have this Court turn a

blind eye to Defendants' misconduct, calling upon it to apply the treaties in an unequal manner

and to ratify Defendants' transgressions by awarding them protections of immunity despite their

breach.  Such an outcome is unsupported by the law and by fundamental principles of justice.

1.  *Defendants UN and MINUSTAH Are Not Entitled to Immunity Because They*
    *Have Failed to Fulfill Their Conditional Obligations.*

As set forth in Section III.B, *supra*, Defendants UN and MINUSTAH are not entitled to

immunity when they have breached their obligations under Section 29 because Section 29 is an

implied condition precedent to Section 2.  *See Int'l Fid. Ins. Co. v. Ctny. of Rockland*, 98 F.

Supp. 2d 400, 434 (S.D.N.Y. 2000).  Defendants' complete breach of Section 29 renders

immunity under Section 2 inoperative in this case.

2.  *Defendants UN and MINUSTAH Are Not Entitled to Immunity Because They Have Materially Breached the CPIUN.*

It is a well-established principle under both U.S. and international law that a party which has failed to perform its side of the bargain is no longer able to reap the benefits of that bargain. Under U.S. law, one party's material failure to perform operates to discharge the duties of the other party. *E.g.*, Restatement (Second) on Contracts, § 237 cmt. a; *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). Contract law principles govern the interpretation of a treaty such as the CPIUN. *See Bank of New York v. Yugoimport SDPR J.P.*, 780 F. Supp. 2d 344, 359 (S.D.N.Y. 2011) (quoting *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921)) ("Treaties are to be interpreted upon the principles which govern the interpretation of contracts … with a view to making effective the purposes of the high contracting parties."). Similarly, under international law, a material breach of a treaty by one party excuses corresponding performance by the other parties. Ex. 19 (G.G. Fitzmaurice, Special Rapporteur on Treaties, Report on the Law of Treaties, U.N. Doc. A/CN.4/120), art. 20 (1-2) ("By virtue of the principle of reciprocity … non-performance of a treaty obligation by one party to the treaty will, so long as such non-performance continues, justify an equivalent and corresponding non-performance by the other party or parties."); *see also, e.g.*, *Gabcikovo-Nagymaros Project* (Hung. v. Slovk.), 1997 I.C.J. 7, 56 (Sept. 25); *Diversion of Water from the Meuse* (Neth. v. Belg.), 1937 P.C.I.J. (ser. A/B) No. 70, at 4 (June 28) (no breach of a bilateral treaty if the other party had previously breached similar provisions of the same treaty); *Tacna-Arica Question* (Chile v. Peru), 2 R.I.A.A. 921, 943–44 (1922) (holding that wrongs as would operate to frustrate the purpose of the agreement by one party of a bilateral treaty would suffice to release the other party from its obligations).

Defendants' breach of Section 29 rises to the level of material breach of the CPIUN. A

party is in "material breach of a treaty" when it violates "a provision essential to the accomplishment of the object or purpose of the treaty." Vienna Convention art. 60(3). Section 29 constitutes an essential provision because it concerns dispute settlement, and such terms are, by nature, essential. *See* Ex. 20 (Sir Humphrey Waldock, Second Report on the Law of Treaties, *in* [1963] 2 Y.B. Int'l L. Comm'n 36, 72, 79) (Prior draft of the Vienna Convention expressly listing dispute settlement clauses as an example of an essential clause); Ex. 21 (Bruno Simma & Christian J. Tams, The Vienna Conventions on the Law of Treaties: A Commentary 1360 (Olivier Corten & Pierre Klein eds. 2011)) (identifying dispute settlement clauses as quintessential ancillary clauses that may be essential in nature, violations of which give rise to material breach).

Moreover, as a matter of statutory construction, Section 29 is an essential provision because it preserves the CPIUN's object and purpose of enabling an immunity regime that carefully balances immunities from national courts with the need to meet the UN's legal liabilities and ensure respect for victims' fundamental rights to due process and to effective remedies. Section 29 is the linchpin designed by the treaty's drafters to secure an appropriate balance and to prevent an otherwise unjustifiably broad immunity. For these reasons, Defendants' violation of Section 29 amounts to a material breach of the CPIUN. *See* Vienna Convention art. 60(3). Thus, the obligation to afford the UN immunity under the CPIUN, as courts have identified in other cases, is inapplicable here in light of Defendants' material breach.

   2.   *The UN and MINUSTAH's Bad Faith Deprives Them of Standing to Assert the Defense of Immunity.*

Separately, the UN and MINUSTAH's acts in bad faith deprive them of standing to seek immunity from this Court under the doctrine of unclean hands. It is a bedrock principle that a party is barred from obtaining relief from a court after engaging in unconscionable conduct or

acting in bad faith in relation to the subject matter of a litigation. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244 (1933); *Goldstein v. Delgratia Mining Corp.*, 176 F.R.D. 454, 458 (S.D.N.Y. 1997); *see also Craig v. Bank of New* York, 169 F. Supp. 2d 202, 210 (S.D.N.Y 2001) (unclean hands bars breach of contract claims).

Although historically the doctrine of unclean hands has been applied primarily in equity under U.S. law,[6] it also constitutes a general principle of international law that is properly applied where a party has acted in bad faith with respect to its obligations under an international treaty, regardless of whether the dispute arises at law or equity. *See* Ex. 22 (Report of the International Law Commission, 57th Sess., UN Doc. A/60/10, (2005)), ¶ 236 ("[T]he clean hands doctrine [i]s an important principle of international law that *ha[s] to be taken into account* whenever there [i]s evidence that an applicant State ha[s] not acted in good faith and that it ha[s] come to court with unclean hands.") (emphasis added); *Diversion of Water from the Meuse,* 1937 P.C.I.J. (ser. A/B) No. 70 ¶ 321 (Jun. 28) (opinion of J. Hudson) (applying unclean hands to bar a party from seeking enforcement of a treaty right and noting that "[w]hat are widely known as principles of equity have long been considered to constitute a part of international law…."); *id.* ¶ 211 (opinion of J. Anzilotti) (the principle is "so just, so equitable, so universally recognized, that it must be applied in international relations…."). The doctrine requires that a party seeking the enforcement of a treaty has itself completely fulfilled the obligations of that treaty. *Id.* ¶ 323.

Courts have generally described conduct sufficient to constitute unclean hands as "unconscionable," "unfair," "immoral," or "transgress[ing] equitable standards of conduct." *See,*

---

[6] Courts differ as to the application of unclean hands to matters governed by U.S. law. *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 168 (8th Cir. 1995) ("The Supreme Court has not definitively revisited [whether equitable defenses apply at law] since the merger of law and equity in modern federal practice."). Courts in the Second Circuit principally, but not exclusively, apply unclean hands to matters at equity. *See Smith v. Long*, 723 N.Y.S.2d 584, 586-87 (N.Y. Sup. Ct. 2001) (party's unclean hands caused "forfeit[ing] of right, in law or in equity, to protection or recourse"); *Craig v. Bank of New* York, 169 F. Supp. 2d 202, 210 (S.D.N.Y 2001) (unclean hands bars breach of contract and breach of fiduciary duty claims).

*e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945); *Lia v. Saporito*, 909 F. Supp. 2d 149, 174 (E.D.N.Y. 2012).  In this case, Defendants have interpreted their treaty obligations in a manner that disregards the law and does violence to the treaties' aims.[7]  Invoking immunity to avoid this reciprocal obligation amounts, in itself, to bad faith and unclean hands.  *See* Ex. 12, at 177 (the duty of good faith means that "[a]n international organization which deals with private parties cannot use its jurisdictional immunity to hide from its responsibilities … to create alternative and adequate means of redress in case disputes arise.").

Moreover, Defendants' entire course of evading responsibility for the cholera epidemic and their handling of Plaintiffs' claims demonstrates a pattern of bad faith that surpasses any threshold necessary to invoke unclean hands.  First, the UN and MINUSTAH repeatedly refused requests to engage in a *bona fide* investigation and released false and misleading information to obscure the evidence establishing their negligence.  Compl. ¶¶ 105-41.  Second, they failed to respond to Plaintiffs' claims for fifteen months, during which time another 1,386 people died from cholera and nearly 170,000 people suffered non-fatal injuries.  Compl. ¶ 177.  Third, they tersely rejected the claims, providing their grounds for denial in a mere two lines of text that stated no recognized lawful basis.  Fourth, for over three years, Defendants have repeatedly stonewalled Plaintiffs, members of the U.S. Congress, members of the Haitian Government, the international media, other UN officers, and the general public.  They have defied repeated requests to shed light on their legal procedure or otherwise address the epidemic and their responsibility therein.  *See, e.g.*, Lindstrom Decl. Ex. 4 (refusing to offer Plaintiffs any additional

---

[7] Plaintiffs believe that there are additional facts that demonstrate that Defendants knowingly and intentionally disregarded their obligations toward Plaintiffs. As such, it would, at a minimum, be premature for this Court to rule that Defendants are entitled to immunity without first affording Plaintiffs limited discovery to establish the full extent of Defendants' breach and bad faith acts.  If indeed Defendants knew their asserted "public law" claim was no more than a ruse to avoid providing any forum to Plaintiffs, they could not be accorded immunity for such bad faith conduct.

explanation for the rejection of claims); Lindstrom Decl. Ex. 5 (Letter from Rep. Conyers et al. to Amb. Samantha Power, U.S. Permanent Rep. to the UN (Jan. 10, 2014)), at 1 (deploring UN response to cholera culpability as "wholly inadequate," and noting that Defendant Ban misled members of Congress in his response to a Congressional letter on cholera, falsely claiming credit for establishing two wastewater plants in Haiti to combat cholera) (signed by sixty-five Congressional Representatives); Editorial Board, *United Nations Must Admit Its Role in Haiti's Cholera Outbreak*, Wash. Post, Aug. 13, 2013 (criticizing the UN for responding to a preceding editorial in an evasive manner that "pointedly ignored the editorial's focus" of calling for UN responsibility for cholera).   This pattern of misrepresentation and evasion is particularly unconscionable because the UN's inaction and delay continues to cause needless deaths and infections.  *See* Tim Witcher, Mariano Andrade, UN Warns of Surge in Haiti Cholera Deaths, ReliefWeb, Jan. 22, 2014 (estimating "close to 180,000 cases and even up to 2,000 fatalities" in 2014); *see also* Jonathan Katz, *UN Cholera Envoy: 'It was Never the Intention … to Bring Cholera in Haiti'*, Interview with UN Senior Coordinator for Cholera Response in Haiti, Feb. 24, 2014 (conceding that the failure to be honest about the gravity of the situation has contributed to the UN's slow response).

Defendants UN and MINUSTAH act not only as tortfeasors in this case, but also as sole and final adjudicator of their own misconduct.  They fail to hold themselves to the principles they broadly claim to espouse and to the language of the treaties they have negotiated.  Their actions thus rise to the level of unconscionable behavior, and, under the doctrine of unclean hands, this Court should refuse to afford them immunity from suit and service of process.

## V.     DEFENDANTS BAN AND MULET ARE NOT ENTITLED TO IMMUNITY IN LIGHT OF THE BREACH OF THE CPIUN.

The Government asserts that Defendants Ban and Mulet are immune pursuant to Sections 18 and 19 of the CPIUN.[8]  SOI at 6-7.  However, the immunity accorded to individual officers under the CPIUN—and by extension, the SOFA—derives from that accorded to the organization. *See* CPIUN § 20 ("Privileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves."); Ex. 2, at 70 ("[P]rivileges and immunities are only given to [UN] officials in the interest of the Organisation in whose service they are, and in no way for the benefit of the individual concerned…."); Ex. 23 (Linda S. Frey & Marsha L. Frey, The History of Diplomatic Immunity 540 (1999)) (explaining that "the privileges and immunities of officials stem directly from the immunity of the international organization").  As a result, where immunity is not available to Defendants UN and MINUSTAH, it is also not available to Defendants Ban and Mulet for acts carried out in their official capacities.[9]

---

[8] The Vienna Convention on Diplomatic Relations, 23 U.S.T. 3227, 500 U.N.T.S. 95 ("VCRD"), cited by the Government in its Statement of Interest, is relevant to UN officials only to the extent that it defines the nature and scope of the immunity enjoyed by those individuals under Section 19 of the CPIUN.  *See* CPIUN § 19 (stating that the Secretary-General and all Assistant Secretaries-General enjoy the same privileges and immunities "accorded to diplomatic envoys, in accordance with international law").  Because immunity under the VCDR is only incorporated by reference in Section 19 of the CPIUN, Defendants Ban and Mulet may not invoke immunity under the CPIUN due to the breach that renders CPIUN immunity inoperable.

[9] To the extent that the Government argues that Defendants Ban and Mulet are immune from suit pursuant to the International Organizations Immunities Act ("IOIA"), 22 U.S.C. § 288 *et seq.*, in footnote 2 of its Statement of Interest, that argument must fail because the IOIA is a statute of general application that confers immunity on various designated international organizations, whereas the CPIUN specifically governs the UN and its officers. Under the principle of *lex specialis derogat lex generalis*, where two laws apply to the same factual situation, the more specific will prevail over the more general in the event of a conflict.  *Rodgers v. United States*, 185 U.S. 83, 89 (1902); *see also In re Lazarus*, 478 F.3d 12, 18-19 (1st Cir. 2007).  Taken in their entireties, the IOIA and CPIUN are inconsistent and conflict with each other.  The CPIUN clearly sets forth a careful balance between the broad immunity of the UN and its officers from national courts and the offsetting obligation to provide an alternative remedy to victims of UN wrongdoing.  In contrast, the IOIA imposes no such countervailing obligation.  Because the IOIA and the CPIUN are in conflict, as the more specific law, the CPIUN must prevail as a source of immunity. *See Rodgers v. United States*, 185 U.S. at 89; *In re Lazarus*, 478 F.3d at 18-19.  Moreover, because the IOIA was enacted in 1945, while the CPIUN entered into force in 1946 (and did not enter into force in the United States until 1970), the CPIUN must also prevail as the later in time. *See Whitney v. Robertson,* 124 U.S. 190, 194 (1888) ("[I]f [a treaty and a statute] are inconsistent, the one last in date will control the other, provided always the stipulation of the treaty on the subject is self-executing.").  The IOIA is therefore preempted by the CPIUN, and is not a valid source of immunity for the UN and its officers.

Moreover, UN officer immunity is offset by the same obligations to provide for appropriate modes of settlement that limit the organization's immunity.  CPIUN § 29(b); SOFA ¶ 55 ("[A]ny dispute or claim of a private-law character … to which MINUSTAH *or any member thereof* is a party … shall be settled by a standing claims commission….") (emphasis added).  Thus, the Court should refuse to accord immunity to Defendants Ban and Mulet for the same reasons that it should refuse to accord immunity to their employers.  That is, the enjoyment of immunity under the CPIUN is conditioned on the obligation to provide an alternative mode of settlement, which has not been met.  *See supra* Part III.B.  Even if this Court were to find that immunity under the CPIUN is not conditioned on compliance with Section 29, Defendants Ban and Mulet are still not entitled to immunity under the CPIUN because Section 29 is a material provision of the treaty, the breach of which precludes the application of immunity.  *See supra* Part IV.B.2

Finally, it would be equally improper for this Court to accord immunity to Defendants Ban and Mulet as with the organizational defendants when they have unclean hands due to their bad faith breach of Section 29.  As the most senior officers of the UN and MINUSTAH, respectively, Defendants Ban and Mulet were personally responsible for ensuring that the organizations complied with their obligations in good faith.  Defendants not only failed to prevent bad faith acts by the organizations, but also violated the obligations directly through their own arbitrary refusals to comply with Section 29 and through their continued evasion of responsibility and failure to state their reasons for rejecting Plaintiffs' claims.  Compl. ¶¶ 172-82. Defendant Ban has publicly confirmed that it was his personal decision to refuse to settle the claims.  Compl., ¶ 179.  In numerous statements attributable to Defendant Ban, his Spokesperson has kept Plaintiffs in the dark by refusing to provide information or justification regarding the

dismissal of their claims.  *See, e.g.*, Lindstrom Decl. Ex. 6 (Daily Press Briefing by the Office of

the Spokesperson for the Secretary-General (Feb. 21, 2013)) (stating that "[i]t's not the United

Nations practice to discuss in public the details of and the response to claims filed against the

Organization," and refusing to provide information on why considering the claims would

necessitate review of political and policy matters); Lindstrom Decl. Ex. 7 (Daily Press Briefing

by the Office of the Spokesperson for the Secretary-General (Feb. 22, 2013)) (stating that

"[c]laims found to be outside the scope of Section 29 of the Convention are not receivable" and

"will not receive further consideration by the Organization" without explaining why the claims

do not fall under Section 29).  Similarly, as head of MINUSTAH until June 2, 2011, and

following his promotion to Assistant Secretary-General for UN Peacekeeping, Defendant Mulet

has overseen the mishandling of the claims.  Compl., ¶¶ 22, 272-74.  Defendant Mulet also

oversaw MINUSTAH's response to allegations that it was responsible for introducing cholera,

delaying a *bona fide* investigation, and releasing misleading information.  Compl. ¶¶ 107-136,

139-140.  Such actions run counter to equitable standards of conduct, and therefore give rise to

unclean hands.

    Thus, to afford these Defendants immunity protections would be unjust and would run

afoul of the principle of clean hands.  For all of the foregoing reasons, this Court should refuse to

afford immunity to Defendants Ban and Mulet under the CPIUN.

VI.    **THE COURT SHOULD NOT DISMISS THE CLAIMS OF PLAINTIFFS WHO
       ARE U.S. CITIZENS BECAUSE DOING SO WOULD VIOLATE THEIR RIGHT
       OF COURT ACCESS.**
       The Court should also refuse to accord immunity to Defendants in this case because

dismissal would violate the U.S. plaintiffs' constitutional right of access to the courts.[10]  A U.S.

law or treaty may not be interpreted or applied in a way that would be inconsistent with the

---

[10] The U.S. citizen plaintiffs include Delama Georges and all other similarly situated U.S. citizens he and the other named Plaintiffs seek to represent.

Constitution.  *Reid v. Covert*, 354 U.S. 1, 16 (1957) ("No agreement with a foreign nation can confer power on the congress, or on any other branch of government, which is free from the restraints of the constitution.").  Accordingly, the Court may not interpret the CPIUN in such a way as would violate the constitutional rights of the U.S. plaintiffs in this case.

### A. The U.S. Plaintiffs Have a Right of Court Access That Is Protected Under the Constitution.

One such right of those Plaintiffs is the right of access to the courts.  *See Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004) (deeming the right of access to the courts to be a "fundamental" right protected under the U.S. Constitution).  This right—essential to the guarantee of justice for all in our nation—is deeply rooted in the foundation of our legal system, originating from the Magna Carta and later incorporated into the Anglo-American legal tradition. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803); *Ashby v. White* (King's Bench 1703).  It is a right that has been made available specifically to civil plaintiffs such as the U.S. victims in this case.  *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741-43 (1983) (noting that "[t]he right of access to a court is too important" and as such prohibits enjoining "[t]he filing and prosecution of a well-founded" tort lawsuit); *Hikel v. King*, 659 F. Supp. 337, 340 (E.D.N.Y. 1987) (finding that the "right of access to the courts includes ... the right to bring an ordinary civil case").

The right of access to the courts is "among the most precious of the liberties safeguarded by the Bill of Rights" because it is indispensable to the vindication of all other rights.  *United Mine Workers, Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967); *see also Chambers v. B.&O. R.R.*, 207 U.S. 142, 148 (1907) ("The right to sue and defend in the courts is the alternative of force ....  [I]t is the right conservative of all other rights, [that] ... lies at the foundation of orderly government," and "is one of the highest and most essential privileges of

citizenship."); *Marbury*, 5 U.S. at 163 ([T]he very essence of civil liberty ... consists in the right

of every individual to claim the protection of the laws, whenever he receives an injury," and

"[o]ne of the first duties of government is to afford that protection.").  The right is rooted in

various constitutional provisions: the Article IV Privileges and Immunities Clause, the First

Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth

Amendment Equal Protection and Due Process Clauses.  *Christopher v. Harbury*, 536 U.S. 403,

415 n.12 (2002); *see also Monsky v. Moraghan*, 127 F.3d 243, 246 (2d Cir. 1997) ("It is well

established that all persons enjoy a constitutional right of access to the courts, although the

source of this right has been variously located in the First Amendment right to petition for

redress, the Privileges and Immunities Clause ... and the Due Process Clauses ...."); *Ryland v.

Shapiro*, 708 F.2d 967, 971-72 (5th Cir. 1983) (noting the various constitutional bases in which

the right of access has been located).

### B.  Infringement of the Right of Court Access Is Subject to Strict Scrutiny.

In light of the great importance placed upon the right of court access, this right has been

afforded the highest level of protection.  Courts have generally required that an infringement of

the right to access court is subject to strict scrutiny.  *See Lane*, 541 U.S. at 529 ("[A] variety of

basic rights, including the right of access to the courts at issue in this case … call for a standard

of judicial review at least as searching, and in some cases more searching, than the standard that

applies to sex-based classifications."); *Guttman v. Khalsa*, 669 F.3d 1101, 1121-22 (10th Cir.

2012) ("In *Lane*, the Court addressed the right of access to the courts—a fundamental right that

may not be encroached upon unless the infringing provision survives strict scrutiny."); *Ryland*,

708 F.2d at 972 ("[I]t is clear that, under [various provisions of] our Constitution, the right of

access to the courts is guaranteed and protected from unlawful interference and deprivations by

the state, and only compelling state interests will justify such intrusions."). This is particularly true in the case of the right of access to bring civil claims, which are most often protected under the First Amendment's right to petition—infringements of which are routinely subject to strict scrutiny. *See Sure-Tan Inc*. *v. NLRB*, 467 U.S. 883, 897 (1984); *NAACP v. Button*, 371 U.S. 415, 438-44 (1963).

> 1.  *Granting Immunity in This Case Would Not Satisfy Strict Scrutiny.*

Under the strict scrutiny standard, the proponent of a challenged practice "has the burden of proving that [the] classifications 'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995)); *Republican Party of Minn. v. White*, 536 U.S. 765, 774-75 (2002). The Government cannot demonstrate that granting absolute immunity to the UN and MINUSTAH would meet that standard in this case.

> a.  *There Is No Compelling Justification to Violate Plaintiffs' Right of Access*.

First, no compelling interest exists for shielding Defendants against national court jurisdiction in this case. A finding of immunity would, in effect, afford these entities blanket impunity and freedom from liability of any sort for the harms they have caused. Such impunity is not what the United States agreed to when it ratified the CPIUN, a treaty whose provision of immunity from national court jurisdiction is conditioned on ensuring that the UN would still assume responsibility for torts such as the introduction of cholera to Haiti. Such impunity is also not what is provided for under the SOFA, which explicitly preserves organizational liability for private law claims as set forth in paragraphs 54 and 55. Moreover, such impunity was not envisioned at the time of the UN's formation, as is evident from the UN Charter—the foundational document of the UN—which provides only for such privileges and immunities "as

are necessary for the fulfilment of [the organization's] purposes." U.N. Charter art. 105(1). As such, the application of immunity as the Government has suggested in this case does not accord with the original intent of the immunity framework for the UN. There is, therefore, no compelling reason to grant that immunity.

In addition, the interest often cited for upholding UN immunity—ensuring that the organization has the ability to proceed without fear of interference in the performance of its functions—does not apply in this case. That interest has been recognized in employment disputes involving the UN, which, if heard in national courts, could "open[] the door to divided decisions of the courts of different member states passing judgment on [the organization's] rules, regulations, and decisions." *Mendaro*, 717 F.2d at 618 (D.C. Cir. 1983) (citation omitted). That interest may also apply where victims seek review of the UN's execution of its mandate in some way, such as those cases concerning the failure of UN peacekeepers to adequately protect a population in wartime. *Cf.* Ex. 24 (Stichting Mothers of Srebrenica and Others v. Netherlands, App. No. 65542/12, Eur. Ct. H.R. (2013)) (declining to review whether UN failed to protect civilians from massacre in Srebrenica). That interest does not apply here, where the organizations' improper dumping of cholera-infected waste into Haitian waters does not relate to their internal administration and was not part of their mandate in Haiti. Indeed, upholding Defendants' immunity in this case would not serve to protect their ability to properly carry out their mandate. Rather, it would serve only to allow them to evade the rule of law altogether. For these reasons, the Government cannot point to a compelling interest why the Court should grant Defendants immunity in this case.

      b.  *Upholding Immunity in This Case Would Not Be Narrowly Tailored Because Plaintiffs Have Been Denied Any Alternative Remedy.*

Even if this Court were to find that absolute immunity would further a compelling state

interest, granting such immunity is not the least restrictive means of serving that interest, and does not pass constitutional muster.  In granting immunity to Defendants in this case, the Court would not merely be burdening Plaintiffs' right to access the judiciary to prosecute their underlying lawsuit, it would completely abrogate that right and deny Plaintiffs any chance for redress, given that Defendants have foreclosed all potential avenues other than a domestic court. Thus, quite opposite from being narrowly tailored, the infringement on Plaintiffs' right of access would be as broad as it could possibly be.

An infringement on the right of access is not narrowly tailored when there is no alternative means of redress.  For example, "[t]he utter exclusiveness of court access and court remedy … was a potent factor" in a Supreme Court decision to strike down as unconstitutional a state law that required litigants to pay court fees as a prerequisite to bringing an action for divorce, in light of the fact that a marriage could only be dissolved through a divorce action. *United States v. Kras*, 409 U.S. 434, 445 (1973) (discussing *Boddie v. Connecticut*, 401 U.S. 371 (1971)); *see also N.Y. Central R.R. Co. v. White*, 243 U.S. 188, 201 (1917) ("[I]t perhaps may be doubted whether the state could abolish all rights of action, on the one hand, or all defenses, on the other, without setting up something adequate in their stead.").  By contrast, where courts have upheld infringements on the right of court access, the plaintiffs were not entirely foreclosed from pursing a remedy.  *See, e.g.*, *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 967-68 (6th Cir. 2004) (upholding a state statute granting immunity to drug manufacturers only in certain situations).

Indeed, this case differs from previous cases in which absolute immunity has been upheld because Plaintiffs would suffer from the total lack of any means of redress, and not simply from the alleged inadequacy of such means.  In previous cases involving the immunity of the UN, its

43

subsidiaries, and its officers, U.S. citizen plaintiffs—primarily UN employees or former

employees—have had alternative methods of dispute resolution available to them through the

UN's internal processes.  *See, e.g.*, *Brzak*, 597 F.3d 107; *Boimah*, 664 F. Supp. 69.  Therefore,

while the UN, its subsidiaries, and its officers were found to be immune from the jurisdiction of

the courts in those cases, they were not immune from all liability whatsoever.  For example, the

U.S. plaintiff in *Brzak* was a UN employee who could (and did) avail herself of the UN's internal

dispute resolution system, and so the court did not find that dismissal of her suit on immunity

grounds unconstitutionally infringed upon her right of access.  *See* 597 F.3d at 110.  Here, by

contrast, Plaintiffs have been fully denied access to any such alternative dispute resolution

mechanism that would make the Defendants' immunity narrowly tailored.

    This complete denial of access also renders the immunity implicated in this case different

in kind from the immunity of entities and persons other than the UN that courts have previously

upheld.  For example, foreign sovereign immunity is narrowly tailored in light of the fact that it

is a restrictive, not absolute immunity, as evidenced by the Foreign Sovereign Immunities Act,

which eliminates the immunity of foreign states in U.S. courts under certain circumstances

(including where a state commits tortious acts).  28 U.S.C. § 1605(a); *see also Victory Transp.*

*Inc. v. Comisaria Gen. de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir. 1964)

(explaining that "[s]overeign immunity is a derogation from the normal exercise of jurisdiction

by the courts," and holding that it "should be accorded only in clear cases"); *Et Ve Balik Kurumu*

*v. B.N.S. Int'l Sales Corp.*, 25 Misc.2d 299, 303-04 (N.Y. App. Div. 1960) (describing the

"evolution away from the absolute doctrine of immunity" for foreign sovereigns).  Foreign

sovereign immunity is also narrowly tailored in light of the fact that "there is almost always,

though sometimes rather inconveniently, the option of suing the foreign state before its own

domestic courts." August Reinisch & Ulf Andreas Weber, *In the Shadow of Waite and Kennedy*, 1 Int'l Orgs. L. Rev. 59, 88-89 (2004). Conversely, the UN has not agreed to such exceptions under the CPIUN, and has completely refused to allow Plaintiffs to avail themselves of its internal administrative dispute resolution processes; and, because it is not a sovereign entity, the UN has no domestic court in which Plaintiffs could bring suit. In this way, the Government's position in its Statement of Interest would, in fact, provide the UN with more robust immunity than that afforded to each and any of the individual foreign sovereigns of which it is composed.

The Government's proposed absolute immunity for Defendants is also different from the type of "absolute immunity" afforded to the U.S. government and its officers. Unlike the UN and its subsidiaries, the United States has established exceptions to its sovereign immunity by consenting to be sued for the tortious acts it commits, *inter alia*. 28 U.S.C. § 1346(b)(1). Similarly, although officers of the U.S. government have absolute immunity from certain types of liability, they do not have absolute immunity from all forms of liability. As the Supreme Court has recognized: "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it." *United States v. Lee*, 106 U.S. 196, 220 (1882).

For example, prosecutors enjoy absolute immunity for violations committed in the course of initiating and prosecuting a case, but have only qualified immunity for other acts. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976). Moreover, "prosecutorial misconduct is deterred, apart from private civil actions, by the threat of criminal prosecution and professional discipline, and by prosecutors' accountability to either superiors or the electorate." *Milstein v. Cooley*, 257 F.3d 1004, 1007-08 (9th Cir. 2001)

(citations omitted). Judges also enjoy immunity from damages for acts done in their judicial capacity, but not from prospective relief, or for improper ministerial or administrative acts. *Glick v. Gutbrod*, 782 F.2d 754, 756 (7th Cir. 1986). Moreover, plaintiffs have a right to appeal unjust decisions, and judges may be held accountable for any crimes they commit and may be removed from office for committing serious misconduct. *Wallace v. Powell*, No. CIV.A 09-CV-286, 2009 WL 4051974, at *6 (M.D. Pa. Nov. 20, 2009) ("Judicial immunity, however, does not 'insulate the judiciary from all aspects of public accountability.'" (citing *Dennis v. Sparks*, 449 U.S. 24, 31 (1980)).

Similarly, legislators are protected by immunity for legislative activities, but not for illegal or purely personal acts, and they are, of course, accountable to the voters. *See Lilly v. Lewiston-Porter Cent. Sch. Dist.*, 853 F. Supp. 2d 346, 358 (W.D.N.Y. 2011); *Kelly v. Chambers*, No. 07 CV 1005, 2008 WL 4279976, at *3-4 (N.D. Ill. Sept. 17, 2008). Executive officers, including the President, only have absolute immunity for official acts; such officers may be held responsible for abuses of their discretionary powers. *Clinton v. Jones*, 520 U.S. 681, 694-95 (1997); *Butz v. Economou*, 438 U.S. 478, 485 (1978) ("The single submission by the United States … is that all of the federal officials sued in this case are absolutely immune from any liability for damages, even if, in the course of enforcing the relevant statutes, they infringed respondent's constitutional rights, and even if the violation was knowing and deliberate…. [W]e are quite sure that [this position] is unsound, and consequently reject it."). Thus, when courts have previously upheld "absolute immunity," they have in no way upheld absolute impunity.

Furthermore, the reasoning for upholding absolute immunity in other contexts is inapplicable here. In other cases, immunity protected the defendants' ability to perform their

functions for the public good.  By contrast, immunity in this case would only protect Defendants'
ability to introduce a deadly disease to Haiti, which clearly does not further the public good.

For the foregoing reasons, rejecting the UN's immunity in this case would in no way
suggest that other types of immunity should also be rejected in future cases involving the UN.
Rather, refusing to find Defendants immune is uniquely necessary in this case to avoid
impermissibly violating the U.S. Plaintiffs' right of court access.

### C.  This Court Should Follow Past Precedent Refusing to Enforce or Uphold Immunity Provisions Where the Application of Such Immunity Would Violate Constitutional Rights.

As demonstrated above, immunity is rarely so over-broad as to violate constitutional
rights.  But where it is, courts have restricted, invalidated, or refused to apply such immunity.
For example, in *People v. Weiner*, a New York court refused to afford the UN immunity,
rejecting its effort to enjoin the presentation of testimony that might have formed the basis for a
counter-claim against the organization in a misdemeanor case.  378 N.Y.S.2d 966 (N.Y. Crim.
Ct. 1976).  After weighing the UN's interests in having immunity applied, the court refused to
limit the proceedings because doing so would run afoul of fundamental fairness and would
violate the U.S. citizen party's constitutional right of access.  It held:

> There is a limit to which the [UN Charter] can inure to the detriment,
> disadvantage, and unequal protection of a citizen of the United States.  A basic
> concept and motivating factor of the founders of this Republic was the absolute
> right of every citizen to petition for redress in its courts…. [UN immunity] was
> not intended to be used by [UN officers] as a sword to pierce constitutional
> protections which are inherent in American citizenship.

*Id.* at 975-76; *see also Ranollo*, 67 N.Y.S.2d 31 (refusing to accord a UN employee immunity
where doing so would result in complete denial of access to justice).

Similarly, this Court should decline to accord Defendants immunity here because doing
so would violate the U.S. Plaintiffs' right to access court.  As applied in this case, immunity

under the CPIUN does not pass strict scrutiny.  The Government cannot point to a compelling interest to accord immunity to Defendants in this case. Even if it could, the burden on the right would not be narrowly tailored using the least restrictive means, given that Plaintiffs have been denied the promised alternative means to seek redress.  Thus, application of immunity would result in a complete denial of justice.

## CONCLUSION

Plaintiffs filed suit in this Court only after exhausting all alternative avenues of review, including an attempt to present their petition to a standing claims commission that the UN is obligated to establish under the CPIUN and SOFA.  By declining Plaintiffs' repeated requests for a forum in which to redress their harms, Defendants have broken the promises they made under these treaties, and should not be allowed to invoke the protections of those treaties.

In violating Section 29, the UN has failed to fulfill a necessary condition to receiving immunity, and has committed a material and intentional breach of the CPIUN.  Section 29 is not dead-letter law, and it is not discretionary.  Defendants' immunity must be understood and enforced only in the context of the treaty as a whole — which balances the privilege of immunity against the obligation to hear and settle claims —  including Section 29's mandatory requirement (evidenced by its use of the word "shall") that the UN provide for the settlement of disputes.  That immunity is unavailable when Defendants fail to comply with their obligations under Section 29.

Nonetheless, the Government urges this Court to accept an unprecedented and unreasonable interpretation of Defendants' immunity that disregards their flagrant breach of the treaties conferring such immunity.  Accepting that interpretation would completely deny Plaintiffs access to justice, and would grant the UN impunity.  Such a result cannot be justified

under the law.

Plaintiffs do not seek a wholesale revocation of UN immunity, and do not question the broad immunity protections necessary for the UN to fulfill its core functions and to make difficult policy decisions central to its mission. But immunity cannot apply on the facts of this case. Defendants cannot explain how negligently failing to screen cholera-infected UN personnel from Nepal, and to maintain properly functioning wastewater facilities on its bases, are UN functions worthy of immunity protections. Nor can Defendants justify how these acts, and the resulting contamination of Haiti's water supply, possibly implicate its political or policy-making functions. There is no justifiable explanation for the Defendants' decision to violate their non-discretionary legal obligations to hear and settle claims that sound in tort. Accordingly, Plaintiffs urge this Court to rule narrowly and find that the scheme of immunity does not shield the UN from suit or service of process in the egregious circumstances of this case.

Because Defendants are not immune from this suit, this Court should deny the Government's request for dismissal and should affirm that service of process has been properly made on Defendants. In the alternative, this Court should permit Plaintiffs to serve Defendants via alternate means. Accordingly, Plaintiffs respectfully request that Defendants be directed to respond to Plaintiffs' Complaint by a date certain, and that the Court thereafter hold a conference pursuant to Rule 16 of the Federal Rules of Civil Procedure to set a pre-trial schedule.

Dated: May 15, 2014

Respectfully Submitted,

*/s/: Beatrice Lindstrom*_____
Beatrice Lindstrom (S.D.N.Y. No. BL8321)
Institute for Justice & Democracy in Haiti
666 Dorchester Avenue
Boston, MA 02127
Tel: (617) 652-0876

Brian Concannon (admitted *pro hac vice*)
Institute for Justice & Democracy in Haiti
666 Dorchester Avenue
Boston, Massachusetts 02127
Tel: (617) 652-0876

Ira Kurzban (admitted *pro hac vice*)
Kurzban Kurzban Weinger Tetzeli & Pratt P.A.
2650 S.W. 27th Avenue
Second Floor
Miami, Florida 33133
Tel: (305) 444-0060
Fax: (305) 444-3503

Jeffrey Brand (admitted *pro hac vice*)
Center for Law and Global Justice
University of San Francisco School of Law
2130 Fulton Street
San Francisco, CA 94117
Tel: (415) 422-6360
Fax: (415) 422-6433

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of May, 2014, a true and correct copy of the foregoing document was served via mail, on the following:

United Nations
1 United Nations Plaza
New York, NY 10017

MINUSTAH headquarters
Log Base
Boulevard Toussaint Louverture and Clercine 18
Port-au-Prince, Haiti

Ban Ki-Moon
3 Sutton Place
New York, NY 10022

Edmond Mulet
429 East 52nd Street
Apartment 36A-E
New York, NY 10022

Copies of the same have also been sent via electronic mail to the following:

Ellen Blain, Esq.
Assistant United States Attorney
ellen.blain@usdoj.gov

Nicholas Cartier, Esq.
United States Department of Justice
nicolas.cartier@usdoj.gov

Dated: May 15, 2014                      Respectfully submitted,

   New York, New York


         */s/: Beatrice Lindstrom*

         Beatrice Lindstrom (S.D.N.Y. Bar No BL8321)
         Institute for Justice & Democracy in Haiti
         666 Dorchester Ave.
         Boston, MA 02127
         Tel: (617) 652-0876