# EXHIBIT 1

ordered pursuant to duly issued Requisitions. Payment shall be made according to the Food Rations prices listed in Annex D (Pricing Schedule), provided that the goods are in a satisfactory condition when delivered to the United Nations.

7. Article 16.9 of the Contract further provides that:

Upon the expiration or termination of this Contract, the Contractor shall give the United Nations and/or its successor, *the right to purchase any or all of the Equipment* owned by the Contractor and used exclusively for the performance of the services under this Contract that the Contractor desires to sell. (Emphasis provided.)

8. In accordance with article 16.7, therefore, the United Nations would have a strong basis for arguing that [Company] is only entitled to payment for rations, either in stock or in transit, which were ordered by the United Nations prior to the date of termination. We understand from PD that payment for such stocks has already been made to the Contractor. In relation to article 16.9, we further understand from PD that, with the exception of two refrigerated containers that were transferred to UNMEE, the Equipment used by [Company] to provide services under the Contract was either removed from the mission area or abandoned by the Contractor following the termination of the Contract. PD has also confirmed that the United Nations did not make any agreement, or promise any payment, in respect of the equipment prior to termination of the Contract.

Conclusion

9. Based on the information provided by PD, therefore, apart from the above-mentioned refrigerated containers, we can find no legal basis upon which [Company] would be entitled to reimbursement of the residual value of the equipment it used to provide services under the Contract. We also note that, to date, [Company] has provided no basis to substantiate its claim, either under the terms of the Contract, or otherwise. Should [Company] provide such substantiation at a future date, we would be happy to consider the matter further.

10. Insofar as the two refrigerated containers transferred to UNMEE are concerned, [Company] would *prima facie* be entitled to payment for the containers, as agreed at the time the transfer took place.

11 November 2009

## 4. Liability and responsibility of the United Nations

### (a) Interoffice memorandum to the Controller, Assistant Secretary-General, Office of Programme Planning, Budgets and Accounts, regarding *ex gratia* payment to an injured civilian Haitian

Payment of *ex gratia* decided upon by the Secretary-General as deemed necessary in the interest of the Organization when no clear legal liability on part of the Organization is found by the Legal Counsel—Civilian injured during military operation between United Nations soldiers and local gang—No clear legal liability on part of the United Nations—Importance of convening a Board of Inquiry in cases of this nature

1.   This is in response to your note addressed to the Legal Counsel, dated 10 December 2008, seeking the advice of the Office of Legal Affairs (OLA) in connection with a recommendation by the United Nations Stabilization Force in Haiti (MINUSTAH) Local Claims Review Board (LCRB) to pay [Name], a civilian Haitian national, an *ex gratia* payment of [USD].

## Background

2.   According to the documents attached to your note, [Name] was injured in the Cité Militaire area of Port-au-Prince, on 13 July 2006. The incident occurred while United Nations soldiers from the MINUSTAH Brazilian Battalion (BRABATT) were engaged in a military operation involving local gang members. [Name], who was apparently crossing the street at the time, was shot in the leg during an exchange of gunfire.

3.   We understand that MINUSTAH did not convene a Board of Inquiry in respect of this case. Two investigations were, however, conducted by the MINUSTAH Military Force Provost Marshall (FPM) and by the MINUSTAH Special Investigation Unit (SIU).

4.   In its report, dated 2 March 2007, the FPM found that [Name] "did not see where the shots came from" and that "it was not possible to recover the projectiles that hit [her]." The FPM added that "given the position occupied by the hostile forces," [Name] had most likely been shot by them. The FPM further concluded, however, that, although the MINUSTAH "acted in self-defence," "the possibility of collateral damage caused by an accidental fire can not be completely discarded."

5.   In its report, dated 12 March 2007 (SIU/PAP/800/06), the SIU endorsed the conclusions of the MINUSTAH military police, confirming that "although the BRABATT troops were acting in self-defense and according to the rules, it is not possible to discard definitely the possibility of collateral damage."

6.   On 26 December 2006, [Name] submitted a claim for compensation in the amount of [USD] to MINUSTAH. On 12 November 2007, she amended her claim and requested that she be sent to a country "like Cuba" to receive medical treatment for her injuries.

7.   The matter was submitted to the MINUSTAH LCRB on 24 April 2008. Noting the inconclusive findings of the two MINUSTAH investigation reports, the LCRB found that, unless there was conclusive evidence that MINUSTAH was responsible for the injury sustained by [Name], the Organization would not be liable to compensate her. The LCRB decided, therefore, to defer its review of the claim, pending the advice of the MINUSTAH Legal Office as to whether the Organization's liability had been engaged.

8.   The MINUSTAH Legal Office provided advice in respect of [Name]'s claim on 10 July 2008. The advice concluded that the "liability of the United Nations cannot be clearly established."

9.   On 28 July 2008, the LCRB reconvened to review [Name]'s claim. During that meeting, the LCRB considered that "it continues to be unclear and inconclusive as to whether the Organization was liable or not for collateral damage and that any compensation granted would be purely on humanitarian grounds." The LCRB, taking note of the sensitive political visibility of this matter, recommended, "in the best interest of the Organization," that [USD] be paid to [Name] on an *ex gratia* basis.

10.   The recommendation of the LCRB was endorsed by the MINUSTAH Chief of Mission Support and submitted to the Controller for his consideration and approval on 14 October 2008.

### Legal Analysis

11.   Financial regulation 5.11 provides that the "Secretary-General may make such *ex gratia* payments as are deemed to be necessary in the interest of the Organization" (ST/SGB/2003/7). In accordance with financial rule 105.12, "*[e]x gratia* payments may be made in cases where, although in the opinion of the Legal Counsel there is no clear legal liability on the part of the United Nations, payment is in the interest of the Organization . . . The approval of the Under-Secretary-General for Management is required for all *ex gratia* payments." In deciding whether an *ex gratia* payment may be made, therefore, the role of the Office of Legal Affairs is to determine whether the Organization is legally liable or not to make the payment.

12.   In the present case, we note that neither of the investigations conducted by MINUSTAH in respect of this incident were able to establish whether the injury sustained by [Name] was caused by BRABATT, or by the local gang members. In the absence of evidence of BRABATT's responsibility, it is the opinion of this Office that there is no clear legal liability on the part of the United Nations to compensate [Name].

13.    Should the Controller decide that it is in the interest of the Organization that an *ex gratia* payment be made to [Name], we recommend that a signed release be obtained from her before such payment is made. We would also reiterate how important it is to ensure that a Board of Inquiry is convened in cases of this nature.

29 January 2009

### (*b*)   Note to the Controller, Assistant Secretary-General for Programme Planning, Budget and Accounts, regarding requests for reimbursement for infrastructure installed by the European Union in Chad

Request for reimbursement for infrastructure installed in Chad by the European Union-led peacekeeping force (EUFOR) prior to transfer of military authority to the United Nations—No basis for obligation to reimburse the European Union (EU) under Security Council resolutions 1861 (2008) and 1778 (2007)—Exchange of letters and subsequent technical arrangement provide for reimbursement for infrastructure installed at N'Djamena and Abeche airports—Discussions held between the United Nations and the EU may have created an expectancy that an increased level of reimbursement would be provided, but does not amount to a legal obligation

1.   This is in response to your note dated 19 March 2009, requesting the advice of the Office of Legal Affairs (OLA) in relation to the Organization's potential exposure to legal liability if it does not reimburse the European Union (EU) for the infrastructure installed by the European Union-led peacekeeping force (EUFOR) in Chad.

2.   We understand that your request has arisen in the context of a request by the Department of Field Support (DFS) for reconsideration of a decision by the Office of Central