EXHIBIT 4



CAMBRIDGE STUDIES IN INTERNATIONAL AND COMPARATIVE LAW

# International Organizations
# Before National Courts



AUGUST REINISCH

CAMBRIDGE

www.ourpgs.com

more information - www.cambridge.org/0521653266

This page intentionally left blank

**International Organizations Before National Courts**

This book investigates in a radically empirical way how national courts 'react' to disputes involving international organizations. Comprehensively analyzing both national courts' attitudes and techniques and underlying policy reasons, it first describes various legal approaches that result in adjudication or non-adjudication of disputes concerning international organizations. Secondly, it discusses policy issues *pro* and *contra* the adjudication of such disputes. It scrutinizes the rationale for immunizing international organizations from domestic litigation, especially the 'functional' need for immunity, and substantially debates the implications of a human rights-based right of access to a court on the immunizing of international organizations against the jurisdiction of national courts. The book finally identifies contemporary trends, seeking to ascertain whether a more flexible principle exempting certain types of disputes from domestic adjudication might substitute for the traditional immunity concept, which would simultaneously guarantee the functioning and independence of international organizations without impairing private parties' access to a fair dispute settlement procedure.

AUGUST REINISCH is Professor of Public International Law and EC Law at the University of Vienna Law School, and a lecturer at the Austrian Diplomatic Academy in Vienna and at the SAIS/ Johns Hopkins University in Bologna.

www.ourpgs.com

CAMBRIDGE STUDIES IN INTERNATIONAL AND COMPARATIVE LAW

This series (established in 1946 by Professors Gutteridge, Hersch Lauterpacht and McNair) is a forum for studies of high quality in the fields of public and private international law and comparative law. Although these are distinct legal subdisciplines, developments since 1946 confirm their interrelationship. Comparative law is increasingly used as a tool in the making of law at national, regional and international levels. Private international law is increasingly affected by international conventions, and the issues faced by classical conflicts rules are increasingly dealt with by substantive harmonisation of law under international auspices. Mixed international arbitrations, especially those involving state economic activity, raise mixed questions of public and private international law. In many fields (such as the protection of human rights and democratic standards, investment guarantees, international criminal law) international and national systems interact. National constitutional arrangements relating to 'foreign affairs', and to the implementation of international norms, are a focus of attention.

   Professor Sir Robert Jennings edited the series from 1981. Following his retirement as General Editor, an editorial board has been created and Cambridge University Press has recommitted itself to the series, affirming its broad scope.

   The Board welcomes works of a theoretical or interdisciplinary character, and those focusing on new approaches to international or comparative law or conflicts of law. Studies of particular institutions or problems are equally welcome, as are translations of the best work published in other languages.

| General Editors | James Crawford |
| | *Whewell Professor of International Law, University of Cambridge* |
| | David Johnston |
| | *Regius Professor of Civil Law, University of Cambridge* |
| Editorial Board | Professor Hilary Charlesworth   *University of Adelaide* |
| | Mr John Collier   *Trinity Hall, Cambridge* |
| | Professor Lori Damrosch   *Columbia University Law School* |
| | Professor John Dugard   *University of Leiden* |
| | Professor Mary-Ann Glendon   *Harvard Law School* |
| | Professor Christopher Greenwood   *London School of Economics* |
| | Professor Hein Kötz   *Max-Planck-Institut, Hamburg* |
| | Professor D. M. McRae   *University of Ottawa* |
| | Professor Onuma Yasuaki   *University of Tokyo* |
| Advisory Committee | Professor Sir D. W. Bowett QC |
| | Judge Rosalyn Higgins QC |
| | Professor Sir Robert Jennings QC |
| | Professor J. A. Jolowicz QC |
| | Professor Sir Eli Lauterpacht QC |
| | Professor Kurt Lipstein |
| | Judge Stephen Schwebel |

*A list of books in the series can be found at the end of this volume*

# International Organizations Before National Courts

AUGUST REINISCH



PUBLISHED BY THE PRESS SYNDICATE OF THE UNIVERSITY OF CAMBRIDGE
The Pitt Building, Trumpington Street, Cambridge, United Kingdom

CAMBRIDGE UNIVERSITY PRESS
The Edinburgh Building, Cambridge CB2 2RU, UK
40 West 20th Street, New York, NY 10011-4211, USA
477 Williamstown Road, Port Melbourne, VIC 3207, Australia
Ruiz de Alarcón 13, 28014 Madrid, Spain
Dock House, The Waterfront, Cape Town 8001, South Africa

http://www.cambridge.org

© August Reinisch 2004

First published in printed format 2000

ISBN 0-511-03318-4 eBook (Adobe Reader)
ISBN 0-521-65326-6 hardback

# Contents

*Preface*                                                        *page* xi
*Acknowledgements*                                                    xii
*Table of cases*                                                     xvii
*Table of legal instruments*                                           lv
*List of abbreviations*                                               lxv

1  **Purpose, subject and methodology of this study**                  1
   Introduction                                                        1
   Subject of the study                                                4
   Survey of existing material and literature                         17
   Methods                                                            21


PART I   DESCRIPTIVE ANALYSIS

2  **Avoidance techniques**                                           35
   Non-recognition as a legal person under domestic law               37
   Non-recognition of a particular act of an international
        organization – *ultra vires* acts and non-attributability     70
   Prudential judicial abstention through doctrines
        concerning act of state, political questions,
        and non-justiciability                                        84
   Lack of adjudicative power of domestic courts                      99
   No case or controversy                                            124
   Judicial discretion to prevent harassing lawsuits and
        mock trials                                                   126
   According immunity to international organizations                  127

viii    CONTENTS

3    **Strategies of judicial involvement**                               169
     Non-qualification as international organization                      170
     No delegation of immunity                                            172
     Recognition of an international organization as a legal
        person under domestic law                                        175
     Denying immunity                                                     177
     Restricting the scope of immunity                                    185
     Broad waiver interpretation                                          214


PART II   POLICY ISSUES

4    **Rationales for judicial abstention**                               233
     The protection of the functioning and independence of
        an international organization                                     233
     A counterbalance to the relative weakness of
        international organizations                                       238
     The influence of states on an international organization
        should be channelled through its 'internal law'                  239
     Equality of the member states of an international
        organization                                                     241
     Securing uniformity in dispute settlement                           243
     Derived or delegated state sovereignty                              245
     Immunity as an inherent quality of international legal
        personality                                                      246
     Lack of territory                                                   248
     Precedent and prestige                                              250


5    **Reasons for asserting jurisdiction**                               252
     Judicial protection as a public good sought by and
        against international organizations                              252
     Making sense of immunity qualifications                            253
     Encroachment on the territorial sovereignty of the
        forum state                                                      254
     Higher degree of integration: the federal state analogy            255
     Enhancing the creditworthiness of international
        organizations as a functional reason to limit
        immunity                                                         255
     No immunity for *iure gestionis* activities: the same
        immunity standard as the one used for states                    258
     Fairness to third parties                                           262
     Human rights and constitutional limits                             278

PART III    FUTURE DEVELOPMENTS

6    **Do national courts provide an appropriate forum for
     disputes involving international organizations?**       317
     Critical appraisal of the quality of the existing case law    317
     The broader framework       318
     The parameters       324
     Possible solutions       328

7    **Conclusions**       391

     *Bibliography*       394
     *Index*       444

*The emerging international standard of a human right of access to court*

A deprivation of access to the regular courts in order to determine civil rights (and obligations) of individuals will pose serious constitutional problems in many legal systems[141] and – from an international law point of view even more alarmingly – important human rights questions.

International human rights texts reflect an emerging consensus that access to court in order to have one's rights and duties determined can be regarded a fundamental right. According to Article 10 of the Universal Declaration of Human Rights:

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him.

Article 14(1) of the International Covenant on Civil and Political Rights provides, *inter alia*, that:

All persons are equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law.

Article 6(1) of the European Convention on Human Rights states that:

In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law.

The wording of these provisions, in particular of Article 6(1) of the European Convention on Human Rights might leave some doubt as to whether it merely entitles a person to a fair and public trial in pending proceedings or whether it also confers an entitlement to such proceedings. Since its judgment in *Golder*,[142] however, the European Court of Human Rights has repeatedly held that 'the right of access [to court] constitutes an element which is inherent in the right stated by Article 6 § 1'[143] – an element without which the scrupulously enumerated characteristics of 'fair, public and expeditious . . . proceedings' were 'of no value at all'.[144] In *Golder*, the court concluded that:

---

[141] See pp. 290*ff* below.
[142] European Court of Human Rights, 21 February 1975.
[143] *Golder*, European Court of Human Rights, 21 February 1975, Series A, No. 18, para. 36.
[144] *Ibid*., para. 35.

Article 6 §1 secures to everyone the right to have any claim relating to his civil rights and obligations brought before a court or tribunal. In this way the Article embodies the 'right to a court', of which the rights of access, that is the right to institute proceedings before courts in civil matters, constitutes one aspect only.[145]

This is also in conformity with the draft language used for Article 10 of the Universal Declaration of Human Rights which originally provided that:

Every one *shall have access* to independent and impartial tribunals in the determination of any criminal charge against him, and of his rights and obligations.[146]

### The right of access to court and jurisdictional immunity

It is surprising to note that the apparent contradiction between an international-law-based human right of access to court and the restriction of such access by the concept of immunity has rarely been discussed.[147] The controlling instruments state that 'in the determination of his (civil) rights and obligations' 'everyone' shall have recourse to a fair judicial proceeding – a language that does not contain any restrictive wording implying limits *vis-à-vis* a certain class of persons. This broad and unqualified language indeed does not suggest any exceptions necessary for immunity reasons.[148] Nevertheless, the idea that a wholesale exclusion of foreign states from the jurisdiction of domestic courts might contravene human rights requirements has been advanced only very occasionally.[149]

---

[145]  *Ibid.*, para. 36. Reaffirmed and quoted in *Ashingdane*, European Court of Human Rights, 28 May 1985, Series A, No. 93, para. 55; *Philis*, European Court of Human Rights, 27 August 1991, Series A, No. 209, para. 59; *Fayed*, European Court of Human Rights, 21 September 1994, Series A, No. 294-B, para. 65, *The Holy Monasteries*, European Court of Human Rights, 9 December 1994, Series A, No. 301-A, para. 80.

[146]  Report of the UN Human Rights Commission, (ECOSOC) Official Records, 3rd year, 6th Session, E/600, Annex A (emphasis added).

[147]  See, however, Lauterpacht, 'The Problem', 2, who had argued in 1951 that, with 'the recognition of human freedoms as part of international law . . . it may be opportune to re-examine the problem of jurisdictional immunities of foreign states'.

[148]  The European Court of Human Rights, however, acknowledged that the right of access to court resulting from Article 6(1) of the European Convention on Human Rights was 'not absolute' and contained 'implicit limitations'. *Cf. Ashingdane*, European Court of Human Rights, 28 May 1985, Series A, No. 93, 24; *Fayed*, European Court of Human Rights, 21 September 1994, Series A, No. 294-B; *Golder*, European Court of Human Rights, 21 February 1975, Series A, No. 18, 37; *Lithgow and others*, European Court of Human Rights, 8 July 1986, Series A, No. 102, 71; see also pp. 284*f* and 307 below.

[149]  The contribution of Pahr to the *Festschrift Modinos* which expressly addresses state immunity and Article 6(1) of the European Convention on Human Rights is such a rare exception. Pahr argues that, since the European Convention on Human Rights's Article 6(1) contains no restrictions, it is in principle applicable to legal disputes of a civil

For the silent majority, sovereign immunity and other jurisdictional immunities are obviously taken for granted and considered unaffected by the adoption of Article 6(1) of the European Convention on Human Rights. One of the main arguments for harmonizing the apparent contradiction between Article 6(1) and state immunity might be found in a historic interpretation of the European Convention on Human Rights provisions. The rules on state immunity could be regarded as pre-existing norms of international law which were not intended to be affected by Article 6(1). Thus, the further validity of state immunity might be seen as an implicit exception to Article 6(1).[150]

Although there appear to be no authoritative statements of organs applying human rights guarantees which would expressly confirm this view – regarding state immunity, diplomatic immunity or the immunity of international organizations – there are decisions of such bodies that seem to support the view that the 'enactment' of rights of access to court did not intend to abrogate existing international law principles. For

character between states and private parties. Willibald P. Pahr, 'Die Staatenimmunität und Artikel 6 Absatz 1 der Europäischen Menschenrechtskonvention', in *Mélanges offerts à Polys Modinos. Problèmes des droits de l'homme et de l'unification Européenne* (Paris, 1968), 222–32 at 223. Although a clear delimitation of what constitutes 'civil rights and obligations' does not appear feasible to him, Article 6(1) guarantees in a certain core area of law – which is at least roughly ascertainable – a fair trial without any restriction or regard to who is a party to such proceedings. In this respect he considers state immunity incompatible with Article 6(1) (Pahr, 'Die Staatenimmunität', 231: 'In diesem Rechtsbereich ist daher für eine Staatenimmunität im oben dargelegten Sinn kein Raum.'). While he deals at length with the difficulty of defining 'civil rights and obligations' in order to determine the scope of application of Article 6(1), he does not elaborate on the potential justification for a further existence of the rule of state immunity also within the framework of the European Convention on Human Rights. Without further reasoning, he dismisses the argument that states would continue to be amenable to suit in their own courts as insufficient to guarantee a fair trial and to uphold the principle of equality of arms before the courts (*Waffengleichheit*). Pahr, 'Die Staatenimmunität', 231. This statement is even more surprising considering the fact that, after the 1950s, state immunity remained part of the accepted rules of international law applied by domestic courts in Europe.

[150]  *Cf.* Helmut Damian, *Staatenimmunität und Gerichtszwang. Grundlagen und Grenzen der völkerrechtlichen Freiheit fremder Staaten von inländischer Gerichtsbarkeit in Verfahren der Zwangsvollstreckung oder Anspruchssicherung* (Berlin, Heidelberg, New York and Tokyo, 1985), 17, arguing that the right of access to court has its effect *de lege lata* only within the scope of a state's jurisdiction which means beyond the limits of the international rules on immunity: 'Die Rechtsschutzgarantie entfaltet ihre Wirkung *de lege lata* innerhalb des staatlichen Zuständigkeitsbereichs, also jenseits der überkommenen völkerrechtlichen Grenzen des Immunitätsrechts'. See also Michael Bothe, 'Die strafrechtliche Immunität fremder Staatsorgane' (1971) 31 *Zeitschrift für ausländisches öffentliches Recht und Völkerrecht* 246–70 at 256; and Wolfgang Heidelmeyer, 'Immunität und Rechtsschutz gegen Akte der Besatzungshoheit in Berlin' (1986) 46 *Zeitschrift für ausländisches öffentliches Recht und Völkerrecht* 519–38 at 520, note 2.

instance, in *Lingens and Leitgeb* v. *Austria*,[151] the European Commission of Human Rights thought that:

The fact that certain crucial evidence . . . remained outside the reach of the court due to the witness' parliamentary immunity cannot, however, be regarded as an unfair element in the proceedings because it cannot be assumed that the States parties to the Convention wished, in undertaking to recognise the right set forth in Article 6, to make any derogation from the fundamental principle of parliamentary immunity which is embodied in the Constitutions of most States with a parliamentary system.[152]

Similarly in *Re a Solicitor, H* v. *United Kingdom*,[153] the European Commission of Human Rights found that 'it is not a denial of a fair hearing under Article 6 . . . if [the applicant's] claim against the trial judge is struck out on the ground that the trial judge enjoys immunity from suit while acting in his judicial capacity'. If this argument is correct concerning domestic immunity principles, it may be all the more pertinent where international law principles mandating immunity are concerned. In a number of judgments[154] the European Court of Human Rights explicitly stated that the right of access to court as guaranteed by Article 6(1) is 'not absolute' and acknowledged 'implicit limitations' of this right. Although it has not been expressly decided that way, it may well be that immunity ought to be considered one of these implicit limitations.[155]

Acceptance of the traditional practice of granting immunity to international organizations might have been also a decisive factor for the European Commission of Human Rights to see no human rights concerns

---

[151] European Commission of Human Rights, Application No. 8803/79, 11 December 1981.

[152] *Lingens and Leitgeb* v. *Austria*, European Commission of Human Rights, Application No. 8803/79, 11 December 1981, (1983) 34 *Decisions and Reports* 171 at 179. See already *Agee* v. *United Kingdom*, European Commission of Human Rights, Application No. 7729/76, 17 December 1976, (1977) 7 *Decisions and Reports* 164 at 175, holding that 'Article 6(1) must be interpreted with due regard to parliamentary immunity as traditionally recognised in the States parties to the Convention. The principle of immunity in respect of such statements is generally recognised as a consequence of an effective political democracy within the meaning of the preamble to the Convention.'

[153] European Commission of Human Rights, Application No. 8083/77, 13 March 1980.

[154] *Ashingdane*, European Court of Human Rights, 28 May 1985, Series A, No. 93, 24; *Fayed*, European Court of Human Rights, 21 September 1994, Series A, No. 294-B; *Golder*, European Court of Human Rights, 21 February 1975, Series A, No. 18, 37; *Lithgow and others*, European Court of Human Rights, 8 July 1986, Series A No. 102, 71.

[155] *Cf.* Jochen A. Frowein and Wolfgang Peukert, *Europäische MenschenRechtsKonvention. EMRK-Kommentar* (2nd edn, Kehl, Strasbourg and Arlington, 1996), 205, who argue that according to the European Commission of Human Rights Article 6 has to be interpreted in light of the reservation of the traditional and generally recognized principle of parliamentary and diplomatic immunity.

involving Article 6(1). In *Ary Spaans* v. *The Netherlands*,[156] a case involving the immunity from suit of an international organization,[157] the Commission laconically remarked:

> The Commission notes that it is in accordance with international law that States confer immunities and privileges to international bodies like the Iran–United States Claims Tribunal which are situated in their territory. The Commission does not consider that such a restriction of national sovereignty in order to facilitate the working of an international body gives rise to an issue under the Convention.[158]

In two recently decided cases before the European Commission on Human Rights, in *Karlheinz Beer and Philip Regan* v. *Germany*[159] and *Richard Waite and Terry Kennedy* v. *Germany*,[160] the defendant government tried to rely on this jurisprudence. Germany maintained that 'the right of access to court is subject to inherent limitations which include the traditional and generally recognised principle of parliamentary and diplomatic immunity and also the immunity of international organisations'.[161] Despite earlier decisions on the admissibility of the complaints[162] the Commission did not substantively change its previous case law. Rather, it found no violation of Article 6(1) as long as an 'equivalent legal protection' was available.[163]

Nevertheless, even if the historical acceptance of state and organizational immunity as a limitation of the scope of Article 6(1) may be plausible and currently predominant, it seems that a dynamic interpretation of human rights texts – demanding constant revision of hitherto accepted standards[164] – could have rendered this traditional approach invalid. The 'European consensus' relating to the material content of the rights contained in the European Convention on Human Rights is clearly something

---

[156] European Commission of Human Rights, Application No. 12516/86, 12 December 1988 (admissibility).

[157] See pp. 299*f* below in more detail.

[158] (1988) 58 *Decisions and Reports* 119 at 122.

[159] European Commission of Human Rights, Application No. 28934/95; 2 December 1997.

[160] European Commission of Human Rights, Application No. 26083/94; 2 December 1997.

[161] European Commission of Human Rights, Application No. 28934/95; 2 December 1997, para. 54.

[162] European Commission of Human Rights, Application Nos. 28934/95 and 26083/94; 24 February 1997.

[163] See pp. 304*f* below.

[164] *Cf*. the Court's judgment in *Tyrer*, European Court of Human Rights, 25 February 1978, Series A No. 26, para. 31, stating that '[t]he Convention is a living instrument which . . . must be interpreted in the light of present-day conditions'. See also Franz Matscher, 'Methods of Interpretation of the Convention' in R. St. J. Macdonald, F. Matscher and H. Petzold (eds.), *The European System for the Protection of Human Rights* (Dordrecht, Boston and London, 1993), 63–81 at 68, on the 'evolutive and dynamic method' of interpretation used by the Strasbourg organs.

that is not unchangeable. It may well be that the exclusion of a certain class of potential defendants (international organizations and sovereign states under an absolute immunity standard) was acceptable in the 1950s; this concept, however, may have changed. The expansive interpretation of the rights protected under the European Convention of Human Rights in general is a clear evidence for this trend. The European Commission of Human Rights seems to be well aware of the potential friction between access to court and immunity demands. In *Graham Dyer* v. *United Kingdom*,[165] relying on the Court's judgment in the *Golder*[166] case, it reasoned:

Were Article 6(1) to be interpreted as enabling a State Party to remove the jurisdiction of the courts to determine certain classes of civil claim [*sic*!] or to confer immunities from liability on certain groups in respect of their actions, without any possibility of control by the Convention organs, there would exist no protection against the danger of arbitrary power.[167]

As far as access to court as an element of the vindication of individual rights is concerned, an interesting parallel can be derived from the developments in the context of human rights violations and amnesty laws both on the inter-American and the universal International Covenant on Civil and Political Rights (ICCPR) level. Stopping short of giving individual victims a right to see their aggressors punished, authoritative interpretations of the relevant human rights instruments by the Inter-American Commission on Human Rights and the United Nations Human Rights Committee concluded that general amnesty laws are, as a matter of principle, incompatible with the duties of states parties to the Inter-American Convention on Human Rights and the ICCPR. In particular, as far as grave violations of human rights are concerned, such as torture, disappearance, etc., national legislative acts leading to the impunity of those having committed such human rights violations were considered to be contrary to the general obligation of states to 'respect and ensure' specific human rights.[168]

---

[165]  European Commission of Human Rights, Application No. 10475/83, 9 October 1984.

[166]  European Court of Human Rights, 21 February 1975, Series A, No. 18, para. 35.

[167]  *Graham Dyer* v. *United Kingdom*, European Commission of Human Rights, Application No. 10475/83, 9 October 1984, (1984) 39 *Decisions and Reports* 246 at 252.

[168]  *Cf.* General Comment Nos. 7 and 20, 'Article 7', adopted by the Human Rights Committee under Article 40(4) of the International Covenant on Civil and Political Rights. See also the Reports of the Inter-American Commission on Human Rights concluding that Argentine and Uruguayan amnesty laws violated not only the obligation of states to 'respect and ensure' the human rights contained in Article 1 of the Inter-American Convention on Human Rights, but interestingly also its Article 8 granting '[e]very person . . . the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent and impartial tribunal, previously established by law, in the substantiation of any accusation of a criminal nature made against him or for the

There are, of course, important differences between impunity, and thus substantive exemption from criminal prosecution, and procedural immunity from civil liability. However, the examples cited appear to evidence a growing consensus that measures aimed at, or at least having the effect of, insulating – 'immunizing' – certain persons from their accountability or responsibility become less and less acceptable under current human rights standards. Considering that the fair trial provisions of the ICCPR, the Universal Declaration and the European Convention on Human Rights are almost identically worded, the transfer of these European standards to the universal plane and *vice versa* does not appear to be excluded.

Even if one does not accept this 'dynamic interpretation' argument requiring an evolutionary reconsideration of the proper immunity standard, it appears that the notion of an original implied exception for immunity against the plain wording of the applicable human rights instruments is more problematic than one might think. Why should, in case of a conflict between two international rules, the human rights obligation give way to the immunity obligation of a forum state? Even without referring to any argument of a higher value of human rights norms[169] or their potential *ius cogens* character,[170] one could ask why the human rights norm should not prevail in such a conflict.[171]

One of the reasons why this apparent contradiction of individual rights to pursue one's civil rights and obligations in court and immunity under

determination of his rights and obligations of a civil, labor, fiscal, or any other nature'. Inter-American Commission on Human Rights, Report No. 28/92 *Annual Report*, 41*ff* (Argentina); Inter-American Commission on Human Rights, Report No. 29/92, 2 October 1992, *Annual Report*, 154*ff* (Uruguay).

[169] On the domestic legal level such a solution is certainly conceivable. For instance, in the Austrian legal system the provisions of the European Convention on Human Rights are directly applicable treaty norms of constitutional law status. *Bundesgesetzblatt* No. 59/1964. *Cf.* Rudolf Bernhardt, 'The Convention and Domestic Law' in Macdonald, Matscher and Petzold (eds.), *The European System for the Protection of Human Rights*, 25–40 at 27. In cases of conflict with other international norms that are incorporated into the domestic legal order, the fundamental rights of constitutional rank will prevail.

[170] Even the *Restatement (Third)*, § 702, Reporters' Note 11, claiming the *ius cogens* quality of a number of human rights, does not consider a right of access to court to be one of them.

[171] This is exactly the question that has been posed – though not answered – by the French Cour de Cassation in its annual report, commenting on the *Hintermann* case (see p. 298 below). The court considered that an organization's immunity may lead to a denial of justice and asked whether '[c]e déni de justice peut-il être évité par la primauté de la convention européenne des droits de l'homme, qui garantit le libre accès au juge et le procès équitable?' ('whether this denial of justice could be avoided by recognizing the primacy of the European Convention on Human Rights which guarantees the free access to a judge and to a just procedure'). Cour de Cassation, *Rapport annuel* (1995), 418, cited by Byk, 'Case Note', 142.

international law has not given rise to more controversy might lie in the fact that a number of potential cases will no longer arise because of the change of the international rules on state immunity. In a way, the standard of the European Convention on State Immunity, which codified the European trend of restrictive immunity, implicitly acknowledged the human rights concerns raised above. By allowing suits against states in certain types of actions, generally relating to their *iure gestionis* activities, a broad range of claims concerning at least the core of civil rights and obligations seems to be possible. The same is, of course, true in all other countries adhering to a restrictive immunity concept. Where states deny the jurisdiction of their judicial fora over lawsuits against a foreign state only with regard to the latter's *iure imperii* acts, their obligation to provide access to court in cases concerning the determination of 'civil rights and obligations' can be largely fulfilled.

Even if the law has not yet moved towards a higher standard of protection for individuals seeking redress against sovereigns or international organizations in matters concerning their 'civil rights and obligations', the policy argument remains valid that a wholesale exemption of a particular class of potential defendants from the jurisdiction of domestic courts severely curtails the affected individuals' right to have their day in court.[172] If one accepts the proposition that human rights considerations should restrict the scope of sovereign immunity, the same would appear to be true with regard to the immunity of international organizations.

The right of access to court as discussed in case law

It is important to realize that the issue of the immunity of international organizations and the right of access to court of individuals involves a complex three-party relationship, comprising:

(1) an individual's substantive entitlement *vis-à-vis* an international organization and his or her human right of access to court *vis-à-vis* a forum state;

---

[172] *Cf.* the reasoning of the judge in the court of first instance in *Trawnik and another* v. *Ministry of Defence*, High Court, Chancery Division, 16 April 1984, a case brought by German citizens against UK officers complaining against the erection of a shooting range in West Berlin by the British armed forces stationed there: 'I do not need the European Convention on Human Rights to tell me that it is deplorable that . . . there is no court with power to decide whether the plaintiffs are entitled to the remedy that they seek. If heard their claim might fail . . . but at least the plaintiffs would have had their day in court.' In *Trawnik and another* v. *Lennox and another*, Court of Appeal, 1984, the Court of Appeal was less impressed with such arguments and disallowed the action: 'The plaintiffs may be suffering a wrong for which there is no remedy in our courts. This is to be regretted; but sympathy for the plaintiffs is no justification for adding as a defendant an officer of state who, as a matter of law, has no interest in the proceedings.'

(2)   the forum state's obligation *vis-à-vis* the individual to provide access to court and its potential obligation *vis-à-vis* the defendant international organization to grant immunity; and

(3)   the international organization's substantive obligation *vis-à-vis* the individual and its potential right to immunity *vis-à-vis* the forum state.

What is important but frequently overlooked is the fact that the right of access to court is an individual's right *vis-à-vis* the forum state and not *vis-à-vis* the international organization intended to be sued. This is exactly the point that seems to have been confused by the Belgian court in the *Manderlier* v. *Organisation des Nations Unies and Etat Belge (Ministre des Affaires Etrangères)*[173] case. There the Civil Tribunal of Brussels disposed of the argument that the UN's immunity from suit in Belgium would violate Article 6 of the European Convention on Human Rights which it qualified as completely effective and applicable under Belgian law, by asserting that 'the Convention was concluded between fourteen European States only, and cannot be applied to and imposed upon the United Nations'.[174] It was, however, not a question of the UN's allegiance to the principles of the European Convention on Human Rights, but rather of Belgium's obligation, as party to a human rights instrument, to provide access to its courts in a dispute involving the UN as defendant.

Express pleas for a limitation of an international organization's immunity from suit based on human rights concerns are rarely found in legal writing.[175] This does not alter the strength of the argument that an

---

[173]   Civil Tribunal of Brussels, 11 May 1966; Brussels Appeals Court, 15 September 1969.

[174]   (1972) 45 ILR 446 at 452.

[175]   One of the few examples is Hammerschlag's case note on *Morgan* v. *IBRD*, US District Court DC, 13 September 1990. On *Morgan*, see pp. 165 and 200 above. This author openly deplores the District of Columbia district court's decision to dismiss a suit brought against the World Bank for reasons of immunity and harshly criticizes this result whereby 'fundamental rights of individuals have been compromised in favor of the expansion of global economic interest', since the court 'based its decision on economic rationales, entirely disregarding human rights issues'. Daniel Hammerschlag, '*Morgan* v. *International Bank for Reconstruction and Development*' (1992) 16 *Maryland Journal of International Law and Trade* 279−303 at 280, note 9. The suit for intentional infliction of emotional distress, false imprisonment, libel and slander brought by an employee of a temporary employment agency who worked for a two-and-a-half-year period for IBRD was certainly not one of the 'ordinary' employment disputes encountered within international organizations. Morgan, who was suspected of having stolen money from within the premises of the IBRD, was interrogated and forcibly detained by IBRD officials and security guards. When they could not produce any evidence, but rather continued to harass him, Morgan in return sought compensatory and punitive damages. Hammer-schlag, however, does not pursue the issue of a possible friction with the human rights guarantee of access to court in civil matters as embodied in Article 14 of the International Covenant on Civil and Political Rights, Article 6 of the European Convention on

international organization's immunity should not cover all those cases which determine the civil rights and obligations of individuals – an argument that appears to be equally valid whether it relates to the rights and obligations *vis-à-vis* states, diplomats or international organizations.

Although there is not much discussion in the literature, some national court decisions seem to refer – at least in passing – to the potential friction with constitutional guarantees as a result of excluding international organizations from the adjudicative power of domestic courts. There are a number of serious attempts to address the problem of access to judicial dispute settlement and immunity under fundamental rights guarantees; the discussion is particularly highly developed in the framework of domestic constitutional guarantees.[176]

In Germany the arguments circle around Articles 19(4) and 101(1) of the Basic Law. Article 19(4) provides:

Should any person's rights be violated by public authority, recourse to court shall be open to him. Where no other jurisdiction has been established, recourse to the courts of ordinary jurisdiction is available.

Article 101(1) provides:

Extraordinary courts are inadmissible. No one may be removed from the jurisdiction of his lawful judge (*gesetzlicher Richter*).

Two well-known decisions of the German Constitutional Court involving Eurocontrol mainly concern Article 19(4) of the Basic Law and recourse against administrative acts, and are thus only indirectly relevant to the

Human Rights, etc., but rather focuses on the issue of whether international organizations should be answerable for human rights violations. He immediately links this issue with the question of whether such accountability should be determined by US courts and thus lead to the forfeiture of immunity. Although he does not mention this line of case law, Hammerschlag seems to rely heavily on US court decisions denying immunity from suit to foreign sovereigns in certain tort cases. *Cf. Filartiga* v. *Peña-Irala*, 630 F. 2d 876 (2d Cir. 1980); *Forti* v. *Suarez-Mason*, 672 F. Supp. 1531 (NDC 1987). More recently, Michael Singer, 'Jurisdictional Immunity of International Organizations: Human Rights and Functional Necessity Concerns' (1995) 36 *Virginia Journal of International Law* 53–165, calls for a reappraisal of the law of immunity from suit of international organizations. Like Hammerschlag, he is primarily concerned about human rights violations perpetrated by international organizations and the lack of available fora to remedy such wrongs. He does not address the possible human rights friction resulting from a state's obligation to grant immunity and at the same time to give access to its courts in the determination of civil rights and obligations.

[176] *Cf.* Mauro Cappelletti, *The Judicial Process in Comparative Perspective* (Oxford, 1989), 226*ff*; and Karl Heinz Schwab and Peter Gottwald, 'Verfassung und Zivilprozeß' in Walther J. Habscheid (ed.), *Effektiver Rechtsschutz und verfassungsmäßige Ordnung* (Bielefeld, 1983), 1–89 at 37*ff* for an overview on national constitutional provisions guaranteeing access to courts.

present problem. The court stated in those cases that Eurocontrol exercised 'foreign' public authority when setting the rates of the applicable flight charges (*Eurocontrol-Flight Charges II*)[177] or when regulating the legal relationship with its employees (*Hetzel* v. *Eurocontrol*).[178] Thus, it was not amenable to suit as a matter of constitutional law since Article 19(4) of the Basic Law provided for legal recourse only against acts of German authorities. Accordingly, the constitutional claims failed. However, these cases also suggest that there might be implicit limits to the abandonment of legal remedies resulting from the grant of immunity to international organizations.

In *Hetzel* v. *Eurocontrol II*,[179] the Federal Constitutional Court clearly stated that, if the legal protection against acts of international institutions proved 'insufficient', this in itself might constitute a violation of the implicit constitutional limitation to the transfer of sovereign powers according to Article 24(1) of the Basic Law.[180] In particular, it thought that the lack of an effective legal remedy against the acts of a public authority

---

[177] Federal Constitutional Court, 23 June 1981. The same qualification of the flight invoicing was reached in *Trans-Mediterranean Airways* v. *Eurocontrol*, Royal Decree (administrative decision of the Crown), 16 January 1974. In an attempt to dispute flight charges invoiced from Eurocontrol, a Lebanese airline appealed to the Dutch Crown. The appeal was rejected since 'Eurocontrol invoices could not be regarded as decisions of an administrative body of the Netherlands Government within the meaning of the Administrative Decisions Appeal Act'. (1977) 8 *Netherlands Yearbook of International Law* 258. In a preliminary ruling the ECJ also held that flight charges set by Eurocontrol are *iure imperii* activities. Thus, the Brussels Convention covering civil and commercial matters was not applicable. *LTU* v. *Eurocontrol*, Case 29/76, ECJ, 14 October 1976. This view was confirmed in *SAT Fluggesellschaft mbH* v. *Eurocontrol*, Case 364/92, ECJ, 19 January 1994, where a German airline had challenged the flight charging methods of the organization, alleging that they infringed the competition rules of the EC. The Belgian courts had doubts as to whether this activity could fall under the competition rules and, in particular, whether Eurocontrol could be regarded as an 'undertaking' in the sense of Article 85*ff* of the EC Treaty. The Belgian Cour de Cassation, 10 September 1992, referred the question to the ECJ. In its preliminary ruling, the ECJ stated: 'Taken as a whole, Eurocontrol's activities, including the collection of route charges on behalf of the Contracting States, are connected with their nature, their aim and the rules to which they are subject, to the exercise of powers relating to the control and supervision of air space which are typically those of a public authority and are not of an economic nature justifying the application of the Treaty rules of competition'. [1994] ECR I-43 at 44. This ruling was followed in *Irish Aerospace (Belgium) NV* v. *European Organisation for the Safety of Air Navigation and Civil Aviation Authority*, Queen's Bench Division (Commercial Court), 6 June 1991, stating that 'Eurocontrol's public service assignment of ensuring the safety of air navigation could not be deemed to be an economic or commercial activity'. [1992] 1 *Lloyd's Reports* 383.

[178] Administrative Court Karlsruhe, 5 July 1979; Appellate Administrative Court Baden-Württemberg, 7 August 1979; Federal Constitutional Court, 10 November 1981.

[179] Federal Constitutional Court, 10 November 1981.

[180] Article 24(1) of the Basic Law provides: 'The Federation may by legislation transfer sovereign powers to intergovernmental institutions.'

could be such a violation.[181] Though the court did not consider it necessary to embark on a discussion of where the exact constitutional limits of Article 24 were and what kind of guarantees had to be fulfilled, it seems to follow quite clearly that at least the existence and availability of an alternative dispute settlement procedure can be seen as a constitutionally mandated minimum. In *Hetzel* v. *Eurocontrol*, the plaintiffs also tried to argue that the fact that Eurocontrol enjoyed immunity from suit in Germany and offered legal recourse for aggrieved employees only to an administrative tribunal violated the constitutional law prohibition of 'exceptional/extraordinary courts' (*Ausnahmegerichte*) enshrined in Article 101(1), first sentence of the Basic Law.[182] The Constitutional Court rejected this claim as well and held that the exclusive competence of the ILO Administrative Tribunal for labour disputes between Eurocontrol and its employees did not deprive the affected individual of his or her right to access to court, because the procedure and jurisprudence of that tribunal satisfied the principles of the rule of law/legality.[183]

In *Eurocontrol-Flight Charges II*,[184] the Federal Constitutional Court rejected the contention of the claimants that the exclusive jurisdiction of Belgian courts violated the principles of the German Basic Law. It held that the German Constitution did not provide a subsidiary jurisdiction for German courts over disputes concerning flight charges of Eurocontrol since the provision allegedly infringed, Article 19(4) of the Basic Law, provided for legal recourse against acts of German authorities only, not against acts of intergovernmental institutions.[185] What is important to note, however, is the fact that the Federal Constitutional Court reiterated its view – already enunciated in the famous *Solange* decisions[186] – accord-

[181] '[M]it Blick auf die Grundprinzipien der Verfassung bestehende Grenzen dieser Übertragungsermächtigung könnten überschritten sein, wenn bei der Schaffung einer zwischenstaatlichen Einrichtung und bei ihrer organisatorischen und rechtlichen Ausgestaltung der – schon im Rechtsstaatsprinzip verankerten – Gewährleistung eines wirksamen Rechtsschutzes gegen Akte der öffentlichen Gewalt nicht hinreichend Rechnung getragen wurde.' Federal Constitutional Court, 10 November 1981, BVerfGE 59, 63 at 86.
[182] See p. 290 above.
[183] Federal Constitutional Court, Second Chamber, 10 November 1981, 2 BvR 1058/79, BVerfGE 59, 63 at 91. Also in *Strech* v. *Eurocontrol*, Labour Court Karlsruhe, 5 December 1978; State Labour Court Baden-Württemberg, 28 September 1979, a related labour dispute, the State Labour Court of Baden-Württemberg considered that the procedure of the ILO tribunal conformed to the principles of democracy and the rule of law.
[184] Federal Constitutional Court, 23 June 1981.    [185] BVerfGE 58, 1 at 26.
[186] *Internationale HandelsgesellschaftmbH* v. *Einfuhr- und Vorratstelle für Getreide und Futtermittel*, Federal Constitutional Court, 29 May 1974; *Re Application of Wünsche Handelsgesellschaft*, Federal Constitutional Court, 22 October 1986. See also p. 311 below. Also, in this respect, the German Constitutional Court has recently quite clearly affirmed its *Solange* jurisprudence by stating its willingness to scrutinize acts of European Community

ing to which the constitutional license to transfer sovereign powers to international organizations under Article 24(1) of the Basic Law is limited by the necessity to respect the core elements of the German Constitution. Among those core elements are the fundamental rights of individuals which may not be removed by such a transfer of sovereignty.[187] The Federal Constitutional Court was, however, clearly of the opinion that the option of legal recourse that was offered by Belgian courts satisfied the basic rights requirement of an effective legal protection.[188]

In this respect it confirmed what the German Federal Administrative Court had already stated in *Eurocontrol-Flight Charges I*.[189] In this earlier decision arising from the same dispute, a German air transportation company brought suit against Eurocontrol challenging the legality of its competence to collect flight charges. The German Federal Administrative Court upheld the reasoning of the lower courts which had decided that German courts had no jurisdiction to scrutinize the flight charges of Eurocontrol because such jurisdiction vested exclusively in Belgian courts as a result of Eurocontrol's internal law. The highest German administrative court emphasized that – since the Belgian courts would adequately guarantee a fair trial – the resulting lack of jurisdiction of the German courts posed no constitutional law problems.[190]

In another German decision, *X* v. *Y* (the *ESRO* case),[191] the plaintiff specifically attacked the grant of immunity to officers of the European Space Research Organization as a violation of Article 101 of the German Basic Law. The court, however, thought that the constitutional prohibition of 'exceptional/extraordinary courts' did not guarantee the access to German courts, but rather presupposed the jurisdiction of German courts. Thus, a total exemption from German jurisdiction was held to be

organs that threaten to infringe basic rights of German citizens: 'Acts done under a special power, separate from national powers of Member States, exercised by a supra-national organization also affect the holders of basic rights in Germany. They therefore affect the guarantees of the Constitution and the duties of the Constitutional Court, the object of which is the protection of constitutional rights in Germany – in this respect not merely as against German state bodies.' *Brunner et al.* v. *European Union Treaty (Constitutionality of the Maastricht Treaty)*, German Federal Constitutional Court, 12 October 1993, (1994) 31 *Common Market Law Review* 251 at 253.

[187] BVerfGE 58, 1 at 40: 'Allerdings läßt [Article 24] die Übertragung von Hoheitsrechten auf zwischenstaatliche Einrichtungen nicht schrankenlos zu . . . Ein unaufgebbarer Bestandteil des Verfassungsgefüges sind die fundamentalen Rechtsgrundsätze, die in den Grundrechten des Grundgesetzes anerkannt und verbürgt sind.'

[188] BVerfGE 58, 1 at 42.     [189] Federal Administrative Court, 16 September 1977.

[190] BVerwGE 54, 291 at 304.

[191] Federal Labour Court, 25 January 1973. An employment dispute brought against an officer of ESRO was dismissed because the court considered the actions complained of to be covered by the defendant's functional immunity.

www.ourpgs.com

compatible with the constitutional prohibition of exceptional courts and not to violate the German constitutional principles of democracy and the rule of law.

Although these decisions have given rise to a number of scholarly comments,[192] they seem to confine themselves to the narrow issue of the applicability of Article 19(4) of the Basic Law to acts of international organizations and do not deal with the problem of 'non-sovereign' or 'non-public' acts of international organizations and the legal protection against such acts by the German courts.[193] However, under the three-party relationship, outlined above, it would be exactly this aspect which is of interest in the present context, i.e. whether individuals have a right to go to court over private law disputes with international organizations and not whether German administrative/constitutional law controls should extend over non-German official acts.

Some Italian cases seem to be relevant to this discussion.[194] They

[192] Bleckmann, *Internationale Beamtenstreitigkeiten*; A. E. du Perron, 'Eurocontrol, Liability and Jurisdiction' in J. W. E. Storm van's Gravesande and A. van der Veen Vonk (eds.), *AirWorthy. Liber Amicorum I. H. P. Diederiks-Verschoor* (Deventer, Antwerp, London, Frankfurt, New York and Boston, 1985), 135–49; Ludwig Gramlich, 'Innerstaatlicher Rechtsschutz für internationale Bedienstete?' (1985) 6 *Juristische Rundschau* 221–8; Christoph H. Schreuer, 'Eurocontrol: Wechselwirkungen staatlicher und innerstaatlicher Jurisdiktion' in Rechtswissenschaftliche Fakultät der Universität Salzburg (ed.), *Aus Österreichs Rechtsleben in Geschichte und Gegenwart. Festschrift für Ernst C. Hellbling* (Berlin, 1981), 371–82; Seidl-Hohenveldern, *Die Immunität internationaler Organisationen*; and Ignaz Seidl-Hohenveldern, 'Zur internationalen Zuständigkeit deutscher Gerichte für Rechtsstreitigkeiten über Gebührenforderungen der Eurocontrol' (1982) 31 *Zeitschrift für Luft- und Weltraumrecht* 111–15.

[193] Gramlich, 'Innerstaatlicher Rechtsschutz', 221*ff*; and Manfred Wenckstern, 'Verfassungsrechtliche Fragen der Immunität internationaler Organisationen' (1987) *Neue Juristische Wochenschrift* 1113–18 at 1114. In his short article on constitutional questions of the jurisdictional immunity of international organizations, Wenckstern only briefly touches upon the issue of a potential conflict of this international norm with the rule of law principle as codified in the German Constitution. He merely cites the famous *Eurocontrol-Flight Charges II* case as evidence of the proposition that the strict rules of Article 19(4) of the Basic Law are applicable only *vis-à-vis* acts of German authorities, not acts of international organizations. In his view the requirements of the rule of law principle can be fulfilled by a minimum standard of jurisdictional protection afforded by arbitral tribunals or international courts as long as a minimum protection is guaranteed and as long as the transfer to non-German dispute settlement organs is justified by material reasons (*sachliche Gründe*). Wenckstern, 'Verfassungsrechtliche Fragen', 1114. However, Wenckstern does not mention the European Convention on Human Rights dimension or other human rights concerns.

[194] See also *Astrup* v. *Presidente Consiglio ministri*, Constitutional Court, 27 June 1973; *FAO* v. *Colagrossi*, Corte di Cassazione, 18 May 1992; *Luggeri* v. *ICEM*, Tribunale Santa Maria Capua Vetere, 20 June 1966; Court of Appeals of Naples, 18 December 1970, discussed at p. 310 below.

sometimes refer to the right to a 'natural judge' contained in Article 25(1)[195] of the Italian Constitution and sometimes to Article 24(1) of the Italian Constitution according to which '[e]veryone is entitled to institute legal proceedings for the protection of his rights and legitimate interests'. In *Food and Agriculture Organization* v. *Istituto Nazionale di Previdenze per i Dirigenti di Aziende Industriali (INPDAI)*,[196] the Italian Supreme Court reasoned that this constitutional requirement has to be taken into consideration when assessing the scope of immunity of an international organization.[197] Although the court referred to Article 24 only in passing, it seems relevant that it denied the FAO's claim to absolute immunity and subjected the organization to the jurisdiction of Italian courts as far as private law disputes arising from a lease agreement were concerned.[198]

Among the many US cases dealing with the jurisdictional immunity of international organizations only a few consider its implication for a right of access to courts. This may have to do with the fact that – apart from the trial-by-jury requirement of the Seventh Amendment[199] – the US Constitution does not contain a right of access to court comparable to the strong formulation of the German, Italian or even the Japanese one.[200] In *People* v. *Mark S. Weiner*,[201] criminal proceedings were brought against a private individual accused of having sprayed paint on an outside wall of the UN headquarters building. The defendant alleged that he had been assaulted and harassed by the UN security officer who reported the incident to the police and that he intended to file a counterclaim. In

[195] 'No one shall be denied the right to be tried by his natural judge pre-established by law.' This principle requires that in any lawsuit the competent judge will not be chosen *ad hoc* but rather be determined by legislation. *Cf*. Cappelletti, *The Judicial Process*, 220.

[196] Supreme Court, 18 October 1982. See pp. 187*f* above for details of the case.

[197] (1983) 66 *Rivista di diritto internazionale* 187 at 189. The Supreme Court rejected the FAO's claim to immunity observing that under the FAO's constitutive treaty member states were only required to undertake to accord to the organization immunities 'in so far as it may be possible under their own constitutional procedure'. In the court's view, the Italian Constitution requires that such immunity from suit as may be granted to international organizations should take into account the principle laid down in Article 24 of the Constitution that the legitimate interests of citizens should be afforded judicial protection.

[198] (1983) 66 *Rivista di diritto internazionale* 187 at 190*ff*.

[199] Amendment VII: 'In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.'

[200] Article 32 of the Constitution of Japan provides 'No person shall be denied the right of access to the courts.'

[201] Criminal Court of the City of New York, New York County, 19 January 1976.

anticipating this potential 'counter complaint', the Criminal Court of the City of New York held that the defence of immunity would not be granted. The court reasoned that since the UN and its officials enjoyed only functionally limited immunity the reporting security officer could not claim immunity for acts in excess of his authority. The court, however, did not stop here, but rather relied on an additional line of reasoning, in the court's words on 'equitable considerations which motivate this court to reach its conclusions'[202] – considerations which basically balance the UN's right to immunity with the constitutional right of US citizens of access to court. The court found that '[t]here is a limit to which the international agreement creating the United Nations can inure to the detriment, disadvantage, and unequal protection of a citizen of the United States' and that '[a] basic concept and motivating factor of the founders of this Republic was the absolute right of every citizen to petition for redress in its courts'.[203] In *Urban* v. *United Nations*,[204] the District of Columbia Court of Appeals recognized that a 'court must take great care not to "unduly impair [a litigant's] constitutional right of access to the courts"'.[205] Apparently, however, it did not consider it an impairment to issue an injunction against a frivolous 'litigant flooding the court with meritless, fanciful claims',[206] enjoining him from filing any more lawsuits without obtaining prior leave from the court. There was no need for the court to reach the issue of immunity from suit, since it held that this particular denial of a litigant's access to court was justified 'to protect the integrity of the courts and the orderly and expeditious administration of justice'.[207]

The French case of *Ministre des Affaires étrangères* v. *Dame Burgat et autres*[208] might lend itself in a very indirect way to support the argument that wholesale exemptions of a class of persons from the jurisdiction of domestic courts may pose a problem under domestic legal principles of equality and fairness and may even ultimately entail the forum state's responsibility.[209] The owners of an apartment in Paris, which was leased to a person enjoying absolute immunity under the UNESCO headquarters agreement, had unsuccessfully brought a claim for a rent increase. Subsequently, they brought suit against the French state claiming that the said immunity had made it impossible for them to vindicate their rights against the tenant. In a remarkable decision, the Conseil d'Etat held that the principle of equality concerning public expenses led to the French state's responsibility because the conclusion of the UNESCO head-

---

[202] 378 NYS 2d 966 at 975.     [203] *Ibid.*     [204] US Court of Appeals DC Cir., 2 August 1985.
[205] 768 F. 2d 1497 at 1500 (DC Cir. 1985).     [206] *Ibid.*, 1499.     [207] *Ibid.*, 1500.
[208] Conseil d'Etat, 29 October 1976.     [209] See also p. 329 below.

www.ourpgs.com

quarters agreement deprived the plaintiffs of a judicial forum to pursue their rights.[210]

Sometimes, however, the manner in which domestic courts handle these issues reflects their superficial approach. In *Girod de l'Ain*,[211] one of the grounds to challenge a governmental decree enabling France compulsorily to acquire land in order to lease it subsequently to CERN was an alleged violation of the preamble of the French Constitution and of the European Convention on Human Rights. The Conseil d'Etat recognized that:

[the] decree being challenged does not contain any rule with regard to the exercise of means of redress available to persons who suffered damage caused by CERN, with a view to obtaining compensation. It follows that on the ground based on the alleged violation by the decree of the provisions of the European Convention on Human Rights which recognize every person as having the right to seek legal redress before a national tribunal, as well as the principle contained in the preamble of the Constitution according to which every person is entitled to compensation for damage engaging the civil liability of natural or legal persons under private law, must be rejected.[212]

It has been rightly said that the Conseil d'Etat's conclusion is a *non sequitur* because it is exactly this lack of redress procedures which raises a fundamental rights problem.[213]

---

[210] The Conseil d'Etat concluded 'qu'ainsi la responsabilité de l'Etat se trouve engagée sur le fondement du principe de l'égalité des citoyens devant les charges publiques'. (1977) 104 *Journal de droit international* 631.

[211] Conseil d'Etat, 25 July 1986. Mr Girod de l'Ain and other individuals as well as environmental groups tried to challenge the French decision to declare certain parts of French territory for public use and to rent them to CERN in order to enable that international organization to built a particle accelerator there. The Conseil d'Etat rejected the challenges based on various constitutional and administrative law arguments, holding, *inter alia*, that the lease of part of French territory to CERN under the circumstances in question did not constitute a cession of territory under Article 53 of the French Constitution; that an environmental impact study had in fact been properly conducted; etc. Since the relief sought was not directed against CERN, but rather against the French state, CERN's immunity was not directly in issue. The Conseil d'Etat, however, had to consider the consequences of the declaration of public use for the immunities of CERN. The petitioners had claimed, *inter alia*, that the declaration would have had to be made in the form of a law, instead of a mere administrative decree, because it enlarged CERN's immunities. The Conseil d'Etat rejected this claim holding that 'cette declaration d'utilité publique n'ayant ni pour objet, ni pour effet, d'étendre les prérogatives ou les immunités, notamment l'immunité de juridiction, dont beneficie le CERN en tant qu'organisation internationale' ('this declaration of public utility does not have either the object or the effect of extending the prerogatives or immunities, in particular the immunity from jurisdiction, which CERN enjoys as an international organization'). (1987) 33 *Annuaire français de droit international* 905.

[212] (1990) 82 ILR 89*ff*.

[213] *Cf.* David Ruzié, 'La France et l'Organisation européenne de recherche nucléaire' (1986) 2 *Revue française de droit administratif* 956–60 at 960.

www.ourpgs.com

In the more recent case of *Hintermann* v. *Union de l'Europe occidentale*,[214] a human rights challenge to the lack of jurisdiction of French courts over suits against international organizations is taken more seriously by the Cour de Cassation. The court rejected the claim by Mr Hintermann, former Vice-Secretary-General of the Western European Union (WEU), that the organization's immunity from suit violated his rights under Article 6(1) of the European Convention on Human Rights in a laconic fashion typical for French courts. It did not address the potential conflict of treaty norms stemming from the European Convention's right of access to court and the grant of immunity to the defendant organization in the WEU Treaty. What are important, however, are the court's reflections in its annual report concerning the *Hintermann* case. There it recognized the potential denial of justice stemming from an organization's immunity and asked whether such denial of justice could be avoided by according primacy to the European Convention on Human Rights.[215] Although the court's 'timidity' prevented it from addressing or even solving this issue in its own decision,[216] it noted in its report that '[i]l appartiendra, éventuellement, à la Cour européenne des droits de l'homme, de trancher le conflit'.[217]

The Spanish Constitutional Court was faced with a similar factual situation and reached a similar result to the French court in *Ministre des Affaires étrangères* v. *Dame Burgat et autres*.[218] In *X* v. *Deodato*,[219] a Spanish landlady had unsuccessfully tried to recover rent arrears from an Italian diplomat. The Constitutional Court rejected her claim that the immunity granted to a foreign diplomat from civil proceedings violated Article 24 of the Spanish Constitution which provides for a right of access to courts in the vindication of one's legitimate rights and interests. In justifying this

[214] Cour d'appel de Paris, 10 April 1990, Cour de Cassation, 14 November 1995.

[215] 'Les immunités de juridiction des organisations internationales . . . ont, pour conséquence, lorsque n'est pas organisé au sein de chaque organisation un mode de règlement arbitral ou juridictionnel des litiges, de créer un déni de justice . . . Ce déni de justice peut-il être évité par la primauté de la convention européenne des droits de l'homme, qui garantit le libre accès au juge et le procès équitable?' Cour de Cassation, *Rapport annuel* (1995), 418, cited by Byk, 'Case Note', 142.

[216] In a reasoning which reminds of the separation-of-powers justification for the act of state doctrine (*cf.* p. 86 above), the court noted that it did not want to take 'la responsabilité de perturber le droit des relations internationales en mettant pratiquement à néant les privilèges et immunités juridictionnels des nombreuses organisations internationales auxquelles la France est partie'. Cour de Cassation, Rapport annuel (1995), cited by Byk, 'Case Note', 142.

[217] *Ibid.*, 149 ('it is incumbent on the European Court of Human Rights to eventually settle the conflict').

[218] Conseil d'Etat, 29 October 1976.    [219] Tribunal Constitucional, 28 September 1995.

result, it referred to the alternative remedies available to a plaintiff in such a situation and held that such a claimant could demand that the Spanish Government declare a defaulting diplomat *persona non grata*. If such a request were rejected, the Spanish Government would have to pay compensation for all damages arising for the plaintiff. What is most interesting, however, is the Spanish court's lengthy reasoning concerning the potential friction between a constitutional right of access to court and an internationally agreed upon immunity for certain persons. It thought that Article 31(1) of the applicable Vienna Convention on Diplomatic Relations 1961, which restricted Article 24 of the Spanish Constitution, did not violate constitutional principles because it served a legitimate purpose and because it did so in a proportionate manner leaving the core of the constitutional right under Article 24 untouched. It saw a legitimate purpose of immunity in the effective performance of diplomatic representation according to the principle *ne impediatur legatio*; as to the second requirement, the court thought that immunity could only be reconciled with an individual's right of access to court if he or she had appropriate procedural alternatives in order to guard his or her legitimate interests. In the court's view these alternatives were available since the plaintiff could either sue in the courts of the diplomat's sending state or ask Spain to declare him *persona non grata*.

Turning to international judicial organs, it is surprising that they too seem to be very reluctant to state an incompatibility between the granting of immunity to international organizations and constitutional or, for that matter, human rights guarantees. It seems that also the European Commission of Human Rights disposed of the very few true cases involving the immunity of international organizations too expeditiously because it did not pay sufficient attention to the difference between the individual *vis-à-vis* the member state refusing access to its courts, and the individual *vis-à-vis* the international organization infringing human rights.[220] In *Ary Spaans* v. *The Netherlands*,[221] the applicant expressly invoked Article 6(1) of the European Convention on Human Rights. He complained that the final Dutch immunity decision in *AS* v. *Iran–United States Claims Tribunal*[222] deprived him of his right of access to a court or tribunal in the determination of the legal validity of the unilateral termination of his employment contract with the Iran–United States Claims Tribunal. The Commission, however, declared the application

---

[220] *Cf.* pp. 288f above.
[221] European Commission of Human Rights, Application No. 12516/86, 12 December 1988.
[222] Supreme Court, 20 December 1985. See pp. 157 and 208 above.

inadmissible. It thought that according to Article 1 of the European Convention on Human Rights the member states were responsible for securing the rights and freedoms defined in the Convention only to 'everyone within their jurisdiction'. Since the Netherlands granted immunity to the Tribunal, the acts of the latter were considered to be outside the jurisdiction of the Netherlands. Thus, no issue of responsibility involving the Netherlands could arise.[223] If one followed the reasoning of the Commission, a state party to the Convention could avoid its responsibility simply by limiting its jurisdiction through grants of immunity. However, it seems that this approach, based on a preliminary division of jurisdiction, is misleading. The precise question is whether under Article 6(1) of the Convention a state is obliged to provide a forum for certain kinds of disputes (concerning civil rights and obligations) and whether this obligation may be limited in certain situations (because the disputes are directed against a certain class of persons, such as international organizations, diplomats etc.). The question is not whether Article 6(1) might be inapplicable because a state has chosen to relinquish its 'jurisdiction' to the benefit of an international organization or other immune person – a situation that might arise from a transfer of state powers.[224]

It is clear from the existing case law that the Convention organs regularly do not consider themselves competent to decide upon alleged infringements of human rights by international organizations or other inter-state entities which are not parties to the respective human rights instrument, even if all or some of its member states are. The cases *Ilse Hess* v. *United Kingdom*,[225] *Heinz* v. *Contracting Parties who are also Parties to the European Patent Convention*[226] and *M(elchers) & Co.* v. *Federal Republic of*

---

[223] 'Because of the immunity enjoyed by the Tribunal, the administrative decisions of the Tribunal are not acts which occur within the jurisdiction of the Netherlands within the meaning of Article 1 of the Convention and thus do not engage the responsibility of the Netherlands under the Convention.' (1988) 58 *Decisions and Reports* 119 at 122.

[224] The declaration of inadmissibility of the *Spaans* application, qualifying it as incompatible *ratione personae* within the meaning of Article 27(2) of the Convention, resembles the Commission's decision in *Ilse Hess* v. *United Kingdom*, European Commission of Human Rights, Application No. 6231/63, 28 May 1975. See p. 301 below. The important difference between the two situations is, however, that in the *Hess* application it was unclear whether the alleged violation of the Convention could be attributed to the UK individually or only to the Four Powers jointly, whereas in the *Spaans* application there was no issue of attributing the responsibility for a violation of Article 6(1). It was clear that this was an obligation incumbent upon the Netherlands and not upon the Tribunal. Still, the Commission relied on the same reasoning for its inadmissibility decision.

[225] European Commission of Human Rights, Application No. 6231/63, 28 May 1975.

[226] European Commission of Human Rights, Application No. 12090/92, 10 January 1994.

*Germany*[227] are illustrative of this view. They form part of the accepted case law of the European Commission of Human Rights that decisions taken by an international organization, of which states parties to the European Convention on Human Rights are members, do not involve the exercise of national jurisdiction within the meaning of Article 1 of the Convention and thus cannot, in principle, lead to a violation of the Convention by the member states.[228] In the *Hess* case,[229] the complaint, alleging that the continued imprisonment of the applicant's husband Rudolf Hess at Spandau prison violated the Convention, was declared inadmissible because the responsibility for the prison was held not to be 'a matter within the jurisdiction of the United Kingdom within the meaning of Article 1 [of the Convention]'. Spandau prison was administered jointly by the Four Powers, and in the Commission's view this joint authority could not be divided into four separate jurisdictions.[230] In *Heinz* v. *Contracting Parties who are also Parties to the European Patent Convention*,[231] a complaint claiming that the European Patent Organization member states – bound by the European Convention on Human Rights – were responsible for an alleged property rights violation of that organization was declared inadmissible. In the Commission's view decisions taken by the European Patent Office did not involve the exercise of national jurisdiction within the meaning of Article 1 of the Convention.[232] One of the precedents relied upon in *Heinz* was *M(elchers) & Co.* v. *Federal Republic of Germany*,[233] where the Commission held that 'it is in fact not competent *ratione personae* to examine proceedings before or decisions of organs of the European Communities, the latter not being a

[227] European Commission of Human Rights, Application No. 13258/77, 9 February 1990.
[228] See pp. 304 and 311*f* below for potential exceptions.
[229] European Commission of Human Rights, Application No. 6231/63, 28 May 1975.
[230] In its more recent decision in *Vearncombe* v. *Federal Republic of Germany and United Kingdom*, European Commission of Human Rights, Application No. 12816/87, 18 January 1989, the Commission did not resolve the issue of whether the nuisance caused by the construction and use of a shooting range by the British military authorities in Berlin could be attributed to the UK. The Commission observed, however, that 'authorised agents of a State (including armed forces) not only remain under the jurisdiction of that State when abroad, they also bring other persons or property with the jurisdiction of that State to the extent that they exercise authority over such persons or property' and it expressed its opinion that 'there is in principle, from a legal point of view, no reason why acts of the British authorities in Berlin should not entail the liability of the United Kingdom under the Convention'. (1989) 59 *Decisions and Reports* 186 at 194.
[231] European Commission of Human Rights, Application No. 12090/92, 10 January 1994.
[232] (1994) 76-A *Decisions and Reports* 125 at 127.
[233] European Commission of Human Rights, Application No. 13258/77, 9 February 1990.

party to the Convention on Human Rights'.[234] Similarly, in *Conféderation Francaise démocratique du Travail* v. *European Communities*,[235] a complaint against the European Communities was rejected because they were not parties to the European Convention on Human Rights. The dismissal was also based on the ground that the member states when cooperating to adopt a decision within the EC Council did not exercise 'their jurisdiction' in the sense of Article 1 of the Convention.

A Communication of the UN Human Rights Committee in *HvdP* v. *The Netherlands*[236] confirms this view. There an employee of the European Patent Office, with its headquarters in Munich, claimed that he had been treated in a discriminatory fashion by his employer. After having exhausted the internal administrative remedies provided by the European Patent Organization and after having had recourse to the ILO Administrative Tribunal, the complainant applied to the UN Human Rights Committee, arguing that his rights according to Article 25 of the International Covenant on Civil and Political Rights (ICCPR), pursuant to which every citizen should have access, on general terms of equality, to a public service, had been violated and that the internal administrative review procedure did not constitute an effective remedy in the sense of Article 2 of the ICCPR. He claimed that the European Patent Organization 'though a public body common to the Contracting States, constitutes a body exercising Dutch public authority'. The UN Human Rights Committee rejected this claim. In explaining its inadmissibility decision it stated that 'the recruitment policies of an international organization . . . cannot, in any way, be construed as coming within the jurisdiction of the Netherlands or of any other State party to the [ICCPR]'.[237]

It is rather curious to note that an application by the same person in the same matter to the European Commission of Human Rights was declared inadmissible on a rather different ground in *HvdP* v. *The Netherlands*.[238] Relying on its previous case law according to which 'litigation concerning access to, or dismissal from, civil service falls outside the scope of Article 6(1) of the Convention', the Commission held that 'litigation concerning the modalities of employment as a civil servant, on either the national or international level, falls outside the scope of Article

[234] See, however, pp. 304*ff* and 311*f* below concerning the important qualification regarding the circumstances under which member states might become indirectly responsible for acts of international organizations.
[235] European Commission of Human Rights, Application No. 8030/77, 10 July 1978.
[236] UN Human Rights Committee, Communication No. 217/1986, 8 April 1987.
[237] (1988) 9 *Human Rights Law Journal* 255.
[238] European Commission of Human Rights, Application No. 11056/84, 15 May 1986.

6(1)'[239] and that applications relating thereto were thus inadmissible *ratione materiae*.

It is submitted that, contrary to these cases concerning alleged human rights violations by international organizations, which have been regularly held by the Convention's organs not to entail the responsibility of their member states as a matter of principle, the issue of a potential violation of the duty to provide access to courts by states parties to human rights obligations that may result from their granting immunity to international organizations cannot be properly regarded as a question of dividing spheres of 'jurisdictions' between states and organizations. As already mentioned, this approach – apparently pursued in the *Spaans* decision[240] – would leave it to the member states to limit their responsibility under the Convention by reducing their 'jurisdiction' through the grant of immunity.[241] This, however, would seem to run counter to the interpretation of and the importance accorded to the right of access to court in the jurisprudence of the Court and the Commission. In its judgment in the *Golder* case,[242] the European Court of Human Rights made it quite plain that states parties to the Convention were not wholly free to exclude certain types of actions from the jurisdiction of their courts.[243] In decisions like *Graham Dyer* v. *United Kingdom*[244] and *Kaplan* v. *United Kingdom*,[245] the Commission also demonstrated its awareness that the 'immunization' of certain groups in respect of their actions[246] as well as the elimination of the jurisdiction of courts beyond a certain point[247]

---

[239] (1988) 9 *Human Rights Law Journal* 265 at 266.

[240] European Commission of Human Rights, Application No. 12516/86, 12 December 1988.

[241] See pp. 286 and 300 above.

[242] European Court of Human Rights, 21 February 1975, Series A, No. 18.

[243] 'Were Article 6 § 1 to be understood as concerning exclusively the conduct of an action which had already been initiated before a court, a Contracting State could, without acting in breach of that text, do away with its courts, or take away their jurisdiction to determine certain classes of civil actions and entrust it to organs dependent on the Government.' *Golder*, European Court of Human Rights, 21 February 1975, Series A, No. 18, para. 35.

[244] European Commission of Human Rights, Application No. 10475/83, 9 October 1984.

[245] European Commission of Human Rights, Application No. 7598/76, 17 July 1980.

[246] 'Were Article 6, para. 1 to be interpreted as enabling a State Party to remove the jurisdiction of the courts to determine certain classes of civil claim or to confer immunities from liability on certain groups in respect of their actions, without any possibility of control by the Convention organs, there would exist no protection against the danger of arbitrary power.' *Graham Dyer* v. *United Kingdom*, European Commission of Human Rights, Application No. 10475/83, 9 October 1984, (1984) 39 *Decisions and Reports* 246 at 252.

[247] '[T]he jurisdiction of the courts cannot be removed altogether or limited beyond a certain point.' *Kaplan* v. *United Kingdom*, European Commission of Human Rights, Application No. 7598/76, 17 July 1980, (1981) 21 *Decisions and Reports* 5 at 33.

would be contrary to the Convention. On the other hand, it is part of the settled case law of the Court that the right of access to court as embodied in Article 6 of the Convention is not absolute or unlimited. It is clear, however, that any limitation of that right may not destroy its 'very essence'[248] and that the degree of access to court provided for by national legislation has to have regard to the principle of the 'pre-eminence of law in a democratic society'.[249] These requirements taken together imply that any restriction of the right of access to court has to satisfy the principle of proportionality.[250] At this point it seems appropriate to reconsider the substantive policy reasons discussed above in favour and against the adjudication of disputes involving international organizations by national courts.[251] It is submitted that it would not be inconceivable that the legitimate interests of individuals to have their civil rights and obligations determined by an independent court may outweigh the justifiable concern of international organizations to function freely and independently. It seems plausible that the availability of alternative dispute settlement fora would be one of the crucial elements within such a balancing approach.[252] If a balancing of interests in certain cases turned out in favour of having domestic courts adjudicating claims brought against international organizations, this would clearly run counter to a wholesale exemption of international organizations from the jurisdiction of national courts as a result of their immunity from suit or legal process.

As far as true immunity of international organizations cases are concerned, the European Commission of Human Rights recently used a similar balancing test and slightly modified its *Spaans* approach without, however, reaching a different result. *Karlheinz Beer and Philip Regan* v. *Germany*[253] and *Richard Waite and Terry Kennedy* v. *Germany*[254] both concerned the compatibility of a sweeping grant of immunity to the European Space Agency (ESA) by German legislation. In lawsuits brought by employees of private companies claiming that pursuant to the Ger-

---

[248] *Ashingdane*, European Court of Human Rights, 28 May 1985, Series A, No. 93, para. 57; *Lithgow and others*, European Court of Human Rights, 8 July 1986, Series A, No. 102, para. 194(b); *Philis*, European Court of Human Rights, 27 August 1991, Series A, No. 209, para. 59; *Fayed*, European Court of Human Rights, 21 September 1994, Series A, No. 294-B, para. 65.

[249] *Ashingdane*, European Court of Human Rights, 28 May 1985, Series A, No. 93, para. 24.

[250] *Cf.* Christoph Grabenwarter, *Verfahrensgarantien in der Verwaltungsgerichtsbarkeit* (Vienna and New York, 1997), 444.      [251] See pp. 252*ff* and pp. 233*ff* above.

[252] See pp. 366*f* below.

[253] European Commission of Human Rights, Application No. 28934/95, 2 December 1997.

[254] European Commission of Human Rights, Application No. 26083/94, 2 December 1997.

man Provision of Labour Act they had acquired the status of employees of the defendant organization, ESA successfully relied upon its immunity from German jurisdiction. Thereon applicants complained under Article 6(1) of the European Convention on Human Rights that they did not have a hearing by a court on the question of whether a contractual relationship had existed between them and ESA. While the German Government relied on the existing case law of the Convention organs and maintained that 'the right of access to court is subject to inherent limitations which include the traditional and generally recognised principle of parliamentary and diplomatic immunity and also the immunity of international organisations' the Commission was no longer satisfied with such an easy explanation. Contrary to its reasoning in the *Spaans* decision, it saw a potential violation of Article 6(1) of the Convention and considered that any limitation of the right of access to court would have to 'pursue a legitimate aim and [that there had to be] a reasonable relationship of proportionality between the means employed and the aim sought to be achieved'.[255] It found the legitimate aim in the independence and protection of the proper functioning rationale and concluded that the 'legal impediment to bringing litigation before the German courts, namely the immunity of the European Space Agency from German jurisdiction, [was] only permissible under the Convention if there [was] an equivalent legal protection'.[256] In an interesting final twist to this decision, which was secured by a close vote of seventeen to fifteen, the European Commission of Human Rights – while acknowledging that the applicants 'did not . . . receive a legal protection within the European Space Agency which could be regarded as equivalent to the jurisdiction of the German labour courts'[257] and probably inspired by the peculiar circumstances of the case – concluded that it could not 'apply the test of proportionality in such a way as to force an international organisation to be a party to domestic litigation on a question of employment governed by domestic law'.[258] It is submitted, however, that this apparently crucial issue of whether German labour legislation would be binding for an international organization is not an issue of judicial jurisdiction proper but rather a question of the applicable law.[259] Taking the 'equivalent legal protection' requirement seriously could have resulted in a different finding.

---

[255] *Ibid.*, para. 65.    [256] *Ibid.*, para. 74.    [257] *Ibid.*, para. 79.    [258] *Ibid.*, para. 80.
[259] This view seems to be alluded to by the dissenting opinion of Mr G. Ress who found that 'the question as to whether and to what extent domestic legislation of this kind can be held against an international organisation, which regularly enacts its own staff regulations, cannot be resolved in removing such matters from judicial review' *Ibid.*