# EXHIBIT 6

(b) *Lt.-Col. J. Queru and Capt. P. Jeannel.* These two United Nations military observers from France were killed on 28 August 1948 at Gaza airfield by Saudi Arabian troops to which the Egyptian Army had entrusted the guarding of the airfield. A claim was presented against the Government of Egypt for $52,874.20, with respect to their deaths. This amount consisted of $25,000 paid by the United Nations to the beneficiary of each of the deceased and $2,874.20 for damage to aircraft. The claim has not yet been settled.

(c) *Lt.-Col. E. Thalen.* Lt.-Col. Thalen, a Swedish military observer serving with UNTSO, suffered an injury resulting in total disability when fired upon by members of the Jordanian National Guard. A claim for $26,518.26 in respect of the monetary damage borne by the United Nations with respect to Lt.-Col. Thalen's injuries was presented to the Government of Jordan and was paid in full. This amount consisted of $18,000 paid by the United Nations to Lt.-Col. Thalen and $8,518.26 in medical expenses.

(d) *Colonel Flint.* Colonel Flint, a Canadian military observer serving with UNTSO, was killed on Mt. Scopus in 1958. A claim was presented to the Government of Jordan in 1966 and remains under consideration.

(iii) *Claim in respect of a member of a UNEF contingent*

The Government of the United Arab Republic paid reparations amounting to $21,433 to the Government of Canada, in respect of the damages incurred by the latter by reason of the death of a member of the Canadian contingent to UNEF in circumstances for which the Government of the United Arab Republic admitted responsibility.

Under regulation 40 of the UNEF Regulations, responsibility for benefits or compensation awards in respect of service-incurred death, injury or illness rests with the State from whose military services the individual soldier has come. Unlike the case of military observers or of staff members, therefore, the United Nations does not itself incur a financial loss unless the Government concerned claims reimbursement. In the case under discussion the Government of the United Arab Republic admitted responsibility and paid the amount asked by the Canadian Government through the Commander of UNEF.

(iv) *Claim in respect of a United Nations staff member*

Mr. Ole Helge Bakke, a United Nations staff member, was killed in circumstances involving the responsibility of the Government of Jordan. A claim for $36,803.76 and 22,000 Norwegian Kroner ($3,080) was presented against the Government of Jordan but the case has not yet been settled. The sum claimed consisted of $25,000 paid to the widow and of funeral, administrative and excess insurance expenses. The claim for 22,000 Norwegian Kroner was made on behalf of Mr. Bakke's dependent mother.

53. In the case of certain United Nations peace-keeping operations, and to some extent in various headquarters agreements, regular machinery and procedures exist to deal with international claims arising between the United Nations and States; none of the cases which have arisen, either in these or in other instances have been the subject of third-party settlement, whether before a court or by means of an agreed form of arbitration. In the majority of these cases, however, the element of material damage has been slight and the major issue has been the duty of protection owed to the Organization, its premises and its staff, and the obligation of the State concerned to respect the Organization's inviolability and freedom from interference. No international claims have been presented by the United Nations against subjects of international law other than States.

(b) *Claims made against the United Nations by States or by other international organizations*

54. No claims have been made against the United Nations by other international organizations in respect of a breach of international law. As regards claims made against the United Nations by States, these have been comparatively rare. Apart from cases involving car accidents, the only claims of any significance brought by States (whether on their own behalf or on behalf of their nationals) arose out of the United Nations activities in the Democratic Republic of the Congo. Belgium submitted a number of claims in respect of injuries suffered by Belgian nationals and for loss of or damage to Belgian owned property, alleged to have been caused by troops under United Nations command. These claims, together with certain United Nations counter-claims, were settled following lengthy negotiations, without recourse to third party procedures. In an exchange of letters dated 20 February 1965, between the Secretary-General and the Minister for Foreign Affairs of Belgium, the Secretary-General wrote as follows:

Sir,

A number of Belgian nationals have lodged with the United Nations claims for damage to persons and property arising from the operations of the United Nations Force in the Congo, particularly those which took place in Katanga. The claims in question have been examined by United Nations officials assigned to assemble all the information necessary for establishing the fact submitted by the claimants or their beneficiaries and any other available information.

The United Nations has agreed that the claims of Belgian nationals who may have suffered damage as a result of harmful acts committed by ONUC personnel, not arising from military necessity, should be dealt with in an equitable manner.

It has stated it would not evade responsibility where it was established that United Nations agents had in fact caused unjustifiable damage to innocent parties.

It is pointed out that under these principles, the Organization does not assume liability for damage to persons or property, which resulted solely from military operations or which, although caused by third parties, gave rise to claims against the United Nations; such cases are therefore excluded from the proposed compensation.

Consultations have taken place with the Belgian Government. The examination of the claims having now been completed, the Secretary-General, shall, without prejudice to the privileges and immunities enjoyed by the United Nations, pay to the Belgian Government one million five hundred thousand United States dollars in lump-sum and final settlement of all claims arising from the causes mentioned in the first paragraph of this letter.

Case 1:13-cv-07146-JPO   Document 33-6   Filed 05/15/14   Page 3 of 3

The distribution to be made of the sum referred to in the preceding paragraph shall be the responsibility of the Belgian Government. Upon the entry into force of this exchange of letters, the Secretary-General shall supply to the Belgian Government all information at his disposal which might be useful in carrying out the distribution of the amount in question, including the list of individual cases in respect of which the United Nations has considered that it must bear financial responsibility, and any other information relevant to the determination of such responsibility.

Acceptance of the above-mentioned payment shall constitute lump-sum and final settlement between Belgium and the United Nations of all the matters referred to in this letter. It is understood that this settlement does not affect any claims arising from contractual relationships between the claimants and the Organization or those which are at present still handled by United Nations administrative departments, such as ordinary requisitions.

Accept, Sir, the assurances of my highest consideration.

*(Signed)* U THANT
Secretary-General [34]

The Minister for Foreign Affairs of Belgium accepted the proposals made and the agreement entered into force on 17 May 1965.

55. The Acting Permanent Representative of the Soviet Union wrote to the Secretary-General on 2 August 1965 [35] stating that Belgium had "committed aggression against the Democratic Republic of the Congo and as an aggressor has no moral or legal basis for making claims against the United Nations either on its own behalf or on behalf of its citizens". In these circumstances

... the payment of compensation by the United Nations Secretariat to the Belgian Government for the so-called losses caused to Belgian citizens in the Congo by United Nations forces cannot be regarded as other than an encouragement to aggressors, as a reward for brigandage. In accordance with the generally recognized rule of international law concerning the responsibility of the aggressor for the aggression committed by him, the Belgian Government should itself bear full moral and material responsibility for all consequences of its aggression against the Republic of the Congo.

The Permanent Mission of the USSR to the United Nations draws the Secretariat's attention to the fact that it has no right in this case to enter into any agreements on behalf of the United Nations concerning the payment of compensation without the authorization of the Security Council.

Accordingly, the Permanent Mission of the USSR to the United Nations expects the Secretary-General to take immediate steps to cancel the agreement concluded by the Secretariat concerning the payment of the above-mentioned compensation.

56. The Secretary-General replied as follows:

... The arrangement to which your letter refers was brought about in the following circumstances. In the course of the United Nations activities in the Congo, the Secretariat received a number of claims from Belgian citizens as well as from individuals of various other nationalities alleging that they had suffered injury or damage to property by acts of United Nations personnel which gave rise to liability on the part of the Organization.

It has always been the policy of the United Nations, acting through the Secretary-General, to compensate individuals who have suffered damages for which the Organization was legally liable. This policy is in keeping with generally recognized legal principles and with the Convention on Privileges and Immunities of the United Nations. In addition, in regard to the United Nations activities in the Congo, it is reinforced by the principles set forth in the international conventions concerning the protection of the life and property of civilian population during hostilities as well as by considerations of equity and humanity which the United Nations cannot ignore.

Accordingly, the claims submitted were investigated by the competent services of ONUC and at United Nations Headquarters in order to collect all of the data relevant to determining the responsibility of the Organization. Claims of damage which were found to be solely due to military operations or military necessity were excluded. Also expressly excluded were claims for damage found to have been caused by persons other than United Nations personnel.

On this basis, all individual claims submitted by Belgian nationals, as well as those submitted by nationals of other countries, were carefully scrutinized and a list of cases was established by the Secretariat with regard to which it was concluded that compensation should be paid. Of approximately 1,400 claims submitted by Belgian nationals, the United Nations accepted 581 as entitled to compensation.

As regards the role of the Belgian Government, it was considered that there was an advantage for the Organization both on practical and legal grounds that payment to the Belgian claimants whose claim has been examined by the United Nations should be effected through the intermediary of their Governments. This procedure obviously avoided the costly and protracted proceedings that might have been necessary to deal with the 1,400 cases submitted and to settle those in which United Nations responsibility was found.

Following consultations, the Belgian Government agreed to act as an intermediary and also agreed that the payment of a lump sum amounting to $1.5 million would constitute a final and definite settlement of the matter. At the same time, a number of financial questions which were outstanding between the United Nations and Belgium were settled. Payment was effected by off-setting the amount of $1.5 million against unpaid ONUC assessments amounting approximately to $3.2 million.

Similar arrangements are being discussed with the Governments of other countries, the nationals of which have similarly suffered damage giving rise to United Nations liability. About 300 unsettled claims fall within this category.

In making these arrangements, the Secretary-General has acted in his capacity of chief administrative officer of the Organization, consistently with the established practice of the United Nations under which claims addressed to the Organization by private individuals are considered and settled under the authority of the Secretary-General.[36]

There have been a number of other claims presented by States on behalf of their nationals arising out of ONUC operations, which were settled on a broadly similar basis.

## Section 6. *Treaty-making capacity*

(a) *Treaty-making capacity of the United Nations*

57. The United Nations has concluded a large number of international agreements with other subjects of international law i.e. both with States and with other international organizations. The capacity of the Organization or its organs to conclude agreements is provided in various provisions of the Charter itself. In Article 43 the Security Council is empowered to enter into agree-

---

[34] *Official Records of the Security Council, Twentieth Year, Supplement for July, August and September 1965*, document S/6597.

[35] *Ibid.*, document S/6589.

[36] See foot-note 34, above.