EXHIBIT 7



United Nations

A/51/389

# General Assembly

Fifty-first session

Distr.: General

20 September 1996
Original: English

**Agenda item 129 and 140 (a)**

**Financing of the United Nations Protection Force, the United Nations Confidence Restoration Operation in Croatia, the United Nations Preventive Deployment Force and the United Nations Peace Forces headquarters**

**Administrative and budgetary aspects of the financing of the United Nations peacekeeping operations: financing of the United Nations peacekeeping operations**

Report of the Secretary-General

*Summary*

The present report is submitted pursuant to paragraph 16 of General Assembly resolution 50/235 of 7 June 1996, in which the Assembly requested the Secretary-General to develop revised cost estimates for third-party claims and adjustments, following completion of a thorough study by the Legal Counsel.

The present report addresses the scope of United Nations liability for activities of United Nations forces, procedures for the handling of third-party claims and limitations of liability.

It is estimated at this time that the requirements for settlement of United Nations Peace Forces third-party liability claims amount to $15.5 million.

In paragraph 54 of the present report, the General Assembly is requested to endorse the proposals and recommendations contained in section IV concerning financial and temporal limitations, counter-claims, set-offs and recovery from the States contributing contingents in specific cases of gross negligence, wilful misconduct or international criminal liability of the member of the Forces.

96-24939 (E)     031096

*96-24939*

# Contents

|        |                                                                                           | Paragraphs | Page |
|--------|-------------------------------------------------------------------------------------------|:----------:|:----:|
| I.     | Introduction                                                                              | 1 - 5      | 3    |
| II.    | Scope of United Nations liability for activities of United Nations forces                 | 6 - 19     | 4    |
|        | A.   The principle of liability                                                           | 6 - 8      | 4    |
|        | B.   Scope of United Nations liability for the ordinary operation of the force            | 9 - 15     | 4    |
|        | C.   Scope of liability for combat-related activities                                     | 16 - 19    | 6    |
| III.   | Procedures for the handling of third-party claims                                         | 20 - 37    | 7    |
|        | A.   Current procedures                                                                   | 20 - 25    | 7    |
|        | B.   Problems encountered with the current procedures                                     | 26 - 29    | 7    |
|        | C.   Modified procedures for the settlement of third-party claims                         | 30 - 37    | 8    |
| IV.    | Limitations of liability                                                                  | 38 - 44    | 10   |
|        | A.   Financial limitation                                                                 | 39         | 10   |
|        | B.   Temporal limitation                                                                  | 40         | 10   |
|        | C.   Counter-claims and off-sets                                                          | 41         | 10   |
|        | D.   Recovery from States contributing contingents:  concurrent responsibility           | 42 - 44    | 10   |
| V.     | Summary and conclusions                                                                   | 45 - 48    | 11   |
| VI.    | Cost estimates for the settlement of third-party liability claims                         | 49 - 53    | 12   |
| VII.   | Action to be taken by the General Assembly at its fifty-first session                     | 54         | 12   |

A/51/389
English
Page 3

## I.  Introduction

1.  The present report is submitted in response to a recommendation of the Advisory Committee on Administrative and Budgetary Questions in its report on the financing of the United Nations Protection Force (UNPROFOR), the United Nations Confidence Restoration Operation in Croatia, known as UNCRO, the United Nations Preventive Deployment Force (UNPREDEP), the United Nations Peace Forces headquarters (UNPF), the United Nations Mission in Bosnia and Herzegovina (UNMIBH) and the United Nations Transitional Administration in Eastern Slavonia, Baranja and Western Sirmium (UNTAES) (A/50/903/Add.1). In paragraph 20 of that report the Advisory Committee recommended that the current procedures on settling third-party claims associated with United Nations peacekeeping efforts be the subject of a thorough study by the Legal Counsel, the results of which should be reported by the Secretary-General to the General Assembly through the Advisory Committee not later than November 1996. Furthermore, the Advisory Committee recommended that on the basis of the study the Secretary-General develop and propose during the fifty-first session of the Assembly appropriate measures and procedures that would provide for a simple, efficient and prompt settlement of third-party claims, secure United Nations interests, limit its liabilities and allow for a coordinated approach to the issue on the part of the United Nations organizations, agencies and programmes.

2.  The General Assembly endorsed this recommendation in paragraph 16 of its resolution 50/235 of 7 June 1996.

3.  In order to evaluate the current procedures for handling third-party claims[1] and propose new or modified procedures that will simplify and streamline the settlement of claims and limit the liability of the Organization, it is necessary to describe the scope of United Nations liability for the activities of United Nations forces, more particularly, in relation to the types of damage most commonly encountered in the practice of United Nations operations. These are non-consensual use and occupancy of premises, personal injury and property loss or damage arising from the ordinary operation of the force, and such injury and damage as result from combat operations.

4.  In view of the fact that such damage has occurred both in traditional peacekeeping operations (the so-called "Chapter VI" operations) and in enforcement actions conducted under Chapter VII of the Charter, the approach of the present study to the question of United Nations third-party liability cuts across the peacekeeping/peace-enforcement divide. It distinguishes instead between the tortious liability of the Organization for damage caused in the ordinary operation of the force regardless of the type of operation and its liability for combat-related damage whether in the course of a Chapter VII operation or in a peacekeeping operation where force has been used in self-defence.

5.  The present report comprises three parts: the first part describes the scope of United Nations liability for damage resulting from the ordinary operation of the Force, from "operational necessity" and combat-related damage. The second part examines the existing procedures for settling third-party claims, the difficulties that have arisen in practice and new or modified mechanisms that will ensure simple, efficient and prompt settlement of third-party claims. The third part proposes for the consideration of the General Assembly financial and temporal limits on the liability of the Organization and measures of recovery from States contributing contingents.

## II.  Scope of United Nations liability for activities of United Nations forces

### A.  The principle of liability

6.   The international responsibility of the United Nations for the activities of United Nations forces is an attribute of its international legal personality and its capacity to bear international rights and obligations. It is also a reflection of the principle of State responsibility — widely accepted to be applicable to international organizations — that damage caused in breach of an international obligation and which is attributable to the State (or to the Organization), entails the international responsibility of the State (or of the Organization) and its liability in compensation.

7.   In recognition of its international responsibility for the activities of its forces, the United Nations has, since the inception of peacekeeping operations, assumed its liability for damage caused by members of its forces in the performance of their duties.[2] In conformity with section 29 of the Convention on the Privileges and Immunities of the United Nations, it has undertaken in paragraph 51 of the model status-of-forces agreement (see A/45/594) to settle by means of a standing claims commission claims resulting from damage caused by members of the force in the performance of their official duties and which for reasons of immunity of the Organization and its Members could not have been submitted to local courts.

8.   The undertaking to settle disputes of a private law nature submitted against it and the practice of actual settlement of such third-party claims — although not necessarily according to the procedure provided for under the status-of-forces agreement — evidence the recognition on the part of the United Nations that liability for damage caused by members of United Nations forces is attributable to the Organization.

### B.  Scope of United Nations liability for the ordinary operation of the force

#### 1.  Non-consensual use and occupancy of premises

9.   The use of land and premises for the headquarters, camps and offices of the United Nations force and for the accommodation of its members is, obviously, essential for the operational and administrative activities of the United Nations operation in the host country. Based on the assumption that by inviting a peacekeeping force into its territory, the host State has consented to provide it with premises, the various status-of-forces agreements have consistently included an obligation on the part of the host State to provide the United Nations peacekeeping operation, free of charge, with such areas for headquarters, camps or offices, and other premises for the accommodation of its members. This obligation is now reflected in article 16 of the model status-of-forces agreement.

10.  In practice, however, article 16 of the model agreement has rarely been applied to the letter, with the result that, with few exceptions, the United Nations has had itself to negotiate the rental for its premises with the owners of privately owned premises. The problem of premises became particularly acute in situations where no Government existed to donate or obtain the premises for the Organization, or where the existing Government did not exercise effective control over the United Nations area of operation, or had otherwise refused to cooperate with the force. In all those situations, the need to take temporary possession of land and premises, often privately owned, has inevitably arisen and with it the twofold question of: (a) whether the taking of possession is lawful, and (b) whether compensation is due for such non-consensual use and occupancy.

11. Given that the power to seize private property[3] situated in its territory resides with the host Government, it is the latter which, at the request of the United Nations, should normally seize such property and hand it over to the United Nations Force.[4] It is only when the Government fails to provide the necessary premises and they could not be otherwise secured that the United Nations force may take temporary possession of land and premises — whether State or privately owned — as may be operationally necessary for the deployment of the force and the pursuance of its mandate.

12. The legality of the occupancy under these conditions does not, however, exempt the Organization from liability to pay adequate compensation or fair rental for privately owned property, while maintaining its right to seek reimbursement from the Government pursuant to article 16 of the model status-of-forces agreement or the principle reflected therein. Unlike privately owned property, for which compensation must be paid if temporarily occupied, State-owned property need not be compensated for when temporarily used, pursuant to paragraph 16 of the status-of-forces agreement.

## 2. "Operational necessity" as an exemption from liability

13. The liability of the Organization for property loss and damage caused by United Nations forces in the ordinary operation of the force is subject to the exception of "operational necessity", that is, where damage results from necessary actions taken by a peacekeeping force in the course of carrying out its operations in pursuance of its mandates.[5]

14. It is, of course, difficult, if not impossible to determine in advance what would constitute "operational necessity" in any given situation. That decision must remain within the discretionary power of the force commander, who must attempt to strike a balance between the operational necessity of the force and the respect for private property. In deciding upon the operational necessity of any given measure the following must be taken into account:

(a) There must be a good-faith conviction on the part of the force commander that an "operational necessity" exists;

(b) The operational need that prompted the action must be strictly necessary and not a matter of mere convenience or expediency. It must also leave little or no time for the commander to pursue another, less destructive option;

(c) The act must be executed in pursuance of an operational plan and not the result of a rash individual action;

(d) The damage caused should be proportional to what is strictly necessary in order to achieve the operational goal.

15. Although the principle of "operational necessity" has already been applied in the practice of the claims review boards as an exemption from liability, consideration should be given to formal incorporation of the exemption into paragraph 51 of the model status-of-forces agreement, which, as already mentioned, apart from establishing a dispute settlement procedure also circumscribes the scope of United Nations liability for acts performed by members of its forces in their official duties. Claims resulting from the operational necessity of a peacekeeping operation would thus be excluded from the scope of competence of the standing claims commissions in the following terms: "any dispute or claim of a private law character, *not resulting from the operational necessity of the United Nations peacekeeping operation*, to which the United Nations operation or any member thereof is a party".

## C.   Scope of liability for combat-related activities

### 1.   United Nations liability is determined by the principles and rules of international humanitarian law

16.    The applicability of international humanitarian law to United Nations forces when they are engaged as combatants in situations of armed conflict entails the international responsibility of the Organization and its liability in compensation for violations of international humanitarian law committed by members of United Nations forces. The scope of third-party liability of the Organization, however, will have to be determined in each case according to whether the act in question was in violation of any particular rule of international humanitarian law or the laws of war. Thus, for example, the fact that damage was caused in itself may not necessarily engage the liability of the United Nations. Such liability would be entailed if the damage was caused in violation of international humanitarian law rules and could not be justified on grounds of "military necessity".

### 2.   Liability is engaged where command and control is vested

17.    The international responsibility of the United Nations for combat-related activities of United Nations forces is premised on the assumption that the operation in question is under the exclusive command and control of the United Nations. Where a Chapter VII-authorized operation is conducted under national command and control, international responsibility for the activities of the force is vested in the State or States conducting the operation. The determination of responsibility becomes particularly difficult, however, in cases where a State or States provide the United Nations with forces in support of a United Nations operation but not necessarily as an integral part thereof, and where operational command and control is unified or coordinated. This was the case in Somalia where the Quick Reaction Force and the US Rangers were provided in support of the United Nations Operation in Somalia (UNOSOM II), and this was also the case in the former Yugoslavia where the Rapid Reaction Force was provided in support of the United Nations Protection Force (UNPROFOR).

18.    In joint operations, international responsibility for the conduct of the troops lies where operational command and control is vested according to the arrangements establishing the modalities of cooperation between the State or States providing the troops and the United Nations. In the absence of formal arrangements between the United Nations and the State or States providing troops, responsibility would be determined in each and every case according to the degree of effective control exercised by either party in the conduct of the operation.

19.    The principle that in coordinated operations liability for combat-related damage in violation of international humanitarian law is vested in the entity in effective command and control of the operation or the specific action reflects a well-established principle of international responsibility. While it would be desirable to make provisions for the attributability of responsibility in the arrangements with the State or States providing troops, absent such arrangements, claims for damage caused by auxiliary troops should be submitted to their Governments for processing and settlement. This, in fact, was the procedure followed in the case of UNOSOM II and the forces made available in support of the United Nations operation.

## III.  Procedures for the handling of third-party claims

### A.  Current procedures

20. Two kinds of procedures presently exist for the handling of third-party claims: the procedure provided for under article 51 of the model status-of-forces agreement and the one established internally by the United Nations. The standing claims commission under the model agreement provides for a mechanism for the settlement of disputes whereby both parties, namely, the United Nations and the host country, participate on an equal footing; the mechanism established internally by the United Nations leaves the investigation, processing and final adjudication of the claims entirely in the hands of the Organization.

21. Article 51 of the model agreement provides for the establishment of a standing claims commission to settle disputes of a private law character involving the United Nations operation or any of its members. Accordingly:

> "Except as provided in paragraph 53, any dispute or claim of a private law character to which the United Nations peacekeeping operation or any member thereof is a party and over which the courts of [host country/territory] do not have jurisdiction because of any provision of the present Agreement, shall be settled by a standing claims commission to be established for that purpose. One member of the commission shall be appointed by the Secretary-General of the United Nations, one member by the Government and a chairman jointly by the Secretary-General and the Government ... The awards of the commission shall be final and binding, unless the Secretary-General of the United Nations and the Government permit an appeal to a tribunal established in accordance with paragraph 53.".

22. However, to date, third-party claims of a private law nature have been settled without resort to the establishment of standing claims commissions. Instead, it has been the practice, with respect to most past and present United Nations operations, for a local claims review board established in the mission on the basis of authority delegated by the Controller to examine, approve or recommend settlement of third-party claims for personal injury or death and for property loss or damage that are attributable to acts performed in connection with official duties by civilian or military members of the mission.[6]

23. When a claims review board approves a settlement amount within its delegated financial authority, the relevant administrative office of the peacekeeping mission — normally the claims unit — proceeds to offer such a settlement amount to the claimant. In the vast majority of cases, the offer is accepted by the claimant and payment is made against the execution of a release form.

24. When, however, the settlement amount recommended by a claims review board exceeds its authorized financial limit, the third-party claim is referred by the mission to Headquarters for review and approval. In those cases, the recommendations of the local claims review board are submitted to the Field Administration and Logistics Division of the Department of Peacekeeping Operations, which, in turn, forwards them to the Director of the Peacekeeping Financing Division of the Office of Programme Planning, Budget and Accounts for review and approval.

25. The claims review board mechanism applies to all United Nations operations regardless of their size. Designed to be set up at the time the mission is established, in practice they are set up when the need arises.

### B.  Problems encountered with the current procedures

26. Recent United Nations operations have encountered an increasing number of claims being filed against the Organization. Some of these claims are substantial, involving potentially high amounts of compensation to be paid by the Organization. The number of low-value claims, as well as the number of frivolous claims, have also increased, notably in missions such as UNOSOM and UNPF. Regardless of its amount, each claim requires considerable time and effort on the part of United Nations personnel at the mission and at

Headquarters to investigate, document and make recommendations for settlement. The increasing number and complexity of claims that have arisen from recent major United Nations operations have taxed the ability of the Organization to deal with claims efficiently and promptly. This has resulted in growing backlogs and longer delays in the settlement of claims. Such delays can be unfair to claimants, create difficulties in the relations between the Organization and host Governments and, depending upon the extent of the delays, run the risk of exposing the Organization to severe criticism and expose mission staff members to danger.

27.    Shortage of staff for the investigation and the processing of claims both at the field level and at Headquarters has magnified the problems. At the field level, each claim requires an investigation of the cause of the damage and its attributability to the United Nations operation (in case of property loss or damage to premises an engineering inspection must be conducted). At the level of Headquarters units, staff is called upon to deal simultaneously with exceptionally large numbers of claims from several major current or recent United Nations operations. Many of these are third-party claims of relatively low amounts that would be better resolved in the field, had they not exceeded the financial authority delegated to local claims review boards.

28.    Particular mention must be made of the situation during and after the winding down or closure of a United Nations operation. It is during these periods that the burdens on the claim-handling mechanisms are particularly acute. In addition to the backlog of claims that arose prior to the closure of the operation, substantial numbers of new claims are presented during this period by local claimants who, aware that the operation is to close, seek to obtain compensation for their claims before the United Nations operation departs. Yet, typically during this period personnel of the United Nations operation, including those whose functions constitute part of the claims-handling mechanism (e.g. on the fact-finding and decision-making levels) are reduced substantially, limiting even further the number of claims that the field personnel can handle. This results in a significant number of claims remaining unresolved at the end of the liquidation period.

29.    The procedural problems encountered by local claims review boards have been exacerbated by the lack of clarity as to the scope of United Nations liability for property loss or damage, in general, and its liability for damage resulting from "operational necessity", in particular.

## C.    Modified procedures for the settlement of third-party claims

### 1.    Claims review board

30.    The existing mechanisms and procedures for dealing with third-party claims are not inadequate per se. In considering modified procedures, the key role of the field in the claims review process should, therefore, be recognized and maintained. The information and documentation relating to the circumstances of a claim are generally located in the field (for example, reports on investigation of a claim, interviews of witnesses, reports on condition of property). In addition, the personnel of the United Nations operation are most familiar with local factors bearing on the claim, such as the cause and scope of the damage and the quantum of compensation. To continue the existing mechanism whereby the local claims review boards have authority to settle claims up to a specified financial amount and have initial responsibility to review claims over that amount, is, therefore, still a viable alternative.

31.    However, in order to be able to cope with large numbers and amounts of claims, the United Nations operation would have to be provided with the personnel needed to deal with such claims. In addition, the financial authority of the local claims review boards could be changed based on the work in progress of the Interdepartmental Working Group on Third-party Claims. Those claims which exceeded the financial authority of the local boards would continue to be forwarded to Headquarters with a recommendation for a final decision.

32.  In addition, instead of having only one local claims review board in a peacekeeping operation trying to cope with large numbers of claims, multiple boards could be created. This would enable the various boards to divide their work into specific areas, such as personal injury or property damage claims. It would be necessary, however, to provide the administrative, financial, operational and legal personnel to serve on such boards.

33.  The availability of personnel to deal with third-party claims is especially important towards the end of the mission and during the liquidation phase, since experience has shown that at these times claims tend to increase greatly in number. In this regard, it is important that arrangements be made to keep a sufficient number of adequately trained personnel in the mission to carry out the investigation and processing of claims before the end of the liquidation period.

### 2.  Lump-sum agreements

34.  A lump-sum settlement of claims, by which the Organization negotiates a settlement directly with the Government acting on behalf of its nationals, offers the Organization the advantages of efficiency and expediency of settlement and limitation of its financial liability. Under this mode of settlement, the Government (normally of the host State) in the exercise of its right to diplomatic protection of its nationals, espouses their claims, aggregates and submits them to the United Nations and negotiates on their behalf a lump-sum amount in settlement of the claims. Once a lump-sum amount is paid, it is for the Government to distribute it to its nationals in the manner it sees fit.

35.  The lump-sum approach offers considerable advantages. Firstly, the procedure avoids the costly and protracted proceedings that would have been necessary to deal individually with a large number of claims. Secondly, since the lump-sum compensation amount negotiated with the Government would be in full and final settlement of all claims (whether by the Government or its nationals), the settlement would constitute a finite limit to the financial responsibility of the Organization. It would also avoid a situation where individual claims continue to be submitted some time after a United Nations operation has terminated. Thirdly, it would eliminate the necessity for the United Nations to determine the question of who owns the property in respect of which the claim was made;[7] such determination would be left for the Government. And fourthly, in the context of a lump-sum settlement it would be possible to deduct from the lump-sum amount claims that the United Nations may have against the Government or payments due by the Government to the Organization.

36.  A lump-sum settlement of third-party claims was used in the Congo operation (1960-1964), where a large number of claims by Belgian and other nationals was submitted to the Organization for personal injury and death and for property loss or damage not qualified as "military necessity" caused by United Nations troops. In espousing the claims of their nationals, the Governments of Belgium, Greece, Italy, Luxembourg and Switzerland agreed on a lump-sum amount in final settlement of all claims against the United Nations for damage to persons or property arising from the United Nations Operation in the Congo (ONUC).[8]

37.  The choice of a lump-sum settlement as a mode of handling third-party claims is largely dependent on the State's willingness to espouse the claims of its nationals. Where no Government exists in the United Nations area of operation, or where the existing Government is unwilling to espouse the claims, the Organization will still have to face individual claimants. When the conditions for a lump-sum settlement are met, trained personnel would be required in the field and at Headquarters to investigate, review and analyse the claims. The lump-sum agreement itself would be negotiated between the Organization and the claimant State at the level of Headquarters.

## IV.  Limitations of liability

38.  In view of the substantial increase in the number and amount of third-party claims against the United Nations, the General Assembly may wish to consider the following limitations on the liability of the

Organization. They include financial and temporal limitations, counter-claims and set-offs, and recovery from the States contributing contingents in specific cases of gross negligence, wilful misconduct or international criminal liability of the member of the force.

## A.    Financial limitation

39.    The financial liability of the Organization may be set at a level not exceeding a specified amount in respect of economic loss,[9] and may further be limited in respect of non-economic loss (e.g. pain and suffering) and exclude payment of punitive or moral damages. Although the ceiling of compensation and the modalities of establishing the financial limitation of the Organization must be further studied, the principle of limitation on financial liability has been recognized in international practice.[10]

## B.    Temporal limitation

40.    A temporal limitation is a form of limitation on the liability of the Organization, in that claims submitted after the limitation period would no longer be regarded as valid. Such a limitation period would reflect the need to investigate and establish the relevant facts that gave rise to the claim *in situ*. Accordingly, stale claims or claims submitted after an unreasonable period of time following the occurrence of the event giving rise to the claim would be excluded from consideration.[11]

## C.    Counter-claims and off-sets

41.    It is conceivable that the United Nations may have claims against a party that has asserted a claim against it. If these claims by the United Nations arise from the same situation that gave rise to the claim against it, they are regarded as "counter-claims"; if they arise from a different situation, they are regarded as "off-sets". Cases in which the Organization has counter-claims or off-sets against an individual claimant are not very common. More common are situations in which the United Nations has claims against the host Government, arising out of payments made by the Organization, which it was under no legal obligation to make, in order to enable the mission to continue to function. These have included, for example, payments of taxes demanded by host Governments on petroleum and other products and services, payments in the nature of taxes (e.g. road tolls) and payment of rent for premises that the host Government was obligated to provide free of charge pursuant to the applicable status-of-forces agreement or the principles and practices of peacekeeping. On many occasions payments were made under protest, with the United Nations reserving its rights to claim reimbursement of the amounts paid from the Governments concerned.

## D.    Recovery from States contributing contingents: concurrent responsibility

42.    In the relationship between the United Nations and the host State, the Organization is internationally responsible for the activities of United Nations forces. However, in the relationship between the Organization and the States contributing contingents, the Organization may seek recovery from the State of nationality if the damage was caused as a result of gross negligence or wilful misconduct of a member of its national contingent, or has entailed his international criminal responsibility.

43.    In the case of property loss or damage caused by negligence or wilful misconduct of a member of the force, article 9 of the model contribution agreement between the United Nations and the State contributing resources to the United Nations peacekeeping operation provides (A/50/995, annex):

"The United Nations will be responsible for dealing with any claims by third parties where the loss of or damage to their property, or death or personal injury, was caused by the personnel or equipment provided by the Government in the performance of services or any other activity or operation under this Agreement. However, if the loss, damage, death or injury arose from gross negligence or wilful misconduct of the personnel provided by the Government, the Government will be liable for such claims."

44.    Recovery may also be sought from States contributing contingents where combat-related damage is caused by members of their national contingent in violation of international humanitarian law and where the international criminal responsibility of the individual member is entailed. Given the exclusive criminal jurisdiction of the State of nationality and its obligation to ensure respect for international humanitarian law by members of its force, the General Assembly may wish to consider recognizing the concurrent responsibility of the State of nationality for violations of international humanitarian law by members of its national contingent and its responsibility in compensation.

## V.   Summary and conclusions

45.    In its request for a legal study, the Advisory Committee envisaged a two-stage process: an examination of current procedures on the basis of which the Secretary-General, in the course of the fifty-first session of the General Assembly, would develop and propose means of ensuring a simple, efficient and prompt settlement of third-party claims, of limiting the liability of the Organization, protecting its interests and allowing for a coordinated approach of all United Nations organizations, agencies and programmes. The study contained in the present report combines the two stages envisaged by the Advisory Committee.

46.    The scope and limitations of United Nations liability have been delineated. It was established that non-consensual use and occupancy of privately owned land and premises should be compensated for, but that the right of the Organization to seek recovery from the host Government should be reserved. The United Nations liability for property loss or damage in the ordinary operation of the force is recognized subject to the principle of "operational necessity", within the parameters described above. The liability of the Organization for combat-related damage is determined by the principles and rules of international humanitarian law and is limited in cases where combat operations are conducted by forces not constitutionally or effectively under the exclusive command and control of the United Nations.

47.    The existing procedures, consisting mainly of local claims review boards, have, in principle, proved to be adequate, although the increase in the number, amount and complexity of claims has strained their ability to cope effectively with third-party claims arising from recent United Nations operations. Changes and modifications proposed in the existing mechanism, such as, creating multiple claims review boards, increasing their financial authority and provision of additional experienced staff at the field and Headquarters levels, are designed to address the practical difficulties encountered. The approach of the lump-sum settlement has been proposed as a preferred solution. Since the procedure of standing claims commissions provided for under the model status-of-forces agreement has, thus far, never been used, its advantages and disadvantages can not be fully evaluated.

48.    Finally, the study proposes measures of limiting the financial liability of the Organization where its legal liability has been engaged. The means of such limitations are recommended as a matter of policy, some of which represent a modification of the prevailing practice while others are compatible therewith. They include: financial and temporal limitations, counter-claims and set-offs, and recovery from States contributing contingents for damage caused by gross negligence, wilful misconduct, or which entails the international criminal responsibility of the individual member of the Force.

## VI.   Cost estimates for the settlement of third-party liability claims

49. It was estimated in the report of the Secretary-General of 16 March 1996 (A/50/696/Add.4 and Corr.1) that an amount of $20 million was needed for the settlement of third-party liability claims during the pre-liquidation period of UNPF from 1 January to 30 June 1996. It was further estimated in the report of 29 March (A/50/696/Add.5) that additional amounts of $5 million would be required for this purpose during the liquidation period from 1 July 1996 to 28 February 1997 and $500,000 in connection with the provision of common support services for the period from 1 July 1996 to 30 June 1997.

50. Pending the submission of the present report, the Advisory Committee recommended that the amount provided for third-party liability claims for the period from 1 January to 30 June 1996 be reduced from $20 million to $10 million. This reduced amount was included in the commitment authorization provided by the General Assembly in its resolution 50/235.

51. At the time the cost estimates were prepared at the beginning of the year, there were some 800 potential Board of Inquiry cases to be reviewed, each of which could have resulted in a claim against the United Nations. It had also been anticipated that as the forces returned facilities rented by battalions departing from the mission area, there would be an increasing number of claims against the United Nations for damages arising from the use of those facilities. It was therefore estimated that the settlement of these claims could amount to some $20 million during the pre-liquidation period from 1 January to 30 June 1996 and $5.5 million for the 12-month period thereafter. These assumptions have not materialized, however.

52. A total of 151 claims remain pending. These include 37 cases amounting to $28.8 million. The processing of these claims has been complicated and delayed by the tendency of former leasers/landlords to submit claims for the total refurbishment of their premises. Such claims fail to distinguish between costs resulting from alleged UNPF misuse and those resulting from war damage, lack of maintenance, fair wear and tear and time-related deterioration. In addition, the claims are not presented in a way that allows the individual elements of work to be identified. In a number of cases, the amount claimed has appeared to be so obviously based on total refurbishment of the premises that the decision has been taken to suspend processing of the claim and to request the claimant to resubmit his/her claim specifying only instances of damage attributable to UNPF misuse.

53. The amount of $10 million that has been authorized for the period from 1 January to 30 June 1996 and the amount of $5.5 million contained in the cost estimates for the period from 1 July 1996 to 30 June 1997 appears adequate at the present stage for the settlement of claims, based on the number of actual claims received since the cost estimates were prepared, the rate at which claims continue to be received by UNPF, the number of claims that have been settled or closed and the number and value of outstanding claims.

## VII.  Action to be taken by the General Assembly at its fifty-first session

54. The actions to be taken by the General Assembly at its fifty-first session are to note the report of the Secretary-General and to endorse the proposals and recommendations regarding limitations on the liability of the Organization as described in section IV.

### Notes

[1]   For the purpose of the present report, third-party claims do not include claims that arise within the context of a contractual or other direct legal relationship between the claimant and the United Nations. Claims arising from contracts or leases are, therefore, excluded from this study. Claims arising from accidents involving official United Nations vehicles are also excluded. In most cases they are covered under the terms of the United Nations worldwide insurance policy against third-party liability and are, therefore, settled by the insurance company's designated representative or agent in accordance with the local law of the State concerned. If, however, the insurance company has not designated a representative to handle such cases in that locale, such claims are

reviewed by the local claims review board of a mission in the first instance and thereafter forwarded to the insurance company for processing.

2     In a letter dated 6 August 1965 from the Secretary-General to the representative of the Union of Soviet Socialist Republics concerning the payment of indemnities to Belgian citizens resident in the Democratic Republic of the Congo (S/6597), it was stated:

> "It has always been the policy of the United Nations, acting through the Secretary-General, to compensate individuals who have suffered damages for which the Organization was legally liable. This policy is in keeping with generally recognized legal principles and with the Convention on the Privileges and Immunities of the United Nations."

3     In the absence of a definition of what constitutes State-owned property, or a test of ownership in case of doubt or mixed ownership, the notion of State property should be interpreted strictly. By analogy with article 56 of the Hague Regulations, the property of municipalities should be considered for the purposes of peacekeeping operations as private property.

4     See the Secretary-General's summary study on the experience derived from the establishment and operation of the United Nations (A/3943, para. 142).

5     The concept of "operational necessity" as used herein has been developed in the practice of United Nations operations. It is distinguishable from the concept of "military necessity", which is limited to combat operations and is governed by the laws of war. Both concepts are, however, conceptually similar in that they serve as an exemption from liability, or a legitimization of an act that would otherwise be considered unlawful.

6     See ST/AI/149/Rev.4, paras. 16-18. Normally, a typical claims review board consists of a minimum of three staff members performing significant administrative functions. Wherever possible, a Legal Adviser, or a staff member with legal training should also be a member. The following is an example of the typical composition of a local claims review board:

| | |
|---|---|
| Chairperson | : Chief Administrative Officer |
| Member | : Legal Adviser |
| Member | : Chief, Finance Officer |
| Member | : Chief, General Services |
| Secretary (ex-officio) | : Chief, Claims Unit |

7     The question of who owns the property has arisen in a number of claims for property damage submitted by local authorities in the former Yugoslavia. These claims have raised difficult questions as to whether the owner of the property, and thus the party entitled to compensation, was the local authority or a private party.

8     The procedure for settling the Belgian claims was described in the Secretary-General's letter of 6 August 1965 to the representative of the Union of Soviet Socialist Republics. Accordingly, the claims submitted were investigated by the competent services of ONUC and United Nations Headquarters. Claims for damage due to military operations or military necessity were excluded, as well as claims for damage caused by non-United Nations personnel. Of approximately 1,400 claims submitted by Belgian nationals, the United Nations accepted 581 as entitled to compensation. Following consultations with the Government of Belgium, a lump-sum payment in the amount of $1.5 million was agreed as a final settlement of the matter. At the same time, a number of financial questions that were outstanding between the United Nations and Belgium were settled. Payment was effected by offsetting the amount of $1.5 million against unpaid ONUC assessments amounting to approximately $3.2 million (see note 2 above, document S/6597).

9     The Headquarters regulation No. 4 on "Limitation of damages in respect of acts occurring within the Headquarters district", adopted by the General Assembly in its resolution 41/210 of 11 December 1986, contains the following definition of "economic loss":

"'Economic loss' means the reasonable cost of repairing or replacing property, and, in respect of death, injury or illness, any reasonable past, present and estimated future:

"(i)      Health care expenses;

"(ii)     Rehabilitation expenses;

"(iii)    Loss of earnings;

"(iv)     Loss of financial support;

"(v)      Cost of homemaker services;

"(vi)     Transportation expenses;

"(vii)    Burial expenses;

"(viii)   Legal expenses."

[10]   See the Convention on Damage Caused by Foreign Aircraft to Third Parties on the Surface, 1952, the Convention on Third Party Liability in the Field of Nuclear Energy, 1960, the United Nations Convention on the Carriage of Goods by Sea (the "Hamburg Rules"), 1978, the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention"), 1929, as amended by the Hague Protocol, 1955, and the Montreal Protocol No. 4, 1975, and the International Convention on Civil Liability for Oil Pollution Damage, 1969.

[11]   For the international practice on establishing periods of limitations, see ibid.

- - - - -