# EXHIBIT 13

## The problem of immunity

The main obstacle to the promotion of the accountability of the UN and other international organisations through national courts is the law of immunity. Clearly, immunity 'does not free the organization from any obligation', but it 'may frustrate the enforcement of the law'.[120]

The wording of Article 105 of the UN Charter supports the functional approach to the immunity of the UN and its officials. In terms of Article 105, the privileges and immunities of the UN are those 'necessary for the fulfilment of its purposes'; the privileges and immunities of its officials are those that 'are necessary for the independent exercise of their functions in connection with the Organisation'.[121] But this qualification appears only in the preamble of the General Convention on Privileges and Immunities of the UN.[122] Section 2 of that Convention provides that the UN, its property and assets 'shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity. It is, however, understood that no waiver of immunity shall extend to any measure of execution'. The General Convention thus signalled a shift to absolute immunity.

In addition to the Organisation's immunity, personal immunity is conferred on three categories of individuals connected with the Organisation: representatives of member states, officials of the UN and experts on missions. In particular, under the General Convention, UN officials are 'immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity' (Section 18). This immunity is, however, subject to an important qualification. Section 20 provides that '[p]rivileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves. The Secretary General shall have the right and the duty to waive the immunity of any official in any case where, in his opinion, the immunity would

---

[120] Schermers and Blokker, *supra* note 80 at 1026.
[121] The functional approach is adopted in the constituent instruments of other international organisations as well, see Reinisch *supra* note 94 at 140 and fn. 542.
[122] UN Convention on the Privileges and Immunities of the United Nations (1946) 1 UNTS 15 and *corrigendum* 90 UNTS 327. See also UN Convention on the Privileges and Immunities of the Specialised Agencies (1947) 33 UNTS 261, which contains broadly similar provisions. See A. J. Miller, 'Privileges and Immunities of United Nations Officials', 4 *International Organisations Law Review* (2007) 169 and, by the same author, 'The Privileges and Immunities of the United Nations', 6 *International Organisations Law Review* (2009) 7.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

impede the course of justice and can be waived without prejudice to the interests of the United Nations'. The power to waive the immunity is vested in the Secretary General, whereas 'executive directors of semi-independent programmes have no such power'.[123] The power to waive the immunity of the Secretary General himself rests with the Security Council.

The general view has been for a long time that courts generally uphold the principle that 'under the [UN] Convention the United Nations' immunity is absolute, subject only to the organization's express waiver thereof in particular cases', and that, as a result, the distinction between *acta jure gestionis* and *acta jure imperii* does not apply to the immunities of international organisations.[124] However, the comprehensive review of judicial practice undertaken by Reinisch suggests that 'national courts, on the whole, do not appear to be convinced that international organisations should enjoy absolute immunity from suit',[125] although techniques for restricting immunity developed by domestic courts have often lacked cogency. In particular, the Italian Court of Cassation has maintained that the application of the doctrine of restrictive immunity should be extended to international organisations, and that, as a result, they should not enjoy immunity for acts *jure gestionis*.[126] In the US courts have often been careful not to exclude, as a matter of principle, the applicability of restrictive immunity to international organisations,[127] and there have been pronouncements contrary to the prevailing trend which favour absolute immunity. For

---

[123] *UN Juridical Yearbook* (1969) 225.

[124] For example, *Boimah v. UN General Assembly*, 664 F. Supp. 69 at 71; *Ashkir et al. v. United Nations*, Civ. No. 97–2266 (TFH).

[125] Reinisch, *supra* note 94 at 391.

[126] *Food and Agricultural Organisation v. Istituto Nazionale di Previdenza per i Dirigenti d' Azienda Industriali (INPDAI)*, Corte di Cassazione, Case No. 5399 (1982), 87 ILR 1, (1982) *United Nations Juridical Yearbook* 234, but in *FAO v. Colagrossi* 101 ILR 386, the Court of Cassation appears to have departed from its own precedents. On the dispute between FAO and Italy, see Reinisch, *supra* note 94 at 131–4. Morgenstern sees the Italian reservation to the General Convention as the starting point of the dispute (F. Morgenstern, *Legal Problems of International Organizations* (Cambridge: Grotius, 1986) 6 ff.).

[127] See *Askir v. Boutros Ghali et al.*, 933 F. Supp. 368, in which the District Court for the Southern District of New York did not find it necessary to pronounce in favour of absolute or restrictive immunity 'because even if the more limited restrictive immunity doctrine applied, the claims in this case do not arise out of commercial activity by the United Nations'. See also *De Luca v. UN*, 841 F. Supp. 531; *Boimah*, *supra* note 124.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

example, a court in New York held that a driver employed by the UN who had exceeded the speed limit was not entitled to immunity because 'to recognize the existence of a general and unrestricted immunity from suit or prosecution on the part of the personnel of the United Nations … even though the individual's function has no relation to the importance or the success of the Organization's deliberations, is carrying the principle of immunity completely out of bounds'.[128]

The judge added:

'To establish such a principle would in effect create a large preferred class within our borders who would be immune to punishment on identical facts for which the average American would be subject to punishment. Any such theory does violence to and is repugnant to the American sense of fairness and justice and flouts the very basic principle of the United Nations itself, which in its preamble to its Charter affirms that it is created to give substance to the principle that the rights of all men and women are equal.'[129]

In another case, originating from a lawsuit brought by a private company against the Organisation of American States, the distinction between *acta jure gestionis* and *acta jure imperii* was applied by a US Court.[130]

In the US, the argument for restrictive immunity gains some traction from the terms of the immunity statutes. Under the International Organizations Immunities Act, international organisations are granted 'the same immunity from suit and every form of judicial process as is enjoyed by foreign governments',[131] and it could thus be argued that the exceptions under the Foreign Sovereign Immunities Act to the general jurisdictional immunity of foreign states ought to apply to international organisations too.[132] However, as observed by Reinisch, US courts 'have been very careful to avoid deciding' the question of the 'same immunity … as foreign governments' qualification in the Act.[133]

In some cases the plea of immunity was rejected because it fell outside the scope of the General Convention. For example, in *Kadic v. Karadic*, the defendant's argument that, as an invitee of the UN, he was entitled to immunity under the Headquarters Agreement was dismissed.[134] In another case, *Mushikiwabo et al. v. Barayagwiza*, the plaintiffs sought

---

[128] *Westchester County on Complaint of Donnelly v. Ranollo*, 67 N.Y.S. 2d 31 at 34.
[129] *Ibid.*
[130] *Dupree Associates Inc. v. Organization of American States and the General Secretariat of the Organization*, US District Court for the District of Columbia, 63 ILR 92.
[131] 22 USCS §288a.     [132] 28 USCS §1605.     [133] Reinisch, *supra* note 94 at 179–80.
[134] *Kadic v. Karadic*, 70 F.3d 232.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

damages for the defendant's involvement in the genocide in Rwanda and for the key role he allegedly played in the murder of some of their relatives.[135] The defendant maintained that he enjoyed immunity because he was attending a session of the UN when he was served with the summons. The government of Rwanda sent a note officially to waive immunity, although this was not probably necessary. Neither *Kadic* nor *Mushikiwabo* concerned cases brought directly against either the UN or UN officials. However, Louise Mushikiwabo later unsuccessfully attempted to bring a case against the Organisation for its failure to protect the persons, including many of her relatives, who had sought refuge in the Ecole Technique Officielle in Kigali in the early days of the genocide.

Human rights arguments to limit the scope of immunity of international organisations have been used only sporadically, and generally unsuccessfully. Absolute immunity of the UN was upheld by the District Court in the Hague in a case brought by victims of the massacre of Srebrenica,[136] and by the Second Circuit of the US Court of Appeals in a case of sexual harassment.[137] The Belgian Civil Tribunal upheld the immunity of the UN in *Manderlier v. UN*, despite the plaintiff's argument that his rights under the Universal Declaration of Human Rights, in particular his right to an effective remedy under Article 8, had been infringed upon.[138] The Court of Appeal in Brussels reached the same conclusion but admitted that the fact that there was no court to which the appellant could submit his dispute within the UN 'may be deplored', and 'does not appear to conform to the principles proclaimed in the Universal Declaration of Human Rights'.[139] The *Manderlier* decisions, which date back to the 1960s, arose out of a dispute between a Belgian citizen and UN troops in Congo during ONUC. Even if the Belgian courts had accepted Manderlier's arguments, it would have still been impossible to give execution to their judgment because of the UN's absolute immunity from execution.

---

[135] *Mushikiwabo et al. v. Barayagwiza*, US District Court of the Southern District of New York, 94 Civ. 3627 (JSM).

[136] *Foundation Mothers of Srebrenica v. The Netherlands and the UN*, Case No. 295247/HA ZA 07–2973, Judgment in the incidental proceedings of 10 July 2008, available through the search engine of www.rechtspraak.nl. See O. Spijkers, 'The Immunity of the United Nations in Relation to the Genocide in Srebrenica in the Eyes of a Dutch District Court', 13 *Journal of International Peacekeeping* (2009) 197.

[137] *Brzak v. United Nations*, No. 08–2799, 597 F.3d 107 (2010).

[138] 45 ILR 446 and 69 ILR 139 (respectively first instance and appeal decision). The Universal Declaration is GA Res. 217A (III) of 10 December 1948.

[139] 69 ILR 139 at 143.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

Absolute immunity is rooted in concerns about the interference of member states with the work of international organisations. Such concerns cannot be easily brushed aside. Cases such as *Mazilu* and *Cumaraswamy* certainly bespeak the importance of maintaining a regime of immunity for the UN.[140] The *Mazilu* case concerned a Romanian member of the Sub-Commission on Prevention of Discrimination and Protection of Minorities who had been requested to prepare a report on human rights and youth. Mr Mazilu later complained that the Romanian government forced him to retire, and prevented him from submitting his report or otherwise participating in the works of the Sub-Commission. The *Cumaraswamy* case arose from an interview given to the press by the Special Rapporteur on the Independence of Judges and Lawyers, in which he commented on commercial litigation in Malaysian courts. Two Malaysian companies argued that the article was defamatory and filed a lawsuit for damages. In both cases the position of the UN was supported by the ICJ. However, while the *Mazilu* case had to do with the unacceptable interference of a government with an expert on mission, the *Cumaraswamy* case dealt with third parties who considered themselves aggrieved by the words of the Special Rapporteur. The conclusion of the Court was correct in *Cumaraswamy*, too, since it would have been excessive to qualify his statements as 'unofficial' simply by virtue of their being rather incautious or inopportune.

The fact that, notwithstanding the provisions on immunity, UN personnel are still arrested is another indication that immunity serves an important function.[141] International organisations also need to be protected from other types of governmental interference, as the screening of UN employees by some countries of nationality shows (discussed in Chapter 1). In this sense, it is difficult to disagree with the European Court of Human Rights when it states that 'the attribution of privileges and immunities to international organisations is an essential means of ensuring the proper functioning of such organisations free from unilateral interference by individual governments'.[142]

The General Convention seeks to moderate absolute immunity in two ways. First, Section 29 of the General Convention obliges the UN

---

[140] See *infra* note 147.

[141] C. H. Brower, 'International Immunities: Some Dissident Views on the Role of Municipal Courts', 41 Virg. J. Int. L. (2000) 146 at 38 ff.

[142] *Waite and Kennedy v. Germany*, Judgment, 18 February 1999, Application No. 26083/94 at para. 63. See also *Beer and Regan v. Germany*, Judgment, 18 February 1999, Application No. 28934/95.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

356    ACCOUNTABILITY

'to make provision for appropriate modes of settlement of' disputes
of a private law character to which the UN is a party, and disputes
involving any official of the UN in respect of whom immunity has not
been waived.[143] Such modes of settlement of disputes are normally
made available to employees on a permanent basis, but to third par-
ties on ad hoc basis especially for the purposes of settling claims aris-
ing in peacekeeping operations. Some courts have taken the view,
albeit by way of *obiter dicta*, that a breach of this obligation by the UN
could result in the assumption of jurisdiction by the national court.[144]
The importance of the existence of an alternative method of dispute
settlement was also emphasised by the ECtHR.[145]

Secondly, as mentioned, the General Convention contains pro-
visions on immunity waivers. According to some, these provisions
refute the thesis that the General Convention is in contradiction
with the Charter, and demonstrate that the Convention subscribes to
the functional necessity approach.[146] However, clear criteria for the
waiver of immunity are set out only for the immunity of officials
but not for the immunity of the Organisation. Moreover, under the
Convention, there is no adequate remedial mechanism for all those
cases in which the Secretary General wrongly denies the waiver of
immunity. In practice, the Secretary General enjoys complete discre-
tion in the exercise of this power as his decision to refuse to waive
immunity cannot be appealed to another organ. Such discretion
seems incompatible with the fact that, at least as far as the immunity
of officials is concerned, the Secretary General has a duty to waive
it in certain circumstances. The conduct of the Secretary General
can be reviewed only if a request is put to the ICJ by a competent
organ of the UN or of a specialised agency under Sections 29–30 of
the General Convention. In the two cases arising out of a dispute
under the General Convention that the ICJ has so far considered,[147]
the requests were submitted by the Economic and Social Council.

---

[143] Miller (2009), *supra* note 122 at 95ff.
[144] *Ibid.* at 99.
[145] *Waite and Kennedy, supra* note 142 at para. 68.
[146] Brower, *supra* note 141 at 27.
[147] *Applicability of Article 6, 22 of the Convention on the Privileges and Immunities of the
United Nations* (hereinafter '*Mazilu* case'), Advisory Opinion, ICJ Reports (1989)
177; *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the UN
Commission on Human Rights* (hereinafter '*Cumaraswamy* case'), Advisory Opinion, ICJ
Reports (1999) 62.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

Both cases concerned the immunity of experts on mission, but the question of the exercise of the Secretary General's duty to grant a waiver of immunity in some circumstances has not yet formed the object of an advisory opinion of the Court. In the *Cumaraswamy* case, Judge Koroma did note the Court's reluctance to examine the consistency of the conduct of the Special Rapporteur with the terms of his mandate.[148] But that case dealt, at most, with incautious utterances by an expert on mission, and not with violations of human rights; such reluctance as was observed by Judge Koroma might well be set aside in other cases involving more serious conduct.

Consistently with the terms of Section 2 of the General Convention, domestic courts have not normally agreed to lift the immunity of an international organisation on the basis of an implied waiver.[149] In *Mendaro v. World Bank*, the appellant argued that a provision in the Articles of Agreement of the World Bank amounted to an implied waiver of immunity.[150] However, the US Court of Appeals for the District of Columbia Circuit, affirming the decision of the District Court to reject the claim, added that immunity must be 'narrowly read in light of both national and international law governing the immunity of international organizations'.[151]

The practice on immunity waivers suggests that this power is very seldom exercised.[152] Immunity tends to be waived when an investigation conducted by OIOS gathers evidence of theft of UN property committed by an official.[153] OIOS also seeks the prosecution of individuals

---

[148] *Cumaraswamy* case, *supra* note 147 at 121 (diss. op. of Judge Koroma).

[149] But see *Lutcher SA Cellulose e Papel v. Inter-American Development Bank*, US Court of Appeals, DC Circuit, 382 F.2d 454.

[150] *Mendaro v. World Bank*, 717 F.2d 610. A comment on *Mendaro* is in M. Singer, 'Jurisdictional Immunity of International Organizations: Human Rights and Functional Necessity Concerns', 36 *Virg. J. Int. L.* (1995) 53. For a discussion of sexual harassment cases brought by women employed by international institutions, see H. Charlesworth and C. Chinkin, *The Boundaries of International Law: A Feminist Analysis* (Manchester University Press, 2000) 187–9.

[151] *Ibid.*, *Mendaro v. World Bank* at 611. Waivers of immunity are traditionally interpreted narrowly in the context of state immunity too, e.g. *A Company Ltd v. Republic of X*, High Court, Queen's Bench Division (Commercial Court), 87 ILR 412, [1990] 2 Lloyd's Rep 520.

[152] On the practice on immunity waivers in respect of the organisation see Miller (2009), *supra* note 122 at 88ff.; on the practice on immunity waivers in respect of officials see Miller (2007), *supra* note 122 at 236ff.

[153] UN OIOS, 'Report of the Office of Internal Oversight Services on the Investigation into Allegations of Theft of Funds by a Staff Member of the United Nations

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

external to the Organisation who have committed a crime – fraud or theft for the most part – of which the UN has been a victim. In cases of corruption and forgery, the sanction against UN staff is often only a disciplinary one, or consists simply of the dismissal of the officials in question; prosecution by national authorities is seldom sought in such cases.[154] In cases brought by individuals, including former staff, against the UN, there is still enormous reluctance to waive immunity. The UN does not generally waive immunity even for traffic violations, although these are usually insurable.[155]

Brower has argued that 'the expansion of municipal court jurisdiction is unlikely to make international organizations significantly more accountable because international law already requires international organizations to minimize their reliance on immunity and to provide claimants with alternatives to municipal court litigation'.[156] In his view, the current system already adheres 'to the functional necessity doctrine, but give international officials the primary authority for making immunity determinations'.[157] This position may be doctrinally correct, but in practice accountability of both the organisation and the officials is very low under the current system. Clearly, a balance needs to be struck between the needs of the Organisation and the rights of individuals who are directly affected by it. The shield of absolute immunity is one that the UN cannot keep for too long, particularly if it intends to maintain and increase its operational role. Absolute immunity jars with the evolution of the law of immunity in other areas. In a world where in most jurisdictions states have ceased to enjoy immunity for commercial acts and where former head of states have been put on trial, it is difficult not to think of the UN as enjoying absolute immunity on borrowed time. Interestingly, whereas in the past the authoritative scholarship in the

Conference on Trade and Development', 28 January 1999, UN Doc. A/53/811; UN OIOS, 'Report of the Office of Internal Oversight Services for the Period between 1 July 1997 and 30 June 1998', 23 September 1998, UN Doc. A/53/428 at paras. 151 ff.; Report 1999–2000, *supra* note 55 at para. 49. OIOS' rules do not specify when an investigation would result in criminal prosecution by national authorities (see Secretary General, 'Report of the Secretary-General on the Rules and Procedures to be applied for the investigation functions performed by the Office of Internal Oversight Services', 11 October 2000, UN Doc. A/55/469 at paras. 21–2).

[154] *Ibid.*, UN OIOS Report 1997–98 at paras. 75 and 143–4.
[155] Schermers and Blokkers, *supra* note 80 at 378.    [156] *Ibid.*
[157] Brower, *supra* note 141 at 8.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014

field defended absolute immunity,[158] more recent scholarship tends to favour a shift to restrictive immunity.[159]

A restrictive approach to immunity would have to be tailored to the terms of the General Convention. But there are at least two bases for restrictions of immunity that would not conflict with the provisions of the Convention, not least in light of the fact that those provisions must be interpreted against the background of the functional approach in the Charter. First, courts could reject the plea of immunity where the denial of a waiver by the Secretary General is arbitrary or manifestly unfounded. Given that the Secretary General has a right-duty to grant a waiver when it comes to officials, the standard of review could be lower than in the respect of waivers for the organisation for which the discretion of the Secretary General is wider. Secondly, courts should deny immunity to the UN where it has failed to provide alternative means of dispute settlement.

### The doctrine of equivalent protection

### The origins: the *Solange* decisions

Developed originally by the German Constitutional Court and later adopted by the European Court of Human Rights, the doctrine of equivalent protection offers a basis for the exercise of judicial control over the acts of international organisations. This control, however, is not exhaustive. Judicial scrutiny on the basis of equivalent protection is normally *mediated* rather than *direct*: what comes under examination is the act of the state transferring powers to the international organisation, not the act of the international organisation that caused the breach. The content of the doctrine also appears to vary depending on the nature of the court: treaty-based judicial bodies apply it differently from constitutional or supreme courts. Despite their differences, national and international courts are moving in a similar direction and the doctrine of equivalent protection now enjoys a considerable degree of conceptual coherence.

The German Constitutional Court developed the doctrine of equivalent protection in response to the expansion of the powers and functions of the European Communities. In its well-known *Solange I* decision in 1974 the German Court asserted its entitlement to review

---

[158]  For example, W.C. Jenks, *International Immunities* (London: Stevens, 1961) at 41.
[159]  Reinisch, *supra* note 94 at 317ff. and 391ff.; Wellens, *supra* note 94 at 208ff.

Downloaded from Cambridge Books Online by IP 128.122.149.145 on Fri Feb 07 17:57:34 GMT 2014.
http://dx.doi.org/10.1017/CBO9780511862687.012
Cambridge Books Online © Cambridge University Press, 2014