# EXHIBIT 15

## Page 102 — Riccardo Pavoni

upheld the immunity of the UN. The plaintiffs argued inter alia that the UN's immunity should be set aside because of the *jus cogens* nature of the prohibition on (tolerating) genocide.[151] The District Court dismissed the argument for two reasons. In the first place, it pointed to the absence in the 1948 Convention[152] of any obligation to grant civil remedies to victims of genocide. This seems to accept that the obligations laid down in that Convention, whatever their status, do not include either per se or as a corollary the right to bring an action for compensation for damage.[153] Secondly, aware that this right may however ensue from sources external to the 1948 Convention, such as the ECHR and the ICCPR, the court recalled the ECtHR *Al-Adsani* jurisprudence and concluded that

there is no generally accepted standard in international-law practice on the basis of which current immunities allow exception within the framework of enforcement in civil law of the standards of ius cogens, like the prohibitions on genocide and torture.[154]

This finding was therefore based on a very debatable extension of ECtHR case law on state immunity to IOs' immunity.[155] The approach of the Court of Appeal was significantly different. In discussing the test of proportionality as per Article 6 of the ECHR, the court emphasized the special mission of the UN in the international legal order and the crucial function performed by its peacekeeping operations in that respect.[156] This implied that only 'compelling reasons'[157] should lead to removing the UN's immunity as disproportionate to the aim pursued. Hinting at *jus cogens*, the plaintiffs posited that one such compelling reason was triggered by the case at hand, as it involved the heinous crime of genocide.[158] The court disagreed. It drew attention to the fact that the UN was not accused of genocide itself, nor of complicity in genocide, but 'only' of failure to prevent this crime against humanity.[159] Thus, although the latter accusation was serious, it was not 'that pressing that immunity should be [denied] or that the UN's invocation of immunity was, straightaway, unacceptable'.[160]

The obvious inference from this reasoning is that the *jus cogens* status of the obligation to prevent genocide, unlike that of the prohibition to commit genocide, is to be ruled out. A breach of that obligation is not therefore of such a gravity as to

---

the UN's right to immunity was pleaded by the Netherlands and decided in proceedings incidental to the principal case of *Association Mothers of Srebrenica and Others v The Netherlands and the United Nations*.
[151] *Association Mothers of Srebrenica* (District Court) (n 150) para 3.4.
[152] Convention on the Prevention and Punishment of the Crime of Genocide, 9 December 1948, 78 UNTS 277.
[153] *Association Mothers of Srebrenica* (District Court) (n 150) para 5.19. This argument seems therefore to fall back on the theory of the impassable boundary between substantive and procedural obligations.
[154] Ibid para 5.20.
[155] And indeed, as we shall see (section 4.2 below), the court later attempted to distinguish the case at hand from the ECtHR *actual* jurisprudence on IOs' immunity.
[156] *Association Mothers of Srebrenica* (Appeal Court) (n 46) para 5.7.     [157] Ibid.
[158] Ibid para 5.8.     [159] Ibid para 5.10.
[160] Ibid. The court further specified: 'The reproach that the UN failed to prevent genocide … and therefore was negligent is *insufficient* in principle to [deny] its immunity', ibid, emphasis added.

## Page 103 — Human Rights and the Immunities of Foreign States

justify a denial of immunity. Hence, this decision evidently shows that *jus cogens* may well have a role to play in immunity cases. The Hague Appeal Court did not reject the argument based on the severity of the charges against the UN on the assumption that the latter were alien to an ancillary procedural rule to provide access to justice. The sole distinction retained by the court concerned the different gravity of the substantive obligations themselves. It is also remarkable that *both* Dutch courts had no hesitation in disavowing Article 103 of the UN Charter as an absolute bar to removing the UN's immunity *in any situation*. They stated that Article 103 did not imply the prevalence of the UN Charter over *jus cogens* and fundamental rights at large, either of a customary or a *treaty* nature.[161]

What remains to be clarified is the actual function which, according to the Appeal Court's reasoning, *jus cogens* may discharge in immunity cases. The court never alluded to the possibility that the gravity of the crimes at stake may lead to such a drastic outcome as the invalidation of the provisions granting immunity to the UN set forth in the UN Charter and in the General Convention. In the next section, it will be submitted that this decision provides further evidence of the interpretative potential of *jus cogens*.

### 4.2 Reconciling IOs' immunity with the right of access to justice: interpretation as the key tool for the courts

The ECtHR jurisprudence on the immunity of IOs may be taken as an eminent example of systematic interpretation aimed at reconciling the competing obligations and interests at stake. In *Waite and Kennedy*, the Court addressed the compatibility of the immunity enjoyed by the European Space Agency (ESA) with the right of access to justice in Article 6 of the ECHR. It performed the classic two-tier test of legitimacy and proportionality of restrictions on ECHR rights. There was no doubt that rules on IOs' immunity pursued the legitimate aim of 'ensuring the proper functioning of such organisations free from unilateral interference by individual governments'.[162] In respect of proportionality, the Court underscored that 'a material factor'[163] to be taken into account was 'whether the applicants had available to them *reasonable alternative means* to protect *effectively* their rights under the Convention'.[164] Such remedies indeed existed, as the applicants might have had recourse to the pertinent body internal to the IO, namely the ESA Appeals Board,[165] *plus* they might have sued the firms which had hired them out before domestic courts.[166] The Court unanimously concluded that Germany had not breached Article 6.[167]

A rational balance between the competing obligations at stake was thus found in the necessary existence of 'alternative means of legal process'[168] open to aggrieved individuals who are unable to sue IOs before national courts because of immunity

---

[161] *Association Mothers of Srebrenica* (District Court) (n 150) para 5.16; ibid (Appeal Court) (n 46) para 5.5 (Art 103 'was not intended to allow the Charter to … set aside … fundamental rights recognised by international (customary) law or in international conventions').
[162] *Waite and Kennedy* (n 36) para 63.     [163] Ibid para 68.     [164] Ibid, emphasis added.
[165] Ibid para 69.     [166] Ibid para 70.     [167] Ibid para 74.     [168] Ibid para 73.

104                                    Riccardo Pavoni

rules. This is usually taken to mean that whenever such alternative means are absent or patently ineffective, IOs' immunity ought to be lifted.

The latter interpretation has been challenged on the grounds that the ECtHR did not actually state in *Waite and Kennedy* that alternative means of redress were a *precondition* to the enjoyment of IOs' immunity. Such means were simply 'a material factor' in reviewing the proportionality of the interference with Article 6.[169] Their absence, or a fortiori their ineffectiveness, would not automatically entail a denial of immunity. This is indeed textually accurate, but it runs counter to the earlier and subsequent practice inter alia followed by European states and the ECtHR itself.

First of all, the ECtHR should by no means be seen as a forerunner in this area of the law. Its *Waite and Kennedy* jurisprudence built upon a wide array of earlier domestic decisions which, along similar lines, resorted to the principle of alternative remedies as a justification for granting immunity to IOs. While most of these cases are well documented,[170] others have come to light only in recent times. The latter include, for instance, a 1992 decision by the Supreme Court of Cyprus involving the immunity of the UN and of the United Nations Peacekeeping Force in Cyprus (UNFICYP). The Supreme Court accorded immunity to the UN pursuant to the 1946 General Convention and the 1964 UNFICYP Agreement. It pointed out, however, that such immunity did not encroach upon the right of access to courts as protected by the Cypriot Constitution, because the mechanism internal to UNFICYP for settling disputes with its local personnel ensured that '[t]he applicant was not left without a remedy'.[171]

The post-*Waite and Kennedy* practice is even more telling. Insofar as the ECtHR is concerned, mention must be made of a little-known decision concerning the immunity of the NATO Undersea Research Centre in Italy.[172] In coming to the conclusion that the immunity afforded to the IO at hand did not violate Article 6, the Court not only reiterated the same approach canvassed in *Waite and Kennedy*, ie that such immunity was in line with the ECHR just because NATO had established an internal Appeals Board to hear staff disputes. It also went beyond *Waite and Kennedy* because it gave specific reasons why that NATO body was to be considered an *effective* remedy fulfilling the requirements of Article 6.[173] It is true that, recently, in a case involving disciplinary measures against an employee of the International Olive Council (IOC), the Court briskly dismissed the applicant's complaint insofar as it related to the denial of access to justice arising from the IOC's immunity.[174] However, this decision must be distinguished, as the IOC had accepted the jurisdiction of the ILOAT and the applicant had indeed (to no avail) challenged the disputed disciplinary sanctions before that tribunal.[175] The only lesson that may be

---

[169] Angelet and Weerts (n 43) 10.
[170] For a thorough review, see A Reinisch, *International Organizations Before National Courts* (CUP, Cambridge 2000).
[171] *Stavrinou v United Nations*, (1992) CLR 992, ILDC 929 (CY 1992) with insightful comments by Constantinides (Supreme Court of Cyprus, 17 July 1992), H8.
[172] *AL v Italy* (n 53); see M Di Filippo, 'Individual Right of Access to Justice and Immunity of International Organisations: An Italian Perspective' (2007) 17 Italian YIL 79, 96.
[173] *AL v Italy* (n 53) 5.
[174] *Lopez Cifuentes v Spain*, App No 18754/06 (7 July 2009), paras 26 and 31.
[175] Ibid paras 9, 10, and 20.

---

           *Human Rights and the Immunities of Foreign States*                105

taken from this case is that the ECtHR is unwilling to examine the compatibility of the ILOAT with the fair trial guarantees in Article 6.[176] By contrast, the same case does *not* stand for the proposition that alternative remedies are just another consideration when reviewing grants of IOs' immunity under Article 6.

At the national level, the *Waite and Kennedy* jurisprudence has spurred a new wave of case law whereby the recognition of IOs' immunity has consistently been made dependent upon the existence of alternative forums competent to hear private claims.[177] This is undoubtedly true for Belgium,[178] Switzerland,[179] and France,[180] while possibly true for the Netherlands.[181] Such decisions are oscillating *only* in respect of the degree of judicial review exercised vis-à-vis the specific alternative remedies at stake (if any). Thus, at times they resulted in a denial of immunity,[182] whereas in others immunity was afforded. But *none* of them ever questioned the requirement of alternative means of legal process as a precondition for the enjoyment of immunity.

The sole notable exception comes from the United Kingdom. In a recent case concerning the alleged repudiation of a contract by UNESCO,[183] an English court upheld the latter's immunity as provided by the 1947 Specialized Agencies Convention. Justice Tomlinson stated that the *Waite and Kennedy* test was not intended by the ECtHR as a 'pre-requisite to the compatibility with Article 6 of organisational immunity'.[184] This decision may be distinguished from the previous ones. The IO concerned was a UN specialized agency and this raised specific

---

[176] This would indeed require a major step forward on the part of the ECtHR and would overrule its previous jurisprudence finding that remedies internal to IOs, such as the appeals boards of ESA and NATO, are essentially in line with the requirements of Art 6.
[177] For exhaustive accounts, see C Ryngaert, 'The Immunity of International Organizations Before Domestic Courts: Recent Trends' (2010) 7 IOLR 121; Reinisch (n 148) 295–303.
[178] *SA Energies Nouvelles et Environnement v European Space Agency*, ILDC 1229 (BE 2005) (Brussels Court of First Instance, 1 December 2005); *Siedler v Western European Union*, ILDC 53 (BE 2003) (Brussels Labour Court of Appeal, 17 September 2003), ILDC 1625 (BE 2009) (Court of Cassation, 21 December 2009); *Lutchmaya v General Secretariat of the ACP Group*, ILDC 1363 (BE 2003) (Brussels Court of Appeal, 4 March 2003), ILDC 1573 (BE 2009) (Court of Cassation, 21 December 2009); *General Secretariat of the ACP Group v BD*, ILDC 1576 (BE 2009) (Court of Cassation, 21 December 2009).
[179] *Consortium X v Switzerland*, ILDC 344 (CH 2004) (Federal Supreme Court, 2 July 2004).
[180] *African Development Bank v Degboe* (n 143). Although the Supreme Court did not quote Art 6 ECHR in its judgment, the impact of the *Waite and Kennedy* decision on this French jurisprudence is undeniable.
[181] The *Waite and Kennedy* test was clearly performed by the Hague Appeal Court in its 2010 *Mothers of Srebrenica* decision (n 46), see text accompanying nn 198–204 below, and also by the Dutch Supreme Court in *X v European Patent Organization*, (2009) NIPR 290 (23 October 2009). The latter was a highly interesting case at the crossroads between an employment and a human rights dispute (right to a safe working environment). Although the Supreme Court addressed the case as a purely labour dispute, it agreed to review certain controversial aspects of the ILOAT procedure, such as its de facto denial of oral hearings, see ibid para 35 of the judgment, and especially paras 15 and 23–8 of the opinion of Advocate-General Strikwerda (19 June 2009). By contrast, the Supreme Court ignored the *Waite and Kennedy* test in a 2007 decision according immunity from *criminal* jurisdiction to the European Atomic Energy Community pursuant to the elusive notion of IOs' functional immunity, *Greenpeace Nederland v Euratom*, ILDC 838 (NL 2007) with a headnote by Brölmann (13 November 2007).
[182] *Siedler* (n 178); *Lutchmaya*, ibid; *General Secretariat of the ACP Group v BD*, ibid; *African Development Bank v Degboe* (n 143).       [183] *Entico* (n 46); see Fox (2008) (n 10) 731–2.
[184] *Entico* (n 46) para 27.

issues which have been recalled elsewhere.[185] It is however telling that even here, Justice Tomlinson was eager to clarify that an alternative—presumptively effective—remedy was available to the claimant, ie arbitration under the rules of the United Nations Commission on International Trade Law.[186]

Italy is a special case, as far as its recent judicial decisions on IOs' immunity[187] never cite the *Waite and Kennedy* judgment nor Article 6 of the ECHR, but only rely upon the Italian constitutional right of access to justice. To some extent, this is understandable as the requirement of effective alternative remedies is a well-settled principle of Italian jurisprudence, pre-dating the pertinent ECtHR case law.[188] Nevertheless, it would be important for this jurisprudence to be fortified with arguments drawn from international law and references to other domestic court practice. In this respect, the most recent Italian decision on IOs' immunity has indeed endorsed an approach which can be squared with international law. In *Drago*, the Supreme Court denied immunity to an IO because of the latter's failure to set up adjudicatory bodies endowed with impartiality and independence and that were competent to hear staff disputes.[189] Most importantly, in the court's view, this failure did not result in a violation of the right to judicial protection under the Italian Constitution. It was instead to be regarded, first and foremost, as a breach of a specific treaty obligation included in the headquarters agreement at hand,[190] according to which the IO was bound to establish adequate procedures for settling disputes with its personnel. Hence, non-fulfilment of that obligation entailed the *inapplicability* of the agreement's provision[191] granting immunity to the IO.[192] Although the court relied upon an interpretation in harmony with the Italian Constitution, the same outcome may well be explained on the basis of international law principles.[193] Chiefly, the principle of *effective interpretation* of treaties urges hermeneutic solutions which are capable of preserving the *effet utile* of each and every of the treaty rules at stake. Applied to the court's reasoning in *Drago*, this means that compliance with the treaty rule granting immunity in a case where the concerned IO has not established adequate means of dispute settlement would undermine the effectiveness of the treaty rule binding the IO to do so.

Interpretation operates here from *within* the treaty regime affording immunity to IOs in order to safeguard the right of access to justice without calling into

---

[185] See section 2.2 above, text accompanying nn 44–54.
[186] *Entico* (n 46) paras 12–15 and 28.
[187] See especially *European University Institute v Piette*, No 149/99, (2000) *Rivista di diritto internazionale privato e processuale* 472 (Court of Cassation, 18 March 1999); *Pistelli v European University Institute*, No 20995/05, 89 *Rivista di diritto internazionale* 247 (2006), ILDC 297 (IT 2005) (Court of Cassation, 28 October 2005).
[188] See, for instance, the decisions concerning the FAO's immunity (n 144). For a thorough review, see Di Filippo (n 172) 80–9; G Adinolfi, 'L'immunità delle organizzazioni internazionali dalla giurisdizione civile nella giurisprudenza italiana' (2007) 23 *Comunicazioni e studi* 233.
[189] *Drago v International Plant Genetic Resources Institute*, No 3718/07, ILDC 827 (IT 2007) (19 February 2007).
[190] Agreement between the Italian Republic and the International Plant Genetic Resources Institute Relating to Its Headquarters in Rome (1991), Art 17.
[191] Ibid Art 5.
[192] *Drago* (n 189) paras 6.7–6.8.
[193] For a discussion of various options to this effect, see Di Filippo (n 172) 91–2.

---

question external, purportedly overriding, rules. The latter may instead be retained as elements to be taken into account pursuant to an evolutionary or systemic interpretation of treaties.

This notion of a synallagmatic relationship between IOs' immunity and IOs' duty to establish mechanisms to settle private disputes is nothing new.[194] It arises from a long-standing debate involving the interpretation of similarly worded standard clauses contained in IOs' immunity instruments. For instance, Article VIII, section 29 of the General Convention provides, so far as material, that the UN 'shall make provisions for appropriate modes of settlement of: (a) disputes arising out of contracts or other disputes of a private law character to which the United Nations is a party'. In *Entico*, Justice Tomlinson ruled out that the fulfilment of an identical obligation foreseen by the Specialized Agencies Convention[195] was a prerequisite for granting immunity to UNESCO.[196] But this holding was exclusively based on *textual* interpretation, pursuant to which the provisions applying to UNESCO's immunity appeared 'clear, unequivocal and unconditional'.[197]

The approach of the Hague Appeal Court in *Mothers of Srebrenica* was significantly dissimilar. The court acknowledged its task as one of making a decision in 'a field of tension'[198] where 'the pros and cons must be balanced between two very important principles of law',[199] namely the UN's immunity and imperative purposes and the right to a remedy and reparation for victims of international crimes. In achieving that balance, the court was quite attentive to the availability of alternative remedies for the complainants. It seriously considered the latter's argument that the UN had undeniably failed to establish mechanisms of redress open to their claims as required by Article VIII, section 29(a) of the General Convention. However, it was unable to reach the conclusion that that failure, although regrettable,[200] ought per se to result in removing the UN's immunity.[201] The crucial point in the court's reasoning was that granting immunity to the UN did not completely erase the complainants' right of access to justice.[202] There indeed existed alternative remedies, such as, in particular, compensation claims against the individuals responsible for the genocide as well as against the State of the Netherlands itself.[203] Whereas the effectiveness of these alternative remedies is questionable, this may be regarded as a balanced decision showing a genuine effort to take into account all the competing obligations at stake. The court did not accept the notion of a synallagmatic relationship between the UN's immunity and its obligation to establish means for settling private disputes. It nonetheless engaged in an articulated interpretative exercise which included, as pertinent considerations, non-compliance with that obligation, the *customary*[204] right of access to justice, and the gravity of

---

[194] In respect of remedies available to individuals affected by UN targeted sanctions, recent support for the thesis at stake comes from L Condorelli, 'Le Conseil de sécurité, les sanctions ciblées et le respect des droits de l'homme' in M Cremona, F Francioni, and S Poli (eds), *Challenging the EU Counter-terrorism Measures through the Courts* (EUI Working Paper AEL 2009/10) 131, 137–8.
[195] Art IX, s 31(a).	[196] *Entico* (n 46) paras 17–18.	[197] Ibid para 18.
[198] *Association Mothers of Srebrenica* (Appeal Court) (n 46) para 5.9.	[199] Ibid.
[200] Ibid para 5.13.	[201] Ibid.	[202] Ibid para 5.11.	[203] Ibid paras 5.11–5.12.
[204] Ibid para 5.1.