EXHIBIT 17

# 10
# Italy

*Riccardo Pavoni*

## I. Introduction

This chapter will revisit Italian case-law on international organizations with a view to understanding why transnational judicial dialogues, be they explicit or implicit, horizontal or vertical, may only rarely be identified in the pertinent decisions. This is so with respect to both the older and newer Italian decisions relating to the law of international organizations. At the outset, it should be recalled that Italian jurisprudence on international organizations, particularly in the field of their immunities, is quite voluminous and has often devised innovative and advanced solutions.[1] However, it is also marked by recurrent oscillations and has been frequently criticized for being *isolated* vis-à-vis the prevailing practice in other countries.[2] I endorse this characterization of Italian case-law on international organizations as isolationist, although not by reference to the substantive correctness of the court findings in the various cases, but precisely for its disregard of foreign and international court decisions.[3] Indeed, from the 1930s onwards,[4] such case-law has incrementally developed in an essentially self-contained and autarkic fashion. The courts have been basically concerned with quoting and building upon their own precedents. This may confirm that, where there already exists a substantial body of national jurisprudence covering an international law issue, dialogue with foreign courts is exceptional.[5]

Nonetheless, the latter remark only accounts for a part of the story. For several reasons, an enquiry into the Italian court isolationism in cases involving the law of international organizations appears interesting. First of all, such isolationism has

---

[1] See, for instance, A Cassese, 'L'immunité de juridiction civile des organisations internationales dans la jurisprudence italienne' (1984) *AFDI* 556; A Reinisch, *International Organizations Before National Courts* (CUP 2000) 186–97. For recent reappraisals, M Di Filippo, 'Individual Right of Access to Justice and Immunity of International Organisations: An Italian Perspective' (2007) 17 *IYIL* 87; G Adinolfi, 'L'immunità delle organizzazioni internazionali dalla giurisdizione civile nella giurisprudenza italiana' (2007) 23 *Comunicazioni e studi* 233; S Dorigo, *L'immunità delle organizzazioni internazionali dalla giurisdizione contenziosa ed esecutiva nel diritto internazionale generale* (Giappichelli 2008) 56, 59, 62, 64–8, 75, 80–1, 116; P Pustorino, 'The Immunity of International Organizations from Civil Jurisdiction in the Recent Italian Case Law' (2009) 19 *IYIL* 57.

[2] See, eg, C Dominicé, 'L'immunité de juridiction et d'exécution des organisations internationales' (1984/IV) 187 *Recueil des Cours* 145, 180 (criticizing the Italian courts' application of an allegedly implicit restrictive immunity standard to international organizations, pursuant to the distinction between *acta iure imperii* and *acta iure gestionis* 'imported' from the law of state immunity).

[3] I expressed similar ideas when examining recent Italian judicial trends in the field of state immunity, see R Pavoni, 'A Decade of Italian Case Law on the Immunity of Foreign States: Lights and Shadows' (2009) 19 *IYIL* 73, 76–7.

[4] See *International Institute of Agriculture v Profili* (1931) RDI 386, (1929–1930) 5 Ann Dig 413 (*Cassazione del Regno*, 26 February/13 May 1931).

[5] See A Reinisch, 'The International Relations of National Courts: A Discourse on International Law Norms on Jurisdictional and Enforcement Immunity', in A Reinisch and U Kriebaum (eds), *The Law of International Relations—Liber Amicorum Hanspeter Neuhold* (Eleven 2007) 289, 307.

156                                    *Riccardo Pavoni*

nothing to do with any fundamental legal or cultural objections from Italian courts towards citing and discussing foreign case-law, especially when questions of public international law are at stake. Particularly in the area of international immunities, Italian courts have at times been willing to engage in extensive references to and consideration of the practice of foreign states, including their jurisprudence. A prominent example is the 1992 *Condor* decision, where the Constitutional Court quoted with approval French, German, Swiss, and Dutch case-law as evidence of the emergence of a restrictive rule of state immunity from execution.[6] This shows that certain Italian courts have been fully aware of the importance of domestic judicial decisions as elements of the uniform and constant state practice which is necessary for the formation of customary international law. In this connection, it is appropriate to recall that customary law enjoys constitutional status in Italy and is automatically incorporated into the Italian legal system.[7] This means that customary law has to be applied directly and immediately to any pertinent legal situation and that any Italian legislative act of a non-constitutional nature which is inconsistent with a customary rule may be struck down by the Constitutional Court.

A second, related reason why the exceptional recurrence of judicial dialogues in Italian cases involving international organizations is puzzling is that, by contrast, a growing process of trans-judicial communication has emerged in the modern *Ferrini* litigation, where Italian courts have held that state immunity for *iure imperii* acts may be lifted when the defendant state is accused of egregious breaches of human rights and humanitarian law. Italy has thus been identified as a country denoted by a high level of judicial dialogue in this area[8] as Italian courts have been willing to explain both why most of the existing national and international pertinent decisions could not be followed or had to be distinguished, and why, conversely, other—albeit quite limited—national case-law deserved support.[9] The wealth of 'external' references in

---

[6] *Condor and Filvem v Ministry of Justice* (1992) RDI 395, (1994) 33 ILM 596 (15 July 1992 No 329) paras 2–3. Further examples taken from less recent case-law on state immunity are *Intergovernmental Committee for European Migration (ICEM) v Chiti* (1974) Foro Italiano I-376, 77 ILR 577 (Court of Cassation, 7 November 1973 No 2910) (referencing the widespread acceptance of the restrictive doctrine of state immunity by the supreme courts of other countries, specifically in the United States); *Nacci v Bari Institute of the International Center for Advanced Mediterranean Agronomic Studies* (1994) RDI 837 (Court of Cassation, 8 June 1994 No 5565) (discussing at length international and foreign practice in the field of state immunity in employment disputes).

[7] According to the Constitution of the Italian Republic (in force 1 January 1948), article 10, first period, '[t]he Italian legal order conforms to the generally recognized norms of international law' ('L'ordinamento giuridico italiano si conforma alle norme del diritto internazionale generalmente riconosciute').

[8] P Webb, 'Immunities and Human Rights: Dissecting the Dialogue in National and International Courts', in O K Fauchald and A Nollkaemper (eds), *The Practice of International and National Courts and the (De-)Fragmentation of International Law* (Hart Publishing 2012) 245, 250.

[9] For our purposes, the most representative samples of this line of jurisprudence are: *Ferrini v Germany* (2004) RDI 539, ILDC 19 (IT 2004), 128 ILR 659 (Court of Cassation, 11 March 2004 No 5044); *Germany v Mantelli and ors* ILDC 1037 (IT 2008) (Court of Cassation, 29 May 2008 No 14201); *Lozano v Italy* (2008) RDI 1223, ILDC 1085 (IT 2008) (Court of Cassation, 24 July 2008 No 31171); *Criminal proceedings against Milde* (2009) RDI 618, ILDC 1224 (IT 2009) (Court of Cassation, 13 January 2009 No 1072); and most recently, *Germany v Autonomous Prefecture of Vojotia*, ILDC 1815 (IT 2011) (Court of Cassation, 20 May 2011 No 11163) (this decision marked the apotheosis of the engagement of Italian courts in trans-judicial dialogue; the Court quoted and discussed a host of cases, theories and legal writings; most notably, for the first time it undertook a thorough analysis of the relevant United States judicial practice in the belief—with which I essentially agree—that it provides solid arguments in support of the *Ferrini* principle). Now that the ICJ has adjudged as unlawful the Italian *Ferrini* practice, the future of this process of trans-judicial communication is particularly uncertain, see *Jurisdictional Immunities of the State (Germany v Italy; Greece Intervening)*, ICJ, Judgment of 3 February 2012.

---

                                          *Italy*                                         157

these judgments is indeed impressive. Quite unusual for Italian case-law, certain *verbatim* quotes of translated excerpts of foreign decisions are also included. However one sides within the 'state immunity and human rights' debate, and regardless of the accuracy of any given citations made by the courts, this extensive engagement of the *Ferrini* jurisprudence in trans-judicial dialogue implies that it cannot simplistically be labelled as an isolationist judicial trend in the sense retained in this work. On the contrary, the far-reaching review of foreign and international precedents, legal materials, and scholarly writings undertaken by the Italian courts in these decisions bestows upon them a remarkable aura of authoritativeness. This is why the *Ferrini* case-law constitutes a promising model for future trans-judicial communication in Italian practice concerning international organizations' immunities and state immunity for inter-national organizations' immunities and state immunity, bearing in mind that, although inter-national organizations and state immunity are conceptually distinct areas, they are both fertile ground for judicial dialogues and share the crucial feature of involving cases frequently and 'naturally' adjudicated at the domestic level.

Finally, and pragmatically, the persistent reticence of Italian courts about foreign practice relating to international organizations is increasingly difficult to square with contemporary achievements in (legal) information and communication technologies. The proliferation of internet-based expert databases and translating services, such as the *Oxford Reports on International Law in Domestic Courts*, as well as the creation of transnational networks to foster exchange of experiences among judges, greatly facilitate the circulation of national jurisprudence.[10]

This chapter first offers a brief overview of Italian case-law on international organizations with a view to outlining its current state (section II). Next, some exceptional cases of explicit judicial dialogue arising from that case-law are illustrated (section III.1), while a separate analysis is devoted to a possible implicit form of trans-judicial cross-fertilization disclosed by the Italian decisions endorsing the theory of the availability of alternative remedies as a condition for the immunity of international organizations (section III.2). In the following section, certain significant Italian court misinterpretations vis-à-vis the problem of clarifying that a transnational legal methodology would have prompted correct solutions (section IV). A few concluding remarks follow (section V). The overall message of the chapter is a plea for enhanced judicial dialogue as a means for boosting the legitimacy and persuasiveness of national decisions at a time where court involvement with the law of international organizations is bound to increase exponentially.

## II. A brief overview of Italian case-law on international organizations

The Italian case-law on international organizations is almost exclusively confined to issues of jurisdictional immunities and, within that context, to labour disputes brought by international organizations' employees. However, in examining such cases, the courts have, at times, extensively debated the concept of international legal personality of international organizations and the theories surrounding it. The reason thereof is associated with a long-held court position,[11] according to which the enjoyment of

---

[10] Reinisch (n 5) 308.
[11] Dating back to the 1931 *Profili* decision (n 4).

jurisdictional immunities by international organizations is conditional on their international legal personality. As with states, international personality and immunities have been considered as two sides of the same coin, thereby paving the way for the granting of immunity to international organizations (ie those identified as international legal persons) on the basis of a *customary* rule rooted in, and applicable by analogy to, the *par in parem* principle of the law of state immunity.

Thus, Italian courts have never explicitly advocated an autonomous ad hoc customary rule on the immunity of international organizations. Instead, they have frequently adjudicated international organizations' immunity cases by relying on the principles retained in the area of state immunity. Such an approach has been followed where the pertinent treaty rules on the immunity of international organizations were either interpreted very narrowly or qualified by specific Italian reservations to international organizations' immunity agreements, pursuant to which immunities would have been granted to international organizations in conformity with the general principles of international law valid for states. Chiefly, this applies to certain decisions regarding the Food and Agriculture Organization (FAO)[12] and the Bari Institute of the International Center for Advanced Mediterranean Agronomic Studies (ICAMAS).[13] Notably, in some of these cases, the courts saw fit to adjust the criteria used in the field of state immunity to the peculiar structure and features of international organizations, thereby resorting to arguments amenable to a functional immunity test centred on the necessity of avoiding interferences with the effective realization of international organizations' aims and functions.[14] By contrast, the professed customary basis for international organizations' immunity has rarely led to the recognition of immunity to organizations that would otherwise be deprived thereof on the basis of treaty law. This is due to the fact that the cases have almost always involved international organizations of which Italy was a member, the immunity agreements of which were duly ratified. There is one important exception, namely a series of disputes brought against the Italian Latin-American Institute (ILAI), an international organization accorded immunity under a headquarters agreement that Italy had not ratified. In these decisions, the courts unequivocally granted immunity to the ILAI in the light of its international personality and the consequent application by analogy of the customary state immunity rule.[15]

---

[12] *Food and Agriculture Organization v INPDAI* (1983) RDI 187, 87 ILR 1 (Court of Cassation, 18 October 1982 No 5399).

[13] See, eg, *Iasbez v Bari Institute of the International Center for Advanced Mediterranean Agronomic Studies* (1978) RDI 575, 77 ILR 602 (Court of Cassation, 21 October 1977 No 4502); *Bari Institute of the International Center for Advanced Mediterranean Agronomic Studies v Anelli* (2001) Foro Italiano I-2597 (Court of Cassation, 7 November 2000 No 1150).

[14] See, eg, *Intergovernmental Committee for European Migration (ICEM) v Di Banella Schirone* (1978) RDI 575, 77 ILR 572 (Court of Cassation, 8 April 1975 No 1266): 'There can … be no doubt that activity involved in the pursuit of the aims of an international body includes action concerning the self-organization of that body, that is to say action involved in the creation of a suitable organizational structure for the very purpose of achieving those basic aims. Although it is instrumental in character, organizational work, based on the body's autonomous and self-contained nature, is undoubtedly of a public character and is directly connected with the pursuit of that body's institutional aims … [I]t cannot be held that internal organization of a public character … consists solely of the regulation of the relationship between the body and high-level management officials. On the contrary, this field of activity must be regarded as including the relationship with their employer of *all persons who permanently and continuously form part of the establishment of the body concerned*' (at 575, emphasis added). Cf Reinisch (n 1) 193, 209–10.

[15] See, eg, *Cristiani v Italian Latin-American Institute* (1986) RDI 146, 87 ILR 20 (Court of Cassation, 23 November 1985 No 5819); *Italian Latin-American Institute v Bonanni* (1992) RDIP 143 (Court of Cassation, 18 August 1990 No 8433).

---

More recent cases show a partial *revirement* of the Italian courts vis-à-vis the problem of the legal basis of international organizations' immunity. In 1992, the Supreme Court denied immunity from *execution* to the International Training Center of the International Labour Organization (ILO), reasoning that the Center had a personality distinct from that of the ILO, that the agreements concerning the Center did not provide for immunity, and that an application by analogy of the state immunity rules had to be excluded.[16] Eventually, the best opportunity for developing Italian jurisprudence on international organizations' immunity arose from certain employment disputes brought against the European University Institute (EUI), a well-known educational institution located in Florence, whose immunities are not altogether clear in the applicable agreements. In *EUI v Piette*,[17] the Supreme Court asserted jurisdiction because the EUI's *limited* international legal capacity did not warrant an application by analogy of the customary state immunity rule. Moreover, according to the Court, the EUI's immunity from suit was ruled out by the pertinent conventional norms. The general point made by the Court in relation to the legal basis of international organizations' immunities was that 'the formation of a custom extending the principle of *par in parem non habet jurisdictionem*, which is applicable among states, to all international organizations, is not certain'.[18] Therefore, the immunities of an international organization, such as the EUI, must necessarily arise, explicitly or implicitly,[19] from the relevant treaty provisions (or national legislation). The same approach was canvassed in *Vocino v European School of Varese*,[20] *Pistelli v EUI*,[21] and *Drago v International Plant Genetic Resources Institute*.[22] Hence, the most recent case-law confirmed the customary basis of the immunities of international organizations as a corollary of the latter's international personality.[23] The Supreme Court has made clear that this is not necessarily significant clarification of earlier decisions. Without repudiating the customary basis

---

[16] *International Training Center of the ILO v Tirone* (1993) RDIPP 969 (Court of Cassation, 29 October 1992 No 1781). See Di Filippo (n 1) 82–3.

[17] *European University Institute v Piette* (2000) RDIPP 472 (Court of Cassation, 18 March 1999 No 149), commented by M Iovane in (1999) 9 *ITL* 155.

[18] *European University Institute v Piette* (n 17) 476–7, own translation ('non è sicura la formazione di una consuetudine che permetta di estendere a tutte le organizzazioni internazionali il principio par in parem non haber iurisdictionem, operante tra gli Stati … ').

[19] *European University Institute v Piette* (n 17) 480.

[20] *Vocino v European School of Varese* (1999) Giustizia civile Massimario 562 (Court of Cassation, 15 March 1999 No 138). Although this judgment was published before the *Piette* decision, the latter was nonetheless quoted with approval by the Court, by reference to its *dispositif* which had been made publicly available on 12 November 1998. The full text of Italian judgments, including the grounds for decision, is usually published at a different, later, date than that of the public hearing where their *dispositif* is announced. Notably, the judge rapporteur for both the *Piette* and *Vocino* decisions was the same (Judge Federico Roselli).

[21] *Pistelli v European University Institute* (2006) 89 RDI 247, ILDC 297 (IT 2005) (Court of Cassation, 28 October 2005 No 20995). In this case, however, the Court showed a more relaxed attitude towards the EUI's immunity. Thus, in reversing *Piette*, it granted immunity to the EUI, because the EUI's immunity from contentious jurisdiction could *implicitly* be inferred from other forms of immunity provided for in the pertinent agreements, such as immunity from execution and immunity of officials.

[22] *Drago v International Plant Genetic Resources Institute* (2007) Giustizia civile Massimario 2, ILDC 827 (IT 2007) (Court of Cassation, 19 February 2007 No 3718).

[23] This is also shown by *Lakomy v Multinational Force and Observers* (2001) RDIPP 423 (Court of Cassation, 3 August 2000 No 531), commented by A Chechi (Court of Cassation, 19 February 2007 No 3718). Here, the Court granted immunity on the basis of the applicable agreement which was considered as a *lex specialis* vis-à-vis the *otherwise applicable* customary rule of state immunity.

valid for *all* international organizations, it shall assess the various immunity claims on a case-by-case basis.[24]

Italian courts have been forerunners in regarding international organizations' immunity as subordinated to the availability of effective remedies alternative to those of the forum state. As early as 1955, the Supreme Court denied immunity to the International Refugee Organization (IRO) in a labour dispute, on the grounds that the arbitral process envisaged in the IRO's Staff Regulations was unlawful, as its administration was entirely entrusted to the Italian Office of State Attorneys (Avvocatura dello Stato), with no prior determination of any rules regulating the process.[25] The Court's basis for this pioneering finding is not straightforward. It was probably influenced by its assumption of an implied waiver of immunity arising from the repeated references to the applicability of Italian legislation in the legal instruments regulating the IRO's activities in Italy.[26] But the Court also mentioned the necessity to secure the individual right of access to justice.[27]

This tension between the immunity of international organizations and the fundamental right to judicial protection has always been apparent in Italian practice and case-law,[28] although exclusively through the prism of Article 24, first period, of the Italian Constitution, pursuant to which '[e]veryone may bring cases before a court of law in order to protect their rights and legitimate interests'.[29] However, it was during the 1990s, in cases involving the FAO and the Bari Institute of ICAMAS, that the courts have unmistakeably taken the view that the constitutional legality of immunity rules is conditional on the creation of alternative remedies open to individual claimants by the international organization concerned. Thus, the FAO's immunity has been regarded as a lawful restriction on the right to judicial protection, given the FAO's acceptance of the jurisdiction of the ILO Administrative Tribunal (ILOAT). In the Supreme Court's opinion, this Tribunal is 'authoritative and endowed with the impartiality which is required as a matter of international public order',[30] and its judicial system does not

---

[24] The Supreme Court has not so far indicated which specific international organizations would be considered as enjoying immunity as a matter of customary law. It is safe to assume that this should at least be the case for the most important 'universal' international organizations, such as the United Nations and its specialized agencies, and 'core' regional organizations, such as the European Union and the Council of Europe. However, this criterion based on the 'importance' of an international organization inevitably involves a large measure of discretion, if not arbitrariness.

[25] *Maida v Administration for International Assistance* (1956) RDI 546, 23 ILR 510 (Court of Cassation, 27 May 1955), commented by L Ferrari Bravo, 'Le controversie in materia di impiego presso enti internazionali e la giurisdizione italiana' (1956) RDI 550. The IRO had in the meantime been dissolved and was therefore represented before the Court by another international entity. It is important to note that the IRO was a specialized agency of the United Nations.

[26] See C F Amerasinghe, *Principles of the Institutional Law of International Organizations* (2nd edn, CUP 2005) 336; Reinisch (n 1) 224–5.

[27] *Maida* (n 25) 549: dovendo la controversia sorta fra l'IRO ed il suo impiegato, per necessità non sopprimibile, avere un giudice ed essere risolta' ('it is imperative that the dispute between the IRO and its employee be entrusted to a judge and accordingly settled', own translation).

[28] As regards earlier decisions see, eg, *ICEM v Di Banella Schirone* (n 14) 576, para 5: 'Nor can it be argued that a conclusion on these lines deprives certain workers of all protection by the courts. Such protection is, of course, denied as far as the Italian courts are concerned but provision *must* and can be made for it in the legal system to which the international body is subject, it being for that body itself to see to the establishment, within its internal structure, of the appropriate machinery' (emphasis added).

[29] 'Tutti possono agire in giudizio per la tutela dei propri diritti e interessi legittimi'; Constitution of the Italian Republic, article 24, first period.

[30] *FAO v Colagrossi* (1992) 75 RDI 407, 101 ILR 386 (Court of Cassation, 18 May 1992 No 5942), own translation ('giudice … autorevole e dotato di quella terzietà che è di ordine pubblico internazionale'); reiterated in *Carretti v FAO* (2004) Archivio civile 1328 (Court of Cassation, 23 January 2004 No 1237).

unreasonably encroach upon the plaintiffs' procedural guarantees, as regards for instance time limits for filing suit and pleadings.[31] In *Nacci*, the Supreme Court reached a similar conclusion in relation to the immunity of the Bari Institute of ICAMAS, even if in this case the alternative remedy was an Appeals Commission internal to the international organization. The Court still viewed that Appeals Commission as an 'organ endowed with independence and impartiality',[32] in light of the expertise of its members and their selection among third persons unaffiliated with the international organization. Although the degree of independence of the members of the Commission was not equivalent to that of judges, and although the Commission was regarded as a 'private court' deprived of authoritative powers over the gathering of evidence and the execution of its decisions, the Court nonetheless ruled out a breach of the right to judicial protection.

That the immunity of international organizations may be consistent with the right of access to justice also when the relevant dispute-settlement body is an internal commission or board has been confirmed in the litigation involving the immunity of the EUI. Indeed, the *Pistre* decision, according to which the immunity of the EUI Appeals Commission was merely an administrative remedy internal to the international organization and did not therefore warrant the EUI's immunity, has been expressly overturned by the Supreme Court. Thus, in *Pistelli*, the Court stated that, for its staff disputes, the EUI had set up an adequate system of judicial protection, and that accordingly it was entitled to jurisdictional immunity. The EUI's selection of the members of the Appeals Commission from a list prepared by international judicial bodies, and the power of the EUI High Council (but *not* of the private claimant) to designate the Court of Justice of the European Union as the body competent to adjudicate the dispute *in lieu* of the Appeals Commission, were sufficient to demonstrate the independence and impartiality of that dispute-settlement system.[33]

A different conclusion again was reached in *Drago*, where the immunity of the International Plant Genetic Resources Institute (IPGRI) was denied since the IPGRI Appeals Committee was considered as a mere internal remedy, unsuited to provide appropriate judicial protection to an employee contesting her/his dismissal.[34] In 2001, the IPGRI had accepted the jurisdiction of the ILOAT, but this was immaterial since the allegedly unlawful conduct had taken place before then.[35] Crucially, instead of challenging the legality of the IPGRI's immunity before the Constitutional Court, the Supreme Court simply decided to leave the relevant immunity rule unapplied insofar as the particular case was concerned. The Court reasoned that the non-fulfilment by the international organization of its duty to establish adequate procedures for adjudicating staff disputes, as envisaged in the Headquarters Agreement with Italy,[36] made the rule affording immunity under the same Agreement inoperative, rather than constitutionally invalid. Perhaps inadvertently, the Court thus endorsed the frequently-held view of

---

[31] *Carretti v FAO* (n 30).

[32] *Nacci* (n 6), own translation ('organo … dotato di indipendenza e di obiettività').

[33] *Pistelli* (n 21) paras 14.1–14.3. For a critique, see N Ronzitti, 'Sull'immunità concessa all'ente nessun contrasto con la Costituzione' (2006/3) *Guida al Diritto* 40.

[34] *Drago* (n 22) para 6.6. The IPGRI Appeals Committee could in no way be seen as independent and impartial, as for instance its jurisdiction could only be triggered by the initiative of IPGRI's Director General. It was a sort of advisory body to the international organization's Director General, who remained competent to take the final decision in the dispute; see Di Filippo (n 1) 90.

[35] It is also worth recalling that ILOAT's jurisdiction *ratione personae* does not extend to individuals employed on a fixed-term basis by international organizations, such as the plaintiff in this case.

[36] Agreement between the Italian Republic and the International Plant Genetic Resources Institute Relating to Its Headquarters in Rome (1991), article 17.

the synallagmatic relationship between the treaty norms affording immunity to international organizations, on the one hand, and envisaging a duty to set up appropriate means of dispute settlement, on the other.[37]

It is not clear whether, in the Italian courts' view, the alternative-remedy test applies to disputes with international organizations different from employment cases,[38] especially in disputes over alleged fundamental rights violations attributable to the organizations. Most interestingly, in the context of the *Ferrini* litigation involving claims of reparation for World War II crimes, certain claimants instituted proceedings (also) against the International Organization for Migration (IOM) seeking the termination of the contracts they had concluded with the IOM when they filed applications to receive the compensation foreseen by the German Foundation 'Remembrance, Responsibility and Future'.[39] The Tribunal of Turin granted immunity to the IOM on the grounds that, like any international intergovernmental organization, it enjoyed immunity, and that the activity performed by the IOM within Germany's reparation programme was in fact connected to its institutional functions.[40] The Tribunal thus simply accepted that the IOM was entitled to customary functional immunity, without enquiring into the existence of alternative remedies open to the claimants for contesting the legality of the contracts in question. It concluded with the enigmatic statement that, after all, the plaintiffs had brought a claim for breach of contract against the IOM (and not one for compensation for breach of *ius cogens*).[41]

## III. Traces of trans-judicial dialogue on international organizations in Italian case-law

### 1. Rare instances of explicit dialogue

Only rarely has the Italian jurisprudence on international organizations summarized earlier relied upon, or at least referred to, foreign or international practice, including judicial decisions. Transnational dialogues have been exceptional.

One exception is the 1985 *Cristiani* decision involving the immunity of the ILAI in a labour dispute. The Court of Cassation opened a lengthy discussion on the legal basis and rationale of the immunities of international organizations with the acknowledgement that the Italian courts' theory of the international personality of international

---

[37] See also for further references, R Pavoni, 'Human Rights and the Immunities of Foreign States and International Organizations', in E de Wet and J Vidmar (eds), *Hierarchy in International Law: The Place of Human Rights* (OUP 2012) 71, 106–8.
[38] Insofar as employment cases are concerned, the only dissonant, recent decision is *Lakomy* (n 23), where the Supreme Court granted immunity to an international organization without any consideration of the alternative-remedy test. This may be due, at least in part, to the failure to invoke the test on the part of the plaintiff.
[39] With these contracts, the beneficiaries of the disbursements envisaged by the German Foundation waived their right to claim any other amount of compensation in any other *fora*, including before domestic courts.
[40] *Allasio and ors v Germany, International Organization for Migration and ors* (Tribunal of Turin, 20 October 2009 No 7137), para 2. It is unclear on what basis the Tribunal distinguished the *Pistelli* case-law concerning the EUI. The decision may be taken as recognizing that the IOM is an international organization remarkably more 'important' than the EUI and, as such, entitled to customary immunity.
[41] *Allasio and ors v Germany* (n 40), own translation ('Gli attori, del resto, hanno proposto contro la stessa [IOM] una domanda di inadempimento contrattuale (e non di risarcimento per violazione dello "ius cogens")'). Unfortunately, the decision on IOM's immunity was not appealed against, see *Allasio and ors v Germany and ors* (Court of Appeal of Turin, 21 January 2012 No 99).

---

organizations as a prerequisite of such immunities was *not* generally accepted by foreign courts and in doctrine. Without providing any specific citation, the Court stated:

As it is well-known, both in the doctrine and jurisprudence of the various countries, it is not possible to identify a *communis opinio* on the necessary correlation between international personality and immunity.[42]

However, after recalling competing theories on the legal basis of international organizations' immunity, the Court noted:

Yet, whatever its basis, jurisdictional immunity is generally granted, in doctrine and jurisprudence, to unions of states, be they endowed with legal personality or understood as collectivities of States... As to the limits of immunity, it is also recognized that immunity covers all the relationships that are linked to the essential functions of organizations.[43]

The language of such holdings, eg the reference to a *communis opinio*, makes it clear that the Court was mentioning the practice of other countries as a chief element for an enquiry into the state of customary international law on issues of legal personality and immunities of international organizations. Thus, in the light of conflicting jurisprudence, the Court determined that no customary norm afforded immunity to international organizations simply as a corollary of their international personality. Nevertheless, it considered that there existed a general acknowledgement of the customary nature of a rule granting functional immunity to international organizations (including the ILAI). However, the lack of precise citations on the part of the Court makes it very difficult to test the soundness of its conclusions and regard them as an accurate and influential statement of the international law in force at the time.[44]

A further example of this type of indeterminate and vague dialogue with foreign courts comes from the famous *FAO v INPDAI* decision, where the Supreme Court denied immunity to the FAO in respect of a claim for an increase in the tenancy fees owed by the organization under a tenancy agreement relating to real property intended for use as offices of the organization itself. The Court endorsed a narrow notion of functional immunity, namely one confined to situations where 'a close, direct and necessary connection'[45] between the international organizations' activities at stake and its institutional aims might be ascertained. A different view, according to the Court, would imply an undue equation of functional immunity with absolute immunity, because '[t]he rule of international law... would inevitably assume a character which was not originally intended nor provided for, and the... evolution of doctrine and jurisprudence would be utterly disregarded.'[46] Again, the absence of specific citations runs counter to the authoritativeness and accuracy of the preceding holdings, even more so in this case, in which it becomes uncertain whether the Court, in addition to

---

[42] *Cristiani* (n 15) para 1, own translation ('Come è noto, sia in dottrina che nella giurisprudenza dei vari Paesi, non è riscontrabile una *communis opinio* circa la correlazione necessaria tra personalità internazionale ed immunità').
[43] *Cristiani* (n 15), own translation ('Tuttavia, quale che sia il fondamento dell'immunità giurisdizionale, essa è generalmente riconosciuta, in dottrina e giurisprudenza, alle unioni di Stati, abbiano esse personalità giuridica o siano intese quali collettività di Stati... Circa i limiti dell'immunità, è pure riconosciuto che questa spetti per tutti i rapporti che siano ricollegabili alle funzioni essenziali delle organizzazioni').
[44] As a matter of fact, there do not exist many precedents expressly upholding the customary basis of international organizations' immunity. At the time of the *Cristiani* decision, the state of the law was, and still is, quite uncertain. Cf Reinisch (n 1) 145–57, 167–8.
[45] *FAO v INPDAI* (n 12) 8.       [46] *FAO v INPDAI* (n 12).