# EXHIBIT 18

**UNITED
NATIONS**

**A**



## General Assembly

Distr.
GENERAL

A/C.5/49/65
24 April 1995

ORIGINAL:  ENGLISH

Forty-ninth session
FIFTH COMMITTEE
Agenda item 105

REVIEW OF THE EFFICIENCY OF THE ADMINISTRATIVE
AND FINANCIAL FUNCTIONING OF THE UNITED NATIONS

Procedures in place for implementation of article VIII,
section 29, of the Convention on the Privileges and
Immunities of the United Nations, adopted by the
General Assembly on 13 February 1946

Report of the Secretary-General

## I.  INTRODUCTION

1.   Decision 48/493 B of 29 July 1994 provides, inter alia, as follows:

"The General Assembly decided to request the Secretary-General to
report to the General Assembly at its forty-ninth session on the procedures
in place for the implementation of article VIII, section 29, of the
Convention on the Privileges and Immunities of the United Nations, adopted
by the General Assembly in its resolution 22 A (I) of 13 February 1946,
under which the United Nations should make provisions for appropriate modes
of settlement of:

"(a)  Disputes arising out of contracts or other disputes of a private
law character, to which the United Nations is a party;

"(b)  Disputes involving any official of the United Nations who by
reason of his official position enjoys immunity, if immunity has not been
waived by the Secretary-General."

2.   The present report is submitted in response to that request.

A/C.5/49/65
English
Page 2

II.  DISPUTES ARISING OUT OF CONTRACTS OR OTHER DISPUTES OF
A PRIVATE LAW CHARACTER, TO WHICH THE UNITED NATIONS
IS A PARTY

A.  <u>Disputes arising out of commercial agreements (contracts
and lease agreements)</u>

3.   The major features of the practice that has evolved with respect to the
status, privileges and immunities of the United Nations has been analysed in two
studies prepared by the Secretariat to assist the work of the International Law
Commission. 1/  Those studies indicate that, in order to implement section 29 of
the Convention on the Privileges and Immunities of the United Nations
(hereinafter referred to as the "General Convention"), it has been the practice
of the United Nations to make provision in its commercial agreements (contracts
and lease agreements) for recourse to arbitration in the event of disputes that
cannot be settled by direct negotiations.  This practice has also been followed
by subsidiary bodies of the United Nations, such as the United Nations
Development Programme (UNDP) and the United Nations Children's Fund (UNICEF).

4.   There have been various arbitration clauses used by the United Nations in
contracting over the years, depending on whether the contractors (or lessors)
resided inside or outside the United States and where the commercial agreement
was to be performed.  While earlier commercial agreements invoked the rules
established by such regional arbitration entities as the American Arbitration
Association (AAA) and the Inter-American Commercial Arbitration Commission or by
the International Chamber of Commerce, the arbitration clauses now in use invoke
the Arbitration Rules of the United Nations Commission on International Trade
Law (UNCITRAL) which were approved by the General Assembly in 1976. 2/
"UNCITRAL Arbitration" is facilitated by having it conducted under the auspices
of a properly instituted arbitral body, which can provide practical services of
various kinds.  These arbitral bodies serve as the appointing authority under
the Rules and are normally prepared to provide other administrative services
needed during an arbitral hearing.

5.   The Office of Legal Affairs of the United Nations Secretariat has prepared
standard arbitration clauses for use by the Organization and its separately
administered organs such as UNDP and UNICEF in all commercial contracts and
purchase orders as well as lease agreements.  The following clauses are normally
used:

(a)  Arbitration (for contracts to be performed within the United States of
America):

"Any dispute, controversy or claim arising out of or relating to this
Contract, or the breach, termination or invalidity thereof, shall, unless
it is settled amicably by direct negotiation, be settled by arbitration in
accordance with the UNCITRAL Arbitration Rules then obtaining.  Such
arbitration shall be conducted under the auspices of the American
Arbitration Association (AAA) which shall also serve as the Appointing
Authority under the Rules.  The Parties agree to be bound by the
arbitration award rendered in accordance with such arbitration, as the
final adjudication of any such dispute, controversy or claim."

/...

(b) Arbitration (for contracts to be performed outside the United States of America):

> "Any dispute, controversy or claim arising out of or relating to this Contract, or the breach, termination or invalidity thereof, shall, unless it is settled amicably by direct negotiation, be settled by arbitration in accordance with the UNCITRAL Arbitration Rules then obtaining. Such arbitration shall be conducted under the auspices of the International Chamber of Commerce (ICC) 3/ which shall also serve as the Appointing Authority under the Rules. The Parties agree to be bound by the arbitration award rendered in accordance with such arbitration, as the final adjudication of any such dispute, controversy or claim."

However, these standard clauses may, on occasion, be amended to some extent to accommodate requests made by individual contractors/lessors and to take account of particular local conditions.

6.   The United Nations also has a standard clause on privileges and immunities, which is incorporated in all of its commercial agreements. The clause normally used reads as follows:

> "Nothing in or relating to this Contract shall be deemed a waiver of any of the privileges and immunities of the United Nations, including, but not limited to, immunity from any form of legal process."

This provision, which usually follows the arbitration clause, makes clear to the contractor/lessor that the United Nations, by entering into contractual relations with private firms or individuals and by accepting arbitration as the method of dispute settlement, has not agreed to waive its immunity from legal process, which the Organization enjoys in accordance with section 2 of the General Convention. Section 2 reads as follows:

> "The United Nations, its property and assets wherever located and by whomsoever held, shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity. It is, however, understood that no waiver of immunity shall extend to any measure of execution."

It is clear, however, that the "privileges and immunities clause" does not adversely affect the commitment to arbitration since the Organization has agreed to be bound by the arbitration award as the final adjudication of the dispute, controversy or claim; the privileges and immunities clause provides protection to the Organization against possible court proceedings initiated prior to or after the award unless a waiver of immunity is expressly granted.

7.   The overwhelming majority of commercial agreements that have been entered into by the United Nations have been performed without the occurrence of any serious difficulty and, when problems have arisen, they have been resolved through direct negotiations in most instances. The United Nations has, therefore, had recourse to arbitral proceedings in only a limited number of cases to date. The arbitral awards that have been delivered have been largely based on the particular facts relating to the contract concerned and have not

A/C.5/49/65
English
Page 4

raised points of general legal interest regarding the status, privileges and immunities of the Organization.  However, it may be that, with the dramatic increase in the number of United Nations peace-keeping operations and the resultant increase in the volume of commercial agreements concluded by the Organization, the Organization will face an increasing number of commercial disputes that might lead to arbitration proceedings if the parties are unable to settle their differences through negotiations.

8.    Some contracts have, because of error or oversight, not included an arbitration clause.  In the event of a dispute in such cases, the United Nations has agreed to submit the dispute to arbitration through the formulation of a <u>compromis</u>, which is, in effect, an agreement of the parties to insert an arbitration clause into the contractual relationship; the terms of the <u>compromis</u> are agreed to after the initial contract has been concluded.

### B.  <u>Other disputes of a private law character</u>

9.    In addition to disputes arising out of commercial agreements, the Organization has encountered claims of a private law character, which may, in broad terms, be categorized under the following headings:  (a) third-party claims for personal injuries (arising outside the peace-keeping context), (b) claims related to United Nations peace-keeping operations, (c) claims related to operational activities for development and (d) other claims.  Each category is discussed below.

#### 1.  <u>Third-party claims for personal injury (arising outside the peace-keeping context</u>)

10.   One of the principal categories of "other disputes of a private law character" consists of claims submitted by persons in respect of injuries incurred on United Nations premises or caused by vehicles owned by the Organization or operated by its personnel for official purposes.

(a)   <u>Tort claims arising from acts within the Headquarters district in New York</u>

11.   In conjunction with the Organization's decision to become self-insured against third-party liability at its New York Headquarters, the General Assembly in 1986 adopted, pursuant to section 8 of the Headquarters Agreement concluded in 1947 between the United States and the United Nations, 4/ a special Regulation (hereinafter referred to as "Headquarters regulation No. 4") to place reasonable limits on the amount of compensation or damages payable by the United Nations in respect of claims by third parties for death, personal injury or illness or for damaged, destroyed or lost property arising from acts or omissions occurring within the Headquarters district in New York. 5/ Headquarters regulation No. 4, in effect, provides that, in any tort action against the United Nations or against any person acting on its behalf, to the extent the Organization may be required to indemnify such person, the damages are limited as follows:

/...

(a)  For any economic loss (as specifically defined in the regulation), damages may not exceed:  (i) the limits prescribed, <u>mutatis mutandis</u>, for death, injury or illness in the "Rules governing Compensation to Members of Commissions, Committees or Similar Bodies in the Event of Death, Injury or Illness Attributable to Service with the United Nations" <u>6</u>/ and (ii) "Reasonable amounts" for damaged, destroyed or lost property;

(b)  For any non-economic loss (e.g., pain and suffering), a maximum of US$ 100,000;

(c)  For punitive or moral damages, nothing is payable.

It should, however, be recognized that Headquarters regulation No. 4 is not designed to limit damages for all torts committed in the Headquarters district; the limits of the regulation apply only if the claim is against the United Nations itself or against one of its agents (e.g., a staff member or a contractor) whom the United Nations is obliged to indemnify.

12.  The Secretary-General has promulgated procedures for dealing with tort claims that fall within the purview of Headquarters regulation No. 4.  As set out in the Secretary-General's Bulletin entitled "Resolution of tort claims", <u>7</u>/ such claims are initially reviewed by the Office of Legal Affairs which, if it considers that the claim is legally justified and can be settled by payment of a sum not exceeding US$ 5,000, may recommend to the Controller that the claim be settled and, subject to his approval, may negotiate an appropriate settlement. Claims that are not so settled by Office of Legal Affairs and in respect of which the Organization is not insured must be reviewed by an internal Tort Claims Board, which is comprised of five members of the Secretariat.  If the Board concludes that there is liability on the part of the Organization in respect of a claim, it makes a recommendation to the Controller on a maximum compensation amount to be offered to the claimant as a settlement and, if the Controller agrees, the Office of Legal Affairs makes such an offer and conducts negotiations under the guidance of the Board.  In the event that the claimant is dissatisfied with the settlement offer, the Bulletin provides for recourse to arbitration as follows:

"In the event that negotiations with a claimant do not result in an amicable settlement of the claim, the claimant shall be offered the option to submit the claim to arbitration.  Such arbitration shall be held under the auspices of the American Arbitration Association, in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law in force, and taking into account, as appropriate, Headquarters regulation No. 4 on limitation of damages in respect of acts occurring within the Headquarters district (General Assembly resolution 41/210 of 11 December 1986).  The place of arbitration shall be New York City.  Any award pursuant to such arbitration shall be binding on the parties as the final adjudication of the claim." <u>8</u>/

13.  Similar claims submitted for personal injury or property damage arising from acts occurring on United Nations premises in duty stations other than New York have been very rare and have, to date, been settled amicably through negotiations.  In the event, however, that a future claim cannot be resolved

/...

A/C.5/49/65
English
Page 6

amicably, the matter would be referred to arbitration.  Fortunately, such tort
claims have seldom been presented at duty stations other than New York
Headquarters and, thus, there has been no need for any special procedures to be
promulgated for those duty stations.

(b)  <u>Claims arising from accidents involving vehicles operated by United Nations
     personnel for official purposes</u>

14.  The second main group of personal injury claims that have been presented by
third parties are those resulting from accidents caused by vehicles operated by
United Nations personnel (either United Nations-owned or United Nations-leased)
for official business.  Given that the Organization has maintained a commercial
insurance policy, with world-wide coverage, to protect itself against third-
party liability in respect of accidents involving its vehicles (as well as any
leased vehicles that are incorporated in its official fleet and given United
Nations plates), such claims, for the most part, have been met by means of that
insurance coverage.  In such cases, the claims are dealt with by the insurers
(or their designated agents) in accordance with the local law of the particular
State concerned.  If it is determined that there is no liability on the part of
the United Nations in respect of a particular claim and, therefore, that no
compensation is payable to the third-party claimant under the United Nations
world-wide insurance policy, the Organization may, depending on the
circumstances of the particular case, decide to make an <u>ex gratia</u> payment under
the terms of financial rule 110.13.

      (2)  <u>Claims related to United Nations peace-keeping operations</u>

15.  Within the context of United Nations peace-keeping operations, the
Organization has, to date, been confronted with disputes or claims of a "private
law" character that have fallen primarily into two main categories.  The first
category consists of claims for compensation submitted by third parties for
personal injury or death and/or property loss or damage incurred as a result of
acts committed by members of a United Nations peace-keeping operation within the
"mission area" concerned.  The second category consists of claims arising out of
commercial agreements (contracts or lease agreements) that the United Nations
has entered into, either in the field or at Headquarters, with private firms or
individuals to meet the requirements of a peace-keeping operation. <u>9</u>/

(a)  <u>Third-party claims for compensation for personal injury/death or property
     loss/damage</u>

16.  As regards the handling of third-party claims for compensation for personal
injury or death and/or property loss or damage resulting from acts of members of
a United Nations peace-keeping operation, it is relevant to recall that the
model status-of-forces agreement between the United Nations and host countries,
submitted by the Secretary-General to the General Assembly pursuant to
paragraph 11 of its resolution 44/49 of 8 December 1989, presents a procedural
framework for the settlement of "any dispute or claim of a private law
character". <u>10</u>/  That framework envisages that a "standing claims commission"
will be established for the purpose of settling most such claims. <u>11</u>/  In this
regard, paragraph 51 of the model agreement specifies:

                                                                        /...

"Except as provided in paragraph 53, any dispute or claim of a private
law character to which the United Nations peace-keeping operation or any
member thereof is a party and over which the courts of [host country/
Territory] do not have jurisdiction because of any provision of the present
Agreement, shall be settled by a standing claims commission to be
established for that purpose.  One member of the commission shall be
appointed by the Secretary-General of the United Nations, one member by the
Government and a chairman jointly by the Secretary-General and the
Government ... The awards of the commission shall be final and binding,
unless the Secretary-General of the United Nations and the Government
permit an appeal to a tribunal established in accordance with paragraph 53.
..." 12/

17.  However, to date, such claims of a private law nature have been settled
without resort to the establishment of the contemplated mechanism of a claims
commission (which, in any event, would be problematic in the context of
Chapter VII operations where no "host Government" would be available to
participate).  It has been the practice, with respect to past and present United
Nations peace-keeping operations, for an internal local claims review board to
be established in the mission, on the basis of authority delegated by the
Controller, to examine and recommend settlement of third-party claims for
personal injury or death and/or property loss or damage that are attributable to
acts performed in connection with official duties by civilian or military
members of the mission. 13/  Claims arising from accidents involving official
United Nations vehicles are normally not submitted for review by such a Board
as, in most cases, they are covered under the terms of the United Nations
world-wide insurance policy against third-party liability and are therefore
settled by the insurance company's designated representative/agent in the
mission area.  If, however, the insurance company has not designated a
representative to handle such cases in that locale (as was the situation during
the early months of the United Nations Transitional Authority in Cambodia
(UNTAC) mandate), such claims are reviewed by the local claims review board of a
mission in the first instance and thereafter forwarded to the insurance company
for processing which, regrettably, results in delays in settlement awards, and
often invokes hostility on the part of the claimants.

18.  Generally, third-party claims reviewed by a local claims review board are
referred by the peace-keeping mission concerned to United Nations Headquarters
only when the settlement amount recommended by the board exceeds the authorized
financial limit (as set out in the applicable "delegation of authority" from the
Controller).  In those cases, the recommendations of the Local Claims Review
Board are submitted to the Field Operations Division, Department of Peace-
keeping Operations, which, in turn, forwards them to the Director of the Peace-
keeping Financing Division, Office of Programme Planning, Budget and Accounts,
for review and approval. 14/

19.  When approval of a recommended settlement amount is given by the requisite
authority, i.e., either by the designated certifying officer of a peace-keeping
mission (usually the Chief Administrative Officer) or by United Nations
Headquarters, the relevant administrative office of the peace-keeping mission
(normally the Claims Unit) proceeds to offer such a settlement amount to the
claimant.  In the vast majority of cases, the offer is accepted by the claimant

/...

A/C.5/49/65
English
Page 8

and payment is made against the execution of a release form (wherein the
claimant agrees to indemnify and hold harmless the United Nations, its officials
and agents, from any and all claims and causes of action by third parties
arising from or relating to the injuries or loss at issue).

20.  Within this context, it is important to note that there has been a marked
increase in the number of third-party claims that have been submitted to the
United Nations Operation in Somalia (UNOSOM II) - the first Chapter VII peace-
keeping operation in recent years established under United Nations command -
and, in addition, that the nature of those claims has varied, to a certain
extent, from those that have arisen within the context of traditional Chapter VI
operations.  The question of how to assess and handle the category of claims for
personal injury or death and/or property loss or damage arising from
"enforcement actions" of UNOSOM II (involving the use of force) is currently
under study by the relevant Secretariat offices as this matter raises complex
issues of public international law that must eventually be reviewed by the
General Assembly. 15/

(b)  Third-party claims arising from commercial agreements

21.  As for disputes or claims related to commercial agreements entered into
between the United Nations and private firms or individuals to meet the
particular requirements of United Nations peace-keeping operations, such matters
are dealt with in essentially the same manner as has been described in respect
of other commercial agreements concluded by the Organization (see paras. 3-8
above).  In those cases where the commercial agreement was prepared and executed
by the administration of a peace-keeping operation rather than by New York
Headquarters, it has been the usual practice for that administration, in
consultation with the appropriate offices at Headquarters, to seek to resolve
the matter in the field through direct negotiations with the respective
contractor/lessor.  In the vast majority of cases, a settlement of the matter
has been reached through direct negotiations between the parties (either in the
field or at Headquarters).  In the few cases where the Organization has not been
able to negotiate a settlement of the matter, it has resorted to arbitral
proceedings.

(c)  Claims related to operational activities for development

22.  The activities of UNDP and UNICEF around the world are, in most cases,
undertaken pursuant to agreements entered into with the recipient States, which
lay down the conditions for UNDP and UNICEF assistance to the programmes and
projects of the Government concerned.  UNDP and UNICEF enter into commercial
agreements with contractors (or lessors) and the dispute resolution mechanisms
described in section II(A) above apply to the separately administered organs
(see paras. 3-8).  However, in consideration of the fact that UNDP and UNICEF
assistance to national programmes and projects (including entering into
agreements with contractors for the provision of goods and services) are
provided at the request of and for the benefit of the respective recipient
State, it has been the practice of both UNDP and UNICEF to include in their
agreements with recipient Governments a provision to shift liability to the
latter in respect of third-party claims.  In effect, the provision ensures that
the Government concerned will be responsible for dealing with, and satisfying,

/...

third-party claims and will hold harmless the United Nations in respect of any
such claims that may arise, except in cases of gross negligence or wilful
misconduct on the part of the United Nations organ or its representatives
(where, depending on the circumstances, the Organization might pursue its
contractual remedies against a contractor).  The standard provision in the UNDP
standard basic assistance agreement reads as follows:


"<u>Article X</u>

"<u>Facilities for Execution of UNDP Assistance</u>

"2.  Assistance under this Agreement being provided for the benefit of the
Government and people of _____, the Government shall bear all
risks of operations arising under this Agreement.  It shall be responsible
for dealing with claims which may be brought by third parties against the
UNDP or an Executing Agency, their officials or other persons performing
services on their behalf, and shall hold them harmless in respect of claims
or liabilities arising from operations under this Agreement.  The foregoing
provision shall not apply where the Parties and the Executing Agency are
agreed that a claim or liability arises from the gross negligence or wilful
misconduct of the above-mentioned individuals."

The corresponding provision in the UNICEF basic cooperation agreement reads as
follows:


"ARTICLE XXI

"<u>Claims against UNICEF</u>

"1.  UNICEF cooperation in programmes under the present Agreement is
provided for the benefit of the Government and people of the country and,
therefore, the Government shall bear all the risks of the operations under
the present Agreement.

"2.  The Government shall, in particular, be responsible for dealing with
all claims arising from or directly attributable to the operations under
the present Agreement that may be brought by third parties against UNICEF,
UNICEF officials, experts on mission and persons performing services on
behalf of UNICEF and shall, in respect of such claims, indemnify and hold
them harmless, except where the Government and UNICEF agree that the
particular claim or liability was caused by gross negligence or wilful
misconduct."

/...

A/C.5/49/65
English
Page 10

C.  Other claims

23.  The Organization does not agree to engage in litigation or arbitration with the numerous third parties that submit claims (often seeking substantial monetary compensation) based on political or policy-related grievances against the United Nations, usually related to actions or decisions taken by the Security Council or the General Assembly in respect of certain matters.  Such claims, in many instances, consist of rambling statements denouncing the policies of the Organization and alleging that specific actions of the General Assembly or the Security Council have caused the claimant to sustain financial losses.  The Secretary-General considers that it would be inappropriate to utilize public funds to submit to any form of litigation with the claimants to address such issues.

24.  The other major category of claims of a private law nature that have been received to date by the Organization have been from disappointed job applicants, i.e. individuals who are aggrieved that they were not selected for a United Nations position.  Such claims typically allege the occurrence of prejudice or some other impropriety in the selection process.  The Organization's policy is not to enter into any litigation or arbitration with such individuals but to reply in a reasoned manner to such individuals with a copy provided to their Permanent Mission if it has become involved in the matter.  Furthermore, appointments, other than short-term appointments, are examined by joint staff-management appointment machinery (the Appointment and Promotion Board and its subsidiary bodies) and the Secretary-General considers that this procedure ensures fairness in selection.  Again, the Secretary-General considers that it would be inappropriate to use public funds to submit to any form of litigation with the many disappointed job applicants world wide who wish to contest their non-selection.  Of course, as regards those persons who are recruited as staff members and present complaints relating to the terms of their employment, the Staff Regulations and Rules set forth a wide range of internal dispute resolution procedures that are available to consider such complaints (see Staff Regulations and Rules, chap. XI).

III.  DISPUTES INVOLVING ANY OFFICIAL OF THE UNITED NATIONS WHO
BY REASONS OF HIS OFFICIAL POSITION ENJOYS IMMUNITY, IF
THE IMMUNITY HAS NOT BEEN WAIVED BY THE SECRETARY-GENERAL

A.  Origin of immunities

25.  The entitlement of United Nations officials to immunities is explicitly enshrined in Article 105, paragraph 2, of the Charter of the United Nations, which, inter alia, stipulates that officials of the Organization shall "... enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization".  This fundamental principle was further developed in the General Convention.  The immunities of United Nations officials under the General Convention are confirmed or, in some cases, further delineated in headquarters agreements concluded by the Organization with host States.  They are also reflected in numerous agreements concluded by the Organization with Member States regarding various fields of activities (for example, the UNDP standard basic assistance

/...

agreements, the UNICEF basic cooperation agreements, status-of-forces agreements for peace-keeping operations, conference agreements, etc.).

### B.  Scope and nature of immunities

26.  The specific privileges and immunities, exemptions and facilities of United Nations officials are set out in Articles V and VII of the General Convention. In accordance with article V, section 17, of the General Convention, the Secretary-General is vested with the authority to specify the categories of officials to whom the provisions of these articles will apply.  In this respect, the Secretary-General is guided by General Assembly resolution 76 (I) of 7 December 1946, which approved the granting of the privileges and immunities referred to in articles V and VII "... to all members of the staff of the United Nations, with the exception of those who are recruited locally and are assigned to hourly rates".  This approach provides that no distinction should be made among staff members on the basis of nationality, rank, residence or place of recruitment.

27.  With the exception of a relatively small number of senior officials of the Organization, the nature and extent of the privileges and immunities to be accorded to staff members are strictly functional rather than diplomatic. Pursuant to article V, section 19, of the General Convention, only the Secretary-General, under-secretaries-general and assistant secretaries-general, are entitled to "... the privileges and immunities, exemptions and facilities accorded to diplomatic envoys in accordance with international law".  All other officials of the United Nations, pursuant to article V, section 18, of the General Convention, enjoy functional privileges and immunities, including the immunity from legal process, only in connection with acts performed by them in their official capacity.  The functional nature of immunities of United Nations officials derives from the notion that these privileges and immunities appertain exclusively to the Organization. 16/  In this respect, article V, section 20, of the General Convention unequivocally stipulates that the "privileges and immunities are granted to officials in the interests of the United Nations and not for the personal benefit of the individuals themselves".

### C.  Waiver of immunity

28.  The authority to waive the immunity of United Nations officials is entrusted by the General Convention to the Secretary-General.  In accordance with article V, section 20, of the General Convention, "the Secretary-General shall have the right and the duty to waive the immunity of any official in any case where, in his opinion, the immunity would impede the course of justice and can be waived without prejudice to the interests of the Organization".

29.  In respect of the Secretary-General, the General Convention bestows the right to waive his immunity on the Security Council.  No instance has arisen in which the Security Council has been requested to waive the immunity of the Secretary-General.

A/C.5/49/65
English
Page 12

## D. Policy of the Organization

30.  At the outset, it ought be noted that if a claim is against an official for acts performed in the course of his or her official functions, the Organization will inform the claimant that the action is against the Organization itself and then the normal procedures for dispute resolution set out in paragraphs 3 to 8 above should apply.  It is only if an act relates to private activities of the official that the issue of waiver is examined.

31.  Should there be a dispute not dealt with in accordance with the preceding paragraph involving any official of the Organization who by reason of his official position enjoys immunity, if immunity has not been waived, the United Nations, in accordance with Article VIII, section 29(b) of the General Convention, is expected to make provisions for appropriate modes of settlement of such a dispute.  The General Convention itself, however, does not provide for a specific mechanism for the settlement of disputes of this character. Nevertheless, the General Convention, by its article V, section 21, directs the United Nations to "... cooperate at all times with the appropriate authorities of Members to facilitate the proper administration of justice, secure the observance of police regulations and prevent the occurrence of any abuse in connection with the privileges, immunities and facilities" set out in article V.

32.  Consideration of cases relating to disputes referred to above has generally been delegated by the Secretary-General to the Office of Legal Affairs.  Most of these cases are either traffic accidents or domestic disputes.  In the case of traffic accidents, the matter is handled by the appropriate insurance company which, if it cannot settle the case, will appear in court to defend the claim. In the case of domestic disputes, immunity is usually waived.  It should be noted, however, that the Secretary-General has discretionary authority, under section 20 of the General Convention, to consider in any case whether the immunity of any United Nations official would impede the course of justice and whether it can be waived without prejudice to the interests of the Organization. As noted above, in the great majority of cases reported to the Office of Legal Affairs, immunity has been waived.  In a few cases, however, the Organization has not waived immunity but has cooperated with the competent authorities, on a strictly voluntary basis, by providing, for example, the necessary information with a view to assisting the authorities in the proper administration of justice and preventing the occurrence of any abuse of the privileges and immunities.

## IV.  CONCLUSION

33.  The above procedures and mechanisms, in the view of the Secretary-General, implement the obligation to provide an appropriate means of dispute resolution in respect of disputes arising out of contracts or other disputes of a private law character or involving any official of the United Nations who by reason of his official position enjoys immunity that has not been waived by the Secretary-General.

/...

<u>Notes</u>

<u>1</u>/   See A/CN.4/L.118 and Add.1 and 2 (<u>Yearbook of the International Law Commission</u>, 1967, vol. II, pp. 154-324) and A/CN.4/L.383 and Add.1-3 (<u>Yearbook of the International Law Commission</u>, 1985, vol. II, Part one, addendum, pp. 145-210).

<u>2</u>/   See General Assembly resolution 31/98 of 15 December 1976.

<u>3</u>/   The United Nations would normally agree to a request by a non-United States contractor/lessor for another arbitration authority to be designated to administer the arbitration.

<u>4</u>/   See United Nations <u>Treaty Series</u>, vol. II, No. 147.

<u>5</u>/   See General Assembly resolution 41/210 of 11 December 1986.  As provided for under section 8 of the Headquarters Agreement, Headquarters regulation No. 4 displaces any inconsistent federal, state or local law or regulation of the United States, to the extent of such inconsistency, which would otherwise have been applicable within the Headquarters district.

<u>6</u>/   See ST/SGB/Rev.1 and ST/AI/119.  These rules are based on those governing compensation for staff members for service-incurred death, injury or illness as set out in ST/SGB/Staff Rules/Appendix D/Rev.1 (1966) and Amend.1 (January 1976).

<u>7</u>/   See ST/SGB/230 of 8 March 1989.

<u>8</u>/   Ibid, para. 6.

<u>9</u>/   The United Nations has also established mechanisms to handle claims submitted by contributing States on behalf of their nationals for compensation for death or injuries attributable to service with a United Nations peace-keeping operation; however, such claims are not regarded as "private law" claims.

<u>10</u>/   See A/45/594.

<u>11</u>/   The model status-of-forces agreement sets forth, in paragraphs 47 to 49, the circumstances under which a member of the civilian component or of the military component of a United Nations peace-keeping operation may be subject to criminal or civil proceedings instituted in the courts of the host country/Territory.

<u>12</u>/   The model status-of-forces agreement specifies, in paragraph 53, that an appeal of an award made by a claims commission may be submitted only to a tribunal of arbitrators if agreed to by the parties and that the tribunal's decisions are final:

"Any other dispute between the United Nations peace-keeping operation and the Government, and any appeal that both of them agree to allow from

/...

A/C.5/49/65
English
Page 14

the award of the claims commission established pursuant to paragraph 51 shall, unless otherwise agreed by the parties, be submitted to a tribunal of three arbitrators.  The provisions relating to the establishment and procedures of the claims commission shall apply, _mutatis mutandis_, to the establishment and procedures of the tribunal.  The decisions of the tribunal shall be final and binding on both parties."

13/  The draft "Field Administration Manual" (September 1992), which has been distributed to all United Nations peace-keeping missions, discusses, in part IV of chapter 3, the delegation of financial authority for the establishment of a local claims review board and, in chapter 10, sets out the terms of reference and the guidelines for such a Board.  These sections of the draft Manual are currently under review by the relevant offices of the Secretariat.

14/  See the delegation of authority set out in the Financial and accounting instruction No. 31/Revision 166/Amend.9 of 27 September 1993, issued by the Controller.

15/  It is relevant to recall that the Organization established special compensation arrangements with several Member States in respect of claims that had been submitted by their nationals for personal injuries and/or property losses or damages arising from operations of the United Nations Operation in the Congo (ONUC) (see A/CN.4/L.118, paras. 54-56).  See also the exchanges of letters between the United Nations and Belgium (United Nations _Treaty Series_, vol. 535, No. 7780), Switzerland (ibid., vol. 564 No. II 621), Greece (ibid., vol. 565 No. 8231), Luxembourg (ibid., vol. 585 No. 8487) and Italy (ibid., vol. 588 No. 8525).

16/  It should be noted that certain headquarters arrangements for United Nations duty stations foresee that officials below the level of assistant secretary-general can also enjoy diplomatic privileges and immunities, exemptions and facilities.

-----