illegality—i.e., breach of international law—unless this takes place in circumstances justifying non-performance as indicated in division A above.

2. Where there is a breach of a treaty, it gives rise to international responsibility, irrespective of its character or gravity. This responsibility must be discharged as soon as possible by such means as may be necesary or appropriate for the purpose, in accordance with the provisions of the present section.

3. A State which has committed a breach of treaty is itself responsible for taking the necessary steps for bringing about a cessation of the breach and for making any reparation due in respect of it, in accordance with the provisions of the present section.

4. A breach of treaty by one party, or a failure by it to take the necessary steps to discharge the responsibility arising from the breach, confers on the other party or parties a right of redress, and of taking remedial action, as indicated in section 2 below.

*Article 35. Method of discharging the responsibility arising from breach of treaty*

1. The method of discharging the responsibility arising from a breach of treaty, or of making the reparation due in respect of such a breach, depends in the first place on the provisions of the treaty, or, if these are silent on the matter, then, subject to the provisions of the present section, on the general rules of international law relating to state responsibility.

2. Breaches of treaty may assume various forms, and may in particular arise from:

(*a*) Some action prohibited by the treaty;

(*b*) A failure to carry out a specific requirement of the treaty (which may consist in the failure to perform some act, to grant certain treatment, or to allow the exercise of certain rights or performance of certain acts);

(*c*) Action taken in a manner, or for a purpose, that is not in conformity with the treaty.

3. In the classes of cases indicated in the preceding paragraph, the measures appropriate to discharge the international responsibility of the State having committed the breach are as follows:

(i) *In case (a):* Immediate cessation of the action in violation of the treaty prohibition where this is still continuing, and the furnishing of suitable reparation, by way of damages or otherwise, in respect of the violation;

(ii) *In case (b):* Immediate execution of the requirements in question and the furnishing of suitable reparation for its previous non-execution; or, if execution is no longer possible, or would not be adequate in the circumstances, damages or other reparation for non-performance;

(iii) *In case (c):* Correction or cessation of the action in question, as may be appropriate, together with the furnishing of suitable reparation for any prejudice caused.

4. Subject to any specific provisions of the treaty itself, all such questions as those of the appropriate measure of damages, indirect damages, remoteness of damage, payments by way of interest, etc., are governed by the ordinary principles of international law applicable to the reparation of international injuries.

*Article 36. Consequences of breaches of treaties involving benefits for individuals*

Where there has been a breach of a treaty obligation involving benefits for individuals, the measure of damages or of other reparation due, apart from any obligation of specific performance, will *prima facie* be the prejudice caused to the individual concerned. Where, however, the breach involves a specific prejudice to the contracting State itself, over and above, or independently of, that caused to the individual, additional reparation will be due in respect of it.

SECTION 2. MODALITIES OF REDRESS FOR BREACHES OF TREATY

SUB-SECTION i. GENERAL STATEMENT OF AVAILABLE REMEDIES

*Article 37. Action by way of redress open to the parties*

In the event of a breach of treaty by one party or, as the case may be, of a failure by that party to take the necessary action by way of reparation as provided in section 1 above, the other party or parties will, subject to the provisions of the present section, be entitled:

(*a*) To take any step, or seek or apply any remedy or means of recourse, specifically provided for in the treaty itself;

(*b*) Resort to any other available means of recourse if none are provided in the treaty;

(*c*) Subject to the provisions of article 38 below, to regard the treaty obligation as finally and definitively terminated in those cases where the breach is of a fundamental character as defined in articles 18 to 20 of part III of chapter 1 of the present Code, and provided also that the treaty is not a multilateral treaty of the kind described in paragraph (3) (*e*) of article 18;

(*d*) Subject to the provisions of article 20 and of article 39, to have recourse to an equivalent and corresponding non-performance of the treaty;

(*e*) Subject to the provisions of article 39, to sequestrate, detain or place an embargo on any public property or assets of the party having committed the breach, and situated within the jurisdiction of the other party or parties, not being in the nature of diplomatic or consular property or assets;

(*f*) Subject to the provisions of article 18 and of article 39, to have recourse by way of reprisals to non-performance of some other provision of the treaty, or of another treaty with the party having committed the breach, or, in respect of that party, of some general rule

of international law which would otherwise require to be observed.

SUB-SECTION ii. SPECIAL PROCEDURAL CONSIDERATIONS AFFECTING CERTAIN MEANS OF REDRESS

*Article 38. Case (c) of Article 37*

In order to justify action under sub-paragraph (c) of article 37, the conditions and procedures specified in articles 18 to 20 of part III of chapter 1 of the present Code must be strictly complied with.

*Article 39. Cases (e) and (f) of Article 37*

1. In order to justify action under sub-paragraphs (e) and (f) of article 37, either:

(i) The breach, unless admitted, must have been established by the finding of an appropriate international arbitral or judicial tribunal; or

(ii) The counter-action must be accompanied by an offer to have recourse to arbitration or adjudication if the breach is denied, or by acceptance of a request for it, if made by the other party.

2. Where an offer of, or request for, arbitration or adjudication has been accepted under paragraph 1 (ii) above, any counter-measures instituted under sub-paragraph (e) of article 37 can only take the form of an embargo or *saisie conservatoire* pending the final decision of the tribunal on the substantive merits of the case. In the case of counter-measures instituted under sub-paragraph (f) of article 37, however, the tribunal may, if it thinks fit, order the suspension of any such counter-measures.

3. The counter-measures instituted must:

(a) Be necessary in the circumstances, in order to provide adequate redress or avoid further prejudice;

(b) Be proportionate to the breach justifying them;

(c) Cease so soon as the occasion for them is past, by reason of resumed performance of the treaty obligation, or cessation of its infraction, provided, however, that reparation has been made in respect of the non-performance or infraction.

## II. COMMENTARY ON THE ARTICLES

*Note:* The texts of the articles are not repeated in the commentary. Their page numbers are given in the table of contents at the beginning of the report.[14]

*General observation.* For the purposes of the commentary, familiarity with the basic principles of treaty law is assumed, and only those points calling for special remark are commented on. In addition, in order not to overload an already full report, authorities have not been cited for principles that are familiar, or where these can be found in any standard textbook, but only on controversial points, or where otherwise specially called for.

---

[14] For the arrangement of the present chapter, see footnote 9.

## Second chapter. The effects of treaties

### Part I. The effects of treaties as between the parties (operation, execution and enforcement)

*Article 1. Scope of part I*

1. Part I of the present chapter deals with the effects of treaties as between the actual parties to the treaty concerned. The effects in relation to third States, and the position of the latter with reference to a treaty to which they are not parties, will be considered in part II, which will be the subject of a later report.

2. The terms "operation, execution and enforcement" in the title to part I are more or less traditional. Possibly, a better terminology would be "operative force, performance and redress for breach". "Enforcement", in particular, is of doubtful suitability, since in the present state of international organization, treaties cannot normally be directly enforced.

3. *Paragraph 1* reflects the fact that, when all is said and done, the effect of a treaty depends first and foremost on the text of the treaty itself. This fact has already been alluded to in the introduction to the present report, where it is pointed out that a chapter on the effects of treaties can only be of a very generalized character, setting out those effects which can be regarded as more or less common to all treaties, whatever their particular character or content.

4. More detailed provisions on the effects of treaties could only be formulated with respect to particular categories of treaties having a common element, and would require a very close preliminary study of a large number of such treaties, together with, in all probability, an inquiry from Governments as to their practice in relation to these treaties. It is not possible now, in connexion with the present chapter, to engage in such a study or inquiry, but if it were eventually thought desirable that a Code on the law of treaties should deal in a fairly detailed way with questions affecting particular classes of treaties (e.g., commercial treaties, maritime treaties, civil aviation conventions, trading agreements, and so on), a separate section dealing with these matters could be compiled later.

5. *Paragraph 2.* Although certain rules and principles of treaty execution and performance apply generally in respect of all treaties, it is normally open to the parties to any particular treaty to exclude or modify the application to that treaty of some particular rule of treaty law that would otherwise govern it. It would seem, however, that the more fundamental principles of treaty law could not be treated in this way. Such principles as *pacta sunt servanda*, the continuity of the State, the supremacy of international law over domestic law, etc. are juridical facts. They are unalterable, because without them no binding treaty could exist.

6. In this last respect, the Rapporteur finds it difficult to accept the view put forward in such a provision as article 23 of the Harvard Draft Convention on Treaties.[15] In that article, the statement of the rule that failure to perform a treaty obligation cannot be justified

---

[15] Harvard Law School, *Research in International Law*, III. *Law of Treaties,* Supplement to the *American Journal of International Law,* vol. 29, 1935. In the corresponding provision in

on the ground of municipal law deficiencies or constitutional difficulties, is prefaced by the phrase "Unless otherwise provided in the treaty itself". It is correctly pointed out in the Harvard Draft that although "such provisions in treaties... have been rare... they have not been entirely lacking"; and examples are cited of treaties containing a clause providing that "should either party be prevented by future action of its legislature from carrying out the terms of this arrangement, the obligations thereof shall thereupon lapse".

7. In the opinion of the Rapporteur, any such "arrangement" is not properly speaking a treaty, and does not involve legal, but at most moral obligations, or a sort of political or administrative understanding—perhaps a sort of "gentleman's agreement" between governments. The clauses quoted are based on the cardinal error of equating the party to the treaty (which is properly speaking the *State,* and the *whole* State) with what is only one organ or part of the State, namely, the government or administration. Treaties (considered as legal instruments) are binding on all the organs of the State, and a failure to carry out the treaty attributable to any of these organs (including the legislature) is a breach of it, and entails international responsibility. The existence in the instrument concerned of a provision on the lines above quoted simply means that the party to the treaty, the State, can at any time (through its legislature) legitimately fail to perform it, or cause the "obligation" to cease. This is no more, therefore, than a voluntary undertaking without ultimate legal continuity or force, and such a position has no place in the law of treaties proper.

8. The general question of treaties and the domestic laws of the parties is discussed in connexion with article 7 below; and exactly the same type of consideration applies *mutatis mutandis* to the suggestion made in article 24 of the Harvard Draft that parties to a treaty can equally "contract out" of the rule (deriving from the principle of the unity and continuity of the State) that changes of government in a State do not affect the treaty obligations of the State; as to this, see further below in connexion with article 6.

## DIVISION A. OPERATION AND EXECUTION OF TREATIES

### Section 1. Character, extent and limits of the treaty obligation

*Article 2. Fundamental principles governing the treaty obligation*

9. The present section deals with the general topic of the character and extent of the treaty obligation and of the limits of that obligation. A second main section of division A treats of certain particular questions of treaty application; while division B deals with the consequences of, and redress for breach of treaty (enforcement, so-called).

10. Article 2 sets out in very general form certain fundamental principles of treaty law which have already twice been referred to in previous reports presented by the Rapporteur. The first of these occasions was in the first (1956) report (A/CN.4/101, pp. 108 and 118). This report, which dealt primarily with the subject of the conclusion of treaties, contained a section entitled "Certain Fundamental Principles of Treaty Law", articles 4 to 6 of which covered some of the principles mentioned in article 2 of the present section. In his commentary to those articles, the Rapporteur expressly mentioned that these principles really appertain more to the subject of the operation and effect of treaties, but he posed the question whether, notwithstanding that fact, it might nevertheless be desirable to have some mention of these important principles at the beginning of the Code. At its eighth session in 1956, the Commission devoted two or three meetings to a very general discussion of the Rapporteur's first report, in the course of which this and certain other matters were mentioned. While no final conclusions were reached, the Rapporteur had the impression that the Commission did not think it necessary to deal with these principles at the beginning of the Code, and would prefer that they should appear in their logically correct position as part of the subject of treaty operation and effects. Therefore, there will be no difficulty in eventually omitting the articles on this subject which were included in the Rapporteur's first report.

11. In the meantime, however, these same principles have also shown themselves to be directly relevant to the subject of the termination of treaties which was dealt with in the Rapporteur's second (1957) report (A/CN.4/107, pp. 23 and 39-43). While it was perhaps not essential to do so, the Rapporteur thought it desirable to include in that section of the work an article (article 5 in part III of chapter 1 of the Code) stating a number of grounds which do *not* justify a party to a treaty in purporting to terminate it or to treat the obligation as being at an end.[16] As has already been explained in the introduction to the present report, the subject of the termination of treaties, considered in the 1957 report, has considerable affinities with part of the content of the present chapter, in so far as the latter deals with the question of the grounds that may, and those that will not, justify a party in failing to carry out a treaty obligation. Just as certain grounds may, according to circumstances, either justify the *ad hoc* non-performance of a particular treaty obligation (though without bringing the treaty itself, or the obligation, to an end), or else may justify the complete termination of the treaty as a whole, so also do some of the same grounds (although often put forward) *not* justify either non-performance of a particular treaty obligation or the termination of the treaty or obligation

---

a previous report, i.e., that on treaty termination (article 5 in the second (1957) report), the Rapporteur followed the Harvard draft without commenting on the matter. A revised view is now presented.

[16] It was not strictly necessary to do so because, as this section of the work professed to state affirmatively what were the elements that would cause a treaty to come to an end or justify a party in regarding it as terminated, and to state these exhaustively, it could be said to follow automatically that any other ground was necessarily excluded. However, as was explained in the commentary to article 5 in the Rapporteur's second report, certain other grounds have so frequently been put forward by Governments, at one time or another, as justifying the termination of a treaty, that it seemed desirable in any Code to indicate them definitely as being insufficient.

as a whole. In these circumstances, and without prejudice to the arrangement ultimately to be adopted for the present Code, it seems better to leave undisturbed the provisions on this subject, and the commentary thereto, which already figure in part III of chapter 1 of the Code (Rapporteur's second (1957) report), and refer to these as may be necessary in commenting on the corresponding articles of the present chapter.

12. It is clear that any really detailed commentary on the principles set out in article 2 of the present section would involve something like a treatise on the fundamental philosophy of international law, and this is not necessary for present purposes. As has already been stated, however, certain observations are contained in the commentary to article 5 in the Rapporteur's second report (1957), and reference is accordingly made to these, and also to the commentary to articles 3 to 8 below.

SUB-SECTION i. NATURE AND EXTENT OF THE TREATY OBLIGATION

*Article 3. Obligatory character of treaties:*
ex consensu advenit vinculum

13. *Paragraph 1.* This is sufficiently covered by the remarks already made in connexion with article 2 above. The paragraph does, however, attempt to give effect to the important principle that the foundation of the treaty obligation does not really lie in the treaty itself, even if it may superficially appear to do so. No treaty would be binding if there were not already a rule of law to the effect that undertakings given in certain circumstances and in a particular form create binding obligations. Such a rule must necessarily lie outside the treaty, since no instrument can derive binding force from itself alone. The principle that consent given in due form creates a legal obligation is not a treaty rule of law, though it is a rule on which the whole of treaty law is founded. Such a rule could not be created by treaty because the very treaty purporting to do so would not itself be binding without such a rule already pre-existing independently, as a rule of general international law (and of course the rule that consent gives rise to obligation has applications far wider than those of the particular sphere of treaties).

14. *Paragraph 2.* The position regarding treaty rights is merely the converse of that relating to treaty obligations. It has nevertheless seemed desirable to include this paragraph, because perhaps too much emphasis tends to be laid on the role of treaties in creating obligations as opposed to their role in creating rights. It is true that some treaties involved only, or mainly, obligations;[17] but as regards the great majority of treaties, the intention is that the performance by one party of its obligations will confer on the other party (or parties) a benefit which the latter can legally claim; and this is normally reciprocal. Even in those cases where a treaty appears to involve nothing but obligations for one or more, or all, the parties, nevertheless each party (although it may itself receive no direct benefit therefrom) has a right to claim the performance of the obligation by every other party.

*Article 4. Obligatory character of treaties:*
pacta sunt servanda

15. *Paragraph 1.* This requires no special comment, apart from the general observations already made. There is no need for philosophical discussion when it is so obvious that treaties would lose their entire purpose and *raison d'être* as legal instruments, were it otherwise than as here provided.

16. *Paragraph 2.* The question of the—so to speak—spirit in which a treaty must be carried out perhaps belongs strictly to the sphere of treaty interpretation, which will be the subject of a later report. It seems nevertheless desirable to include some general statement of principle in the present chapter. The principles of good faith and of reasonableness (which are not quite identical) in the execution of treaties, are well recognized, and have been given effect to by international tribunals.[18] Indeed the very lack, internationally, of the same possibilities of enforcement as exist in the case of private law contracts, probably imposes on States and Governments something in the nature of a special duty under international law to use the utmost good faith in the execution of treaties.[19]

17. "... so as to give it a reasonable and equitable effect..." The question whether or not, and if so in what circumstances, a treaty ought to be given the "maximum" effect of which it is capable, is again really a question of interpretation. It is the familiar question of a restrictive *versus* a liberal interpretation of treaty obligations. As such, it does not fall to be dealt with here. It is, however, germane to the present chapter to give some indication as to the general spirit in which the treaty ought to be carried out, and for that purpose to try to give some element of precision to the rather vague term "good faith". Whether, in particular circumstances, some provision of a treaty ought to be interpreted restrictively or the reverse is a matter of the rules of interpretation; but within those limits it is

---

[17] For instance, treaties of the social or humanitarian type engage the parties to conform to certain modes of conduct, mainly in the interest and for the benefit of individuals as such, irrespective of nationality, and with no direct material benefit for any of the States parties to the treaty, apart from such as they may indirectly derive from the good will and improvement in international and other relations that may be expected to result from the observance of such treaties. Treaties dealing with human rights afford a very good illustration of this type of treaty.

[18] See, for instance, as an example amongst modern cases, the dictum of the International Court of Justice in the Morocco case *(I.C.J. Reports 1952,* p. 212) when, speaking of the exercise of a certain right under a treaty, the Court said "The power... rests with the ... authorities, but it is a power which must be exercised reasonably and in good faith." See also the four-judge minority opinion in the case of Admission of a State to the United Nations (Charter, Art. 4), Advisory Opinion: *I.C.J. Reports 1948,* pp. 82-93.

[19] It has been suggested (Schwarzenberger, *International Law as applied by International Courts and Tribunals,* vol. 1, 3rd ed. (1957), p. 448) that "treaties may be described as *bonae fidei negotia* as distinct from *stricti juris negotia*". The present Rapporteur also, in a course of lectures delivered at The Hague Academy of International Law in 1957, suggested that a doctrine corresponding to the private law doctrine of action *uberrimae fidei* might be applicable generally in the discharge of international obligations.

always possible for parties to adopt a reasonable and equitable approach to their duty of carrying out the treaty, so as to give it an adequate effect.

18. "... according to the correct interpretation of its terms..." The exact nature of the obligation, of course, always depends on the correct interpretation of the treaty according to its terms. The duty to apply it in good faith, and so as to give it a reasonable and equitable effect, can only exist within the scope of the treaty obligation itself, according to its correct interpretation. What paragraph 2 as a whole means is that the correct interpretation of a treaty having been ascertained, it *then* becomes the duty of the parties to carry it out reasonably, equitably and in good faith, accordingly.

19. *Paragraph 3*. This needs no particular comment. The obligation to carry out a treaty naturally presupposes that there *is* a valid treaty, which has been regularly concluded, is still in force, and which is not vitiated by any element affecting its essential validity; and, in the case of multilateral treaties, that the State concerned is and remains a party to it. Only on those assumptions can there be an obligation to carry out the treaty, because only on those assumptions is there a binding obligation. These matters have of course already been dealt with in chapter 1.

20. *Paragraph 4*. This draws the deduction, so to speak, from the positive aspect of the principle *pacta sunt servanda*, and from the remaining provisions of the article, especially those of paragraph 1. It will be sufficient, by way of comment, to refer to paragraphs 33 to 36 of the commentary to the corresponding provisions in the sections on termination of treaties (article 5 (iii) in the Rapporteur's second (1957) report).

*Article 5. Obligatory character of treaties: relationship of obligations to rights*

21. This article deals with one or two points which, while basically general, usually arise with reference to multilateral treaties; and *paragraph 1* refers in particular to a point already mentioned in paragraph 14 and footnote 17 above. As there explained, certain kinds of multilateral treaties do not involve direct benefits for *any* of the participating countries. The benefit is of a general character arising from participation in a common cause for the general good. What each party has a right to claim as the counterpart of its own performance of the treaty, is that it shall be duly performed by each of the other parties.

22. *Paragraph 2*. It is considered that as a statement of principle, the provision here suggested must be correct. It was stated in general terms by the International Court of Justice in the case of the Reservations to the Convention on Genocide,[20] when the Court said that none of the parties to an international convention " is entitled to frustrate or impair, by means of unilateral decisions or particular agreements, the purpose and *raison d'être* of the convention." Difficulties may nevertheless arise in applying this principle in particular cases.

Something was said under this head in connexion with the subject of "renunciation of rights" dealt with in article 15 of part III of chapter 1 of the present Code,[21] to which reference may be made. Clearly, and especially in the case of multilateral treaties, a failure by one or more parties to claim or enforce their rights under a treaty may very much weaken its force, and in practice render it impossible for the other parties to insist upon or obtain its execution. At the same time, it is difficult in principle to deny the right of a party to renounce its rights under a treaty or not to insist upon them. The conclusion must be that paragraph 2 of article 6 would require to be applied with particular regard to the circumstances of each case. Nevertheless, as a statement of principle it appears to be justified.

23. On the other hand, it is necessary to treat as a special case the situation that arises in connexion with multilateral treaties when the provisions of an earlier treaty are or may be affected by those of a later one concluded by some only of the parties to the earlier treaty. Even though the parties to the later treaty still remain technically bound towards those parties to the earlier who are not also parties to the later treaty, the position of these latter parties may be prejudiced in fact, if not in law. This case, to which exceptional considerations apply, in such a way that the later treaty is not necessarily invalidated, is fully dealt with in connexion with the subject of conflicting treaties in article 18 of part II of chapter 1 of the Code and the commentary thereto.[22]

*Article 6. Obligatory character of treaties: the principle of the unity and continuity of the State*

24. *Paragraph 1*. The first sentence of this article indicates that the treaty obligation always rests upon the State, since it is the State which is the international entity. A State has, however, always to act through agents, such as Heads of State, Governments, Ministers, etc. Provided the agency is a regular one, and the formal method of conclusion involved is one that binds the State in accordance with the provisions of part I of chapter 1 of the present Code,[23] it is immaterial what particular form or method, or what particular agency, is chosen to act on behalf of a State.

25. The principle embodied in the second sentence of the paragraph follows inevitably from the first. Governments are the agents of the State, and if a State is bound, the Government as the agent is obliged to carry out the treaty.

26. "... irrespective of the character of its origin, or of whether it came into power before or after the conclusion of the treaty...". The obligation of a Government, as the agent of a State, to carry out the State's treaty obligations is in no way affected by the fact that the treaty was not actually concluded by that particular Government but by some previous Govern-

---

[20] *I.C.J. Reports 1951*, p. 21.

[21] Rapporteur's second (1957) report (A/CN.4/107), paras. 82-85 of the commentary.

[22] See the Rapporteur's third (1958) report (A/CN.4/115), commentary, paras. 88-90.

[23] See Rapporteur's first (1956) report (A/CN.4/101).