ment or administration; for the change of Government has in no way affected the continuity of the *State,* and therefore at no point has the treaty obligation been terminated or diminished. Nor does it matter by what means the particular Government concerned has come into power, whether in the ordinary course of events or by some abnormal or "unconstitutional" means. If it purports to be and in fact is the Government of the State, it must carry out the State's international obligations.

27. *Paragraph 2* states certain particular consequences of the general principle enunciated in paragraph 1. It is in relation to these matters that the principle of the unity and continuity of the State comes most frequently into play as respects treaty obligations. With reference to the general principle of the identity and continuity of the State, the following passage from Hall is cited because of its importance with reference to the far-reaching effects (*vide infra, passim*) of the fact that governments are only the agents of the State and not the State itself: [24]

> "It flows necessarily from this principle that internal changes have no influence upon the identity of a State. A community is able to assert its right and to fulfil its duties equally well, whether it is presided over by one dynasty or another, and whether it is clothed with the form of a monarchy or a republic. It is unnecessary that governments, as such, shall have a place in international law, and they are consequently regarded merely as agents through whom the community expresses its will, and who, though duly authorized at a given moment, may be superseded at pleasure. This dissociation of the identity of a State from the continued existence of the particular kind of government which it may happen to possess is not only a necessary consequence of the nature of the state person; it is also essential both to its independence and to the stability of all international relations. If, in altering its constitution, a State were to abrogate its treaties with other countries, those countries in self-defence would place a veto upon change, and would meddle habitually in its internal politics. Conversely, a State would hesitate to bind itself by contracts intended to operate over periods of some length, which might at any moment be rescinded by the accidental results of an act done without reference to them. Even when internal change takes the form of temporary dissolution, so that the State, either from social anarchy or local disruption, is momentarily unable to fulfil its international duties, personal identity remains unaffected; it is only lost when the permanent dissolution of the State is proved by the erection of fresh States, or by the continuance of anarchy so prolonged as to render reconstitution impossible or in a very high degree improbable."

28. *Sub-paragraph* (a) *of paragraph 2.* No better statement of the *rationale* of this rule could be found than that contained in the commentary to article 24 of the Harvard Draft Convention on Treaties,[25] which gives the following explanation:

> "Forms of government and constitutional arrangements in these days are constantly being changed, and if the enjoyment of treaty rights and the duty of performance were dependent upon the continuance of the *status quo* in respect to the governmental organization or constitutional system of the parties, one State would never be able to count with certainty on rights which have been promised it by another—and promised, it may be, for a period of indefinite duration. If changes in the organization of a State's form of government or modifications of its constitutional system had the effect of terminating or altering its treaty obligations or of rendering them voidable, a State which desired to avoid or reduce its obligations would need only to introduce a change in the organization of its government or alter its constitutional system. If such changes produced that effect, States would hesitate to enter into treaties, because in that case one of the foundations of the treaty system, namely, the permanence of treaties, would cease to exist and treaty obligations would be terminable or impairable at the will of any party."

29. Of course, a particular treaty obligation may, *by reason of its actual subject-matter,* be such that it applies, and can only apply, on the basis that the particular form of government prevailing in the contracting States at the time of the treaty continues. Thus, to quote the Harvard Draft again:[26]

> "... a treaty between two States having the monarchical form of government may provide for the mutual protection of their respective monarchs or relate to matters affecting their royal families or with other matters peculiar to the monarchical form of government."

The Harvard Draft continues:[27]

> "Manifestly, the obligations of such a treaty would necessarily be affected by a transformation of one or both of these States into a republic."

However, as the Harvard Draft goes on to say,[28] such cases are and have always been rare, and no special provision is necessary for them. Furthermore, when they do occur, they are clearly covered by the principles either of impossibility of performance (see below, article 14, and also case (iv) in article 17 of part III of chapter 1 of the present Code[29]), or else by that of the complete failure of the *raison d'être* of the treaty or treaty obligation—a case which, as a ground of termination of a treaty, has already been considered as case (v) in part III of chapter 1 of the Code.[30] In all such cases, the justification for non-performance lies in the

---

[24] William Edward Hall, *A Treatise on International Law,* 8th ed., Pearce Higgins, 1924, p. 21.

[25] Harvard Law School, *Research in International Law,* III. *Law of Treaties.* Supplement to the *American Journal of International Law,* vol. 29, 1935, p. 1045.

[26] *Ibid.*

[27] *Ibid.*

[28] *Ibid.,* pp. 1045, 1046.

[29] Rapporteur's second (1957) report (A/CN.4/107). For comment, see paras. 98-100 of the commentary in that report.

[30] *Ibid.,* commentary, paras. 101-103.

particular circumstances and in the nature of the treaty, not in any general principle that a change of administration or régime is a ground for non-performance.

30. The Harvard Draft goes on to refer to the quasi-unanimity of the authorities in the above sense and cites a large number of them [31] from which it appears that they are "in complete agreement that, as a general principle, changes in the governmental organization or constitutional system of a country... have no effect on the treaty obligations of States which undergo such changes".[32] It may be of interest to cite some of the more striking passages from these authorities, as given in the Harvard Draft. Thus Vattel, as there quoted, says:[33]

> "Since, therefore, a treaty... relates directly to the body of the State, it continues in force even thought the State should change its republican form of government and should even adopt the monarchical form; for State and Nation are always the same, whatever changes take place in the form of government, and the treaty made with the Nation remains in force as long as the Nation exists."

The same principle was affirmed in Protocol No. 19 of the Conference on Belgian Affairs held in London in 1831:[34]

> "According to this higher principle, treaties do not lose their force by reason of any change in policy... the changes which have taken place in the status of a former State do not authorize it to consider itself released from its previous undertakings."

Similarly, in the Swiss case of Lepeschkin v. Gosweiler,[35] the Swiss Federal Tribunal said:

> "It is a principle of international law, recognized and absolutely uncontested, that the modifications in the form of government and in the internal organization of a State have no effect on its rights and obligations under the general public law; in particular, they do not abolish rights and obligations derived from treaties concluded with other States."

Finally, Moore stated:[36]

> "As a person invested with a will which is exerted through the government as the organ or instrument of society, it follows as a necessary consequence that mere internal changes which result in the displacement of any particular organ for the expression of this will, and the substitution of another, cannot alter the relations of the society to the other members of the family of States as long as the State itself retains its personality. The State remains, although the government may change; and international relations, if they are to have any permanency or stability, can only be established between States, and would rest upon a shifting foundation of sand if accidental forms of government were substituted as their basis..."

> "A State subject to periodical changes in the form of its government or in the persons of its rulers has a deeper interest, perhaps, in the maintenance of this doctrine than another more securely rooted in the principles of social order, but it is absolutely necessary to the whole family of States, as the only possible condition of intercourse between nations. If it was not the duty of a State to respect its international obligations, notwithstanding domestic changes, either in the form of the government or in the persons who exercise the governing power, it would be impossible for nations to deal with each other with any assurance that their agreements would be carried into effect, and the consequence would be disastrous on the peace and well-being of the world."

31. *Revolutionary changes of social and political orders.* While there is little difficulty, and an almost complete consensus of opinion as regards "ordinary" or constitutional changes of government, or even "normal", "unconstitutional" changes, it has been maintained in recent times that the same is not the case where the change goes beyond the sort of change of government or régime (whether regular or irregular) that is to be expected as one of the incidents of international life, the possibility of which States may be supposed to have taken into account in entering into treaties. According to this view, the position is different where the change goes beyond this and affects the whole social and political order of the State concerned. A good statement of this view was given by M. Korovin, Professor of International Law in the State University of Moscow, as follows:[37]

> "Every international agreement is the expression of an established social order, with a certain balance of collective interests. So long as this social order endures, such treaties as remain in force, following the principle, *pacta sunt servanda,* must be scrupulously observed. But if in the storm of a social cataclysm one class replaces the other at the helm of the State, for the purpose of reorganization not only of economic ties but the governing principles of internal and external politics, the old agreements, in so far as they reflect the pre-existing order of things, destroyed by the revolution, become null and void. To demand of a people at last freed of the yoke of centuries the payment of debts contracted by their oppressors for the purpose of holding them in slavery would be contrary to those elementary principles of equity which are due all nations in their relations with each other. Thus in this sense the Soviet Doctrine appears to be an extension of the principle of *rebus sic stantibus,* while at the same time limiting its field of application by a single circumstance—the social revolution."

---

[31] *Op. cit.*, pp. 1046-1051.

[32] *Ibid.*, p. 1046.

[33] E. de Vattel, *Le droit des gens ou principes de la loi naturelle appliqués à la conduite et aux affaires des nations et des souverains,* vol. I, reproduction of books I and II of 1758 edition (Washington, D.C., Carnegie Institution of Washington, 1916), book II, chap. XII, para. 185.

[34] Jules de Clercq, *British and Foreign State Papers,* vol. 18, p. 780.

[35] *Journal des tribunaux et revue judiciaire,* 1923, p. 582.

[36] John Bassett Moore, *History and Digest of the International Arbitrations to which the United States has been a Party* (Washington, D.C., United States Government Printing Office, ed. 1898), p. 3552.

[37] "Soviet Treaties and International Law" in *American Journal of International Law,* 1928, p. 763.

Some of the reasoning in this passage is clearly unacceptable. But certain underlying ideas merit serious consideration. Commenting upon it, the Harvard Draft says:[38]

> "It can hardly be denied that there is some foundation for the distinction which the Soviet jurists and the writers on international law cited above make between the effect on treaty obligations of ordinary governmental and constitutional changes, on the one hand, which occur normally in the process of the political and constitutional development of a State, and changes, on the other hand, which are the result of violent revolutions which involve not only an alteration of the governmental organization or constitutional régime of the State but also a complete transformation of the political and even the economic and social organization of the State, and which result in the establishment of a new order of things with which treaties concluded under preceding régimes are wholly or largely incompatible. But like other distinctions in law and political science which may be sound in principle, the lack of precise criteria by which the line of demarcation between the two types of changes can be drawn makes it difficult to lay down a rule which would be just and free from danger but which at the same time would recognize exceptions to the general principle that the obligations of a State are not affected by changes in its governmental organization or constitutional system. See as to this, Charles Calvo, *Le droit international théorique et pratique*, 5th ed. (Paris, Arthur Rousseau, 1896), vol. I, sect. 100."

The last sentence of this passage brings out very well the dangers of admitting an exception to the general rule in order to meet this type of case—dangers which could well be serious for the integrity and continuity of treaties. The Harvard Draft continues:[39]

> "Under these circumstances, it would seem to be the safer course to adopt a rule which enunciates the general principle and to leave States whose governments and constitutional systems have undergone profound and far-reaching transformations, such as those referred to above, which result in a new order of things to which existing treaties are no longer applicable, to seek by negotiation a revision or abrogation of the treaties or to invoke the application of the rule *rebus sic stantibus* as a means of freeing themselves by an orderly and lawful procedure from the obligation of further performance."

The present Rapporteur is content to leave it at that —remarking only that it is somewhat doubtful if the doctrine of *rebus sic stantibus* in any way necessarily applies in such a case, according to the principles laid down in respect of that doctrine in the Rapporteur's second (1957) report.[40] Nevertheless, provided the State concerned is willing, in invoking the doctrine of *rebus sic stantibus*, to submit to the procedures provided by article 23 in part III of chapter 1 of the present Code,[41] it would at least be entitled to argue the case and seek the application of that doctrine.

32. *Sub-paragraph* (b) *of paragraph 2.* The principle of the singleness—that is of the unity and continuity— of the State equally entails that, when a breach of treaty occurs, it is quite immaterial through what agency of the State it takes place, or what particular organ, whether by act of commission or omission, has caused, or is (*on the internal plane*) responsible for the breach. This is a purely domestic matter. Internationally, the result is the same: the treaty has been broken, and the State (which is an indivisible whole internationally) is responsible.

33. The most obvious and frequent application of this principle occurs in the field of legislation and of the acts or failures of the legislature in relation to the implementation of the treaty. This aspect of the matter will be more conveniently considered in connexion with article 7 below, under the head of the supremacy of international law over domestic law. A not less striking application of the rule is afforded by considering the position of the judiciary. As to this, the Harvard Draft says:[42]

> "Under the jurisprudence or practice of many States the courts are obliged to apply, and the executive authorities to enforce, municipal legislation rather than treaty stipulations with which the legislation is inconsistent. If the enactment of legislation of this kind affords no such excuse, the action of the courts of the State which enacted it in upholding its infra-territorial validity, or of the executive authorities in enforcing it, when they are obliged under their own municipal law to do so, does not add anything to the legitimacy of the excuse for non-performance. The municipal law of the State which thus obliges its courts and executive authorities is itself inconsistent with the principle here asserted, namely, the obligation of a State to fulfil its treaty engagements regardless of what its municipal law my require."

Even in the United States, where Congress exercises such a marked influence on treaty implementation, writers of great authority express the same view. Thus Hyde says:[43]

> "It must be clear that, while an American court may deem itself obliged to sustain an Act of Congress, however inconsistent with the terms of an existing treaty, its action in so doing serves to lessen in no degree the contractual obligation of the United States with respect to the other party or parties to the agreement. The right of the nation to free itself from the burdens of a compact must rest in each instance on a more solid basis than the declaration of the Constitution with respect to the supremacy of the laws as well as treaties of the United States."

All contrary views are based on the cardinal error of treating the State as a divisible entity for international purposes—an error which the government of the State

---

[38] *Op. cit.*, p. 1054.

[39] *Ibid.*, p. 1054.

[40] See A/CN.4/107, and in particular articles 21 and 22 together with paras. 141-179 of the commentary in that report.

[41] *Ibid.*, para. 180 of the commentary.

[42] *Op. cit.*, pp. 1035, 1036.

[43] *Ibid.*, p. 1036.

in breach of the treaty not infrequently itself commits. Thus governments have been known to disclaim responsibility on the ground that the breach was not their act, but that of the legislature or judiciary, over which, so they say (and this may be correct internally), they have, constitutionally, no control. Thus, they say, they are not responsible for what has occurred. On the internal plane, this may be true. But internationally, the exact attribution of responsibility internally is a domestic matter, and irrelevant. The responsibility or otherwise of the government as such—i.e., of the executive organ—simply does not arise, for the *State* is responsible. The government may be morally blameless, but it must, as the executive organ, accept responsibility for a failure of the statal system as a whole to carry out treaty obligations incurred, by and on behalf of the State as such. As good a statement as can be found of the error involved by any other view was given by Sir Eric Beckett in the following terms:[44]

> "... this contention is based on an error—an error which consists in attributing international responsibility to the government alone (though the government is merely the executive organ of the entity internationally responsible) instead of attributing it to the State *itself*, which is an entity that comprises the legislative organ, the judicial organ, and even the people, as well as the executive organ, the government."

34. *Sub-paragraph* (c) of *paragraph 2*. It is unnecessary to linger over this rule, which is well recognized, and equally derives from that of the continuing identity of the State which, according to Hall,[45] "is considered to subsist so long as a part of the territory which can be recognized as the essential portion through the preservation of the capital or of the original territorial nucleus, or which represents the State by continuity of government, remains either as an independent residuum or as the core of an enlarged organization". Where identity is completely lost as a result of territorial changes (annexation, merger, division into two or more States, etc.), a case of state succession arises. The treaty obligation may or may not devolve on the new State or States concerned, but that is a matter of the law of state succession which does not affect the principle of the present sub-paragraph.

35. It may of course be that certain territorial changes render the further performance of the treaty literally *impossible*; but, in that case, the legal justification for non-performance would arise from the impossibility itself, not from the territorial change as such, which would merely be the cause of the impossibility.

36. Naturally, if the obligation relates specifically to territory lost as the result of the change, there will, as the sub-paragraph recognizes, no longer be any duty to carry out the obligation. But this is really simply a specific case of impossibility and need only be mentioned for the avoidance of doubts.

*Article 7. Obligatory character of treaties: the principle of the supremacy of international law over domestic law*

37. *Paragraph 1*. This states the principle in its traditional form in so far as it relates to treaties. In commenting, it is not necessary to go into philosophical issues concerning the precise relationship between international law on the one hand and domestic or national law on the other, or to discuss theories of monism, dualism, etc., especially since, despite the great theoretical divergencies between these doctrines, the practical result of them all, though arrived at by different means, is the same and is as stated in the article.[46]

38. "...take precedence of, and prevail *internationally*..." The article does not attempt to say that, in the event of a conflict between a treaty obligation and some domestic law, the treaty law will necessarily prevail *on the internal plane,* in the sense that the judge must give effect to the treaty obligation even if this involves contravening some provision of the domestic law which is otherwise binding upon him. The point is that, whatever happens, *the international obligations and responsibilities of the State are not affected.* If the judge in fact applies the treaty, there will be no breach of an international obligation. If he does not, then the responsibility of the State will be entailed, and this will not be affected by the fact that, purely as a matter of domestic law, he was justified in his act, for, in such a case, the domestic law itself is at fault, and responsibility exists on that ground. As to this, see the remarks already made in paragraphs 31 and 33 above.

39. *Paragraph 2.* This and the succeeding paragraph state the main practical deductions to be drawn from the general principle laid down by paragraph 1. The *rationale* of the principle, and of its consequences in the treaty field, was expressed by the United States Secretary of State with reference to the Cutting case, as follows:[47]

> "...if a government could set up its own municipal laws as the final test of its international rights and obligations, then the rules of international law would be but the shadow of a name and would afford no protection either to States or to individuals. It has been constantly maintained and also admitted by the Government of the United States that a government cannot appeal to its municipal regulations as an answer to demands for the fulfilment of international duties. Such regulations may either exceed or fall short of the requirements of international law and in either case that law furnishes the test of the nation's liability and not its own municipal rules. This proposition seems now to be so well understood and so generally accepted, that it is not deemed necessary to make citations or to adduce precedents in its support."

Attention may also be called, in illustration of the general principle, to the well-known case of the

---

[44] "Les questions d'interêt général au point de vue juridique dans la jurisprudence de la Cour permanente de Justice internationale", *Recueil des cours de la Haye*, vol. 39 (1932, I), p. 155. Sir Eric Beckett was Principal Legal Adviser to the Foreign Office, London, 1945-1953.

[45] *Hall, op. cit.* (see footnote 24).

[46] On this subject, see the Rapporteur's lectures given at The Hague Academy of International Law in 1957, sections 41-47 (to be published in due course in the *Recueil des cours*).

[47] *Papers relating to the Foreign Relations of the United States,* 1887, p. 751; Moore, *A Digest of International Law,* vol. 2, 1906, p. 235.

*Alabama*, in which the fact that United Kingdom legislation was deficient in provisions enabling the Government to prevent unneutral expeditions from being fitted out and leaving the country in time of war (the United Kingdom being neutral), was held not to afford any answer to a charge of a breach of the rules of neutrality.[48] The principle involved was stated as follows in the United States argument in the case:[49]

> "It must be borne in mind, when considering the municipal laws of Great Britain, that, whether effective or deficient, they are but machinery to enable the Government to perform the international duties which they recognize, or which may be incumbent upon it from its position in the family of nations. The obligation of a neutral State to prevent the violation of the neutrality of its soil is independent of all interior or local law. The municipal law may and ought to recognize that obligation; but it can neither create nor destroy it, for it is an obligation resulting directly from international law, which forbids the use of neutral territory for hostile purpose."

40. That the same principle applies not merely to conflicts with ordinary provisions of municipal law, but also to conflicts with provisions of the constitution of the State concerned, was made clear by the Permanent Court of International Justice in the case of the Treatment of Polish Nationals in Danzig, when the Court said:[50]

> "It should...be observed that...according to general principles of law... a State cannot adduce as against another State its own Constitution with a view to evading obligations incumbent on it under international law or treaties in force... it results that the question of the treatment of Polish nationals or other persons of Polish origin or speech must be settled exclusively on the basis of the rules of international law and the treaty provisions in force between Poland and Danzig."

The Permanent Court made the same affirmation in regard to municipal law in the Graeco-Bulgarian Communities case, as follows:[51]

> "...it is a generally accepted principle of international law that in relations between Powers who are contracting Parties to a treaty, the provisions of municipal law cannot prevail over those of the treaty."

41. "...whether enacted previously or subsequently to the coming into force of the treaty...", "...nor by deficiencies or *lacunae*..." It is obviously immaterial (because the practical result is the same—namely, inability to perform the obligation) whether the conflict arises from some positive provision, *a contrario*, of the local law or constitution; or negatively, by reason of a lack of such enabling provisions as may be required internally for the execution of the treaty; and similarly, whether these conflicts or deficiencies were in existence at the time when the treaty entered into force, or have been created, or have come about, subsequently.

42. "...or special features or peculiarities of the law or constitution..." This is taken from article 23 of the Harvard Draft, and by way of comment reference may be made to the discussion on pages 1039 to 1044 of the relevant volume.[52] The case is there considered mainly with reference to the special features of federal constitutions; but clearly the principle is of general application. The authors of the Harvard Draft evidently took the view that, although under a given federal constitution certain powers may be reserved to the component states of the Federation, so that the federal government cannot intervene in the matters thus regulated, this would not absolve the Federation from responsibility for a failure to carry out a treaty or other international obligation. In the last resort, the constitution can be amended, and, if it is not, the State must abide by the international consequences of an inherent inability to carry out its international obligations in certain respects. However, most federal constitutions vest in the federal authority the power to conduct the foreign relations of the State. This power involves a right for the federal legislature to legislate in such manner as may be required to control the action of the various component states (or withdraw from them certain powers) in relation to foreign affairs. Thus the Harvard Draft, citing a number of United States authorities, says[53] that

> "...if, as a result of the governmental organization of a State, the execution of its treaty obligations is dependent in part upon the action of the local governments and it is within the power of the national government to remedy this situation by withdrawing from the local governments the authority which they have in respect of the execution of treaties and transferring it to the national government, and if it refuses to do this, it should likewise bear the responsibility for the non-performance of any treaty obligations which may result therefrom. This appears to have been admitted by Presidents Harrison, McKinley, and Roosevelt, who urged Congress to enact legislation of this kind which would enable the United States to enforce more effectively its treaty obligations in respect to the treatment of aliens."

By way of illustration, two cases are cited:[54]

> "Switzerland acted on this principle when, after becoming a party to the Paris Convention of March 20, 1883, for the protection of industrial property, a matter to which the legislative competence of the Confederation did not extend, Article 64 of the Swiss Federal Constitution was amended to bring

---

[48] This case led directly to the passing of the so-called "Foreign Enlistment Act", 1870, in the United Kingdom, in order to prevent any such occurrence in the future.

[49] *Papers relating to the Treaty of Washington, Geneva Arbitration,* 1872, p. 47.

[50] Publications of the Permanent Court of International Justice, *Judgments, Orders and Advisory Opinions,* series A/B, No. 44, p. 24.

[51] *Ibid.,* series B, No. 17, p. 32.

[52] See footnote 15.

[53] *Ibid.,* p. 1043.

[54] *Ibid.,* pp. 1043, 1044.