the protection of industrial property within the competence of the national government and thus enable the State to execute the stipulations of the treaty... It may be assumed that the Congress of the United States acted on the same principle when, by the Act of August 29, 1842, passed as a result of the McLeod affair, it extended the jurisdiction of the federal courts to cover such cases, and thus removed the possibility of future conflicts with foreign countries arising out of incidents over which the local rather than the national courts formerly had jurisdiction."

43. *Paragraph 3.* This paragraph has been inserted because of the recent decision of the International Court of Justice in the Guardianship of Infants case (Netherlands v. Sweden)[55] which, although it certainly cannot have been intended by the Court to throw doubt on the principle of the prevalence of treaty obligations over domestic law provisions, appears to have implications dangerous to that principle, as was cogently brought out in the (on this point) dissenting views expressed by Sir Hersch Lauterpacht. Without attempting to go into all the facts of this case, the question it raises may be stated as follows. There may exist a treaty between two States about subject-matter (A)—e.g., " Guardianship of Infants ", where the infant is a national of one of the parties resident in the territory of the other—and the specific laws of the parties respecting the guardianship of infants as such may be in perfect conformity with the treaty. However, there may be a law on another subject (B), which is technically distinct from (A) —e.g., " Child Welfare ", " Protection of Young People " etc.—and the provisions of this law may be such that if applied they will, or may, result in consequences contrary to those apparently contemplated by the treaty. In such a case, the defendant party may seek to justify its action on the ground that the treaty cannot have been intended to prejudice the operation of general laws not directly concerned with the subject-matter of the treaty, and having a different primary object. In the Guardianship of Infants case before the International Court of Justice, this type of contention resulted in custody of the person of a minor, which (as the relevant treaty *prima facie* required) would, on " guardianship " grounds, have been conferred on a certain person, being conferred on someone else, on " child welfare " grounds.

44. It is clear that all such cases must depend very much on their own facts, and also on the interpretation of the particular treaty involved; and the Rapporteur is not concerned here to question the correctness of the decision of the Court as such, which, as the separate opinions showed, could also be based or explained on other grounds (see below, paras. 47 and 48; also footnotes 56 and 62). This type of contention nevertheless has disquieting implications. No doubt, in theory, a distinction can be drawn between, on the one hand, the case where a State clearly evades the application of a treaty by relying on provisions of its legislation that ostensibly relate to another subject, but nevertheless lead to non-performance of the treaty; and, on the other hand, cases where the treaty itself can be interpreted as having been intended by the parties only to prevent (or compel) some particular action, on certain specific grounds—but not necessarily on others, if applicable. But the distinction is nevertheless a fine one, which in many cases it will be difficult to draw clearly or satisfactorily.

45. In his separate (but, on the main issue, concurrent)[56] opinion, Sir Hersch Lauterpacht stated the question as follows:[57]

> " If a State enacts and applies legislation which, in effect, renders the treaty wholly or partly inoperative, can such legislation be deemed not to constitute a violation of the treaty for the reason that the legislation in question covers a subject-matter different from that covered by the treaty, that it is concerned with a different institution, and that it pursues a different purpose ? "

Sir Hersch went on to point out that the difficulty was increased by the fact that the conflict between the treaty and the legislation in question may be concealed, or may be " made to be concealed ", by what might be " no more than a doctrinal or legislative difference of classification "; and he drew attention to the fact that an " identical provision which in the law of one country forms part of a law for the protection of children may, in another..., be included within the provisions relating to guardianship ". " That," he said, " as will be seen, is no mere theoretical possibility."[58] He refused to admit that a valid distinction could be based on the mere fact that the treaty and the law had different objects, if in practice the substance was the same, and added that when a State concludes a treaty " it is entitled to expect that that treaty will not be mutilated or destroyed by legislative or other measures which pursue a different object but which, in effect, render impossible the operation of the treaty or of part thereof ".[59] The correct view was, therefore, so he thought, that a treaty must be held to cover " every law and every provision of a law which impairs, which interferes with, the operation of the treaty ".[60]

46. In giving practical illustrations of what might occur, Sir Hersch Lauterpacht said:[61]

> " The following example will illustrate the problem and the consequences involved: States often conclude treaties of commerce and establishment providing for a measure of protection from restrictions with regard to importation or export of goods, admission and residence of aliens, their right to inherit property, functions of consuls, and the like. What is the position of a State which has concluded a treaty of that type and then finds that the other party

---

[55] *I.C.J. Reports 1958*, p. 55.

[56] Sir Hersch concurred in the *dispositif* of the decision, namely, the rejection of the Netherlands claim; but he did so on the *ordre public* point mentioned below (see paras. 48 and 115) which the parties had treated as the main issue in the case, although the Court itself thought it unnecessary to pronounce on it.

[57] *I.C.J. Reports 1958*, p. 80.

[58] *Ibid.*, pp. 80, 81.

[59] *Ibid.*, p. 81.

[60] *Ibid.*

[61] *Ibid.*, pp. 81, 82.

whittles down, or renders inoperative, one after another, the provisions of that treaty by enacting laws 'having a different subject-matter' such as reducing unemployment, social welfare, promotion of native craft and industry, protection of public morals in relation to admission of aliens, racial segregation, reform of civil procedure involving the abolition of customary rights of consular representation, reform of the civil code involving a change of inheritance laws in a way affecting the right of inheritance by aliens, a general law codifying the law relating to the jurisdiction of courts and involving the abolition of immunities, granted by the treaty, of public vessels engaged in commerce, or any other laws 'pursuing different objects'? It makes little or no difference to the other party that the treaty has become a dead letter as the result of laws which have so obviously affected its substance, but which pursue a different object." [62]

Sir Hersch eventually went on to make the following general statements of principle: [63]

"A State is not entitled to cut down its treaty obligations in relation to one institution by enacting in the sphere of another institution provisions whose effect is such as to frustrate the operation of a crucial aspect of the treaty. There is a disadvantage in accepting a principle of interpretation, coined for the purposes of a particular case, which, if acted upon generally, is bound to have serious repercussions on the authority of treaties."

" . . .

"Once we begin to base the interpretation of treaties on conceptual distinctions between actually conflicting legal rules lying on different planes and for that reason not being, somehow, inconsistent, it may be difficult to set a limit to the effects of these operations in the sphere of logic and classification."

47. It is on the views thus expressed by Sir Hersch Lauterpacht in this case that the Rapporteur has based paragraph 3 of article 7 of this section. As far as the principle of the thing goes, these views seem clearly correct. This is not to say that there may not be cases where, on the interpretation of the particular treaty, it appears that it did not purport to limit the freedom of action of the parties in certain respects, despite the fact that in some cases this could have consequences different from what would have resulted from the strict application of the treaty if no other considerations had existed. This indeed seems to have been the real basis on which the majority of the Court reached their conclusion.) [64] What is inadmissible is the *general proposition* that to recall Sir Hersch's language (see paragraph 46 above)—a State is entitled "to cut down its treaty obligations in relation to one institution by enacting in the sphere of another institution provisions whose effect is such as to frustrate the operation of a crucial aspect of the treaty".

48. Equally, there may be cases, or classes of treaties, where international law or custom implies a condition in the treaty, of such a nature as even to allow, on certain grounds, action that would otherwise be contrary to its *express terms*. The exception of *ordre public*, inherently to be implied in treaties dealing with private international law topics (on which a number of individual opinions in the Guardianship of Infants case —though not the decision of the Court itself—were based), is a case in point; and other cases are considered below in connexion with article 23. But this again is quite a different matter from a proposition of a general character permitting non-performance of a treaty merely because such non-performance can be based on the application of a law which, as a matter of classification, relates to some other field or institution.

*Article 8. Obligatory character of treaties: the case of conflicting treaty obligations*

49. *Paragraphs 1 and 2.* In principle, a State which becomes a party to two treaties that are in mutual conflict is nevertheless bound by both of them. This does not mean to say that it can in practice carry both of them out, but that it incurs international responsibility for the failure to perform whichever of them is not carried out. Which this is to be depends on considerations discussed in an earlier report.[65] Assuming (for otherwise there is no real conflict) that the two treaties were concluded with two different parties, then, for each of these two parties, the other treaty is *res inter alios acta,* and each of these parties is, by reason of the principle *pacta tertiis nec nocent nec prosunt,* entitled to insist on the due performance of the particular treaty concluded with itself, or on reparation for any failure to do so. It should perhaps be added that the Rapporteur has not felt it necessary to say any more here about the "effect" of a later treaty or treaty obligation on an earlier one than has already been said in his second and third reports, for two reasons. In the first place, the matter is primarily one of the interpretation of the two treaties or treaty obligations concerned. Secondly (apart of course from the cases coming within the scope of the

---

[62] Sir Hersch here pointed out that some of the laws he had just mentioned might be of such a nature as to come within the scope of certain exceptions always implied in treaties or in some classes of treaties—a matter considered below in connexion with article 23 of the present draft; but, he said, " the argument here summarized does not proceed on these lines. It is based on the allegation of a difference between the treaty and the law which impedes its operation ".

[63] *I.C.J. Reports 1958*, p. 83.

[64] See the Court's final conclusion reading as follows (*I.C.J. Reports 1958*, p. 71):

"It thus seems to the Court that, in spite of their points of contact and in spite, indeed, of the encroachments revealed in practice, the 1902 Convention on the guardianship of infants does not include within its scope the matter of the protection of children and of young persons as understood by the Swedish Law of June 6th, 1924. The 1902 Convention cannot therefore have given rise to obligations binding upon the signatory States in a field outside the matter with which it was concerned, and accordingly the Court does not in the present case find any failure to observe that Convention on the part of Sweden."

[65] See the Rapporteur's third (1958) report (A/CN.4/115), articles 18 and 19 and commentary thereto.

present article), either the later obligation terminates the earlier (whether by actual cancellation or by replacing it with an amended version), or the existence of the earlier one has the effect of invalidating the later. These aspects of the effects of treaties on one another are therefore, or should be, fully covered by the sections on termination and essential validity. Where, on the other hand, neither of the two treaties or treaty obligations is either terminated or invalidated by the other, but yet they conflict, then and only then will the situation contemplated by the present article arise.

50. *Paragraph 2. Sub-paragraphs* (a) *and* (b) require no comment beyond what has already been made in an earlier report.[66] Strictly, in neither case is there any true conflict. In the one, the parties have by their own action eliminated one of the two sets of obligations concerned; and in the other, one set of obligations is rendered null and void.

51. *Sub-paragraph* (c) *of paragraph 3.* Article 103 of the Charter of the United Nations provides that " in the event of a conflict between the obligations of the Members of the United Nations under the Charter and their obligations under *any other* international agreement, their obligations under the Charter are to prevail." Since all Members of the United Nations, whether in relation to pre-existing or to subsequent treaties, have become Members on this basis, it must be assumed that they have also accepted the fact that if any treaty obligations owed to them by other Members conflict with the obligations of those Members under the Charter, the latter will prevail—with the result that performance of the treaty cannot be claimed, and no responsibility will be incurred *vis-à-vis* another Member State of the United Nations in respect of such non-performance.

52. In respect of non-member States, on the other hand, the position cannot be quite the same. It is clear that for the Member State, its Charter obligations will duly prevail over those of any other treaty, even though the other party to the treaty is not a Member of the United Nations. It is less easy, however, to hold that, in such circumstances, the Member State incurs no responsibility at all for the breach of the treaty, and that the non-member State, party to the treaty, has no valid international claim. On the basis of the principle *res inter alios acta* and *pacta tertiis nec nocent nec prosunt*, this provision of the Charter cannot be a ground *vis-à-vis* a non-member State for violating a treaty with such a State. The Charter obligation may prevail in the sense that the other treaty cannot be carried out because of the Charter obligation and of Article 103; but it would seem that the Member State will nevertheless be under an obligation to make due reparation to the non-member for the breach involved.[67]

SUB-SECTION ii. LIMITS OF THE TREATY OBLIGATION (CIRCUMSTANCES JUSTIFYING NON-PERFORMANCE)

53. The extent of the treaty obligation is not unlimited, nor does the obligation prevail in all circumstances. The object of this sub-section is to group together a statement of those circumstances in which non-performance of a treaty obligation would, in principle, be justified. This is considered under three heads:

(a) General principles and classification;

(b) Non-performance justified on general grounds of law;

(c) Non-performance justified by virtue of a term or condition implied by law in the treaty.

RUBRIC (a). GENERAL PRINCIPLES AND CLASSIFICATION

*Article 9. General definition of non-performance justified by operation of law*

54. The point sought to be brought out in this article is that the grounds of non-performance mentioned in the present sub-section do not derive from (and therefore they necessarily operate independently of) any specific term of the treaty. It goes without saying that, if the treaty itself provides certain grounds of non-performance or permits of non-performance in certain circumstances, then non-performance on those grounds or in those circumstances will be justified; but that is a matter of the interpretation of the treaty, and not therefore within the scope of the present chapter.

*Article 10. Scope of the present sub-section*

55. The object of this article is to make it clear that the case dealt with in the present sub-section, though a related one, is distinct from that of the grounds upon which, by operation of law, a treaty as such, or a particular part of it, can be regarded as wholly terminated or indefinitely suspended. The latter case has been considered elsewhere.[68] The present sub-section assumes that the treaty itself remains in force, and considers the circumstances in which, despite this fact, its non-performance, either in whole or in part, may become justified. Consequently, whereas in the report on the termination of treaties (Rapporteur's second (1957) report) the grounds of termination there considered looked towards a permanent or semi-permanent outcome—namely, complete termination, or at least indefinite suspension, of the treaty, either as a whole or as regards some particular obligation under it—the present sub-section has in view mainly non-performances of a temporary or *ad hoc* character which, so far from having any element of permanence, look forward to a *resumption* of performance so soon as the occasion that justified the non-performance is past. It is in this that the real difference between the subject of " grounds of non-performance " and that of " grounds of termination " lies, and which calls for their separate treatment, despite the close analogy between them.

56. Notwithstanding these considerations, the Rapporteur has thought it desirable to include two cases in which, in the nature of things, the non-performance will

---

[66] *Ibid.*

[67] See the similar conclusion reached in paragraph 85 of the commentary in the Rapporteur's third (1958) report (A/CN.4/115).

[68] See the Rapporteur's second (1957) report (A/CN.4/107), articles 16-23 and commentary thereon.

be permanent and for all practical purposes the obligation will terminate or lapse (subject in one case to the rules of state succession). These cases form the subject of articles 21 and 22 below. They have already figured in the sections on termination (see footnote 68 hereto), although in one case perhaps not quite adequately. They are re-introduced here in order to take the opportunity of distinguishing them from the superficially similar cases arising with reference to the subject of Essential Validity which was considered in the Rapporteur's third (1958) report.[69] As to this, see below in the commentary to articles 21 and 22. (Some rearrangement of all this may eventually be desirable.)

57. Article 23, on the other hand, which may also give rise to semi-permanent situations of non-performance, involves considerations of a different order, and had to be included in the present sub-section.

### Article 11. Classification

58. This article attempts to give a general statement, under main heads, of the circumstances in which non-performance of a treaty obligation may be justified. *Paragraph 1* is little more than a restatement in more analytical form of article 9, the commentary to which is contained in paragraph 54 above.

59. *Paragraph 2.* There is a certain ambiguity in the division in this paragraph between justifications for non-performance operating *ab extra* and *ab intra* the treaty. Strictly, both operate *ab extra,* inasmuch as neither derives from any specific *term of the treaty* permitting non-performance, or even from a term of the treaty which can be read by implication as permitting non-performance. The grounds in question are either general legal grounds justifying non-performance having nothing at all to do with the treaty, or else they can consist of conditions which, by general operation of law, are to be read into the treaty, even though they are not expressed or even implied by any actual term of it. All these grounds are considered under rubric (*b*) of the present sub-section.

### Article 12. Certain general considerations applicable in all cases where a right of non-performance by operation of law is invoked

60. Whatever the ground of non-performance, and however it may arise, assuming it to be a ground provided for in the present sub-section, certain common considerations will govern its operation.

*Paragraph 1.* This paragraph is self-explanatory. Obviously no ground of non-performance, however much otherwise justified by general considerations of law, can be invoked if specifically excluded by the treaty itself. Moreover, just as in the case of war, some treaties are specifically concluded with a view to application in time of war or hostilities (Hague, Geneva Conventions, etc.)—and therefore obviously do *not* fall under what might otherwise be the terminative or suspensory effect of war on treaties—so equally may some treaty obligations be specifically intended to apply to some of the situations contemplated in the present sub-section.

61. *Paragraph 2.* Some grounds of non-performance, such as impossibility of performance, do not involve any choice; but in most cases, they involve circumstances affording a *faculty* of non-performance to the party concerned, and that party can elect whether to exercise this faculty or not. This being so, it would seem that such party must exercise the faculty within a reasonable time. If it does not do so, it will be taken to have accepted the situation that originally gave rise to the faculty as being one that does not affect its obligation to continue performance of the treaty in full. Naturally, this principle cannot be invoked by any other party to the treaty not itself performing its obligations under the treaty.

62. *Paragraph 3.* The principle involved here is the same, *mutatis mutandis,* as the one already discussed in an earlier report in relation to the grounds for the termination of treaties. For comment reference may be made to the Rapporteur's second (1957) report (A/CN.4/107), paragraph 91 of the commentary.

63. "...(unless this act or omission was both necessary and legally justified)...". This deals with a rather difficult point, perhaps not altogether satisfactorily handled in the earlier report referred to. Some contributory acts might involve no illegality, yet be unnecessary and such as could have been avoided. *Per contra* no *illegal* act can be said to be "necessary". Therefore, only if the contributory act (where it exists) can be shown to have been both lawful *and* necessary, will it not preclude the party concerned from invoking the relevant ground of non-performance.

64. *Paragraph 4.* It is sufficient to refer to the commentary to article 16, paragraph 5, in the Rapporteur's second (1957) report (A/CN.4/107, para. 92 of the commentary).

RUBRIC (*b*). NON-PERFORMANCE JUSTIFIED *ab extra* BY OPERATION OF A GENERAL RULE OF INTERNATIONAL LAW

### Article 13. Acceptance of non-performance by the other party or parties

65. This article and articles 14 to 19, inclusive, deal with the grounds of non-performance based on general legal considerations and having no reference to the particular treaty. Article 13 itself requires no explanation, since it is obvious that, even if a non-performance is not intially justified, its acceptance by the other party or parties concerned will suffice to legitimize it. As is stated in paragraph 2, however, to have this effect the acceptance must be clear and unmistakable, and must indicate that the other party does more than merely tolerate the non-performance in the sense of not seeking any redress for it and not taking counter-action or having recourse to any available remedies. All these things can occur without the other party having in any way given its consent to the non-performance. There must consequently be such an acceptance as amounts to an agreement by the other party that performance shall not take place.

---

[69] See footnote 22.

*Article 14. Impossibility of performance*

66. *Paragraphs 1 and 2.* In connexion with these paragraphs, it will be sufficient *mutatis mutandis* to refer to paragraphs 98 to 100 of the commentary to the Rapporteur's second report, dealing with the case of impossibility as a ground for the termination of a treaty, except of course that, *ex hypothesi,* the requirement of the permanent and irremediable character of the impossibility —necessary as a ground of termination—will not apply in the present case.

67. "Temporary or *ad hoc* impossibility of performance..." A permanent impossibility would of course bring the treaty or the particular obligation to an end altogether. The case here contemplated is therefore necessarily that of a temporary impossibility justifying non-performance for the time being. This really applies to all the grounds of non-performance considered in this report—at least to all those coming under rubric (*a*) of the present sub-section (see paras. 55-57 above). The point (which, though made with reference to the question of *force majeure* (i.e., impossibility), really applies in respect of all the grounds of non-performance considered in the present rubric), is well brought out in the following passage from Rousseau:[70]

> "The causes for the lapse of treaties should not be confused with *force majeure,* which may create an obstacle to the performance of a treaty. This distinction is made both in theory and in conventional law. On the one hand, Professor Scelle clearly distinguishes impossibility of fulfilment from desuetude *(Précis,* II, p. 419). On the other hand. the convention on treaties adopted at Havana on 20 February 1928 by the Sixth International Conference of American States deals in two separate articles with *force majeure* (art. 14) and the *rebus sic stantibus* clause (art. 15).

> "In international law, the effect of *force majeure* will be to exonerate a State from the responsibility which would normally devolve upon it for non-performance of a treaty. When the *force majeure* disappears, the obligation of performance will reappear, this being proof that the treaty subsists."

68. *Paragraph 3.* The reasons for this paragraph arise out of the very nature of the plea of *rebus sic stantibus.* It is obvious that this plea is never likely (and certainly ought not) to be raised, in respect of any provision of a treaty that is not fundamental to the treaty. It follows that, if there are valid grounds for the plea of *rebus sic stantibus* at all, they will be grounds for terminating the treaty altogether. The principle that the plea of *rebus sic stantibus* can only be put forward on a basis fundament to the continuation in force of the treaty has already been fully brought out and discussed in relation to articles 21 to 23 of part III of chapter 1 of the Code.[71] Change of circumstances having reference to a treaty obligation which is *not fundamental to the treaty* in question, can hardly itself be a fundamental change of circumstances of the kind required for the application of the principle of *rebus sic stantibus*; and it must be concluded therefore that that principle has no application to the case of the non-performance of a particular treaty obligation except in those cases where the obligation is fundamental, so that the principle *rebus sic stantibus,* if applicable at all, would tend towards the termination of the treaty. It is no doubt true that minor obligations may become obsolete. Their termination or justified non-performance may occur through acquiescence or desuetude, and it seems unnecessary to provide specially for such cases.

69. The Rapporteur has also considered whether what figured as case (v) in article 17 of the sections on termination of treaties,[72] namely, complete disappearance of the *raison d'être* of the treaty or treaty obligation, ought to figure in the present sub-section also. It is of course perfectly possible that a treaty as a whole remains in force, but that certain of its provisions have become obsolescent or inapplicable. An example of the kind of case involved might be that already considered above in another connexion, in paragraph 29 of this commentary—i.e., where there are in a treaty certain provisions based on the existence of a monarchical system of government for the parties, but they have subsequently become republics. However, it would seem that such cases would normally both be covered by the principle of impossibility of performance, and, in any event, would involve the total extinction or termination of the obligation concerned rather than any mere non-performance as such, so that the question of simple non-performance would not arise or be relevant. It does not therefore seem necessary to deal with this case in the present context.

*Article 15. Legitimate military self-defence*

70. The case here contemplated, namely, that of the temporary non-performance of a particular treaty obligation on grounds of legitimate military self-defence, is distinct from the case of the termination or suspension of a treaty as a whole by reason of war or hostilities, which falls to be dealt with as a separate matter.[73] War does not necessarily terminate or suspend all treaties or treaty obligations, but when it does do so, it effects either a complete termination or a suspension for the duration of the hostilities. What is contemplated in the present context is the case of a specific and more or less *ad hoc* non-performance of some particular obligation of an otherwise still subsisting treaty, on the ground of legitimate self-defence. The present case therefore assumes that the treaty remains in full force and, in principle, fully operative, and merely considers the circumstances in which, on grounds of legitimate self-defence, it may be permissible not to perform for the time being a particular obligation of the treaty, or possibly all the obligations of the treaty. It should perhaps also be mentioned that the case is, in principle, also distinct from that of impossibility of performance, although in practice impossibility might in fact well exist.

71. *Paragraph 1.* The Rapporteur does not consider that so-called "necessity", sometimes suggested as a general ground justifying non-performance of treaty

---

[70] Charles Rousseau, *Principes généraux du droit international public* (Paris, Editions A. Pédone, 1944), vol. I, p. 365.

[71] See A/CN.4/107, paras. 141-180 of the commentary.

[72] *Ibid.,* paras. 101-103 of the commentary.

[73] *Ibid.,* para. 106 of the commentary.