obligations, can (considered as a category) be regarded as being a valid ground of non-performance. To put the matter differently, *the only kind of necessity which entails that justification* is legitimate military self-defence. Again, the term "military" has been used advisedly in order to exclude other contexts in which the term "self-defence" has recently come to be used, such as "economic self-defence" or "ideological self-defence". Certain of these factors might be grounds upon which a party might seek to avail itself of any legitimate method of bringing the treaty to an end, or, in some cases, they might give rise to a situation of impossibility of performance, or of the application of the doctrine of *rebus sic stantibus,* which might cause or justify the termination of the treaty in accordance with principles set out in a previous report; but so long as the treaty subsists, they are not, in general, grounds for failing to perform its obligations. The case of military self-defence is different in principle, provided that the conditions specified by *sub-paragraphs (a) to (d)* are fulfilled.

72. These conditions are self-explanatory. The one contained in *sub-paragraph (b)* is necessary in order to avoid a pretext for the non-performance of treaty obligations in the course of an operation that does not properly consist of military self-defence being made.

73. *Paragraph 2* is self-explanatory. This, as already indicated in connexion with articles 10 and 14 (paras. 55-57 and 66-69 above), is of the essence of the type of non-performance not affecting the basic continuance of the obligation, which is contemplated in this part of the Code.

74. *Paragraph 3* is the corollary of paragraph 2 *(a).* Apart from the exception mentioned, it would seem that a mere threat, that may or may not materialize, is not a sufficient justification, and that nothing but acual operations, or an obvious and imminent threat of them ("in motion" so to speak) will justify non-performance of the obligation on this ground.

75. It should perhaps be mentioned here that the case chiefly contemplated by this article is where the other party to the treaty is not itself the author of, or concerned in, the military operations that have given rise to the need for non-performance. If the other party should be in that position, it would then become very probable that justification for non-performance would exist not merely on this but on certain of the other grounds mentioned in the sub-section (e.g., reprisals). Alternatively, the case is likely to come within the scope of the rules about the effect of "war" (including hostilities) on treaties—see paragraph 70 above, and footnote 73.

*Article 16. Civil disturbances*

76. This article requires no detailed comment beyond what has been furnished in connexion with article 15. Something must be said, however, about the principle involved. Little is contained in most of the authorities; but the [case is] recognized in Lord McNair's work on treaties,[74] in which a number of opinions of the Law Officers of the Crown in England are quoted in illustration of it (as indeed also of the general principle of article 15 above). Thus, in an opinion given by the King's Advocate[75] (the well-known Court of Admiralty jurist and internationalist, John Dodson), dated 6 February 1835, the following view was expressed:[76]

> "I must take leave, however, to add that under the special circumstances of a disputed succession to the Throne, and an internal Civil War, Spain may possibly be justified, by a necessary attention to her own security and preservation, in making prohibitory municipal regulations applicable to British Vessels in common with those of all other Foreign Friendly Nations, but which in case of certain Ports should not apply to her own vessels, since no Nation is bound to abide by a Treaty of Commerce under circumstances which render an adherence to it inconsistent with its own security."

In a footnote to this passage, Lord McNair expresses doubts about some of the possible implications of this view, as follows:[77]

> "This language comes dangerously near that which is used by some writers stating the *rebus sic stantibus* doctrine. But the temporary suspension of a commercial treaty in order to cope with a rebellion belongs to a different order of ideas."

The present Rapporteur also would query the reference to "security" at the end of Dodson's opinion. Clearly, what was involved (it being only a civil war) was not the security of the State as such (the international entity and party to the treaty), but that of the Government, or of a particular régime. It is therefore scarcely on this that any right of non-performance of an otherwise applicable treaty can be founded. Lord McNair founds it on the idea of an implied condition which international law reads into all treaties, so as to cover this kind of case (i.e., he would place the case in effect amongst those covered by rubric *(b)* of the present sub-section). It can certainly be viewed in that light; but the Rapporteur feels there are grounds for giving this exception a more objective status, as an independent rule of law rather than as a condition implied by law (in the treaty). The case is closely analogous to that of self-defence (article 15 above). A government is not the

---

[74] Arnold Duncan McNair, *British practice and opinions* (Oxford, Clarendon Press, 1938).

[75] The King's (or Queen's) Advocate in England was a member of an institution known as "Doctors' Commons", the members of which were trained (and were doctors) in the civil rather than the common law. They were usually known as "the civilians" or "the doctors". Their special field was canon law, succession, and maritime and international law. Doctors' Commons was founded in the 16th century, and continued until it was abolished by Act of Parliament in 1857, its functions having then been integrated in the general legal system of the country. In the preface to his *International Law Opinions* (Cambridge, 1956, 3 vols.), and in his address to the Grotius Society, "The Debt of International Law in Britain to the Civil Law and the Civilians" (*Transactions of the Grotius Society*, vol. 39, 1953), Lord McNair has shown the extent of the recourse which, over several centuries, the Crown and its executive advisers had to Doctors' Commons for advice on international law questions.

[76] McNair, *op. cit.*, p. 236.

[77] *Ibid.*

State; but, if it is the legitimate government, it represents the State and alone has the right to do so. It has a right to maintain itself against unconstitutional attempts to overthrow it, and no government can govern without the right—and as of right—to deal with riots and civil disturbances. If therefore it proves unavoidable for the exercise of these rights, then treaty obligations must, it is conceived, temporarily (though only temporarily) and subject, *mutatis mutandis,* to the same conditions as are mentioned in article 15, take second place.

### Article 17. *Certain other emergency conditions*

77. *Paragraphs 1 and 2.* Although, as already stated, the Rapporteur does not consider that any general doctrine of "necessity" can be included amongst the grounds justifying non-performance of a treaty obligation, it is generally considered that, in addition to the cases specified in articles 15 and 16, major emergencies arising from natural causes (or, in English legal terminology, from "acts of God") such as storm damage, earthquakes, volcanic eruptions, etc., may justify non-performance of a treaty obligation. In some of these cases a situation of impossibility, either permanent or temporary, may arise, and in all of them a situation of near impossibility, actual or moral, must exist in order to justify non-performance. *Paragraph 2* is intended to afford the necessary tests.

78. This case also is considered by Lord McNair,[78] who quotes an opinion given by Lord Phillimore (then Sir Robert Phillimore) as Queen's Advocate, dated 29 August 1866, with regard to a prohibition of the export of cereals, under famine conditions, from the (at that time) Turkish principalities of Moldavia and Wallachia. The opinion stated:[79]

> "That a Treaty of Commerce, such as that between Her Majesty and the Sultan (signed at Kanlidja 29th April, 1861), does not prevent one of the contracting States from prohibiting, in time of famine, the exportation of native produce necessary for the sustenance of the people—is a proposition of International Law, which may be said to be well established by the reason of the thing, and by the usage of States (Vattel L.2; c.12; s.179). Such a dearth appears, according to the letter of Mr. Consul Green (Bucharest 13th August, No. 24) actually to exist in these Principalities, so far as the Cereals, Maize, Barley, and Millet are concerned; upon the first of which crops the food of the people is said mainly to depend.
>
> Assuming this to be the true state of the case, I am of opinion that it was competent to the Government of these Principalities to prohibit, during the continuance of this dearth, the exportation of these Cereals. I am further of opinion that Her Majesty's Government cannot be advised to claim, as a matter of right, that Contracts for these Cereals made by British Merchants with Traders in the Principalities, previously to the issue of the order, shall be exempted from its operation, and that grain, thus already contracted for, shall be allowed to be exported."[80]

A somewhat similar opinion regarding a prohibition on the import of cattle, on grounds of public health, is also cited by Lord McNair as an illustration of the same principle. The present Rapporteur has, however, preferred to deal with this as a case illustrating the principle embodied in article 23, *sub-paragraph (c)* of this sub-section. The right to apply a country's normal quarantine regulations, despite what might appear to be the conflicting terms of a commercial treaty, has come to be regarded as an implied exception or condition to be read into commercial treaties as a class; whereas the case of emergency, due to famine conditions, seems rather to turn on objective principles of law outside the treaty. But no doubt the distinction may be a fine one.

79. *Paragraph 3* requires no comment.

80. *Paragraph 4* is intended to emphasize the fact that, despite the circumstances, mere difficulty in the performance of the treaty obligation is not in itself a ground justifying non-performance.

### Article 17A. *Previous non-performance by another party*

81. The reasons why no article dealing with this matter is included at this point in rubric (*b*) of the present sub-section are given in paragraph 102 below in connexion with article 20 in rubric (*c*), which contains provisions on the subject.

### Article 18. *Non-performance by way of legitimate reprisals*

82. *Paragraph 1.* This article involves an issue of considerable difficulty. Before discussing it, and in order to clear the ground, it should be mentioned that, as the opening paragraph of the article states, the case contemplated is not that of the application of the simple reciprocity condition normally to be read into all treaties, except such as fall within certain special categories,[81] and by reason of which if one party fails to carry out a treaty obligation of the "reciprocal" or "interdependent" type,[82] the other party is *pro tanto* absolved likewise from doing so in relation to that party—or, at any rate, the first party will have no legal ground of complaint if this consequence results from its own prior non-observance of the treaty. This case is covered by article 20 of this sub-section. It can of course also be regarded as a case of "reprisals", which in a certain sense it is. The right involved seems, however, to spring much less from the general international law principle of reprisals as such, and much more directly from the normal requirement of reciprocity implicit in the treaty relationship, and implied by law in all treaties involving reciprocal or mutually interdependent rights and obligations. Therefore, it seems best to deal with it

---

[78] *Op. cit.* in footnote 74.

[79] McNair, *op. cit.,* p. 240.

[80] Sir Robert Phillimore went on to say that compensation might be due in the latter class of case.

[81] See paragraph 3 (*e*) of article 18.

[82] These terms are explained in article 19, and the commentary thereto, in the Rapporteur's second (1957) report (A/CN.4/107).

in that way, leaving those cases that would not be covered by the reciprocity rule to be dealt with on a basis of reprisals.

83. "... where [the application of the reciprocity rule]... would not afford an adequate remedy, or would be impracticable..." Action on a "reciprocity" basis is only possible and effective in certain kinds of cases. It applies mainly in cases where the breach of treaty is negative in character, i.e., involves a simple non-performance of some requirement of the treaty. Thus, if State A withholds from State B certain mutual tariff concessions provided for by treaty, State B can proceed (and it will usually suffice for it to proceed) to an equivalent withholding of the same concessions from State A. But many breaches of treaty are not of this kind. For instance, if a treaty provides, *inter alia,* for the payment of certain sums of money, as compensation, by State A to State B, and A fails to pay, B may be unable to resort to like action because no specific payments are due from it to A, either under the treaty or otherwise, so that any counter-action, to be effective, must take another form. Again, if A, contrary to a treaty provision, nationalizes or expropriates property of B or its nationals in A's territory, it may be theoretically *possible,* but actually quite *impracticable,* for B to proceed to a like action in respect of the property of A or its nationals in B's territory—or perhaps there may be no such property, or only in amounts quite incommensurate with the B property existing in A territory.

84. It is clear, therefore, that—subject to the safeguards against abuse set out in paragraphs 3 and 4 of this article—effective self-redress [83] must include the possibility in certain cases of resorting to action that may involve not a precisely corresponding non-performance or infraction of the treaty in question, but a non-performance or infraction of some other provision of the treaty, or, it may be, of a different treaty.[84] This would have to be based on the principle of reprisals and this is the case contemplated by the present article.

85. Subject to the overriding rules of international law about the aggressive or otherwise illegal use of force, there can be no doubt about the general right of legitimate reprisals, i.e., reprisals within the limitations of such conditions as, for example, that the action taken must have some appropriate relationship to the act or omission provoking it, and must be proportionate or commensurate in its effects—or at any rate not manifestly the contrary—and also must be limited to what is necessary in order to obtain redress. Subject to these conditions, reprisals are, for instance, according to Oppenheim:[85]

> "... admissible not only, as some writers maintain, in case of denial or delay of justice, or other ill-treatment of foreign citizens prohibited by International Law, but in all other cases of an international delinquency for which the injured State cannot get reparation through negotiation or other amicable means, be it non-compliance with treaty obligations, violation of the dignity of a foreign State, violation of foreign territorial supremacy, or any other internationally illegal act."

Rousseau [86] equally recognizes the right of reprisals (subject to the same safeguards) as being specifically applicable to the case of breaches of treaty, but remits the study of the matter to a later volume dealing with the general subject of redress, use of force, etc.[87] Hyde [88] also admits the practice, though inclined on historical grounds to confine it to cases of the taking or withholding of foreign property by way of retaliation. Other authorities [89] recognize the doctrine of reprisals, while also, in certain cases, regarding it (correctly of course) as a consequence of the insufficiently organized condition of the international society. Thus Guggenheim [90] says:

> "Since there is no differentiation of functions in customary international law, that is the only way in which the injured party can react against the wrong which has been done to it. Its only recourse is to acts which, if they did not constitute a sanction—that is, if they were not the expression of a means of legal protection—would have to be considered a violation of law."

In a footnote to this passage, Guggenheim adds: "Kelsen was the first to defend the precise theory in 'Unrecht und Unrechtsfolge im Völkerrecht', *Zeitschrift für öffentliches Recht,* 1932, 571/55." He continues:[91] "Reprisals may consist of any acts having *per se* the character of acts contrary to international law, with the exception of those constituting acts of war." By this, of course, is meant acts that would be illegal if they were not justified by way of reprisals for a prior illegality, and the author makes it clear that they can only legitimately take place subject to certain conditions. Spiropoulos equally, after citing the same conditions, says:[92] "Although the suspension of an international obligation by way of reprisal is certainly contrary to law, it nevertheless does not constitute an *unlawful* act in itself." Hall, in discussing the measures of redress "which it is permissible to take", instances reprisals, and in listing what they may consists in, states "... or, finally, in the suspension of the operation of treaties".[93] Similarly, Verdross [94] says:

---

[83] Owing to the undeveloped condition of international institutions, international law must, for the present, continue to be a system which, subject to the rules about the use of force, admits of certain limited possibilities of what might be called peaceful self-redress.

[84] This is not of course intended to sanction gratuitous treaty-breaking.

[85] L. Oppenheim, *International Law: A Treatise,* vol. II, 8th ed., H. Lauterpacht (ed.) (London, Longmans, Green and Co., 1955), pp. 136, 137.

[86] *Op. cit.* in footnote 70 above, p. 371.

[87] Oppenheim also classifies the matter in this way.

[88] Charles Cheney Hyde, *International Law, chiefly as interpreted and applied by the United States,* 2nd rev. ed. (Boston, Little, Brown and Company, 1947), vol. II, pp. 1660 *et seq.*

[89] Besides those cited or quoted from in the text, such authorities as Rivier, Heffter, Wheaton, etc. may be mentioned.

[90] Paul Guggenheim, *Traité de droit international public* (Geneva, Géorg et Cie, S.A., 1953), vol. II, pp. 84, 85.

[91] *Ibid.,* p. 86.

[92] Jean Spiropoulos, *Traité théorique et pratique de droit international public* (Paris, Librairie générale de droit et de jurisprudence, 1933), p. 289.

[93] *Op. cit.* in footnote 24 above, p. 433.

[94] A. Verdross, *Völkerrecht* (Vienna, Springer Verlag, 1950), p. 328.

"By a reprisal is to be understood a derogation from [international] law on the part of a State which has suffered prejudice in its international law rights, with the sole juridical object of inducing the State which has taken up this illegal position against it, either to make reparation for the wrong done, or to cease from further prejudical acts."

Verdross adds: [95]

"Reprisals have been recognized since the birth of modern international law, as a means of legal protection in inter-State relations."

Finally, Accioly and Kelsen may be cited together in the following quotation from Accioly [96] (Rapporteur's translation from the Portuguese):

"Kelsen maintains... that reprisals 'are not illegal, in so far as they take place as a reaction against an illegality'. Indeed, it would seem possible to attribute to such a reaction the character of legitimate [self] defence—which, as is known, is expressly admitted by the Charter [of the United Nations].

"The eminent Austrian master elsewhere defines as reprisals... 'acts which, being normally illicit, are exceptionally permitted as the reaction of a State against a violation of its rights by another State'."

86. These citations from diverse authorities, both older and more modern, would appear to be sufficient to establish the following propositions:

(a) In certain circumstances, and subject to certain conditions and safeguards required by international law, there exists, at the least, a right of what might be termed "peaceful reprisals", not involving the aggressive or illegal use of force.

(b) Such reprisals may take the form of non-observance of what would otherwise be a treaty obligation, or of a breach of such an obligation.

(c) Such a derogation from a treaty obligation (provided it is appropriate to the circumstances and no lesser action will meet the case) may take place as a "reply" either to a derogation from the same obligation by the other party to the treaty, or from another obligation of that treaty or from an obligation under another treaty, or from a general international law obligation.

87. At this point, it becomes necessary to consider the doctrine of "election" which is not infrequently put forward, but which the Rapporteur considers—at any rate in the present context, and in the form it usually takes—to be erroneous. It is stated in the Harvard Research Volume on Treaties as follows: [97]

"... since the breach of a treaty by one of the parties thereto does not automatically terminate the treaty, it is evident that the innocent party may simply elect to regard the treaty as continuining in force between it and the party which committed the breach. In that case, the innocent party is itself relieved of none of its obligations under the treaty, for even if it had a right to abrogate unilaterally the treaty relation existing between it and the party committing the breach thereof, failure to exercise that right leaves the treaty binding upon all parties in exactly the same manner as prior to the breach."

It is no doubt true that, as stated in the above-quoted passage, where a right exists to elect to regard a treaty as terminated, and this right is not exercised, the treaty remains in force for both parties. But it does not at all follow, as a necessary deduction from this, that one party must go on observing the treaty in all respects although the other party is not doing so, or is failing to observe some particular provision of it. This would be to ignore the fact that international law has always admitted the possibility not only that a treaty itself, and as such, may remain in force, although it is not in all respects being observed by one or more of the parties —indeed the whole of this sub-section is founded on that assumption—but also that the non-observance by one party may justify a corresponding, or (by way of reprisals) a different non-observance by the other. In short, what the Harvard system—if it may be so called—implies, is that there is no middle course, when a breach of treaty occurs, between complete termination of the treaty by the injured party, or a complete and integral observance of the treaty obligations by that party, despite non-observance of some or all of these by the other party. This is certainly not the true position.

88. Nor are the authorities cited in the Harvard Volume in support of the above-quoted proposition very convincing. Several of them [98] consist of citations from decisions of domestic tribunals, particularly in common-law countries. But analogies drawn from private law do not hold in this case, for private law has nothing corresponding to the international law doctrine of legitimate self-redress in certain circumstances, by way of counter-action or reprisals. It is no doubt true under many systems of private law that, if a contract is broken in certain ways, the other party has a right to treat it as being at an end; but that, if that party does not elect to exercise his right, it must continue to perform its part of the contract, subject to a right to seek damages or other redress *in the courts* for the non-performance by the other party. International law, on the other hand, has to take into account the absence in many cases of any sure right of redress through international tribunals, or of any sure means of securing enforcement of their decisions, if not carried out; and therefore, within limits, recognizes what is in effect a middle course, namely, the legitimacy of certain measures of self-redress taken as a means of meeting that situation.

89. The Harvard Volume also cites certain international authorities, but these do not seem really to support the deduction that because, in certain events, a treaty remains in force despite the fact that some obligation under it is not being carried out by one of the parties (and the other party has not contended that the treaty is at an end), such other party must nevertheless itself observe all the provisions of the treaty and cannot resort even to a corresponding—still less to any different—form of non-observance, i.e., to no *via media*

---

[95] *Ibid.*

[96] Hildebrando Accioly, *Tratado de Direito Internacional Público*, Rio de Janeiro, 1956-1957, vol. 3, p. 82. The quotations from Kelsen are given as coming from his *Principles of International Law*, pp. 23 and 24.

[97] *Op. cit.* in footnote 15, p. 1078.

[98] See *op. cit.*, pp. 1078 and 1079.

[99] See *op. cit.*, p. 1079.

between termination and integral observance. There is, for instance, a reference to Oppenheim; but the passage referred to [100] merely says that "Violation of a treaty by one of the contracting States does not *ipso facto* cancel the treaty; but it is within the discretion of the other party to cancel it on this ground." [101] This is true (subject to the requirement that the discretion exists only if the breach is a fundamental one—see footnote 101, below), but it in no way supports the further proposition that, if the other party elects *not to exercise this discretion,* it has no other means of redress for the breach except a (possibly or, at any rate, probably) non-existent faculty of bringing the matter before an international tribunal. Lord McNair is also cited by the Harvard Volume, in respect of a statement contained in his course delivered (in French) at The Hague Academy of International Law in 1933.[102] But again, the relevant passage does not support the Harvard deduction. It reads: [103]

> "Violation of a treaty by one of the contracting States does not *ipso facto* cancel the treaty, but at the most, allows the other party to opt in favour of its cancellation (All violations are not, of course, serious enough to justify such action . . .)."

In this passage, the phrase "at the most" would seem to refer to the fate of the treaty as a *whole,* i.e., it means that in respect of termination, the most that exists is a *faculty* of abrogation for the injured party, not an automatic abrogation *ipso facto,* if a breach occurs. Again, it does not in any way follow that because this faculty is not exercised in a particular case (assuming that the breach were sufficiently fundamental to justify that), and the treaty consequently subsists, the injured party has no other or lesser rights, i.e., of counter-action by way of a corresponding, or of some different non-observance. Moreover, in those cases—which are the ones principally contemplated by the present sub-section—where the breach by the other party is not sufficiently fundamental to give rise to a faculty of termination for the other party at all, so that no such faculty exists, there can be no doubt about the right of corresponding or other non-observance under the conditions laid down in these articles. It may well be that, *as a matter of policy,* a State which wishes to preserve the existence of a treaty, despite infractions by the other party, would deem it expedient *not to avail itself of its right of retaliation* or counteraction; but that, of course, is another matter.

90. Crandall [104] also is cited in the Harvard Volume; but here again the position is that Crandall discusses the matter with reference to the question of treaty termination, and largely on the basis of what kind of breach by one party will justify the other in denouncing the treaty; this is, of course, quite a different question.

91. For all these reasons, the present Rapporteur feels that, while the view put forward in the Harvard Volume is not implausible,[105] it is, in fact, not correct as a matter of international law, and is derived largely from private law doctrines that have no application in the international field. He considers the correct position on this particular matter to be as stated in article 18 of the present draft under discussion, and also in article 20, discussed below, to which much of the argument equally applies. No doubt, as regards the propriety of counter-action by way of reprisals, a good deal turns on the exact moment at which it is permissible to take such action. No one would suggest that the right arises immediately and before any attempt at settlement has been made. This is the reason for the inclusion in article 18 of such provisions as sub-paragraphs (*c*) and (*f*) of paragraph 3.

92. *Paragraph 2 of article 18.* This is amply supported by the authorities cited earlier.

93. *Paragraph 3, sub-paragraph (a).* This merely repeats, *ex abundanti cautela,* the qualification already mentioned in paragraph 1.

94. *Paragraph 3, sub-paragraphs (b), (c) and (d).* These state conditions which, as general safeguards, it is believed that international law normally attaches to the exercise of reprisals in any circumstances.

95. *Paragraph 3, sub-paragraph (e).* It follows automatically from the nature of the class of treaties

---

[100] In the 4th edition; it is also reproduced verbatim in the 8th (Lauterpacht) edition, vol. 1, p. 947.

[101] Earlier editions of Oppenheim took the view that to confer this faculty, the breach need not even be a fundamental one. In a footnote to the 4th edition, Lord McNair, as editor, queried the correctness of this view, which is in effect abandoned in the 8th (Lauterpacht) edition—see footnote 4 on p. 947 of vol. 1. See also the Rapporteur's second (1957) report (A/CN.4/107), articles 18-20 and commentary thereto.

[102] "L'application et l'interprétation des traités d'après la jurisprudence britannique", *Recueil des cours,* 1933, I.

[103] See *op cit.,* p. 282.

[104] Crandall, *Treaties, their Making and Enforcement,* 2nd ed., 1916, pp. 456, 462 *et seq.*

[105] An argument might be advanced as follows. It might be said that three cases must be distinguished:

*Case 1.* One of the parties to the treaty purports illegally to repudiate or put an end to it. In those circumstances, the other party may elect either to accept the repudiation or termination, subject to its right to seek redress or reparation for the illegality involved, or to decline to accept the repudiation or termination as being illegal and null, but, in that case, must continue to regard the treaty as remaining in full force. If so, however, that party has voluntarily and designedly waived its right to accept termination, and must therefore continue itself to carry out the treaty, although, of course, it will retain its right to seek redress or reparation for the non-performance by the other party.

*Case 2.* One party, without actually repudiating or purporting to terminate the treaty, commits a fundamental breach of it of a kind which, in accordance with the principles stated in the Rapporteur's second (1957) report, articles 18-20, will justify the other party in regarding the treaty as terminated, or in bringing it to an end. Here again, such other party has a right of election. If it does not elect to terminate the treaty, then it is bound itself to continue to observe the treaty while seeking redress or reparation for the non-performance by the other party.

Even if, however, it were accepted in the above cases that there is no middle course between absolute termination and absolute observance, the argument could not cover case 3.

*Case 3.* This is the case contemplated by articles 18 and 20, i.e., where one party neither repudiates the treaty nor commits such a fundamental breach of it as would justify the other party in bringing it to an end, but simply commits a breach of the treaty. In that case, the other party, not having a right to terminate it simply on the basis of that breach, has no direct remedy except to have recourse to a corresponding non-performance or, if that is insufficient, then, by way of reprisals, to a non-performance of some other obligation of that treaty, or of another treaty between it and the same party.