referred to in this paragraph that no violation of such a treaty will justify non-observance by another party. Still less would a party to such a treaty be justified in any non-observance of it by way of counter-action to the *violation by another party to it of some other treaty*, or of a general rule of international law. There is no room for "reprisals" in connexion with such treaties.

96. *Paragraph 3, sub-paragraph (f)*. Because of the difficulties that may arise in the application of this article and the uncertainties that may exist as to whether, on the grounds stated, a right of non-observance has accrued, it is considered that it should only be possible to invoke this ground of non-observance subject to the safeguards involved by following the appropriate procedures set out in article 39. The general reasons for this are of a very similar order as those which led the Rapporteur to think that safeguards and procedures of this character must be followed where it is a question of invoking the principle of *rebus sic stantibus*, or that of fundamental breach, as grounds for regarding a treaty as terminated (see second (1957) report, A/CN.4/107).

97. *Paragraph 4*. This states a general rule of international law invariably considered as governing the *character of the reprisals* that may legitimately be resorted to. It is also intended to subordinate the whole process to general international law. Reprisals taking the form of the non-observance of a treaty obligation are, after all, only one kind of reprisal, and not generically different in their legal characteristics from other kinds.

98. *Paragraph 5*. This states the rule normally applicable in cases coming under the present sub-section (see paragraphs 55, 56 and 67, above).

RUBRIC (*c*). NON-PERFORMANCE JUSTIFIED *ab intra* BY VIRTUE OF A CONDITION OF THE TREATY IMPLIED IN IT BY INTERNATIONAL LAW

*Article 19. Scope of the present rubric*

99. *Paragraphs 1 and 2*. This rubric deals with the case of non-performance justified not by a general rule of international law wholly outside the treaty, but by a condition which, though not actually written into the treaty or to be implied from its terms, is nevertheless to be read into it by virtue of a rule of international law. With this comment, *paragraph 1* is self-explanatory. Where conditions are written into a treaty, or arise as a clear implication from its actual terms, the matter is one simply of the interpretation of the treaty, and does not call for the application of any external rules.

100. Another way of putting the point would be to say that it is implicit in the type of case treated of in the present rubric that, on the face of it, the treaty concerned creates a specific obligation, so that the question is whether international law implies a condition justifying the non-performance of that obligation in certain circumstances. Since the very issue of whether non-performance is justified is one that assumes the existence of a *prima facie* or apparent obligation under the treaty, conditions expressed in or implied by the language of the treaty itself, relate to the existence of the obligation, not to justification for its non-performance, and this is a matter governed by the general rules relating to the interpretation of treaties to be contained in chapter 3 of the present Code.

101. *Paragraph 3*. The point of this paragraph may be seen by contrasting the ensuing articles 20 to 22, inclusive, with article 23.

*Article 20. Conditions implied in the case of all treaties: condition of reciprocity or continued performance by the other party or parties*

102. As is so often the case with regard to the law of treaties, it is possible to classify a given rule under more than one head. It is possible to take the view that (apart from treaty or other international obligations in the nature of *jus cogens*, release from which cannot result from any mere non-performances by another State) there is a general *international law rule of reciprocity* entailing that the failure of one State to perform its international obligations in a particular respect, will either *entitle other States to proceed to a corresponding non-performance* in relation to that State, or will at any rate *disentitle that State from objecting to such corresponding non-performance*. On the basis of this general principle, applied to treaties, the case dealt with by the present article 20 could figure as an article in rubric (*b*) above, in the space provided for article 17A. On the other hand, it is possible, and it is probably more appropriate, to regard the requirement of reciprocity in the light of a condition which is inevitably to be implied, and is by law to be read into all treaties of the "reciprocal" or "interdependent" types (see para. 82 above), i.e.—all treaties other than those of the absolute or self-existent kind, already referred to in article 18, paragraph 3 (*e*) above and paragraph 95 of the present commentary. It is upon this view of the matter that the present article 20 is based (see further comment in para. 82 above).

103. Hall, in discussing the difficult case which has already been considered in the commentary to article 18 (see paras. 82-91 above, much of which is applicable here also), clearly implies that whether the breach of the treaty affords ground for regarding it as wholly terminated or not, non-performance of a particular obligation will on the basis of an implied condition of reciprocity normally justify a corresponding non-performance by the other party. Hall, under the rubric "Implied Conditions under which a Treaty is made", says that it is "obviously an implied condition of the obligatory force of every international contract that it shall be observed by both of the parties to it."[106] He then goes on to discuss the subject of *fundamental* breaches giving rise to a right to terminate the treaty, and finally considers the case of lesser infractions that would not normally have that result. In discussing this latter case, Hall says[107] that "it would be seldom that the infraction of an article which is either disconnected from the main object, or is unimportant ... could in fairness *absolve the other party from performance of*

---

[106] *Op. cit.* in footnote 24 above.
[107] *Ibid.*, p. 409.

his share of the rest of the agreement..." (italics added). The words italicized clearly imply that even if no case exists for the non-performance of the treaty as a whole or for regarding it as terminated, there is a case for the non-performance by the other party or parties of the particular provision which has been the subject of the infraction. To these considerations may be added almost the whole of the argument given in relation to article 18 in paragraphs 82-91, on the basis that the greater, wider or more drastic right must include the lesser.

104. *Paragraph 2*. This requires no explanation. A similar provision might perhaps have been added to article 18, but it would seem otiose to do so, since it must be clear that anything in the nature of reprisals can only be directed against the particular party culpable.

105. *Paragraph 3*. This paragraph has been included because of the advisory opinion given by the International Court of Justice in the second phase of the Peace Treaties case.[108] Certain treaties contained a provision for the settlement of disputes, according to which, if a dispute arose, each party was to appoint a member of a three-member Arbitral Commission, and the parties were to agree on the third member. If, however, they failed to do so within a month, either party could ask the Secretary-General of the United Nations to appoint the third member. It was not stated—nor probably could it have been—that the Secretary-General was bound to comply with the request. In the actual cases which were the subject of the request for an advisory opinion, not only had the parties not agreed on the third member of the Commission, but one of them denied there was a dispute, and refused to appoint its arbitrator or to co-operate in any way in the treaty procedure for the settlement of disputes. In these circumstances, the question arose whether the other party, if it had appointed its arbitrator, and if the time limit specified by the Treaty had expired, could call upon the Secretary-General to appoint the "third" member of the Commission; and whether in that case, and if the appointment was made, the resulting *two*-member Commission would be validly constituted under the Treaty, and could proceed to hear the case and render a legally binding decision. The Court answered these questions in the negative, on the ground that, however much one party might be (and was) in breach of the Treaty by refusing its co-operation in setting up the treaty tribunal, this situation could not, in the given case, be met by proceeding without it, since this would result in setting up a tribunal that was not the one contemplated by the treaty. In its opinion (three of the Peace Treaties were involved in the case), the Court said that

"The breach of a treaty obligation cannot be remedied by creating a Commission which is not the kind of Commission contemplated by the Treaties."[109]

The Court also said [110]

"The case envisaged in the Treaties is exclusively that of the failure of the parties to agree upon the selection of a third member and by no means the much more serious case of a complete refusal of co-operation by one of them, taking the form of refusing to appoint its own Commissioner. The power conferred upon the Secretary-General to help the parties out of the difficulty of agreeing upon a third member cannot be extended to the situation which now exists."

The Court did however indicate that in other circumstances the position might be different: [111]

"...the Secretary-General would be authorized to proceed to the appointment of a third member [only] if it were possible to constitute a Commission in conformity with the provisions of the Treaties."

In short, the matter is one for the interpretation of the particular treaty, and paragraph 3 of article 20 has been drafted accordingly; but it seemed desirable to make some reference to the matter, in view of this important pronouncement by the Court on what is a not uncommon type of case.

*Article 21. Conditions implied in the case of all treaties: condition of continued compatibility with international law*

106. *Paragraph 1*. The object of this paragraph is to bring out the difference between the case where incompatibility with a rule or prohibition of general international law in the nature of *jus cogens* affects the treaty at its very inception, thus rendering it lacking in essential validity in accordance with the articles of the Code referred to in this paragraph.[112] That is not the case dealt with here, which assumes the original validity of the treaty, and deals with the question of justification for non-performance of some obligation of the treaty by reason of a rule of international law which has gained general acceptance subsequent to the treaty, and which is incompatible with the performance of the obligation.

107. *Paragraph 2*. Since the conditions governing non-performance of a treaty obligation on the grounds contemplated by this article are broadly the same as those which will justify regarding a treaty as being wholly terminated, it will be sufficient for the present to refer to the commentary to case (vi) in article 17 of part III of chapter 1 of the Code.[113]

108. *Paragraph 3*. It is necessary to cover not only the case where, after the conclusion of the treaty, a new incompatible rule of international law in the nature of *jus cogens*, with which the treaty is in conflict, receives general acceptance, but also the case where circumstances not present at the time of the conclusion of the

---

[108] *I.C.J. Reports 1950*, p. 65.

[109] *Ibid.*, p. 229.

[110] *Ibid.*, p. 227.

[111] *Ibid.*, p. 228.

[112] See Rapporteur's third (1958) report (A/CN.4/115), articles 21 and 22 and relevant commentary.

[113] See paras. 104 and 105 of the commentary in the Rapporteur's second (1957) report (A/CN.4/107).

treaty have arisen subsequently, and have brought into play an existing rule of international law of this kind, which was not relevant to the circumstances as they were when the treaty entered into force. An obvious example of this type of case is that of a treaty concluded in time of peace, and primarily applicable under peace-time conditions, in the event of a war arising either between one of the parties and a third State, or between two third States, giving rise to circumstances in which questions of the law of neutrality may become material for one or other of the parties, in relation to the execution of the treaty. Some illustrations of this are given by Lord McNair in his work on *The Law of Treaties* based on the opinions of the Law Officers of the British Crown. Thus, in an opinion dated 17 August 1885,[114] the Law Officers approved of instructions being sent to the British Ambassador in Japan to the effect that a certain treaty between Great Britain and Japan "must be read subject to the obligations of international law in time of war, and that Great Britain could not claim, under the treaty, to commit any act which would involve Japan in a breach of neutrality...". Instructions were sent accordingly. The point at issue was the right which Great Britain might otherwise have been able to claim under the treaty to use certain naval yards and hospitals in Japan in the event of a war in which Great Britain might be involved, Japan being neutral. Again, in an earlier report dated 23 August 1870, given by the Queen's Advocate[115] (Mr. Travers Twiss, afterwards Sir Travers Twiss), the opinion was expressed that the International Telegraphic Conventions of 1865 and 1868 must, as between a belligerent and a neutral State, be construed as being subject to the duties imposed by general international law upon neutral States. The Queen's Advocate observed[116] that

> "As a war between France and Prussia would impose upon the other contracting parties supervening duties incidental to a state of neutrality, they [i.e. the contracting parties] must..., in the absence of express words to the contrary, be taken [sc. only] to have become parties to the treaty subject to their obligation of fulfilling those duties."

109. *Paragraph 4*. The significance of this paragraph depends upon the distinction between *jus cogens* and *jus dispositivum*. This matter has already been sufficiently gone into in relation to the subject of the essential validity of treaties.[117]

*Article 22. Conditions implied in the case of all treaties: condition of unchanged status of the parties*

110. *Paragraph 1*. This paragraph is intended to bring out the distinction between the case of a lack of treaty-making capacity existing in one or more of the parties at the time when the "treaty" is concluded, thus entailing lack of essential validity for the instrument concerned, considered as an international treaty. This subject has already been dealt with in article 8 of part II of chapter 1 of the Code, and a commentary on it will be found in paragraphs 19 to 30 of the Rapporteur's third (1958) report. The present article 22 deals with the case that arises where no such incapacity existed at the time when the treaty was made, but there has been a change in the status of one of the parties subsequently.

111. *Paragraph 2*. This refers to the case where the subsequent change of status involves a total loss of its previous identity on the part of the party concerned. This, subject to the rules of State succession, will normally lead to the termination of the whole treaty (if it is a bilateral treaty) or to the participation of that party in it (if it is a multilateral one). This case has already been considered as case (i) in article 17 of part III of chapter 1, and is commented on in paragraph 95 of the Rapporteur's second (1957) report.

112. *Paragraph 3*. This deals with the case to which the present article 22 is really intended to relate, namely where there has been a supervening change of status —not, however, being such as to involve a complete loss or change of identity for the party concerned. *Prima facie*, this will not in itself entail any diminution of the treaty obligation, or afford a ground for its non-performance. Where, however, as the result of the change, a situation arises in which the performance of the treaty obligation is no longer dependent on the sole will of the party concerned, that party must, considered as such, be regarded as absolved from futher performance. Hall[118] states the principle involved as follows:

> "It is also an implied condition of the continuing obligation of a treaty that the parties to it shall keep their freedom of will with respect to its subject-matter except in so far as the treaty is itself a restraint upon liberty, and the condition is one which holds good even when such freedom of will is voluntarily given up. If a State becomes subordinated to another State, or enters a confederation of which the constitution is inconsistent with liberty of action as to matters touched by the treaty, it is not bound to endeavour to carry out a previous agreement in defiance of the duties consequent upon its newly-formed relations."

However, although in accordance with what has just been said a change of status on the part of one of the original parties to the treaty may take out of the hands of that party the capacity to ensure the performance of the treaty, and thereby absolve it from performance, it does not follow that the obligation will wholly lapse. Thus, to take the cases cited by Hall, where one State comes under the protection of another, the rules of State succession may oblige the Protecting Power to take over the responsibility for carrying out the treaty obligation. It may be the same if a State becomes part of a federal union, and also in other circumstances. This, however, is a matter of the law of State succession, and therefore not further discussed here.

---

[114] McNair, *op. cit.* in footnote 74 above.

[115] See explanation given in footnote 75 above.

[116] McNair, *op. cit.*, p. 247.

[117] See the Rapporteur's third (1958) report (A/CN.4/115), para. 75 of the commentary.

[118] *Op. cit.* in footnote 24 above.

*Article 23. Conditions implied in the case of particular classes of treaties*

113. *Paragraph 1*. The conditions considered in the immediately preceding articles can fairly be regarded as being implied by international law in the case of all treaties. There are, however, a number of conditions which international law implies according to circumstances, in the case of particular classes of treaties.

114. *Paragraph 2*. It is not possible at present to deal exhaustively with this matter, partly because it depends on the development of treaty practice and procedure and is therefore not static, and partly for reasons which are given in a footnote to the article itself. The present paragraph 2 of the article, however, instances a certain number of prominent examples of this class of case.

115. *Sub-paragraph (a)*. The question of an implied exception on grounds of *ordre public* in treaties relating to private international law topics came up for consideration recently before the International Court of Justice in the Guardianship of Infants case (Holland v. Sweden).[119] The Court, however, decided the case on another point, and while referring to the question of *ordre public,* did not consider it necessary to pronounce upon it. On the other hand, some of the judges delivering separate opinions,[120] laid great stress on the recognized existence of this exception as an implied condition of treaties dealing with questions of private international law and conflicts of laws. These opinions appear to the Rapporteur to be sufficiently cogent to warrant the inclusion of this exception in the present article, though of course only for this class of treaty.

116. *Sub-paragraph (b)*. It is well known that, according to the common form of commercial treaties, articles of a very wide general character are included which, on the face of them, confer national treatment upon foreigners in the matter of access to the country concerned, to carry on trade and commerce there, etc. These claims, read literally, might appear to confer something like absolute rights in the matter. Such treaties have, however, never been read as prejudicing the right of the local authorities of a country to prohibit entry to individual persons on grounds personal to themselves, or in pursuance of a general and non-discriminatory policy concerning immigration or the taking of employment. It is true that in some of the more modern commercial treaties the previous apparently absolute right tends to be specifically qualified by certain phrases. For instance, the subjects or citizens of the contracting parties are only to have rights of access etc. on the basis of national treatment " upon conforming themselves to the laws and regulations applicable generally to nationals ". Such phrases do not always appear in earlier treaties. They have nevertheless clearly been regarded as implied, and their subsequent appearance in later treaties must probably be regarded as declaratory of an existing position, rather than as creating anything new. In the same way, the right of deportation has never been regarded as affected by these clauses.

117. *Sub-paragraph (c)*. Very similar considerations apply here too, except that what is normally involved in the case of imports and exports of goods is not national but most-favoured-nation treatment. Nevertheless, the general right to trade conferred by many commercial treaties has never been regarded as prejudicing the right of the local authorities to prohibit altogether traffic in certain categories of goods or articles, or in certain particular circumstances as indicated in the article. Again, it is true that in many of the later treaties specific clauses are included referring to such a right of prohibition in terms ; but as before, the effect of such provisions appears to be little more than declaratory. Lord McNair instances an opinion given by the English Law Officers of the Crown dated 18 March 1867,[121] in which the Law Officers considered the effect of an Anglo-Italian Commercial Treaty containing " the usual reciprocity clauses with respect to the free importation to any country of produce of one of the contracting parties into the country of the other ". The question was whether this prevented the United Kingdom authorities from prohibiting the import of cattle on health grounds (e.g. suspected foot and mouth disease). The Law Officers said that in their view " no clauses of this description can be rightly considered as restraining the power of the Government to prohibit, when exceptional circumstances, as the present, exist, and for the sake of public health and well-being of the country, the importation of foreign cattle." That the Law Officers were not, however, postulating any general principle of so-called " necessity " as a ground justifying non-performance is clear from the following sentence: " It is a maxim of international law that cases of this kind are always considered as tacit and necessary exceptions from the treaty." In short, a condition covering this type of case is to be regarded as implied in commercial treaties.

---

[119] *I.C.J. Reports 1958*, p. 55.

[120] In particular Judges Badawi, Lauterpacht, and Moreno Quintana. The following passage from Sir Hersch Lauterpacht's opinion is quoted as giving the most comprehensive and forceful statement of the principle (Report, pp. 91, 92):

" In the first instance, the Convention now before the Court is a Convention of public international law in the sphere of what is generally described as private international law. This means : (*a*) that it must be interpreted, like any other treaty, in the light of the principles governing the interpretation of treaties in the field of public international law ; (*b*) that that interpretation must take into account the special conditions and circumstances of the subject-matter of the treaty, which in the present case is a treaty in the sphere of private international law.

" Secondly, in the sphere of private international law the exception of *ordre public*, of public policy, as a reason for the exclusion of foreign law in a particular case is generally —or, rather, universally—recognized. It is recognized in various forms, with various degrees of emphasis, and, occasionally, with substantial differences in the manner of its application. Thus, in some matters, such as recognition of title to property acquired abroad, the courts of some countries are more reluctant than others to permit their conception of *ordre public*—their public policy—to interfere with title thus created. However, restraint in some directions is often offset by procedural or substantive rules in other spheres. On the whole, the result is the same in most countries—so much so that the recognition of the part of *ordre public* must be regarded as a general principle of law in the field of private international law."

[121] *Op. cit.* in footnote 74 above.

118. *Sub-paragraph (d)*. This deals with an implied term which has always, and in the nature of the case, been regarded as a condition of treaties of guarantee, and it needs no special comment.

SECTION 2. PARTICULAR QUESTIONS OF TREATY APPLICATION

SUB-SECTION i. TEMPORAL AND TERRITORIAL APPLICATION OF TREATIES

RUBRIC (*a*). TEMPORAL APPLICATION

*Article 24. Beginning and duration of the treaty obligation*

119. *Paragraphs 1-3*. These provisions are of a routine character, but nevertheless require to be included in a complete Code. They relate to the exact moment at which the treaty obligation begins and that at which it ends. The references to other parts of the Code are to those provisions which determine the coming into force and the termination of any treaty.[122]

120. *Paragraph 2*. In the case of multilateral treaties, as has already been seen from article 41, paragraph 4, in part 1 of chapter 1 of the Code,[123] the coming into force of a treaty, as such, only creates obligations for those States which at that date have taken the necessary steps, whether by signature, ratification or accession, to indicate their participation in it. For other parties, their obligation will arise subsequently, as and when they deposit their instruments of ratification or accession.

121. *Paragraph 4*. The principle embodied in this paragraph was recognized by the International Court of Justice in the first phase of the Ambatielos case, when the Court rejected a certain argument on the ground that it "...would mean giving retroactive effect to Article 29 of the Treaty of 1926, whereas Article 32 of this Treaty states that the Treaty, which must mean all the provisions of the treaty, comes into force...upon ratification."[124]

122. "Unless a treaty specifically so provides, or a necessary implication to that effect is to be drawn from its terms...". This exception to the rule of non-retroactivity was again recognized by the International Court in the same case, when it said[125] that the conclusion that a given article of the relevant treaty was not retroactive "...might have been rebutted if there had been any special clause or any special object necessitating retroactive interpretation." There is some danger of confusion about the subject of the retroactivity of treaties. In a certain sense, a treaty, whatever it may say, can never be retroactive, because it can never come into force previous to the date provided for according to its terms, or in default of clear terms on the subject, according to the principles already set out in part I of chapter 1 of the Code.[126] But a treaty can of course perfectly well provide that, although it does not come into force until a certain date, it shall nevertheless, when it does come into force, be deemed to relate back in certain ways to events that have already occurred. Where a treaty has retroactive effect in this sense, the obligation to apply it, or any particular provision of it retroactively, can nevertheless not exist before a certain date, namely the date of the coming into force of the treat; but that fact does not prevent the obligation that has to be applied retroactively, arising when this date is reached—on the contrary, it causes it to do so. It is clear that only express terms or an absolutely necessary inference can produce such a result. The presumption must always be against retroactivity.

RUBRIC (*b*). TERRITORIAL APPLICATION

*Article 25. General principles*

123. *Paragraph 1*. Questions of the territorial application of a treaty do not normally arise in those cases where the whole process of the operation and execution of the treaty can be carried out exclusively through the action of the central metropolitan Government of the State concerned, and in this category figure especially the classes of treaties mentioned in this paragraph, such as treaties of alliance, peace and friendship, recognition, institution of diplomatic relations, and so forth.

124. *Paragraph 2*. This reflects the obvious principle that the question of territorial application is governed primarily by the terms of the treaty itself, in all cases where the treaty, expressly or by implication, makes provision as to its territorial application.

125. *Paragraph 3*. Where the treaty is silent, or no clear implication can be drawn from it (or unless, though not silent, *its application is specifically confined* to a certain particular part or to parts of the territories —or to certain territories only—of the contracting parties), then the remaining provisions of this rubric will be applicable.

*Article 26. Application to metropolitan territory*

126. *Paragraph 1*. There can never be any doubt that, unless a treaty otherwise specifically provides, it must apply automatically at least *to the whole of the metropolitan* territory of any contracting party.

127. "...or to all territories forming part of the metropolitan territory of each contracting party". These words have been inserted because in the case of certain States, the whole of their metropolitan territory or territories is not necessarily situated within the confines of a single frontier, and these territories may either be separated from each other by intervening territory of another State, or may be situated overseas.

128. *Paragraph 2*. This attempts to supply a definition of the term "metropolitan territory", and is intended to establish what *prima facie* distinguishes a metropolitan from a dependent territory.

---

[122] Rapporteur's first (1956) and second (1957) reports (A/CN.4/101 and A/CN.4/107, respectively).

[123] First (1956) report.

[124] *I.C.J. Reports 1952*, p. 40.

[125] *Ibid.*

[126] See footnotes 122 and 123.