129. "Subject to the provisions of paragraph 3...". These words are inserted because it is necessary to deal specially with the case of federal unions and federations. This case forms the subject of *paragraph 3*. Under all federal constitutions, the constituent states, parts or provinces of the union or federation possess at least some degree of local autonomy; while in some cases, or at any rate in theory, they may have complete local autonomy in all matters not of necessity common to the union or federation as a whole and as a unit, such as defence and the conduct of foreign relations. Nevertheless, there can be no doubt that the constituent parts of a federal union or federation do form part of its metropolitan territory.

130. It naturally results from the words "Unless a treaty otherwise provides..." in paragraph 1 of this article, that it in no way prevents the insertion of the so-called "federal clause" in treaties, where there is agreement to do this.

*Article 27. Application to dependent territories*

131. *Paragraph 1.* If a satisfactory definition of a metropolitan territory can be established, then, in principle, it would be sufficient to define a dependent territory as any territory which was not by definition a metropolitan territory.

132. *Paragraph 2.* This states the basic rule that, in principle, and unless otherwise provided expressly or by clear implication, a treaty extends automatically to all the dependent territories of any contracting party.

133. "Subject to the provisions of paragraph 3...". The basic rule as thus stated was, however, instituted at a time (and primarily in relation to a state of affairs) when many or most dependent territories were more or less wholly dependent, and lacking in any form of self-government or autonomous local institutions. This situation is under modern conditions becoming increasingly rare, if indeed it is not near to disappearing. It is probably true to say that only a small number of the dependent territories still existing in the world are in this position, and they are progressively becoming fewer. This has led certain authorities, such as Rousseau, to propound a rule completely reversing the basic rule set out in paragraph 2 of the present article. He formulates the rule as follows: [127]

> "Except in cases where a treaty, in view of its purpose, deals exclusively with colonies, treaties concluded by a State do not extend automatically to its colonies."

According to this view, therefore, a treaty would never apply to dependent territories unless it either related specifically to certain territories in this class or else, as Rousseau goes on to make clear, unless the treaty itself provided in terms for its application to the dependent territories of the contracting parties.

134. The Rapporteur, while in general agreement with the view propounded by Rousseau, does not think it necessary or desirable to make it so categorical. It seems to him preferable to retain the basic rule as formulated in paragraph 2 of this article, but to create exceptions to it in favour of those cases where it is obvious that the constitutional position with reference to a dependent territory does not permit of any automatic application of a treaty to it without its consent, or without the completion of various formalities of such a kind that they are primarily a matter for the local institutions of the dependent territory concerned.

135. *Paragraph 3.* In this paragraph, the exceptions just referred to are set out. In the cases covered by *sub-paragraphs (a)* and *(b)*, it is clear that the government of the metropolitan territory of the State which is a party to the treaty has no constitutional power to enforce either the acceptance or the observance of the treaty by the dependent territory. In such circumstances, participation in the treaty by that State cannot of itself entail its application to the dependent territory.

136. *Sub-paragraph (c).* This contemplates the not uncommon situation where, although the dependent territory is not fully self-governing internally even in the field covered by the treaty, the constitutional relationship between it and the metropolitan government is such that the active co-operation of the local authorities and of the local institutions would be necessary for the execution of the treaty in that territory, and would be materially impossible without it; or where, according to those constitutional relationships, treaties entered into by the metropolitan government are not to be applied to the dependent territory without at least prior consultation with it. Here equally, it would be difficult, and would indeed be contrary to the rights of the dependent territories themselves, if participation in the treaty by the metropolitan government were held automatically to entail its application to the dependent territory.

137. *Paragraph 4.* This is intended to bring out the point that the determining factor involved in the cases dealt with by paragraph 3 of the article is that of the *normal constitutional position* existing in relation to the dependent territories concerned, or existing as between them and the metropolitan government; and not the possibility that the metropolitan government may, in the last resort, possess legal or physical powers of coercion which would enable it to compel the dependent territory to carry out the treaty. Such powers may indeed in a number of cases exist or be held in reserve, but they are not intended to be used except under specifically defined circumstances or, most exceptionally, in case of emergency. They are certainly not intended to be used for the purpose of enforcing the application of a treaty to a dependent territory in circumstances other or contrary to those contemplated by the constitutional position respecting that territory; [128] and a metropolitan government ought not to be placed in a position in which it must either decline altogether itself to participate in the treaty, or else, in the last resort, employ measures of coercion to enforce the acceptance and

---

[127] Rousseau, *op. cit.* in footnote 70 above.

[128] Especially where, as will frequently be the case in this context, this constitutional position is part of a planned development towards self-government or complete independence.

application of the treaty by what may be constitutionally highly developed dependent territories which do not wish to accept the treaty, or to whose local interests such acceptance would be contrary.

### Article 28. Determination of the status of metropolitan and dependent territories

138. *Paragraph 1.* This article has been included because difficulty often arises over the question of who has the right in the last resort to determine whether a given territory is a metropolitan or a dependent territory. An attempt to define a metropolitan territory and hence inferentially a dependent territory, has been made in articles 26 and 27. Subject to that, the question must be one that depends on the interpretation of the relevant constitutional provisions and international instruments.

139. *Paragraph 2.* The opening words of this paragraph "Subject to any relevant treaty provisions, and to any international right of recourse that may exist...", are intended to indicate that such determination may, in the last resort, not be exclusively a matter for the metropolitan government to carry out, in a final and conclusive way. Subject to that, however, it seems that the determination must and indeed can only be made in the first instance by the metropolitan government. This is indicated by *sub-paragraph (a)*. The point dealt with in *sub-paragraph (b)* is a connected but separate one. It is not a question of determining the status of a given territory, whether metropolitan or dependent, but of determining what is actually covered administratively or geographically by the territory concerned—in short, what are its boundaries, whether certain adjacent pieces of territory, enclaves or islands off its coasts, are include in it, etc.

140. *Paragraph 3.* It seems desirable to include a provision on these lines. States cannot, subsequent to the conclusion of a treaty, alter its territorial application by a mere *ipse dixit* to the effect that certain territories, apparently part of its metropolitan territories, are not so, or *vice versa*. Any such determination, dependent purely on a declaration by the government concerned, must either have been made and published in advance of the conclusion of the treaty, or else be specifically brought to the attention of the other parties at the time of the conclusion of the treaty.

141. *Paragraph 4.* On the other hand, a genuine alteration in the status or constitutional position of a particular territory, or in its relations with the metropolitan government, may have occurred subsequent to the conclusion of the treaty, and for this reason the words "resulting from a genuine change in the status or constitutional position, etc." are included. In such a case, this paragraph of the article would not, as such, be applicable. It would not, however, necessarily follow that the treaty itself would either become, or cease to be, applicable to the territory concerned. This would depend upon its terms and on the rules of (or on rules analogous to those of) State succession.

SUB-SECTION ii. EFFECT OF THE TREATY
ON THE INTERNAL PLANE

RUBRIC (*a*). EFFECT OF TREATIES ON AND RESPECTING
THE INSTITUTIONS OF THE STATE

### Article 29. Relevance of the domestic aspects of treaty application

142. Neither this article nor anything in this sub-section is intended to raise philosophical issues as to the manner in which a treaty produces its effects on the domestic plane, i.e. whether directly or only through the intermediary of the local law and constitution. For reasons to be explained in connexion with a later article, it is considered that, from the purely practical point of view, this question has little importance. The article contents itself with propounding the incontrovertible fact that a treaty produces its effects primarily in the international field, in which it is the duty of the parties to carry it out, and that the question of its effects in the domestic field is only relevant because that question may, in practice, affect the capacity (though not the legal obligation) of the parties to discharge that duty.

### Article 30. Duties of States in relation to their laws and constitutions

143. This and the next succeeding article both represent little more than a "spelling out" on the domestic plane of certain of the general principles already dealt with in earlier parts of the present report, and reference may be made to paragraphs 32 to 48 above. It is particularly important to bear in mind that however much, on the domestic plane, the administration, the legislature and the judiciary may be separate entities, and however much on that plane they may perhaps be in conflict with one another and similarly not amenable to control one by the other, nevertheless, from the international point of view, the State is one single indivisible entity. If a treaty becomes binding upon the State by conclusion in due form, it becomes binding upon the State as a whole, and, by derivation, upon each of its several organs and institutions, each of which becomes bound, as part of the State, to play whatever part is necessary in order to make the treaty effective. It can therefore never be accepted (for instance, as a ground excusing non-performance of a treaty) that, although the administrative organs of a State were ready and willing to carry it out, the legislative organs failed to pass the necessary legislation, or that the judicial organs failed to give effect to the treaty in the courts. The point is made over and over again by the authorities, and many useful examples of this are cited in the Harvard Draft Convention on Treaties.[129] For instance, as far back as 1833, Mr. Livingston, United States Secretary of State, in a passage quoted by Wharton,[130] said:

> "The Government of the United States presumes that whenever a treaty has been duly concluded and

---

[129] *Op. cit.* in footnote 15 above; see commentary to articles 20 and 23 of the Harvard Draft, *passim.*

[130] Wharton, *A Digest of the International Law of the United States,* 1887, p. 67.

ratified by the acknowledged authorities competent for that purpose, an obligation is thereby imposed upon each and every department of the government to carry it into complete effect, according to its terms, and that on the performance of this obligation consists the due observance of good faith among nations."

About the same time (1839), the French Conseil d'Etat " affirmed that the *obligation to execute treaties rests not upon a single organ or authority but upon all those, legislative, executive and judicial, whose collaboration may be necessary* "—(Rapporteur's italics).[131] The same point is made in Dana's Wheaton [132] as follows:

" If a treaty requires the payment of money, or any other special act, which cannot be done without legislation, the treaty is still binding on the nation; and it is the duty of the nation to pass the necessary laws. If that duty is not performed, the result is a breach of the treaty by the nations, just as much as if the breach had been an affirmative act by any other department of the government. Each nation is responsible for the right working of the internal system, by which it distributes its sovereign functions."

144. *Rousseau equally formulates the same principle,* when he says [133] that *all the organs of the State* " being obligated to contribute towards the application of the treaty, the legislative organ—which is just as much an organ of the State as the executive and judicial organs—is thus bound to take the measures necessary ... for bringing the treaty into force"; and he continues (citing the judgement of the Permanent Court of International Justice in the case of German Interests in Upper Silesia) to make the point about the lack of relevance from the international standpoint of domestic difficulties, conflicts etc., which are of interest only on the internal plane. In this passage he says: [134]

" International jurisprudence very clearly confirms the *superiority of treaties over domestic law* by providing that in case of conflict the former shall prevail over the latter irrespective of which of the two legal acts was the first to take effect. For the international judge, municipal laws are 'merely facts which express the will and constitute the activities of States'. (Permanent Court of International Justice, judgement of 25 May 1926, Case concerning certain German interests in Polish Upper Silesia (the merits), *Publications of the Court,* Series A, No. 7, p. 19)".

Equally, in the case of the Exchange of Greek and Turkish populations, the Permanent Court affirmed it as a " self-evident principle " that

" ... a State which has contracted valid international obligations is bound to make in its legislation such modifications as may be necessary to ensure the fulfilment of the obligations undertaken." [135]

Reference may also be made to the judgement of the Permanent Court in the case of the Jurisdiction of the Courts of Danzig.[136] In another form and context, having particular reference to the case of federal States, the same position was taken up by the tribunal in the Montijo case, in which a federal government denied responsibility for the acts of a component state in relation to a treaty. The Umpire said:

" For treaty purposes the separate States are non-existent; they have parted with a certain defined portion of their inherent sovereignty, and can only be dealt with through their accredited representative or delegate, the federal or general government. But, if it be admitted that such is the theory and the practice of the federal system, it is equally clear that the duty of addressing the general government carries with it the right to claim from the government, and from it alone, the fulfilment of the international pact." [137]

145. *Paragraph 1 of article 30.* The remarks made in paragraphs 141 to 143 above are relevant and sufficient as a commentary to this paragraph, which simply states the basic duty of every State (and by the term " State " is meant the whole State, including all of its organs) so to conduct itself in relation to its law and constitution that it is in a position to carry out its treaty obligations.

146. *Paragraph 2* is based on the view, supported by the authorities already cited, that provided the object contemplated by paragraph 1 is attained, it is immaterial by what means this is done, and it is a domestic matter for each State to decide for itself what method shall be employed. This paragraph has accordingly been expressly drafted so as to try to avoid the necessity for theoretical controversy about whether the treaty obligation operates on a monistic or dualistic basis, etc. There are in fact a number of possible positions theoretically, and, in practice, a number of possible ways in which a State can ensure that its domestic position allows it to carry out its treaty obligations, or places no obstacle in the way of their performance. Beyond that it seems unnecessary to go for present purposes.

147. *Paragraph 3.* However much it may be argued that, as a matter of principle, an international treaty ought to operate directly in the domestic field (i.e. ought to be " self-executing "), it is not possible in practice to compel States to adapt their laws and constitutions to conform with this position unless they in fact wish to do so. Moreover, even in countries where, in principle, treaties are self-executing, considerable difficulties arise in the practical application of the self-executing rule, and it is by no means always possible to avoid the necessity for some kind of special legislation or administrative or other action, as the case may be. *Paragraph 3* is merely intended to emphasize that where,

---

[131] Harvard Law School, *Research in International Law,* III, *Treaties,* p. 979, citing Dalloz, *Jurisprudence général, Répertoire,* vol. 42, I, No. 131, p. 555.

[132] Wheaton, *Elements of International Law,* 8th American edition by Dana, p. 715: Dana's Note, No. 250, citing Kent, 1, pp. 165-166.

[133] *Op. cit.* in footnote 70 above.

[134] *Ibid.,* p. 418.

[135] Publications of the Permanent Court of International Justice, *Collection of Advisory Opinions,* series B, No. 10, p. 20.

[136] *Ibid.,* No. 15, p. 26.

[137] Moore, *History and Digest of International Arbitrations,* 1898, pp. 1439, 1440.

on account of the domestic position such action is necessary in order that the treaty may be implemented, it must be taken.

148. *Paragraph 4.* This represents the negative counterpart of the affirmative rule laid down in paragraph 3, and also makes the point that the State has an obligation not merely to take such action as is necessary in order to make the treaty effective on the domestic plane, but is also under an obligation to keep this position intact so long as the treaty remains in force, i.e. not to take, subsequently to the conclusion of the treaty, any action, or pass any legislation which would prevent the continued implementation of the treaty.

149. *Paragraph 5.* A certain practice (though very far indeed from invariable) has sprung up of including in treaties specific clauses about the obligation of the parties to take any necessary legislative or other measures for the implementation of the treaty. But this is precisely because of the tendencies that have been manifested by governments from time to time to offer "*de fréquentes résistances*" (as Rousseau puts it) [138] to the logic of the principles here formulated. Such provisions are included *ex abundanti cautela*, and have a merely affirmatory or declaratory effect. Their absence —and in most cases they are absent—in no way implies their contrary.

*Article 31. Position and duties of particular organs of the State*

150. In general, the comments made in connexion with the immediately preceding articles (see especially paras. 141-143) apply, even more specifically, to the present article.

151. *Paragraph 1.* This propounds the principle that from the international point of view it is immaterial, and indeed, theoretically, need never even be the subject of inquiry or discussion, through what particular organ a State discharges its international treaty responsibilities. This is a purely domestic matter which is left to each State to decide for itself.

152. *Paragraph 2.* The converse of this, however, is that, while it is left to the State to take this decision, the State is correspondingly bound, in so far as it may be necessary, to take it and to secure that the organ charged with the responsibility for implementation on the internal plane duly plays its part.

153. *Paragraph 3.* This paragraph is directed to the type of case in which, for instance, a treaty is not implemented on the internal plane because when, in the course of legal proceedings, the question of implementing the treaty arises, the court decides that it is unable to give effect to the treaty for lack of the necessary domestic legislation directly binding upon it. It may be that in taking up this attitude the judge is, from the domestic point of view, fully justified. Indeed, it may be the only course which is possible for him to follow, considered from that point of view. This, however, merely means that the State, considered as an international entity, has failed to take the steps necessary in order to secure the implementation of the treaty by its tribunals; and for this omission the State is accordingly responsible if, as a result of it, the treaty fails to be carried out. It is not possible in such a case for the State to shelter behind the doctrine that the administration is not in a position to interfere with the decision of the courts, just as it cannot plead lack of the necessary control over the legislature. This is never, in law, the point, for the obligation is the (whole) State's, not that of the administration alone. Thus, in the example given, the decision of the courts would have been different if the necessary legislative steps had been taken.

154. The legal position would be just the same if the necessary legislation existed, but the courts had failed to apply it, or had misapplied it in such a way that the treaty was not implemented. It may be that, in such circumstances, the administration as such cannot interfere with or change the decision of the courts. Nevertheless, there is a failure to carry out the treaty arising from the action of one of the organs of the State and, accordingly, the State, considered as an international entity, is responsible.

RUBRIC (b). EFFECTS OF TREATIES ON AND IN RESPECT OF PRIVATE INDIVIDUALS AND JURISTIC ENTITIES WITHIN THE STATE

*Article 32. Treaties involving obligations for private individuals or juristic entities*

155. This and the succeeding article have been drafted in such a way as to try and avoid any theoretical controversy about the position of private individuals and juristic entities under international law, and how far they are directly *subjects* of it.[139] That, on the other

---

[138] *Loc. cit.* in footnote 70 above.

[139] A good statement of the position about this, in so far as treaties are concerned, was given by the Permanent Court in the Jurisdiction of the Danzig Courts case (series B, No. 15), when the Court said (Report, pp. 17-18):

"The point in dispute amounts therefore to this: Does the *Beamtenabkommen*, as it stands, form part of the series of provisions governing the legal relationship between the Polish Railways Administration and the Danzig officials who have passed into its service (contract of service)? The answer to this question depends upon the intention of the contracting Parties. It may be readily admitted that, according to a well established principle of international law, the *Beamtenabkommen*, being an international agreement, cannot, as such, create direct rights and obligations for private individuals. But it cannot be disputed that the very object of an international agreement, according to the intention of the contracting Parties, may be the adoption by the Parties of some definite rules creating individual rights and obligations and enforceable by the national courts. That there is such an intention in the present case can be established by reference to the terms of the *Beamtenabkommen*."

In commenting on this, Rousseau (*op. cit.* in footnote 70 above, pp. 438, 439) says:

"Our conclusion will quite naturally be based on this very important judicial precedent. It can indeed be said that an *international treaty is not in itself a source of national law.* It merely creates an obligation between States, a rule which States ought to follow. Individuals are not affected by rules of international law unless those rules reach them through the medium of national laws. That is the doctrine—of positivist origin—which is generally accepted today. And the Permanent Court of International Justice says that it is a 'well established principle of international law'.

"However, ... *it is always possible to stipulate the contrary* and to decide that a treaty will constitute a direct source of rights and obligations for individuals. Here the intention

hand, they may be the *objects* of rules of international law or of treaty provisions, admits of no doubt.

156. With regard to treaties that may impose duties upon individuals (which term, to avoid repetition, will herein be used as comprising—*mutatis mutandis*—juristic entities), or prohibit them from certain courses of conduct, it has to be remembered that, whether as a matter of theory and principle, an individual is or is not a subject of international law, he can never be a subject of international law in the same way as a State, assuming it to possess full, treaty-making capacity. Such a State is subject to no authority but its own and is in a position to take the necessary steps to carry out any treaty to which it has become a party. In the case of the individual, the will and authority of his State and Government is normally interposed between him and the execution of any international obligations which may be incumbent upon him either generally or by reason of a treaty. Whatever the theoretical position, his State or Government can, in practice, prevent the performance of such obligations if they exist, or alternatively place him in a position in which he may have no reasonable alternative but to take action of a kind prohibited by the rule or treaty concerned.

157. For present purposes it is not intended, neither is it necessary, to go into the question of how far a situation of this kind will absolve the individual from personal responsibility. The point is that, whether or not he has a direct obligation, and whether or not he is directly responsible for any failure to implement it, his State and Government are certainly under a duty to ensure that so far as the position under the domestic laws of the State is concerned, their nationals are free to carry out such duties as may result from a treaty—for after all, it is the State which is the party to the treaty, not the individual as such; and but for the action of his State, the individual would not have the duty in question. In the same way, it is for the State, in the execution of the treaty, to take such steps as may be necessary to compel its nationals to observe it, where this is required for its due implementation.

*Article 33. Treaties involving benefits for private individuals or juristic entities*

158. *Paragraph 1.* This is an easier case than the one which has just been considered. Nevertheless, the fundamental principles applicable are precisely the same, and it will be sufficient to refer to the commentary contained in the immediately preceding paragraphs.

159. *Paragraph 2.* It is generally accepted, and indeed it must be the case, that the State being the party to the treaty, it can, acting through its normal agent, namely the Government, renounce its rights under the treaty, even though these may redound to the benefit or advantage of individual persons being its nationals, or of national juristic entities. Whether, on the domestic plane, this is a proper thing for the State to do, is entirely a matter of the local law and constitution and is not of direct interest to international law. For any impropriety in this respect, the State would be answerable either administratively or judicially on the domestic, but not on the international, plane.[140]

160. The second and third sentences of paragraph 2 go together. It is obvious that an individual—including a juristic entity—can, so far as he personally is concerned, renounce any benefit or advantage accruing to him under a treaty; but this action cannot bind his State, or prevent the State from insisting on due performance, if it thinks fit. For instance, a general point of principle may be involved affecting other individuals besides the particular individual concerned, or affecting the State as a whole, and the State may consider it necessary to insist upon this in spite of the willingness of a particular individual to renounce his rights.

161. Some cases, on the other hand, have in their nature a two-fold aspect: there has been an injury not merely to some individual, but also separately to the State itself, apart from the prejudice caused to it in the person of its national. In a certain sense, a breach of treaty could be said always to have this double aspect in cases where individual rights are concerned. A good illustration (not necessarily confined to a case of treaties) is where, in reference to some maritime matter, a "flag" aspect is involved, concerning the State as such, in addition to injury caused to particular individuals, or failure to accord them the treatment provided for under some treaty. In cases of this kind, international tribunals have not infrequently awarded damages under the two separate heads of those relating to the individual concerned, and those relating to the flag and the State as such.[141]

SUB-SECTION iii. MISCELLANEOUS PARTICULAR QUESTIONS OF TREATY APPLICATION

162. This is left blank, partly because, as in the case of article 23, an exhaustive treatment of it would need a detailed study of a large number of treaty clauses of different kinds, and possibly information as to the practice of Governments respecting such clauses; partly also because many of the questions involved are likely to turn out to be governed by considerations of treaty interpretation pure and simple, and it seems best there-

---

of the parties is decisive as is evident from an examination of treaty practice as well as of arbitral and judicial practice."
The Rapporteur does not dissent from this conclusion, although he thinks it tends to avoid the real issue that arises in such cases, namely that whatever the individual's rights before his own (or the other party's) domestic tribunals, has he a *direct international right* under the treaty, or is it the case that the international right is still vested solely in his State as the party to the treaty, which alone can take action on that plane if the right is denied?

[140] In a number of United Kingdom cases, it has been decided that the Crown not being an agent of the citizen in relation to a treaty, even where it involves benefits for individuals, the action of the executive in such a matter cannot normally be controlled by the domestic tribunals (see Rustomjee v. the Queen (1876) L.R., 1 Q.B.D. 487; 2 Q.B.D. 69; Civilian War Claimants Association v. the King, L.R. (1932) A.C. 14; Administrator of German Property v. Knoop, L.R. (1933) 1 Ch. 439).

[141] The case of the *I'm Alone* (United States v. Canada) is in point; see the present Rapporteur's article in the *British Year Book of International Law* for 1936, p. 82. The proceedings and decision of the Commissioners were published by the King's Printer, J. O. Patenaude, Ottawa, 1935.