# EXHIBIT 20

recognized by everyone and enforced by the courts. International law, having no common authority and no compulsory jurisdiction, was more flexible, and should remain so.

37. In paragraph 5 of his commentary on articles 8 and 9 the Special Rapporteur emphasized, in connexion with error, the need to settle each case in the light of its circumstances. Although in two cases the International Court of Justice had taken a position which could be cited in support of Mr. Bartoš' argument, it had used very cautious terms. In the case concerning *Sovereignty over certain Frontier Land* (Belgium - Netherlands) it had stated that: "The only question is whether a mistake, such as would vitiate the Convention, has been established by convincing evidence." [4] And in the Case concerning the Temple of Preah Vihear it had stated that "the principal juridical relevance of error, where it exists, is that it may affect the reality of the consent supposed to have been given".[5] Thus the Court believed that there was a connection between error and evidence, and between error and substantive conditions to be verified.

38. Moreover, there was an inconsistency in the draft of article 7 submitted to the Commission; for after stating the possibility of declaring that fraud nullified consent to be bound by a treaty, it mentioned the possibility of affirming the treaty. In fact it recognized that there was no absolute nullity. It was significant that the word "nullity" was not found in the relevant cases. In the *Legal Status of Eastern Greenland* case, the Permanent Court of International Justice had decided that the steps taken by the Norwegian Government had been "unlawful and invalid".[6] Elsewhere, case-law relied on the notion of an instrument which could not be invoked against another State. In the absence of a common authority and of a compulsory jurisdiction, the principle that a State could not rely on its fraudulent transaction could achieve the same result as a theory of nullity.

39. Mr. TSURUOKA said that the concept of fraud was undoubtedly important. The general principle that fraud affected the reality of consent, which was recognized in the law of many countries, was implicit in international law. The question was simply whether it was worth mentioning, in view of the rarity of cases of fraud and the difficulty of defining the scope of the question precisely. No member of the Commission insisted on the inclusion of an article dealing specifically with fraud, but many thought that fraud should be mentioned somewhere in the draft articles.

40. The Commission should find a compromise between codification *simpliciter* and the progressive development of law. A defrauded State should be protected and justice be safeguarded no doubt, but at the same time any wrongful application of the principle should be avoided.

41. The Commission should therefore choose one of two possible approaches. Either it could decide that fraud could be pleaded only before an international court; the difficulty then would be to win acceptance of that solution by a majority of States. Such a solution would certainly protect the defrauded State, for, as Mr. Gros had said, a State which considered itself defrauded and whose complaint was well founded would convince the court. It might perhaps also forestall reckless charges of fraud, and thus make for harmony in international relations. Or, despite the almost total lack of precedents, the Commission might try to develop the law, by defining fraud, determining its effects in law, and deciding how the principle should be applied in practice. It would then be faced with the difficulty of finding objective criteria in a domain ruled principally by subjective criteria.

42. The Drafting Committee should try to define the limits of the concept of fraud; if that proved too hard, then the only alternative, however difficult, would be to fall back on the idea of an international court exclusively competent to rule on cases in which consent to a treaty was alleged to have been induced by fraud.

43. Mr. AGO said he agreed with Mr. Tunkin that there were certain principles which were valid in any system of law. What he had meant to say at the previous meeting was that the same principles might operate differently in different circumstances and that international relations were a very different matter from relations between private persons.

44. One of the difficulties raised by the notion of fraud was linguistic. The French word "*dol*" did not perhaps mean exactly the same thing as the English word "fraud". Moreover, the Latin words *fraus* and *dolus* had different meanings. In *dol*, jurists placed the emphasis on intention. The concept of *dol* applied not only to contracts, but also to unlawful acts. In the case of an offence, the fraudulent intention was not the same thing as *faute* or negligence. There could be no *dol* without deliberately pursued intention. In the conclusion of a treaty, there was *dol* only if one party deliberately induced the other party to acknowledge as true something that was false and at the same time material to the formation of consent to the treaty. Such a situation, though not impossible in international relations, was much rarer than in relations between individuals, because States had certain safeguards which individuals lacked.

45. The cases which had been cited could not be presented as examples of consent procured by fraud. In the case of the Italo-Abyssinian Treaty of 1889, as he had already pointed out, there had been two texts which differed. Was the difference due to a misunderstanding or had it been introduced intentionally? The question was of no importance in that context, since in any case it could not be said that consent had been induced by fraud, for the lack of concordance between the texts had resulted in absence of consent.

46. If the Commission wished to prepare a complete draft convention and include in it a theory of defects in consent, then it should deal with the question of fraud. But he warned his colleagues against the danger of opening the door too wide to the ingenuity of States seeking to evade treaty obligations. In fact, fraud was

---

[4] *I.C.J. Reports*, 1959, p. 222.

[5] *Idem*, 1961, p. 30.

[6] *P.C.I.J.*, Series A/B, No. 53, p. 75.

more likely to be pleaded to secure the voidance of a treaty than to secure a partner's consent to a new treaty.

47. The best approach would probably be to draft a single article dealing with whatever factors might vitiate consent; in that way the subject would not receive too much prominence in the draft.

48. Mr. YASSEEN said the rule that fraud vitiated consent existed in international law because it was a general principle of law. It was accepted in every system of national law. A State could not argue that fraud did not invalidate consent to a treaty. The principle was part of positive international law, in accordance with Article 38 of the Statute of the International Court of Justice, which treated the general principles of law as an autonomous source of international law.

49. The controversy on *laesio* could be cited in support of that argument. It was generally maintained that in international law *laesio* was not recognized as vitiating consent. And in attempting to fill that gap, some writers had invoked the general principles of law to show that *laesio* vitiated consent to the conclusion of a treaty. But it had been replied that there was a rule of international law which laid down that *laesio* was not recognized as vitiating consent to treaties. It was true that that argument could hardly be invoked in the case of fraud, for it could not be said that there was a rule of international law to the effect that fraud did not vitiate consent to a treaty.

50. As to the question whether an article on fraud should appear in a convention on the law of treaties, he thought that such an important matter should certainly not be disregarded; otherwise, the draft might give the impression that the Commission did not believe that fraud invalidated consent.

51. Some speakers had referred to the difficulty of proving fraud in the absence of a court. The institutions of international life had obviously not progressed as far as national institutions, but means of settling international disputes did exist. In his statement immediately after his appointment the Secretary-General had said: "We live in an imperfect world, and have to accept imperfect solutions, which become more acceptable as we learn to live with them and as time passes by." [7]

52. He was still convinced that article 7 should be retained. Even though solutions as satisfactory as those existing in national law were impossible, that was no reason for abandoning the principle.

53. Sir Humphrey WALDOCK, Special Rapporteur, summarizing the discussion, said that a few members were evidently opposed to the inclusion of an article on fraud and Mr. Gros had voiced objections that went beyond the issue of whether fraud was in fact attributable to States. Most members, however, including himself, could not subscribe to the view that the question of the reality of consent did not have any place in treaties between States and was a matter which lay outside the scope of the draft articles.

54. The majority view seemed to be that some provision concerning fraud was necessary; the question to be decided was exactly how much emphasis it should be given. Some members had suggested that the matter could be dealt with among the causes of error covered by article 9, while others favoured a separate article on the subject.

55. Clearly some definition of fraud was needed, but the one he had attempted to incorporate in article 7 might be wider than that commonly accepted in continental systems of law. It followed fairly closely the concept of fraud in English law, which comprised the deliberate intent to deceive, mentioned by Mr. Ago as an essential element in the definition, but also went further to include reckless mistakes intended to obtain the consent of the other party without regard to whether the statements were true or false; if such statements were found to be untrue, they fell within the law of deceit.

56. After reflecting on the discussion, he had come to the conclusion that that particular aspect of the doctrine of fraud, which was specially relevant to commercial transactions, had perhaps little place in the context of relations between States, and having heard something of the continental concept of "*dol*" he had come round to the view that a comparatively narrow definition was advisable. A narrow definition would at the same time serve to obviate the dangers of abuse whereby States would seek to invoke fraud as a mere pretext to free themselves from obligations deriving from treaties which had proved less advantageous than originally expected. It was also desirable in order to maintain a clear distinction between fraud and other elements vitiating consent, such as coercion.

57. Certain other issues, such as proof of fraud and by what procedures it should be determined, as well as the question of severance, though highly relevant, might perhaps be left aside until the Commission took up section IV of his report. He had deliberately dealt with substance and procedure separately, since whatever view was taken of those other matters, it was necessary to formulate the law relating to the substance of the question.

58. With regard to some of the points raised, in particular by Mr. Tsuruoka, on the remedies proposed in article 7, he had provided for an element of choice in paragraph 1. In his own view the differences between the formulations in paragraph 1 (*a*) on the one hand, and in paragraphs 1 (*b*) and 1 (*c*) on the other, were not of prime importance.

59. His personal opinion was that the best solution would be to follow Mr. Elias' suggestion and deal with the question of fraud in article 9, adopting a strict definition of the kind advocated by Mr. Ago. For the time being, article 7 could be referred to the Drafting Committee for consideration after the Commission had dealt with the two following articles; it would then be in a position to harmonize the Commission's views on all those three articles.

60. The CHAIRMAN said he believed that the division of opinion in the Commission was more apparent than

---

[7] *Official Records* of the General Assembly, seventeenth session, plenary meetings, 1182nd meeting, para. 23.

real and accordingly suggested that article 7 be referred to the Drafting Committee for consideration in the light of the discussion on articles 8 and 9. That would leave the Drafting Committee some discretion as to how the question of fraud was to be handled, but the Commission's final decision in the matter would be reserved.

*It was so agreed.*

61. The CHAIRMAN invited the Commission to consider articles 8 and 9 together.

### ARTICLE 8 (MUTUAL ERROR RESPECTING THE SUBSTANCE OF A TREATY)

### ARTICLE 9 (ERROR BY ONE PARTY ONLY RESPECTING THE SUBSTANCE OF A TREATY)

62. Sir Humphrey WALDOCK, Special Rapporteur, introducing the articles, said that article 8 dealt with the case in which both Parties had been in error and article 9 with the case in which one of them had suffered from an error induced by acts, statements or omissions by the other, whether through fraud, innocent misrepresentation or negligence. The position of the Parties was different in the two cases and he had accordingly dealt with them in separate articles. Another reason for so doing, apart from drafting considerations, was that the provision contained in article 8, paragraph 3, was inapplicable to article 9. The Commission would have to decide whether or not it wished to maintain the distinction between mutual and unilateral error; if not, the two articles could be combined.

63. Mr. PAREDES said he held to the view that international law had been greatly influenced in its formation and development by the principles of private law, which had stimulated and guided it within the limits imposed, of course, by the differences between those two branches of law arising from the subjects they governed. That was more clearly evident as soon as the primitive concept of sovereignty began to be replaced by the principle of the interdependence of nations; it was the only way of understanding many of the ideas embodied in the United Nations Charter, including, of course, the concept of State responsibility. Consequently, he was not afraid to seek clarification of international law in the principles of internal law.

64. On the other hand, in view of the great value of Mr. Tsuruoka's opinions, he had felt alarm and anxiety on hearing him say that in international affairs only the formal and external aspect of treaties was important, not the intrinsic content. He himself believed the opposite: the outward appearance was the form taken by the substance and realization, or by the object in view.

65. With regard to fraud in international relations it had been said that there were very few recorded cases and that it was difficult for one party to deceive the other because they both had adequate means of ascertaining the truth: technical experts, maps of all kinds, explorers, etc. Such statements were understandable if historical events in Europe alone were considered, without taking the other continents into account; but on a comprehensive view of history it would be found that in the last third of the previous century a great number of treaties had been concluded by flagrantly fraudulent means: those establishing protectorates and concessions in Africa and Asia. The statement that it was easy to obtain information about the land, which was true of Europe, was not true of the immense and tangled rain-forests and steep terrains of other parts of the world; there the conquerors and the conquered people were not on equal footing.

66. The Special Rapporteur had made an admirable synthesis of the contemporary doctrine of error in articles 8 and 9. Error was one of the factors that could vitiate consent, since consent depended on knowledge of the subject-matter and the object of the agreement, and the free decision to conclude it. If one of those elements was lacking, neither consent nor the treaty resulting from it existed.

67. He had no objections to the drafting of articles 8 and 9, but in order to make the idea more precise and the provision more effective, he suggested that in article 8, paragraph 1 (c), a sentence should be added to the effect that " This circumstance shall be presumed to exist when the error prevents implementation of all or part of the provisions of the Treaty."

68. In spite of what had been said he saw no justification for the different consequences ascribed to mutual error in article 8 and error by one party only in article 9, under which the other parties must have contributed to causing the error. Whatever course the proceedings had taken, the error, since it remained one of the elements of consent, invalidated the treaty. The intervention of the other party in inducing error corresponded to the element of fraud, which was being studied separately.

69. Mr. VERDROSS said he had some doubt about the problem of error of law referred to in article 8. International law was so complex that a rule as rigid as rules of national law could not be accepted. For example, two States had held that League of Nations mandates had lapsed with the League's disappearance; but the International Court of Justice had later given a contrary judgement. The two States in question could, however, hardly be said to have committed an inexcusable error of law. Judge Anzilotti's opinion in the *Eastern Greenland* case had been cited in support of the idea of inexcusable error of law; but in holding that a government could not be ignorant of the legitimate consequences following upon an extension of sovereignty, Judge Anzilotti had been speaking only about the particular case then before the Court. That opinion could not form the basis for a general rule that an error of law was never excusable.

70. Mr. ROSENNE said that, in articles 8 and 9, the Special Rapporteur had accomplished a piece of codification and had been guided by practical considerations. He (Mr. Rosenne) shared the doubts expressed by Mr. Verdross regarding the exclusion of error of law from the scope of the draft. He suggested that paragraph 1 (*a*) of article 8 be dropped, since in any case the point was adequately covered by paragraph 1 (*b*).

71. After hearing Mr. Verdross' interpretation of Judge Anzilotti's opinion in the *Eastern Greenland* case he wished to add that in the *Temple* case (preliminary objections) the International Court of Justice had not rejected *a priori* an argument based on an alleged error of law, but had disposed of the contentions on different grounds altogether. Its pronouncement that "Furthermore the principal juridical relevance of error, where it exists, is that it may affect the reality of the consent supposed to have been given"[8] should appear in the commentary alongside the passage from the judgement on the Merits reproduced by the Special Rapporteur at the end of paragraph 3 in his combined commentary on articles 8 and 9.

72. In order to bring paragraph 3 (*a*) of article 8 into closer conformity with the language used by the International Court in the *Temple* case, the words "by the exercise of due diligence" should be deleted. That requirement was borrowed from municipal law but, was difficult to apply even on the domestic plane and added little to the text.

73. He had some misgivings about the purport of paragraph 3 of article 9, as he doubted whether it was appropriate to speak of error being invoked by a State acceding to a treaty when the error would have been made at the stage of negotiation. He also enquired whether it was international that only accession, and not acceptance and approval, had been mentioned in that provision.

74. Recalling a discussion on terminology which had taken place at the previous session (657th meeting paras 70-72), he suggested using different words for "mistake" denoting errors of substance as in articles 8, 9 and 10, and "error", denoting the types of error or omission which were the subject of articles 26 and 27 of Part I and article 10 of Part II. He assumed that all the official languages of the United Nations and other important languages possessed two equivalent words.

75. He was not fully convinced of the need for two separate articles on the matters under consideration, but that could be regarded as a drafting point and left to the Drafting Committee.

The meeting rose at 1 p.m.

---

[8] *I.C.J. Reports*, 1961, p. 30.

---

### 680th MEETING

*Wednesday, 15 May 1963, at 10 a.m.*

*Chairman:* Mr Eduardo JIMÉNEZ de ARÉCHAGA

---

INTER-AMERICAN JURIDICAL COMMITTEE

1. The CHAIRMAN said that he had received a communication from the Inter-American Juridical Committee stating that Mr. Caicedo Castilla had been nominated to attend the Commission's fifteenth session as an observer.

Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda]
(*resumed from the previous meeting*)

2. The CHAIRMAN invited the Commission to continue consideration of articles 8 and 9 in section II of the Special Rapporteur's second report (A.CN.4/156).

ARTICLE 8 (MUTUAL ERROR RESPECTING THE SUBSTANCE OF A TREATY) (*continued*)

ARTICLE 9 (ERROR BY ONE PARTY ONLY RESPECTING THE SUBSTANCE OF A TREATY) (*continued*)

3. Mr. BRIGGS said he was not greatly concerned at the fact that paragraph 3 (*a*) of article 8 largely nullified paragraph 1, as he preferred paragraph 3 (*a*).

4. The provision contained in paragraph 2 (*a*) was too extreme since it established a unilateral right to denounce a treaty when none existed in contempory international law.

5. With those points in mind and in order to bring article 8 more into harmony with the case-law referred to in the commentary, he suggested that it be redrafted on the following lines:

> "1. Where a treaty has been entered into by the parties under a mutual error respecting the substance of the treaty, no party shall be entitled to invoke an error as invalidating its consent to be bound where
>
> (*a*) the party in question contributed by its own conduct to the error, or could have avoided it, or if the circumstances were such as to put that party on notice of the possibility of the error; or
>
> (*b*) the party in question has so conducted itself as to bring the case within the provisions of article 4 of this Part.
>
> "2. However, if
>
> (*a*) the error was one of fact and not law;
>
> (*b*) the error related to a fact or state of facts assumed by the parties to exist at the time that the treaty was entered into;
>
> (*c*) the assumed existence of such fact or state of facts was material in inducing the consent of the States concerned to be bound by the terms of the treaty;
>
> then in any such case the party in question may, by mutual agreement with the other party or parties concerned, either (*i*) denounce the treaty as from such date as may be decided, or (*ii*) confirm its consent to be bound by the treaty subject to any modifications that may be decided upon in order to take account of the error."

6. The Drafting Committee should perhaps give some thought to the wording of the last part of paragraph 2 in the Special Rapporteur's draft; it should be made clear that it was not the treaty that was to be affirmed,

it being already in force, but the parties consent to be bound.

7. There was some force in the argument advanced by Mr. Paredes at the previous meeting, but his amendment to paragraph 1 (c) was misplaced: impossibility of performance could not be treated in the same provision as error.

8. If the general structure he had suggested for article 8 was acceptable, it could probably be expanded to incorporate the substance of article 9.

9. Mr. CASTRÉN said that article 8 was, on the whole, satisfactory. He accepted the rule stated in paragraph 1 which specified the circumstances in which a party had a right to be released from commitments entered into on the basis of error; sub-paragraph (c) should, however, be formulated more clearly.

10. Under paragraph 2 (b), a treaty entered into by the parties under a mutual error could only be denounced or amended by mutual agreement with all the parties concerned. That was a perfectly correct proposition so far as amendments were concerned, but it was hard to see why the Special Rapporteur did not admit unilateral denunciation in such a case; he had not given his reasons in the commentary. Surely the fact that the error was mutual was not sufficient.

11. Paragraph 3, which reflected the decision of the International Court of Justice in the *Temple of Preah Vihear* case,[1] could with advantage be simplified, particularly sub-paragraph (a). Also, the cases covered by sub-paragraph (b), which referred to article 4, and particularly its sub-paragraph (c), were partly dealt with in article 8, paragraph 3 (a).

12. With regard to article 9, he had some doubts concerning paragraph 3, which recognized the right of a State acceding to a treaty to plead error in order to be released from its obligations. Actually, errors generally occurred during the negotiation or conclusion of a treaty, and paragraph 1 of article 9 dealt with the case in which the error had been induced by the attitude of the other party. But could the States which had drafted the text of a treaty be said also to have deceived States which had not participated in its conclusion, but had acceded to it subsequently? In practice, it seemed that no acceding State had ever pleaded error as a ground for denouncing a treaty. At any rate, error in that case was not mutual, and the rules stated in article 8 were therefore not applicable. In his commentary the Special Rapporteur said that he had followed the previous rapporteur on that point. He (Mr. Castrén) had searched in vain in Sir Gerald Fitzmaurice's report for a passage stating that the case of an acceding State could be treated on a par with that of a State induced to conclude a treaty by an error. He therefore proposed that paragraph 3 of article 9 should be deleted.

13. Mr. ELIAS said that, for reasons very similar to those which had prompted Mr. Briggs' suggestion, he proposed that articles 8 and 9 be combined to read:

" *Mistake (including fraud) affecting the essential validity of Treaties*

" 1. (a) Where parties have entered into a treaty under a mutual mistake as to the substance of the treaty, any party may treat the mistake as invalidating *ab initio* its consent to be bound by the treaty, unless the parties afterwards mutually agree to affirm it subject to such conditions or modifications as may be decided upon.

" (b) Where a State accedes to a treaty in the conclusion of which it did not take part, it shall be entitled to treat a mistake upon which it was based as invalidating *ab initio* its consent to be bound by the treaty.

" 2. A party to a treaty vitiated by mutual mistake shall not, however, be entitled to resile from the treaty if

" (a) it has contributed by its own conduct to the mistake, or could have avoided it, or if the circumstances were such as to put it on notice of the possibility of the mistake, or

" (b) it has so conducted itself as to bring the case within the provisions of Article 4 of this Part.

" 3. Where only one or some of the parties to a treaty has or have entered into it under a mistake induced by the innocent misrepresentation, fraud or negligence of the other party or parties, then, subject to the payment of adequate reparation by the guilty party or parties, the innocent party or parties shall be entitled to treat the mistake as invalidating the treaty *ab initio*, unless it has so conducted itself as to bring the case within the provisions of Article 4 of this Part.

" 4. For the purpose of this Article, the mistake must be such as related to a fact or state of facts assumed by the parties to exist at the time that the treaty was entered into, and the assumed existence of such fact or state of facts was material in inducing the consent of the States concerned to be bound by the terms of the treaty."

14. He had reproduced the substance of paragraph 3 of article 9 in paragraph 1 (b), since the Special Rapporteur, in paragraph 11 of his commentary on that article, had made it clear that he was following Sir Gerald Fitzmaurice in assimilating the special case of a State being led to accede through a mistake to a case of a mutual error.

15. Paragraph 2 of his proposal contained the exceptions to the rule stated in paragraph 1, which was based on a selection of certain elements in paragraphs 1 and 2 of the original article 8.

16. Paragraph 3 dealt with mistakes by one party only.

17. In paragraph 4 he had embodied the principle stated by the Special Rapporteur in paragraph 1 (c) of article 8, but had made it applicable, as he believed was correct, to both mutual and unilateral mistakes.

---
[1] *I.C.J. Reports*, 1962, p. 26.

18. If it were decided to include some definition of fraud in the draft, it could be incorporated as a separate sub-paragraph of paragraph 4 of his text.

19. The CHAIRMAN, speaking as a member of the Commission, said he subscribed to the view that the provisions under discussion, which related to defects in consent, formed part of the general principles of international law recognized by civilized nations. However, as only those elements of private municipal law that were common to all civilized nations could be transferred to international law, the present rules would have to be built up from the lowest common denominators of the main legal systems of the world. It was by that kind of process that the Special Rapporteur had come round to the view that the narrower concept of fraud prevailing in continental systems of law should be adopted in preference to the English concept.

20. On the other hand, the concept of error in continental civil law was perhaps wider than in common law systems. Mr. Paredes' surprise at the Special Rapporteur's drawing a distinction between mutual and unilateral error was understandable, as the distinction did not exist in continental systems, under which it was not necessary for both parties to be in error for the contract to be voided. If, under the Common law, error by one party alone could only be accepted as a ground for invalidating consent when it had been caused by fraud, then presumably in the search for the lowest common denominator the Commission could go no further in its work of codification.

21. His own impression was that the conditions which, under article 8, paragraph 1, had to be fulfilled before error could be invoked as a ground for invalidating a treaty were too close to those obtaining in English private law. The Drafting Committee should devise a more general rule, perhaps seeking inspiration in the continental principle that the error must have been of a kind which had determined consent.

22. In paragraph 2 (*a*) of article 8, as in article 7, the Special Rapporteur had placed too much emphasis on unilateral action, and that was likely to prove unacceptable to most members of the Commission because of the element of insecurity it might introduce. The general view probably was that defects in consent could only invalidate the treaty when their existence was recognized by agreement between the parties or declared by third-party determination; he did not wish to enter into the question of international jurisdiction at that stage.

23. He supported Mr. Rosenne's amendment deleting the words " by the exercise of due diligence " in paragraph 3 (*a*), as to follow more closely the wording of the International Court in the *Temple of Preah Vihear* case.

24. Perhaps paragraph 3 (*b*) of article 8 was redundant and no such express reference to article 4 was needed.

25. Mr. TUNKIN said that Mr. Elias's suggestions for combining articles 8 and 9 should be of assistance to the Drafting Committee, but he doubted whether the problem of fraud could also be covered in the same article.

26. Paragraph 1 of article 9 raised the question whether a distinction ought to be made between its application to multilateral treaties and to bilateral treaties, as the situation would clearly be different in the two cases.

27. He questioned whether there was any justification for the restrictions imposed in paragraph 1 on the grounds for invoking error to invalidate consent, which might in practice prove more advantageous to what had been aptly described as the more experienced States. International rules should not be modelled too closely on the internal law of States, seeing that the situations they were designed to regulate must be of a different character.

28. Mr. AGO said he agreed with Mr. Tunkin. The idea that error could vitiate consent only if it was somehow attributable to the other party seemed to him unduly restrictive. If an error was intentionally induced by the other party, that was, in practice, the case referred to by article 7, i.e. fraud; but in the case of an error in the true sense of the word, it mattered little whether it had been caused unintentionally by the other party or was due to other circumstances, so long as the error had been the deciding reason for consent and consent was thus vitiated. The two cases — fraud and error — should be differentiated, and a single article should deal with both mutual error and error by one party only.

29. The Drafting Committee should now be able to settle the problem, since the members of the Commission were agreed on the substance.

30. Mr. EL-ERIAN said he approved of the approach adopted by the Special Rapporteur in articles 8 and 9, which he had rightly based on the International Court's decision in the *Temple of Preah Vihear* case.

31. Reference had been made to general principles of law and the view advanced that any rules common to the legal systems of nations should be regarded as rules of international law. He certainly could not endorse that interpretation of article 38, paragraph 1 (*c*), of the Statute of the International Court of Justice; the greatest caution was called for in drawing analogies from municipal law. That provision was intended to refer to general principles recognized in the different systems of law.

32. Mr. PAL said that the existence of error, whether mutual or unilateral, surely meant that there had been no consensus of view between the parties and consequently no real *consensus ad idem*. Nevertheless, in his country, where the rules were derived from English law, a distinction was made, as to the consequences, between mutual and unilateral error. *Caveat emptor* was a general rule of the law of contract.

33. A case not covered in the draft was that in which one of the parties, while aware that the other was in error, took advantage of the error and accepted the treaty. That case presumably fell within the scope of the provision concerning error induced by misrepresentation in article 9, paragraph 1. Incidentally, there seemed to be no need to qualify misrepresentation as " innocent ", since it had been distinguished from fraud.

34. He agreed that the application of article 8, paragraph 1 (*a*), should be confined to errors of fact. For