purposes of international law, a mistake over the internal law of one of the parties would be an error of fact and not of law, and the basic principle *ignorantia juris haud excusat* was hardly pertinent in respect of international law as it stood at present.

35. It would be appropriate to deal with the problem of fraud in article 9, because if two of its essential features, the intent to procure consent and the achievement of that purpose, were present, its effect was to bring about error in the mind of the consenting party.

36. Mr. PAREDES asked that his amendment to article 8, paragraph 1 be referred to the Drafting Committee, as the speakers who had mentioned it seemed to approve of its contents even though they did not think it should be inserted where he had suggested. The Drafting Committee could choose the appropriate place for its insertion.

37. In accordance with his previous statement, which has been endorsed by several members of the Commission, he emphasized that error by the parties, whether mutual or by only one of them, when as serious as was assumed in the text of the articles under discussion, vitiated the treaty *ab initio*; for as there was no correct understanding of the object or subject-matter of the agreement, there was no consent by the parties and consequently no agreement, which was the basis of the validity of a treaty. Malicious deceit or concealment used by one party to induce another to give its consent came within the realm of fraud and should be studied separately.

38. He was firmly convinced that, if it was to be perfected and to make progress, international law must recognize and enter into the informative spirit of internal law which, being more highly developed, was an adequate guide for juridical principles.

39. Mr. CASTRÉN observed that if the concept of error was widened too much it would come within the scope of the doctrine of *rebus sic stantibus*, which should be considered separately. Consequently, errors of law could hardly be taken into consideration as well.

40. Mr. BARTOŠ said that the Commission's draft should take defective consent into account. It was error that was the essential ground for nullity, even in cases of misrepresentation, for the error was induced by fraud. But on the other hand, as a counterpart to the guarantee given to the party in error, it was necessary to safeguard the security of international relations. Having regard to the stability of contractual relations, all errors could not be regarded as reasons for invalidation. Moreover, they were not so regarded either in Roman law or in comparative private law. Certain conditions were always imposed for recognition of the effects of error.

41. To be recognized as a ground for invalidation the error must be "excusable". It might be conceded that an error which would normally not be excusable, was excusable for a party acting in good faith if caused by the actions of the other party. It must be recognized that in principle an error could not be presumed to be excusable. The burden of proof was on the party con-

cerned, which must show that there had been not only no bad faith on its part, but also no negligence.

42. At that point the question of the "judge" arose. It was obvious that a treaty was not automatically invalidated, even if the error produced its effects *ex tunc*. A State could not regard itself as being released from its treaty obligations by its own decision without applying to an established Court, to which it must submit its claim that the treaty was void. That condition was necessary, for otherwise the State itself would be the judge in its own cause, which was not admissible in law. But difficulties arose, for in view of the provisions of Article 36 of the Statute of the International Court of Justice, it would be quite illusory to provide for compulsory jurisdiction in the Convention. Nevertheless, he was convinced that it would be desirable to prevent a State from being the judge in its own cause, which meant in fact being the judge of the other party.

43. Admittedly, many cases of error deserved to be taken into consideration in international law. But, as Mr. Ago had said, it should be borne in mind that States were too much inclined to seek grounds for evading their obligations. It was the duty of the Commission to devise rules that would prevent the possibility of abuse on the pretext of an error, which could always be found. To have effect, the error should not only be excusable, but also sufficiently serious; in other words it must cause more harm to the party concerned than to international relations. That idea should be expressed in the draft.

44. With regard to the lapsing of claims for voiding a treaty, in other words the time within which the claim must be brought, the necessary limitations were laid down in article 4. In that connexion he reminded the Commission that he maintained his reservation on the provisions of article 4 concerning treaties in simplified form.

45. The Commission should adopt more precise provisions on the question of error, with the necessary safeguards against abuses.

46. Mr. YASSEEN said it was necessary to make sure that consent was unambiguous and not vitiated by error. To be successfully pleaded, error must be a decisive factor and, whether it was the result of an intentional act or of negligence, any such error should be regarded as vitiating consent. He could agree to articles 8 and 9 being combined, but he still thought that fraud was a separate question, which should be dealt with in a separate article.

47. The whole theory of defective consent was based on general principles of law. Those principles had given rise to many theories. Without wishing to go into details, he supported the view taken by many authorities, and in particular by Mr. Verdross, that in order to qualify as a general principle of law, a principle must be directly derived from the concept of justice and accepted by nearly all civilized nations or the great majority of them.

48. Two implied conditions were also necessary. First, as to applicability: it must be possible to apply the principle in the international order; there must be an environment similar to that in which it was applied

in internal law. Thus the crimes of theft and rape, for instance, were not covered by rules of international law, although they were recognized as crimes by the laws of all the States in the world. Secondly, as to adaptation: the principle must be adapted to the international order; the analogy with relations in the domestic life of a nation did not rule out certain differences, or the need for some adaptation of the principle it was intended to apply in the international order. Such adaptation seemed essential; hence the difficulty of the Commission's task.

49. Mr. VERDROSS explained that in his definition of the general principles of law, referred to by Mr. Yasseen, an essential element was their applicability in international law. He added that in the fifth edition of his treatise,[2] at present printing, the expression " civilized nations " was no longer used, because its use was no longer justified. That expression must now be understood to include all Members of the United Nations.

50. Mr. TSURUOKA said that the Commission should beware of drafting the provisions on error in such a way that a State might unilaterally void a treaty, wholly or in part, on the pretext that it had committed an error. Precisely because the consensus of opinion seemed to be in favour of broadening the concept of error, some limitations to prevent abuses were necessary.

51. Mr. BARTOŠ said he agreed with Mr. Yasseen that the general principles introduced into international law had grown up in the practice of civilized nations or, in other words, in municipal law. But it was comparative law which showed whether a principle or an institution was accepted by nearly all civilized nations. It was thus that a general principle was established as a universal principle and became a source of international law. It was for international case-law to decide whether a principle was universally accepted and adopted as a general principle of international law.

52. He could not however, agree with Mr. Yasseen about the principles he had cited as being confined to municipal law, which would not be applicable in international law. Theft and rape were crimes in the eyes of all nations and were accordingly crimes in international law; any diplomat who committed such acts would certainly be declared *persona non grata*, and if the case were heard under international law the decision would be that the receiving State was justified in considering those acts as serious offences.

53. Mr. AMADO said that he invariably approached the subjects under discussion from the point of view of pure international law. Bilateral treaties had gradually yielded to multilateral treaties, and the concept of error, so important in contracts, lost much of its weight in the case of agreements drawn up by conferences attended by a large number of States.

54. Mr. Verdross's idea that the general principles of law must conform with justice showed once again how deplorable was the absence of judicial authority in inter-

national law, which was still developing and had not yet evolved to the same extent as municipal law.

55. He shared Mr. Tsuruoka's apprehensions. He believed, too, that error, in order to be admissible as a plea, must affect the substance of the treaty. Consequently, the language used by the Special Rapporteur in the last sentence of paragraph 4 of his commentary on articles 8 and 9 — which reflected the International Court's decision in the *Mavrommatis Concessions* case [3] — should also be used in the body of the text.

56. In addition, the error must exist in fact, for the state of international law was such that there could, unfortunately, be no inquiry into the parties' intentions. The parties' intentions, which were a key factor in private law, could not carry equal weight in international law.

57. He would prefer to see articles 7, 8 and 9 combined, but as many members did not agree with that view, he would not press it.

58. Mr. TUNKIN said that his views on the general problem of the principles of international law differed from those expressed by Mr. Yasseen and Mr. Verdross, but he would not elaborate them at that stage, as the problem was not under discussion. He had explained his theory in a recent book entitled " Theoretical Questions of International Law ".[4]

59. Sir Humphrey WALDOCK, Special Rapporteur, said that the first point he would like to take up in connexion with articles 8 and 9 was whether a distinction should be made between bilateral and multilateral treaties, because some Members had shown an inclination to draw that distinction in discussing other articles. Personally, he was disinclined to draw such a distinction because the possibility of an error vitiating consent could arise for a small multilateral treaty very much in the same way as for a bilateral treaty, and any attempt to draw a distinction among multilateral treaties would lead to difficulties of definition of which the Commission had had experience in drafting its first Report. The very fact that it was extremely unlikely that an error would be alleged in the case of a general multilateral treaty suggested that it was not necessary to differentiate between bilateral and multilateral treaties.

60. The main question in connexion with the two articles was whether the distinction between mutual error and error by one party only should be retained. That distinction was made in the common law legal systems, where it reflected a genuine difference in the position of the parties. If one party had been led into the error by the fault of the other party, there was not complete equality in their positions with respect to the error and there was a case for treating unilateral error differently from multilateral error, as was done in articles 8 and 9. However, after hearing the views of other members as to the different rules applied in continental systems, he was prepared to agree that, for purposes of international law, the distinction between the two kinds of error should not be made. Clearly that

[2] Verdross, A. von, Völkerrecht, Vienna, Springer, 1959.

[3] *P.C.I.J.*, Series A, No. 11.

[4] Voprosy teorii mezhdynarodnogo prava, Moscow, 1962, Gurizdat.

question must be definitely settled by the Commission before the articles could usefully be referred to the Drafting Committee.

61. Another point was whether article 7, concerning fraud, should be merged with articles 8 and 9. He noted that even members who, like Mr. Elias, advocated that course, still wished to have a separate paragraph on fraud, and there appeared to be general agreement not to drop the distinction between error induced by fraud and error of other kinds. The distinction should be maintained because, although where fraud induced consent it led to an error of some kind, it would not necessarily be the type of error required for purposes of annulment on grounds of error alone; for in cases of fraud the conditions of error would be less strict.

62. With regard to the definition of error and to the exclusion of errors of law by paragraph 1 (*a*) of article 8, it had rightly been pointed out by Mr. Pal that the "law" mentioned in the context was exclusively international law. Municipal law was fact for purposes of international law and mere errors of municipal law were not therefore errors of law for the purposes of article 8.

63. Mr. Verdross and certain other members, however, had objected to stress being laid on the exclusion of errors of law. Admittedly, the distinction between errors of law and errors of fact was not always a very easy one to make. Even in municipal law, it often happened that a question of right depended on facts as well as law. Since, like Mr. Bartoš and Mr. Amado, he would not like to leave the door wide open to pretexts for the evasion of obligations under a treaty, he was inclined to adopt a somewhat strict position on the question of errors of law, in line with what appeared to be the approach to pleas of error adopted by the Permanent Court of International Justice in the *Eastern Greenland* case [5] and by the International Court of Justice in the *Temple* case.[6] It might be true, as Mr. Verdross had pointed out, that Judge Anzilotti in the *Greenland* case had made his observations concerning error with reference to the particular case. But in that case Judge Anzilotti and the majority of the Court had shown no disposition to listen to a plea of error as to rights; while in its judgement both on the Preliminary Objections and on the Merits the Court; in the *Temple* case, had dealt very strictly with pleas of error. Consequently while he was prepared to accept the deletion of paragraph 1 (*a*) of article 8, he wished to retain paragraph 1 (*b*) with its indication that the error must relate "to a fact or state of facts".

64. He noted the criticism by some members of the expression "was material in inducing the consent", used in paragraph 1 (*c*). His intention in that passage had been to reflect the ruling by the Permanent Court of International Justice in the *Mavrommatis Concessions* case.[7] He had used the classic English expression "was material" but if that expression was not considered satisfactory by other members, he would be prepared to use such language as "was a condition".

[5] *P.C.I.J.*, Series A/B, No. 53, pp. 77 and 91.
[6] *I.C.J. Reports*, 1962, p. 26.
[7] *P.C.I.J.*, Series A, No. 11.

65. With regard to paragraph 3 (*a*), his intention had been to reflect the ruling of the International Court of Justice in the *Temple* case. He had ventured to add, between the word "could" and the words "have avoided" the additional words "by the exercise of due diligence". Those words, he felt, would be necessary for purposes of a codification, although they had not been used by the Court. While perhaps not necessary in the context of the Court's decision in the particular case, it seemed necessary in a codification to qualify the Court's phrase in some way, unless the Commission was in effect to negative altogether the relevance of error in the law of treaties; for it might be possible to argue that any error could have been avoided by the party concerned. The insertion of some such phrase as "by the exercise of due diligence" therefore seemed necessary.

66. As to the proposals for the redrafting of articles 8 and 9 made by Mr. Briggs and Mr. Elias, he could not comment on them in detail until he had seen them in writing. Both appeared to contain valuable ideas and would no doubt be of assistance to the Drafting Committee.

67. With regard to paragraph 2 (*a*) of article 8, the words "the party in question may regard the error as nullifying *ab initio* its consent..." should be construed as meaning "the party in question may invoke...".

68. Articles 8 and 9 should be considered in conjunction with the other draft articles of Part II, particularly article 2 (The presumption in favour of the validity of a treaty) and article 3 (Procedural restrictions on the exercise of a right to avoid or denounce a treaty). Some degree of strictness in the matter was desirable so as to provide safeguards against possible abuse of the recognition of fraud and error as factors vitiating consent.

69. It could be left to the Drafting Committee to decide whether the provisions on fraud should constitute a separate article or merely a separate paragraph of a consolidated article.

70. Mr. YASSEEN said that he still questioned the distinction made in the draft between error of fact and error of law. Admittedly, the Permanent Court of International Justice had tended to regard municipal law as a fact; but what was the status of regional international law? If, for example, a Latin-American country concluded a treaty with an Asian country and the latter committed an error with regard to Latin-American international law, should that error be regarded as an error of law? Ignorance of the law was no excuse, but an Asian country could hardly be expected to know Latin-American law.

71. Sir Humphrey WALDOCK, Special Rapporteur, said that the question was an interesting and difficult one. He supposed Mr. Yasseen had in mind an error regarding such a matter as the Latin-American practice of asylum. The International Court had held there existed a regional international law, and it might be either customary law or treaty law. In principle, it would seem that matters of regional international law were questions of international law rather than questions of fact.

72. Mr. CASTRÉN said that, in the hypothetical case mentioned by Mr. Yasseen, general international law would alone be applicable.

73. Mr. YASSEEN said he was not convinced. The Latin-American country might argue, for example, that the right of asylum, which it recognized was also recognized in Asia, whereas the Asian country might suppose that that right did not exist in Latin America. The resulting misunderstanding would certainly raise the question whether an error of fact or an error of law was involved.

74. Mr. TUNKIN said that the point could be covered by deleting paragraph 1 (a) of article 8, as suggested by Mr. Rosenne. The provisions on error would not then be confined to errors of fact.

75. Sir Humphrey WALDOCK, Special Rapporteur, said he was prepared to delete paragraph 1 (a) of article 8, so as not to exclude the possibility that an error of law might in some circumstances be relevant. However, under the terms of paragraph 1 (b), it would be made clear that the error must relate to " a fact or state of facts ". It would be going too far to contemplate a general rule allowing all errors of law as vitiating consent.

76. Mr. ROSENNE agreed that the deletion of paragraph 1 (a) and the retention of paragraph 1 (b) would go a long way towards covering the point that had been raised.

77. As he recalled it, the International Court of Justice had held in several cases that the existence of a purely regional rule of international law had to be proved. The Court thus seemed to view such rules as questions of fact rather than of general international law.

78. He also recalled that, with regard to the question of reservations, the opinion in some Latin-American countries was that the Latin-America system of reservations was part of general international law, while in others it was regarded as a peculiarly Latin-American system whose acceptance by the international community was desirable. It was hard to say whether an error arising out of that difference of opinion would be an error of fact or an error of law.

79. The CHAIRMAN suggested that the point raised by Mr. Yasseen should be referred to the Drafting Committee for consideration in connexion with the definition of error.

80. If there were no objection, he would consider that the Committee agreed to refer articles 8 and 9 to the Drafting Committee on the understanding that the distinction between mutual error and error by one party only would be dropped. The Committee would take the comments of members into consideration and would decide whether the question of fraud should form the subject of a whole article or be dealt with in a separate paragraph.

*It was so agreed.*

ARTICLE 10 (ERRORS IN EXPRESSION OF THE AGREEMENT)

81. The CHAIRMAN invited the Special Rapporteur to introduce article 10.

82. Sir Humphrey WALDOCK, Special Rapporteur, said that the purpose of article 10 was mainly to draw attention to the fact that articles 26 and 27 of Part I dealt with the problem of errors in expression of the agreement, and that such errors did not invalidate consent.

83. Mr. VERDROSS proposed the deletion of article 10. As articles 8 and 9 specified the cases in which error would have legal effects, they implied those in which it would not; to revert to the matter in the next article was unnecessary.

84. Mr. TABIBI said that it would be useful to retain article 10, because sometimes an error of expression could strike at the very root of a treaty. In fact, in a bilateral treaty, one party could exploit an error of expression in such a way as to perpetrate an actual fraud; an example was provided by the 1889 Treaty between Abyssinia and Italy already mentioned by Mr. Tunkin.

85. The fact that, in treaties drawn up under United Nations auspices, five official languages were used, raised a number of problems. Quite apart from the question of concordance, for countries like his own there was a serious problem in that all five were foreign languages. For example, during the extensive discussions at the First Conference on the Law of the Sea in 1958 on the subject of access to the sea for landlocked countries, it had become clear that the term " access " was construed by English jurists less broadly than he himself had understood it at the time.

86. He suggested that article 10 should be considered by the Drafting Committee jointly with articles 7, 8 and 9.

87. Mr. CASTRÉN supported Mr. Verdross's proposal that article 10 should be deleted. The Commission could hardly include in Part II an article which repeated something already stated in Part I.

88. Mr. ELIAS also considered article 10 unnecessary. Three situations could arise in connexion with errors in expression. The first was that in which both parties agreed that such an error had been made: it was adequately covered by articles 26 and 27 of Part I. The second was that in which the parties did not agree and the error affected a material point: essentially, it was then a question of a mistake, which would be covered by the provisions of articles 8 and 9. The third situation was that in which the parties did not agree, but the error did not go to the root of the treaty: that would be a matter of interpretation and could be left to the judge or arbitrator. Article 10 was consequently unnecessary since all the points that could arise were already covered by other articles.

89. Mr. ROSENNE pointed out that, in the case of the First Conference on the Law of the Sea mentioned by Mr. Tabibi, if there had been an error, it went much further than a mere error of expression.

90. Articles 26, paragraph 3, and 27, paragraph 5, of Part I, laid down that where an error in a treaty had to

be corrected, " the corrected text shall replace the original text as from the date the latter was adopted, unless the parties shall otherwise determine ". Article 10, paragraph 1, of Part II explained the juridical meaning of " shall replace ", and thus completed articles 26 and 27 of Part I by indicating the juridical consequences of correction. That could be specially important for bilateral treaties drawn up in two languages.

91. He suggested that the Drafting Committee should consider whether the purpose of article 10, paragraph 1, was best served by means of a provision in section II or by means of a passage in the commentary on articles 26 and 27.

92. Mr. AGO said that in the case cited by Mr. Tabibi the error introduced by the use of the word " access " in different senses by the different parties would have vitiated consent. The case would therefore have been one of those covered by articles 8 and 9. In article 10, on the other hand, the Special Rapporteur had dealt with the case in which there was consent and agreement was complete, but the expression of that agreement was defective. He could think of cases of that kind which had actually occurred when the governments of two adjacent countries had agreed that a certain village should be under the sovereignty of one of them; they had expressed the agreement by reference to a meridian or parallel and had later realized that they differed in their understanding of its position with reference to the village in question. Thus there had been agreement as to the essential fact that the village was to be placed under the sovereignty of one of them and not the other, but the agreement had been badly expressed by the reference to a meridian. When the error had been discovered, the two States had corrected it immediately. Hence no problem of defect in consent had been involved.

93. Like Mr. Rosenne, he was not sure that articles 26 and 27 of Part I entirely covered the point. Article 10 met a real need, but it might be out of place among the articles concerning vitiation of consent.

94. Mr. BARTOŠ said he agreed with Mr. Ago so far as genuine errors in expression were concerned. But when the error was due to non-concordance of equally authentic texts in different languages, the case was much less clear and differed from that envisaged by the Special Rapporteur. The question of the non-concordance of expressions in different languages had already been met with in Part I of the draft on the Law of Treaties, since the will of the contracting parties was presumed to be well established and there was no question of vitiation of consent.

95. Mr. BRIGGS said he supported the proposal to delete article 10. He was opposed to the insertion in the draft articles of any provision to the effect that a party had the unilateral right to denounce a treaty. If, therefore, the unilateral right stated in paragraph 2 (a) of article 8 and in paragraph 2 (a) of article 9 were omitted, there would be no need to retain article 10.

96. Mr. TABIBI said that, after hearing the views of other members, he would no longer press for the retention of article 10.

97. Sir Humphrey WALDOCK, Special Rapporteur, said he agreed that, if the articles of Part I and of the present Part were to be taken together, it could be argued that articles 26 and 27 of Part I largely covered the point dealt with in article 10. Both those articles were essentially procedural and in article 10 the Commission was dealing with the substantive aspect of the matter, even if the conclusion was the negative one that an error of expression did not affect the reality of consent. It might not be very appropriate to try to cover the point by an addition to articles 26 and 27 of Part I. Furthermore it was always dangerous to assume that anyone reading or interpreting the draft articles would view them in the same light as members of the Commission who had discussed them from the beginning. It therefore seemed useful to include article 10 with its cross-reference to articles 26 and 27 of Part I. He did not feel that to deal with the matter merely by means of a commentary would be adequate.

98. The CHAIRMAN suggested that article 10 should be referred to the Drafting Committee for consideration in the light of its drafting of articles 7, 8 and 9 and of the discussion which had taken place in the Commission. The Drafting Committee would report to the Commission on the question whether article 10 should be retained as such or its contents expressed by means of a modification of articles 26 and 27 of Part I, or even in the commentary on those articles.

*It was so agreed.*

The meeting rose at 12.55 p.m.

---

681st MEETING

*Thursday, 16 May 1963, at 10 a.m.*

*Chairman:* Mr. Eduardo JIMÉNEZ DE ARÉCHAGA

## Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda] *(continued)*

1. The CHAIRMAN invited the Commission to consider article 11 in section II of the Special Rapporteur's second report (A/CN.4/156).

ARTICLE 11 (PERSONAL COERCION OF REPRESENTATIVES OF STATES OR OF MEMBERS OF STATE ORGANS)

2. Sir Humphrey WALDOCK, Special Rapporteur, said that the problem of personal coercion could arise jointly with the problem envisaged in article 12: the illegal use or threat of force. In principle, however, the two forms of coercion were distinct, and examples could be given of coercion of representatives without any actual use or threat of force against the State itself. For reasons of clarity, it was therefore wise to deal with the two subjects separately.

3. There was a misprint in paragraph 1 (a) of article 11, where the words " or again " should be deleted. With

regard to the drafting, in order to take into account the comments made by members during the discussion of articles 7, 8 and 9, he proposed to amend the expression in paragraph 1 (a) " the State in question shall be entitled . . . to declare that the coercion nullifies . . ." so as to state the right of the State to invoke coercion as nullifying the act in question.

4. It was also his understanding that many members would prefer that paragraphs 1 (b) and 1 (c), which stated the right of the aggrieved State to a certain choice of how to deal with the matter after the discovery of coercion, should be dropped. The Drafting Committee could then simplify paragraph 1 considerably.

5. With regard to paragraph 2, members appeared to consider that the provision for estoppel in article 4 of Part II was sufficient; and the question of ratification could be dealt with by means of a clause stating the exceptions to paragraph 1.

6. He suggested that points of drafting should be left on one side for the time being and that the Commission should concentrate on the question whether the principle of article 11 was acceptable.

7. Mr. PAREDES, referring to his remarks at the previous meeting concerning general principles of law, explained that he had not maintained that rules of internal law should be applied integrally and without change in international law: he had only said that international law could, and should, have recourse to the principles of internal law in formulating its own rules. The differences between the subjects to which the two systems of law applied and the different activities they governed should not be forgotten. It was by the principles of internal law, not its rules, that international law should be guided. Consequently, he did not agree that any importance attached to the fact that certain rules existed in most national systems of law.

8. Articles 11 and 12 dealt with vitiation of consent through force used against a person to compel him to give his consent. The only difference was that article 11 referred to the use of force against the physical person of the negotiator and article 12 to its use against the collective person called the State. But the result was the same in both cases: nullity of the treaty ab initio. The general theory was correct, and on that the Special Rapporteur should be highly commended, but some slight amendments were needed.

9. Paragraph 1 of article 11 began: " If coercion, actual or threatened, physical or mental, with respect to their persons or to matters of personal concern, has been employed against individual representatives . . ."; he did not find the restriction acceptable, because there could be coercion which alarmed the victim and deprived him of personal liberty, though it did not relate to " matters of personal concern " to him: it might relate to the noblest concerns such as defence of his country. If his country was threatened with invasion or his city with bombardment or similar damage, the negotiator would feel as much or more alarmed as if his person or property had been attacked. And the general threat might include attacks against his private property. It would therefore be preferable to use the words " coercion . . . so serious as to be liable to impair or destroy the reality of consent ".

10. Paragraph 2 (a) of article 11 provided that the rule of nullification ab initio should not apply where " a treaty, which is subject to ratification, acceptance or approval, has been signed by a representative under coercion but, after covering the coercion, the State proceeds to ratify, accept or approve the treaty; ". But it did not add, as was essential, that before any such acts of acceptance, all coercion must have ceased. He himself believed that as the act performed by the intimidated representative was null and void, it could not be subsequently validated in any way.

11. Mr. de LUNA said that some provision should be drafted which would prevent the treaty from being declared non-existent in accordance with paragraph 1 (a); the fact that the State against whose representative coercion had been employed was entitled under paragraph 1 (c) to approve the treaty, and under paragraph 2 to ratify it, implied that the treaty existed. While, therefore, he did not wish to expatiate on the well-known distinction between the non-existence, the nullity and the voidability of legal instruments, he would suggest that paragraph 1 (a) be redrafted to read:

" (a) to declare that the said instrument is void ab initio; or ".

12. Mr. PESSOU said he had been intending to make a similar comment. Paragraph 1 seemed to assume the co-existence of two rules, the absolute nullity of the treaty, under sub-paragraph (a), and its voidability under sub-paragraphs (b) and (c).

13. Article 11, and more particularly paragraph 1, prompted a number of other reflexions. First, as from what time should the discovery of the event which vitiated consent be dated ? Secondly, paragraph 1 (a) almost gave the impression of a sanction against the representative on whom coercion had been practised. Thirdly, in paragraph 1 (c), which at least had the merit of leaving ample latitude to the injured State, the eventuality contemplated was psychologically very improbable.

14. It might be possible to redraft articles 11, 12 and 13 in such a way as to inter-relate their provisions more satisfactorily.

15. Mr. TABIBI said that article 11 was very important, but should be placed, together with article 12, immediately after article 7 instead of after articles 8 and 9. The problem of coercion was closer to fraud than to error.

16. He very much doubted the advisability of including the provisions of paragraph 2 (a). It was hardly appropriate to suggest that the illegal use of force could be condoned. It would be dangerous to encourage such an idea.

17. Sir Humphrey WALDOCK, Special Rapporteur, said there was no suggestion that the States concerned would give their approval to the illegal act of coercion. He did not attach any great importance to paragraph 2 (a) but thought it covered the somewhat remote possibility