Case 1:13-cv-07146-JPO    Document 33-30    Filed 05/15/14    Page 1 of 6

of the aggrieved State finding it in its interest not to denounce the treaty altogether, but to ratify it after obtaining some adjustment, which might be more satisfactory than complete annulment of the treaty.

18. Mr. BARTOŠ said he was convinced that there was a close connexion between the two kinds of coercion referred to in articles 11 and 12. For example, physical or mental coercion exercised on the person of a State's representative might well be used at the same time as threats against the State itself. In reality, a State's representatives were intermediaries who very often suffered the consequences of another country's general policy towards their own country.

19. With regard to paragraph 2 (a), if the treaty had been ratified, but in the circumstances referred to in article 12, then it was difficult to regard such ratification as valid in all cases. Hence articles 11 and 12 should at least be supplemented by a mention of *renvoi* and of the possibility of both kinds of situation envisaged in the articles occurring simultaneously.

20. Again, the discovery of coercion raised no great difficulties, but it might perhaps be desirable also to take account of the time when the threat ceased, which was obviously much more difficult to determine. He thought the decisive moment should be really established and that it was only after the threats had ceased that the acts of the injured State would be regarded as ratifying the treaty. That observation also applied to articles 12 and 13.

21. In his view articles 11, 12 and 13 were closely interrelated, but they regulated three different cases and different grounds for nullity, which should be dealt with in separate provisions.

22. Mr. ELIAS said he found articles 11 and 12 generally acceptable, subject to the amendments announced by the Special Rapporteur. He wished, however, to draw attention to a number of points.

23. First, in article 11, paragraph 1, he was concerned about the interpretation to be placed on the expression " with respect to their persons or to matters of personal concern ". It was explained in paragraph 3 of the commentary that " This phrase is intended to confine the coercion covered by this article to coercion of the individual as distinct from the State, and yet to be broad enough to include such forms of coercion of the individual as threats directed against his family or dependants ". In fact, the words were not precise enough to convey the intended meaning. The corresponding provision in Sir Gerald Fitzmaurice's third report read " Duress or coercion against the persons mentioned in paragraph 1 includes duress or coercion, actual or threatened, against their relatives or dependants, but not against their property ".[1] It should be made clear whether the intention was to exclude property or not.

24. The commentary on article 12 set out adequately the reasons why the Special Rapporteur had followed Sir Hersch Lauterpacht rather than Sir Gerald Fitzmaurice in deciding to include an article on the subject of coercion against the State. In that commentary, the Special Rapporteur emphasized that coercion against the State constituted a violation of the United Nations Charter, and for a modern draft, the Charter was the proper criterion.

25. Three exceptions should be considered. The first, mentioned by Lord McNair[2], was concerted international action by the United Nations to enforce treaty obligations on recalcitrant members. The second exception was armistice agreements and peace settlements, mentioned in paragraph 7 of the commentary on article 12. The third was economic and financial treaties, in respect of which the door could not be left open too widely for the plea that a State had entered into them under the influence of necessity.

26. He agreed that the subject matter of articles 11 and 12 should be kept separate.

27. Mr. TUNKIN agreed that the two types of coercion dealt with in articles 11 and 12 should be kept separate. The use of force, or threat of force, constituted a very grave violation of Article 2, paragraph 4, of the United Nations Charter, and might even constitute a breach of the peace or a threat to the peace. Coercion against a representative was also a serious breach of international law, though of a different order.

28. His main comment, however, concerned the approach to articles 11 and 12. Both articles provided that the injured State was entitled to declare that coercion nullified the treaty *ab initio*, and that the injured State could choose a different course of action. The alternative courses of action mentioned in paragraphs 1 (b), 1 (c) and 2 of both articles amounted to an acceptance by the injured State of the situation created by means of coercion.

29. Thus the approach adopted in articles 11 and 12 was to deal with grave breaches of international law in the same manner as with error. Those breaches, however, were on an altogether different plane. Contemporary international law not only permitted, but indeed dictated a different approach to the problem of coercion against a negotiator or against a State. It was no longer possible to take the view that coercion was a matter of concern only to the parties to the transaction; both forms of coercion dealt with in articles 11 and 12 were matters of general concern. Therefore, although the consequences of an error in the conclusion of a treaty could be decided by the parties themselves, in the situations envisaged in articles 11 and 12, any State, whether a party to the treaty or not, should be able to raise the issue.

30. The approach which he recommended was based on such fundamental principles of international law as the prohibition of the use or threat of force, and the principle of peaceful coexistence.

31. He had, at that stage, no specific proposal to make regarding the formulation of articles 11 and 12. Perhaps the most appropriate course would be to confine the provisions of those articles to a statement that a treaty

---

[1] *Yearbook of the International Law Commission, 1958*, Vol. II (United Nations publication, Sales No.: 58.V.1, Vol. II), p. 26.

[2] McNair, *The Law of Treaties*, 1961, pp. 209-210.

obtained by means of coercion was null and void *ab initio*. Such a statement would be based on the justified assumption that, under contemporary international law, an instrument obtained by such illicit means must be considered as non-existent. If any action were taken at a subsequent stage to give life to the invalid instrument, such action would constitute the conclusion of a new agreement. The signature given under coercion would not have created any legal instrument. Moreover, the responsibility of the State which had committed the acts of coercion would be involved.

32. Mr. ROSENNE said that on the whole he agreed with the comments made by Mr. Bartoš. He also agreed with those speakers who had stressed that articles 11, 12 and 13 dealt with different subjects.

33. He commended the Special Rapporteur for his decision to drop sub-paragraphs (*b*) and (*c*) from paragraph 1, but suggested that the possibility of election should be mentioned in the commentary. In that connexion, he recalled the decision taken by the Commission at its previous session with regard to articles 18 to 20 of Part I on the subject of reservations, when it had been made clear that a State was not obliged to draw the ultimate conclusions from its objection to a reservation.[3]

34. It was difficult to discuss article 11 without discussing article 12 as well, although the two articles dealt with different situations. He felt a great deal of sympathy with Mr. Tunkin's views on both those articles, especially article 12, the approach to which should be different from the approach to the question of error. The matters dealt with in articles 11 and 12 were not of concern to the parties only. However, the Commission was engaged in codifying the law of treaties, not rules for the pacific settlement of disputes. That question was dealt with in Chapter VI of the Charter; Chapter VII contained the articles on "Action with respect to threats to the peace, breaches of the peace, and acts of aggression", and any State was entitled to invoke those provisions in appropriate cases. Those provisions of the Charter, and even more the practices evolved by the United Nations since 1945, enabled international organs to deal adequately with the kind of situation envisaged by Mr. Tunkin. To take the classic example of the methods used to obtain the signatures of the President and Foreign Minister of Czechoslovakia to a treaty creating a German protectorate over Bohemia and Moravia, mentioned in paragraph 1 of the commentary to article 11, there could be no doubt that under the United Nations Charter, action of that kind would be a matter of major concern to the whole international community. The Charter provided machinery to deal with such cases, if necessary speedily.

35. Thus, while there was considerable force in Mr. Tunkin's statements regarding article 12, he thought that in codifying the law of treaties, the Commission should be careful to remain within the scope of the subject and to avoid entering into other subjects, such as action with respect to threats to the peace under Chapter VII of the Charter, and the international responsibility of States. If the Commission were thus to broaden the scope of its work, it would be difficult, if not impossible, for it to complete its task on the law of treaties.

36. Mr. AGO complimented the Special Rapporteur on having provided the Commission with an excellent basis for the discussion of such a delicate matter. He (Mr. Ago) had not yet formed an opinion on the question whether articles 11 and 12 should be kept separate or not. However, the two subjects were different, though closely linked; the Commission would certainly have to revert later to the question how the provisions covering them were to be arranged.

37. Mr. Tunkin and Mr. Rosenne had spoken about the relationship between articles 11 and 12 and the preceding articles, which dealt with fraud and error. The Commission was concerned with the effects of fraud, error and coercion on the validity of treaties. Fraud and error affected only the validity of the instrument, whereas coercion might entail both the nullity of the instrument and other consequences involving the international responsibility of States. In the circumstances, the Commission should confine itself to the effect on a treaty's validity; but it could not ignore the fact that there were other consequences too. He therefore agreed with Mr. Tunkin that in the draft the analogy between the different cases, and especially between articles 11 and 12, seemed rather strained.

38. In substance, the scope of article 11 was restricted to coercion, actual or threatened, with respect to the person of the representative of a State or to matters of personal concern to him, whereas coercion of a representative by threats to his State was dealt with in article 12, although the Special Rapporteur had cited in his commentary on article 11 the example of the third-degree methods employed against the President and Foreign Minister of Czechoslovakia, which had involved a mixture of personal pressure on the individuals and threats against the State. He thought that the line of demarcation between the two kinds of coercion should be shifted slightly: on one side there should be coercion of representatives (whether by suggesting danger to their persons or to their country) and on the other, coercion by the use of force against a State. That could be done by merely dropping the words "with respect to their persons or to matters of personal concern" from paragraph 1.

39. With regard to the choice open to the aggrieved State, he would willingly agree to Mr. Tunkin's suggestion that that State should be free to declare the instrument void *ab initio*. Any possibility of denouncing or affirming the treaty should be ruled out, for either action would imply its initial validity. The word "approve" in paragraph 1 (*c*) meant that a State could conclude another valid treaty with the same content, but it would in any case be free to do that and there was no need to say so expressly in the article. The meaning could not be that an agreement vitiated by coercion was rendered valid by approval. The Commission was

---

[3] *Official Records* of the General Assembly, seventeenth session, Supplement No. 9, p. 24, commentary to article 20.

4

Case 1:13-cv-07146-JPO   Document 33-30   Filed 05/15/14   Page 3 of 6

considering the effect of coercion on the validity of consent, and the effect was nullity.

40. Lastly, since the instrument was void *ab initio*, paragraph 2 (*a*) was unnecesary.

41. Mr. VERDROSS said that the Special Rapporteur had drawn a sharp distinction between the older and the more recent doctrine of international law. Under the older doctrine an instrument signed by an organ of a State was void if violence had been used against that organ, but violence might be lawfully used against a State itself. The United Nations Charter had laid down quite a different form of international law, for Article 2, paragraph 4, prohibited the threat of force as well as the use of force.

42. He rather doubted the merit of the dictinction made between the situations described in articles 11 and 12. If an organ of a State had acted under physical duress, or if a State was the victim of aggression, matters were clear enough; but the two forms of coercion were virtually indistinguishable where there was merely a threat to use force. The representative of a State might be threatened with reprisals against himself or his family and simultaneously with disaster to his country, or he might be promised personal gain while his country was simultaneously threatened with bombardment.

43. The recognition of a *jus cogens* rule from which the parties concerned could not depart by agreement *inter se* made the problems even clearer, and he personally advocated that solution. States Members of the United Nations could not depart from the provisions of Article 2, paragraph 4, of the Charter *inter se*, for it imposed obligations to the whole international community. Hence it was not only a matter of the reciprocal relations of States, but also of international obligations under *jus cogens*.

44. Mr. YASSEEN said that in drafting article 11 the Special Rapporteur had taken account both of international doctrine and of international practice. The principle on which the article was based was not in dispute. It was generally agreed that coercion used against the person of a State's representative vitiated consent and so justified the repudiation of a treaty concluded in such circumstances. International practice followed the same principle.

45. However, opinions differed somewhat concerning details. Mr. Ago had raised the question of coercion used with respect to the person of, or to matters of personal concern to, the representative of a State. In the particular context, the crucial issue was whether the coercion was effective, in other words capable of compelling a representative to agree to what he would normally have refused. But there might be other forms of coercion not covered by article 11. The case of a representative who was forced to sign a document under the threat of bombardment of his country's capital might be regarded as equivalent to a threat with respect to matters of personal concern to him, but as there was room for doubt on that point it would be desirable to find a formula that was satisfactory in such case.

46. With regard to the effects of coercion, the instrument signed under duress was undoubtedly void; but could such an instrument be confirmed or approved? Some speakers had drawn an analogy between article 11 and the earlier articles dealing with fraud and error. Yet surely the situation was not the same in the case of coercion as in that of fraud or error, for duress affected not only the reciprocal relations of the two parties concerned, but also the relations of both with the international community.

47. In a convention on the law of treaties that difference might well be reflected in a difference in the consequence of nullity of the instrument. It was very important to include provisions which took account of that difference, not only in article 11, but also *a fortiori* in article 12. The difference was fully consonant with the development of international law, for the modern law condemned both the use of force and the threat of force in international relations. The practical interests of States would not be impaired, inasmuch as a State which could neither confirm nor approve a treaty signed by its representative under coercion could always negotiate the treaty again.

48. Mr. AMADO said he had read with great pleasure the Special Rapporteur's commentary on article 11, in which the substance and the form blended so admirably.

49. With regard to the statements of earlier speakers who had distinguished coercion from fraud and error, he said that coercion was precisely the contrary of fraud. So far from being characterized by trickery or concealment, coercion was an open, outright threat, a forcible display of power having the object of compelling the partner to yield to a stronger will and of preventing him from manifesting his own will.

50. It was unquestionable, therefore, that an instrument signed under such conditions was void. A representative subjected to coercion could not be said to have a will of his own. A case in point was that of the President of the Czechoslovak Republic, who had been subjected to intimidation by Hitler. Such events might recur, for the world was at the mercy of such phenomena as Nazism, which were beyond all human control; it was therefore necessary to take precautions to reduce the risks to a minimum.

51. With regard to the factors constituting coercion, he disliked the expression " matters of personal concern " used in the article. A formula should be found that distinguished between coercion used against the individual and coercion used against the State. He would prefer articles 11 and 12 to be continued in a single provision dealing with coercion and drawing the distinction to which he had referred.

52. He was glad to note, as several other members of the Commission had done, that international law was developing along the right lines. The United Nations Charter had created a situation which all States should recognize. But in preparing for the instruments through which the will of States could receive expression, the Commission should not depart from the special technique of treaties.

53. Mr. EL-ERIAN said that article 11 was acceptable; he particularly endorsed the Special Rapporteur's broad conception of the nature of personal coercion which, as was explained in paragraph 3 of the commentary, need not be restricted to acts or threats of physical force.

54. The Special Rapporteur had also rendered a signal service in extending the concept of coercion against a State in the succeeding article, where he had departed from the traditional view that the validity of a treaty was not affected by having been brought about by the threat or use of force. Legal rules had undergone a fundamental change as a result of the efforts after the First World War to prohibit the use of force as an instrument of State policy. Landmarks in the process had been the League of Nations Covenant, the General Treaty for the Renunciation of War as an Instrument of National Policy [4] (Pact of Paris) and the Stimson doctrine [5] of non-recognition of situations, treaties or agreements brought about by the use of force in violation of the League of Nations Covenant and the Pact of Paris. The Commission itself had enunciated the principle in article 11 of the Declaration on Rights and Duties of States.[6]

55. Mr. CASTRÉN said he was prepared to accept article 11 with the drafting changes mentioned by the Special Rapporteur earlier in the meeting. The Special Rapporteur was to be commended for dealing with all forms of coercion — actual or threatened, physical or mental.

56. Several members had criticized paragraph 2 (a). Personally, he was not against its deletion, provided that the commentary indicated that the States concerned might, if they wished, affirm a treaty concluded in such circumstances, for it was surely a matter of concern primarily to the contracting States; they could hardly be required to re-negotiate the treaty.

57. Sir Humphrey WALDOCK, Special Rapporteur, summarizing the discussion, said there was general agreement that the two forms of coercion dealt with in articles 11 and 12 should be treated separately, but the Drafting Committee might find that they could be covered in a single article.

58. He recognized that some members felt difficulty concerning the expression "matters of personal concern" in paragraph 1, by means of which he had sought to cover those cases in which it might be difficult to discern the borderline between coercion against an individual and coercion against a State, and to take into account the fact that direct physical constraint was less likely to occur than attempted corruption, threat of disclosure of a past indiscretion or threat of action against members of a representative's family. The expression "in their personal capacity" would probably be a satisfactory substitute and wide enough for the purpose he had in mind.

59. He saw no objection to deleting sub-paragraphs (b) and (c) of paragraph 1, in which he had introduced an element of election as to the kind of action the injured State might take. A more serious problem posed by paragraph 1 was how to formulate the consequences of personal coercion. In his opinion it would even be dangerous to stipulate that in such cases the State could declare the treaty nullified *ab initio*, unless the procedural checks provided for in section IV of his draft were applied. It would be still more dangerous to state that such an effect followed automatically, because then unilateral assertions might be made which would seriously undermine the stability of the treaty-making process and, in the absence of an international judge, would give free rein to subjective judgement by the State concerned.

60. He particularly wished to emphasize that point after hearing Mr. Tunkin's argument in favour of a categorical declaration that, for reasons of international public order, coercion must nullify a treaty *ab initio*. It was because of the danger of unilateral assertions of nullity that he had used the phrase "The State in question shall be entitled ...", making the question one of a right which must be invoked and exercised in accordance with the procedures laid down in section IV. Article 11, like the other articles in sections II and III, must be read in conjunction with the procedural provisions contained in section IV of the report and intended to govern the exercise of the substantive rights arising from sections II and III.

61. There was some force in the objections raised to the provision contained in paragraph 2 (a), which he did not regard as of cardinal importance. It was intended to cover the case where, despite the irregular or even criminal conduct of one of the parties in improperly influencing the representative of the other by threats or some form of corrupt action, the injured State nevertheless wished to maintain the treaty. That kind of situation might conceivably arise, for example, with economic or commercial treaties. If the provision in paragraph 2 (a), admittedly of a rather academic nature, which appeared in the Harvard Draft, was thought unacceptable because it seemed to sanction in some measure acts that violated basic principles of international law, it should be omitted. It must, however, be understood that the members of the Commission could not have it both ways. If they declared that coercion rendered the signature an absolute nullity, the State could not be recognized as having any right to ratify or adopt the treaty.

62. The CHAIRMAN suggested that article 11 and the amendments thereto be referred to the Drafting Committee. Mr. Tunkin's interesting thesis that the nullity of a treaty signed under coercion should be absolute, on the analogy of civil law, and that its validity could not merely be asserted by the parties, could be taken up in connexion with article 12.

*It was so agreed.*

---

[4] League of Nations *Treaty Series*, Vol. 94, p. 57.

[5] *Foreign Relations of the United States, Japan, 1931-1941*, Vol. I, p. 76.

[6] *Yearbook of the International Law Commission, 1949*, p. 288.

ARTICLE 12 (CONSENT TO A TREATY PROCURED BY THE ILLEGAL USE OR THREAT OF FORCE)

63. The CHAIRMAN invited the Special Rapporteur to introduce article 12.

64. Sir Humphrey WALDOCK, Special Rapporteur, said that article 12 raised certain major issues affecting international public order and had links with article 13, though the latter was not primarily concerned with the use of force to extract consent, but with the situation in which the object or execution of a treaty might be held to infringe *jus cogens*.

65. The general comment he had made regarding the formulation of paragraph 1 of article 11 was applicable to paragraph 1 of article 12.

66. He presumed that the Commission was in general agreement that paragraphs 1 (*b*) and 1 (*c*) should be dropped, as had been done in the case of the preceding article.

67. Mr. PAREDES said it had long been recognized that the use of force vitiated consent to a treaty. On the American continent, that fact had been recognized and accepted by the nations since the first Pan-American Conference in 1890 and repeatedly emphasized in many documents, including the Convention on the Rights and Duties of States adopted by the Seventh International Conference of American States held at Montevideo in 1933, article 11 of which read:

"The contracting States definitely establish as the rule of their conduct the precise obligation not to recognize territorial acquisitions or special advantages which have been obtained by force, whether this consists in the employment of arms, in threatening diplomatic representations, or in any other effective coercive measure ..."

68. The thesis emphasized in article 12 did no more than reflect the contemporary doctrine of the rejection of force as a means of imposing the will of one State on another — a doctrine which had been given full expression in the United Nations Charter and in the regional Charter of the Organization of American States.

69. In his opinion paragraph 1 of article 12, which seemed to refer only to the use of armed force, should also cover other forms of coercion which obviously had serious effects in international life: for instance, economic blockades, which could be severe enough to strangle a nation. Diplomatic pressure was also frequently used to influence the conduct of a State.

70. Mr. de LUNA said he agreed with Mr. Tunkin that articles 11 and 12 should be kept separate; but he thought they might be simplified.

71. The principle that a treaty imposed by the illegal use or threat of force was invalid had not yet become a positive rule of international law; it would gradually become a rule through evolution necessary for the era of peaceful coexistence. Several attempts in that direction had been made in the past, notably the Stimson doctrine of the non-recognition of situations resulting from the unlawful use of force.

72. Paragraph 2 very much weakened the principle of the article by providing a pretext for a State to declare lawful an instrument concluded through the use or threat of force, if the injured State subsequently acted as though the treaty were valid. Such a provision might unfortunately enable the aggressor State, by devious but still unlawful means, to keep the fruits of its aggression. Mr. Tunkin had rightly said that the interest of the entire international community was involved, as well as the interest of the two parties. The article should not leave the parties free to act in that way; it should be condensed to read:

" Any treaty concluded by force or by the threat of force in violation of the principles of the Charter of the United Nations is void *ab initio*."

73. For technical reasons of law, it should not be provided that a treaty concluded as a result of the illegal use or threat of force was non-existent, for that would be going too far. It would suffice to say that such a treaty was void *ab initio*, not voidable.

74. With regard to the connexion between articles 11 and 12, he thought that wherever it was employed, coercion was always directed against a State through one of its organs. Modern information media, such as broadcasting, made it possible to intimidate the people of a State directly. That did nod constitute either coercion of an organ of the State, or direct coercion of the State itself, but indirect coercion of a State through its citizens.

75. Mr. CASTRÉN said that article 12 raised a very important question of principle. Traditional theory recognized the validity of a treaty obtained by the threat or use of force against the State itself. But the approach chosen by the Special Rapporteur appeared to be the right one; it was in line with the modern trend in international law and raised no insuperable difficulties in practice.

76. He agreed with the Special Rapporteur that the concept of coercion should be kept within fairly strict bounds and that certain forms of pressure on a State, such as political or economic pressure, should be disregarded. Article 12 dealt with physical force only.

77. In his reference in paragraph 1 to violation of the principles of the Charter of the United Nations, the Special Rapporteur had no doubt had in mind Article 2, paragraph 4, of the Charter; but general international law, even apart from the United Nations system, also prohibited the use of force in international relations, save in a few exceptional cases, one of which, a peace treaty imposed on an aggressor, was mentioned in the commentary. Even in that case, however, some limits should be set. The victim of an aggression was admittedly entitled to fair and equitable reparation, but he could not claim more. To permit the total annexation of the aggressor's territory or the loss of its political independence would be going too far. He hoped that by the end of its discussion of article 12, the Commission would be able to find a form of words broad enough to take account of the necessary exceptions.

The meeting rose at 1 p.m.

## 682nd MEETING

*Friday, 17 May 1963, at 10 a.m.*

*Chairman:* Mr. Eduardo JIMÉNEZ DE ARÉCHAGA

### Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda] *(continued)*

1. The CHAIRMAN invited the Commission to continue consideration of article 12 in section II of the Special Rapporteur's second report (A/CN.4/156).

ARTICLE 12 (CONSENT TO A TREATY PROCURED BY THE ILLEGAL USE OR THREAT OF FORCE) *(continued)*

2. Mr. VERDROSS said that the principle laid down in article 12 had been recognized even before the United Nations Charter had been adopted and consequently did not only bind the States which had acceded to the Charter. It had first been stated in international practice in the Stimson doctrine,[1] in which the United States had declared that it would not recognize any treaty brought about by means contrary to the League of Nations Covenant or the Briand-Kellogg Pact.[2] The League of Nations Assembly had subsequently adopted a resolution to the effect that it was incumbent on the Members of the League not to recognize any such treaty.[3] The principle was not explicitly stated in the United Nations Charter, but was clearly implicit in its Article 2, paragraph 4; for, obviously, if recourse to force was an international crime, a treaty imposed by force could not be valid.

3. Article 12, paragraph 1, was therefore rather too narrow in scope, for it referred only to force employed in violation of the principles of the Charter of the United Nations, and did not mention violation of other possible obligations. According to the prevailing doctrine, the fundamental principles of the United Nations Charter were also binding on States not Members of the United Nations, though that did not mean that all non-member States recognized those principles. It would therefore be useful to say so expressly.

4. Secondly, the phrase in paragraph 1 "in violation of the principles of the Charter of the United Nations" was too weak; a better wording would be: "in violation of an obligation inherent in the Charter or in any other international treaty", so that no doubt could remain that the principle was a principle of universal international law binding on all States, whether Members of the United Nations or not.

5. Mr. BARTOŠ said he agreed with Mr. Paredes that the threat of force could take the form of economic pressure. History offered many examples of total, or almost total, blockade imposed by certain States to obtain concessions from others: one instance was the customs war between Austria-Hungary and Serbia. Austria-Hungary, which was the only route for Serbian exports to the West — at that time the sole market for agricultural products — had prohibited the entry and transit of Serbian cattle and threatened to raise customs duties on the export and transit (sic) of wheat in order to compel Serbia to renounce its claims to Bosnia and Herzegovina, which Austria-Hungary planned to annex.

6. The Special Rapporteur had been right in basing article 12 on a principle following from the basic provisions of the United Nations Charter. The use of force, however, was always a violation of the principles of the Charter. Even the right of self-defence recognized in Article 51 of the Charter merely authorized provisional resort to force in order to enable a State to preserve its independence until the Security Council, to which it was bound to appeal, had taken the necessary measures.

7. What was meant in that case was the right to resort to physical defence. A State could not resort to force or to the threat of force to conclude a treaty even if its cause was just, for that would be a violation of the principles of the Charter. The case had to be brought before the Security Council, which, as one means of restoring peace, might recommend a friendly settlement, but one free from any element of force.

8. One of the questions that arose in regard to the effect of the use of force on the validity of a treaty was whether a treaty signed under coercion was voidable, void or non-existent. Generally speaking, he favoured the French theory of non-existent instruments, but even under French case-law the non-existence of an instrument had to be declared by a court if it was contested, and also in order to safeguard relations in public life. For practical reasons he therefore considered it preferable to adopt the theory that the treaty was void, rather than non-existent.

9. A further question then arose, namely, whether the effect of regarding a treaty obtained through the use of force as void, voidable or non-existent applied *inter partes* or *erga omnes*, particularly in the case of voidable treaties. It was difficult to give an absolutely definite answer. In the first place States, whether Members of the United Nations or not, were certainly always entitled to appeal to the General Assembly or to the Security Council if the violation committed against a State, whether a Member or not, could be regarded as a threat to international peace by any State, and not only by the injured State. It could therefore be said that the question whether an instrument had in fact originated from the use or threat of force concerned the international community. If it had, the injured State was not necessarily the only State which could legitimately plead invalidity on the ground that force had been employed; it was a matter of concern to the international community as a whole. That principle gave any member of the international community the right to appeal.

10. Secondly, even if a treaty had been obtained by force, or if there was some doubt about the matter, could the State concerned ratify the treaty after the coercion had ceased ? He believed that a State could not only ratify such an instrument by a renewed expression of its free

---

[1] *Foreign Relations of the United States, Japan, 1931-1941*, Vol. I, p. 76.

[2] League of Nations *Treaty Series*, Vol. 94, p. 57.

[3] League of Nations *Official Journal*, 1932, Special Supplement No. 101, Vol. I, p. 87.

Case 1:13-cv-07146-JPO   Document 33-30   Filed 05/15/14   Page 6 of 6