Case 1:13-cv-07146-JPO   Document 33-31   Filed 05/15/14   Page 1 of 6

will, but could give it absolute effect *ex tunc*. Too much abstract and political preciseness should not be attempted in legal matters if it was liable to endanger the security of international relations. But it should certainly not be left to the aggrieved State alone to decide the matter, nor should that State be able to plead that the case lay exclusively *inter partes* or to invoke the doctrine of *res inter alios acta* vis-a-vis third States. The matter concerned the international community, which must be certain that the coercion had ceased.

11. The Commission must decide on the form of paragraph 1 of the article; it had to choose between division into several sub-paragraphs and a statement of the principle alone.

12. Once the threat had been removed, States could always affirm or denounce a treaty obtained by force, but denunciation and avoidance were two different acts. If the injured State did not ask that the treaty should be voided, the question arose whether it should be granted the right to denounce the treaty on the exceptional ground that consent had been vitiated by coercion. Affirmation should not be mentioned as one of the consequences; it should rather be a rule that any instrument could be affirmed once the will had become free again and could be properly expressed. He was not opposed to the expression of that idea, provided that affirmation was not made a consequence of the use of force, but a possibility open to the injured State, of getting out of the situation created by the coercion if the circumstances in fact required it and if that solution was more convenient to the victim.

13. He had reservations regarding paragraph 1 (*b*). Moreover, he did not think that the Commission could vote on article 12 as drafted; no doubt the question would be re-examined by the Drafting Committee, but he did not think that Committee would be competent to do so until the Commission had settled the principle.

14. Mr. BRIGGS said there had been an air of unreality about the discussions on the articles concerning fraud, error and coercion, in the course of which the Commission had touched upon some rather theoretical problems that rarely arose in practice. He feared that it might be running into danger of creating new ways of evading treaty obligations.

15. Article 12 might be described as well meant, but juridically meaningless. No doubt the thesis that a treaty concluded under duress was binding shocked contemporary opinion and there would be general agreement on the need for remedies against coercion in violation of the principles of the Charter. That was precisely the purpose of chapters VI and VII of the Charter, in which a positive approach had been adopted. In contrast to that positive approach, he had always regarded the Stimson doctrine as a negative one, proclaimed by a State unwilling to assume, at a particular moment, effective obligations for the preservation of peace.

16. Though machinery had been established under the Charter to deal with the use or threat of force, there had been some reluctance on the part of United Nations organs to refer matters involving violations of the principles of the Charter to the International Court of Justice, on the ground that the law was insufficiently clear. Article 12 would certainly not make it any clearer, and failed to elucidate the nature of principles which were only too often discussed in terms of political slogans, rather than as legal concepts.

17. The provisions of article 12 as it stood might enable States, by subjective interpretation of such terms as "coerced", "acts of force", "threat of force" and "violation of the principles of the Charter", to secure unilateral nullification of a treaty which might not in fact have been vitiated in that way. The situation which article 12 was designed to cover was certainly one which must be considered, but unless the article could be formulated with greater precision, it was probably premature and would be better omitted.

18. Mr. ROSENNE said that, from the general political and moral standpoint, articles 12 and 13 were of capital importance, and the way in which they were handled would be a test of the Commission's ability to provide the kind of guidance it was called upon to give the General Assembly by virtue of its Statute and of Article 13, paragraph 1 (*a*), of the United Nations Charter. Cases of the kind which Article 12 was designed to cover were relatively rare, but were symptomatic of a serious deterioration in the conduct of international relations.

19. Reviewing the Commission's past work relevant to the subject, he recalled that article 9 of the draft Declaration on Rights and Duties of States, combining the principles of the 1928 General Treaty for the Renunciation of War as an Instrument of National Policy[4] and of the United Nations Charter, had proclaimed a positive duty of every State "to refrain from resorting to war as an instrument of national policy, and to refrain from the threat or use of force against the territorial integrity or political independence of another State, or in any other manner inconsistent with international law and order."[5] Article 11 of the same Declaration, though not directly connected with the law of treaties, was also relevant to the subject under discussion, in that it imposed upon States "the duty to refrain from recognizing any territorial acquisition by another State acting in violation of article 9." The General Assembly, in its resolution 375 (IV) had deemed the draft Declaration "a notable and substantial contribution towards the progressive development of international law and its codification" and as such commended it "to the continuing attention of Member States and of jurists of all nations". The duty of non-recognition, enunciated in such categorical terms in the Declaration, implied the absolute voidance of transactions that had been conducted under duress. Those pronouncements could be taken as the Commission's point of departure in the present discussion.

20. The Commission should also bear in mind the emphasis placed by the General Assembly in its resolution 1765 (XVII) on the "need for the further codification and progressive development of international law with

---

[4] League of Nations *Treaty Series*, Vol. 94, p. 57.
[5] *Yearbook of the International Law Commission, 1949*, p. 288.

682nd meeting — 17 May 1963    55

a view to making it a more effective means of implementing the purposes and principles set forth in articles 1 and 2 of the Charter", and its recommendation that the Commission should continue its work on the law of treaties in order that it " may be placed upon the widest and most secure foundations ".

21. It was of interest to note from the Sixth Committee's report on the report of the International Law Commission on the work of its fourteenth session, the view expressed by a number of representatives that instruments " which had been obtained through extortion, violence or bad faith, or which contained provisions contrary to the fundamental principles of modern international law, were illegal and could not enjoy or continue to enjoy the protection of the principle *pacta sunt servanda* "; other representatives had maintained that " to stress some principles to the detriment of others would place matters in the wrong perspective, for the Commission must eventually consider all pertinent principles ".[6] Those two points of view should find expression in the draft articles.

22. The kind of considerations which had prompted the Special Rapporteur to provide in article 13 that a treaty was void if its object or execution involved " the infringement of a general rule or principle of international law having the character of *jus cogens* ", and in particular if it involved " the use or threat of force in contravention of the principles of the Charter ", must lead to similar conclusions regarding treaties procured by those means. The Special Rapporteur had in fact followed Sir Hersch Lauterpacht, who had described his formulation of the principle in article 12[7] of his report as " *lex lata* ", stating that existing law was no longer what it had been prior to the First World War.[8] The same thesis, with varying degrees of emphasis, had been defended by many other writers.

23. Nevertheless, the Commission must always be mindful of the need to safeguard the stability of treaties and to take all reasonable steps to prevent arbitrary action and unjustified unilateral invalidation of treaties. A regular procedure to establish that a treaty was void *ab initio* was essential in a work of codification or progressive development, and that procedure could never depend merely on a unilateral assertion.

24. As Sir Gerald Fitzmaurice had pointed out in his third report, procedural provisions depending exclusively on the reaction of the injured State would be unrealistic;[9] in a serious case of coercion, such as the agreement concluded between Nazi Germany and Czechoslovakia in 1939, the victim would hardly be in a position to invoke procedural rules of the type envisaged by the Special Rapporteur in article 25 of section IV of his report (A/CN.4/156/Add.2). Machinery had been created by the Charter of the United Nations that enabled any Member State, in the exercise of its rights under that instrument, to bring before the appropriate organ of the United Nations any dispute or situation resulting from the use or threat of force. Indeed, all Members, if not every State, had a general political and legal interest in the general observance of the obligations, both positive and negative, deriving from the principles of the Charter and of contemporary international law.

25. It was important to realize that the consequence of voidance *ab initio* was simply that there was no treaty: it was not " *opposable* " in any way, nor could it be invoked either before a domestic tribunal or before any international organ. There would be nothing to register under Article 102 of the Charter, and the regulations on the registration of treaties might need some amendment in order to leave no doubt on that point.

26. From the fact that legally the treaty did not exist, it followed that recognition of the right and interest of all States to secure acknowledgement of the voidness of the treaty required no reconstruction of the general theory of the law of treaties; it was not a case of according to third parties a right to intervene in a treaty, and accordingly he had some difficulty in accepting paragraph 2 of article 12 as proposed by the Special Rapporteur.

27. The drafting of the text should be broad and precise, and give rise to no ambiguity. In fact, he was inclined to favour an emphatic statement of principle of the kind proposed by Sir Hersch Lauterpacht in Article 12 of his first report, but following more closely the language of the Charter and reading: " Treaties imposed by or as the result of the threat or use of force against a State or in any other manner inconsistent with the purposes and principles of the Charter of the United Nations are invalid ". He did not wish, at that juncture, to go into the question of the interpretation of certain Articles of the Charter, which had been touched upon by some members, and reserved his position on that question.

28. In addition to the provisions regarding the rights of the aggrieved party suggested by the Special Rapporteur in article 25, there was the right of any State to seize the competent organs of the United Nations of a dispute or any situation resulting from the use or threat of force of which the illegal and void so-called treaty was the manifestation. Sir Hersch Lauterpacht had proposed *de lege ferenda* that only the Court should be recognized as competent to adjudicate in the matter; personally, he doubted whether that would be sufficient.

29. He shared the Special Rapporteur's view, expressed in paragraph 9 of his commentary to article 25, that the procedural system must be brought more into line with Article 33 of the Charter; he thought that applied, in the case in point, to the whole of the procedural system. On the other hand, the Commission need not at that stage concern itself with the operation of Article 33, which was to be discussed in the General Assembly, as a result of which he hoped that the machinery for the pacific settlement of disputes would be strengthened.

30. Although there was powerful authority for the categorical view of the *lex lata* put forward by Sir Hersch Lauterpacht, a recent writer had stated: " There is as

---

[6] A/5287, paras. 42 & 43.

[7] *Yearbook of the International Law Commission, 1953*, Vol. II (United Nations publication, Sales No.: 59.V.4, Vol. II), p. 147.

[8] *Ibid.*, p. 149.

[9] *Yearbook of the International Law Commission, 1958*, Vol. II (United Nations publication, Sales No. 58, V.1, Vol. II), p. 38, para. 62.

yet no general acceptance of the view that the customary law has been modified and the International Law Commission, in its work on the Law of Treaties, has not considered any change in the law in this respect. At the same time, it is curious that little consideration has been given to the force of Article 2, paragraph 4, of the United Nations Charter in this connexion." [10] The only defence that could be offered to that serious indictment was that the book had been written before the Commission took up the question dealt with in article 12.

31. He hoped that before long the obsolete concepts based on the legitimacy of the use of force would be discarded as a historic relic and symbol of human folly, and that the modern law of nations would place the use of force where it belonged, beyond the pale of the law, with all the necessary consequences for all branches of contemporary international law.

32. Mr. YASSEEN said that some writers took the view that international law did not regard coercion applied to the State as an act vitiating consent; they considered that a treaty imposed by force was normal, enforceable, and in fact valid. His own view, however, was that except in the matter of peace treaties there was no such international custom. Besides, the alleged rule had been hotly contested.

33. Many writers were reluctant to regard even peace treaties imposed by force as valid, for they held that duress was incompatible with the notion of agreement, which was based on the consent of both parties. In defence of such treaties it had been said that they were the outcome of *de facto* international legislation imposed by one party on the others. Some writers had, by analogy with municipal law, asserted that peace treaties, far from being international agreements, were in fact legislation imposed by a stronger power, in the same way as in a democracy the majority imposed its will on the minority.

34. Even if the existence of a customary rule to the effect that duress did not vitiate a treaty were admitted, that rule had now lost its psychological basis, which was one of its constituent elements, and would no longer be tolerated by international public opinion.

35. Nor was it admitted in modern times that a State could resort to force to impose its will. The Convenant of the League of Nations and other international instruments had restricted the right to resort to war. The Charter of the United Nations prohibited the use or threat of force, which must be regarded as international offences. Logically, therefore, since States were not allowed to resort to force, constraint vitiated treaties.

36. Article 12 took the changed situation into account in principle, but he thought that paragraph 1 was not sufficiently general. Mr. Verdross had said that it was not enough to refer only to a violation of the principles of the Charter. Some of those principles constituted an important part of modern international law, but they did not constitute the whole body of rules of international law. Accordingly, the paragraph should state that coercion vitiated a treaty if it was employed in breach of an international obligation.

37. With regard to the effects of the use of force on the validity of a treaty, in his opinion a treaty imposed by force was void absolutely, for the entire international community was involved, not merely the two parties to the treaty. The treaty might be renegotiated, but it could not be approved or affirmed as it stood.

38. Mr. AGO said that the more he thought about the relationship between the cases contemplated in articles 11 and 12 respectively, the more convinced he became that they differed fundamentally. Article 11 embodied the classic rule that the use of force against a State's representatives vitiated consent to a treaty, a rule which enabled the State whose consent was thus vitiated to declare the treaty void; if that State did not do so, then the treaty remained valid. Article 12, on the other hand, applied to cases in which the treaty was considered void not because of some defect in consent, but because the use of force was inadmissible as a means of changing an international situation. Article 12 was therefore more closely linked to article 13, which also related to cases in which the treaty was absolutely void, and void *erga omnes*, whatever might be the will of the State concerned. In fact, a State which was subject to coercion on losing a war was often not in a position to declare the peace treaty void.

39. The Commission would be assuming a great responsibility in deciding on the rule to be stated in article 12. He was inclined to think the article should lay down that the treaty was automatically void, and do so in very clear and simple terms, for example, by specifying that any treaty concluded by a State under coercion by the threat or use of force in violation of the principles of the United Nations Charter was void.

40. The expression "in violation of the principles of the Charter" had been criticized; but while it was true that international obligations other than those under the Charter existed, the fulfilment of international obligations was itself — and rightly — a principle of the Charter. The objection that States not Members of the United Nations were not bound by the Charter was easily answered; the reference to the principles of the Charter rather than to the Charter itself made the formula broad enough, for those principles applied to all members of the international community.

41. The question of procedure should, of course, be considered, but in connexion with the structure of the draft as a whole, not in connexion with each separate article.

42. He would go a little further than Mr. Bartoš in opposing the idea that a State could affirm a treaty which it had signed in the circumstances stated in article 12: if the threat ceased, the State could negotiate another treaty, but the original treaty was null and void.

43. Mr. PAL said that he found the substance of article 12 acceptable. In his country, the principle governing the effects of coercion on agreements was derived from the English common law systems and was incorporated in the legislation of 1872 codifying the law of contract,

---

[10] Brownlie, "International Law and the Use of Force by States", Oxford, 1963, Clarendon Press, p. 405.

682nd meeting — 17 May 1963    57

which laid down that a contract obtained by means of fraud, misrepresentation or duress was voidable at the instance of the injured party. He did not, however, find the drafting of the article fully satisfactory.

44. At first he had felt some hesitation in subscribing to the thesis propounded by Mr. Tunkin that a treaty entered into through an act or threat of force should be declared void *ab initio*. The repudiation of a treaty did not stand on the same footing as that of a contract. The former was likely to give rise to many complex problems, both economic and political, the historical forces having in the meantime pressed on beyond the *status quo*, perhaps towards a higher form of human community. He had also been apprehensive of unwittingly helping to open up a new field of irreconcilable tension and thus defeating the very purpose of the law. But the arguments subsequently adduced in support of Mr. Tunkin's view by Mr. Verdross, Mr. Ago and particularly persuasively by Mr. Bartoš, had fully convinced him; his misgivings about increasing the danger of international tension by opening the door to unilateral action by one of the parties seeking to repudiate the treaty had also been considerably allayed by the procedural safeguards laid down in article 25 in section IV of the Special Rapporteur's report, read with the provision contained in article 3 in section I. Both those articles were essential. If law was to be a scheme of order and not a mere speculative system of logic, the decision must not be left to the parties themselves.

45. Mr. GROS said he shared Mr. Ago's views regarding the difference between the purposes of articles 11 and 12 and the need for a more serious sanction than the mere voidability of a treaty concluded in the circumstances specified; like Mr. Ago, he regarded it as inadmissible that such a treaty could be affirmed.

46. Referring to his earlier comments on the difficulty of transferring rules of private law concerning contracts to the law of treaties, he said that in the case of article 12 the crucial issue was not the defect in consent, but the application of a sanction for a breach of the rule of international law prohibiting the use of force. Even in private law, at least in French law, when the court voided an instrument concluded under physical or mental duress, it was not so much because consent had been vitiated, as because there had been unlawful use of force.

47. The language suggested by Mr. Ago was more decisive, more definitive, and less open to controversy than article 12 as drafted, and was therefore preferable.

48. Mr. TUNKIN said that the importance of article 12 could hardly be exaggerated. He agreed with the view expressed by the late Sir Hersch Lauterpacht, and quoted by Mr. Rosenne, that the rule embodied in article 12 was part of *lex lata*. It was a rule of contemporary law, although, of course, it had not formed part of international law before the first World War.

49. Mr. Ago had spoken in the same sense and had, in addition, given convincing reasons for keeping separate the two different cases dealt with in articles 11 and 12 respectively.

50. As he had already pointed out at the previous meeting, and as had also been said by a number of other speakers, the principles stated in article 12 followed from the prohibition of the use of force in international relations. That principle had been enunciated for the first time by the Soviet State in its very first constitutional act, in the form of the prohibition of aggressive war. The Soviet Decree of 8 November 1917 had proclaimed that aggressive war was the gravest crime against humanity. That principle had been incorporated in the Pact of Paris of 1928, which had outlawed aggressive war in international relations. The United Nations Charter had developed the principle and in Article 2, paragraph 4, had prohibited the threat and the use of force. The terms of that paragraph were such as no longer to leave any loophole for justifying the illegal use of force.

51. It had been pointed out by the late Sir Hersch Lauterpacht and many others, including himself, that those provisions of the Charter had marked a great advance in international law; it was no longer possible to represent the use of force, unfortunately resorted to occasionally by some States, as falling outside the prohibition of aggressive war. The Principles of the Charter were principles of general international law and as such were binding upon all States. The prohibition of the use of force, as embodied in the Charter, had replaced the old rule of international law which used to acknowledge the right of a sovereign State to wage war — the *jus ad bellum*.

52. Since the use of force against a State was illegal, except in the case of self-defence covered by Article 51 of the Charter, it followed that a treaty imposed by the use or threat of force must be null and void.

53. At the previous meeting, he had advocated a shorter formulation for article 12. The article should state the rule that a treaty imposed by the use or threat of force in violation of the Principles of the Charter was null and void *ab initio*.

54. A further point, which he had mentioned at the previous meeting, was that, under contemporary international law, the question of a treaty imposed by coercion was the concern of all States and not only of the parties to the treaty. Accordingly, he could not accept the wording of paragraph 1, to the effect that the injured State " shall be entitled to declare ...".

55. Peace treaties were of course imposed by force: some, but not all, might well be void under contemporary international law. A peace treaty imposed in violation of the Charter would be void. However, a peace treaty could be imposed in a manner consistent with the Principles of the Charter. He had discussed the problem in an article he had recently contributed to a publication edited by Mr. Ago.[11] In that article, he had explained that the 1947 peace treaties and the various agreements between the Allies concerning Germany had been validly based on the principle of the responsibility of the aggressor State.

---

[11] Tunkin, G. I., " Alcuni nuovi problemi della responsabilita della Nato nel diritto internazionale", Comunicazioni e Studi, Instituto di diritto internazionale e straniero, University of Milan, 1963, Vol. XI.

56. With regard to paragraph 1, the text could be improved by introducing into it the actual language of Article 2, paragraph 4, of the Charter so as to refer to " the threat or use of force against the territorial integrity or political independence of any State, or in any other manner inconsistent with the Purposes of the United Nations "; that would provide a more precise formulation for the article. Moreover, from the legal point of view, it was desirable to use the same language in the article as in the provision of the Charter on which it was based; any difference between the two texts could lead to the interpretation that a different meaning was intended.

57. With regard to the formulation proposed by Mr. Rosenne, he stressed the need to adhere to the language of Article 2, paragraph 4, of the Charter. A text which purported to annul all treaties obtained by any kind of force would not be acceptable. Some internationalists had construed the prohibition of the use of force to mean that any act which resulted from the use of force was illegal in its results. Such a viewpoint, which placed the aggressor on the same level as the victim of aggression, was contrary to contemporary international law.

58. It had been suggested by some members that article 12 would be meaningless without a reference to an international tribunal. In fact, the absence of a legislature, an executive and a judiciary was a feature common to all spheres of international law, as already pointed out by Mr. Verdross. International law could not be approached with ideas drawn from municipal law and it was highly dangerous to decry a rule of international law merely because it authorized a State sometimes to act unilaterally. An example was provided by Article 51 of the Charter, which left it to an individual State to take very grave action in self-defence against armed attack.

59. With the approach he had criticised, it might be claimed that the whole of international law was meaningless in the absence of compulsory jurisdiction. The whole matter was a very general one and of the greatest importance. Most internationalists felt that, despite its weaknesses, international law played a vital role in the maintenance of peace and in the development of friendly relations between States.

60. He personally believed very strongly that the contention that there could be no international law without compulsory jurisdiction would, at that stage, do nothing but harm to the development of international law.

61. Mr. AMADO said that the discussion reminded him of the time when the Commission had been considering the question of defining aggression. Not having been able to arrive at a complete definition based on an enumeration of aggressive acts, the Commission had decided to draft a general definition. He himself had proposed one which stated that " any war not waged in exercise of the right of self-defence or in application of the provisions of article 42 of the Charter of the United Nations is an aggressive war ".[12] On that occasion, too, the Commission had found itself faced with the difficulties inherent in the lack of any sanction for the act of aggression. Those same difficulties still existed.

62. The Special Rapporteur had stated the problem with admirable precision and lucidity. Article 12 seemed like the dénouement of a play — the condemnation of resort to force — in which the first act had been played by the States of Latin America. It was they, for example, which, in connexion with the dispute between Brazil and Serbia on the question of gold loans, had introduced an innovation into international law in the form of the *clausula rebus sic stantibus*. The second act had shown the danger which ensued from unilateral action by one State in relation to a treaty. That was what the Special Rapporteur was referring to in paragraph 2 of his commentary to article 12 when he drew attention to the danger of opening the door to the evasion of treaties. The third act, the climax of the plot, reflected the anxiety of a man like Sir Gerald Fitzmaurice, quoted by the Special Rapporteur in paragraph 3 of his commentary. The Special Rapporteur had dominated his subject magnificently, and the Commission, far from keeping silent, as Mr. Briggs wished, should follow him.

63. With regard to the exact wording of the article, he said that the principles embodied in the Charter of the United Nations were sacred; they were of the very essence of international life, and should be mentioned in the article. He would accept the shorter version suggested by Mr. Ago, but as he was not yet absolutely sure about the precise form of the rule to be stated, he would agree to whatever wording was preferred by the majority.

64. Mr. TABIBI agreed that article 12 was one of the cardinal articles of the whole draft. Attempts had been made to defend the traditional doctrine that the validity of a treaty was not affected by the fact that it had been obtained by force or the threat of force. That doctrine, however, belonged to a different epoch, when it had been the fashion to compel small and weak nations to submit to treaties by force or threat of force and then to enforce those treaties with the argument that their annulment or denunciation would endanger the stability of treaties, the security of international relations, and international law itself. In fact, the international law which was thus upheld was one of the many principles which had been formulated and used for the benefit of a small group of nations against others which happened to be weaker and smaller.

65. The present epoch was a totally different one, in which the Charter of the United Nations had brought about very great changes. By accepting the Charter, over a hundred Member States had pledged themselves to a new contemporary order — an order in which the use and the threat of force were prohibited under Article 2 of the United Nations Charter. That Article did not constitute a mere doctrine; practical steps had been taken by the United Nations to enforce it both in 1958 in the Middle East and in 1961 in the Congo.

66. The prohibition of the use of force and the threat of force had been reaffirmed by every important resolution of the United Nations. A striking recent example

---

[12] *Yearbook of the International Law Commission, 1951*, Vol. II (United Nations publication, Sales No.: 1957.V.6, Vol. II), pp. 131-132, para. 40.

was provided by the "Declaration on the granting of independence to colonial countries and peoples", embodied in General Assembly Resolution 1514 (XV) of 14 December 1960. The prohibition had been reiterated by the General Assembly at its most recent session in Resolution 1815 (XVII), unanimously adopted on 18 December 1962 on the recommendation of the Sixth Committee, which stated "the principle that States shall refrain in their international relations from the threat or use of force against the territorial integrity or political independence of any State, or in any other manner inconsistent with the Purposes of the United Nations". In operative paragraph 3 of that resolution, the General Assembly had decided to study that principle under the item "Consideration of principles of international law concerning friendly relations and co-operation among States in accordance with the Charter of the United Nations", which it had decided to place on the provisional agenda for its eighteenth session.

67. The International Law Commission, as a subsidiary organ of the General Assembly, should take account of the situation reflected in that resolution, bearing in mind that the majority of States Members of the United Nations was among those which had suffered most from treaties imposed by the use or threat of force. His own country was among those which had had that unfortunate experience in the nineteenth century. It was therefore essential to incorporate in article 12 the basic idea of Article 2, paragraph 4, of the Charter.

68. He fully agreed with Mr. Tunkin that the use and the threat of force were a matter of concern not only to the parties to a treaty concluded under duress, but to the whole international community. Article 12 should clearly reflect that situation.

69. For those reasons, he could support paragraph 1, sub-paragraphs (a) and (b), of article 12, provided that the relevant provisions of the Charter were incorporated in them. On the other hand, he could not accept sub-paragraph (c), which appeared to give recognition to the illegal use or threat of force; he was certain that if such a provision were submitted to governments, it would not be accepted by them, and it should therefore be dropped.

70. The CHAIRMAN, speaking as a member of the Commission, said that he fully approved of article 12, but he wished to comment briefly on some of the points raised by previous speakers.

71. First, with regard to the possibility of the use or threat of force other than physical force, such as economic pressure, to which reference had been made by Mr. Paredes and Mr. Bartoš, he favoured the use in article 12 of the actual words of Article 2, paragraph 4, of the Charter. By using the language of the Charter the Commission would be neither restricting nor widening the scope of that language, nor prejudicing in any way the manner in which the provision might be interpreted in a particular case by the competent United Nations organs. That approach seemed to him essential, since the Commission was engaged in codifying the law of treaties and not in a study of the law of the Charter.

72. Secondly, with regard to the proposals to delete paragraphs 1 (c) and 2, which provided for affirmation and estoppel, he could accept the deletion of those provisions from article 12, but it would then be necessary to amend article 4 of Part II, so as to exclude article 12 from its application.

73. Thirdly, with regard to the drafting of the article, he agreed with Mr. Ago and Mr. Rosenne. As he understood it, Mr. Rosenne's proposal was not in substance different from that of Mr. Ago, since he wished to reintroduce language originally proposed by Sir Hersch Lauterpacht. That proposal would invalidate any treaty obtained by the use or threat of force in violation of the United Nations Charter. He understood that Mr. Rosenne also wished to broaden the wording so as to take into account the relevant rulings of the International Court of Justice.

74. Mr. ROSENNE, confirming the Chairman's interpretation of his proposal, which was on the same lines as that of Mr. Ago, said the only real difference was one of drafting and could be referred to the Drafting Committee.

75. Mr. de LUNA said that Mr. Amado's phrase "the dénouement of a play" was extremely appropriate. Three views of war had been taken, historically. The first, and very ancient, view had been that all war was a crime; that view had been propounded by Tertullian and was still held by the Quakers, Jehovah's Witnesses and conscientious objectors. The second had been that there were two kinds of war; unjust wars and just wars, the latter being a lawful means of relief or punishment if every remedy by way of pacific settlement had been exhausted, if the cause was just, if the good expected from victory was greater than the evil to be apprehended from fighting, and if the war was conducted *recto modo*. That thesis had been maintained by Vitoria, Suarez, Grotius and the naturalist school in general and was based on the notion of the general weal of the international community. The third view had been that of nineteenth century positivism, which had discarded the limitation of natural law and had maintained that the distinction between a just war and an unjust war was meaningless, all wars being justified provided that the State which declared war was a sovereign State. According to that theory, a sovereign State was in every case empowered to declare war.

76. The problem before the Committee in regard to article 12 could obviously not have arisen so long as the third view had prevailed, or so long as States had gone to war to recover debts, for example. As recently as 1933, so eminent a lawyer as Sir John Fischer Williams in a course of lectures at the Hague [13] had denounced as nonsense the contention that the result of an unlawful act did not exist in international law. Nevertheless the treaty concluded between the Russian Soviet Federal Socialist Republic and Turkey on 16 March 1921 [14] had condemned intimidation as a means of imposing con-

---

[13] Académie de droit international, Recueil des cours, 1933, Vol. II, p. 203.
[14] British and Foreign State Papers, Vol. 118, p. 990.