Case 1:13-cv-07146-JPO    Document 33-32    Filed 05/15/14    Page 1 of 6

tractual obligations, even before the Stimson declaration mentioned by Mr. Verdross. On 7 January 1932 Mr. Stimson, the United States Secretary of State, in a unilateral declaration of United States policy in Asia had proclaimed that the United States would not recognize any situation brought about by the illegal use of force. That declaration had not been in any way binding, and the United States had been free to withdraw it at any time. The principle embodied in it had, however, become binding as a result of the League of Nations resolution, adopted under Article 10 of the League Covenant on 11 March 1932,[15] which had declared that it was incumbent on the Members of the League not to recognize any situation or treaty which might be brought about by means contrary to the League Covenant or to the Briand-Kellogg Pact. In the following year the American States had pledged themselves, by article 11 of the Montevideo Convention,[16] not to recognize territorial acquisitions or special advantages which had been obtained by force. That principle had been subsequently accepted in several international instruments, and had been embodied in article 17 of the Charter of the Organization of American States, signed at Bogota in 1948,[17] which provided that no territorial acquisitions or special advantages obtained by force would be recognized.

77. The principle was thus recognized in positive law, but it had not become a part of general international law, since by its decision at the 101st meeting of the League Council, the League of Nations had subsequently given Member States discretion to recognize the conquest of Abyssinia both *de facto* and *de jure*. Later had come the *Anschluss* and then Munich.

78. After the Second World War, however, a new situation had been created by the Nüremberg and Tokyo trials and especially by the adoption of Article 2, paragraph 4, of the United Nations Charter. Sir Hersch Lauterpacht had been right: the non-recognition of treaties imposed by force was most certainly a part of positive law.[18]

79. The Commission's conclusion should follow the lines laid down by the Special Rapporteur. The world was passing through a revolution due not only to the abolition of distance, but especially to the speed of communications, which enabled everyone to follow political events and made public opinion a key factor in international life.

80. The question whether a *jus cogens* rule existed did not worry him. The United Nations could act on its own initiative, not only at the request of an aggrieved State, which was not always in a position to report the coercion employed against it.

81. The rule stated in article 13 should apply *erga omnes* rather than *inter partes*; first, because of the obvious connexion between articles 12 and 13 — since all the instances in which article 12 applied were violations of a principle of international law based on *jus cogens* — and secondly because the vital interests of the international community required that any obligations imposed by unlawful coercion should be invalid.

82. He agreed with Mr. Ago that there should be no question of affirming the treaty. He could accept the wording proposed by Mr. Rosenne except for the phrase " or in any other manner inconsistent with the purposes and principles of the Charter ..." which would introduce matters dealt with in article 13. The categorical wording suggested by Mr. Ago should satisfy Mr. Verdross and Mr. Yasseen and give the Commission the basic formulation it needed.

The meeting rose at 1.5 p.m.

### 683rd MEETING

*Monday, 20 May 1963, at 3 p.m.*

*Chairman:* Mr. Eduardo JIMÉNEZ de ARÉCHAGA

### Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda] (*continued*)

1. The CHAIRMAN invited the Commission to continue consideration of article 12 in section II of the Special Rapporteur's second report (A/CN.4/156).

ARTICLE 12 (CONSENT TO A TREATY PROCURED BY THE ILLEGAL USE OR THREAT OF FORCE) (*continued*)

2. Mr. PAREDES, commenting on some points raised during previous discussions, said he fully supported the thesis that when coercion had been employed against one of the parties the treaty was void *ab initio*, or as some national codes had it, null and void, which meant that it was treated as though it had never existed. Mr. Tunkin had emphasized the anxiety which such conduct caused, not only to the State directly concerned but to the community which had witnessed an immoral act and reacted against it. Indeed, he seemed to believe that every member of the international community was entitled to denounce the treaty, in much the same way as in municipal law any member of the public could report a crime.

3. In such cases there could be no question of ratifying the treaty or of legalizing it by any other means. It did not exist and had never existed, and the appropriate course was to conclude a new treaty, if the parties so desired, with all the necessary conditions for validity.

4. In his opinion the provision in paragraph 1 of article 12 would have more force and be more in keeping with the spirit of the United Nations Charter, which enjoined members to settle their differences by the means indicated in regional agreements, if the words " or of regional agreements in which all the contracting parties are participants " were inserted after the words " in violation of the principles of the Charter of the United Nations ".

---

[15] League of Nations *Official Journal*, 1932, Special Supplement No. 101, Vol. I, p. 87.

[16] League of Nations *Treaty Series*, Vol. 165, pp. 27 ff.

[17] United Nations *Treaty Series*, Vol. 119, pp. 48 ff.

[18] See *Yearbook of the International Law Commission, 1953*, Vol. II (United Nations publication, Sales No. 59.V.4, Vol. II), p. 147, comment on article 12.

Case 1:13-cv-07146-JPO   Document 33-32   Filed 05/15/14   Page 2 of 6

5. Many speakers had stressed the lack of a court competent to hear and settle international disputes, for in international relations there were not yet any judges to whom States were obliged to submit. That was, unfortunately, the case and the lack of jurisdiction was deplorable, for since the choice of a judge was voluntary it was hardly likely that anyone accused of any kind of international offence would submit to any jurisdiction. The only remedy then would be, as he had proposed, that the victim of aggression should be able to appear before the United Nations Security Council and declare the treaty void because of vitiation.

6. Mr. CASTRÉN said that, among the versions suggested for article 12, those of Mr. Verdross and Mr. Yasseen were fairly close to the draft article in that they referred to the obligations deriving from the Charter and to the principles of general international law.

7. While Mr. Ago's proposal was acceptable, he preferred that first put forward by Mr. Rosenne (682nd meeting, para. 27) and reintroduced by Mr. Tunkin and Mr. Tabibi. By referring to, and actually quoting the language of, Article 2, paragraph 4, of the Charter, that proposal removed all possibility of misinterpretation and laid down a sufficiently broad rule, since a reference to the purposes of the United Nations was made in that paragraph of the Charter. The fundamental rules of the Charter formed part of general international law, and as such bound even States which were not Members of the United Nations.

8. Since the ban on the use of force was of concern to the entire community of nations, paragraph 1 (c) and the whole of paragraph 2 should be deleted from article 12.

9. He gathered that Mr. Tunkin shared his opinion that a peace treaty dictated by a State which, though the victim of aggression, had won the war, was exceptional and should be regarded as valid, because a State which started a war of aggression was answerable for the consequences of its act. Nevertheless, the reparations demanded should be reasonable, as Grotius had maintained even in his day. He proposed that the Commission should refer to the case of peace treaties in the commentary.

10. Mr. TSURUOKA said he agreed with the majority of the Commission on the principle that treaties entered into by a State "through an act of force, or threat of force" should be deemed void. However, he hoped that the Commission, in enunciating that rule, would also settle the question of procedure and state that the treaty could be declared void only by an international tribunal to which the question had been submitted by the parties concerned.

11. He had two main reasons for that proposal. First, it was difficult to verify the existence of a threat of force or its use. There had been much discussion on the definition of aggression — a typical case for the application of article 12 — which gave rise to some scepticism regarding the proper application of that article. Secondly, it was difficult to establish that a party would not have consented to a treaty without the acts complained of. It was true that article 12 dealt with a question of public order, but it also involved an aspect of the problem of vitiated consent. If the treaty was to be declared void, it was at least partly because consent had been vitiated.

12. If the argument that the question was exclusively one of public order were carried to its logical conclusion, every aggressor State would automatically be deprived of the capacity to conclude a treaty. But it was not always necessary or useful to invalidate treaties concluded by an aggressor State. Treaties on such matters as medical services or the exchange of prisoners, for example, should be recognized as valid, especially as the consent of the injured State was real. The Commission should take account of those facts and proceed with caution.

13. He therefore recommended a solution which, while protecting the victim's legitimate interests, would ensure the stability of international law.

14. Sir Humphrey WALDOCK, Special Rapporteur, commenting on the points made during the discussion said that as he had explained in the commentary, international public order was the principle on which article 12 was based. Quite apart from the law of treaties as such, the act of any State seeking to procure the conclusion of a treaty by the use or threat of force could be challenged as a violation of the rules of international law concerning the maintenance of peace proclaimed in the United Nations Charter, and could be brought before the Security Council or the General Assembly by the injured party, whether a Member of the United Nations or not, or by any other State even if it had no direct interest in the object of the treaty.

15. He had framed the article in terms of the right of the victim to invoke nullity, but not in a manner that would in any way exclude the right of any other State to raise the matter in a United Nations organ. That approach, however, as some members had pointed out, could open the door to unilateral and unfounded assertions of coercion to obtain release from treaty obligations, and a clear majority had emerged in favour of drafting article 12 in the form of a simple declaration that the illegal use or threat of force nullified a treaty. He had found the arguments put forward in support of such a formulation persuasive and unimpeachable in logic, since the principle clearly followed from article 2, paragraph 4, of the Charter, which had become a part of contemporary international law, but of course he still attached the same importance to procedural requirements for establishing that coercion had in fact taken place.

16. A State repudiating a treaty on the ground of alleged coercion without raising the matter in the United Nations would not easily escape the charge of having acted arbitrarily — a view that would be borne out by the provisions of the Charter. Mr. Tsuruoka's concern lest a victim of aggression be precluded from arriving at an agreement with the aggressor, say about the treatment of prisoners of war during the hostilities, was important, but did not affect the question whether or not the article should be expressed in terms of international public order.

17. If article 12 were to be re-drafted in that way, it must be kept quite separate from article 11 and must

also exclude any possibility of some form of ratification at a moment when the injured State was no longer subject to the influence of coercive action. As Mr. Ago had rightly pointed out, a new treaty could be arrived at, but only by means of a new transaction, even if the old text were used as a basis.

18. As far as the drafting of the article was concerned, he was inclined to favour a simple text of the kind suggested by Mr. Ago in some such terms as: " Every treaty the conclusion of which is procured by the use or threat of force in violation of the principles of the Charter of the United Nations shall be absolutely void ".

19. A general wording of that kind was preferable to a text modelled on the language of Article 2, paragraph 4, of the Charter, which had to be read in conjunction with its other provisions concerning the use of force in self-defence or its use by the United Nations itself for the maintenance or restoration of peace. It was, after all, important to bear in mind the distinction, so emphatically brought out by Mr. Tunkin, between a treaty imposed on an innocent State and one imposed on an aggressor. A more general wording would be less open to the danger of conflicting interpretations.

20. Another reason for referring to the principles of the Charter rather than to the specific provisions of Article 2, paragraph 4, was that the former were generally regarded as part of international law and as such binding upon all States, whether Members of the United Nations or not, so that the problem of applicability to non-member States raised by Mr. Yasseen and Mr. Verdross would be solved.

21. The amendment to paragraph 1 proposed by Mr. Paredes would be self-defeating, since it would detract from the force of the general principle, which ought to be asserted in strong terms.

22. The CHAIRMAN suggested that article 12 be referred to the Drafting Committee for revision in the light of the discussion. No doubt the Special Rapporteur would also wish to make some changes in the commentary.

*It was so agreed.*

ARTICLE 13 (TREATIES VOID FOR ILLEGALITY)

23. The CHAIRMAN suggested that article 13 be taken in conjunction with article 1, paragraph 3 (c) of section 1, which contained a definition of *jus cogens*.

24. Sir Humphrey WALDOCK, Special Rapporteur, said that article 13, which was of a rather general character, had been difficult to draft: he had explained his general approach to the subject fairly fully in the commentary.

25. For lack of a better, he had used the term *jus cogens*, which was not an entirely new concept in international law and was touched upon in the work of certain writers, including MacNair, but had not yet been at all fully developed. The concept was probably known in most legal systems, though it had no exact equivalent in common law countries. He agreed that article 13 should be dicussed in conjunction with article 1, paragraph 3 (c), in which he had offered what was more of a description than a definition of *jus cogens*.

26. Paragraph 1 of article 13 stated the rule and paragraph 2 contained some examples, though not exhaustive, of what might be meant by violations of *jus cogens*. The examples were all fairly self-evident and each involved some element of international criminality, but he had deliberately refrained from going into too much detail. A general reference to violation of the principles of the Charter would not serve, because they were not all imperative in character.

27. Paragraph 3 dealt with the question of severance in its special application to the subject of article 13. The question of the extent to which it was permissible to separate illegal from legal provisions of a treaty might be controversial, and a special provision on the matter was needed in article 13, as the situation dealt with was different from that of treaties voidable on the ground of error. However, the paragraph could be left aside for consideration together with article 26 in section IV, which contained procedural provisions concerning severance.

28. Mr. BRIGGS said that the opening phrase of article 13 was not well chosen because a treaty constituted international law for the parties. Nor was it desirable to refer to its execution. It might be going too far to say that a treaty whose object was perfectly lawful was void because its execution infringed a general principle of international law.

29. While he understood the reasons why the Special Rapporteur had employed the expression "*jus cogens*", some other term ought to be found because, though it was sometimes used, it would give rise to difficulties. Personally, he had always avoided it and would be loath to try to explain its meaning.

30. He accordingly proposed that the article be redrafted in much simpler form to read:

" A treaty is void if its object is in conflict with a peremptory norm of general international law from which no derogation is permitted except by a subsequently accepted norm of general international law ".

He had inserted the concluding proviso to cover the point dealt with in paragraph 4 of the Special Rapporteur's text.

31. Paragraph 2 should be deleted entirely, as it would give rise to unnecessary controversy.

32. He agreed with the Special Rapporteur's suggestion that discussion of paragraph 3 should be held over until the Commission took up article 26.

33. As to whether an article dealing with the subject of article 13 was necessary at all, he thought that the kind of provision he proposed was at least preferable to the method adopted in articles 8-12, which conferred on the party alleging injury a unilateral right of denunciation, although no adequate safeguards were provided in article 25.

34. At the previous meeting, he had criticized article 12 because he was concerned with the threat to the stability of treaties that would result from imprecisely drafted provisions on validity which, in the absence of compulsory jurisdiction, would allow a unilateral right to nullify.

Case 1:13-cv-07146-JPO   Document 33-32   Filed 05/15/14   Page 4 of 6

35. In order to dispel any misapprehension about his views on the relation between compulsory jurisdiction and international law, he expressed his complete agreement with Mr. Tunkin's assertion that international law existed and was legally binding, even in the absence of such jurisdiction. But he questioned the utility of elaborating complex concepts of validity and nullity if they were to be left open to subjective interpretation instead of objective judicial determination, and were thus merely to provide States with new ways of evading treaty obligations.

36. The new text for article 12 just proposed by the Special Rapporteur was acceptable and he accordingly considered that article 13 should have its place in the draft.

37. Mr. YASSEEN said that the point raised in article 13 was as important as it was delicate: the invalidity — or, as some thought, the non-existence — of a treaty, the object of which was incompatible with a rule or principle having the character of *jus cogens*. The first question to be settled was whether peremptory norms could be said to exist in international law — whether there existed an international public order from which States could not derogate by agreement *inter se*. Personally, he would answer the question in the affirmative, but he thought that such peremptory norms were hard to identify and to apply. The concept of public order was generally recognized in municipal law, but was rather intangible, for it varied with time and place.

38. In international law, *jus cogens* raised not only the question of the autonomy of the will of States, but also that of the order of precedence of rules of international law. The point to be determined in any particular case was whether an international agreement could or could not conflict with a pre-existing rule of law. In municipal law, that problem of precedence was generally decided according to a specific criterion; it was not the substance of the rule but the body establishing it which determined its position in the hierarchy of rules of law. In France, for example, a legislative decree could be referred to the Conseil d'Etat because, although dealing with a matter for which the legislature was in principle competent, it was considered a mere regulation from the formal viewpoint.

39. In international law, however, the contracting parties themselves were the legislators and created the rules of law. The question what criterion should be adopted for deciding the order of precedence of the rules was therefore very complex. The criterion could not be the number of States accepting the rule, for that number was not always proportionate to its value and importance. Nor could it be the formal source of the rule; and it was particularly hard to say whether custom should always take precedence over a treaty rule, or vice versa. Thus the only possible criterion was the substance of the rule; to have the character of *jus cogens*, a rule of international law must not only be accepted by a large number of States, but must also be found necessary to international life and deeply rooted in the international conscience.

40. He agreed with the Special Rapporteur that it would be regrettable not to recognize the principle of *jus cogens*, for there was no doubt that a treaty designed to promote slavery, for example, or to prepare for aggression, ought to be declared void. All that was difficult to explain without recognizing the concept of *jus cogens* in international law. While it was difficult to define that concept in practical terms, the Special Rapporteur's method of giving a few examples could usefully be adopted. The examples would guide international practice and gradually bring out the rules necessary for international life and essential for its development — rules which could not be broken without giving rise to general indignation or severe censure.

41. The concept of an international public order was justified not merely, or even necessarily, by considerations of natural law; it derived from positive law, from the whole body of rules in force. Some rules relating to public order might be specifically recognized in treaties, but the absence of a clause explicitly stating that concept would not mean that the rule was purely dispositive. The true intentions of the parties had to be examined further to discover the true force of the rule.

42. The Special Rapporteur had rightly drafted paragraph 3 to make provision for cases in which only part of a treaty was void.

43. Paragraph 4 was necessary because it emphasized that *jus cogens* was not immutable and that the concept of public order must be free to evolve. So long as no supranational body existed, the international conscience was reflected in general multilateral treaties; the conferences which drafted such treaties expressed the needs of international life, echoed its trends and so had authority to determine the force of pre-existing rules.

44. Mr. TABIBI said he agreed with the conclusion of the Special Rapporteur in paragraph 1 of his commentary that " Imperfect though the international legal order may be, the view that in the last analysis there is no international public order — no rule from which States cannot of their own free will contract out — has become increasingly difficult to sustain ". No State could ignore certain rules of international law when concluding bilateral, regional and international treaties. Those rules, which had the character of *jus cogens*, included the provisions of the United Nations Charter and of the conventions on slavery, piracy and genocide. It was therefore appropriate to include in the draft a provision such as article 13, stating that any treaty with those rules was void.

45. Many authorities held firmly to the view that treaties could be considered as *contra bonos mores* and invalid by reason of a conflict or incompatibility with a rule of customary or general international law. Over twenty-five years ago, in an article entitled " Forbidden Treaties in International Law " Mr. Verdross had already expressed a view which foreshadowed the solution embodied in article 13.

46. The position had become even clearer since the signing of the United Nations Charter, Article 103 of which read: " In the event of a conflict between the

obligations of the Members of the United Nations under the present Charter and their obligations under any other international agreement, their obligations under the present Charter shall prevail."

47. However, although he accepted paragraphs 1, 2 and 4 of the Special Rapporteur's draft article 13, he had reservations regarding paragraph 3. If that paragraph were retained as it stood, it would appear to permit the conflict of the provisions of a treaty with *jus cogens* rules and to open the door to the violation of such rules by permitting the severance of the provisions of the treaty. It was difficult to reconcile the suggestion in paragraph 3 that a treaty would not be invalidated by a minor infringement of a *jus cogens* rule with the correct statement in paragraph 5 of the commentary that "any treaty having an illegal object should be totally void and lack all validity until reformed by the parties themselves". It would be difficult to differentiate between minor and major infringements, in the absence of a provision for compulsory submission of the case to the International Court of Justice.

48. He accordingly proposed that paragraph 3 should be amended by the deletion of the word "if" and the words "is not essentially connected with the principal objects of the treaty and is clearly severable from the remainder of the treaty, only that provision..." The provisions of paragraphs 1 and 3 could then be combined.

49. The definition of *jus cogens* in article 1 was somewhat vague. He suggested that the question of the definition should be postponed until the Commission had agreed on the terms of article 13, when it could adopt a definition consistent with those terms.

50. Mr. ROSENNE said that article 13 dealt with an area of treaty law which was completely different from any so far discussed by the Commission. In the earlier articles, the Commission had been considering whether consent had been given to a treaty and, if so, whether that consent was vitiated. In the case contemplated in article 13, consent had been given to the treaty and that consent was not in any way vitiated; from the point of view of both form and substance, *prima facie* a treaty existed. The question which arose related to the object for which consent had been given.

51. The Commission should at some stage consider the question of the placing of article 13. It dealt with matters so fundamental that it should be given a more conspicuous position, but the Commission could take a decision on that point when it came to the second reading.

52. Because article 13 dealt with the object of consent, he could not agree with Mr. Briggs that there was any redundancy in saying that a treaty was void if either its object or its execution involved the infringement of a *jus cogens* rule.

53. In general, he supported the ideas of the Special Rapporteur and congratulated him both on his boldness in so lucidly expressing the content of article 13 and on the adroitness of his approach to a very difficult drafting problem.

54. He assumed the intention was that under article 13 treaties would only be void *ab initio* if they were in conflict with a rule of *jus cogens* in existence at the time they were concluded. The question of the effect on existing treaties of a rule of *jus cogens* which emerged subsequently raised different problems and was partly dealt with in other articles, notably articles 14 and 21. However, it should be considered whether all the provisions relating to *jus cogens* ought not to be brought together. For similar reasons it was necessary to consider whether the various provisions of *jus cogens* were fully consistent with the Special Rapporteur's proposals regarding the *rebus sic stantibus* doctrine.

55. With regard to the definition of *jus cogens*, he suggested that inspiration might perhaps be drawn from the explanation given by Sir Gerald Fitzmaurice in his third report, that *jus cogens* rules "involve not only legal rules but considerations of morals and of international good order".[1] He did not think it very material whether the *jus cogens* was embodied in positive laws or not. Furthermore, the question how far a rule was to be regarded as *jus cogens* might require specific determination in the light of the material context in which the rule was placed.

56. With regard to the use of the term "peremptory norm" in the Special Rapporteur's definition in article 1 and in the wording proposed by Mr. Briggs, he asked whether it was understood in the same sense by both.

57. Because of the novelty of the subject in a codification project, it might be of advantage to regard the present discussion as preliminary. The Commission would derive much benefit from the subsequent discussions in the General Assembly, the comments to be submitted by governments, and no doubt also from the views of writers.

58. He agreed with the Special Rapporteur that the treaties referred to in article 13 should be regarded as void, not merely voidable; they would then produce the same consequences as those coming under article 12. That approach, however, could give rise to certain problems. For example, what course should the Secretary-General of the United Nations adopt if a treaty which was invalid under article 13 were submitted to him for registration?

59. He shared the view that article 25 could with difficulty have application to a treaty which was void *ab initio*. It was probably in the general interest that treaties of the kind mentioned in article 13 should not be made and he recalled that the United Nations Charter contained provisions enabling the political organs to take cognizance of the situation which would arise in a flagrant instance of treaties void for the reasons mentioned in article 13.

60. With regard to paragraph 3, he was in general sympathy with the views expressed by Mr. Tabibi. It was difficult to accept the principle of severability at all unless the treaty itself made some provision for it. Any discussion of severability should be deferred until the Commission considered article 26.

---

[1] *Yearbook of the International Law Commission, 1958*, Vol. II (United Nations publication, Sales No.: 58.V.1, Vol. II), p. 41.

Case 1:13-cv-07146-JPO   Document 33-32   Filed 05/15/14   Page 6 of 6

61. A more important point, however, was that he did not believe that, in practice, there could be such a thing as a minor infringement of a *jus cogens* rule. If a rule of international law had the character of *jus cogens*, it would be a contradiction in terms to suggest that an infringement of that rule could be of a minor character.

62. Mr. PAL, referring to Mr. Rosenne's observations on the placing of article 13, said that in the common law systems, it was normal to approach the various problems dealt with in the order adopted by the Special Rapporteur. The question of the legality of the object was associated with the questions of capacity to enter into the agreement and reality of consent. He therefore had no difficulty with regard to the placing of article 13.

63. On the point raised by Mr. Briggs, he observed that, in domestic systems, objects as vitiating elements might be either those forbidden by law or those merely discouraged by it, and though all other requisites for a valid agreement were complied with, yet, if either of those two categories of objects were in the contemplation of the parties, the agreement would in the former case be illegal and in the latter case void. All illegal agreements were, of course, also void, but all void agreements were not necessarily illegal. Agreements, though not illegal, might be void in the sense that the courts would not enforce them. In the international field that distinction obviously had no place. There, to render the treaty void the object must be illegal and that seemed to him to have been the basis of the formulation of paragraph 1 presented by the Special Rapporteur. He therefore found the provisions of paragraph 1 acceptable.

64. With regard to Mr. Tabibi's views, whatever might have been the position when the international community was geographically more limited, there could be no doubt that an international public order existed now and that certain principles of international law had the character of *jus cogens*. The whole perspective of United Nations policy could be characterized as a value-orientated jurisprudence, directed towards the emergence of a public order in the international community under the rule of law. The Charter sought to establish a process by which the world community could regulate the international abuse of naked force and promote a world public order embodying values of human dignity in a society dedicated to freedom and justice.

65. The establishment of the League of Nations had marked the first pioneering effort to substitute the human device of some sort of constitutional government for the blind play of physical force in the conduct of international relations. The rules and machinery adopted in the days of the League of Nations had been intended to achieve the fivefold purpose of compelling States first, to respect each other's sovereignty, territory and legitimate interests; secondly, to abstain from imperialistic aggression and preparations for it; thirdly, to submit their disputes to international adjudication and to refrain from taking the law into their own hands; fourthly, to respect international agreements; and fifthly, to make compensation for injurious acts and violations of the law. Unfortunately, the subsequent behaviour of States had shown their reluctance to apply those principles in international politics. That behaviour had been symptomatic of a fundamental crisis in the international legal system. Within a decade of the organization of the League, both the spirit and the letter of its rules and standards had been cast aside, thus bringing about a crisis in the international order and leading to the catastrophe of the second world war.

66. A few, perhaps only two, great powers had emerged from the war possessing national and economic power in its most highly concentrated form. However, the events of the two world wars had brought about the birth of gigantic forces in Asia and Africa and the world community was now confronted with the question of the principal co-existence of over a hundred States, and with the problem of co-ordinating different social systems in the international order. That situation demanded a mental adjustment as an actual condition of survival. It was in that context that the United Nations Charter should be studied and applied, so as to help the emergence of the essential order which it was the ultimate objective of the United Nations to achieve.

67. The Commission had already adopted that policy in its approach to article 12. Personally, he could accept the principle underlying article 13 and agreed with the Special Rapporteur in accepting the existence of an international public order. A system of treaties which relied merely on the interdependence of state interests and on the expediency of peaceful arrangements would result in a number of compromises but not in a system of international law and order. Public order should comprise a system of law which replaced a sense of obligation based on expediency by a higher allegiance to the principle of justice. A transition would thus be achieved from an immediately felt obligation prompted by obvious need to a continued obligation expressed in fixed principles; from a simple relationship between self and "another" to a complex relationship between self and "others"; from an obligation discerned by the individual self to the wider obligations defined by the community from a more impartial viewpoint.

68. In spite of the doubts expressed by some, international public order existed, albeit in an imperfect form, and therefore fully justified the inclusion in the draft of the provisions of article 13. He reserved the right to examine the details of the article on the second reading.

69. Mr. CASTRÉN said that, despite the difficulty of the subject matter, article 13 was well drafted; it was lucid, and the accompanying commentary was both full and convincing.

70. In paragraph 1, the Special Rapporteur had given preference to the principle of *jus cogens* over the formula "illegal under international law" proposed by Sir Hersch Lauterpacht. The definition of *jus cogens* had not yet been discussed, but the majority of the Commission seemed to accept the expression, which had, indeed, been used during the discussion of previous articles. In any case, it might be rather dangerous to try to specify at that point all the criteria for determining whether a rule was a *jus cogens* rule, as that would raise compli-

5