cated problems. *Jus cogens* was a general concept of law which did not need to be defined especially in connexion with the law of treaties. Accordingly, it was right to accept the proposition that a treaty was void *ab initio* if its object or its execution involved the infringement of a *jus cogens* rule and that the invalidity could not be cured by subsequent acts.

71. In paragraph 2 the examples given of treaties which were void under the provisions of paragraph 1 were well chosen. If the Commission decided to retain paragraph 2, sub-paragraph (*a*) should be drafted in the same terms as the corresponding part of article 12. The words " act or " in sub-paragraph (*c*) should be deleted, only the idea of omission being retained.

72. Paragraph 3 stated an exception to the general rule laid down in paragraph 1; hence paragraph 1 should open with the words " Subject to the provisions of paragraph 3 ".

73. Mr. AGO said he had no objection to the principles embodied in article 13; the Special Rapporteur had been right to adopt the idea of a peremptory norm of international law.

74. The concept of *jus cogens* defined in article 1, paragraph 3 (*c*), would be considered later, but he must point out that in fact it only appeared in article 13 and might perhaps be defined in that article itself. Generally speaking, only terms which appeared frequently in the body of the draft should be defined in article 1. A definition of *jus cogens* was not really required; the phrase " general peremptory norm of international law " would be sufficient, with the addition, if need be, of the words " from which no derogation is permitted ".

75. The Drafting Committee would thus be able to prepare an appropriate text for paragraph 1. He proposed, in particular, that the words " contrary to international law and " should be deleted and the wording modelled on that used in article 12, the whole strength of which derived, precisely, from its concision.

76. The substance of paragraph 2 was acceptable in principle, but he thought the two kinds of infringement dealt with in sub-paragraphs (*b*) and (*c*) should be combined in a single paragraph, for in some instances, such as genocide, it was hard to distinguish between them.

77. The case dealt with in paragraph 3 was rather academic. There were so few peremptory norms of international law, and they related to matters of such importance, that certain clauses of a treaty were hardly likely to survive if another clause derogated from a peremptory norm of international law. Even if the case was conceivable, paragraph 3 rather weakened the text and did not seem essential.

78. The idea expressed in paragraph 4 was correct in every respect, but perhaps not entirely necessary. The best example of a rule in a general multilateral treaty which abrogated or modified a rule having the character of *jus cogens* would be a rule laid down in a treaty codifying international law. It might indeed modify existing peremptory norms; only then there would be no derogation from a general rule by a particular rule, but rather a replacement of one general rule by another. That went beyond the scope of article 13. He considered, however, that the paragraph should be dropped, as it might give rise to misinterpretation.

79. As to the substantive question raised by Mr. Rosenne concerning the import of paragraph 1 in the case of a treaty concluded before a particular rule had become peremptory, the meaning of the paragraph as drafted was certainly that any treaty infringing a general peremptory norm was void, whether it had been concluded before or after the norm had become peremptory. If the treaty had been concluded afterwards, it was void *ab initio*; if before, it became void as soon as the general rule became peremptory. A treaty by which the parties agreed to commit an act of genocide, for example, would have become void automatically at the moment when the principles relating to the prevention and punishment of genocide were adopted. There was no need to stress that point of interpretation in the article itself; it would be sufficient to mention such matters in the commentary.

80. The article's position in the draft had also been questioned. He had no fixed views on the subject, but he thought that article 13 should certainly follow article 12, since the two articles had certain common features and some of their strength lay in the fact that they affirmed adherence to the same principle.

81. Mr. BARTOŠ congratulated the Special Rapporteur for having adopted for article 13 a concept which had long been discussed by jurists, namely, the existence of an international public order overriding state sovereignty. Even if it could be said that self-limitation was practised by States which accepted the international order on a contractual basis, as it was to be hoped that they would also accept the Convention on the Law of Treaties, the starting point of the Special Rapporteur's thesis was the precedence of that order over the will of States. That was the most important element in the proposed text.

82. The question whether reference should be made to *jus cogens* rules from which States could not derogate by agreement *inter se*, or whether the formula proposed by Mr. Ago should be adopted, was secondary. It was difficult to use the term *jus cogens*, however, because it was subject to different interpretations according to the tradition of private law followed. As Mr. Gros had pointed out, it could be dangerous to use terms borrowed from private law.

83. What, then, was a general principle of international law ? In 1949 he had expressed disagreement with Kelsen's view that the principles stated in the United Nations Charter were contractual, and not binding on States which had not accepted the Charter.[2] The development of international law, which had also been manifested in the adoption of the principles of the Charter, had not come to an end. He was more inclined to support the theory of Oppenheim, according to which,

---

[2] Kelsen, H., *The Law of the United Nations*, London, Stevens, 1950, pp. 106-110.

Case 1:13-cv-07146-JPO   Document 33-33   Filed 05/15/14   Page 2 of 6

in order to be admitted to the international community, a State must first accept the principles of its legal order.[3]

84. Paragraph 2 might convey the impression that only acts which were criminal and liable to sanctions were covered by *jus cogens*. But judging by what he had heard during the discussion, he thought that the members of the Commission all had a broader conception of the content of *jus cogens*. He shared the view that *jus cogens* rules should have a much wider scope. The examples given in paragraph 2, sub-paragraphs (*a*), (*b*) and (*c*), were not in any way open to criticism in themselves; but if they remained in isolation they might give rise to a mistaken idea.

85. Turning to the question of the severability of the clauses of a treaty, he said that to his own knowledge, contrary to what Mr. Ago had affirmed, it often happened in practice that some of a treaty's subsidiary clauses were contrary to public order, whereas the substance of the treaty was in conformity with it. In that matter, French internal law should be followed, under which as little as possible of the content of a contract was voided. When it was possible to do so without upsetting the general balance of a treaty, only its subsidiary clauses should be voided, the validity of the effects of the general will of the parties remaining intact. However, the distinction was not always easy to make, for it could happen that what was asserted to be the principal object of an agreement had no other purpose than to divert attention from its so-called subsidiary clauses. Thus it was not easy to take a clear position on the matter with a view to drafting legal norms on the severance of subsidiary clauses.

86. On the other hand he shared Mr. Ago's opinion on the retrospective effect of *jus cogens* rules. The theory of retroactivity, which was best illustrated by the example of genocide, had been considered at the Vienna Conferences of 1961 and 1963, but had not been accepted by States in regard to the application of principles on which a mandatory character had been conferred by a treaty codifying provisions that had previously been contractual. It was also a question of principle; for what was called classical international law evolved through the modification of existing rules and the adoption of new ones. It would be regrettable to endeavour to retain vestiges contrary to the new provisions creating the *jus cogens* corresponding to the progressive development of international law.

87. Nevertheless, it should not be forgotten that neither international doctrine nor international practice unanimously acknowledged the retrospective effect of rules. Some writers maintained that rights acquired by States under former treaty provisions which were no longer compatible with the international public order subsisted even if the bases of international law changed. He did not agree. To cover that situation it was therefore important — contrary to what Mr. Ago had said — to formulate the point most explicitly in article 13. A commentary was certainly valuable for questions of theory, and teachers and judges would be able to refer to it; but States would not consider themselves bound by the text of a commentary by the Commission, as had been clearly shown by the Geneva Conferences of 1958 and 1960 and the Vienna Conferences of 1961 and 1963.

88. On the question of the placing of articles 11, 12 and 13, he said that, despite some overlapping, those three articles marked a gradation in grounds for voidance, though they nevertheless dealt with three different subjects. They should therefore follow one another in their present order, whatever position might ultimately be assigned to them in the draft as a whole.

The meeting rose at 6.5 p.m.

---

### 684th MEETING

*Tuesday, 21 May 1963, at 10 a.m.*

*Chairman:* Mr. Edouard JIMÉNEZ de ARÉCHAGA

---

Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda] (*continued*)

ARTICLE 13 (TREATIES VOID FOR ILLEGALITY) (*continued*)

1. The CHAIRMAN drew attention to Mr. Pal's proposal, which had been circulated, that paragraph 1 of article 13 be amended to read:

" 1. A treaty is void if its object is opposed to or inconsistent with the ends, purposes and principles of the United Nations."

2. Mr. TSURUOKA said that, so far as theory was concerned, the concept of *jus cogens* existed in general international law and a treaty which conflicted with a *jus cogens* rule was void.

3. He agreed with the Special Rapporteur that the Commission should include that concept in its draft convention on the law of treaties, but he thought that article 13 should be drafted in simpler and more concise terms, because the idea of *jus cogens* was so clear in itself that it did not need to be elaborated. More elaborate drafting had been desirable in articles 11 and 12 in order to specify the practical form to be taken by that idea; but the same did not apply to article 13.

4. Three cases were conceivable in which article 13 would operate. The first was that in which the parties had deliberately concluded a treaty contrary to *jus cogens*. That would be, by the nature of things, a secret treaty, whose validity the parties would not dispute. Such a treaty would in fact be wholly void, but so long as it was kept secret, no country would have an opportunity of challenging its validity. Of course, if it were put into effect, the parties would be answerable for the consequences; but that was irrelevant to the matter under discussion. The second case was where the parties had concluded a treaty which they believed *bona fide* to be legal, but concerning which a third State held a

---

[3] Oppenheim, L., *International Law*, 8th edition, 1955, vol. I, pp. 928-929.

different opinion. In those circumstances, the treaty would at least be presumed to be valid; and it was debatable whether it was wise to grant the third State the right to dispute the treaty's validity, for that raised a delicate question of interpretation. The third case was where the parties had sincerely believed, when concluding the treaty, that it did not contravene any *jus cogens* rule, but one of them had later come to consider that it did. There again a problem of interpretation arose, and that problem should be settled by an international tribunal.

5. Both from the theoretical and from the practical point of view it would therefore suffice if the Commission stated in its draft that any treaty inconsistent with a *jus cogens* rule was void.

6. Mr. LACHS said that the subject dealt with in article 13 was a vital one for contemporary international law, and concerned the demarcation between the formal and the substantive provisions of a treaty.

7. During recent years two perhaps conflicting trends had become discernible: on the one hand an enormous increase in the number of treaties being concluded and in the range of matters they sought to regulate, and on the other a growing number of general principles that were becoming part and parcel of *jus cogens* and thus constituting a limitation on the freedom of States in drafting treaty provisions if they were to comply with such binding rules and to respect the interests not only of third parties, but of the international community as a whole. The Special Rapporteur was to be commended on his judicious and interesting treatment of a difficult subject.

8. Some 80 years ago Bluntschli had singled out four types of treaty that were void for illegality;[1] the list had now become much longer, though that did not necessarily imply that all treaties concluded in the more distant past were legal. It would greatly contribute to the growing prestige of international law if the Commission could determine the relationship between the older treaties and contemporary international law.

9. With regard to the formulation of article 13, he had some doubts about the structure of paragraph 1. The fact of being contrary to international law should not be placed on the same footing as the consequence, which was nullity. Some re-drafting was necessary in order to separate the cause from the effect.

10. With regard to the examples in paragraph 2, although they were clearly included by way of illustration, there was perhaps some risk of piecemeal treatment in adopting that method. Sub-paragraph (*a*) referred to the use of force, but when that entailed armed aggression it became an international crime within the definition laid down in the Charter of the Nürnberg Tribunal.[2] Strictly speaking, the number of international crimes was relatively limited, but the range of illegal acts was much wider. There could be cases in which certain treaty provisions violated international law, for example, by encroaching on the fundamental rights of third States, and were thus undoubtedly illegal though they did not involve crimes. The examples given in paragraph 2 should therefore be added to, and ought certainly to include treaties that were obviously unequal and treaties establishing spheres of influence.

11. He did not share the doubts expressed by some members at the previous meeting and considered that both acts and omissions should be mentioned in sub-paragraph (*c*).

12. Paragraph 3 contained a very useful and important provision that would allow parts of an international instrument not of an integral character, which were illegal, to be detached from the main body of the treaty. Such a provision would certainly be in the interests of the future development of treaty law.

13. On the question of retrospective effect, some treaties the provisions of which were legal when concluded might in the course of time become illegal. Admittedly, it was not easy to give expression to that idea, but it ought to be reflected in some way in article 13, the application of which could not be limited to the moment when the treaty was concluded, but must extend to the whole duration of its existence.

14. Mr. AMADO said that the Special Rapporteur's commentary on article 13 showed that very little had been written on *jus cogens* in international law. And yet, in municipal law the concept of public order had played a very important part; for example, when in earlier days a Brazilian landowner had arrived in England with his slaves, they had become free immediately on setting foot on English soil, where the institution of slavery was contrary to public order. The ideal would be that the concept of public order should have the same force in international law.

15. He admired the progressive spirit in which the Special Rapporteur had attempted to free the notion of *jus cogens* from the mists which enveloped it in international law. But when faced with the first sentence of the commentary on article 13, he could only envy those of his colleagues who, like Mr. Tsuruoka, found the idea of *jus cogens* so clear that it did not need to be defined. He was still wondering how article 13 could best be worded.

16. The problem, reduced to its simplest terms, was how to define illegality in international law, or how to specify the lawful or possible purposes of treaties; above all, the provision should be effective. Article 13 was necessary and its position in the draft articles was the right one, but the Commission should find an expression that was more generally understandable and less purely theoretical than "*jus cogens*". A reference to a general or fundamental rule of law might perhaps be appropriate. The expression "infringement of a general rule or principle of international law", used in article 13, might create difficulties of interpretation, for the question would arise whether "rule" and "principle" were two different things and whether the word "or" was being used disjunctively or conjunctively.

---

[1] Bluntschli, J. C., *Das Moderne Völkerrecht*, Nördlingen, 1878, 3rd edition, section 411, p. 237.

[2] *Charter and Judgment of the Nürnberg Tribunal*, United Nations publication, Sales No.: 1949.V.7, pp. 92-93.

17. He was also opposed to the enumeration of examples: he would prefer a statement of the principle alone.

18. With regard to paragraph 3, he agreed with Mr. Ago and Mr. Bartoš that every effort should be made to preserve everything that was good in a treaty.

19. Mr. YASSEEN'S question concerning the hierarchy of rules of law had underlined the connexion between article 13 and article 14.

20. Mr. TUNKIN said he hoped to resist the temptation to engage in a theoretical discussion. He was in general agreement with the principle stated in article 13 and with many of the comments already made, especially those of Mr. Ago, Mr. Yasseen, Mr. Tabibi, Mr. Lachs and Mr. Amado.

21. To an increasing extent, state practice and legal theory were being based on the assumption that there were some generally recognized principles of international law from which States could not derogate.

22. The fact that some generally recognized principles possessed the character of *jus cogens* was an innovation brought about by historical changes and by the fact that certain aspects of relations between States — even purely bilateral ones, but first and foremost those relating to the maintenance of peace — had become of interest to all. If the existence of *jus cogens* rules were admitted, it followed that a treaty infringing such rules must be regarded as void.

23. The Drafting Committee would, of course, have to discuss what term should be used to describe that relatively new phenomenon in international law, since the expression "*jus cogens*" might not be understood by laymen and indeed was often avoided by jurists themselves, as Mr. Briggs had pointed out at the previous meeting. Perhaps the expression "fundamental principles of international law", though not very precise, might be more intelligible.

24. The concept of international public order was understood differently by different writers. Some held that it was imposed as a consequence of natural law having its source in human nature or emanating from a divine source and independent of the will of States. History showed, however, that in the long run the laws governing the development of human society were decisive, and that once rules of international law ceased to correspond to those laws and to meet the demands of life, they sooner or later became a dead letter and disappeared. But the laws of development were certainly not legal in character, though they did ultimately condition the creation of rules of law by States through agreement, which he held to include not only treaties, but also custom.

25. On that point he had been misrepresented in the Sixth Committee during the General Assembly's seventeenth session by the United States representative, who had attempted to ascribe to him the view that rules of international law were the result of treaties alone. In fact he (Mr. Tunkin) had clearly expounded a different view stressing the importance of customary rules of international law created, in his view, by tacit agreement between States.

26. Some of the rules created by agreement between States in that broad sense were recognized by them as possessing the character of *jus cogens*. In other words, they were not rules imposed from above by the operation of some natural law. That being so, the Special Rapporteur had been right to include the provision contained in paragraph 4 of article 13, because a general multilateral treaty to which all or nearly all States of the international community were parties could abrogate or modify a rule of *jus cogens*. The contention of some authorities, including Sir Hersch Lauterpacht, that general rules could only derive from customary law might have been true fifty years ago, but with the great increase in the number of general multilateral treaties which were virtually universal in character, it was true no longer.

27. Although he agreed with the principle of paragraph 4, the Drafting Committee would have to consider whether that paragraph would not entail some modification of the definition of general multilateral treaties given in article 1 of Part I. Clearly, a multilateral treaty concluded between, say, five States, though it concerned general norms of international law or dealt with matters of general interest to States as a whole, could not be considered a general multilateral treaty.

28. With regard to paragraph 2, the examples given should include unequal treaties, the existence of which was of particular concern to newly independent States. Admittedly the case was covered in general terms by paragraph 1, since unequal treaties were contrary to rules of international law having the character of *jus cogens*, but a special reference to such treaties was undoubtedly needed. For purposes of definition, the language of the resolution adopted by the Afro-Asian Jurists' Conference in 1957[3] could be used; unequal treaties were defined as treaties establishing gross inequality between the obligations of the parties.

29. He did not propose to comment on the separate problem of the settlement of international disputes.

30. He would like to hear the Special Rapporteur's reasons for referring to the "object or execution" of a treaty instead of simply to "a treaty".

31. Mr. PAL, referring to the simplified formula read out by the Chairman at the beginning of the meeting, said that at the risk of being accused of over-simplifying the text, he was proposing that a number of elements should be dropped from paragraph 1, in particular, the reference to *jus cogens*, which he agreed with Mr. Amado in finding somewhat imprecise. The term was not to be found in most books on international law, it was unfamiliar to lawyers trained in common law systems, and he himself had only become acquainted with it as a result of the Commission's discussions at the previous session; for those reasons, he thought it would be more appropriate in the commentary than in the text of the article.

32. The purpose of his own formulation was to bring the paragraph closer to the language of the Charter.

---

[3] Afro-Asian Jurists' Conference, 1957, Damascus Bar Association, p. 233.

It would be for the Drafting Committee to decide which conjunction, " and " or " or ", should be used between " purposes " and " principles ".

33. With regard to Mr. Tunkin's proposal that a treaty should be declared void if there was a manifest inequality in the obligations undertaken by the parties, he could not agree that such inequality would suffice to make a treaty void. Some other element, such as undue influence, coercion, or the fact that one party had taken an unfair advantage of the other, must also be present; otherwise, it might be possible to invalidate a treaty between, say, the United States of America and a small State, on the ground that the United States extended benefits out of all proportion to the obligations assumed by the small State.

34. As to the examples in paragraph 2, since they were given only for the purpose of illustration, as was indicated by the opening words " In particular ", there was no need to increase their number. He found the paragraph acceptable as it stood.

35. He agreed with those who suggested that paragraph 3 should be dropped, because its provisions were not altogether clear. Even under English law, it was not possible to carry the principle of severability as far as it was carried in paragraph 3; severability must have been contemplated by the parties themselves. It could be applied where several promises were included in one agreement; if one of the promises were found to be invalid, it was possible to maintain the others. Examples of severability were in practice confined to cases of restraint of trade; even in those cases, however, the original contract was examined and the judge had to be satisfied that the parties had contemplated the possibility of severance. He did not believe that a provision on those lines could be introduced into the international law of treaties.

36. He agreed with Mr. Tunkin that paragraph 4 should be retained. Its provisions were perhaps needed to help the progressive development of international law. It was desirable to cover the possibility of a change in the rules of international law having the character of *jus cogens*, since even those rules could not be final and stand for all time; all that paragraph 4 provided for was the possible progress of society.

37. The CHAIRMAN, speaking as a member of the Commission, said that he fully approved of article 13 and the ideas behind it, though he favoured a simplification of the text along the lines proposed by Mr. Briggs and Mr. Ago.

38. With regard to paragraph 1, he said that although he had always admired Mr. Pal's spirit of harmony and his anxiety to reconcile his warm support for the progress of international law with his concern for the stability of treaty relations, he thought his proposal would open the door too wide to a party wishing to escape its treaty obligations. A party acting in bad faith might invoke general grounds to claim that the treaty was " inconsistent with the ends, purposes and principles of the United Nations ". As was well known, the purposes and principles of the United Nations were expressed in the Charter in the form of broad, general statements.

39. Personally, he did not favour the retention of a separate reference to the execution of the treaty. From the standpoint of the general theory of agreements, the term " object " included the execution of an agreement.

40. He was, however, in favour of dropping the term "*jus cogens*" and replacing it by wording drawn from article 1, paragraph 3 (c), of Part II. He accordingly suggested for the consideration of the Drafting Committee a formulation of paragraph 1 reading: " A treaty is void if its object involves the infringement of a general rule or principle of international law from which no derogation is permitted and which may be modified or annulled only by a subsequent norm of general international law ". The words " from which no derogation is permitted " were necessary because they reflected the essence of what "*jus cogens*" constituted. The final proviso, specifying that a *jus cogens* rule could only be modified by a subsequent norm of general international law, should satisfy Mr. Ago and Mr. Tunkin by avoiding the confusion between general international law and general multilateral treaties.

41. He had no objection to paragraph 2, which gave examples.

42. It would be worth while to retain paragraph 3, but not in article 13; a more appropriate place would be in article 26, which dealt with the severance of treaties. It was hardly appropriate to introduce such a minor point in so important an article as article 13.

43. Paragraph 4 would become unnecessary if his proposal for paragraph 1 were adopted, since its final words covered the point dealt with in paragraph 4.

44. With regard to Mr. Tunkin's suggestion that an example of treaties which established a gross inequality of obligations should be added to paragraph 2, he could not agree that international law contained a rule on the subject which was above the will of the parties. International law proceeded from the opposite standpoint — that of the supremacy of the will of the parties.

45. To insert the example suggested by Mr. Tunkin would introduce into an article dealing with the legality of treaties a new defect in consent, known to French law as " *lésion* " and having no precise equivalent in the English language. In Roman law, the concept of *laesio enormis* had originated in the protection of minors below the age of twenty-five and had resulted in the emergence of contractual incapacity; it had subsequently been discredited because its abuse had led to contractual instability. Contemporary international law could not accept the concept of *lésion*, since its acceptance might, in practice, involve contractual incapacity for certain States, instead of the absolute equality prevailing today, and might affect the sovereignty and independence of States, which manifested itself, among other forms, in the capacity to enter into any treaty, as shown by the advisory opinion of the Permanent Court of International Justice of 5 September 1931 concerning the *Customs Régime between Germany and Austria*.[4] In the light of that opinion, any suggestion for introducing the concept of *lésion* into international law would appear to be inimical to the principle of the sovereignty of States.

---

[4] *P.C.I.J.*, Series A/B, No. 41, pp. 37-54.

Case 1:13-cv-07146-JPO   Document 33-33   Filed 05/15/14   Page 6 of 6

46. There remained the important question of determining whether inequality of obligations existed in a particular instance, and whether it would be for the parties themselves to decide the point. Even if a decision by a third party was accepted, international law provided no criteria for the determination of that question.

47. From the point of view of international relations, the introduction of that concept would be fraught with danger. In Latin America, for example, many States would be able to claim, under a provision along the lines suggested, that their various frontier treaties had resulted in a manifest inequality of obligations. Treaties over a century old might then be called in question, thereby opening a Pandora's box of difficulties in relations between States.

48. Mr. AGO said that, broadly speaking, he shared the views expressed by the Chairman. There seemed to be general agreement on the contents of article 13. A few questions of detail remained to be considered, and also the question whether certain paragraphs were appropriate.

49. The purpose of paragraph 1 was to state that a treaty was void if it derogated from a rule from which no derogation was permitted; that was very different from the idea of illegality of certain contracts, which Sir Hersch Lauterpacht appeared to have put forward. The Commission should now concentrate on the question of the peremptory norms of *jus cogens* and it might accordingly be well to change the title of the article and, taking account of what Mr. Amado had said, to delete the word "infringement", which introduced the idea of an unlawful act. There was no question of an unlawful act, and hence no question of responsibility; it was a question of derogation from a rule from which no derogation was permitted, and such derogation rendered the treaty void.

50. While he could not concur in everything Mr. Tunkin had said concerning the theory of custom, he agreed that the general rules from which no departure was permitted were either customary rules or rules which, while embodied in a treaty, were still valid as customary rules for States not bound by the treaty, and hence for States in general.

51. He agreed that it would be inadvisable to refer to both "general rules" and "general principles" of international law, for that would suggest that the Commission was attaching different meanings to the words "rule" and "principle"; he would suggest using some such expression as "general and peremptory rule from which no derogation is permitted".

52. He would prefer to avoid any reference to the principles of the United Nations Charter, because they were not all peremptory and, conversely, not all peremptory rules of international law were embodied in the Charter.

53. He had given further thought to the question of the desirability of giving examples, which arose in connexion with paragraph 2, and he thought it would be possible to give examples other than those already included in the draft — for instance, that of freedom of navigation on the high seas. But since it was intrinsically difficult to draw up a list of examples and since the peremptory norms might change, it would be better not to give any examples at all, and to allow the interpretation of the article to develop.

54. With regard to paragraph 3, he was grateful to the Chairman for his suggestion. It was, of course, true that a part of a treaty could be recognized as remaining valid, but that was rather a hypothetical case; besides, the contracting States might not find it easy to agree on which provisions of the treaty should be maintained, for the different parts of a treaty complemented one another and often established some sort of balance. The rule stated in the article would be more forceful if paragraph 3 were deleted.

55. Paragraph 4 was not necessary because it was self-evident that a *jus cogens* rule could not be set aside by a private agreement between States, but could be replaced by another general *jus cogens* rule.

56. Mr. TSURUOKA said he regretted that he had expressed himself so badly that Mr. Amado had misunderstood him. What the Commission was trying to express in article 13 was clear to everybody, and Mr. Ago had just stated it very simply: a treaty that was contrary to a peremptory rule from which no derogation was permitted was void. The ground was less certain when it came to defining the content of such rules.

57. He agreed with Mr. Ago that paragraph 1 should be re-drafted and the substance of the remaining paragraphs transferred to the commentary in order to facilitate the understanding and implementation of paragraph 1.

58. Mr. de LUNA said that Mr. Bartoš had rightly pointed out at the previous meeting that if the notion of *jus cogens* were accepted, that in itself implied the existence of rules of international law which prevailed over the will of States and from which no derogation could be permitted. Ever since 1932 he (Mr. de Luna) had been opposing the theory of state monopoly of international law, which had been upheld by the formalist positivist school predominant at that period. He was very glad, therefore, that the Commission had expressed support for a principle so essential to the maintenance of international peace.

59. Legal positivism presupposed a twofold limitation of international law. It isolated it from every economic, political, social or ethical context and regarded only the law emanating from the will of the State. Having confined international law within those bounds, the positivist school accepted it without expressing any judgement as to value and regarded it as a logically coherent system of rules arranged in a certain hierarchical order. According to that theory, international law, which reflected only the will of the State, was expressed as written law in the form of treaties and the judgements of international courts.

60. But that theory went too far, in that many treaties were no longer in force or were obsolete, even though they might not have been expressly denounced; a rule could not be interpreted outside the social context which had been the original reason for its existence. At the same time, it did not go far enough, because to