regard something experienced by society as *ipso facto* unsuitable for scientific investigation on the grounds that it was a purely metaphysical experience was to descend to negative metaphysics, which conflicted with the true bases of a positive science of law. To get out of the difficulty, the concept of customary international law was called in to shore up rules which could not rely on the formal will of the State, and the theory of legal self-sufficiency was used to adjust the rules of law to social values.

61. The positivist doctrine of law obviously could not recognize the existence of *jus cogens*, or, in consequence, that of an international public order. As Mr. Pal had so well demonstrated, every society was based on a *Weltanschauung* which was held in common by all its members. The positivist doctrine had been feasible in practice because the groups which had successively been in power in the nineteenth century had shared the same *Weltanschauung*. The international society of the period had been able to accept the idea of the unlimited will of the State because it had been relatively stable. But when a phenomenon such as Naziism appeared, the theory became questionable.

62. The contractual conception of international law, which did not recognize *jus cogens*, belonged to the time when international law had been only a law for the Great Powers. But modern international law had become universalized and socialized. The modern ideologies, of which there were at least three, must be co-ordinated if peaceful co-existence was to be achieved; for if they were not, mankind had no future. The notion of *jus cogens* ought to set bounds to the autonomy of the will of States; even if the Commission took the view that all past treaties contrary to *jus cogens* were void, international law would not be shaken to its foundations. What States lost would be balanced by their gain. At all events, selfish national interests could not be allowed to bring the common international weal to nought.

63. The essence of *jus cogens* was best defined *a contrario* by the concept of *jus dispositivum*. A distinction should be drawn between two kinds of *jus dispositivum* rules, namely, the rules from which it was possible to derogate by another rule of international law, by a unilateral act or by agreement between subjects of international law, and the supplementary rules which filled the gaps in a previous set of rules. In municipal law, it could not be said that a rule was a *jus dispositivum* rule because a subsequent law could derogate from it; if that were so, the whole of municipal law and of international law would be *jus dispositivum*. Similarly, it could not be said in international law that a rule was a *jus dispositivum* rule merely because, for example, a treaty between two States might be subject to derogation by virtue of a subsequent treaty.

64. The Special Rapporteur's definition was commendable because it satisfied moral, economic and sociological requirements which were essential for the existence of an international society, and were therefore imperative and absolute. They could not be ignored in international law, for either they would ultimately prevail or else the international community would vanish.

65. He agreed that paragraph 2 should be dropped, because the examples given in it illustrated what was prohibited, whereas *jus cogens* rules were constitutional rules of the international community and were not dependent on the will of States.

66. In paragraph 1, the words "contrary to international law" should be deleted, but the term "*jus cogens*" should be retained. Paragraph 3 should be retained, for the reasons given by Mr. Yasseen.

67. Mr. GROS said that, after so learned a debate, he would confine his remarks to positive law. From a purely pragmatic point of view, it could be said that the members of the Commission were in agreement on the purpose of their meeting, which was, after all, to draft an article of a convention to be submitted to States. A simple text would be best; to submit to one hundred and ten States an article which called for explanations and a definite position regarding the theory of law would not be sound procedure.

68. The purpose of article 13 was simply to state that fundamental rules existed in international law, from some of which no derogation was permitted. That was all that need be said, and it could be said in the terms suggested by Mr. Ago; a statement of the penalty, which was the nullity of the treaty, should follow.

69. An initial question then arose, and all the previous speakers had referred to it: the question of the content of that basic concept. That question arose in connexion with many other points of law, and precise definitions were not always attempted, for international law developed case by case through the slow progress of state practice and judicial decisions. Hence inability to define the content at present should not be regarded as a weakness; a definition would in any case be only approximate, for the law evolved and a definition could only be put in the general form of fundamental rules from which no derogation was permitted during a given period. The Special Rapporteur had brought that out very well at the end of paragraph 3 of his commentary to article 13, where he said: "Accordingly, the prudent course seems to be to state in general terms the rule that a treaty is void if it conflicts with a rule of *jus cogens* and to leave the full content of this rule to be worked out in state practice and in the jurisprudence of international tribunals."

70. With regard to the intrinsic meaning of *jus cogens*, while accepting Mr. Ago's conception of those fundamental rules, he stressed that they were norms. The general principles of law were also rules, for otherwise they would not be generally accepted as governing international public order. Whatever term was used — general principles of law, *jus cogens* or basic norms — they were in fact rules of positive law.

71. That consideration led him to favour the simplified wording proposed for paragraph 1, namely, the deletion of the words "contrary to international law" and of the term "*jus cogens*".

72. The list in paragraph 2 did not raise any difficulty in itself, but it was not indispensable. It would be for the Drafting Committee to discuss that.

73. The hypothetical case dealt with in paragraph 3 seemed somewhat academic, since it involved giving an interpretation of a situation which might arise in other cases, in which the basic norms were not relevant. An interpretation of general treaties which did not deal with the problem of the exceptional basic norms might raise similar difficulties; besides, the effect of the disappearance of certain clauses on the balance of the treaty ought also to be considered. Those were general questions which need not necessarily be dealt with in article 13. He was therefore in favour of deleting paragraph 3.

74. In the light of the explanations given about paragraph 4, it would clearly be better to deal with that matter in the commentary.

75. While the discussion had been most interesting, he thought the time had come to refer article 13 to the Drafting Committee.

76. Mr. YASSEEN said the was convinced of the existence of *jus cogens*, which was a concept of positive law. The existence of *jus cogens* rules had been explained by reference to natural law; but it could be easily explained within the framework of positive law. For there was no doubt that States themselves could change the content of *jus cogens*. Paragraph 4 was therefore of some value, if only because it showed that *jus cogens* was a concept of positive law.

77. Paragraph 1 of article 13 merely stated the consequences of an infringement of *jus cogens* rules. It provided no guidance for recognizing the existence of a peremptory rule. It contained no substantive definition of *jus cogens*, and no criterion for distinguishing rules having the character of *jus cogens* from rules of *jus dispositivum* — optional or dispositive rules.

78. In the absence of any substantive definition and of any criteria, paragraph 2 was thus essential. The content of the concept of *jus cogens* should certainly be stated in the article by means of clear and precise examples, either those given by the Special Rapporteur or perhaps those mentioned by other members, so that States could refer to the content of *jus cogens* in international practice.

79. He had not changed his views on paragraph 3. International treaties should be safeguarded so far as possible, and paragraph 3 did so by making provision for the voiding of part of a treaty.

The meeting rose at 1 p.m.

### 685th MEETING

*Wednesday, 22 May 1963, at 10 a.m.*

Chairman: Mr. Eduardo JIMÉNEZ de ARÉCHAGA

Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda] *(continued)*

1. The CHAIRMAN invited the Commission to continue consideration of article 13 in section II of the Special Rapporteur's second report (A/CN.4/156).

ARTICLE 13 (TREATIES VOID FOR ILLEGALITY) *(continued)*

2. Mr. ROSENNE said he thoroughly approved of the trend of opinion which had emerged during the discussion in favour of simplifying paragraph 1 by combining it with the definition in article 1, paragraph 3 (c), and dropping the term "*jus cogens*".

3. *Jus cogens* was a technical term which was not easy to explain to a non-jurist, and it should be remembered that the articles were going to be applied in very different circumstances by very different people. They would also have to be translated into several languages besides the official languages of the United Nations. The articles should be as clear and as self-contained as possible, even at the expense of *elegantia juris*.

4. The concept of *jus cogens* had existed in international law for a long time, even if in inchoate form. There were, however, profound differences of opinion as to the reasons for its existence and the foundations on which it rested; some based it on positive law, others on natural law, while yet others attributed to it a higher or even divine origin. But on one point there was general agreement — namely, that the concept of *jus cogens* expressed some higher social need. In principle, all legal rules were equal; the very concept of *jus cogens*, therefore, was a derogation from a fundamental legal principle. Ultimately, it was more society and less the law itself which defined the content of *jus cogens*.

5. In practice, the whole of article 13 would be given a restrictive interpretation, not only by courts, but also by other law-applying organs, such as political organs of the United Nations. There were two reasons for that: first, the article restricted freedom of contract, which was a fundamental principle of international law and indeed of international relations; secondly, it provided that treaties concluded in violation of its provisions were null and void. It was therefore essential to balance the rule embodied in the article with another fundamental principle of international law, which appeared in the United Nations Charter itself as a *jus cogens* principle: *pacta sunt servanda*.

6. In view of the wide philosophical differences that had emerged from the discussion, it was essential to retain the examples given in paragraph 2. In spite of their differences on other points, all members were agreed that those examples were illustrations of *jus cogens* principles. They differed on what additional principles should be included; their differences, however, were a warning of the difficulties which could be expected to arise in the application of article 13 and which must on no account be ignored. If the article was to have proper effect, it was essential that all those engaged in treaty-making, and in particular all international lawyers, should have a clear idea of what was meant by *jus cogens*, and an idea that was not merely philosophical or theoretical. A non-exhaustive list of examples should therefore be included in the article itself and nor merely in the commentary, even at the risk of inelegant drafting.

7. He believed, moreover, that it was possible to establish objective criteria for determining whether a particular rule of international law had the character of *jus cogens*.

In that connexion, he agreed with Mr. Tunkin that the distinction between "general rules of international law" and "general principles of international law" was not of any great importance, though there was an advantage in retaining both expressions.

8. It was significant that the three examples given by the Special Rapporteur in paragraph 2 had at least two features in common. First, they were all embodied in some form or another, partly or wholly, in an international instrument; secondly, they had all been applied by courts, including the International Court of Justice, and other organs. For example, the rule stated in sub-paragraph (a) was contained in article 2, paragraph 4, of the United Nations Charter; it derived from the Pact of Paris [1] and had been applied by the Nuremberg Tribunal as *jus cogens*, and by the International Court of Justice in part of its judgement in the *Corfu Channel* case.[2] The rules stated in sub-paragraphs (b) and (c) had been applied by the Nuremberg Tribunal and other courts as existing international law and as *jus cogens*, though they might have a remote conventional origin in The Hague Conventions of 1899 and 1907. They had been reformulated by the International Law Commission and adopted by the General Assembly. The words of Sir Gerald Fitzmaurice, the United Kingdom representative, later a member of the International Law Commission and now a judge at the International Court, to the Sixth Committee on 3 November 1950 were very apposite: "Whatever views might be taken about the situation before the Charter of Nuremberg, the existing position was perfectly clear and no one doubted that the Nuremberg principles had become recognized principles of international law. The affirmation by the General Assembly was sufficient to make them so, so far as the Member States of the United Nations were concerned." [3]

9. In its advisory opinion on *Reservations to the Convention on the Prevention and Punishment of the Crime of Genocide*, the International Court of Justice had established the *jus cogens* duty of all States to co-operate in the suppression of genocide, holding that that duty was quite independent of the Genocide Convention itself and derived from the General Assembly resolutions on the subject.[4]

10. He had been much impressed by Mr. Tunkin's remarkable statement at the 682nd meeting in which he had viewed the second world war as a sanction: the coalition against the aggressors had actually been called the United Nations during that war and the United Nations of today was its successor.

11. He therefore believed that there existed elements which made it possible to determine with a reasonable degree of accuracy whether a given rule constituted *jus cogens*, bearing in mind that, especially where detailed rules were concerned, the question would have to be decided on the individual merits of each case.

---

[1] League of Nations, *Treaty Series*, vol. 94, p. 57.

[2] *I.C.J. Reports*, 1949, p. 35.

[3] *Official Records of the General Assembly, Fifth Session, Sixth Committee*, 233rd meeting, para. 5.

[4] *I.C.J. Reports*, 1951, p. 23.

12. He was not, of course, prepared to say that every General Assembly resolution, even those which constituted declarations, had *per se* the character of *jus cogens*. However, he certainly accepted the view that General Assembly resolutions could have some legal effect, though its precise extent would vary from case to case, and he was glad to note that there was an increasing body of legal opinion which agreed with that view. But having regard to the peremptory effect on treaties of the provisions of article 13, together with the presumed restrictive interpretation which that article would be given, it was essential not to work on the assumption that every General Assembly resolution — even when in the form of a declaration — constituted *jus cogens*.

13. Other objective criteria could be found. For instance, it was significant that discussion on the admissibility of reservations at conferences convened to draft multilateral conventions had largely revolved round the question of determining how far derogation from their provisions was permissible. A convention that permitted reservations to any of its clauses did not embody any *jus cogens* rule. If a convention prohibited reservations to some of its articles, there was a strong presumption that the contents of those articles constituted *jus cogens* with regard to the matter covered by the convention.

14. His conclusion was that it was necessary to include in article 13 a number of carefully chosen, adequately formulated and generally accepted examples. Subject, therefore, to drafting changes, he accepted paragraph 2, but urged the Commission to take a decision on the issue of principle before the article was referred to the Drafting Committee. If the examples were omitted, not only article 13 but the whole draft would become unworkable, unreal and unacceptable to governments.

15. He had not been convinced by the arguments adduced in support of paragraph 3, which might even contain a contradiction in terms. However, in view of the Chairman's proposal that that paragraph should be considered in connexion with article 26 on the severance of treaties, he would not elaborate further on the point.

16. With regard to the conflict between *jus cogens* and the *pacta sunt servanda* rule, he suggested that a treaty could only be considered void under a rule of international law which had the character of *jus cogens* and which had been in existence at the time when the treaty was concluded. He did not believe that, at that stage, the Commission could countenance the view that a treaty which had been validly concluded could become void under a new rule which had come into existence subsequently. The process of change in the rules of international law having the character of *jus cogens* should be carefully studied. In some areas, rules could change imperceptibly and modifications of old rules, or entirely new rules, could take many decades to become established. In other articles of the draft, the Special Rapporteur had dealt with the effects on a treaty of subsequent changes in the law. It was essential to confine the provisions of article 13 to rules having the character of *jus cogens* at the time when the treaty was concluded.

17. He also wished to reserve his position regarding paragraph 4, the wording of which could be construed, although that was certainly not the intention of its author, as enabling changes to be brought about otherwise than by formal amendment of the Charter in the case of rules having the character of *jus cogens* and emanating from the Charter.

18. Lastly, with regard to the position of article 13 in the draft, he had not been convinced by his critics. The contents of article 13 had no connexion at all with articles 11 and 12. Article 13 stated the cases in which a treaty was void and the consequences of voidance. It had been said that, in municipal codes, an article of that type would appear immediately after the articles on vitiation of consent. But there were some fundamental differences between international law and municipal law: the first was that international law was based on the principle of good faith; the second had been stated in very clear terms by the International Court of Justice in the *Right of Passage* Case, in its judgement of 26 November 1957 on the Preliminary Objections: " It is a rule of interpretation that a text emanating from a Government must, in principle, be interpreted as producing and as intended to produce effects in accordance with existing law and not in violation of it." [5] Apart from these two differences, it should also be remembered that, unlike international law, municipal law was applied under the control of judges and courts.

19. Mr. de LUNA said he had listened with interest to Mr. Rosenne's statement, which reflected the speaker's uneasiness over the widely different views of members of the Commission on the philosophical bases of *jus cogens*. It was generally acknowledged that *jus cogens* formed part of positive law; it was disagreement over the content of positive law which was the source of the difficulty. If the term " positive law " was understood to mean rules laid down by States, then *jus cogens* was by definition not positive law. But if " positive law " was understood to mean the rules in force in the practice of the international community, then *jus cogens* was indeed positive law. But surely, however divided opinion might be among its members, the Commission should set an example of peaceful coexistence in the domain of international law and adopt the ideas shared by the majority of its members.

20. As to the problem raised by paragraph 4, he thought that paragraph should be omitted.

21. Mr. Rosenne seemed to think that paragraph 3 was unsatisfactory because of the development of *jus cogens*. Actually, the reason for the change in *jus cogens* was that the legal conscience of the international community had progressed. A situation which had come into being wrongfully should disappear. Nor should that give any cause for anxiety, for international law was moving forward, not backward. He believed in the progress of humanity; the new principles of *jus cogens* which would be accepted in the future would certainly constitute an advance, and not a negation of the rules of the existing *jus cogens*.

[5] *I.C.J. Reports*, 1957, p. 142.

22. Mr. AGO said he wished to clear up certain points, so that no misunderstanding would remain when article 13 was referred to the Drafting Committee.

23. Mr. Rosenne's statement had left him rather perplexed, for he had not had the impression that opinion in the Commission was really divided on the concept of *jus cogens* or peremptory rules. He thought the Commission had recognized that the rules in question were general rules from which no derogation was permissible, even by private agreement between two or more parties. Peremptory rules might be customary or even of conventional origin, provided that they had become general rules in the true sense of the term. They must accordingly be valid for all the members of the international community, and in particular they must be valid as customary rules for States which were not parties to the treaty laying them down.

24. It would be quite wrong to say that the United Nations Charter contained only *jus cogens* rules; but the contrary conclusion should also be avoided. Really peremptory rules were rare, and it was unlikely that they would ever be very numerous in international law.

25. On the question of the legal status of resolutions of the General Assembly, he felt bound to agree with Mr. Rosenne that they were not *jus cogens*. In fact the question did not even arise. The resolutions were not in themselves a source of international law, and hence could certainly not be the source of peremptory rules.

26. The idea expressed in article 13 was not entirely new. While it was true that some writers of the nineteenth and even of the early twentieth century had inclined to the view that in international law every rule was a dispositive rule, and while there was no doubt that the peremptory nature of certain principles had been affirmed mainly in recent times, he did not think that the concept of *jus cogens* or peremptory norms had been unknown to international law before the first world war. Some of the rules of the law of the sea, for example, which had come to be regarded as peremptory in modern times, had been peremptory in the nineteenth century, and even earlier.

27. Mr. Rosenne had raised the important question whether a rule of international law which became peremptory at a particular time affected only treaties concluded thereafter, or whether treaties concluded previously could be rendered invalid by such a rule. In the first place, he (Mr. Ago) thought it was wrong to speak of retrospective effect in the particular context. Secondly, a rule could not be described as peremptory if it allowed treaties to subsist which were contrary to its content, for that would be a contradiction in terms. He agreed with Mr. Rosenne, however, that it might be dangerous to state that idea too positively; he had mentioned it only because the contrary idea had been put forward. He did not think that the Commission should commit itself on that point in an article. The question should be settled by interpretation and practice, for the Commission's main concern should be to safeguard the existence of treaties.

28. Mr. TUNKIN said that Mr. Rosenne had drawn attention to the fact that members were not agreed on

Case 1:13-cv-07146-JPO   Document 33-34   Filed 05/15/14   Page 5 of 6

the philosophical explanation of *jus cogens* and the sources from which it proceeded. But as Mr. Ago had pointed out, there was no disagreement on the juridical nature of *jus cogens*. The important point was that all members agreed on the practical issues that a rule having the character of *jus cogens* was one from which States could not contract out, and that such rules existed. There might be differences of opinion regarding the philosophical explanation of international law as a whole, or of different problems of international law. The essential point in the present discussion was that the Commission was engaged in the formulation not of a theoretical treatise, but of a draft convention. Members would not, of course, be able to agree on theoretical or philosophical issues; still less could they expect States to agree on such issues.

29. Mr. Rosenne appeared to have misunderstood him with regard to the second world war. He had never viewed that war as a sanction. He completely rejected the Kelsen doctrine and had never considered war as a sanction at all. In fact, he believed that even the old international law had never properly regarded war as a sanction.

30. He also regretted that the question of the legal effect of General Assembly resolutions had been raised. That question was not germane to the discussion, but since it had been raised, he felt obliged to state that on the whole he shared the views expressed by Mr. Ago and not those of Mr. Rosenne. The Charter, which constituted the basic document for the interpretation of resolutions of the General Assembly, made it quite clear that those resolutions did not impose legal obligations upon States. It was highly dangerous, and could do nothing but harm, to read into the Charter what was not there, especially with regard to General Assembly resolutions. To claim that such resolutions could impose obligations amounted to asserting the existence of a process of international legislation; that would alter the very nature of the United Nations. He agreed with Mr. Ago that General Assembly resolutions had their own place in the formation of rules of international law, but that they could never bring the law-making process in international law to completion. Rules of international law could only be established by custom or treaty.

31. Mr. YASSEEN said that, like Mr. Ago, he thought it could hardly be admitted that *jus cogens* rules and rules which contradicted them could exist simultaneously. The consequence of the formation of a new peremptory norm should be the voiding of all pre-existing rules incompatible with the new one. That was not a retrospective effect, but the immediate effect of the peremptory norm.

32. As to the force in law of General Assembly resolutions, although those resolutions were not a direct source of international law, they had an undeniable effect on the international legal order. An example had been given at the last session of the General Assembly in connexion with the 1960 resolution on colonialism. Some representatives had argued that resolutions of the General Assembly were merely recommendations, and that in consequence the 1960 resolution on colonialism did not end the validity of the allegedly customary rules on which the colonial system was based. He had contended that the General Assembly resolution in question was the expression of the general opinion of States and could be regarded as proof of the disappearance of the psychological element indispensable for the maintenance of customary rules. Resolutions of the General Assembly, especially when they were adopted unanimously or almost unanimously, unquestionably testified to a development in world opinion which in certain cases could indirectly determine the desuetude of a rule of international law.

33. Mr. BARTOŠ said that Mr. de Luna's remarks at the previous meeting were a little embarrassing, for they suggested either that he had expressed himself badly or that he had been misunderstood. Far from being a metaphysician, he did not believe in the existence of an international legal order of abstract and absolute value which was imposed by the nature of things or which was constant. He was convinced that the international public order was merely the superstructure of the international community which resulted from the evolution of international society. It was the minimum of rules of conduct necessary to make orderly international relations possible.

34. He fully agreed with Mr. Ago, even though his reasoning might be different, that *jus cogens* did not necessarily originate in the United Nations; the Charter had given expression to certain ideas which had appeared simultaneously with a number of new possibilities. In every age, every international community had its public order, its peremptory norms. The norms were continually changing; the Charter did not mark the end of a process of evolution, but merely a stage in that process.

35. With regard to what had been wrongly called the retrospective effect of peremptory rules, he also shared Mr. Ago's view. New rules of public order became operative as from their acceptance and they produced an immediate effect on treaties concluded earlier. If that were not the case, there could be no progress. At the Danube Conference of 1948, for example, the representatives of certain States had raised the question of acquired rights.[6] Moreover, two great principles had been proclaimed by the Conference — namely, the right of riparian States to be sole administrators of the international waterway and the equality of flags in navigation.[7] The problem was outside the scope of the present discussion, but it was pertinent to mention that rights acquired under pre-existing treaties were valid so long as the order under which those treaties had been concluded subsisted; if the order changed, those so-called acquired rights should be extinguished or amended. In such a case — on the assumption, of course, that the change was due to evolution and not revolution — all jurists were agreed that the existing order should be preserved until after any such radical changes had occurred, when there must be a period of adjustment

---

[6] Conférence Danubienne, Belgrade, 1948, Ministère des Affaires Etrangères, Procès-Verbaux des séances plénières.

[7] *Ibid.* Convention relative au régime de la navigation sur le Danube, p. 373, article 1, and p. 379, article 26.

685th meeting — 22 May 1963     77

and transitional measures to facilitate the change-over from one régime to the other.

36. With regard to the authority of resolutions of the United Nations General Assembly — and those of the specialized agencies, which were sometimes even more mandatory in character — like Mr. Yasseen, he distinguished between formal authority and substantive authority. He agreed in principle that those resolutions had no binding formal authority. But some resolutions, such as those relating to questions of internal organization, had immediate effects for Member States and even for other States; they sometimes introduced rules which subsequently became general. Some resolutions adopted on the recommendation of the Fifth Committee, for instance, had introduced rules which had become the law of the Organization.

37. The rules of procedure of international conferences, although apparently concerned with procedure, in fact regulated certain susbtantive law relations between States. The resolutions of international bodies were not always direct sources of international law; but, as Mr. Yasseen had said, they expressed a state of mind. If they were followed by a long and frequent practice, they gave birth to a new concept. For instance, technical assistance, which was nowhere referred to in the Charter, had become an institution; relations of a certain kind had been established between contributing and recipient States, not only within the framework of United Nations activities, but bilaterally too, as a result of the many resolutions which had gradually clarified and modified those relations. Some resolutions represented the birth of a legal idea; others confirmed an existing rule. Accordingly, the resolutions adopted by international bodies were not negligible as sources of international law, even though their value as such was not always formally recognized.

38. The CHAIRMAN said that the Commission had held an interesting discussion, which would prove of value to all jurists on a number of points, including the question of the effect of General Assembly resolutions; it was his duty to point out, however, that that question was not germane to the article under consideration.

39. Mr. de LUNA said that, although he proceeded from entirely different philosophical promises, he found himself nearly always in agreement with Mr. Bartoš, for whose profound knowledge of legal technique, theory and practice, he had the greatest admiration. He had merely wished to say that Mr. Bartoš had given the true definition of *jus cogens*, when he had said that it was the minimum framework of law which the international community regarded as essential to its existence at a particular time; Mr. Bartoš had just repeated that definition.

40. While he had spoken more particularly of certain norms of *jus cogens*, it was by no means his claim that other norms derived from custom or treaty law did not exist in addition to those he had mentioned, which did not originate in the will of States.

41. Sir Humphrey WALDOCK, Special Rapporteur, said that there seemed to be general agreement on the concept to be embodied in article 13, but the problem was how to give it expression. He had used the term "*jus cogens*", which had the merit of brevity and did appear in the work of writers, eminent even if few in number. However, some members of the Commission had criticized the term on the ground that it was not sufficiently familiar to international lawyers, particularly in certain countries, and might be variously interpreted. That criticism would apply with even greater force to the expression "international public order"; personally, he had not been greatly impressed by those objections and thought that the phrase *jus cogens* could at least be conveniently used in the commentary. For purposes of cross reference in the articles themselves, once the principle of *jus cogens* had been formulated, it would be possible to refer to the rule laid down in article 13.

42. With regard to the formulation of article 13, the Commission's view seemed to be that the definition contained in article 1, paragraph 3 (c), in abbreviated form should be transferred to paragraph 1 of article 13.

43. Among the drafting suggestions made, some involved questions of substance. For example, Mr. Ago believed that the notion of infringement ought to be dropped, and although previous special rapporteurs and certain writers had dealt with the subject under the heading of illegality, he had now come round to the view that the rule should be expressed in terms simply of a treaty being void if it conflicted with a general rule of international law from which no derogation was permitted.

44. A slight difference of opinion had arisen as to whether reference should be made both to general rules and to principles. He had referred to both, having in mind that the International Court, in some of its decisions, had mentioned matters which it seemed more natural to speak of as principles than as rules, for example when invoking humanitarian considerations in its judgement in the *Corfu Channel* case. He had no strong views as to whether the double phrase or the word "rules" alone should be used, and the point could be referred to the Drafting Committee. He did not think that there was much difference between members on the substance of the matter. The difference related only to their views concerning the sources of international law. So far as he was concerned, when he spoke of a "principle", such as a principle of humanity being a rule of *jus cogens*, he was doing so on the basis that the principle was to be regarded as having been accepted as a rule of positive law.

45. Mr. Pal's amendment to paragraph 1 did not commend itself to him because it would narrow the scope of the provision; not all rules of *jus cogens* found expression in the Charter, nor were all the rules laid down in the Charter expressed as rules possessing the character of *jus cogens*.

46. Like the majority of members, he considered that article 13 should be placed in the section dealing with essential validity. He doubted whether the draft would be made any more acceptable if the article were given great prominence by being placed at the beginning. The concept it sought to set out was not new, but was not