Case 1:13-cv-07146-JPO   Document 33-35   Filed 05/15/14   Page 1 of 6

perhaps very familiar to statesmen and might not be readily assimilated by them if it were given undue emphasis.

47. He agreed with Mr. Rosenne and Mr. Ago on the question of retrospective effect. In drafting the article he had assumed that what was known as the intertemporal law would apply. In other words, all treaties would be covered by such a provision and the appearance of a new *jus cogens* would affect such pre-existing treaties as did not accord with it by making them no longer capable of being executed, though not invalidating the performance of the treaties in the past. He had attempted to deal with that question separately in section III, article 21 (A/CN.4/156/Add.1). The nineteenth-century conventions for regulating the slave trade were an obvious example of treaties which were valid when drawn up but subsequently became void by the development of a new rule of international law prohibiting the slave trade altogether.

48. In reply to the observations made concerning paragraph 2 of article 13, he explained that the purpose of the examples, all of which contained an element of criminality, was to indicate the kind of legal principles that were comprised in the notion of *jus cogens*. The article imposed restrictions on the freedom of States to conclude treaties and would, as such, be subject to the most careful scrutiny by them. It therefore seemed important to make clear that not every so-called fundamental principle of international law would be caught by those restrictions. States could, by agreement, freely derogate from many of those rules. Mr. Bartoš had, however, rightly pointed out that other principles not involving the commission of an international crime came under consideration and he had certainly not meant to exclude them. On the other hand he had not thought it advisable to attempt to codify the various categories of *jus cogens*. An alternative to expanding the list of examples would be to drop the paragraph altogether and deal with the matter in the commentary. He was inclined to favour the latter course, the more so as the full extent of *jus cogens* would only be determined ultimately by practice, the decisions of international tribunals and the pronouncements of political organs. The decision whether to retain paragraph 2, though involving points of substance, would partly depend on drafting considerations and could at the present stage be left to the Drafting Committee.

49. Opinion had been somewhat divided on paragraph 3, with some members advocating its deletion on the ground that to allow severance in order to maintain the validity of a treaty might appear to imply approval of a treaty which conflicted with *jus cogens*. As he had explained when introducing the article, he had inserted a provision on severance in the particular context of article 13 to draw attention to the fact that different considerations might apply there than in the case of error. The Commission should not take too hasty a decision about denying the possibility of severance in the former case. The sparse practice and little judicial guidance that existed concerning severance was in connexion with something close to *jus cogens*. He referred to the comment made in the International Court of Justice during the case of Certain Norwegian Loans [8] concerning so-called " automatic " reservations which some judges considered to be in conflict with the Statute of the Court. Without going into the question of how far the Statute could be regarded as *jus cogens* it was very clear that the Court regarded it as *jus cogens* for the parties. Some judges considered severance permissible; others did not. Thus paragraph 3 raised a real problem, but it was one that could be held over until the Commission took up article 26 in section IV.

50. Paragraph 4 had not given rise to any major disagreement, and it could be left to the Drafting Committee to decide whether or not the point could be covered in paragraph 1.

51. The references made during the discussion to the legal force of General Assembly resolutions were not altogether germane to the issue and he saw no advantage in pursuing the matter, on which his own views were not far removed from those expressed by Mr. Bartoš. It was necessary to distinguish between different kinds of resolutions in accordance with the different circumstances in which they were made.

52. The CHAIRMAN suggested that as, in the main, agreement had been reached on the substance of article 13, it could now be referred to the Drafting Committee, and the Commission could take up article 14.

*It was so agreed.*

ARTICLE 14 (CONFLICT WITH A PRIOR TREATY)

53. Sir Humphrey WALDOCK, Special Rapporteur, introducing article 14, said that the question of conflict between treaties was a complex one, as any reader of the reports by his predecessor, Sir Gerald Fitzmaurice, or of his own commentary would appreciate. Members would note from paragraphs 1 and 2 that he had come to the opposite conclusion from Sir Gerald Fitzmaurice and Sir Hersch Lauterpacht, who had held that in certain cases invalidity could result from mere conflict with a prior treaty, and might therefore wonder why he had placed article 14 in section II. His reason was that the question had been discussed in the context of essential validity by McNair in his *Law of Treaties*, by Rousseau [9] and by the previous special rapporteurs, though each of them had recognized that in some instances the problem was one of relative priority rather than of validity. If his general thesis in paragraphs 1 and 2, with the special provisions laid down in paragraph 3, were accepted, namely, that mere conflict of treaties did not raise the problem of nullity, but rather of priority, there might be good reason to transfer the article to another section. It did, of course, have obvious links with article 19, which dealt with implied termination by entry into a subsequent treaty. He had not yet formed any definite opinion as to the appropriate place for article 14 and wished to hear the views of the Commission before doing so.

---

[8] *I.C.J. Reports*, 1957, judgement of 6 July 1957.

[9] Rousseau, C., *Principes généraux de droit international public.*

Case 1:13-cv-07146-JPO    Document 33-35    Filed 05/15/14    Page 2 of 6

54. The general problem dealt with in article 14 had some relevance to the question of extended participation in general multilateral treaties concluded under the auspices of the League of Nations, which the General Assembly had asked the Commission to study further.

55. Mr. CASTREN said that once again the Commission was dealing with a difficult problem on which theory was divided and which the previous special rapporteur had treated with great caution. That being so, the Commission should seek guidance in practice, and in the first place in the case-law of the International Court, the body most competent in the matter. That was what the present special rapporteur had done. His draft of article 14 was simple and clear; the provisions proposed were workable, sound and prudent.

56. The Special Rapporteur had rightly emphasized that the Commission was not called upon to interpret the Charter of the United Nations, and had taken the adopted approach in saying that a treaty which conflicted with an earlier treaty should not be declared void; at most the draft should specify, without prejudice to the question of responsibility, which of the two treaties should prevail. As the Special Rapporteur said in his commentary, there were different kinds of treaties, governed by different rules. But it often happened that a single treaty contained elements of different kinds, which complicated the problem. The previous special rapporteur had distinguished a category of treaties which, in the event of a conflict, should take precedence over the others. Like the present special rapporteur, he (Mr. Castren) thought that the concept of *jus cogens*, or an equivalent concept, should be the criterion for deciding that certain treaties had absolute priority; that was the effect of paragraph 4 of article 14. The exceptions for which provision was made in paragraph 3 were also necessary.

57. The only provision of article 14 which he did not find entirely acceptable was that contained in paragraph 2 (*b*) (ii), under which the effectiveness of the second treaty could be contested not merely by a State which was a party only to the second treaty, but also by a State which was a party to both of the conflicting treaties. Such a case was doubtless rare in practice, but from the theoretical viewpoint it might be considered that that right should not be granted to such a State.

58. Mr. BRIGGS said that the Special Rapporteur's commentary on article 14 was extremely illuminating and convincingly demonstrated that conflict with a prior treaty did not raise any major issues of validity. The cases treated in paragraphs 1, 2 and 3 entailed limitations on capacity or stated the principle of priority. That being so, perhaps the Special Rapporteur's suggestion that the question of conflicting obligations be dealt with in a separate section should be adopted, in which case article 14 should perhaps be held over and re-drafted for consideration at a later stage.

59. Mr. ROSENNE said that he supported the views expressed by Mr. Briggs, but would go further than the Special Rapporteur, who seemed to favour combining parts of articles 14 and 19 in a separate section, and urge that article 14 belonged to an entirely separate part of the draft — namely, that to be devoted to the application of treaties. Perhaps the Special Rapporteur should be asked to reconsider the whole question in that context.

60. He endorsed the general conclusion reached by the Special Rapporteur in his commentary.

61. Sir Humphrey WALDOCK, Special Rapporteur, said that if the Commission agreed with the arguments he had set out in his commentary, perhaps after consulting the Drafting Committee he might be asked to state his views as to how the subject of article 14 should be handled.

62. Mr. TUNKIN said that the Commission needed time for reflection on the complex problem dealt with in article 14; no hasty decision ought to be taken.

63. Mr. PAL did not consider that the question of conflicts between treaties belonged to section II. He agreed with Mr. Tunkin that no immediate decision could be taken on the matter.

64. Mr. AMADO said that the Special Rapporteur had certainly had sound reasons for placing article 14 in the section concerned with essential validity. Moreover, in most textbooks the conflict of treaties was considered immediately after their validity. He hoped the Commission would take the opportunity of throwing new light on a question which, as he had observed at the previous meeting, was closely linked with that of the legality of the objects of treaties.

65. Mr. ROSENNE said he wished to withdraw the comment he had made regarding the second world war (para. 10 above) as a result of having misunderstood a statement made by Mr. Tunkin at the 682nd meeting.

*The meeting rose at 1 p.m.*

---

### 686th MEETING

*Friday, 24 May 1963, at 10 a.m.*

*Chairman:* Mr. Eduardo JIMÉNEZ de ARÉCHAGA

---

State responsibility: Report of the Sub-Committee
(A/CN.4/152)
[Item 3 of the agenda]

1. The Chairman, opening the discussion on item 3 of the agenda, invited the Chairman of the Sub-Committee on State Responsibility to introduce the Sub-Committee's report (A/CN.4/152).

2. Mr. AGO, Chairman of the Sub-Committee on State Responsibility, summarizing the Sub-Committee's work, drew attention to the conclusions given in paragraph 5 and to the proposed programme of work set out in paragraph 6 of the report. The Sub-Committee had worked in an excellent atmosphere;

Case 1:13-cv-07146-JPO    Document 33-35    Filed 05/15/14    Page 3 of 6

80                              Yearbook of the International Law Commission, Vol. I

it had adopted its conclusions and recommendations — which were positive — unanimously, and had reason to be very well satisfied with the experiment made in preparatory work on a most difficult question.

3. Mr. ROSENNE, commending the Chairman and members of the Sub-Committee on their work, said that they had clearly gone into the subject thoroughly and a number of points about which he had felt some difficulty at the previous session had now been elucidated.

4. The Commission's original terms of reference regarding the topic of state responsibility had been laid down in General Assembly resolution 799 (VIII), in which the Commission had been requested " to undertake the codification of the principles of international law governing State responsibility". Later, however, they had been broadened by the recommendation in resolution 1765 (XVII) that the Commission should " continue its work on state responsibility, taking into account the views expressed at the seventeenth session of the General Assembly and the report of the Sub-Committee on State Responsibility and giving due consideration to the purposes and principles enshrined in the Charter of the United Nations." He inferred from those resolutions that the General Assembly was looking to the Commission primarily for codification, though without excluding the possibility of progressive development.

5. The Sub-Committee's general conclusions were fully adequate and acceptable. The immediate objective should be to survey and evaluate the present state of the law and practice and to prepare precise draft articles covering the essential elements of the doctrine of state responsibility.

6. While he understood the reasons which had led the Sub-Committee to suggest, in footnote 2 to its report, that the question of the responsibility of subjects of international law other than States be left aside, he considered that the Special Rapporteur to be appointed on the subject would need to be careful in dealing with the question of the possible responsibility of States towards other subjects of international law and to avoid any lack of balance that could result from leaving aside a question which, grosso modo, did form part of the subject. That point should not be overlooked, even though that aspect of State responsibility perhaps more properly belonged to another subject on the Commission's agenda — namely, relations between States and intergovernmental organizations.

7. Assuming that the outline programme of work put forward by the Sub-Committee was accepted, the question remained what should be the next stage of the work. In view of the priorities already established by the Commission, he doubted whether much time could be devoted to state responsibility at its next — the sixteenth — session, and the best course might accordingly be not to require the Special Rapporteur to present a fully integrated set of draft articles in 1964, but to indicate what general line of approach he intended to adopt. Presumably time would be allotted for discussion of the subject at the seventeenth and eighteenth sessions.

8. In the meantime, some useful preparatory work could be done by the Secretariat, which might be asked to prepare a summary of the fairly lengthy discussions on state responsibility which had taken place in various organs of the United Nations, not only of those in the Sixth Committee; for example, there had been highly pertinent debates on sovereignty over natural resources. Such a summary would give an idea of the scope of the subject as seen by Members of the United Nations and of what problems were of particular interest to them.

9. It might be useful to re-examine the reasons for the failure, where state responsibility was concerned, of the 1930 Conference for the Codification of International Law [1] in the context of the broader treatment being proposed by the Sub-Committee. He made that suggestion because the Conference's failure in another domain, namely, the law of the sea, far from discouraging the Commission or the General Assembly from tackling that subject, had, in fact, provided a point of departure.

10. It might also be useful, though that could be left to the Secretariat's initiative, to prepare a digest of recent decisions of international tribunals on the lines of that relating to state succession (A/CN.4/151), classified in accordance with the programme proposed by the Sub-Committee.

11. Mr. PAL said he was in full agreement with the programme decided upon by the Sub-Committee, or rather with the recommended " main points to be considered as to the general aspects of the international responsibility of the State ".

12. The Sub-Committee had unanimously agreed to recommend that, with a view to codification of the topic, the Commission should give priority to defining the general rules governing the international responsibility of the State. He entirely agreed with that decision of the Sub-Committee, especially as he felt assured that it did not exclude any feasible progressive development from the scope of the study.

13. The Commission was told that careful attention should be paid to the possible repercussions which new developments in international law might have had on responsibility. He took it that the expression " new developments in international law " was comprehensive enough to include all relevant new developments in international life. There would certainly be included many new historical factors not yet adequately assimilated in legal thinking on the subject. He felt assured of that from the gist of the discussions given in the summary records of the Sub-Committee's proceedings. Things that had happened or were happening in the economic, social and political order were inevitably reflected in the legal order; indeed, law must be the record of life's experience if a fatal unhinging of social relations was to be avoided.

---

[1] *Acts of the Conference for the Codification of International Law*, Geneva, 1930, League of Nations, Vol. I, pp. 43-44 and Vol. IV.

Case 1:13-cv-07146-JPO   Document 33-35   Filed 05/15/14   Page 4 of 6

14. It was inexpedient to go into details of the programme at that stage; that could be left to the Special Rapporteur. The details would require careful study, however. For example, under the second point in the programme, " the forms of international responsibility ", the duty to make reparation and perhaps the basis, if any, of such reparation, would have to be considered. The suggested inclusion of the doctrine of " unjust enrichment " would also be considered in that context, and the memorandum submitted on the subject by Mr. Jiménez de Aréchaga gave ample indication of the amount of study involved.

15. In dealing with the entire question of state responsibility, it was essential to remember that the State was an institution and that the question being considered was that of the responsibility of that institution in the discharge of its appointed task. It might not be possible to make a value-judgement on any particular conduct on the basis of timeless, absolute criteria, but the Commission might have to enquire whether and to what extent the conduct was " meaningful " at the time. The conduct would have to be examined to see whether and to what extent it was inevitable for the fulfilment of a given task. He would refrain from entering into further detail, however, and would only express his full concurrence with the recommendation of the Sub-Committee, so far as it went.

16. He suggested that when a special rapporteur had been appointed, the Commission should request him to prepare a complete plan of work, including special aspects of the subject, as had been done by the Special Rapporteur on the law of treaties. Priority should be given to the fields in which tensions that threatened the peace of the world had already appeared. Those fields would no doubt give rise to controversies and difficulties, but that was no reason for evading them. Every field of tension in international life should be brought under study and norms should be drawn up which could become instruments of the international community seeking to subdue the potential anarchy of forces and interests to a tolerable harmony. Beyond that general comment he did not, at that stage, wish to suggest any specific topic and preferred to leave the question to be dealt with when the complete plan was placed before the Commission by the Special Rapporteur, whom he hoped the Commission would appoint at the present meeting.

17. Mr. TABIBI said that the Sub-Committee's proposals were acceptable; he welcomed the fact that, in deference to the Commission's wishes, those of its members who had submitted memoranda had refrained from going into detail and had confined themselves to defining the general nature and elements of the doctrine.

18. The responsibility of States for the maintenance of peace was the most important topic, but responsibility for injury to persons and property had by no means lost its significance even with the acquisition of independence by many States. The feeling in the Commission on Permanent Sovereignty over Natural Resources had been that the work on state responsibility should proceed rather faster. That Commission's report, as well as the relevant General Assembly decisions and documents, should be studied by the Special Rapporteur as an indication of contemporary opinion and the present-day needs of States.

19. Mr. CASTREN said that the Sub-Committee had done excellent work, respecting its terms of reference and taking into account the opinions expressed by the members of the Commission at the fourteenth session. He approved of the proposed programme of work, and was glad the Sub-Committee had unanimously recommended that, with a view to the codification of the topic, priority should be given to the definition of the general rules governing the international responsibility of the State. The Sub-Committee had also been right to propose that the Commission should leave aside the question of the responsibility of subjects of international law other than States.

20. He took it to be agreed that, in its future study of the subject, the Commission would take account of new developments in international law in other fields closely related to State responsibility.

21. Mr. LACHS said that to his regret he had been prevented from submitting a paper on state responsibility, as he had hoped, but he fully endorsed the general approach adopted in the working paper presented by Mr. Ago, whose profound knowledge of the subject was also reflected in the Sub-Committee's report as a whole.

22. Initially, views in the Sub-Committee seemed to have been divided over the treatment of the topic, but he was able to associate himself with the conclusion finally reached that it would be wise at the outset to define the scope of the doctrine and restrict the study to the responsibility of States. To go beyond that might lead to confusion and possibly to the construction of artificial concepts.

23. The question of the protection of the property of aliens certainly formed part of the subject and deserved attention. Even in that narrow sphere a new approach was necessary to take account of significant developments and many important changes, one of the most recent of which was an interesting decision of the Bremen Court of Appeal.

24. With regard to the points listed by the Sub-Committee for study, there could be no doubt that the question of the origin of international responsibility must be discussed. On the other hand, he wondered whether it would be wise to examine possible responsibility based on " risk " in cases where a State's conduct did not constitute a breach of an international obligation. On that point he agreed with the view expounded by Mr. Yasseen in the Sub-Committee: the problem would lead them into questions of *diligentia* and should be left outside the scope of the enquiry.

25. He had similar doubts about the wisdom of considering the important questions which might have to be examined in connexion with proving the events giving rise to responsibility, which were part of the law of evidence and as such should be left aside. The

6

Case 1:13-cv-07146-JPO   Document 33-35   Filed 05/15/14   Page 5 of 6

Commission must concern itself with matters of substantive law. Once the legal basis of responsibility was established, the position would be clear, and special proof would be required only, if at all, in the so-called borderline cases. He held that view although he was aware, as any student of the proceedings of conciliation commissions and arbitral tribunals must be, that in the past there had been many cases involving the question of responsibility in which issues of evidence and proof had played a very large part.

26. He fully agreed with the Sub-Committee's sound and logical conclusions concerning the objective and subjective elements to be determined.

27. As for various kinds of breaches of international obligations, where subjective and objective elements might be found combined, perhaps some arrangement in the order of the problems to be studied would be needed and certain problems of drafting would call for discussion.

28. He had some doubts about paragraph 4 of the first point, in which "state of necessity" seemed to be placed on the same footing as "self-defence". The former had been invoked by States as a justification for violations of international law and in order to give legal sanction to acts essentially illegal, whereas self-defence was by definition qualitatively different.

29. The report as a whole deserved unanimous approval and represented a fresh and well-founded approach to an important topic of international law which was being placed in the proper perspective. The general directives proposed for the study of the subject formed a sound basis for the elaboration of draft articles reflecting the law and the consequences of its violation.

30. Mr. AMADO observed that the old theory of the international responsibility of States, which had been concerned essentially with compensation for injuries to the person or property of aliens, had given way to a more advanced conception in which the problem of sanctions occupied the foreground. For example, during the Sub-Committee's discussions Mr. de Luna, after referring to nuclear-weapons tests, which could pollute the atmosphere of the territory of States that had had no part in them, had maintained that it would only be necessary to say that an unlawful act had taken place; that a State had violated an obligation under international law.[2] The subject was expanding all the time, and that was why, despite the pessimistic forecasts that the United Nations was in danger of dissolution, he hoped that the Commission would keep on working, under United Nations auspices, to develop and codify the law relating to state responsibility.

31. It was most heartening to read a collective report which drew a single and unanimous conclusion from the opinions of a number of eminent authorities. Some of the Sub-Committee's members, such as Mr. Tsuruoka and Mr. Jiménez de Aréchaga, had taken the view that the future study should be restricted to very specific and traditional aspects of the subjects. Mr. Jiménez de Aréchaga's argument concerning unjust enrichment in his memorandum on the duty to compensate for the nationalization of foreign property was certainly highly discerning and opened up wide prospects.[3] Mr. Briggs and Mr. Gros, on the other hand, had upheld the view that the Commission should first establish the source of the international responsibility of States.[4] He agreed with them that that line of inquiry was the key to everything else, and should be given priority over all related studies.

32. Mr. TUNKIN said that he had already expressed his views during the discussion in the Sub-Committee, but he wished to make a few observations on the report and on certain suggestions by previous speakers.

33. The essential part of the report was the plan of work set out in paragraph 6 which showed the various points to be studied by the future special rapporteur. It was important to remember that the enumeration of those points could in no way be considered as an expression of opinion with respect to substance. For example, under the first point of the plan, in paragraph 4, "state of necessity" was mentioned. That was because there had been cases in which States had referred to the doctrine of the state of necessity, so that it was essential for the Commission to express its opinion on the subject. But the inclusion of "state of necessity" in paragraph 4 did not mean the Sub-Committee placed it on the same level as "self-defence", and he fully understood Mr. Lachs' concern on that point.

34. The same applied to footnote 3 of the report, concerning the question of possible responsibility based on "risk"; the Commission would have to consider whether that question should or should not be studied as part of the topic of State responsibility.

35. With regard to future work, the Special Rapporteur on state responsibility should devote special attention to instances of state responsibility relating to the gravest breaches of international law, such as acts of aggression, violations of state sovereignty and refusal to grant independence to colonial peoples; that was the only logical approach. He fully agreed with Mr. Pal that the problems to which he had referred should be given due weight in formulating general norms for state responsibility.

36. With regard to footnote 4, he agreed with Mr. Lachs that the problem of proof was a separate one; procedural matters should not be mixed up with the substantive problems of state responsibility.

37. Mr. Rosenne had made a number of suggestions for documents to be prepared by the Secretariat. One of them entailed re-examination of the work on state responsibility done by the 1930 Hague Conference for the Codification of International Law. He did not feel that any useful purpose would be served by placing such a burden on the Secretariat; ample writings were available on the 1930 Conference, especially on its work on state responsibility. He supported Mr. Rosenne's other suggestions for documents to be prepared by the Secretariat.

---

[2] A/CN.4/152, annex I, p. 15.

[3] *Ibid.*, annex II, pp. 1-21.

[4] *Ibid.*, annex I, pp. 12-14.

38. He agreed with Mr. Pal that the codification of the topic of state responsibility should be accompanied by progressive development where necessary. The General Assembly had never limited the work of the International Law Commission in any particular field to codification alone. It had always been understood, both by the General Assembly and by the Commission itself, that in codifying any branch of international law the Commission should proceed with due regard to recent developments. The need to bear recent developments in mind had again been stressed in General Assembly resolution 1505 (XV) of 12 December 1960 on "Future work in the field of the codification and progressive development of international law". Certainly, in the specific field of state responsibility, the Commission would have to consider some proposals having the character of progressive development.

39. He fully approved of the suggestion that a special rapporteur should be appointed.

40. Lastly, he agreed with Mr. Ago regarding the success of the experiment of the two sub-committees. Whenever the occasion arose, the Commission should use that method to expedite its work.

41. Sir Humphrey WALDOCK said the Sub-Committee's report was a most useful document, as were the individual papers of members of the Sub-Committee. It was his understanding that the programme of work set out in paragraph 6 constituted a general directive rather than a strait-jacket for the future special rapporteur. His own experience was that thorough consideration of a topic was apt to reveal points which had not previously been contemplated.

42. With regard to Mr. Rosenne's suggestions on what the Commission should expect from the Special Rapporteur at the sixteenth session, the opinion of the future special rapporteur would be decisive on that point. For his part, however, he had some doubts about asking him to produce heads of articles that would present broad formulations rather than detailed provisions. Such a procedure might not enable the Commission to make the best possible use of its time. Detailed articles would ultimately have to be produced, and experience suggested that the whole discussion would then take place a second time, despite the fact that heads of articles had already been considered. An additional danger involved in that method was that it was often not possible to get a matter into proper focus until it was seen expressed in detailed provisions.

43. He agreed with Mr. Tunkin regarding the proposal for a paper on the 1930 Hague Conference. It would be sufficient if copies of the records of the conference were made available in the library.

44. He also agreed with Mr. Lachs and Mr. Tunkin regarding the need for both the Special Rapporteur and the Commission to take a very clear position on the problem of "state of necessity". Whatever view members of the Commission might hold on the inadmissibility of that plea in most circumstances, it had so often been resorted to by States in one form or another that it was essential to give prominence to a study of it. The Commission should express very firm conclusions concerning that plea in order to remove the misconceptions which still seemed to exist in respect to it.

45. With regard to the question of proof, he also agreed with Mr. Lachs that questions of evidence should be kept separate from questions of substance. There were, of course, some points on which questions of responsibility and of evidence came quite close together. A good illustration was the argument submitted on behalf of the United Kingdom to the International Court of Justice in the *Corfu Channel* case, urging it to apply the doctrine of *res ipsa loquitur* for the purpose of establishing Albania's responsibility in respect of the explosions in her territorial waters. The Court had not been willing to accept the argument that Albania's responsibility should be made to depend on a presumption of law arising from the fact of the mines' being found in her waters. It had dealt with the question on a different basis from that requested by the United Kingdom, treating the matter as one of evidence and not of responsibility; on that basis it had held that the plaintiff State was entitled to a more liberal use of circumstantial evidence in such cases.[5]

46. With regard to the contents of the report, the Commission should deal with the broad lines and the general principles of state responsibility rather than with particular topics. He saw no reason to give special attention to one field of responsibility rather than to another. The Special Rapporteur on the topic would have to draw his examples from the experience available in the various fields in which questions of state responsibility had arisen in the past.

47. Mr. de LUNA said it was most gratifying that the report before the Commission should have been adopted unanimously; the credit for that was primarily due to the Sub-Committee's Chairman.

48. The first question to be considered was that raised by Mr. Rosenne. He agreed with Mr. Tunkin that in performing its task of progressively developing the law, the Commission was not limited by the resolutions which Mr. Rosenne had cited.

49. The main problem was how to resolve the conflict between the theories of subjective and objective responsibility. According to the former, *faute* alone could originate responsibility. That theory was based on Roman law, in which *dolus* was contracted with *bona fides* and *culpa* with *diligentia*, even though Roman law had also known responsibility without *faute*, for example, in the case of the loss of goods or animals entrusted to the care of boatmen, innkeepers or ostlers. The opposite theory admitted responsibility independently of *faute*, for example, responsibility by reason of risk or of the breach of a rule of international law. That view, which was of Germanic origin, had entered international law through common law.

50. Practice was not uniform, however. It was possible to interpret in the sense of objective responsibility the Island of Palmas case,[6] article 3 of Hague Convention

---

[5] *I.C.J. Reports*, 1949, p. 18.
[6] *American Journal of International Law*, 1928, Vol. 22, p. 867.