Case 1:13-cv-07146-JPO   Document 33-36   Filed 05/15/14   Page 1 of 6

No. IV of 1907,[7] article 14 of the draft declaration on the rights and duties of States prepared by the Commission itself,[8] and several decisions of the International Court of Justice, the Permanent Court of Arbitration and the General Claims Commission. But in other cases, no less numerous, it seemed that the theory of subjective responsibility had prevailed.

51. Thus the concepts involved were vague and they had been variously interpreted by writers, mainly under the growing influence of common law, which applied to about a third of the world's population. Anzilotti, Borchard, Briggs and McNair had given preference to objective responsibility, whereas Oppenheim had favoured subjective responsibility. In a resolution it had adopted in 1927, the Institute of International Law had enunciated a general rule based on subjective responsibility, but had acknowledged the existence of cases of objective responsibility. Conversely, in the preparatory documents for the 1930 Hague Conference for the Codification of International Law, emphasis had been placed on objective responsibility, while the existence of cases of subjective responsibility had been acknowledged.

52. With regard to the Hague Conference, it would be most useful if members could consult the relevant documents more easily.

53. Even though practice and theory seemed to be evolving rather towards the concept of objective responsibility, it was certain that both concepts would continue to exist. The Commission should therefore begin by stating clearly its position on the problem raised by the first point in its programme of work, "origin of international responsibility", before continuing its study.

54. Mr. LIANG, Secretary to the Commission, said it was at Mr. Rosenne's suggestion that the Secretariat had undertaken the preparation of its memorandum on resolutions of the General Assembly concerning the law of treaties (A/CN.4/154), which had proved useful to members of the Commission. He believed it would be equally useful to prepare a memorandum summarizing the discussions and the resolutions of the various United Nations organs on the subject of state responsibility. There had been occasional discussions bearing on the question in various United Nations organs other than the International Law Commission, and there was a formidable mass of documentation on the work of the Commission on Permanent Sovereignty over Natural Resources. A voluminous study by that Commission had been printed. There could, of course, be no question of summarizing the discussions of the Commission on Permanent Sovereignty over Natural Resources, because that Commission had its own summary records. The study itself, a scholarly document, should not be summarized, but would be available in printed form to members of the International Law Commission. The Secretariat could furnish a summary of the discussions and decisions of other organs of the United Nations on state responsibility and an index to the work of the Commission on Permanent Sovereignty over Natural Resources.

55. With regard to the work of the Hague Conference of 1930, he recalled that in 1946 the Secretariat had prepared a very full memorandum [9] for the United Nations Committee of Seventeen appointed by the General Assembly under its resolution 94 (I) of 11 December 1946 on the "Progressive Development of International Law and its Codification"—the Committee on whose recommendation the International Law Commission itself had been established by General Assembly resolution 174 (II) of 21 November 1947. That memorandum dealt at length with the work of international conferences on the codification of international law, and from an informal conversation he gathered that it corresponded in part to what Mr. Rosenne had had in mind. It was therefore unnecessary to undertake any further work. Personally, he believed that the failure of the Hague Conference of 1930 had been due to several causes; a great deal had been written on the subject and much space was devoted to the Conference in the memorandum he had referred to.

56. He thought that the digest of international decisions requested by Mr. Rosenne would be a very useful document, and the Secretariat would be glad to prepare it in suitable form.

57. Mr. BARTOŠ, after congratulating the Sub-Committee on its excellent work, said its report was so lucid that he could endorse it almost without reservation, but he did not agree with all the ideas expressed by members of the Sub-Committee, either in their memoranda or during the discussions. He expressed his satisfaction that certain questions had not been mentioned in the text of the report itself.

58. He agreed with Sir Humphrey Waldock that the Special Rapporteur's task would not be easy, even if a list of the questions to be examined had been drawn up. In one week, the Sub-Committee had not been able to solve all the problems involved or to lay down all the main lines to be followed in the work. Nor would the Commission be doing so merely by approving the report; that would be unscientific, for it should examine the questions of substance before deciding on the broader trends, especially as the topic was so controversial with regard to both practice and theory.

59. With regard to the question raised by Mr. de Luna whether the theory of *faute* should be considered as well as that of responsibility based on risk, he would not revert to the objective element in responsibility, since several speakers, Mr. de Luna in particular, had dealt with it very fully, but would merely draw attention to the connexion between risk and the state of necessity. In modern times, necessity could not be pleaded in defence of a wrongful act, without taking account of certain forms of responsibility, not only where a state of necessity had its origins in a *faute*, but also where acts performed in a state of necessity produced certain consequences. An act regarded as entirely excusable

---

[7] Scott, J. B., *Hague Conventions and Declarations of 1899 and 1907*, 3rd edition, New York, 1918, Oxford University Press, p. 103.

[8] *Yearbook of the International Law Commission, 1949*, p. 286.

[9] A/AC.10/5.

Case 1:13-cv-07146-JPO   Document 33-36   Filed 05/15/14   Page 2 of 6

would not be an international wrongful act; but some risks should nevertheless be accepted by those in a state of necessity.

60. International case-law and practice recognized such risks. In maritime law, for example, there were cases in which no one was at fault, but in which certain liabilities were shared between States as between parties. In a civil war the case-law recognized responsibility incurred by the State in whose territory the war was fought, even though that State could not be said to be at fault by reason of any positive act or omission. The act might be entirely excusable, and, if so, it was not wrongful; but the fact remained that damage had been caused, so that very often the question of responsibility subsisted. In such a case there might be interstate responsibility, and it was based on risk, which also existed in international law.

61. The Sub-Committee had been right not to include specific individual cases of *faute* in its list and to confine itself to the general principle of state responsibility. He would nor for the moment express any opinion on the positions taken or the situations considered by some members of the Sub-Committee in regard to that point in their remarks or memoranda.

62. He must make reservations, however, concerning the consent of the injured State as a circumstance nullifying the wrongfulness of an act. For that raised not only the question of presumed consent, which was relevant to the main problem of the law of treaties before the Commission at that session, but also the question of the limits of consent. His approval of the proposed programme as a whole did not imply that he agreed that the Sub-Committee should be free to adopt the notion that the consent of the injured party could be accepted as a circumstance which always nullified the wrongfulness of the act entirely. He made reservations on that point, although he would not object to its being mentioned in the text of the report itself.

63. The expression " collective sanctions " was used on page 4 in paragraph 3 of the second point. That expression could be interpreted in two different ways in international law; what the Sub-Committee had no doubt had in mind was collective sanctions as provided for in the League of Nations Covenant and defined in the United Nations Charter, namely, sanctions imposed by the international community, not sanctions directed against a group of persons or a people, which had sometimes been called " collective " and which belligerents and occupying Powers were forbidden to apply.

64. The Sub-Committee had rightly refrained from including individual responsibility in paragraph 3 of the first point. The Genocide Convention [10] and the principles of the Nuremberg Charter [11] had postulated it in its most explicit form, but it was not the concern of the Sub-Committee or of the Commission. Acts by individuals had to bear some relation to state responsibility, but the Commission should concern itself for the time being, whether by prohibition or by sanctions, only with state responsibility arising out of acts committed by individuals. In maritime law omissions by individuals might also involve the State's responsibility, as they did under the rules concerning the laws and customs of war on land laid down in the Hague Convention,[12] which made a State responsible for all breaches of those rules by members of its armed forces.

65. In dealing with the question of raparations, the Sub-Committee had been right in using the word " compensation ", but what did compensation really include ? An American theory of compensation was set out in one of the memoranda (A/CN.4/152, annex II, p. 1), but it was by no means certain that all the necessary conditions for compensation had always been so clear in international law. It might be considered that compensation would not always be paid in full, but would be proportional to the responsible State's ability to pay; in other words, for purposes of determining the amount of compensation to be claimed, that State would be treated, by a kind of quasi-analogy, in accordance with the modern rules applicable to bankrupts. In dealing with Germany the injured States had made a global claim to which liability was limited, and had declared beforehand that they were being compensated for the wrongful acts of the Third Reich. In the case of Italy and the other States with which peace had been concluded in Paris in 1947, a lump sum had been claimed, taking account of the ability to pay. That system was very often applied in practice, in cases of compensation to foreigners for expropriation of property.

66. The notion of compensation need not be defined yet, since the general principle was under consideration; the Commission could take that question up later, after considering any proposals submitted to it.

67. The CHAIRMAN, noting that practically all the members of the Commission who were not members of the Sub-Committee on State Responsibility had expressed a favourable view on the Sub-Committee's report, invited Mr. Ago, as Chairman of the Sub-Committee, to sum up the discussion.

68. Mr. AGO thanked the Commission for its appreciation of the Sub-Committee's work.

69. First of all, he wished to reassure all the speakers who had expressed concern at the fact that certain points had been mentioned in the Sub-Committee's report. Neither the Sub-Committee as a whole nor its members individually had expressed a final opinion on how the problems discussed should be solved. For example, the references to consent of the injured party and to the state of necessity did not mean that the Sub-Committee regarded them as circumstances which in every case nullified the wrongful nature of certain acts or omissions. All that the Sub-Committee had wished to do had been to remind the future Special Rapporteur that, however they might be settled, he would have to take those questions into account in his treatment of the subject as a whole.

---

[10] United Nations, *Treaty Series*, Vol. 78, pp. 278 ff.

[11] *Charter and Judgment of the Nürnberg Tribunal*, United Nations publication, Sales No.: 1949.V.7, pp. 91 ff.

[12] Scott, J. B., *op. cit.*, pp. 100 ff.

70. Sir Humphrey Waldock, with the very wide experience he had gained during two years as Special Rapporteur, had said that the instructions given to the special rapporteur on State responsibility should not impose induly strict limitations on his work. A plan of work, which was what the Sub-Committee had drawn up, could include fairly detailed suggestions; but the Special Rapporteur would inevitably find some gaps when he came to the heart of the matter, and would have to make some adjustments. Even though the Commission and the Sub-Commission were in full agreement on the main lines of the programme, it must be possible to depart from it when going into the subject more thoroughly.

71. It had also been asked whether the main emphasis should be on codification or on progressive development. There again, just as he did not believe it possible to draw a clear dividing line between those two activities, he did not think it possible, either, to foresee whether one of them should take precedence over the other. A final conclusion on the matter could not be reached until the substance of the problems had been examined. Neither the Commission, nor the General Assembly or the Sixth Committee, could decide beforehand which points should be codified and which were suitable for progressive development. The Special Rapporteur would first have to submit rules on each point in the light of experience, of reality and of the case-law, which was fairly abundant on certain aspects.

72. Another question was what work the Commission might ask the Secretariat to carry out. A kind of index of everything done or said by the various organs of the United Nations about State responsibility would be very useful to the Special Rapporteur. The work of the 1930 Codification Conference was certainly quite well known and the memorandum which the Secretary had mentioned might be very useful. The documentation on the subject was sufficient, but what would be especially useful would be a collection of the leading cases. It would suffice if the Secretariat prepared a full and accurate index, showing the sources.

73. Provisional work and discussion would probably be of little use, and would duplicate the Sub-Committee's work. The connexion between a principal provision and secondary provisions would only become apparent when the subject was studied as a whole. Thus there was some danger of doing work which would have to be entirely revised the following year. For that reason, and because the Commission would first need to have all the documentary material the Secretariat could provide, and because a great deal of research would be needed before a report could be written, he thought the item should not be placed on the agenda for the 1964 session; a preliminary report should not be scheduled until 1965. Besides, it would be a pity to take up valuable time which might be spent completing the work on the most important subject of the law of treaties.

74. The first report need not necessarily cover the whole subject; it could be confined to the first point, leaving the second till later. That division would be practical, and consistent with the method adopted for the law of treaties. But those were merely suggestions; the Commission could take the necessary decisions as its work proceeded.

75. The CHAIRMAN, after thanking Mr. Ago for his able summary of the discussion, said that, if there were no objections, he would consider that the Commission agreed to approve the report of the Sub-Committee on the understanding that the outline programme of work it contained was without prejudice to the position of any member regarding the substance of any of the questions mentioned in the programme. It was also understood that the outline would serve as a guide to the Special Rapporteur without, however, obliging him to follow it in detail.

*It was so agreed.*

76. The CHAIRMAN said that other points, such as the time for submission of the report, would be taken up at the end of the present session. There remained, however, the important question of the appointment of a special rapporteur for the topic of state responsibility. Mr. Ago, Chairman of the Sub-Committee on State Responsibility, had already been mentioned several times as the member best qualified to undertake the task. He therefore invited the Commission to indicate its approval of Mr. Ago's nomination.

*Mr. Ago was appointed Special Rapporteur for state responsibility by acclamation.*

The meeting rose at 1 p.m.

---

### 687th MEETING

*Monday, 27 May 1963, at 3 p.m.*

*Chairman:* Mr. Eduardo JIMÉNEZ de ARÉCHAGA

---

### Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda]
*(resumed from the 685th meeting)*

1. The CHAIRMAN invited the Commission to resume consideration of article 14 in section II of the Special Rapporteur's second report (A/CN.4/156).

ARTICLE 14 (CONFLICT WITH A PRIOR TREATY) *(continued)*

2. Mr. LACHS, stressing the importance of article 14, commended the Special Rapporteur for his approach and particularly for his commentary. The article raised certain issues of principle and his doubts had not been dispelled by the discussion. In view of the increasing number of treaties and of the danger of incompatibility of their provisions, the Commission must lay down rules for the guidance of States. Its primary concern should be the security of international transactions and the protection of the interests of parties to a treaty who

Case 1:13-cv-07146-JPO   Document 33-36   Filed 05/15/14   Page 4 of 6

wished to rely on its provisions. The parties could not be left helpless when certain signatories entered into a new treaty that conflicted with obligations under the former treaty.

3. Paragraph 4 was the most important provision and should be placed first. Treaties which confirmed general principles of law or gave greater precision to binding rules of law could not be altered, since they confirmed what had been termed *jus cogens*. The source of the obligation lay outside the treaty itself and article 13 applied. Any conflict that might arise in such a case concerned not the treaty, but the very existence of *jus cogens*, of which the treaty only constituted evidence.

4. The second provision in order of importance was that embodied in paragraph 3 (*b*), which reproduced the terms of article 103 of the United Nations Charter. The Charter occupied a special place among instruments of contemporary international law and it was therefore appropriate that paragraph 3 (*b*) should be placed immediately after paragraph 4, which should be placed first. Article 103 of the Charter had wider implications, in particular in point of time, than, for example, article 20 of the Covenant of the League of Nations. Provisions similar to article 103 were to be found in the Paris Peace Treaties of 1947: in article 44 of the Treaty with Italy, article 10 of the Treaty with Rumania, article 8 of the Treaty with Bulgaria, article 10 of the Treaty with Hungary and article 12 of the Treaty with Finland.[1]

5. An interesting illustration of the practice under Article 103 of the Charter was furnished by the Agreement of 1 July 1948 between the Universal Postal Union and the United Nations, article VI of which specified that "no provision in the Universal Postal Convention or related arrangements shall be construed as preventing or limiting any State in complying with its obligations to the United Nations."[2]

6. The Special Rapporteur's paragraphs 1 and 2 dealt with cases in which the freedom of action of States was not limited by a higher law. It would of course be desirable in those cases for States concluding a new agreement to define its relationship to agreements already in existence — as was done in the case of the relationship between the Geneva Protocol of 1924 and the Covenant of the League by article 19 of that Protocol[3] — or to provide for the termination of the old treaty as soon as the new one came into force. An instance of that kind was to be found in International Labour Convention No. 28 of 1929, article 23 of which provided that: "Should the Conference adopt a new Convention revising this Convention in whole or in part, the ratification by a Member of the new revising Convention shall *ipso jure* involve denunciation of this Convention without any requirement of delay...."[4]

7. A somewhat different approach had been adopted in the Universal Copyright Convention,[5] concluded under the auspices of UNESCO in 1952, to which a declaration[6] had been attached containing a set of principles to prevent any conflict which might result from the coexistence of that convention and the earlier Berne Convention.

8. Unfortunately, States often failed to include specific clauses on the subject in their treaties and it was necessary to deal with that contingency. It might be advisable also to include principles covering cases in which such stipulations did exist, bearing in mind that article 15 dealt with such situations in relation to the termination of treaties.

9. With regard to the serious problem raised by the case contemplated in paragraph 1 (*a*), he thought it would be desirable to place at the very outset of that provision a confirmation of the principle of unanimity — a principle to which the Special Rapporteur subscribed. The provisions on the various cases to which the rule applied, and the various exceptions to the rule, should follow.

10. However, the main problem was that of the cases contemplated in paragraph 2. The Special Rapporteur had perhaps attached too much importance to the two cases cited in paragraph 15 of the commentary, which had been decided by the Permanent Court of International Justice; he seemed to rely not so much on what the Court had said, but on what it had not said.

11. The principle of unanimity could not be questioned. In another case, that of the Act of Algeciras of 1906,[7] concerning Tangiers, which had not reached the Court, some of the parties to an older instrument had proceeded to revise it without the consent of the others; the parties which had revised the Act had tried to remedy the situation by communicating their decision to the absent parties with a view to obtaining their consent. Similar action had been taken for the revision of the Treaty of 1839 establishing the neutrality of Belgium.[8]

12. Article 14 did not deal with those treaties which specifically prohibited the conclusion by the parties of special agreements on the same subject, either between themselves or with third States, as was the case with the Berne Convention of 1886,[9] the General Act of Berlin of 1885[10] and the Declaration of Brussels of 1890.[11] The conclusion might be drawn that such stipulations had no legal effect. It was true that treaties containing provisions of that type were few in number, but it was essential to uphold the principle of unanimity and to take the existence of those provisions into account. As Judge Anzilotti had said in his separate opinion in the *Lighthouses Case*, "... it is a fundamental rule in

---

[1] United Nations, *Treaty Series*, vols. 41, 42, 48 and 49.
[2] *Agreements between the United Nations and the specialized agencies* (United Nations publication, Sales No.: 1951.X.I), p. 99.
[3] *League of Nations Official Journal*, Geneva, 1924, *Special Supplement No. 23*, p. 502.
[4] *Conventions and Recommendations*, 1919-1949, Geneva, 1949, International Labour Office, p. 165.
[5] United Nations, *Treaty Series*, Vol. 216, pp. 134 ff.
[6] *Ibid.*, pp. 150 ff.
[7] *British and Foreign State Papers*, Vol. 99, pp. 141 ff.
[8] *Op. cit.*, Vol. 27, pp. 990 ff.
[9] *Op. cit.*, Vol. 77, pp. 22 ff.
[10] *Op. cit.*, Vol. 76, pp. 4 ff.
[11] *Op. cit.*, Vol. 82, pp. 55 ff.

interpreting legal texts that one should not lightly admit that they contain superfluous words...." [12]

13. Another question he wished to raise was that of treaties which had an effect on States that were not parties to them. Some treaties had played a decisive part in the formation of new States or had guaranteed the vital rights of States that were not parties. Such third-party beneficiaries should not be left helpless in the face of attempts to revise the treaties or to conclude new instruments which conflicted with the earlier ones.

14. He proposed that the provisions of article 14 should be rearranged, paragraph 4 being placed first and paragraph 3 second. On the points of substance he had raised, he would make no concrete proposals at that stage, but would await the explanations of the Special Rapporteur.

15. Mr. YASSEEN said that a conflict with an earlier treaty having the same substantive force would raise no difficulties if there were a single international community with a single legislative body. As in municipal law, if the judicature and the legislature were part of the same system it would be merely a matter of interpretation, since in the last resort the solution would depend on the will of the legislature.

16. But the situation was quite different in the sphere governed by international law, and especially by conventional law, since there were a large number of communities and legislative bodies. No problem arose where completely different international communities existed side by side, for every rule would then remain in force within its own sphere; but where conventional rules came into force successively in international communities which differed from each other only in part, that overlapping complicated matters.

17. Two principles had then to be borne in mind. First, respect for acquired rights: a later treaty should not impair the interests of the States parties to an earlier treaty. As a general rule, however, it would be wrong to go so far as to invalidate the later treaty. Secondly, the interests of States, which were parties to the later, but not to the earlier, treaty should be safeguarded. The contractual principle should be ignored, since the Commission was drafting rules *de lege ferenda*, and the development of international law should not be impeded merely for the sake of some States which might not be willing to bow to modern requirements.

18. The line taken by the Special Rapporteur was therefore both moderate and justifiable; it did not impair the rights of the States parties to an earlier treaty, since that treaty was held to prevail. At the same time there was no bar to the treaty's amendment. The later treaty was not invalidated, but could be carried into effect provided that the States signatories to the later treaty fulfilled their obligations to the States parties to the earlier treaty.

19. The Special Rapporteur had not laid down any absolute rule, but had provided for justified exceptions. The proviso regarding the constituent instruments of international organizations seemed perfectly reasonable in view of the importance of such instruments and the need to provide international organizations with certain guarantees. The other exception, relating to *jus cogens* rules, was also essential. Moreover, the solutions adopted in article 14 could be more easily accepted in view of the approval of article 13.

20. Further exceptions might be conceivable, especially for conventions of great political importance based on a balanced compromise achieved with great difficulty, particularly those prohibiting derogation from their provisions by means of later conventions. They might be regarded as somewhat analogous to *jus cogens* rules.

21. The principles on which article 14 was based and the solutions put forward in it were acceptable as a whole, subject to the reservations he had mentioned.

22. Mr. TUNKIN said it was important to avoid the temptation to adopt an approach borrowed from municipal law; in article 14, it would be inappropriate to take a position based on the concept of civil liability. The situation in international relations was very different from that obtaining under municipal law; international treaties were of greater importance than contracts concluded under municipal law, for world peace could depend on the fulfilment of treaty obligations. Consequently, the provisions of article 14 were of vital importance.

23. The problems of principle involved had some bearing on the *pacta sunt servanda* rule. A State which was a party to a treaty would violate that rule if it entered into a later treaty which conflicted with its obligations under the earlier treaty. The question then arose what the legal consequences would be with regard to the validity of the later treaty; he would leave aside, for the time being, the problem of responsibility, which would be dealt with by Mr. Ago as Special Rapporteur for that topic.

24. The principle stated in paragraph 2 was correct, but the problem arose of whether that principle could be applied to every situation. Some speakers had quoted instances in which exceptions might have to be made. Personally, he thought there could be international treaties of which it was not sufficient to say that " the later treaty is not invalidated by the fact that some or all of its provisions are in conflict with those of the earlier treaty." One example was the recent agreement on the neutrality of Laos,[13] which prohibited the establishment of foreign military bases on Laotian territory. It a treaty were concluded in violation of that provision, it would clearly not be sufficient merely to say that the provisions of the earlier treaty would prevail; such a statement might cover most of the practical points involved, but it would also be necessary to state that the second treaty was void.

25. Paragraph 1 dealt with the case where all the parties to the later treaty were also parties to the earlier treaty. In that case, the principle to be applied was that the parties could always change the provisions of the earlier

---

[12] *P.C.I.J.*, Series A/B, No. 62, p. 31.

[13] Command Papers, H.M. Stationery Office, London. Cmd. 9239, pp. 18 ff.

treaty by subsequent agreement. The problem of validity did not arise and paragraph 1 did not properly belong to the subject matter of article 14; he suggested that it should be removed from the article.

26. Mr. de LUNA said he was glad to see that the Special Rapporteur had departed from the approach adopted by his two predecessors, Sir Hersch Lauterpacht, who had held that a treaty should be void " if its performance involves a breach of a treaty obligation previously undertaken by one or more of the contracting parties ",[14] and Sir Gerald Fitzmaurice, who had drawn a distinction between cases in which a previous treaty imposed reciprocal obligations and those in which the obligations imposed were of the " interdependent " or " integral " type.[15]

27. The Special Rapporteur had adopted a more correct approach, which had, moreover, the support both of judgements of the Permanent Court of International Justice and of the principle that conflicts between treaties should be resolved on the basis of the relative priority of conflicting legal norms, not on the basis of the nullity of the later treaty.

28. The most useful idea in the arguments of the two previous Special Rapporteurs, the idea that a treaty conflicting with a *jus cogens* rule was invalid, had been retained; any other solution would needlessly impair the stability of conventional law. Wherever *jus cogens* rules did not apply, the principles to be respected were the autonomy of the will of the parties, the principle that so far as third States were concerned treaties were *res inter alios acta* and the principle *pacta tertiis nec nocent nec prosunt*. Where a party to an earlier treaty assumed a subsequent obligation, it would be sufficient to follow the general principles governing the interpretation and application of treaties, their amendment and termination. Where a State was unable to fulfil one or other of its successive obligations, the principle of responsibility would apply, with its consequence: compensation.

29. In many instances States in a particular region which were parties to multilateral treaties had concluded among themselves regional agreements containing provisions that differed from those of the earlier treaties. For such States it was the regional agreements which had effect, by virtue of the principle *tractatus specialis derogat generali*. Many cases similar to those quoted by the Special Rapporteur and by Mr. Lachs existed in general international law; for example, not all the States parties to the Hague Convention of 1899 had become parties to the Hague Convention of 1907, but both conventions had operated simultaneously by virtue of a special clause in the latter.[16]

30. Mr. ROSENNE said the discussion had strengthened his opinion that article 14 dealt with the interpretation and application of treaties rather than with their validity.

31. In most cases, subject to the overriding rules of *jus cogens*, the real problem was that of determining which set of obligations was to prevail in the event of conflict between an earlier treaty and a later one. As pointed out by the eminent French internationalist Rousseau, that could give rise to delicate situations in which legal considerations were not always predominant.

32. He believed that the guiding principles should be expressed in terms of a residual rule. Indeed, the Special Rapporteur had begun his formulation on that basis, but his approach should be more emphatic. The residual rule would apply where both treaties were completely silent on the question of other treaties and where there had been no real negotiations to try to bridge the gap between them. It was quite common for a clause to be included in a treaty dealing with its relationship with past treaties, with future treaties, or with both. It was essential that that practice should be encouraged and that the efficacy of that type of clause should not be impaired by the adoption of too general a rule. All United Nations conventions codifying international law concluded since 1958 contained a clause on the subject. On the other hand experience showed that provisions for resolving that type of conflict did not always appear on the face of the treaty, but could be agreed in the antecedent negotiations. Accordingly, the residual rule would have to be carefully formulated.

33. Paragraph 9 of the commentary referred to the effect of knowledge of the conflict between the earlier and the later treaty; he wondered whether compliance with the provisions on the registration of treaties might affect that question of knowledge.

34. With regard to paragraph 3 (*a*) of the article, he found it difficult to accept the proposition that the Charter of the United Nations or the constitution of a specialized agency limited the treaty-making powers of member States or raised questions of capacity. What article 108 of the United Nations Charter and similar provisions did was to lay down modalities for the conduct of negotiations, a matter which was covered by article 5 of Part I of the draft.

35. Finally, paragraph 3 (*b*) seemed unnecessary, because the matters it dealt with were already covered by other provisions of the draft.

36. Mr. ELIAS said he found the provisions of article 14 acceptable, except that they omitted to deal with one situation which merited attention. They dealt with the case in which the parties to the later treaty were the same as those to the earlier treaty, the case in which the later treaty had a larger number of parties and the case in which the later treaty had fewer parties; there was, however, a fourth case, admittedly a somewhat rare one: the case in which the later treaty was concluded by parties entirely different from the parties to the earlier one.

37. The provisions proposed by the Special Rapporteur were based on the attitude adopted by the Permanent Court of International Justice in the *Oscar Chinn* [17] and

---

[14] *Yearbook of the International Law Commission, 1954*, Vol. II (United Nations publication, Sales No. 59.V.7, Vol. II), p. 133, article 16.

[15] *Op. cit.*, 1958, Vol. II (Sales No.: 58.V.1, Vol. II), pp. 27-28, articles 18 and 19.

[16] Scott, J. B., *Hague Conventions and Declarations of 1899 and 1907*, 3rd edition, New York, 1918, Oxford University Press.

[17] *P.C.I.J.*, Series A/B, No. 63.