Case 1:13-cv-07146-JPO    Document 33-37    Filed 05/15/14    Page 1 of 5

*European Commission of the Danube* [18] cases. The situation which he had in mind, and which had been the subject of attention at a conference held at Niamey, in the Republic of the Niger in February 1963, on the subject of the River Niger, went beyond those cases.

38. The Act of Berlin of 1885 had established an international regime for the Congo and the Niger. That regime had been confirmed and slightly modified by the Convention of St. Germain of 1919.[19] As far as the Niger was concerned, France and the United Kingdom had been the riparian signatories of those treaties at the time. The territories which had then been colonies of France and the United Kingdom had, of course, since become independent. Nine independent riparian States had thus met at the Niamey Conference to consider arrangements for the development of the Niger and its utilization, in particular for the generation of hydroelectric power and the exploitation of the river's resources. The question which had arisen was whether, and if so to what extent, those nine States could seek to provide, in a treaty establishing a River Niger Commission, for the abrogation of the General Act of Berlin of 1885 and the Convention of St. Germain of 1919, in so far as those States were concerned.

39. That question could be considered from several different angles, one of which was that of State succession. Since the nine independent States had taken over the rights and duties of the former colonial Powers under the two treaties in question, they had also taken over the right to abrogate the treaties and substitute for them arrangements more acceptable from the point of view of their development schemes. The doctrine of *rebus sic stantibus* had also been invoked and, more broadly, the problem of the obsolescence of treaties. The conclusion reached by almost all the members of the prospective River Niger Commission was that the Act of Berlin, the Convention of St. Germain and the intervening Declaration of Brussels of 1890 must be deemed inapplicable to the new situation in which the riparian States found themselves.

40. The States attending the Niamey Conference had reached agreement on a Convention and on a Statute for the River Niger Commission. Those instruments had been communicated to the United Nations and circulated to France and the United Kingdom, the Powers formerly responsible for the Niger Basin, and there appeared to be general agreement that the course adopted had been unexceptionable. In any event, the nine riparian States had reaffirmed the main principles which the Act of Berlin had sought to protect: equality of treatment for the nationals of all States, and freedom of navigation for vessels of all flags.

41. He accordingly suggested that the Special Rapporteur should deal with the case of a treaty concluded between parties entirely different from the parties to an earlier treaty and with the subrogation of new States to the rights and duties of the former colonial Powers.

---

[18] *P.C.I.J.*, Series B, No. 14.
[19] League of Nations, *Treaty Series*, Vol. 8, pp. 27 ff.

42. Mr. TSURUOKA said it seemed to him that the essential point in article 14 was not the substantial validity of a later treaty, since under the Special Rapporteur's draft such a treaty was not invalidated by the fact that some or all of its provisions were in conflict with those of an earlier treaty, but rather the position under conventional law of a State which had concluded two treaties and thereby assumed two mutually conflicting treaty obligations. It would be better to consider that point in connexion with the question of the application and effects of treaties. Any other problems that might arise in connexion with article 14 were relevant either to the revision of treaties or to *jus cogens* rules.

43. Accordingly, the questions dealt with in article 14 might be gone into in the commentary on article 2 or article 13, or even in connexion with the succession of States and governments.

44. Mr. TABIBI said that the length of the commentary on article 14 testified to the complexity of the subject. It was one which ought not to be approached exclusively with a view to codification, as had been done by the two previous special rapporteurs on the law of treaties, but also with a view to progressive development.

45. He agreed with the views expressed by the present Special Rapporteur, in paragraphs 3 and 4 of his commentary, as to the kind of cases in which a question of essential validity might arise, and with his statement in paragraph 18 that international jurisprudence was not perhaps entirely conclusive on the question whether and, if so, in what circumstances, a treaty might be rendered void by reason of its conflict with an earlier treaty. That was probably the main reason why Sir Hersch Lauterpacht and Sir Gerald Fitzmaurice had been chary of admitting that such conflicts ever led to nullity.

46. Although he was in general agreement with the fundamental purpose of the article, he feared that it might lead to difficulties in application, especially if the points raised by Mr. Lachs were not elucidated, and might detract from the force of the other articles on essential validity. It also appeared from the general trend of the discussion that the article in its present form would not prove acceptable. It might be preferable for the Special Rapporteur to reconsider the subject and submit a new text to the Commission.

47. Mr. AGO said that his doubts regarding the need for article 14 — which had been strengthened by the critical examination made by the Special Rapporteur himself — had not been dispelled by the discussion.

48. Paragraph 1 of the article, concerning the case in which the parties to two treaties were the same, stated an obvious truth which no one would think of disputing and which it was therefore unnecessary to reaffirm in the draft.

49. Paragraph 2 dealt with the problem of conflict between two successive treaties to which only some of the parties were the same and the effects of the conflict on the validity of the second treaty. The Commission was not concerned at that point with the problem of revision, which it would consider later. Nor could it,

of course, hold that the earlier treaty ceased to be valid with respect to States not parties to the later one; for manifestly, if some of the parties to a treaty concluded another treaty *inter se* which conflicted with the earlier one, the second instrument was valid as between those parties; but equally obviously, as between those parties and the other parties to the earlier treaty, the validity of the earlier treaty remained intact. If the second instrument made it impossible to carry out some of the obligations deriving from the first, the question which would arise would not be one of validity, but one of international responsibility. Of the two solutions proposed in paragraph 2 (*b*), the first was obvious and the second seemed to deal with a purely theoretical situation, for a State which had participated in the conclusion of the second treaty could hardly contest its effectiveness.

50. Paragraph 3 dealt first, in sub-paragraph (*a*), with the case of a special treaty concluded between States members of an international organization, some provisions of which conflicted with provisions of the constitution of that organization. There could be no doubt that problems of that kind could only be solved by interpretation and application of the constitution concerned. Sub-paragraph (*b*) was not necessary, as it merely reproduced article 103 of the Charter.

51. Paragraph 4 merely repeated what had already been said in article 13.

52. There remained the case mentioned by Mr. Tunkin and Mr. Lachs: that of a State which, having first concluded with other States a treaty placing certain obligations on all of them, subsequently concluded with some of its partners or with other States, a treaty some of whose provisions conflicted with the first treaty. There would appear to be two possibilities: either the first treaty expressly limited the capacity of the parties to conclude other treaties conflicting with its provisions, in which case the second treaty was void; or else the first treaty prescribed no such limitation, in which case the second treaty was valid as between the States which had concluded it, but the State or States which were parties to both treaties had failed to fulfil their obligations under the first treaty and thereby incurred international responsibility, one of the consequences of which was that they were under a duty to eliminate the conflict between the two instruments by terminating or amending the second.

53. To sum up, article 14 contained only provisions which, if not unnecessary, merely reproduced clauses already embodied elsewhere in the draft articles or dealt with problems which the Commission would take up later. He therefore suggested that the Commission should suspend consideration of the article and pass on to the following articles, reverting to article 14 later, if necessary, to see whether any part of it need be retained or not.

54. Mr. VERDROSS said he shared the view of Mr. Tunkin and Mr. Ago that paragraph 1 of article 14 did not apply to the case of a conflict between two treaties, and should therefore be deleted.

55. According to the prevailing doctrine, if a State party to a treaty concluded with another partner a second treaty conflicting with the first, then that State was undoubtedly bound to do everything it could to annul the second. Admittedly, it was reasonable to ask whether the Commission, one of whose tasks was to develop international law, should not go further than that doctrine; he would prefer not to give a categorical answer to that question.

56. If the Commission wished to take a decision concerning a possible conflict between the Charter of the United Nations and the provisions of another international agreement, then it should be a clear decision. It was unnecessary to reproduce Article 103 of the Charter, which had been intentionally drafted in rather vague terms so that it could also apply to a treaty concluded by a Member State with a State which was not a Member; according to Article 103, the Charter obligations prevailed in such a case, but the treaty conflicting with the Charter was not declared void.

57. Mr. PAL said that, after listening to the observations of other members and examining some of the literature on the subject, he had come to the conclusion that there was authority for the view that conflict with a prior treaty at some points touched upon the issue of validity. For instance, according to Oppenheim, a treaty conflicting with a prior treaty was illegal, a view clearly stated in the following passage:

> "Treaties, whether general or particular, lay down rules of conduct binding upon States. As such they form part of international law. They are, in the first instance, binding upon the contracting parties, who must refrain from acts inconsistent with their treaty obligations. This implies the duty not to conclude treaties inconsistent with the obligations of former treaties. The conclusion of such treaties is an illegal act which cannot produce legal results beneficial to the law-breaker." [20]

58. Article 14 should remain in section II among the articles dealing with essential validity, but should be amplified to cover both the important case raised by Mr. Elias and the case in which the earlier treaty contained clauses restricting or purporting to restrict the capacity of the parties to enter into the later treaty. The latter point needed general treatment, whereas the provision in paragraph 3 (*a*) was limited to the constituent instruments of international organizations.

59. Mr. GROS said it had been his understanding at the previous meeting that most members approved of the Special Rapporteur's approach in proceeding from the assumption that article 14 was concerned less with the validity of treaties than with the conflict between two treaties. However, the conflict between successive rules of law raised problems concerning the revision and the termination of treaties and the interpretation of the constitutions of international organizations; he therefore supported Mr. Ago's suggestion that consideration of article 14 should be deferred.

60. With regard to the substance, he particularly endorsed paragraph 20 of the commentary, for he did not think

---

[20] *International Law*, 8th edition, 1955, Vol. I, p. 894.

it was by applying a theory of the nullity of treaties that certain breaches of international law could be effectively penalized. The rule of estoppel was much more practical, as the Permanent Court of International Justice had indicated in its advisory opinion on the European Commission of the Danube, when it had stated the governments " cannot, as between themselves, contend that some of its [the Statute's] provisions are void as being outside the mandate given to the Danube Conference..." [21]

61. Mr. AMADO said that from the length of the commentary it was evident that the Special Rapporteur had had serious doubts about article 14. Indeed, the article did not stand up to searching scrutiny. It was inconceivable that States would behave in a manner that would make such rules necessary. The Commission's task was to give form, not to the doubts of scholars, but to scientific certainties and to the rules accepted by States. He did not think that any of the provisions of the article should be retained, since the whole of its substance was already embodied in articles 2 and 19 and whatever few points were not settled by those two articles would be covered by the provisions governing the interpretation, revision and deposit of treaties.

62. Sir Humphrey WALDOCK, Special Rapporteur, summarizing the discussion, said that although a few members of the Commission were hesitant about removing article 14 from section II, the majority seemed to agree with him that the article did not really raise any issues of essential validity. He had explained, when introducing the article, that it had been inserted in that section because the two preceding Special Rapporteurs had treated its subject-matter in that context, having found that some of the problems arising from conflict with a prior treaty touched upon validity. Until the Commission had expressed its view on the question whether any matters of validity were raised by article 14, he had thought it better to present the article in the context of validity in section II of the report.

63. As he had already suggested, the substance of the article might need to be discussed in connexion with article 19 which raised questions of implied termination of a treaty brought about by concluding a subsequent treaty. But generally speaking, if the Commission did not think the article raised any question of essential validity, it ought to be taken up at the sixteenth session when he would be presenting his draft articles on the application of treaties. It would be easier to deal with the matter of conflict after the Commission had discussed the question of the effects of treaties on third parties.

64. Some members had touched upon the question of revision. That certainly had links with the question of conflict between treaties, but had no relevance to article 14 if it were dealt with in its present context as an article on essential validity.

65. Commenting on some of the detailed observations put forward during the discussion, he said that Mr. Lachs' suggestions about rearranging the order of the clauses had some justification, though perhaps he would differ as to emphasis. But those suggestions called for consideration only if the article were left in section II.

66. Mr. Lachs had drawn attention to treaties containing provisions dealing with the problem of incompatible obligations, or expressly prohibiting the parties from assuming incompatible obligations under some other instrument or giving the treaty priority over other treaties; but the question of validity was usually not touched upon by those provisions. A number of treaties, including the Charter, contained such provisions, and he also knew instances of two treaties containing inconsistent provisions and both claiming priority for their own provisions. But the mere introduction of such clauses did not, in his opinion, transform a conflict into an issue over validity. It was noteworthy that in the *European Commission of the Danube* case the Permanent Court had attached no special significance to the existence of an express prohibition in the Treaty of Versailles against inconsistent agreements, although the point had been stressed in the opinions of the dissenting judges. If the Commission as a whole accepted the general conclusion set out in article 14, that would certainly not mean that it sanctioned entry into inconsistent obligations; such action would be a violation of a previous treaty and would raise a question of responsibility. The injured State could always bring the matter before the United Nations and rely upon such procedural remedies as existed.

67. He would be encroaching on the territory of the Special Rapporteur to be appointed on State succession, if he were to comment on the special case brought up by Mr. Elias of an agreement to which none of the parties were the same as those to the previous treaty. He had not dealt with the matter in the article or in the commentary, because such a situation did not raise a question of validity. The question might have to be taken up in another context. The particular example of the régime of the river Congo mentioned by Mr. Elias was of the greatest legal interest. But it seemed to raise other issues than those of validity — issues of State succession and of *rebus sic stantibus*.

68. Mr. Tunkin had raised the very difficult problem of the possible existence of special cases in which conflict between two treaties might involve validity even if the general thesis propounded in article 14 were accepted, but he would have thought that the example of Laos raised a problem of capacity, and in particular the difficult problem of when diminution of capacity took place as a result of a treaty. The matter had been touched upon during the previous session, but the Commission had shown itself reluctant to press it to any conclusion. In any event, he did not regard such a case as constituting an exception to the general rule he had sought to lay down in article 14 and which appeared to have gained general support. The case seemed, as he had indicated, rather to raise a possible question of capacity and certainly a question of responsibility. In such an instance, the State regarding itself as the injured party could raise the matter in the United Nations and also seek application of the various remedies open to it under general international law.

---

[21] *P.C.I.J.*, Series B, No. 14, p. 23.

Case 1:13-cv-07146-JPO    Document 33-37    Filed 05/15/14    Page 4 of 5

69. Mr. TUNKIN said that the question at issue was not what was the proper place for article 14 but what should be its substance, and the discussion had not sufficiently clarified that. Few members had put forward really definite opinions and, with all respect to the Special Rapporteur, he himself was not convinced that treaties in violation of a previous agreement only raised problems of responsibility and not of validity.

70. As for the action to be taken by the Commission, he supported Mr. Ago's suggestion that the discussion on article 14 should be suspended, so that it could be decided later where the article should be placed and in what form.

71. Sir Humphrey WALDOCK, Special Rapporteur, said he would like to make it plain that he too favoured the course suggested by Mr. Ago.

72. The CHAIRMAN said that article 14 might be left aside until the Commission was in a position to determine whether it should be included in some part of the draft, or whether the question of conflict with a prior treaty ought to be dealt with under the topic of state responsibility or of state succession.

73. Mr. TUNKIN said it should be understood that the Commission would resume the discussion of article 14 at the present session.

74. Mr. ELIAS agreed with Mr. Tunkin: the argument that some of the issues raised by conflict with a prior treaty did not involve essential validity had not convinced him. The matter should not be held over until the following session.

75. The CHAIRMAN proposed that the decision on article 14 be deferred and that the article be taken up again at a later stage in the session.

*It was so agreed.*

The meeting rose at 5.55 p.m.

### 688th MEETING

*Tuesday, 28 May 1963, at 10 a.m.*

*Chairman:* Mr. Eduardo JIMÉNEZ de ARÉCHAGA

### Law of Treaties (A/CN.4/156 and Addenda)
[Item 1 of the agenda] *(continued)*

1. The CHAIRMAN invited the Commission to consider section III of the Special Rapporteur's second report (A/CN.4/156/Add.1), which began with article 15.

SECTION III (THE DURATION, TERMINATION AND OBSOLESCENCE OF TREATIES)

ARTICLE 15 (TREATIES CONTAINING PROVISIONS REGARDING THEIR DURATION OR TERMINATION)

2. Sir Humphrey WALDOCK, Special Rapporteur, said that articles 15, 16 and 17 were clearly linked together and could be regarded as a unity. Article 15 dealt with the case in which the treaty contained provisions intended to regulate either its duration or its termination. Article 16 was, strictly speaking, of the same kind; it dealt with the case in which the treaty, on its face, appeared to contemplate an indefinite duration, making no provision of any kind for denunciation or for termination by other means; its chief relevance was its link with article 17. Article 17 dealt with the case in which the treaty contained no provisions regarding either its duration or its termination.

3. In article 15 he had stated possible rules, in case the Commission wished or thought it right to state in terms the methods by which the duration or termination of a treaty could be determined, in accordance with the various types of clause which a treaty could contain for that purpose. He fully realized that, as already appeared from one or two of the proposals for amendment, the article could be dealt with quite differently; indeed, it could be said simply that " a treaty shall endure, or terminate, in accordance with its terms, where the treaty itself makes provision for that purpose "; if that method of approach were adopted, it would be possible to shorten article 15 very considerably.

4. There were very few points in article 15 on which the matter did not really follow directly from the treaty. Perhaps the main point was in paragraph 4(c), where there was a little problem to which he had suggested an answer, but which he did not think could be said to be settled by the treaty itself. There were quite a number of treaties which contained a clause preventing the treaty from coming into force until a certain number of ratifications had been obtained; the problem was what was to happen if denunciations should reduce the number of parties below the number originally specified. He had dealt with that point in the commentary, and proposed a rule.

5. Apart from that problem, the provisions set out in the article really followed from the particular provisions of the treaty itself, so that if the Commission wished to adopt a different method it would be quite possible to dispense with some of the paragraphs. It was simply a question of whether, in a codification of that kind, it was useful or not useful to try to state explicitly the rules which would, in fact, be applied under the various forms of treaty clauses.

6. A point which might possibly be raised in connexion with paragraph 5 was that two possible methods of termination were sometimes provided for in the same treaty. Even then, it followed from the treaty itself how the two clauses would operate in conjunction, but it might be argued that it was worth noting that particular point, as he had done in paragraph 5(a).

7. Article 17 dealt with quite a complicated question on which there might be different views. If the Commission were to take a widely different view from the Special Rapporteur as to the extent to which implied rights of denunciation were to be understood in treaties, then the provisions of article 17 could be greatly shortened.

8. When the Commission had discussed articles 15, 16 and 17, it could consider whether some contraction or amalgamation of the text was desirable.

9. The CHAIRMAN drew attention to the amendments to article 15 submitted by Mr. Castrén and Mr. Briggs.

Mr. Castrén's proposal read:

" 1. The provisions of a treaty which relate to the duration or to the termination thereof for one or all the parties shall be applicable subject to articles 18 to 22.

" [or, alternatively, a separate article or a reference in the commentary]. A treaty shall not come to an end by reason only of the fact that the number of parties has fallen below the minimum number originally specified in the treaty for its entry into force, unless the States still parties to the treaty so decide."

Mr. Briggs' proposal read:

" 1. Except as otherwise provided in these articles, a party may denounce a treaty only in accordance with the provisions of the treaty or with the consent of all other parties.

" 2. In the case of a bilateral treaty, denunciation by a party in accordance with paragraph 1 terminates the treaty.

" 3. In the case of a multilateral treaty, the party denouncing it in accordance with paragraph 1 ceases to be a party to the treaty."

10. Mr. CASTRÉN said that according to article 15 the general rule was that the provisions of a treaty regarding its duration or termination, if any existed, were applicable; the other possibilities were dealt with in articles 16 to 22. Consequently, article 15 could be confined to stating the general rule, and it was unnecessary to list all the provisions covering the different cases which were contained in bilateral or multilateral treaties.

11. It might, however, be advisable to retain paragraph 4 (c), which provided that a treaty's validity was not impaired by reason only of the fact that the number of parties had fallen below the number originally specified for its entry into force; for the contrary view could also be held. The Special Rapporteur's arguments in favour of that provision were, however, wholly convincing. It was for the Commission to decide whether it preferred to deal with the matter in a separate article or in the commentary.

12. On the other hand, although sub-paragraph 5 (b) contained a new element, the case contemplated in it was hardly likely to arise in practice. Indeed, if a treaty whose duration was expressed to be limited by reference to a specified period, date or event provided that it should automatically be prolonged for a further period or periods unless denounced before the expiry of the first period, it was hardly likely that the duration of the further periods would not also be specified. That case might, if absolutely necessary, be mentioned in the commentary, with a statement of the rule proposed by the Special Rapporteur, which seemed on the whole to reflect the intention of the parties to such a treaty.

13. Mr. Briggs' amendment was very similar to his own, particularly so far as paragraph 1 was concerned. The idea stated in paragraph 2 was correct, but self-evident. As to paragraph 3, it should be noted that a treaty might sometimes be terminated by denonciation when it required a minimum number of parties for validity.

14. Finally, he drew attention to footnote 2 to paragraph 2 of the commentary, in which the Special Rapporteur observed that it was the passing rather than the arrival of the date which was relevant when the duration of a treaty was expressed to be limited by reference to a specified date, since the treaty would expire at midnight on the date fixed by the treaty. In his opinion, that raised a question of interpretation. If a treaty was said to terminate on 31 December 1964, for instance, that meant that it expired after the date had passed; but if it was specified that the final date was 1 January 1965, the parties would probably have had the beginning of that day in mind. It was therefore better to say that the treaty remained in force until the specified date, rather than that it came to an end on a certain date.

15. Mr. VERDROSS said that articles 16 to 22 formed a complete whole and that it was essential to indicate their main lines first.

16. The reasons for terminating a treaty fell into three main groups. First, and simplest, came the common will of the parties. Secondly, if it was the will of the contracting parties when concluding a treaty that it should eventually be terminated, the treaty itself generally contained a denunciation clause. But the will of the parties might also be deduced from the records of proceedings or from the purpose of a treaty. There was no denunciation clause in the United Nations Charter, but the records showed that the parties had been in agreement that States could withdraw in certain circumstances. The third and largest group of treaties comprised those in which the parties had made no provision for termination. In that case, the problem was settled directly by general international law.

17. An article stating the general cases in which a treaty could be terminated should precede section III, before the particular cases were dealt with.

18. Mr. YASSEEN agreed with Mr. Castrén that article 15 might be summed up in a form of words to the effect that the duration and termination of a treaty were governed by the relevant provisions embodied in it. That would be better than an enumeration of all possible clauses on the duration and method of termination of a treaty, since in any case an enumeration could not be exhaustive.

19. Although he approved of Mr. Briggs' method of condensing the article, he thought his proposal omitted rather too much; for it dealt only with denunciation, whereas article 15 also referred to other means by which treaties could be terminated. Paragraph 2 of Mr. Briggs'