EXHIBIT 23

178. Turner, *Terrorism and Democracy*, p. 234.
179. *UN Chronicle* 19 (January 1982): 42. For a similar resolution passed in 1984, see Hevener, ed. *Diplomacy in a Dangerous World*, pp. 277–81.
180. Hargrove, "Security of Diplomats," esp. pp. 19–24; and Hevener, "Reflections on the Interpretation and Application of the Law of Diplomatic Protection," in *Diplomacy in a Dangerous World*, ed. Hevener, p. 53.
181. Hobsbawm, "Political Violence and Political Murder," in *Social Protest*, ed. Mommsen and Hirschfeld, p. 13.
182. Churchill quoted in McClanahan, *Diplomatic Immunity*, p. xi.
183. Bull, *Anarchical Society*, pp. 41–42; and "Revolt vs. the West," in *Expansion of International Society*, ed. Bull and Watson, p. 372.
184. Bull, *Anarchical Society*, pp. 13, 16; also p. 39.
185. Heeren, *Manual*.
186. Bull, *Anarchical Society*, p. 39.
187. Carty, *Decay of International Law?* p. 1.
188. Bull, "Revolt against the West," pp. 369, 428–34.
189. Reuters News Service, 12 January 1997.
190. *Miller Center Report* 9 (spring 1993): 1. See also Mommsen, "Non-Legal Violence and Terrorism in Western Industrial Societies," in *Social Protest*, ed. Mommsen and Hirschfeld, pp. 384–403, 388.
191. Keens-Soper, "Liberal Disposition of Diplomacy," p. 913.
192. Butterfield, *Christianity, Diplomacy and War*, pp. 82–84.
193. Smith, "Anarchy of Power," pp. 208, 215–19.

## · 13 ·

## A Diplomatic Analogy

### International Functionaries and Their Privileges

IN 1926 a court in Geneva refused to entertain a paternity suit against the Yugoslavian delegate to the League of Nations because the defendant "by virtue of his exterritoriality" was not legally domiciled at Geneva. The court, therefore, had no jurisdiction.[1] This case is interesting because the court relied on what for many was a generally discredited theory, extraterritoriality, and because it raised the larger issue of how privileges and immunities bestowed on international functionaries have influenced and become entwined with those accorded their diplomatic counterparts. Privileges and immunities that were traditionally limited to diplomats were gradually extended to the personnel of and representatives to international organizations in four stages. The first stage, beginning in 1804, witnessed the extension of the status of neutrality and the protection of inviolability to various riparian (river) commissions and of "diplomatic privileges" to some international commissions. In the second stage, beginning in 1899, "diplomatic privileges" were granted to certain judicial tribunals. In the third stage, after World War I, the diplomatic formula was extended to the International Court of Justice, the League of Nations, and the International Labor Organization (ILO). The fourth stage, after World War II, witnessed the founding of the United Nations and the move toward certain regional or supranational organizations. At that time diplomatic status was still accorded certain officials, but "official acts" immunity was applied to the majority.

The growth of international organizations and tribunals after World War I raised certain problems, both theoretical and practical, that led to the abandonment of the "classical" formula of diplomatic privileges and immunities for

international functionaries and a shift to functionalism. Still as the number of international organizations, personnel, and representatives increased, the pressure to grant the representatives and some of the officials "diplomatic" status was inexorable. Many residual elements of the classical diplomatic privileges linger on in the practice of international organizations like a recalcitrant but not unwelcome guest. Nonetheless, the juridical rationale for such privileges is different. Diplomatic privileges were designed to guarantee the representative freedom from the territorial jurisdiction of the state to which the diplomat was sent, but international privileges were designed to guarantee the independence of an organization from the jurisdiction of any state, including the official's home state. The situations of the diplomat and of the international functionary are different. First, the diplomat remains subject to the state that sent him whereas the functionary remains exempt from any territorial power. Second, the privileges and immunities of officials stem directly from the immunity of the international organization. Third, certain principles that have been employed to justify diplomatic privilege, namely, the sovereignty of the sending state and reciprocity, have not been used to justify international privileges. Fourth, international privileges rest solely on treaties, whether multilateral or bilateral, conventions, or international comity. Traditional principles of international law do not oblige a state to grant international officials a special status. International functionaries, unlike diplomats, do not possess special prerogatives unless specifically invested with them.[2] When a criminal court in Philadelphia prosecuted one of the British commissioners to the United States sent under the Jay Treaty (1794), his government did not protest. Nor could the United States when Britain refused to grant diplomatic privileges to its commissioners. Neither the British nor the Americans recognized any customary obligation.

## A CUSTOMARY LAW?

Jurists still debate whether a customary law dealing with international immunities has developed or even is developing. As early as 1931 the theorist Lawrence Preuss argued that "a customary law appeared to be in the process of formation."[3] Twenty-three years later, in 1954, the Supreme Court of Mexico declared that the Economic Commission for Latin America (ECLA) could "enjoy immunities recognized by international law." That argument implicitly recognized the existence of a customary international law, as did the agreement concluded between Egypt and the World Health Organization (WHO) when it provided that the organization shall have the "independence and freedom of action belonging to an international organization according to international practice."[4] At the meeting of the International Law Commission convened in 1977, one legal expert, Laurel B. Francis (Jamaica), emphasized that a "wide

range of customary rules had emerged" and that "a large body of such rules was applicable to international organizations and to their accredited officials." For him "customary law" unquestionably played an important role in the development of international immunities.[5] Another expert, R. Q. Quentin-Baxter (New Zealand), concurred, claiming that states had "developed some customary rules of common conceptions in their approach to international organizations and officials."[6] Not everyone agreed. In 1949 John Kerry King had argued that the law regulating international officials had not yet met the tests of customary law, namely, universal acceptance, practice, and effectiveness.[7] Many jurists still supported that position. A Swiss lawyer acerbically noted in 1971 that customary rules were "rare, if not non-existent."[8] Nonetheless, some jurists agreed with Maximiliano Bernad y Alvarez de Eulate, of the University of Saragossa, who pointed out in 1980 that an international custom "may develop from repeated and concordant treaty provisions."[9]

## RATIONALES FOR INTERNATIONAL PRIVILEGES AND IMMUNITIES

Regardless of whether or not a customary law has evolved or is evolving, theorists have provided various rationales to justify international privileges and immunities: precedent, functional needs, the independence or prestige of the organization, and the equality of member states. The first in particular has been vigorously attacked. In 1966 the subcommittee of experts of the Council of Europe echoed the opinion of many when they argued that precedent had played "too important" a role in the past. For them international privileges were justified, mainly but not exclusively on the basis of function.[10] The prestige of the organization and the emphasis on the equality of states also played a role. Many jurists relied on the latter to justify the exemption of the organization and its personnel from taxation. They contended that such exemptions permitted the organization to pay higher wages at lower costs and did not allow any one state, including the host, to profit at the expense of the others. Not surprisingly, the rationales for and extent of diplomatic and international privileges are converging because of the dominance of functionalism in international jurisprudence and because of certain historical similarities between the diplomat and the international official. International privileges in the twentieth century expedited international intercourse just as diplomatic privileges did in the sixteenth and seventeenth centuries.[11] Moreover, so-called international diplomacy followed the same evolutionary path as did traditional diplomacy, from ad hoc temporary conferences to permanent international organizations, just as traditional diplomacy moved from ad hoc representatives to permanent legations.[12]

The decision to accord international officials diplomatic privileges confused