# EXHIBIT 24



EUROPEAN COURT OF HUMAN RIGHTS

COUR EUROPÉENNE DES DROITS DE L'HOMME

THIRD SECTION

DECISION

Application no. 65542/12
STICHTING MOTHERS OF SREBRENICA AND OTHERS
against the Netherlands



2     STICHTING MOTHERS OF SREBRENICA AND OTHERS v. THE NETHERLANDS
DECISION

# Table of Contents

THIRD SECTION ....................................................................................... 1
DECISION................................................................................................... 1
Application no. 65542/12 STICHTING MOTHERS OF SREBRENICA
AND OTHERS against the Netherlands........................................................ 1
THE FACTS ............................................................................................... 4
  A.  Background to the case ........................................................................ 4
    *1.  The breakup of the Socialist Federative Republic of Yugoslavia* .4
    *2.  The war in Bosnia and Herzegovina* ............................................ 5
    *3.  The Srebrenica massacre* ............................................................ 6
    *4.  Reports relating to the Srebrenica massacre* ............................... 7
      (a)  The report of the Secretary General of the United Nations..... 8
      (b)  The report of the NIOD Institute for War, Holocaust and
      Genocide Studies ....................................................................... 9
      (c)  The French parliamentary enquiry ........................................ 10
      (d)  The Netherlands parliamentary enquiry ................................ 10
      (e)  The report of the Republika Srpska Government
      "Commission for Investigation of the Events in and around
      Srebrenica between 10th and 19th July 1995".............................. 11
    *5.  Decisions and judgments relating to the Srebrenica massacre* ..11
      (a)  The International Criminal Tribunal for the Former
      Yugoslavia ................................................................................ 11
      (b)  The Human Rights Chamber for Bosnia and Herzegovina ... 12
      (c)  The International Court of Justice ......................................... 12
  B.  The domestic proceedings ................................................................. 14
    *1.  Initiation of the main proceedings* ............................................. 14
    *2.  The incident of procedure* ......................................................... 15
      (a)  Argument before the Regional Court .................................... 15
      (b)  The judgment of the Regional Court..................................... 15
      (c)  Argument before the Court of Appeal.................................... 17
      (d)  The judgment of the Court of Appeal ................................... 18
      (e)  Argument before the Supreme Court..................................... 21
        i.  The applicants' appeal on points of law ............................. 21
        α.  The summons................................................................... 21
        β.  The explanatory memorandum ......................................... 22
        ii.  The advisory opinion ....................................................... 22
      (f)  The judgment of the Supreme Court..................................... 23
    *3.  Resumption of the main proceedings* .......................................... 26
  C.  Relevant domestic law ...................................................................... 26
    *1.  The Constitution for the Kingdom of the Netherlands* ................ 26
    *2.  The Act containing General Provisions on the Legislation of the*
    *Kingdom* .................................................................................... 26
    *3.  The Code of Civil Procedure* ..................................................... 27
    *4.  The Judiciary (Organisation) Act* .............................................. 27

    *5. The Bailiffs Act 2001* ..............................................................27
    *6. Relevant domestic case-law* ...................................................28
       (a) The *Udruženje Građana "Žene Srebrenice"* case ...............28
       (b) The *Mustafić* and *Nuhanović* cases ....................................28
COMPLAINTS ................................................................................29
THE LAW.........................................................................................30
  A. Standing of the applicant Stichting Mothers of Srebrenica ...........30
  B. Alleged violation of Article 6 of the Convention..........................31
    *1. Applicability of Article 6* ........................................................31
    *2. The immunity of the United Nations* .......................................31
       (a) The applicants' submissions ................................................31
       (b) The Court's assessment .......................................................34
         i. Scope of the case before the Court ....................................34
         ii. Applicable principles ........................................................35
         iii. Application of the above principles...................................37
         α. The nature of the immunity enjoyed by the United Nations
         .........................................................................................37
         β. The nature of the applicants' claim....................................41
         γ. The absence of any alternative jurisdiction........................42
         δ. Link with the claim against the Netherlands State.............43
         ε. Conclusion........................................................................44
    *3. The Supreme Court's refusal to seek a preliminary ruling from*
    *the Court of Justice of the European Union* ...................................44
  C. Alleged violation of Article 13 of the Convention.......................45
  D. The Court's decision ................................................................45

The European Court of Human Rights (Third Section), sitting on 11 June 2013 as a Chamber composed of:

Josep Casadevall, *President,*
Alvina Gyulumyan,
Corneliu Bîrsan,
Ján Šikuta,
Luis López Guerra,
Nona Tsotsoria,
Johannes Silvis, *judges,*

and Marialena Tsirli, *Deputy Section Registrar,*

Having regard to the above application lodged with the European Court of Human Rights on 8 October 2012 (received at the Registry on 11 October 2012),

Having regard to the decision to grant priority to the above application under Rule 41 of the Rules of Court,

Having regard to the decision to grant anonymity to two applicants under Rule 47 § 3 of the Rules of Court,

Having deliberated, decides as follows:


## THE FACTS

1.  Stichting Mothers of Srebrenica is a foundation (*stichting*) under Netherlands law. It was created with a view to taking proceedings on behalf of relatives of persons killed in and around Srebrenica, Bosnia and Herzegovina, in the course of the events of July 1995 described below.

2.  The other applicants are individual surviving relatives of persons killed. They also state that they are victims in their own right of violations of their human rights that occurred in the course of the events of July 1995. A list of the applicants is set out in the appendix.

3.  The applicants were represented by Mr A. Hagedorn, Mr M.R. Gerritsen and Mr J. Staab, lawyers practising in Amsterdam.

4.  The facts of the case, as submitted by the applicants and as apparent from public documents, may be summarised as follows.


### A.  Background to the case

#### 1.  The breakup of the Socialist Federative Republic of Yugoslavia

5.  The Socialist Federative Republic of Yugoslavia (SFRY) was made up of six republics, Bosnia and Herzegovina, Croatia, Macedonia, Montenegro, Serbia and Slovenia. Slovenia and Croatia declared their independence from the SFRY on 25 June 1991 following referenda held earlier. Thereupon the Presidency of the SFRY ordered the JNA

(*Jugoslovenska Narodna Armija*/*Југословенска народна армија*, or Yugoslav People's Army) into action with a view to reasserting the control of the federal government.

6. Other component republics of the SFRY followed Slovenia and Croatia in declaring independence. Eventually only Serbia and Montenegro were left to constitute the SFRY's successor state, the Federal Republic of Yugoslavia (FRY). Hostilities ensued, largely along ethnic lines, as groups who were ethnic minorities within particular republics and whose members felt difficulty identifying with the emerging independent states sought to unite territory that they inhabited with that of republics with which they perceived an ethnic bond.

7. By its Resolution 743 (1992) of 21 February 1992, the Security Council of the United Nations set up a United Nations Protection Force (UNPROFOR) intended to be "an interim arrangement to create the conditions of peace and security required for the negotiation of an overall settlement of the Yugoslav crisis". Although UNPROFOR's mandate was originally for twelve months, it was extended; UNPROFOR (later renamed UNPF, the name UNPROFOR coming to refer only to the operation in Bosnia and Herzegovina) continued in operation until late December 1995. Troop-contributing nations included the Netherlands.

## 2. *The war in Bosnia and Herzegovina*

8. Bosnia and Herzegovina declared independence on 6 March 1992 as the Republic of Bosnia and Herzegovina. Thereupon war broke out, the warring factions being defined largely according to the country's pre-existing ethnic divisions. The main belligerent forces were the ARBH (*Armija Republike Bosne i Hercegovine*, or Army of the Republic of Bosnia and Herzegovina, mostly made up of Bosniacs[1] and loyal to the central authorities of the Republic of Bosnia and Herzegovina), the HVO (*Hrvatsko vijeće obrane*, or Croatian Defence Council, mostly made up of Croats[2]) and the VRS (*Vojska Republike Srpske*/*Војска Републике Српске*, or Army of the Republika Srpska, also called the Bosnian Serb Army, mostly made up of Serbs[3]).

---

[1.] Bosniacs (sometimes spelt Bosniaks) were known as "Muslims" or "Yugoslav Muslims" until the 1992-95 war. The term "Bosniacs" (*Bošnjaci*) should not be confused with the term "Bosnians" (*Bosanci*) which is commonly used to denote citizens of Bosnia and Herzegovina irrespective of their ethnic origin.

[2.] The Croats are an ethnic group whose members may be natives of Croatia or of other former component republics of the SFRY including Bosnia and Herzegovina. The expression "Croat" is normally used (both as a substantive and as an adjective) to refer to members of the ethnic group, regardless of their nationality; it is not to be confused with "Croatian", which normally refers to nationals of Croatia.

[1.] The Serbs are an ethnic group whose members may be natives of Serbia or of other former component republics of the SFRY including Bosnia and Herzegovina. The expression "Serb" is normally used (both as a substantive and as an adjective) to refer to

9.  It would appear that more than 100,000 people were killed and more than two million people were displaced. It is estimated that almost 30,000 people went missing; in 2010, approximately one-third of them were still so listed[1].

10.  The conflict came to an end on 14 December 1995 when the General Framework Agreement for Peace ("the Dayton Peace Agreement", adopted in Dayton, Ohio, USA) entered into force. One of the effects of the Dayton Peace Agreement was the division of Bosnia and Herzegovina into two component Entities, the Federation of Bosnia and Herzegovina and the Republika Srpska (Serb Republic).

### 3.  The Srebrenica massacre

11.  Srebrenica is a municipality in eastern Bosnia. It is delimited to the south by the river Drina which forms the border between Bosnia and Herzegovina and Serbia. To the north it adjoins the municipality of Bratunac. Its western neighbours are the municipalities of Milići and Rogatica. It is now part of the Republika Srpska.

12.  The municipality of Srebrenica is constituted of a number of towns and villages, among them the town of Srebrenica from which the municipality takes its name. Before the outbreak of the war its population was almost entirely Bosniac and Serb, Bosniacs outnumbering Serbs by more than three to one.

13.  Being an obstacle to the formation of the Republika Srpska as a continuous territorial entity as long as it remained in the hands of the central government of the Republic of Bosnia and Herzegovina, Srebrenica came under VRS attack already in the course of 1992.

14.  It appears that the central government of the Republic of Bosnia and Herzegovina refused to countenance any evacuation of Srebrenica's civilian population, since that would amount to the acceptance of "ethnic cleansing" and facilitate the surrender of territory to the VRS.

15.  On 16 April 1993 the Security Council of the United Nations adopted, by a unanimous vote, a resolution (Resolution 819 (1993)) demanding that "all parties and others concerned treat the eastern Bosnian town of Srebrenica and its surroundings as a safe area which should be free from any armed attack or any other hostile act."

16.  By July 1995 the Srebrenica "safe area" was an enclave surrounded by territory held by the VRS. It contained ARBH combatants, most of them disarmed, and civilians. The latter numbered in their tens of thousands,

---

members of the ethnic group, regardless of their nationality; it is not to be confused with "Serbian", which normally refers to nationals of Serbia. This convention is followed by the Court in the present decision except when quoting from a document not originating from the Court itself, where the original wording is retained.

[2.]  See the Press Release of the United Nations Working Group on Enforced or Involuntary Disappearances of 21 June 2010 on its visit to Bosnia and Herzegovina.

mostly Bosniacs; these included by then, in addition to the local residents, persons displaced from elsewhere in eastern Bosnia. There was also an UNPROFOR presence within the enclave, nominally consisting of some four hundred lightly-armed Netherlands air-mobile infantry, known as Dutchbat (from "Dutch" and "battalion"), under the command of a lieutenant colonel. In fact, however, Dutchbat was under-strength by this time, troops returning from leave having been prevented by the VRS from re-joining their unit.

17.  On 10 July 1995 the Drina Corps of the VRS attacked the Srebrenica "safe area" in overwhelming force. The commander of the Netherlands air-mobile battalion asked his United Nations superiors for air support. However, no decisive use of air power was made. The VRS overran the area and took control despite the presence of Dutchbat.

18.  On 12 July 1995 the Security Council of the United Nations adopted, by a unanimous vote, a resolution (Resolution 1004 (1995)) demanding an immediate end to the VRS offensive and the withdrawal of VRS forces from the Srebrenica safe area as well as the safety and restoration of freedom of movement to UNPROFOR personnel.

19.  In the days that followed, Bosniac men who had fallen into the hands of the VRS were separated from the women and children and killed. Others managed to evade immediate capture and attempted to escape from the enclave. Some succeeded in reaching safety but many were caught and put to death, or died *en route* of wounds, or were killed by landmines. It is now generally accepted as fact that upwards of 7,000, perhaps as many as 8,000 Bosniac men and boys died in this operation at the hands of the VRS and of Serb paramilitary forces.

20.  The "Srebrenica massacre", as it has come to be known, is widely recognised as an atrocity unique in the history of Europe since the end of the Second World War[1].

### 4. Reports relating to the Srebrenica massacre

21.  A number of detailed reports in relation to the Srebrenica massacre have been published, of which the following should be mentioned:

---

[1]  For example, Parliamentary Assembly of the Council of Europe, Committee on the Honouring of Obligations and Commitments by member States of the Council of Europe (Monitoring Committee), Doc. 10200, 4 June 2004 (*Honouring of obligations and commitments by Bosnia and Herzegovina*):

> "The Srebrenica massacre, which took place in July 1995 in a UN safe haven in and around the town of Srebrenica, is one of the worst atrocities committed since the Second World War: around 7,000 Bosniac boys and men were executed by the Serbian [sic] forces and their bodies thrown into mass graves." (§ 33)

### (a)  The report of the Secretary General of the United Nations

22.  On 30 November 1998 the General Assembly of the United Nations adopted a resolution (A/RES/53/35) in which, among other things, it requested the Secretary General to provide a comprehensive report, including an assessment, on the events dating from the establishment of the safe area of Srebrenica on 16 April 1993 under Security Council resolution 819 (1993) of 16 April 1993, which was followed by the establishment of other safe areas, until the endorsement of the Dayton Peace Agreement by the Security Council on 15 December 1995.

23.  The Secretary General's report was distributed to the General Assembly on 15 November 1999. The report runs to 113 pages not including its annexes.

24.  The report summarises the various peace-making efforts (including by a "Contact Group" composed of representatives of France, Germany, the Russian Federation, the United Kingdom and the United States) and decision-making procedures in the United Nations Security Council, UNPF and UNPROFOR, as well as the attack and the taking of Srebrenica by the VRS and the massacre that followed.

25.  The following is taken from the final section of the report, entitled "XI. The fall of Srebrenica: an assessment":

"**E.  Role of the Security Council and Member States**

...

490. The community of nations decided to respond to the war in Bosnia and Herzegovina with an arms embargo, with humanitarian aid and with the deployment of a peacekeeping force. It must be clearly stated that these measures were poor substitutes for more decisive and forceful action to prevent the unfolding horror. The arms embargo did little more than freeze in place the military balance within the former Yugoslavia. It left the Serbs in a position of overwhelming military dominance and effectively deprived the Republic of Bosnia and Herzegovina of its right, under the Charter of the United Nations, to self-defence. It was not necessarily a mistake to impose an arms embargo, which after all had been done when Bosnia and Herzegovina was not yet a State Member of the United Nations. Once that was done, however, there must surely have been some attendant duty to protect Bosnia and Herzegovina, after it became a Member State, from the tragedy that then befell it. Even as the Serb attacks on and strangulation of the 'safe areas' continued in 1993 and 1994, all widely covered by the media and, presumably, by diplomatic and intelligence reports to their respective Governments, the approach of the members of the Security Council remained largely constant. The international community still could not find the political will to confront the menace defying it. ..."

and

"**G.  Lessons for the future**

...

501. The international community as a whole must accept its share of responsibility for allowing this tragic course of events by its prolonged refusal to use force in the early stages of the war. This responsibility is shared by the Security Council, the

Contact Group and other Governments which contributed to the delay in the use of force, as well as by the United Nations Secretariat and the mission in the field. Clearly the primary and most direct responsibility lies however with the architects and implementers of the attempted genocide in Bosnia. ..."

### (b) The report of the NIOD Institute for War, Holocaust and Genocide Studies

26.  In November 1996 the Netherlands Government commissioned the State Institute for War Documentation (*Rijksinstituut voor Oorlogsdocumentatie*, "RIOD") to investigate "the events before, during and after the fall of Srebrenica". The purpose was that the materials thus collated should provide "insight into the causes and events that had led to the fall of Srebrenica and the dramatic events that followed".

27.  The report was presented on 10 April 2002 by RIOD's successor institution, the NIOD Institute for War, Holocaust and Genocide Studies (*NIOD Instituut voor Oorlogs-, Holocaust- en Genocidestudies*, a body born of a merger between the Netherlands Institute for War Documentation (*Nederlands Instituut voor Oorlogsdocumentatie*) and the Center for Holocaust and Genocide Studies (*Centrum voor Holocaust- en Genocide Studies*). In the original Dutch it runs to 3,172 pages not including appendices. An English-language version (entitled *Srebrenica: Reconstruction, background, consequences and analyses of the fall of a 'safe' area*) exists. It is intended to be a historical account, not to offer political conclusions or judgments.

28.  The report traces the history of the former Yugoslavia from the Middle Ages through the Second World War up to the Socialist era, in increasing detail, setting out the perspective of the various ethnic groups (Bosniacs, Croats and Serbs in particular). It continues with the declarations of independence by Croatia, Slovenia and Bosnia and Herzegovina, the international political events following the outbreak of hostilities, and the political decision-making that led to the participation of the Netherlands in UNPROFOR and the decision to deploy Dutchbat in the Srebrenica enclave. Events in the Srebrenica area itself following the arrival of Dutchbat, including hostile action by the ARBH and the VRS, are described in detail.

29.  In an epilogue, the report notes that the denial of effective close air support to Dutchbat owed much to the Bosnian Serb response to an air attack carried out in May 1995 on VRS ammunition dumps in Pale, then the Bosnian Serb capital; this had involved taking UNPROFOR personnel hostage and the destruction of an American fighter aircraft by VRS air defences in June 1995. There had also been a failure on the part of governments in possession of intelligence to share it with others. This went a long way towards explaining the turn events had taken. The Dutchbat leadership had been concerned to ensure the well-being of the civilians entrusted to their care; for this they had been dependent on the VRS, and therefore vulnerable to Bosnian Serb manipulation. Finally, the widespread

public perception of the Dutchbat operation as a national failure had turned the fall of Srebrenica and its aftermath into a political issue.

30.  These findings induced the incumbent Government to take political responsibility. On 16 April 2002 it announced its resignation.

#### (c)  The French parliamentary enquiry

31.  France having been a major troop contributor to UNPROFOR as well as being a permanent member of the Security Council of the United Nations, the French National Assembly (*Assemblée nationale*) decided on a parliamentary enquiry. The report (Eleventh Parliament under the Constitution of 1958 – *Onzième législature* – no. 3413) was registered by the chairmanship of the National Assembly on 22 November 2001.

32.  The report charts the political and military developments leading to the creation of the "safe areas" in Eastern Bosnia and the VRS attack on Srebrenica.

33.  The massacre is described, but the report stops short of imputing personal responsibility to individuals, preferring to leave that to the criminal tribunals.

#### (d)  The Netherlands parliamentary enquiry

34.  The Government's resignation led to a debate in the Lower House of Parliament (*Tweede Kamer der Staten-Generaal*), which decided to hold a parliamentary enquiry (*parlementaire enquête*) in order to establish individual political, military and official responsibility.

35.  The report (Lower House of Parliament, parliamentary year 2002–2003, 28 506, nos. 2–3) was presented on 27 January 2003. It runs to 463 pages, mostly taken up by summaries and excerpts of evidence taken from participants in the various decision-making processes, both domestic and foreign.

36.  The report finds that the decision to participate in the international intervention in the former Yugoslavia was inspired partly by humanitarian motives and partly by the desire, felt by both the Government and Parliament, for the Netherlands to play an active role in promoting international peace and security. However, the decision to deploy a lightly-armed air-mobile infantry battalion to an embattled "safe area" had been inspired by wishful thinking rather than by considerations of feasibility.

37.  Over time self-defence had taken on a greater importance than the fulfilment of UNPROFOR's mandate and UNPROFOR's power to deter by its presence had been eroded. The United Nations were primarily to blame for this.

38.  The Bosnian Serb side alone was to blame for the crimes committed. However, although fault was found with the Dutchbat leadership and the

Netherlands government, it was ultimately unlikely that Dutchbat could have prevented the massacre.

> **(e)  The report of the Republika Srpska Government "Commission for Investigation of the Events in and around Srebrenica between 10th and 19th July 1995"**

39.  A "Commission for Investigation of the Events in and around Srebrenica between 10th and 19th July 1995" was established by a decision of the Republika Srpska Government on 15 December 2003. The Commission's remit was to meet the Republika Srpska's obligations, flowing from the Human Rights Chamber's *Selimović and Others* decision (see paragraphs 47 and 48 below), to make its own investigations into the fate of the victims named in the applications lodged with the Human Rights Chamber.

40.  The commission's report, which was published on 11 June 2004, runs to 45 pages not including appendices. It establishes that

> "... between 10th and 19th July 1995, several thousands of Bosniacs were executed, in a manner that represents severe violations of International Humanitarian Law and that the perpetrators, inter alia, undertook measures to cover up the crime by reallocating the bodies; ..."

In addition, it established the responsibility of organs of the Republika Srpska in the matter. A database of the known victims was set up and the whereabouts of various mass graves were disclosed.

41.  On 10 November 2004 the Republika Srpska government issued a statement apologising for the crimes committed.

### 5.  *Decisions and judgments relating to the Srebrenica massacre*

42.  Many important decisions and judgments relating to the Srebrenica massacre have been published, most importantly by the following judicial institutions:

> **(a)  The International Criminal Tribunal for the Former Yugoslavia**

43.  Several individuals have been charged before the International Criminal Tribunal for the Former Yugoslavia (ICTY) in connection with the Srebrenica massacre, among them Major General Radislav Krstić who shortly after the fall of Srebrenica became commander of the VRS's Drina Corps. On 2 August 2001 ICTY's Trial Chamber delivered a 260-page judgment (IT-98-33-T) finding him guilty of genocide, persecutions and murder and sentencing him to forty-six years' imprisonment.

44.  The Trial Chamber's judgment itself gives a detailed description of the events surrounding the fall of Srebrenica to the VRS and the massacre that followed.

45.  Major General Krstić appealed against his conviction and sentence. He did not challenge the Trial Chamber's description of events, focusing

instead on the nature and extent of his criminal responsibility. Ultimately the Appeals Chamber found that, absent proof of genocidal intent, Major General Krstić had not been a principal perpetrator of the crimes committed. It did, however, find him guilty of aiding and abetting genocide and crimes against humanity and reduced his sentence to thirty-five years (judgment of 19 April 2004, IT-98-33-A).

### (b)  The Human Rights Chamber for Bosnia and Herzegovina

46.  The Human Rights Chamber for Bosnia and Herzegovina was a domestic human rights court set up under the Human Rights Agreement set out in Annex 6 to the Dayton Peace Agreement. It had fourteen judges, called "Members", six of whom were nationals of Bosnia and Herzegovina (two Bosniacs, two Croats, two Serbs), the remaining eight being nationals neither of Bosnia and Herzegovina nor of any neighbouring state. It existed until the end of 2003.

47.  On 7 March 2003 the Human Rights Chamber gave a decision on forty-nine applications (the *Selimović and Others* decision). These applications were taken from among some 1,800 similar applications brought before the Human Rights Chamber, all related to the Srebrenica events.

48.  The Human Rights Chamber held that it lacked jurisdiction *ratione temporis* to consider the events occurring before the entry into force of the Human Rights Agreement on 14 December 1995. It did, however, find violations of Articles 3 and 8 of the Convention both taken alone and in conjunction with Article 14 of the Convention as regards the failure to provide information to the applicants about their missing relatives and to conduct any meaningful investigation. It added that "[i]n the context of the Srebrenica cases, these violations [were] particularly egregious since this event [had] resulted in the largest and most horrific mass execution of civilians in Europe in the second half of the twentieth century. ....". It ordered the Republika Srpska to disclose all relevant information in its possession, to release any missing captives still alive, and to conduct a "full, meaningful, thorough, and detailed investigation". In addition, it ordered the Republika Srpska to pay a total of four million Bosnia and Herzegovina convertible marks (BAM) to the Foundation of the Srebrenica-Potočari Memorial and Cemetery.

### (c)  The International Court of Justice

49.  On 20 March 1993 the then Republic of Bosnia and Herzegovina initiated proceedings in the International Court of Justice (ICJ) against the then Federal Republic of Yugoslavia alleging, as relevant to the case before the Court, violations of the Convention on the Prevention and Punishment of the Crime of Genocide. After the entry into force of the Dayton Peace Agreement, the Republic of Bosnia and Herzegovina was succeeded as

applicant party by Bosnia and Herzegovina. The Federal Republic of Yugoslavia, after its dissolution, was replaced as respondent party first by Serbia and Montenegro and finally by Serbia, albeit that any responsibility for past events determined by the ICJ involved at the relevant time the State of Serbia and Montenegro.

50. The ICJ gave judgment on 26 February 2007 (*Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v. Serbia and Montenegro*), Judgment, I.C.J. Reports 2007, p. 43). As regards the Srebrenica massacre, it based its findings of fact on those of ICTY in the above-mentioned judgment of the Trial Chamber in the *Krstić* case, on ICTY's judgment in the *Blagojević* case (IT-02-60-T, Trial Chamber Judgment, 17 January 2005), and on the report of the Secretary-General of the United Nations (see paragraph 25 above).

51. The ICJ held, *inter alia*, that acts of genocide had been committed by members of the VRS in and around Srebrenica from about 13 July 1995 (*loc. cit.*, §§ 291 and 297). However, the decision to commit these acts had been made by individual members of the leadership of the VRS; there was nothing to prove that they had been planned, or committed, by persons for whom the respondent was responsible, or with the knowing complicity of the respondent. The massacre could therefore not be imputed to Serbia and Montenegro (*loc. cit.*, §§ 413-415; §§ 423-424).

52. It held, nonetheless, that an obligation to prevent genocide existed, albeit a qualified one. The obligation in question was one of conduct and not one of result, in the sense that a State could not be under an obligation to succeed, whatever the circumstances, in preventing the commission of genocide: the obligation of States parties was rather to employ all means reasonably available to them, so as to prevent genocide so far as possible. A State did not incur responsibility simply because the desired result was not achieved; responsibility was however incurred if the State manifestly failed to take all measures to prevent genocide which were within its power, and which might have contributed to preventing the genocide.

53. It went on to find that the authorities of the FRY, and above all its president, Mr Slobodan Milošević, had been aware of the tensions reigning in the Srebrenica area between the various ethnic groups and thus of the danger that genocide might occur. Although undeniably possessing influence over the VRS by dint of "political, military and financial links" with it (*loc. cit.*, § 435), they had not brought their influence to bear on the VRS to prevent the genocide from occurring. The international responsibility of Serbia was thereby engaged (*loc. cit.*, § 438).

## B. The domestic proceedings

### 1. Initiation of the main proceedings

54.  On 4 June 2007 the applicants summoned the Netherlands State and the United Nations before the Regional Court (*rechtbank*) of The Hague. The summons was a 203-page document in which the applicants stated that the State of the Netherlands (responsible for Dutchbat) and the United Nations (which bore overall responsibility for UNPROFOR) despite earlier promises and despite their awareness of the imminence of an attack by the VRS had failed to act appropriately and effectively to defend the Srebrenica "safe area", and after the enclave had fallen to the VRS, to protect the non-combatants which it contained. They therefore bore responsibility for the maltreatment of members of the civilian population, the rape and (in some cases) murder of women, the mass murder of men, and genocide. The applicants based their position both on Netherlands civil law and on international law.

55.  The argument under civil law was, firstly, that the United Nations and the State of the Netherlands had entered into an agreement with the inhabitants of the Srebrenica enclave (including the applicants) to protect them inside the Srebrenica "safe area" in exchange for the disarmament of the ARBH forces present, which agreement the United Nations and the State of the Netherlands had failed to honour; and secondly, that the Netherlands State, with the connivance of the United Nations, had committed a tort (*onrechtmatige daad*) against them by sending insufficiently-armed, poorly trained and ill-prepared troops to Bosnia and Herzegovina and failing to provide them with the necessary air support.

56.  The argument under international law, as relevant to the case now before the Court, was based on the International Law Commission's Draft articles on State Responsibility and Draft articles on the Responsibility of International Organizations, the applicants taking the position that the actions of Dutchbat were attributable to both the State of the Netherlands and the United Nations.

57.  Although recognising that individuals were not subjects of classical international law, the applicants argued that a right to redress under international law had been recognised to victims directly by the United Nations General Assembly's Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law, which had direct effect in the Netherlands by virtue of Article 93 of the Constitution for the Kingdom of the Netherlands.

58.  Anticipating the likelihood that the United Nations might invoke their immunity based on Article 105 of the Charter of the United Nations, the applicants argued that any immunity which that organisation enjoyed could go no further than was necessary for it to carry out its tasks, and

moreover that access to a court was guaranteed by, in particular, Article 6 § 1 of the Convention.

59. It appears that the Minister of Justice did not make use of the possibility provided by section 3a of the Bailiffs Act 2001 (*Gerechtsdeurwaarderswet 2001*, see below) to declare to the bailiff that service of the summons would be contrary to the obligations of the State under international law.

### 2. *The incident of procedure*

#### (a) Argument before the Regional Court

60. The United Nations did not appear before the Regional Court, as it had previously indicated to the Permanent Representative of the Kingdom of the Netherlands in New York that it would not.

61. The Netherlands State, already a defendant in its own right, also asked to intervene on its behalf of the United Nations, or in the alternative join the proceedings against the United Nations as a defendant. It submitted that in the light of Article 105 § 1 of the Charter of the United Nations taken together with Article II, section 2 of the Convention on the Privileges and Immunities of the United Nations the Netherlands courts lacked competence in so far as the proceedings were directed against the United Nations; it was for the Netherlands courts to recognise the immunity of the United Nations *ex officio* unless it was explicitly waived. The State had an international legal interest of its own in invoking this immunity, as was reflected particularly in section 3a of the Bailiffs Act 2001.

62. The applicants argued that the immunity of the United Nations was overridden by, in particular, Article 6 of the Convention and the prohibition of genocide, the latter being a rule of *ius cogens* that had found its way into treaty law (in the form of the Convention on the Prevention and Punishment of the Crime of Genocide).

63. The main proceedings were adjourned pending a final decision in the incident of procedure.

#### (b) The judgment of the Regional Court

64. The Regional Court gave judgment on 10 July 2008, *Landelijk Jurisprudentie Nummer* (National Jurisprudence Number, "LJN") BD6795, English translation LJN BD6796. As relevant to the case before the Court, it found that the failure by the Minister of Justice to make a declaration as provided for by section 3a of the Bailiffs Act 2001 did not imply recognition of the jurisdiction of the Netherlands courts by the Netherlands State.

65. Conversely, the State had an interest of its own in defending the United Nations' immunity from jurisdiction in view of its obligations under Article 105 § 1 of the Charter of the United Nations. It then noted that the

United Nations had indicated its desire to see its immunity respected, as it invariably did, and found that the immunity of the United Nations was in fact recognised in international legal practice.

66. Neither the Convention on the Prevention and Punishment of the Crime of Genocide nor any other rule of international law, whether defined by treaty, by customary law or by State practice, obliged the Netherlands to enforce the prohibition of genocide through its civil law; the Convention on the Prevention and Punishment of the Crime of Genocide provided only that States should ensure that genocide was punished.

67. Referring to the case-law of this Court (*Al-Adsani v. the United Kingdom* [GC], no. 35763/97, ECHR 2001-XI), the Regional Court found that in principle sovereign immunity of a State was not overridden by the prohibition of torture laid down in Article 3 of the Convention. The prohibition of torture being as much a rule of *ius cogens* as the prohibition of genocide, it could be concluded that, in the current state of international law, immunity from civil suit in a domestic court – whether enjoyed by a sovereign State or by an international organisation – was not overridden by *ius cogens*.

68. It followed that the United Nations' immunity was not functional, to be weighed in the balance by domestic courts, but absolute.

69. As to Article 6 of the Convention, the Regional Court pointed to the decision of this Court in *Behrami and Behrami v. France and Saramati v. France, Germany and Norway* ((dec.) [GC], nos. 71412/01 and 78166/01, 2 May 2007). It had been held in that decision that troop-contributing nations could not be held to account for the actions of forces placed at the disposal of the United Nations for international peacekeeping operations. From this it followed that Article 6 could not be invoked in support of an exception to the immunity from suit of the United Nations itself.

70. The Regional Court was aware that the Court had, in *Waite and Kennedy v. Germany* [GC], no. 26083/94, ECHR 1999-I, and *Beer and Regan v. Germany* [GC], no. 28934/95, 18 February 1999, made statements suggesting that the immunity of an international organisation was compatible with Article 6 of the Convention only if the organisation itself offered a reasonable alternative for the protection of Convention rights. However, the creation of the United Nations pre-dated the entry into force of the Convention. Moreover, the United Nations was an organisation whose membership was well-nigh universal; this distinguished it from organisations such as the European Space Agency, the organisation in issue in *Waite and Kennedy* and *Beer and Regan*, which had been created only in 1980 and whose membership was limited to European States. Moreover, the Court itself had recognised the special position of the United Nations in *Behrami and Behrami v. France and Saramati v. France, Germany and Norway*. At all events, if any State were to exercise jurisdiction over the United Nations, that State should be the one within whose territory the

organisation had its seat or the acts complained of had taken place; in the present case, that excluded the Netherlands.

71.  The Regional Court thus declined jurisdiction as regards the United Nations without finding it necessary to rule on the request by the Netherlands State for permission to intervene or join the proceedings.

### (c)  Argument before the Court of Appeal

72.  The applicants appealed to the Court of Appeal (*gerechtshof*) of The Hague. Their principal arguments may be summarised as follows.

73.  As relevant to the case before the Court, they argued that the State's reliance on the absolute immunity of the United Nations went hand in hand with its argument that the United Nations alone bore responsibility for the failure to prevent the act of genocide constituted by the Srebrenica massacre. To accept that argument would be to deny access to a court to the surviving kin of the victims of the massacre, which was legally, humanly and morally wrong. The Regional Court had overlooked the nature of the State's argument, which was based not so much on its need to meet its obligations under international law as on its own self-interest, clearly understood (*welbegrepen eigenbelang*). It was not the purpose of the international legal obligation to allow the State to evade its own responsibility.

74.  The United Nations had been required by Article VIII, section 29 of the Convention on the Privileges and Immunities of the United Nations to institute some form of settlement mechanism for disputes of a private nature to which it was a party, but in the more than sixty years of its existence it had failed to do so. There was therefore an urgent need for the Netherlands domestic courts to assume jurisdiction.

75.  The *Al-Adsani* judgment of this Court was not appropriate precedent, since the immunity of an international organisation was different from the immunity of a sovereign State. Moreover, in *Al-Adsani* the Court had been deeply divided. The majority position in *Al-Adsani* had been criticised in that it had allowed sovereign immunity to trump a rule of *ius cogens*, namely the prohibition of torture. It was all the more inappropriate to allow the functional immunity of an international organisation to override an even more fundamental rule of *ius cogens*, namely the prohibition of genocide.

76.  In the *Kadi* and *Al-Barakaat* cases, both the Advocate General to the the Court of Justice of the European Communities and the Court of Justice itself had demonstrated a willingness to step in and provide access to a court where the United Nations itself had failed to do so (Joined Cases C-402/05 P and C-415/05 P, *Yassin Abdullah Kadi and Al Barakaat International Foundation v. Council of the European Union and Commission of the European Communities*, judgment of 3 September 2008).

### (d)  The judgment of the Court of Appeal

77.  The Court of Appeal gave judgment on 30 March 2010, LJN BL8979. It allowed the State to join the proceedings against the United Nations as a defendant and went on to confirm the judgment of the Regional Court for the remainder.

78.  It did not accept that the State was trying to evade its own liability in civil law by invoking the immunity of the United Nations. This being an incident of procedure concerning the competence of the Netherlands domestic courts in relation to the United Nations, it could not anticipate the defence which the Netherlands State would put forward as a defendant in its own right in future proceedings on the merits.

79.  Referring to Article II, section 2 of the Convention on the Privileges and Immunities of the United Nations, which should be interpreted "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose" (Article 31 of the Vienna Convention of the Law of Treaties) and also in the light of Article 105 of the Charter of the United Nations, the Court of Appeal found that no other construction could be placed on that provision than that "the most far-reaching immunity [had] been granted to the United Nations, in the sense that the United Nations [could] not be summoned before any domestic court of the countries that [were] party to that Convention". It did not follow from the wording of Article 105 of the Charter that the immunity of the United Nations was merely functional, it being obvious from the Articles of the Charter preceding Article 105 that the Convention on the Privileges and Immunities of the United Nations (including its Article II, section 2) was intended to specify the "privileges and immunities ... necessary for the fulfilment of [the United Nations'] purposes".

80.  Unlike the Regional Court, the Court of Appeal was not convinced that the Court had deviated from *Waite and Kennedy* and *Beer and Regan* in its decision in *Behrami v. France and Saramati v. France, Germany and Norway*. The latter case had concerned neither the United Nations as a prospective party nor access to the domestic courts within the meaning of Article 6 of the Convention. Nor could it make any difference that the United Nations had been set up before the Convention entered into force; such a finding would be incompatible with the fundamental nature of Convention rights. Nor yet could it be assumed that Article 103 of the Charter of the United Nations had been intended simply to set aside customary international law or international treaties, still less to impair the protection of international human rights standards, it being precisely one of the purposes of the United Nations to promote respect for human rights and fundamental rights. This meant that the criteria by which the immunity from jurisdiction enjoyed by the United Nations were to be judged were those set out by the Court in § 53 of *Beer and Regan*.

81.  The Court of Appeal's judgment continued as follows:

"5.7.  As regards the question whether the immunity from jurisdiction enjoyed by the United Nations is in this case proportionate to the aim pursued, the Court of Appeal would observe the following. The United Nations has a special position among international organisations. The Security Council may, after all, pursuant to Article 42 of the Charter, take such action by air, sea, or land forces as may be necessary to maintain or restore international peace and security. No other international organisation has such far-reaching competences. In connection with these far-reaching competences, by which the United Nations and the troops placed at the disposal of the United Nations can get involved in situations of conflict which will frequently involve conflicting interests of a plurality of parties, there is a real risk that if the United Nations enjoyed only partial immunity from jurisdiction, or none at all, the United Nations might be exposed to claims of parties involved in the conflict and be summoned before the domestic courts of the country where the conflict concerned is being acted out. Precisely in view of the sensitive nature of the conflicts in which the United Nations can become involved, one should also consider situations in which the United Nations will be summoned exclusively in order to frustrate action by the Security Council in whole or in part. One might also imagine that the United Nations might be summoned in countries in which the judiciary does not meet the standards of Article 6 of the Convention. The immunity from jurisdiction granted the United Nations is therefore directly connected with the general interest pertaining to the maintenance of peace and security in the world. For that reason it is of great importance that the United Nations should dispose of as strong an immunity as possible, which should be subject to as little discussion as possible. Against this background, the Court of Appeal is of the opinion that only cogent reasons can entail the consequence that the United Nations' immunity is disproportionate to the aim thereby pursued.

...

5.9.  The Court of Appeal notes in the first place that it is sensitive to the dreadful events (*vreselijke gebeurtenissen*) to which the Mothers of Srebrenica and their relatives have fallen victim and for the suffering caused them thereby. The State has not contested that genocide was committed at Srebrenica; indeed, this is common knowledge. It is entirely understandable that the Mothers of Srebrenica should seek satisfaction in law for this. That, however, is not the end of the matter. As noted above, there is also a considerable general interest that the United Nations be not compelled to appear before a domestic court. In this area of tension there is a need for a balancing act between two legal principles, each of them extremely important, only one of which can be decisive.

5.10.  The Court of Appeal finds in the first place that [the applicants] recognise that the United Nations has not itself committed genocide (...). Nor can it be deduced from the facts as stated by [the applicants] that the United Nations has consciously co-operated in the genocide. [The applicants] essentially blame the United Nations for being negligent (*nalatig*) in preventing genocide. The Court of Appeal is of the opinion that although the blame thus laid on the United Nations is serious, it is not grave (*pregnant*) to the point of overriding its immunity for that reason alone, or to the point that it is for that reason alone unacceptable for the United Nations to invoke its immunity. In this connection, the Court of Appeal finds it significant that, as already mentioned, United Nations peace operations will generally take place in parts of the world where a live conflict (*brandhaard*) has broken out, and that it will generally be possible without great difficulty to blame the United Nations, not for having itself committed crimes against humanity, but for having failed to take adequate measures against [such crimes], [which] may well give rise to abuse. The reproach that the

United Nations has not prevented the genocide in Srebrenica and has been negligent
in that connection is therefore insufficient in principle to pierce its immunity from
jurisdiction. Nor is it decisive that it is not stated in the present case that there is no
abuse in the sense referred to above. If the United Nations could only successfully
invoke its immunity if in the particular case abuse could be proved, its immunity
would be unacceptably diminished (*aangetast*).

5.11.  The next fact relied on by [the applicants] is the absence of a procedural
avenue attended by adequate safeguards (*een met voldoende waarborgen omklede
rechtsgang*). They have pointed out that the United Nations has not, as prescribed by
Article VIII, section 29, opening sentence and under (a) of the Convention on the
Privileges and Immunities of the United Nations, made provision for appropriate
modes of settlement of disputes arising out of contracts or other disputes of a private
law character to which the United Nations is a party. All agree that the United Nations
has not done so. The State has also failed adequately to dispute [the applicants']
reasoned arguments that the 'Agreement on the Status of UNPROFOR' effectively
offers [the applicants] no realistic possibility to sue the United Nations. The Court of
Appeal is however of the opinion that it cannot be established that [the applicants]
have no access to a court at all for what happened in Srebrenica. In the first place, it
has not been made clear from the facts as stated by [the applicants] why it would not
be possible for them to bring the perpetrators of the genocide, and possibly also those
who might be considered responsible for those perpetrators, before a court meeting
the standards of Article 6 of the Convention. In so far as [the applicants] have failed to
do so because the persons liable cannot be found, or offer insufficient prospects of
recovery of damages, the Court of Appeal observes that Article 6 of the Convention
does not guarantee that whoever wishes to bring a civil action will always be able to
find a (solvent) debtor.

5.12.  In the second place, it is open to [the applicants] to summon the State, which
they blame in terms comparable to those applied to the United Nations, before the
Netherlands courts. [The applicants] have in fact made use of this possibility. The
State cannot invoke any immunity from jurisdiction, which means that the
Netherlands courts will have to express themselves on the merits of the claim against
the State in any case. That does not change if in those proceedings, as [the applicants]
claim to expect – with some justice ... – the State puts up a defence to the effect that
its actions in Srebrenica should be attributed (exclusively) to the United Nations. Even
if that defence (...) is made, the courts will in any case have to consider the merits of
[the applicants'] claims and to that extent [the applicants] have access to an
independent court.

5.13.  It follows from the above that it cannot be said that for [the applicants] the
very essence of their right of access to a court is impaired if the United Nations'
immunity from jurisdiction is recognised. The Court of Appeal refers in this
connection to [*Fayed v. the United Kingdom*, 21 September 1994, Series A
no. 294-B], from which it is apparent that the European Court of Human Rights is
prepared to accept even fairly far-reaching limitations on access to a court. There is no
limitation as far-reaching in the present case, given that [the applicants] can sue at
least two categories of parties for the damage suffered by the Mothers of Srebrenica,
to wit, the perpetrators of the genocide and the State. Against this background, the
Court of Appeal does not consider the fact that the United Nations has not, in
accordance with its obligations pursuant to Article VIII, section 29, opening sentence
and under (a) of the Convention on the Privileges and Immunities of the United
Nations, created an alternative remedy for claims such as the present, regrettable

though that be, of sufficient decisive importance to penetrate its immunity from jurisdiction."

### (e)  Argument before the Supreme Court

#### i.  *The applicants' appeal on points of law*

82.  The applicants lodged an appeal on points of law (*cassatie*) with the Supreme Court (*Hoge Raad*). In the course of the proceedings they submitted a summons (*dagvaarding*) and an explanatory memorandum (*schriftelijke toelichting*). Their arguments, as relevant to the case before the Court, may be summarised as follows:

##### α.  The summons

83.  The distinction which the Court of Appeal had made between proceedings against the Netherlands State and against the United Nations lacked justification, in view of the interrelation between the two cases. To hold that the United Nations enjoyed immunity in the present case would enable the Netherlands State to argue that its conduct was imputable to, or legitimised by, the United Nations and thus evade its responsibility.

84.  The immunity of the United Nations under international law was not so extensive as had been held by the Court of Appeal. In the absence of any alternative procedure accessible to the applicants, the Court of Appeal had thus placed the United Nations above the law. The unacceptable nature of such a finding followed from, *inter alia*, this Court's judgments in *Waite and Kennedy* and *Beer and Regan*.

85.  The Court of Appeal had based its findings on the supposition that the applicants were seeking only monetary compensation, which could be paid by any party solvent enough. In fact their claims were not limited to money: they sought recognition of the responsibility of the United Nations for failing to prevent the genocide of which their relatives had become victims. A judicial declaration to this effect could be given only with the United Nations as defendant, not against the Netherlands or for that matter the Serb perpetrators.

86.  The immunity of the United Nations was grounded in a political interest. A court of law, however, should apply law; it was the law which formulated the right of access to a court, which therefore overrode a political interest. This applied all the more since the prohibition of genocide was a rule of *ius cogens*. They further pointed to the number of the majority in the *Al-Adsani* judgment of this Court (nine to eight, the smallest possible) as evidence of a development towards recognising that *ius cogens* – in that case the prohibition of torture – could override immunities hitherto recognised in international law.

87.  In holding that the United Nations had not itself perpetrated genocide, the Court of Appeal had missed the point, which was that the

United Nations had failed in its duty to prevent genocide. Moreover, Dutchbat had connived at genocide by co-operating with the VRS in deporting the civilian population from the Srebrenica safe area and in helping to separate the men from the women and children despite indications that their lives were in jeopardy.

88. It made no difference for purposes of the right of access to court, as guaranteed by Article 6 of the Convention, whether or not there was a solvent debtor or whether or not the Netherlands State could claim immunity from civil suit in its own courts.

89. Finally, the Court of Appeal had failed to go into the question whether the United Nations ought to have waived its immunity.

### β. The explanatory memorandum

90. The applicants supplemented the summons with an explanatory memorandum (*schriftelijke toelichting*), in which they argued at length that the immunity of the United Nations was always intended to be functional, not diplomatic. This was reflected by the wording of Article 105 of the United Nations Charter. Although Article II, section 2 of the Convention on the Privileges and Immunities of the United Nations suggested otherwise, it was subordinate to the Charter by virtue of Article 103. Moreover, it remained possible – and was sometimes a moral, if not a legal obligation – to waive immunity, as in cases of serious human rights violations. This was all the more so since the United Nations had failed itself to provide for the settlement of disputes to which it might be a party, as it was required to by Article VIII, section 29 of the Convention on the Privileges and Immunities of the United Nations.

### ii. The advisory opinion

91. An advisory opinion (*conclusie*) was submitted by the Procurator General (*procureur-generaal*) to the Supreme Court.

92. The Procurator General distinguished between the immunity of states, which was based on their sovereign equality in international law, and the immunity of international organisations, which was intended to enable them to function. Citing *Waite and Kennedy*, he recognised that an international organisation's immunity from domestic jurisdiction might need to be set aside if no internal dispute resolution mechanism was available. In the present case, however, there was an internal alternative, provided by paragraph 48 of the Agreement on the status of the United Nations Protection Force in Bosnia and Herzegovina.

93. For the remainder, the Procurator General expressed the view that the Court of Appeal had based its judgment on a correct assessment of the competing interests involved. To the extent that the applicants argued otherwise, they had based their argument on misconstructions of the Court of Appeal's judgment.

(f)  **The judgment of the Supreme Court**

94.  The Supreme Court gave judgment on 13 April 2012, LJN BW1999.
Its reasoning included the following:

"Basis and scope of the immunity of the United Nations

4.2  The immunity of the United Nations, which should be distinguished from the
immunity of its functionaries and of experts performing missions for it, is based on
Article 105 of the Charter of the United Nations and Article II, section 2, of the
Convention [on the Privileges and Immunities of the United Nations]. This last
provision, which elaborates on Article 105 § 1 [of the Charter], has rightly been
construed by the Court of Appeal – applying Article 31 of the Vienna Convention on
the Law of Treaties – as granting the United Nations the most far-reaching immunity
from jurisdiction, in the sense that it cannot be summoned before any domestic court
of the countries that are party to the Convention [on the Privileges and Immunities of
the United Nations].

The basis and the scope of this immunity, which is intended to ensure the
functioning of the United Nations in complete independence and which for that reason
alone serves a legitimate purpose, is thus different from the immunity from
jurisdiction afforded to foreign states. As is expressed in section 13a of the Act
containing General Provisions on the Legislation of the Kingdom (*Wet Algemene
Bepalingen*), the latter immunity derives from general international law (*par in parem
non habet imperium*), and concerns only actions of a foreign state performed by the
latter in the exercise of its governmental duty (*acta iure imperii*).

Immunity of the United Nations and access to a court

4.2.1  The Court of Appeal has ..., applying the criteria formulated by the European
Court of Human Rights in *Beer and Regan v. Germany* [GC], no. 28934/95,
8 February 1999, and *Waite and Kennedy v. Germany* [GC], no. 26083/94, ECHR
1999-I, gone into the question whether invoking the immunity of the United Nations
is compatible with the right to access to a court (laid down in Article 6 of the
Convention and Article 14 of the International Covenant on Civil and Political
Rights). The State no longer disputes that this right – which is not absolute – is (also)
a rule of customary international law.

...

4.3.3  According to §§ 67-69 [of *Waite and Kennedy*] it is of particular significance
for the Court's finding that honouring the immunity of international organisations
such as ESA [European Space Agency] does not constitute a violation of Article 6 of
the Convention that the Convention for the Establishment of a European Space
Agency ('ESA Convention') explicitly provides for an alternative procedure for the
settlement of private-law disputes, of which the plaintiffs can avail themselves. It is
observed that § 67 mentions 'international organisations' without further explanation,
but that – already in the absence of any consideration relating to the interrelation
between Article 6 of the Convention and Articles 103 and 105 of the Charter of the
United Nations – there is no reason to assume that in referring to 'international
organisations' the Court has wished to refer also to the United Nations, at least not in
so far as it concerns action taken by this organisation within the framework of
Chapter VII of the United Nations Charter (Action with respect to threats to the peace,
breaches of the peace, and acts of aggression).

4.3.4  The (Security Council of the) United Nations has a special place within the
international legal community, as has also been expressed in *Behrami and Behrami*

*v. France and Saramati v. France, Germany and Norway* (dec.) [GC], no. 71412/01. In this decision, which concerns acts and omissions of the United Nations Interim Admisistration Mission in Kosovo (UNMIK) and NATO Kosovo Force (KFOR), deployed in Kosovo pursuant to a Security Council resolution, the Court holds, *inter alia*:

'146. The question arises in the present case whether the Court is competent *ratione personae* to review the acts of the respondent States carried out on behalf of the UN and, more generally, as to the relationship between the Convention and the UN acting under Chapter VII of its Charter.

147. ... More generally, it is further recalled, as noted at paragraph 122 above, that the Convention has to be interpreted in the light of any relevant rules and principles of international law applicable in relations between its Contracting Parties. The Court has therefore had regard to two complementary provisions of the Charter, Articles 25 and 103, as interpreted by the ICJ (see paragraph 27 [of the decision]).

148. Of even greater significance is the imperative nature of the principal aim of the UN [United Nations] and, consequently, of the powers accorded to the UNSC [United Nations Security Council] under Chapter VII to fulfil that aim. ... The responsibility of the UNSC in this respect is unique and has evolved as a counterpart to the prohibition, now customary international law, on the unilateral use of force (see paragraphs 18-20 [of the decision, which trace the development of the prohibition on the unilateral use of force up to the creation of the United Nations]).

149. In the present case, Chapter VII allowed the UNSC to adopt coercive measures in reaction to an identified conflict considered to threaten peace, namely UNSC Resolution 1244 establishing UNMIK and KFOR.

Since operations established by UNSC Resolutions under Chapter VII of the UN Charter are fundamental to the mission of the UN to secure international peace and security and since they rely for their effectiveness on support from member states, the Convention cannot be interpreted in a manner which would subject the acts and omissions of Contracting Parties which are covered by UNSC Resolutions and occur prior to or in the course of such missions to the scrutiny of the Court. To do so would be to interfere with the fulfilment of the UN's key mission in this field including, as argued by certain parties, with the effective conduct of its operations. It would also be tantamount to imposing conditions on the implementation of a UNSC Resolution which were not provided for in the text of the Resolution itself. ...'

In paragraph 27, referred to in this quotation, the Court finds, among other things, that according to the ICJ Article 103 of the Charter of the United Nations means that the obligations incumbent according to the United Nations Charter on the Members of the United Nations take precedence over obligations arising from any other treaty that are inconsistent therewith, regardless of whether it was entered into earlier or later than the United Nations Charter or concerns merely a regional arrangement. And in § 149 the Court holds that, in view of the importance to international peace and security of operations that take place pursuant to resolutions of the Security Council within the framework of Chapter VII of the United Nations Charter, the Convention cannot be construed in the sense that acts and omissions of States Parties governed by resolutions of the Security Council are subject to review by the Court.

4.3.5 The interim conclusion has to be that the Court of Appeal has erred in considering in the light of the criteria formulated in *Beer and Regan* and *Waite and Kennedy* whether the immunity invoked on behalf of the United Nations should be

overridden by the right of access to a court as referred to in Article 6 of the Convention.

4.3.6  That immunity is absolute. Its maintenance moreover is among the obligations of the Members of the United Nations, which, as the Court noted in *Behrami, Behrami and Saramati*, according to Article 103 of the United Nations Charter take precedence over obligations pursuant to other international agreements.

4.3.7  That, however, does not answer the question whether, as [the applicants] argue with reference to, in particular, the dissenting opinions appended to *Al-Adsani v. the United Kingdom* [GC], no. 35763/97, ECHR 2001-XI, which relates to State immunity, the immunity of the United Nations should be overridden by the right of access to a court because the claims are based on the reproach of involvement in – in particular, through not preventing – genocide and other serious violations of fundamental human rights (torture, murder and rape). ...

...

4.3.9  The majority opinion [finding that it had not yet been accepted in international law that States were not entitled to immunity in respect of civil claims for damages for alleged torture committed outside the forum State] was opposed by, among others, the dissenting opinion of six judges of the Grand Chamber now prayed in aid by [the applicants], which – in consonance with at least a not inconsiderable proportion of the domestic and foreign literature on the subject of (State) immunity – includes the following:

'3.  The acceptance therefore of the *jus cogens* nature of the prohibition of torture entails that a State allegedly violating it cannot invoke hierarchically lower rules (in this case, those on State immunity) to avoid the consequences of the illegality of its actions. In the circumstances of this case, Kuwait cannot validly hide behind the rules on State immunity to avoid proceedings for a serious claim of torture made before a foreign jurisdiction; and the courts of that jurisdiction (the United Kingdom) cannot accept a plea of immunity, or invoke it *ex officio*, to refuse an applicant adjudication of a torture case. Due to the interplay of the *jus cogens* rule on prohibition of torture and the rules on State immunity, the procedural bar of State immunity is automatically lifted, because those rules, as they conflict with a hierarchically higher rule, do not produce any legal effect. In the same vein, national law which is designed to give domestic effect to the international rules on State immunity cannot be invoked as creating a jurisdictional bar, but must be interpreted in accordance with and in the light of the imperative precepts of *jus cogens*.'

4.3.10  More important still than the fact that this opinion does not, as matters now stand, reflect the opinion accepted by the Court, is the ruling of the ICJ ... in *Jurisdictional Immunities of the State (Germany v. Italy: Greece Intervening)* [judgment of 3 February 2012]. That case concerned, among other things, the question whether the Italian courts ought to have respected the immunity of Germany in the cases considered by them in which compensation was claimed from Germany for damage resulting from violations of international humanitarian law by German troops in World War II. That question was answered in the affirmative by the ICJ.

...

4.3.14  Although the immunity of the United Nations can be distinguished from State immunity, the difference does not justify finding otherwise as regards the interrelation between the former immunity and the right of access to a court than the ICJ did as regards the interrelation between State immunity and the right of access to

a court. That immunity belongs to the United Nations regardless of the seriousness of the reproaches on which [the applicants] base their claims.

...

4.4.1 ... [The further complaints] – the Supreme Court sees no need to ask the Court of Justice of the European Union for a preliminary ruling ... – do not provide grounds for overturning the ruling of the Court of Appeal (*kunnen niet tot cassatie leiden*). Having regard to Article 81 of the Judiciary (Organisation) Act (*Wet op de rechterlijke organisatie*), no further reasoning is called for, since the complaint does not give rise to a need for a determination of legal issues in the interest of legal unity or legal development."

### 3. Resumption of the main proceedings

95.   After the judgment of the Supreme Court the main proceedings were resumed against the State only. The applicants state that the State submitted that the acts and omissions "before, during and after the fall of Srebrenica" were entirely attributable to the United Nations and that the Netherlands bore no responsibility in the matter.

96.   As far as the Court is aware, the proceedings are still pending at first instance.

## C.  Relevant domestic law

### 1. The Constitution for the Kingdom of the Netherlands

97.   Provisions of the Constitution for the Kingdom of the Netherlands (*Grondwet voor het Koninkrijk der Nederlanden*) relevant to the case are the following:

**Article 93**

"Provisions of treaties and of resolutions of international institutions which may be binding on all persons by virtue of their contents shall become binding after they have been published."

**Article 94**

"Statutory regulations in force within the Kingdom shall not be applicable if such application is in conflict with the provisions of treaties that are binding on all persons or of resolutions by international institutions."

### 2. The Act containing General Provisions on the Legislation of the Kingdom

98.   In its relevant part, the Act containing General Provisions on the Legislation of the Kingdom (*Wet Algemene Bepalingen*) provides as follows:

**Section 13a**

"The jurisdiction of the courts and the enforceability of judgments and executable official documents (*authentieke akten*) shall be limited by the exceptions recognised in international law."

### 3. The Code of Civil Procedure

99. In its relevant part, the Code of Civil Procedure (*Wetboek van Burgerlijke Rechtsvordering*) provides as follows:

#### Article 7

"1. If in proceedings (*zaken*) that must be introduced by a summons (*dagvaarding*) the Netherlands court has jurisdiction with respect to one of the defendants, then it shall also have jurisdiction with respect to other defendants involved in the same proceedings (*geding*), provided that there exists an interconnection between the claims against the various defendants such that reasons of efficiency justify their joint treatment. ..."

### 4. The Judiciary (Organisation) Act

100. As relevant to the case before the Court, the Judiciary (Organisation) Act (*Wet op de rechterlijke organisatie*) provides as follows:

#### Section 81

"If the Supreme Court considers that a complaint does not provide ground to overturn the judgment appealed against and does not require answers to questions of law in the interests of the unity or development of the law, it may, in giving reasons for its decision on such complaint, limit itself to that finding."

### 5. The Bailiffs Act 2001

101. As relevant to the case, the Bailiffs Act 2001 (*Gerechtsdeurwaarderswet 2001*) provides as follows:

#### Section 2

"1. A bailiff is a public official charged with the duties which are placed on bailiffs or reserved to them by or pursuant to the law, excluding all others or not as the case may be. In particular, a bailiff is charged with:

a. serving summonses and other official notifications (*het doen van dagvaardingen en andere betekeningen*) introducing judicial proceedings or forming part of the exchange of documents in judicial proceedings; ..."

#### Section 3a

"1. A bailiff who receives an instruction for an official act shall, if he ought reasonably to be aware of the possibility that its execution might be contrary to the State's obligations under international law, inform the Minister [of Justice] immediately of that instruction in the way laid down in ministerial rules.

2. The Minister can declare to a bailiff that an official act for which he has received, or is to receive, an instruction, or which he has already carried out, is contrary to the State's obligations under international law.

..."

5. If, at the time when the bailiff receives a declaration as referred to in the second paragraph, the official act has not yet been carried out, then the consequence of the declaration shall be that the bailiff is not competent to carry out that official act. An official act carried out contrary to the first sentence shall be null and void. ..."

### 6. *Relevant domestic case-law*

#### (a) The *Udruženje Građana "Žene Srebrenice"* case

102. In August 2003 an organisation called *Udruženje Građana "Žene Srebrenice"* (Citizens' Association "Women of Srebrenica"), an association based in Tuzla, Bosnia and Herzegovina, requested the Regional Court of The Hague to order a preliminary hearing of witnesses (*voorlopig getuigenverhoor*) with a view to bringing civil proceedings in tort against the Netherlands State.

103. On 27 November 2003 the Regional Court gave a decision (LJN AN8978) refusing that request. It took the view that, in the absence of relevant established case-law, it was necessary first to settle the question of principle whether, and in what cases, the State could be held liable for the actions of a military contingent operating under the command and control of the United Nations as Dutchbat had been. Such a decision could not properly be taken in proceedings for the preliminary hearing of witnesses; it required proceedings on the merits. In any case, the documentation available, which was very extensive and included the report of the NIOD Institute for War, Holocaust and Genocide Studies and the report of the Netherlands parliamentary enquiry, ought to be sufficient for the association to assess its chances of success, the more so since many of the witnesses whom the association wanted to hear had already been heard in the course of those two investigations.

#### (b) The *Mustafić* and *Nuhanović* cases

104. Two civil cases have been brought in the Netherlands courts against the Netherlands State by surviving relatives of men killed in the Srebrenica massacre.

105. The plaintiffs in the first case (*Mustafić v. the State of the Netherlands*) are surviving kin of an electrician who was a *de facto* employee of Dutchbat but did not enjoy any status conferred to persons employed by the United Nations directly. They allege that on 13 July 1995 the Netherlands State committed a breach of contract in that the Dutchbat deputy commander had refused to let him stay with his family in the compound at Potočari, as a result of which he was made to leave the compound that same day, whereas the Dutchbat leadership ought to have protected him by keeping him inside and evacuating him with Dutchbat itself. In the alternative, they allege a tort. The plaintiff in the second case (*Nuhanović v. the State of the Netherlands*) was himself a *de facto* employee of Dutchbat, for which he worked as an interpreter but also without the

status of United Nations employee; he is the son of one man killed in the massacre and the brother of another. He alleges a tort in that the Dutchbat deputy commander turned the two men out of the compound in the afternoon of 13 July 1995.

106. The two cases were considered in parallel, first by the Regional Court of The Hague, then by the Court of Appeal of The Hague.

107. At first instance, the Regional Court held that the matters complained of were imputable to the United Nations alone. Dutchbat had been under United Nations command and control; the events complained of had taken place in Bosnia and Herzegovina, a sovereign state over which neither the United Nations nor the Netherlands had jurisdiction.

108. The Mustafić family and Mr Nuhanović appealed to the Court of Appeal of The Hague.

109. The Court of Appeal delivered two interlocutory judgments on 5 July 2011, LJN BR0132 (*Mustafić*) and LJN BR0133 (*Nuhanović*), which in their relevant parts are identical. It ordered the hearing of witnesses on a point of procedure not relevant to the case before the Court.

110. In two essentially identical judgments on the merits delivered on 26 June 2012, LJN BW9014 (*Mustafić*) and LJN BW9015 (*Nuhanović*) respectively, the Court of Appeal overturned the judgments of the Regional Court and held the Netherlands State liable in tort for the damage caused to the appellants as a result of the deaths of their relatives.

111. The State has brought appeals on points of law against these judgments before the Supreme Court. In his advisory opinion to the Supreme Court, presented on 3 May 2013, the Advocate General (*advocaat-generaal*) proposes that the Supreme Court dismiss them (LJN BZ9228, CPG 12/03329).

## COMPLAINTS

112. The applicants complained under Article 6 of the Convention, firstly, that the grant of immunity to the United Nations violated their right of access to court, and secondly, that the Supreme Court had rejected on summary reasoning their request for a preliminary ruling to be sought from the Court of Justice of the European Union.

113. They complained under Article 13 of the Convention that the grant of immunity to the United Nations would allow the Netherlands State to evade its liability towards the applicants by laying all blame on the United Nations, effectively depriving their claims of all their substance.

# THE LAW

## A.  Standing of the applicant Stichting Mothers of Srebrenica

114.  As to whether all applicants can be regarded as "victims" within the meaning of Article 34 of the Convention, the Court has held that this concept must be interpreted autonomously and independently of domestic concepts such as those concerning the interest in taking proceedings or the capacity to do so. In the Court's opinion, there must be a sufficiently direct link between the applicant and the damage which he or she claims to have sustained as a result of the alleged violation for an applicant to be able to claim that he or she is the victim of a violation of one or more of the rights and freedoms recognised by the Convention and its Protocols (see, among other authorities, *Association des amis de Saint-Raphaël et de Fréjus v. France* (dec.), no. 45053/98, 29 February 2000, in respect of the applicant association; and *Uitgeversmaatschappij De Telegraaf B.V. and Others v. the Netherlands* (dec.), no. 39315/06, 18 May 2010, in respect of the applicants *Nederlandse Vereniging van Journalisten* (Netherlands Association of Journalists) and *Nederlands Genootschap van Hoofdredacteuren* (Netherlands Society of Editors-in-Chief)).

115. The Court has actually denied standing as applicants to non-governmental bodies set up with no other aim than to vindicate the rights of alleged victims (see *Smits, Kleyn, Mettler Toledo B.V. et al., Raymakers, Vereniging Landelijk Overleg Betuweroute and Van Helden v. the Netherlands* (dec.), nos. 39032/97, 39343/98, 39651/98, 43147/98, 46664/99 and 61707/00, 3 May 2001, in respect of the applicant *Vereniging Landelijk Overleg Betuweroute*); and even to non-governmental organisations whose very purpose was to defend human rights (see *Van Melle and Others v. the Netherlands* (dec.), no. 19221/08, 29 September 2009, in respect of the applicant *Liga voor de Rechten van de Mens*).

116.  The first applicant, Stichting Mothers of Srebrenica, is a foundation set up for the express purpose of promoting the interests of surviving relatives of the Srebrenica massacre. The fact remains, however, that the first applicant has not itself been affected by the matters complained of under Articles 6 and 13 of the Convention: its "civil rights and obligations" were not in issue, nor its own Convention rights claimed to be violated (see *Smits, Kleyn, Mettler Toledo B.V. et al., Raymakers, Vereniging Landelijk Overleg Betuweroute and Van Helden v. the Netherlands* (dec.), cited above). Consequently it cannot claim to be a "victim" of a violation of these provisions in the sense of Article 34 of the Convention.

117. It follows that in so far as the application is lodged by the first applicant it is incompatible *ratione personae* with the provisions of the Convention within the meaning of Article 35 § 3 (a) and must be rejected in accordance with Article 35 § 4.

## B. Alleged violation of Article 6 of the Convention

118. The applicants alleged violations of Article 6 of the Convention, which, in its relevant part, provides as follows:

> "In the determination of his civil rights and obligations ... everyone is entitled to a fair ... hearing ... by [a] ... tribunal ..."

### 1. Applicability of Article 6

119. Article 6 § 1 applies to disputes (*contestations*) concerning civil "rights" which can be said, at least on arguable grounds, to be recognised under domestic law, whether or not they are also protected by the Convention (see, among many other authorities, *Cyprus v. Turkey* [GC], no. 25781/94, § 233, ECHR 2001-IV; *Al-Adsani v. the United Kingdom* [GC], no. 35763/97, § 46, ECHR 2001-XI; *Fogarty v. the United Kingdom* [GC], no. 37112/97, § 24, ECHR 2001-XI (extracts); *Cudak v. Lithuania* [GC], no. 15869/02, § 45, ECHR 2010; and *Sabeh El Leil v. France* [GC], no. 34869/05, § 40, 29 June 2011). The dispute must be genuine and serious; it may relate not only to the actual existence of a right but also to its scope and the manner of its exercise; and finally, the result of the proceedings must be directly decisive for the right in question (see, among many other authorities, *Zander v. Sweden*, 25 November 1993, § 22, Series A no. 279-B; *Markovic and Others v. Italy* [GC], no. 1398/03, § 93, ECHR 2006-XIV; and *Micallef v. Malta* [GC], no. 17056/06, § 74, ECHR 2009).

120. The Court accepts that the right asserted by the applicants, being based on the domestic law of contract and tort (paragraph 55 above), was a civil one. There is no doubt that a dispute existed; that it was sufficiently serious; and that the outcome of the proceedings here in issue was directly decisive for the right in question. In the light of the treatment afforded the applicants' claims by the domestic courts, and of the judgments given by the Court of Appeal of The Hague on 26 June 2012 in the *Mustafić* and *Nuhanović* cases (see paragraph 110 above), the Court is moreover prepared to assume that the applicants' claim was "arguable" in terms of Netherlands domestic law (see, *mutatis mutandis*, *Al-Adsani*, cited above, § 48). In short, Article 6 is applicable.

### 2. The immunity of the United Nations

#### (a) The applicants' submissions

121. The applicants complained that the recognition of the immunity from domestic jurisdiction of the United Nations by the Netherlands courts violated their right of access to a court.

122. Article 105 of the Charter of the United Nations by its very wording created for the United Nations an immunity that was functional in

character, not absolute. That immunity was justified by, and limited by, the necessity for the organisation to carry out its tasks in independence. Accordingly, whenever the United Nations invoked its immunity, the courts had to determine whether a functional need for such immunity existed.

123.  The immunity from jurisdiction of international organisations was different from the immunity enjoyed by States. Whereas the immunity from jurisdiction of foreign States was based on sovereign equality, as per the maxim "*par in parem non habet imperium*", the right of access to a court was not thereby extinguished: it remained possible to institute proceedings against foreign States in their own courts.

124.  Article II, section 2 of the Convention on the Privileges and Immunities of the United Nations made explicit provision for waiving the United Nations' immunity. Moreover, the ICJ, in paragraph 61 of its *Advisory Opinion on a Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights*, had made it clear that the immunity of a United Nations official (in that case a special rapporteur on human rights) was presumed, and had to be given "the greatest possible weight" by domestic courts, but could nonetheless be set aside "for the most compelling reasons".

125.  Article VIII, section 29 of the Convention on the Privileges and Immunities of the United Nations required the United Nations to make provisions for appropriate modes of settlement of disputes with it. This showed that there was a perceived need to avoid situations in which the immunity of the United Nations would give rise to a *de facto* denial of justice.

126.  The importance of the availability of an alternative judicial remedy was also borne out by the Court's own case-law in the matter of international organisations' immunity from domestic jurisdiction, in particular *Waite and Kennedy v. Germany*, cited above.

127.  As to the particular case, in 1999 the then Secretary General of the United Nations had recognised that errors of judgement and fundamental mistakes had been made. He had concluded that "the international community as a whole", including "the Security Council, the Contact Group and other Governments which [had] contributed to the delay in the use of force in the early stages of the war, as well as ... the United Nations Secretariat and the mission in the field" bore responsibility for these.

128.  The massacre at Srebrenica had been an act of genocide, as had been found by both ICTY (in the *Krstić* case) and the ICJ (in *Bosnia and Herzegovina v. Serbia and Montenegro*). The *Bosnia and Herzegovina v. Serbia and Montenegro* judgment was especially important in that it formulated the obligation to prevent genocide: States were to take, to that end, all measures within their power, they could not evade their international responsibility by claiming, or even proving, that the means at

their disposal would in any case have been insufficient, given that the combined efforts of several States might have sufficed to avert genocide.

129.  The current Secretary General of the United Nations, in response to the applicants' summons in the present case, had stated that the survivors of the Srebrenica massacre were "absolutely right" to demand justice for "the most heinous crimes committed on European soil since World War II" and had expressed his support for that demand. Likewise, in an address to the United Nations General Assembly on 8 October 2009 the then President of ICTY had criticised the failure of the international community to create effective legal remedies accessible to the victims of the conflicts that had occurred in the former Yugoslavia.

130.  The Supreme Court had been wrong to construe *Waite and Kennedy* so as to differentiate between the United Nations and other international organisations. No such distinction was made by the Court itself in *Waite and Kennedy*. Furthermore, in its comments on the International Law Commission's Draft articles on the responsibility of international organizations the Secretariat of the United Nations itself had recognised differences between states and international organisations on the one hand and international organisations among themselves on the other, but had nonetheless made it clear that it considered the United Nations an international organisation within the meaning of those Draft articles. Nor was such a distinction made by the Institute of International Law, for example in its Resolution on the Legal Consequences for Member States of the Non-Fulfilment by International Organizations of their Obligations towards Third Parties, nor yet by the International Law Association, which defined its scope of work broadly as encompassing international organisations "in the traditional sense" without differentiating the United Nations.

131.  The Supreme Court had been wrong to draw from the Court's decision in *Behrami and Behrami v. France and Saramati v. France, Germany and Norway* the conclusion that the United Nations enjoyed absolute immunity from domestic jurisdiction. The Court's decision had been entirely unrelated to immunity from domestic jurisdiction: the Court had in fact held that it lacked competence *ratione personae* over the United Nations.

132.  The effect of the Supreme Court's judgment was to deprive the applicants of "access to a court" entirely. No alternative to domestic courts existed for them to assert their rights against the United Nations. The absence of such a jurisdictional alternative had been found by the Court to be incompatible in principle with Article 6 of the Convention in judgments including *Waite and Kennedy*, and (in relation to the sovereign immunity of foreign States) *Fogarty v. the United Kingdom* [GC], no. 37112/97, ECHR 2001-XI (extracts); *Cudak v. Lithuania* [GC], no. 15869/02,

ECHR 2010; *Sabeh El Leil v. France* [GC], no. 34869/05, 29 June 2011;
and *Wallishauser v. Austria*, no. 156/04, 17 July 2012.

133. The Supreme Court had failed to take into account Section II,
paragraph 29 of the Convention on the Privileges and Immunities of the
United Nations, which required the United Nations to set up some system
for the settlements of disputes to which it was a party. The Supreme Court
had thereby arrived at a result that was "manifestly absurd or unreasonable"
within the meaning of Article 32 of the Vienna Convention on the Law of
Treaties. Rather, domestic courts, and the Court itself, had to bear in mind
the special character of the European Convention on Human Rights as a
human rights treaty as well as recommendations made by international
bodies such as the International Law Commission and the International Law
Association.

134. Finally, the Supreme Court had failed to balance the interests
involved against each other. Whatever the interest served by the United
Nations' immunity from domestic jurisdiction, absolute immunity was not
acceptable if no alternative form of dispute resolution was available. Faced
with the failure of the Secretary General of the United Nations to waive that
organisation's immunity, the Netherlands courts ought to have found that
there were nonetheless compelling reasons to examine the applicants'
claims.

#### (b) The Court's assessment

##### i. Scope of the case before the Court

135. The proceedings brought by the applicants in the Netherlands are
not the first judicial proceedings brought in connection with the Srebrenica
massacre. Complaints connected to the Srebrenica massacre were brought
before a domestic jurisdictional body in Bosnia and Herzegovina, the
Human Rights Chamber, against the Republika Srpska; although that body
lacked jurisdiction *ratione temporis* to consider the massacre itself, it was
able to recognise the suffering of the surviving relatives of its victims in the
aftermath and make an award in that connection (see paragraph 48 above).

136. The Court also notes that in France, in the Netherlands and in the
Republika Srpska, there were domestic enquiries that investigated the events
surrounding the massacre in greater or lesser detail (see paragraphs 26-40
above). One such enquiry led to the resignation of the Netherlands
Government (see paragraph 30 above).

137. However, the attribution of responsibility for the Srebrenica
massacre or its consequences, whether to the United Nations, to the
Netherlands State, or to any other legal or natural person is not a matter
falling within the scope of the present application. Nor can the Court consider
whether the Secretary General of the United Nations was under any moral or
legal obligation to waive the United Nations' immunity. It has only to decide

whether the Netherlands violated the applicants' right of "access to a court", as guaranteed by Article 6 of the Convention, by granting the United Nations immunity from domestic jurisdiction.

138.  The Court reiterates that the degree of access afforded by the national legislation must be sufficient to secure the individual's "right to a court", having regard to the principle of the rule of law in a democratic society (see *Ashingdane v. the United Kingdom*, 28 May 1985, § 57, Series A no. 93; *Bellet v. France*, 4 December 1995, § 36, Series A no. 333-B; and *F.E. v. France*, 30 October 1998, § 46, *Reports of Judgments and Decisions* 1998-VII). It is undeniable that where immunity from jurisdiction is granted to any person, public or private, the right of access to court, guaranteed by Article 6 § 1 of the Convention, is affected (see *Sabeh el Leil*, cited above, § 50).

### ii.  Applicable principles

139.  The principles established by the Court in its case-law are the following:

(a)  Article 6 § 1 secures to everyone the right to have any claim relating to his civil rights and obligations brought before a court or tribunal. In this way the Article embodies the "right to a court", of which the right of access, that is, the right to institute proceedings before courts in civil matters, constitutes one aspect only (see *Golder v. the United Kingdom*, 21 February 1975, § 36, Series A no. 18; see also, among many other authorities, *Waite and Kennedy*, cited above, § 50; and *Beer and Regan*, cited above, § 49).

(b)  The right of access to the courts secured by Article 6 § 1 of the Convention is not absolute, but may be subject to limitations; these are permitted by implication since the right of access by its very nature calls for regulation by the State. In this respect, the Contracting States enjoy a certain margin of appreciation, although the final decision as to the observance of the Convention's requirements rests with the Court. It must be satisfied that the limitations applied do not restrict or reduce the access left to the individual in such a way or to such an extent that the very essence of the right is impaired. Furthermore, a limitation will not be compatible with Article 6 § 1 if it does not pursue a legitimate aim and if there is not a reasonable relationship of proportionality between the means employed and the aim sought to be achieved (see, among many other authorities, *Waite and Kennedy*, cited above, § 59).

(c)  The attribution of privileges and immunities to international organisations is an essential means of ensuring the proper functioning of such organisations free from unilateral interference by individual governments. The immunity from jurisdiction commonly accorded by States to international organisations under the organisations' constituent instruments or supplementary agreements is a long-standing practice established in the interest of the good working of these organisations. The

importance of this practice is enhanced by a trend towards extending and strengthening international cooperation in all domains of modern society. Against this background, the immunity from domestic jurisdiction afforded to international organisations has a legitimate objective (see, in particular, *Waite and Kennedy*, § 63).

(d) Where States establish international organisations in order to pursue or strengthen their cooperation in certain fields of activities, and where they attribute to these organisations certain competences and accord them immunities, there may be implications as to the protection of fundamental rights. It would be incompatible with the purpose and object of the Convention, however, if the Contracting States were thereby absolved from their responsibility under the Convention in relation to the field of activity covered by such attribution. It should be recalled that the Convention is intended to guarantee not theoretical or illusory rights, but rights that are practical and effective. This is particularly true for the right of access to the courts in view of the prominent place held in a democratic society by the right to a fair trial (*Waite and Kennedy*, § 67). It would not be consistent with the rule of law in a democratic society or with the basic principle underlying Article 6 § 1 – namely that civil claims must be capable of being submitted to a judge for adjudication – if a State could, without restraint or control by the Convention enforcement bodies, remove from the jurisdiction of the courts a whole range of civil claims or confer immunities from civil liability on categories of persons (see, *mutatis mutandis*, *Sabeh el Leil*, cited above, § 50).

(e) The Convention, including Article 6, cannot be interpreted in a vacuum. The Court must be mindful of the Convention's special character as a human rights treaty, and it must also take the relevant rules of international law into account (see, among other authorities and *mutatis mutandis*, *Loizidou v. Turkey* (merits), judgment of 18 December 1996, § 43, *Reports* 1996-VI; *Al-Adsani*, cited above, § 55; and *Nada v. Switzerland* [GC], no. 10593/08, § 169, ECHR 2012). The Convention should so far as possible be interpreted in harmony with other rules of international law of which it forms part, including those relating to the grant of immunity to a State (the Court would add: or to an international organisation) (see *Loizidou*, cited above, § 43; *Fogarty*, cited above, § 35; *Cudak*, cited above, § 56; and *Sabeh el Leil*, cited above, § 48).

(f) Measures taken by a High Contracting Party which reflect generally recognised rules of public international law on State immunity (the Court would add: or the immunity of international organisations) cannot in principle be regarded as imposing a disproportionate restriction on the right of access to a court as embodied in Article 6 § 1. Just as the right of access to a court is an inherent part of the fair trial guaranteed in that Article, so some restrictions on access must likewise be regarded as inherent. Examples are those limitations generally accepted by the community of nations as part of the doctrine of

immunity from domestic jurisdiction, whether it concerns the immunity of a foreign sovereign State or that of an international organisation (see *Fogarty*, cited above, § 36; and *Cudak*, cited above, § 57).

(g) When creating new international obligations, States are assumed not to derogate from their previous obligations. Where a number of apparently contradictory instruments are simultaneously applicable, international case-law and academic opinion endeavour to construe them in such a way as to co-ordinate their effects and avoid any opposition between them. Two diverging commitments must therefore be harmonised as far as possible so that they produce effects that are fully in accordance with existing law (see *Nada v. Switzerland*, cited above, § 170).

### iii. Application of the above principles

140. The applicants' argument rests on three pillars. The first is the nature of the immunity from domestic jurisdiction enjoyed by international organisations, which is, in their submission, functional; in this, it contrasts with the sovereign immunity enjoyed by foreign States, which is grounded on the sovereign equality of States among themselves. The second is the nature of their claim, which derives from the act of genocide committed at Srebrenica and is of a higher order than any immunity which the United Nations may enjoy. The third is the absence of any alternative jurisdiction competent to entertain their claim against the United Nations. The Court will consider each of these in turn.

#### α. The nature of the immunity enjoyed by the United Nations

141. The Court takes note of the various understandings of the immunity of the United Nations in State practice and international legal doctrine. Thus, in its judgment of 15 September 1969 (*Manderlier v. United Nations and Belgian State*), *Pasicrisie belge*, 1969, II, page 247, (1969) 69 *International Law Reports* 169, the Court of Appeal of Brussels adopted reasoning implying that that immunity was absolute. In contrast, in *Askir v. Boutros-Ghali*, 933 F.Supp. 368 (1996), the District Court of New York considered the immunity of the United Nations in terms appropriate to the restricted immunity of a foreign sovereign State, effectively taking the view that military operations were *acta iure imperii*. The Secretariat of the United Nations applies, for peacekeeping operations which are seen as "subsidiary organs" of the United Nations, a functional "command and control" test as regards accountability but maintains that the organisation enjoys immunity in the local courts (*Report of the United Nations Secretary General on "Financing of the United Nations Protection Force, the United Nations Confidence Restoration Operation in Croatia, the United Nations Preventive Deployment Force and the United Nations Peace Forces headquarters" and "Administrative and budgetary aspects of the financing of the United Nations peacekeeping operations: financing of the United*

*Nations peacekeeping operations"*, UN Doc A/51/389, paragraphs 7 and 17; *"Responsibility of international organizations: Comments and observations received from international organizations"*, UN Doc A/CN.4/637/Add.1). The Draft articles of the International Law Commission on the responsibility of international organizations are "without prejudice" to the Charter of the United Nations (Sixty-third session of the International Law Commission, UN Doc A/66/10, to appear in *Yearbook of the International Law Commission, 2011*, vol. II, Part Two; see Draft Article 67).

142. Scholarly opinion is that international organisations continue to enjoy immunity from domestic jurisdiction. The International Law Association describes international organisations' immunity from domestic jurisdiction as a "decisive barrier to remedial action for non-State claimants" (International Law Association, *Report of the Seventy-First Conference held in Berlin, 16-21 August 2004*, pages 164 and following, at page 209). This is also the opinion of the Institute for International Law (*The Legal Consequences for Member States of the Non-fulfilment by International Organizations of their Obligations toward Third Parties*, Lisbon Session, 1995, *Annuaire de l'Institut de droit international* 66-I, page 251 and following). The International Law Association considers, *de lege ferenda*, that legal remedies ought to be created to allow individuals to seek redress from international organisations where this has not already been done, going so far as to suggest that a role could be envisaged for domestic courts absent direct access to an international dispute settlement body (*loc. cit.*, at page 228).

143. The Court for its part reiterates that it is not its role to seek to define authoritatively the meaning of provisions of the UN Charter and other international instruments. It must nevertheless examine whether there was a plausible basis in such instruments for the matters impugned before it (see *Behrami and Behrami v. France and Saramati v. France, Germany and Norway*, cited above, § 122).

144. Moreover, as mentioned above (see paragraph 139 (e)), the Convention forms part of international law. It must consequently determine State responsibility in conformity and harmony with the governing principles of international law, although it must remain mindful of the Convention's special character as a human rights treaty. Thus, although the Vienna Convention on the Law of Treaties of 23 May 1969 postdates the United Nations Charter, the General Convention on Privileges and Immunities of the United Nations and the Convention and is therefore not directly applicable (see Article 4 of the Vienna Convention), the Court must have regard to its provisions in so far as they codify pre-existing international law, and in particular its Article 31 § 3 (c) (see *Golder*, cited above, § 29; as more recent authorities and *mutatis mutandis*, *Al-Adsani*, cited above, § 55; *Behrami and Behrami v. France and Saramati v. France, Germany and Norway*, cited above, § 122; and *Cudak*, cited above, § 56).

145. Article 103 of the United Nations Charter provides that the obligations of the Members of the United Nations under the Charter shall prevail in the event of a conflict with obligations under any other international agreement. The Court has had occasion to state its position as regards the effect of that provision, and of obligations flowing from the Security Council's use of its powers under the United Nations Charter, on its interpretation of the Convention (see *Al-Jedda v. the United Kingdom* [GC], no. 27021/08, § 102, ECHR 2011):

> "... the Court must have regard to the purposes for which the United Nations was created. As well as the purpose of maintaining international peace and security, set out in the first subparagraph of Article 1 of the United Nations Charter, the third subparagraph provides that the United Nations was established to 'achieve international cooperation in ... promoting and encouraging respect for human rights and fundamental freedoms'. Article 24(2) of the Charter requires the Security Council, in discharging its duties with respect to its primary responsibility for the maintenance of international peace and security, to 'act in accordance with the Purposes and Principles of the United Nations'. Against this background, the Court considers that, in interpreting its resolutions, there must be a presumption that the Security Council does not intend to impose any obligation on Member States to breach fundamental principles of human rights. In the event of any ambiguity in the terms of a Security Council Resolution, the Court must therefore choose the interpretation which is most in harmony with the requirements of the Convention and which avoids any conflict of obligations. In the light of the United Nations' important role in promoting and encouraging respect for human rights, it is to be expected that clear and explicit language would be used were the Security Council to intend States to take particular measures which would conflict with their obligations under international human rights law."

As is borne out by *Nada*, cited above, § 172, the presumption here expressed is rebuttable.

146. The Court now turns to the immunity granted to the United Nations by the Netherlands courts.

147. Article 105 of the United Nations Charter provides that the United Nations "shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfilment of its purposes".

148. Article II, section 2 of the Convention on the Privileges and Immunities of the United Nations takes matters further by providing that the United Nations "shall enjoy immunity from every form of legal process except insofar as in any particular case it has expressly waived its immunity".

149. Previous cases before the Court in which the question of the immunity from domestic jurisdiction of international organisations has come up have, until now, concerned disputes between the organisation and members of its staff (see *Waite and Kennedy* and *Beer and Regan* aforementioned; see also *Lopez Cifuentes v. Spain* (dec.), no. 18754/06, 7 July 2009).

150. In a number of other cases the Court has been asked to impute acts of international organisations to State Parties to the Convention by virtue of their membership of those organisations (*Boivin v. France and 33 other States* (dec.), no. 73250/01, ECHR 2008; *Connolly v. 15 Member States of the Council of Europe* (dec.), no. 73274/01, 9 December 2009; *Gasparini v. Italy and Belgium* (dec.), no. 10750/03, 12 May 2009; *Beygo v. 46 Member States of the Council of Europe* (dec.), no. 36099/06, 16 June 2009; *Rambus Inc. v. Germany* (dec.), no. 40382/04, 16 June 2009; and *Lechouritou and Others v. Germany and 26 other Member States of the European Union* (dec.), no. 37937/07, 3 April 2012) or their position as host State of such organisation or of an administrative or judicial body created by it (see, in particular, *Berić and Others v. Bosnia and Herzegovina* (dec.), nos. 36357/04, 36360/04, 38346/04, 41705/04, 45190/04, 45578/04, 45579/04, 45580/04, 91/05, 97/05, 100/05, 101/05, 1121/05, 1123/05, 1125/05, 1129/05, 1132/05, 1133/05, 1169/05, 1172/05, 1175/05, 1177/05, 1180/05, 1185/05, 20793/05 and 25496/05, 16 October 2007; *Galić v. the Netherlands* (dec.), no. 22617/07, ECHR 2009; *Blagojević v. the Netherlands*, no. 49032/07, 9 June 2009; and *Djokaba Lambi Longa v. the Netherlands* (dec.), no. 33917/12, ECHR 2012).

151. In addition, the Court has been asked to consider acts taken by Contracting States themselves by virtue of their membership of international organisations. In this connection, it has expressed the presumption that as long as fundamental rights were protected in a manner which could be considered at least equivalent to that for which the Convention provides, State action taken in compliance with legal obligations flowing from membership of the European Union was in accordance with the requirements of the Convention (see, in particular, *Bosphorus Hava Yolları Turizm ve Ticaret Anonim Şirketi v. Ireland* [GC], no. 45036/98, § 156, ECHR 2005-VI; and *Cooperatieve Producentenorganisatie van de Nederlandse Kokkelvisserij U.A. v. the Netherlands* (dec.), no. 13645/05, ECHR 2009).

152. The present case is different from all those mentioned. At its root is a dispute between the applicants and the United Nations based on the use by the Security Council of its powers under Chapter VII of the United Nations Charter.

153. Like resolutions of the Security Council, the Court will interpret the United Nations Charter and other instruments governing the functioning of the United Nations as much as possible in harmony with States' obligations under international human rights law.

154. The Court finds that since operations established by United Nations Security Council Resolutions under Chapter VII of the United Nations Charter are fundamental to the mission of the United Nations to secure international peace and security, the Convention cannot be interpreted in a manner which would subject the acts and omissions of the Security Council

to domestic jurisdiction without the accord of the United Nations. To bring such operations within the scope of domestic jurisdiction would be to allow individual States, through their courts, to interfere with the fulfilment of the key mission of the United Nations in this field including with the effective conduct of its operations (see, *mutatis mutandis*, *Behrami and Behrami v. France and Saramati v. France, Germany and Norway*, cited above, § 149).

155.  Moreover, the Court cannot but have regard to the advisory opinion of the ICJ on a *Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights*, Advisory Opinion, I.C.J. Reports 1999, p. 62 and following (delivered on 29 April 1999), at § 66, where the ICJ holds as follows:

> "Finally, the Court wishes to point out that the question of immunity from legal process is distinct from the issue of compensation for any damages incurred as a result of acts performed by the United Nations or by its agents acting in their official capacity.
>
> The United Nations may be required to bear responsibility for the damage arising from such acts. However, as is clear from Article VIII, Section 29, of the General Convention [on Privileges and Immunities of the United Nations], any such claims against the United Nations shall not be dealt with by national courts but shall be settled in accordance with the appropriate modes of settlement that '[t]he United Nations shall make provisions for' pursuant to Section 29. ..."

β.  The nature of the applicants' claim

156.  The applicants argue that since their claim is based on an act of genocide for which they hold the United Nations (and the Netherlands) accountable, and since the prohibition of genocide is a rule of *ius cogens*, the cloak of immunity protecting the United Nations should be removed.

157.  The Court has recognised the prohibition of genocide as a rule of *ius cogens* in *Jorgić v. Germany*, no. 74613/01, § 68, ECHR 2007-III. In that case it found, based on the Genocide Convention, that Germany could claim jurisdiction to put the applicant on trial (*loc. cit.*, §§ 68-70).

158.  However, unlike *Jorgić*, the present case does not concern criminal liability but immunity from domestic civil jurisdiction. International law does not support the position that a civil claim should override immunity from suit for the sole reason that it is based on an allegation of a particularly grave violation of a norm of international law, even a norm of *ius cogens*. In respect of the sovereign immunity of foreign States this has been clearly stated by the ICJ in *Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, judgment of 3 February 2012, §§ 81-97. In the Court's opinion this also holds true as regards the immunity enjoyed by the United Nations.

159.  Notwithstanding the possibility of weighing the immunity of an official of the United Nations in the balance, suggested in paragraph 61 of its *Advisory Opinion on a Difference Relating to Immunity from Legal Process of a Special Rapporteur of the Commission on Human Rights*, the

Court sees no reason to reach a different finding as regards the immunity enjoyed by the United Nations in the present case, the less so since – unlike the acts impugned in the *Jurisdictional Immunities* case – the matters imputed to the United Nations in the present case, however they may have to be judged, ultimately derived from resolutions of the Security Council acting under Chapter VII of the United Nations Charter and therefore had a basis in international law.

160.  Nor can the statements of the current Secretary General of the United Nations (*Highlights of the noon briefing by Marie Okabe, Deputy Spokesperson for Secretary-General Ban Ki-Moon, U.N. Headquarters, New York, Friday, June 8, 2007*) and the former President of ICTY (*Address of the President of ICTY to the General Assembly of the United Nations*, 8 October 2009), cited by the applicants, lead the Court to find otherwise. Although both purport to encourage States to secure "justice" to surviving relatives of the Srebrenica massacre, neither calls for the United Nations to submit to Netherlands domestic jurisdiction: the former calls for the perpetrators to be put on trial and the recovery of Srebrenica itself to be assisted; the latter, for the setting up of a claims commission or a compensation fund.

γ.  The absence of any alternative jurisdiction

161.  The General Assembly of the United Nations' Basic Principles and Guidelines on the Right to a Remedy and Reparation for Victims of Gross Violations of International Human Rights Law and Serious Violations of International Humanitarian Law (Resolution A/RES/60/147, 16 December 2005) reiterate a "right to a remedy for victims of violations of international human rights law" found in a variety of international instruments. In so doing they refer to, among other things, Article 13 of the Convention (cited in the preamble). They are addressed to States, which are enjoined to take appropriate action and create the necessary procedures. In so doing, however, they state a right of access to justice as provided for under existing international law (see, in particular, paragraphs VIII, "Access to justice", and XII, "Non-derogation").

162. The only international instrument on which individuals could base a right to a remedy against the United Nations in relation to the acts and omissions of UNPROFOR is the Agreement on the status of the United Nations Protection Force in Bosnia and Herzegovina of 15 May 1993, 1722 United Nations Treaty Series (UNTS) 77, which in its Article 48 requires that a claims commission be set up for that purpose. However, it would appear that this has not been done.

163. As the applicants rightly point out, in *Waite and Kennedy* (cited above, § 68) – as in *Beer and Regan* (cited above, § 58) – the Court considered it a "material factor" in determining whether granting an international organisation immunity from domestic jurisdiction was

permissible under the Convention whether the applicants had available to them reasonable alternative means to protect effectively their rights under the Convention. In the present case there is no doubt that such an alternative means existed neither under Netherlands domestic law nor under the law of the United Nations.

164.  It does not follow, however, that in the absence of an alternative remedy the recognition of immunity is *ipso facto* constitutive of a violation of the right of access to a court. In respect of the sovereign immunity of foreign States, the ICJ has explicitly denied the existence of such a rule (*Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, § 101). As regards international organisations, this Court's judgments in *Waite and Kennedy* and *Beer and Regan* cannot be interpreted in such absolute terms either.

165.  There remains the fact that the United Nations has not, until now, made provision for "modes of settlement" appropriate to the dispute here in issue. Regardless of whether Article VIII, paragraph 29 of the Convention on the Privileges and Immunities of the United Nations can be construed so as to require a dispute settlement body to be set up in the present case, this state of affairs is not imputable to the Netherlands. Nor does Article 6 of the Convention require the Netherlands to step in: as pointed out above, the present case is fundamentally different from earlier cases in which the Court has had to consider the immunity from domestic jurisdiction enjoyed by international organisations, and the nature of the applicants' claims did not compel the Netherlands to provide a remedy against the United Nations in its own courts.

### δ.  Link with the claim against the Netherlands State

166.  The applicants complained under Article 13 of the Convention that the State of the Netherlands were seeking to impute responsibility for the failure to prevent the Srebrenica massacre entirely to the United Nations, which, given that the United Nations had been granted absolute immunity, amounted to an attempt by the State to evade its accountability towards the applicants altogether. The Court considers it appropriate to consider this complaint under Article 6 § 1 of the Convention rather than Article 13.

167.  The Court cannot at present find it established that the applicants' claims against the Netherlands State will necessarily fail. The Court of Appeal of The Hague at least has shown itself willing, in the *Mustafić* and *Nuhanović* cases, to entertain claims against the State arising from the actions of the Netherlands Government, and of Dutchbat itself, in connection with the deaths of individuals in the Srebrenica massacre (see paragraph 110 above). The Court notes moreover that the appeals on points of law lodged by the State in both cases are currently still pending (see paragraph 111 above).

168.  At all events, the question whether the applicants' claims should prevail against any defendant is dependent on the establishment of relevant facts and the application of substantive law by domestic courts. Without prejudice to any decision the Supreme Court may yet take in the applicants' case and in the cases of *Mustafić* and *Nuhanović*, it should be pointed out that Article 6 § 1 does not guarantee any particular content for (civil) "rights and obligations" in the substantive law of the Contracting States: the Court may not create by way of interpretation of Article 6 § 1 a substantive right which has no legal basis in the State concerned (see, for example, *Z and Others v. the United Kingdom* [GC], no. 29392/95, § 98, ECHR 2001-V; *Roche v. the United Kingdom* [GC], no. 32555/96, § 119, ECHR 2005-X; and *Boulois v. Luxembourg* [GC], no. 37575/04, § 91, ECHR 2012).

ε.  Conclusion

169.  The above findings lead the Court to find that in the present case the grant of immunity to the United Nations served a legitimate purpose and was not disproportionate.

170.  It follows that this part of the application is manifestly ill-founded and must be rejected in accordance with Article 35 §§ 3 (a) and 4 of the Convention.

### 3.  The Supreme Court's refusal to seek a preliminary ruling from the Court of Justice of the European Union

171.  The applicants complained of the Supreme Court's refusal, on summary reasoning, to seek a preliminary ruling from the Court of Justice of the European Union. They argued that the question of the interrelation between the jurisdictional immunity granted to the United Nations and the principle of effective judicial protection enshrined in European Union law was highly relevant to their case and had never been explored by the Court of Justice before; the Supreme Court ought therefore not to have treated the issue so dismissively.

172.  The Court reiterates that the Convention does not guarantee, as such, any right to have a case referred by a domestic court to another national or international authority for a preliminary ruling (see, among other authorities, *Coëme and Others v. Belgium*, nos. 32492/96, 32547/96, 32548/96, 33209/96 and 33210/96, § 114, ECHR 2000-VII; *Ullens de Schooten and Rezabek v. Belgium*, nos. 3989/07 and 38353/07, § 57, 20 September 2011; and *Ferreira Santos Pardal v. Portugal* (dec.), no. 30123/10, 4 September 2012). Even so, a court or tribunal against whose decisions there is no judicial remedy under national law is required, if it refuses to seek a preliminary ruling from the Court of Justice of the European Union, to indicate the reasons why it finds that the question raised is irrelevant, or that the Community provision in question has already been interpreted by the Court of Justice, or that the correct application of

community law is so obvious as to leave no scope for any reasonable doubt (*Ullens de Schooten and Rezabek*, cited above, § 62).

173. The Court finds that in the instant case the summary reasoning used by the Supreme Court was sufficient. Having already found that the United Nations enjoyed immunity from domestic jurisdiction under international law, the Supreme Court was entitled to consider a request to the Court of Justice of the European Union for a preliminary ruling redundant.

174. More generally, although Article 6 requires judgments of tribunals adequately to state the reasons on which they are based, it does not go so far as to require a detailed answer to every submission put forward; nor is the Court called upon to examine whether an argument is adequately met, or the rejection of a request adequately reasoned. Furthermore, in dismissing an appeal an appellate court may, in principle, simply endorse the reasons for the lower court's decision (see, among other authorities, *Kok v. the Netherlands* (dec.), no. 43149/98, ECHR 2000-VI).

175. It follows that this complaint also is manifestly ill-founded and must be rejected in accordance with Article 35 §§ 3 (a) and 4 of the Convention.

## C. Alleged violation of Article 13 of the Convention

176. The applicants complained that the State of the Netherlands was abusing the immunity granted to the United Nations by laying any blame for the failure to prevent the Srebrenica massacre on the United Nations alone, thus evading its own responsibility towards the applicants. They relied on Article 13 of the Convention, which provides as follows:

 "Everyone whose rights and freedoms as set forth in [the] Convention are violated shall have an effective remedy before a national authority notwithstanding that the violation has been committed by persons acting in an official capacity."

177. Having already considered this complaint under Article 6 § 1 of the Convention, the Court finds that there is no separate issue under Article 13. The requirements of the latter Article are in any case less strict than, and are here absorbed by, Article 6 § 1 (see, among many other authorities, *Coëme and Others*, cited above, § 117).

178. It follows that this part of the application too is manifestly ill-founded and must be rejected in accordance with Article 35 §§ 3 (a) and 4 of the Convention.

## D. The Court's decision

For these reasons, the Court unanimously

*Declares* the application inadmissible.

46        STICHTING MOTHERS OF SREBRENICA AND OTHERS v. THE NETHERLANDS
                                    DECISION

Marialena Tsirli                                         Josep Casadevall
Deputy Registrar                                           President

## Appendix

**1.**   STICHTING MOTHERS OF SREBRENICA is a foundation (*stichting*) with legal personality under Netherlands law created in 2006 with its registered office in Amsterdam.

**2.**   Ms Munira SUBAŠIĆ is a national of Bosnia and Herzegovina who was born in 1948 and lives in Vogošća, Bosnia and Herzegovina.

**3.**   Ms Zumra ŠEHOMEROVIĆ is a national of Bosnia and Herzegovina who was born in 1951 and lives in Vogošća, Bosnia and Herzegovina.

**4.**   Ms Kada HOTIĆ is a national of Bosnia and Herzegovina who was born in 1945 and lives in Vogošća, Bosnia and Herzegovina.

**5.**   Ms Sabaheta FEJZIĆ is a national of Bosnia and Herzegovina who was born in 1956 and lives in Vogošća, Bosnia and Herzegovina.

**6.**   Ms Kadira GABELJIĆ is a national of Bosnia and Herzegovina who was born in 1955 and lives in Vogošća, Bosnia and Herzegovina.

**7.**   Ms Ramiza GURDIĆ is a national of Bosnia and Herzegovina who was born in 1953 and lives in Sarajevo, Bosnia and Herzegovina.

**8.**   Ms Mila HASANOVIĆ is a national of Bosnia and Herzegovina who was born in 1946 and lives in Sarajevo, Bosnia and Herzegovina.

**9.**   Ms Šuhreta MUJIĆ is a national of Bosnia and Herzegovina who was born in 1951 and lives in Sarajevo, Bosnia and Herzegovina.

**10.**  Ms X is a national of Bosnia and Herzegovina who was born in 1982 and lives in Cologne, Germany.

**11.**  Ms Y is a national of Bosnia and Herzegovina who was born in 1952 and lives in Sarajevo, Bosnia and Herzegovina.