# EXHIBIT A

Case 1:13-cv-07146-JPO   Document 42-1   Filed 07/07/14   Page 1 of 9

# DIGEST OF INTERNATIONAL LAW



*prepared by and under the direction of*

**Marjorie M. Whiteman,** B.A., LL.B., M.P.L., J.S.D., LL.D. (HON.)

*Assistant Legal Adviser, the Department of State*

VOLUME

*13*

## PRIVILEGES AND IMMUNITIES

### *In Basic Instruments and Related Agreements*

§ 4

U.N. Charter and League Covenant contrasted

Article 105 of the Charter of the United Nations specifies:

"1. The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes.

"2. Representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization.

"3. The General Assembly may make recommendations with a view to determining the details of the application of paragraphs 1 and 2 of this Article or may propose conventions to the Members of the United Nations for this purpose."

The comparable provisions of the Covenant of the League of Nations were found in paragraphs 4 and 5 of article 7 of the instrument, which provided:

"Representatives of the Members of the League and officials of the League when engaged on the business of the League shall enjoy diplomatic privileges and immunities.

"The buildings and other property occupied by the League or its officials or by Representatives attending its meetings shall be inviolable."

For article 105 of the Charter of the United Nations, see U.S. TS 993; 59 Stat. 1031, 1053. For article 7 of the Treaty of Versailles (Covenant of the League of Nations), see III Redmond, Treaties, etc. (1923) 3329, 3338; I Hudson, *International Legislation 1919-21* (1931) 2, 6.

Kelsen wrote:

". . . Article 7, paragraph 4, of the Covenant, prescribes that representatives of Members and officials of the League shall enjoy 'diplomatic privileges and immunities' when engaged on the business of the League. That may mean, that, in the first place, acts performed by these persons in their capacity as organs of the League shall be exempt from the jurisdiction of the Member states, and only in the second place also private acts performed by them 'when' *i.e.*, during the time they were engaged on the business of the League. By granting exemption from the jurisdiction of the Member states to the official acts of the representatives of the Members and officials of the League, this exemption was granted to the League as such, although the Covenant did not contain an express provision to this effect. Since the 'diplomatic privileges and immunities' referred to in Article 7, paragraph 4, were intended to cover not only the private acts of the representatives and officials but also their acts performed in their capacity as organs of the League, the term had another than its usual meaning. Besides the privileges and immunities granted to representatives of the Members and officials of the League could not be 'diplomatic' since these persons did not exercise diplomatic functions." Kelsen, *The Law of the United Nations* (1959) 340-341.

On the experience of the League of Nations with respect to privileges and immunities in Switzerland, see Hill, *Immunities and Privileges of International Officials* (1947), pp. 24–49; King, *International Administrative Jurisdiction* (1952) 37–52.

When, during World War II, the Director of the International Labor Office, with the approval of the Canadian Government, transferred part of the staff of the International Labor Office to Montreal, the Canadian Government set forth certain aspects of "the status in Canada of the International Labour Office and its staff" in an Order in Council reading in part: <span style="margin-left: 2em;">ILO in Canada, World War II</span>

"2. The International Labour Office shall have legal capacity to conclude contracts and to assume and discharge obligations.

"3. The International Labour Office shall have the right to sue and be sued, but no suit or other proceeding (other than a proceeding by way of set off, counter-claim or cross-action) against the International Labour Office shall be entertained by any court without the express consent in writing of the Director of the International Labour Office.

"4. The premises occupied by the International Labour Office are inviolable, that is to say, no peace officer, sheriff, bailiff, member of the armed forces, or other public authority of like nature, may enter them, in the exercise of his duties, without the consent of the Director of the International Labour Office.

"5. The archives of the International Labour Office are inviolable.

"6. (1) The members of the international administrative staff of the International Labour Office shall enjoy immunity from civil and criminal jurisdiction in Canada unless such immunity is waived by the Director of the International Labour Office.

"(2) The list of the members of the international administrative staff shall be published from time to time in the *Canada Gazette* by the Secretary of State for External Affairs.

"(3) The other members of the staff of the International Labour Office shall enjoy exemption from civil and criminal jurisdiction in Canada in respect of acts performed by them in their official capacity and within the limits of their functions unless such immunity is waived by the Director of the International Labour Office; but they shall be subject to the jurisdiction of the Canadian Courts in respect of acts performed by them in their private capacity.

"7. The International Labour Office and all salaries paid by the International Labour Office to permanent members of its staff shall be exempt from all direct taxes imposed by the Parliament or Government of Canada, such as income tax and National Defence Tax.

"Provided, that this exemption shall not apply to salaries paid to temporary members of the staff, that is to say, members whose contracts of employment with the International Labour Office were made for a period of less than one year."

34                LEGAL PROBLEMS OF INTERNATIONAL ORGANIZATIONS

> Order in Council, P.C. 6283, Aug. 14, 1941, 75 *The Canada Gazette*, No. 8, Aug. 23, 1941, pp. 612–613.
>
> The preamble of this order recited that "by Article 7 of the Covenant of the League of Nations and Article 6 of the Constitution of the International Labour Organization, the International Labour Office as part of the organization of the League enjoys diplomatic privileges and immunities" and further that "the provisions of the Covenant of the League of Nations and of the Constitution of the International Labour Organization constitute obligations of Canada". *Ibid.*, p. 612.

On the distinction between diplomatic and international immunities, Jenks wrote:

<div style="margin-left:2em">Diplomatic immunities distinguished from international immunities</div>

> ". . . Three major differences between diplomatic and international immunities stand out in special relief. One of the recognised limitations of diplomatic immunity is that members of the diplomatic staff of a mission may be appointed from amongst the nationals of the receiving State only with the express consent of that State; apart from inviolability and immunity from jurisdiction in respect of official acts performed in the exercise of their functions, nationals enjoy only such privileges and immunities as may be granted by the receiving State. International immunities may be specially important in relation to the State of which the official is a national. While, as will appear when we proceed to examine current practice, this principle is not always fully accepted, the considerations of principle involved differ profoundly from those applicable to diplomatic immunity. Secondly, the immunity of a diplomatic agent from the jurisdiction of the receiving State does not exempt him from the jurisdiction of the sending State; in the case of international immunities there is no sending State and an equivalent for the jurisdiction of the sending State therefore has to be found either in waiver of immunity or in some international disciplinary or judicial procedure. Thirdly, the effective sanctions which secure respect for diplomatic immunity are the principle of reciprocity and the danger of retaliation by the aggrieved State; international immunities enjoy no similar protection; for this reason, matters satisfactorily covered by recognised practice in respect of diplomatic immunities may need to be formulated in unequivocal international obligations in the case of international immunities. In view of such factors as these the functional requirements of international organisations need to be considered on their own merits and not on the basis of automatic assimilation to the functional requirements of diplomatic intercourse. . . ."
>
> Jenks, *International Immunities* (1961), p. xxxvii.

Committee IV/2 on art. 105

The report of the Rapporteur of Committee IV/2 of the United Nations Conference on International Organization at San Francisco, approved by that Committee, stated in explanation of the text of article 105 (set forth *ante*):

> "Paragraph I(1) of this proposed article refers to the Organization considered as a distinct entity. In so doing it covers all

the agencies of the Organization, that is, the agencies or authorities established by the Charter, as well as the other bodies and organisms which might subsequently be established by virtue of the powers conferred by the Charter. By way of examples of such bodies and organisms, we may point to those to be established by the General Assembly, the Security Council, and the Economic and Social Council, as contemplated by Chapters V, VI, and IX of the Dumbarton Oaks Proposals. Therefore there have been excluded from the provisions contemplated in the proposal of the Committee those agencies not belonging to the Organization, although they may have been brought into connection or relation with the Organization through application of the Charter. Paragraph I(2) refers to: (A) the representatives of the states members of the Organizations; (B) the officials (functionaries, etc.) of the Organization and of its organs, authorities, or agencies referred to in paragraph I(1).

"In order to determine the nature of the privileges and immunities, the Committee has seen fit to avoid the term 'diplomatic' and has preferred to substitute a more appropriate standard, based, for the purposes of the Organization, on the necessity of realizing its purposes and, in the case of the representatives of its members and the officials of the Organization, on providing for the independent exercise of their functions.

"Paragraph II of the draft article empowers the General Assembly to formulate, if it deems it useful, recommendations leading to the determination of the details of application of the provisions in paragraph I. Should it be appropriate, such recommendations could apply only to those members who, for instance, might have weightier obligations owing to the fact that the Organization or its organs happen to have establishments on their territory. These recommendations may, if this method is found opportune, assume the form of a convention (agreement, modus vivendi, etc. . . .) proposed by the General Assembly to a member, to be concluded between the two. Naturally the recommendations of the Assembly might differ according to the particular circumstances of the states to which they would be addressed. On the other hand, the possibility is not excluded of a general convention to be submitted to all the Members. Paragraph II only provides a power which the General Assembly may or may not exercise. It does not impair the provisions of paragraph I. This latter sets forth a rule obligatory for all members as soon as the Charter becomes operative. In the opinion of the Committee, this rule should apply under any circumstances, its authority being in no way subordinated to the exercise by the Assembly of the power specified in paragraph II. <span style="float:right">Obligation</span>

"The draft article proposed by the Committee does not specify the privileges and immunities respect for which it imposes on the member states. This has been thought superfluous. The terms *privileges* and *immunities* indicate in a general way all that could be considered necessary to the realization of the purposes of the Organization, to the free functioning of its organs and to the independent exercise of the functions and duties of

36    LEGAL PROBLEMS OF INTERNATIONAL ORGANIZATIONS

their officials: exemption from tax, immunity from jurisdiction, facilities for communication, inviolability of buildings, properties, and archives, etc. It would moreover have been impossible to establish a list valid for all the member states and taking account of the special situation in which some of them might find themselves by reason of the activities of the Organization or of its organs in their territory. But if there is one certain principle it is that no member state may hinder in any way the working of the Organization or take any measures the effect of which might be to increase its burdens, financial or other."

XIII *Documents of the United Nations Conference on International Organization San Francisco, 1945* (1945), pp. 703, 704–705.

The United Nations Preparatory Commission also stated the view "that, under Article 105 of the Charter, the obligation of all members to accord to the United Nations, its officials and the representatives of its members all privileges and immunities necessary for the accomplishment of its purposes, operates from the coming into force of the Charter and is therefore applicable even before the General Assembly has made the recommendations or proposed the conventions referred to in paragraph 3 of Article 105." *Report of the Preparatory Commission of the United Nations* (1945), PC/20, Dec. 23, 1945, p. 60.

The 1945 *Report to the President* [of the United States] *on the Results of the San Francisco Conference* stated:

". . . It will depend upon the laws and governmental system of each state whether additional legislation will be required in order to enable each Member to carry out the obligations which this Article places upon it. Some states may take care of the matter by administrative regulation or under existing laws; others may feel the need for enacting additional legislation. Article 105 authorizes the General Assembly to make recommendations to Members regarding the implementation of the Article in the several countries, or, should it seem wiser, to propose conventions to the Members for this purpose. This Article of the Charter suggests the general rule and the general obligations, leaving it to experience to suggest the elaboration of the details.

"So far as the United States is concerned, legislation will be needed to enable the officials of the United States to afford all of the appropriate privileges and immunities due the Organization and its officials under this provision. Such legislation would deal with such exemption from various tax burdens and other requirements as is commonly granted to representatives of foreign governments. The enactment of legislation and its application to such persons would not be for the purpose of conferring a favor upon any individuals. It would rather be for the purpose of assuring to the Organization the possibility that its work could be carried on without interference or interruption. The according of such privileges and immunities is merely one aspect of cooperating with the Organization itself."

*Charter of the United Nations, Report to the President on the Results of the San Francisco Conference by the Chairman of the United States Delegation, the Secretary of State, June 26, 1945* (Department of State publication 2349, Conference Series 71, 1945), p. 160.

Note the International Organizations Immunities Act, 1945 (59 Stat. 669), and for pertinent legislation by members of the United Nations, see I *Legislative Texts and Treaty Provisions concerning the Legal Status, Privileges and Immunities of International Organizations* (U.N. Legislative Series, 1959), ST/LEG/SER. B/10, pp. 3–180.

In *United States* v. *Fitzpatrick*, the United States District Court for the Southern District of New York stated:

"The Court concludes that Article 105 of the Charter does not purport to nor does it confer diplomatic immunity. The broadest claim that can be made is that it is self-operative with respect to functional activities. [The Committee which drafted Article 105 expressed the view that it "laid down a rule obligatory for all members as soon as the charter would become effective." U.N. Secretariat, Legal Department, *Handbook on the Legal Status, Privileges and Immunities of the United Nations* (1952) (ST/LEG/2), p. 22. The Report of the Preparatory Commission of the United Nations, Dec. 23, 1945, in *Handbook, op. cit.*, p. 349 is in accord, as is a letter from Ernest A. Gross, Legal Adviser to the Department of State, to a Subcommittee of the House of Representatives, Committee on Foreign Affairs, May 26, 1948 [actually April 29, 1948; see *post*, this *Digest*, p. 138], quoted in Leo Gross, "Immunities and Privileges of Delegations to the United Nations", 16 *International Organization* (1962), pp. 483, 504, n. 46.]"

214 F. Supp. 425, 431 (S.D.N.Y. 1963).

The *Report to the President on the Results of the San Francisco Conference* also stated:

". . . The United Nations, being an organization of all of the member states, is clearly not subject to the jurisdiction or control of any one of them and the same will be true for the officials of the Organization. The problem will be particularly important in connection with the relationship between the United Nations and the country in which it has its seat. The problem will also exist, however, in any country in which the officials of the United Nations are called upon from time to time to perform official duties. The United States shares the interest of all Members in seeing that no state hampers the work of the Organization through the imposition of unnecessary local burdens.

"It would have been possible to make the simple statement that all of these officials and representatives would have diplomatic privileges and immunities but it is not necessarily true that these international officials will need precisely the same privileges and immunities as are needed by the diplomatic representatives of individual states. It accordingly seemed better to lay down as

<sub>Rationale of art. 105</sub>

38                  LEGAL PROBLEMS OF INTERNATIONAL ORGANIZATIONS

a test the necessity of the independent exercise of the functions of the individuals in connection with the Organization."

*Charter of the United Nations, Report to the President on the Results of the San Francisco Conference by the Chairman of the United States Delegation, the Secretary of State, June 26, 1945* (Department of State publication 2349, Conference Series 71, 1945), p. 159.

Previous U.S. position

The position of the United States with respect to the granting of privileges and immunities to international organizations prior to the drafting of the Charter was described by Preuss as follows:

"Although the United States has recognized the legal capacity of public international organizations, it has taken the position that there exists no obligation under customary international law to extend to such organizations the privileges, exemptions, and immunities accorded to foreign governments. It consequently has declined to grant to their officers and employees any special legal status, whether it be that of foreign diplomatic agents or of non-diplomatic government officials. International organizations have tended to claim a governmental status and to demand at least 'foreign government official' treatment for their functionaries, but these demands have been uniformly resisted on the grounds that no basis for such claims has been developed in customary international law, that any special status is as yet dependent upon treaty or upon the municipal law and practice of the state concerned, and that there is, therefore, no justification under the law of the United States for conceding any privileged position to international organizations and their personnel in this country. . . ."

Preuss, "The International Organizations Immunities Act", 40 Am. J. Int'l L. (1946) 332, 333. See also Preuss, "Diplomatic Privileges and Immunities of Agents Invested with Functions of an International Interest", 25 *ibid.* (1931) 695.

Preuss did not mention the fact that there had been, perhaps, an increasing tendency in the United States to limit diplomatic privileges and immunities in the years just prior to 1945 and that, with the adoption of the Charter, the tendency was arrested.

See further 79th Cong., 1st sess., Report of Senate Committee on Finance on Immunities for International Organizations, Dec. 18, 1945, S. Rept. 861, printed in 83d Cong., 2d sess., S. Doc. 87, *Review of the United Nations Charter, A Collection of Documents* (1954) 88, 89; 1945 For. Rel., vol. I, pp. 1557–1567.

See also *Chapman v. Commissioner of Internal Revenue*, 9 T.C. 619 (1947), in which a League of Nations official, who entered the United States in 1940 and carried on official duties from 1940 to July 1946 at Princeton, New Jersey, was denied exemption from income tax. Justice Harron, in a concurring opinion, stated:

". . . It would appear that the Government of the United States is not under any obligation, under international law or treaty or act of Congress, to grant the *immunity* from taxation of income, which is really what petitioner desires. . . ." *Ibid.* 626.